## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

-----------------------------------------------------------------x

| | | |
|---|---|---|
| SHELLEY EVANS, | : | MDL DOCKET NO. 02-1335-B |
| Derivatively on Behalf of Nominal | : | DERIVATIVE ACTIONS |
| Defendant, TYCO INTERNATIONAL LTD., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 02-352-B |
| | : | (Consolidated Derivative Action) |
| v. | : | |
| | : | |
| L. DENNIS KOZLOWSKI, MARK H. | : | |
| SWARTZ, MARK A. BELNICK, FRANK | : | |
| WALSH, MICHAEL A. ASHCROFT, | : | |
| JOSHUA M. BERMAN, RICHARD S. | : | JURY TRIAL DEMANDED |
| BODMAN, JOHN F. FORT, III, | : | |
| STEPHEN W. FOSS, WENDY E. LANE, | : | |
| JAMES S. PASMAN, JR., W. PETER | : | |
| SLUSSER, JOSEPH F. WELCH, EDWARD | : | |
| D. BREEN, JOHN A. KROL, JEROME B. | : | |
| YORK, MACKEY J. McDONALD, GEORGE | : | |
| W. BUCKLEY, BRUCE S. GORDON, | : | |
| SANDRA S. WIJNBERG, DENNIS C. | : | |
| BLAIR, BRENDAN R. O'NEILL and H. | : | |
| CARL McCALL, | : | |
| | : | |
| Defendants, | : | |
| -and- | : | |
| | : | |
| TYCO INTERNATIONAL LTD., | : | |
| | : | |
| Nominal Defendant. | : | |

-----------------------------------------------------------------x

## VERIFIED STOCKHOLDERS' SECOND CONSOLIDATED AND AMENDED DERIVATIVE COMPLAINT

**TABLE OF CONTENTS**

I.      SUMMARY OF THE DERIVATIVE ACTION   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     FACTUAL SUMMARY  OF WRONGDOING IN THE KOZLOWSKI ERA AND
        CONTINUING INTO THE BREEN ERA  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.      The "Criminal Defendants"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.      The Breen Era . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.    JURISDICTION AND VENUE   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.     PARTIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.      Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        B.      Nominal Defendant Tyco  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        C.      Defendant Kozlowski and the Former Board of Tyco   . . . . . . . . . . . . . . . . . . . 11

        D.      Defendant Breen and the Current Board of Tyco  . . . . . . . . . . . . . . . . . . . . . . 13

        E.      The Continuing Involvement of Former Board Members
                With the Current Board  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

V.      OVERVIEW OF SELF-DEALING TRANSACTIONS IN THE KOZLOWSKI ERA   . . 16

        A.      Abuse of KELP Loans  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        B.      Abuse of Tyco's RLP  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        C.      Kozlowski and Swartz Stole Tens of Millions of Dollars Through
                Self-Engineered Forgiveness of Tyco Loans and Improper Bonus Plans   . . . . . . . 19

        D.      Undisclosed Related Party Transactions With Tyco  . . . . . . . . . . . . . . . . . . . . . 21

VI.     BACKGROUND FACTS OF THE KOZLOWSKI ERA  . . . . . . . . . . . . . . . . . . . . . . . 23

        A.      The Kozlowski Era  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

i

B.      Tyco's Relocation to New York  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

C.      Tyco's Reincorporation in Bermuda  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

D.      Tyco's Relocation to Florida  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

E.      Prior Charges of Accounting Irregularities at Tyco  . . . . . . . . . . . . . . . . . . . . . . . . 28

F.      TyCom Initial Public Offering and Bonus  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

G.      ADT Automotive Sale and Bonus  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

H.      Flag Telecom Purchase  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

VII.    THE FORMER BOARD'S LACK OF INDEPENDENCE  . . . . . . . . . . . . . . . . . . . . . . . 36

A.      Frank Walsh  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

B.      John Fort  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

C.      Michael Ashcroft  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

D.      Richard Bodman  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

E.      Stephen Foss  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

F.      Joshua Berman  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

G.      Other Benefits  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

VIII.   KOZLOWSKI, SWARTZ AND BELNICK ABUSED
        TYCO FOR PERSONAL FINANCIAL GAIN  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

A.      Kozlowski's Personal Gain  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

B.      The New York Relocation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

C.      Swartz's Personal Financial Gain  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

D.      Belnick's Personal Financial Gain  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

E.  Tyco's Directors Knew or Acted Recklessly or in Gross Negligence
in Ignoring the Facts of Kozlowski, Swartz, and Belnick's Wrongful
Financial Gain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

IX.  FORMER BOARD'S AUDIT COMMITTEE'S DEROGATION
OF ITS RESPONSIBILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

X.  THE FORMER BOARD'S COMPENSATION COMMITTEE'S DEROGATION
OF ITS RESPONSIBILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

XI.  FALSE ACCOUNTING TO HIDE BONUSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

XII.  FALSE ACCOUNTING IN THE ADT UNIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

XIII.  THE FORMER BOARD'S ATTEMPTS TO PROTECT THEMSELVES . . . . . . . . . . 74

XIV.  VIOLATIONS OF SECTION 84 OF THE BERMUDA COMPANIES ACT OF 1981
BY THE FORMER BOARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

XV.  VIOLATIONS OF SECTION 96 OF THE COMPANIES ACT 1981 OF BERMUDA . 77

XVI.  DAMAGES TO TYCO CAUSED BY THE FORMER BOARD'S CONDUCT,
CAUSATION OF ULTRA VIRES ACT AND THE AFTERMATH . . . . . . . . . . . . . . . 77

XVII.  PHASE 2 OF THE BOIES FIRM'S WORK AND THE AFTERMATH . . . . . . . . . . . 80

A.  The Purportedly Thorough Review Conducted By The Boies Firm
and the Extensive Resources Devoted to Such Review . . . . . . . . . . . . . . . . . . . . . 80

B.  Boies' Reassurances to the Market That No "Large Fraud"
Would Be Uncovered. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

C.  The Conclusions of Phase 2 of the Boies Firm's Work . . . . . . . . . . . . . . . . . . . . . 85

D.  Breen's and the Board's Use of the "Clean Bill of Health" From
Phase 2 of the Boies Report To Obtain Financing . . . . . . . . . . . . . . . . . . . . . . . . . 87

E.  The February 7, 2003 Proxy Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

1.  The Board's Materially False and Misleading Recommendation

To Vote Against Reincorporation in the United States   . . . . . . . . . . . . . . . . 93

2.      The Compensation of Breen and the Current Board, Including
        Stock Options . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

3.      The Board's Recommendation to Vote Against An Independent
        Board Chairman   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

F.      The March 6, 2003 Annual Meeting held in Pembroke, Bermuda
        and the Committee Appointments   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

G.      The Additional Charges Relating to the Fire & Security Services Unit,
        Particularly ADT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

H.      An Additional $1.36 Billion in Pre-Tax Charges Announced
        On April 30, 2003   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

I.      The Board's Payment of $92 Million For Liability Insurance to
        Protect the Former Officers and Directors Who Were Named As
        Defendants in Various Civil and Criminal Actions  . . . . . . . . . . . . . . . . . . . . . . 107

XVIII.  DEFENDANT BREEN AND THE CURRENT BOARD HAD NO INTEREST IN
        EXPEDITIOUSLY AND DECISIVELY ADDRESSING THE COMPANY'S FINANCIAL
        STATEMENT FRAUDS   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

XIX.    THE PROVISIONS OF TYCO'S LOAN COVENANTS WERE NOT CONSIDERED
        TO BE SIGNIFICANT PRIOR TO THE DISCOVERY OF TYCO'S FINANCIAL
        STATEMENT FRAUDS   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

XX.     BREEN AND THE CURRENT BOARD KNOWINGLY, RECKLESSLY OR
        WITH GROSS NEGLIGENCE CONCEALED THE TRUTH ABOUT THE
        SUBSTANCE OF AN ONGOING SEC INVESTIGATION   . . . . . . . . . . . . . . . . . . . . 117

A.      Failure to Adequately Provide for Environmental Remediation Liabilities   . . . . . . . 120

B.      Failure To Adequately Provide For Legal Liabilities, Product Liabilities,
        Workers Compensation And General Liability Insurance   . . . . . . . . . . . . . . . . . . 121

C.      Failure to Adequately Provide For Uncollectible Receivables   . . . . . . . . . . . . . . 121

D.      Failure To Adequately Provide For Excess, Obsolete,

Or Otherwise Worthless Inventory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

E. Failure To Adequately Provide For Other Than Temporary Declines
In The Value Of Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

F. Failure To Write Off Non-Existent Or Worthless Assets And Failure
To Make Good Faith Estimates Of Charges To Earnings . . . . . . . . . . . . . . . . . 125

G. Improper Capitalization Of Selling Expenses As A Component Of Property,
Plant, Equipment And Other Non-Current Assets . . . . . . . . . . . . . . . . . . . . . . 126

H. Failure To Reconcile Balance Sheet Accounts . . . . . . . . . . . . . . . . . . . . . . . . 127

I. Failure To Adequately Provide For Losses Associated
With The Guarantee Of An Equity Investee . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

J. Intentional, Reckless or Grossly Negligent Failure Of Breen and the
Current Board to Insure that Tyco Complied With SEC Rules
Requiring Corporations To Make And Keep Books, Records And
Accounts Which, In Reasonable Detail, Accurately And Fairly Reflect
Their Transactions And The Dispositions Of Their Assets . . . . . . . . . . . . . . . . . 129

K. Breen and the Current Board Intentionally Avoided Areas Of Investigation
That Were likely To Result In Material Charges To Earnings In
Order To Avoid Non-Compliance With The Critical Debt Covenant
Or The Dissemination Of Information That Might Trigger
A Downgrade By Credit Rating Organizations . . . . . . . . . . . . . . . . . . . . . . . . . 132

L. Breen and the Current Board Intentionally, Recklessly or With Gross
Negligence Failed To Write Off Goodwill . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

XXI. THE CURRENT BOARD'S INTENTIONAL, RECKLESS OR GROSSLY
NEGLIGENT FAILURE TO INSURE THAT BREEN AND FITZPATRICK
COMPLIED WITH THE SARBANES-OXLEY ACT'S CERTIFICATION
REQUIREMENTS CONSTITUTED A SERIOUS BREACH OF
FIDUCIARY DUTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

XXII. VIOLATIONS OF SECTION 84 OF THE BERMUDA COMPANIES ACT
OF 1981 BY MEMBERS OF THE CURRENT BOARD AND FORMER
BOARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

XXIII. THE CURRENT BOARD AND THE FORMER BOARD ARE ENGAGED
IN A CONTINUING COURSE OF WRONGDOING, THEREBY DISABLING
THEM FROM DETERMINING INDEPENDENTLY AND IN GOOD FAITH WHETHER
THE CLAIMS ASSERTED HEREIN SHOULD PROCEED AND
RENDERING DEMAND FUTILE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145


COUNT I
CLAIM FOR BREACH OF FIDUCIARY DUTY AND EQUITABLE FRAUD
(Against All Individual Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153
COUNT II
CLAIM FOR WASTE OF CORPORATE ASSETS AND EQUITABLE FRAUD
(Against all Individual Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

JURY TRIAL DEMANDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

Plaintiff, by and through her attorneys, alleges the following upon information and belief.   Plaintiff also bases her Complaint on the investigation by her attorneys, which investigation included, among other things, review of the public documents and press releases of Tyco International Ltd. ("Tyco" or the "Company").   Except as alleged herein, the underlying information concerning defendants' misconduct, and the particulars thereof, are not available to plaintiff and the public and lie within the possession and control of defendants and other Tyco insiders.   Based on the evidence already developed, plaintiff believes additional substantial evidentiary support   exists for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   SUMMARY OF THE DERIVATIVE ACTION

1.   This is a stockholders' derivative action brought on behalf of nominal defendant Tyco against the directors who served and serve on Tyco's board of directors (the "Board") during the acts complained of herein, namely L. Dennis Kozlowski ("Kozlowski"), Mark H. Swartz ("Swartz"),  Michael A. Ashcroft, Joshua M. Berman, John F. Fort, III, Richard S. Bodman, Stephen W. Foss, Wendy E. Lane, James S. Pasman, Jr., W. Peter Slusser, Joseph F. Welch, Edward D. Breen, John A. Krol, Jerome B. York, Mackey J. McDonald, George W. Buckley, Bruce S. Gordon, Sandra S. Wijnberg, Dennis C. Blair, Brendan R. O'Neill and H. Carl McCall (collectively, the "Director Defendants").[1]   This action is also brought against Mark A. Belnick ("Belnick") and Frank Walsh ("Walsh"),  by plaintiff, who is now and, at all times relevant, has been a shareholder of Tyco.

---

[1]  Defendants Kozlowski, Swartz, Ashcroft, Berman, Fort, Bodman, Foss, Lane, Pasman, Slusser and Welch are referred to as the "former Board."  Defendants Breen, Krol, York, McDonald, Buckley, Gordon, Wijnberg, Blair, O'Neill and McCall are referred to as the "current Board."

1

2.       Plaintiff alleges claims for equitable fraud, breach of defendants' fiduciary duties of loyalty and candor, gross mismanagement, and waste of corporate assets.  Plaintiff seeks to recover damages, on behalf of  Tyco as a result of (1) defendants' knowing, reckless or grossly negligent failure to prevent financial abuse through the unfettered and widespread use of Tyco corporate assets for the personal benefit of certain Tyco executives;   (2) defendants' knowing, reckless or grossly negligent dissemination of materially false and misleading statements to shareholders, including statements which misrepresented and omitted material facts about Tyco's financial condition and the advisability of reincorporating in the U.S.; and (3) defendants' knowing, reckless or grossly negligent exposure of Tyco to devastating liability from civil and criminal litigation, as well as Securities and Exchange Commission ("SEC"), state regulatory authorities, and Internal Revenue Service ("IRS") action.  Plaintiff also seeks to recover the costs which Tyco has incurred and will incur to investigate such wrongdoing and defend itself against such claims.

3.       The damage done to Tyco by its former and current Board results not only from the most egregious corporate looting in corporate history, but also from monumental accounting improprieties and manipulations which began in the era of Tyco's former Chairman and Chief Executive Officer, L. Dennis Kozlowski ("Kozlowski") and still continue today under the auspices of Tyco's current Chairman and Chief Executive Officer, Edward D. Breen ("Breen").  The malfeasance of Kozlowski and the Tyco Board of Directors serving under him is only the first chapter in the story of the abuse of Tyco by the fiduciaries charged with protecting it.  The second chapter is about Breen and his Board of Directors -- the current Board -- who have not rescued Tyco from the pernicious wrongdoing inflicted on it and, indeed, have perpetuated the wrongdoing.  The final chapter has not yet been written because Tyco's financial statements are currently under review by the SEC, which may require restatement of prior financial periods,

and its tax returns are under review by the IRS, which may assess deficiencies as a result of Tyco's offshore incorporation in Bermuda to avoid U.S. taxes.

4.      The alleged wrongdoers -- the current Board -- are in control of Tyco and will not legitimately or independently evaluate the claims asserted herein because their personal financial interests are at stake – namely, they will not sue themselves or take any action that will have a negative impact on their own stock option holdings or professional reputations, expose them to public criticism or compromise their position in the pending civil and criminal prosecutions and SEC and IRS investigations.

5.      The current Board is engaged in a continuing course of wrongdoing and is disabled from prosecuting the claims alleged herein because such prosecution would involve suing themselves.  The current Board members assumed their duties knowingly, recklessly or with gross negligence disregarding that (i) Tyco's financial statements were still riddled with accounting problems, (ii) that accounting improprieties were still rampant, (iii) that many co-conspirators in the looting and accounting schemes had not been made accountable for their conduct,  and  (iv) that civil and criminal litigation and investigations were still pending.  Thus, the current Board could not, under any circumstances, independently and in good faith permit Tyco to assert the claims herein without implicating themselves and jeopardizing Tyco's litigation position, its credit ratings and  the value of their own Tyco stock options and reputations.  Therefore, in view of the continuing troubled status of Tyco's financial condition and material potential liability in ongoing litigation and investigations, there are no circumstances under which the current Board could proceed with plaintiff's claims against them or Tyco's former Board without jeopardizing their own personal interests.  This, they have not done and will not do.

6.     Thus, there is no independent organ within Tyco capable of reviewing independently and in good faith the claims asserted herein.  The only avenue for redress of the wrongs alleged herein against the former and current Boards of Tyco is this shareholder's derivative action.  Absent this action, the wrongs alleged herein will not be redressed by Tyco, which has been materially injured by such wrongs.  Neither the former nor current Boards of Tyco, nor any Board committees, have acted independently.  Rather, they have shown through their conduct that they have not permitted and will not permit Tyco to pursue the claims asserted herein and will continue to take action to protect themselves at the expense and to the detriment of Tyco.

7.     Both the former and the current Boards have singled out a few scapegoats and placed the entire blame for the widespread scheme of looting and cover-up squarely on these few individuals in an attempt to divert attention from their failure to act.  Although more than one year has elapsed since the wrongdoing was first revealed and almost six months since the conclusion of the much-touted investigation of Boies Schiller & Flexner LLP ("the Boies Firm"),  no other wrongdoers have been identified, nor has any redress for Tyco been sought beyond this small group of culprits.  The recovery Tyco seeks against them is woefully inadequate and would not even begin to compensate Tyco for the damage it has suffered to date and will continue to suffer.  Tyco's pending actions do not seek recovery for, among other things, Tyco's injury from its material potential liability in shareholder class actions, criminal actions, and SEC and IRS investigations or the enormous costs involved in Tyco's own informal investigations and defending Tyco in the various actions.  It is only the derivative plaintiff in this lawsuit who seeks comprehensive recovery for the overwhelming damage that Tyco has suffered and is continuing to suffer at the hands of the former and current Boards.  Absent this derivative action, the potential to recover hundreds of millions

of dollars for Tyco will be permanently lost.  Indeed, such potential recovery is now being irreparably compromised by the passage of time while the current Board takes no apparent action other than objecting to the prosecution of this derivative action.

## II.   FACTUAL SUMMARY OF WRONGDOING IN THE KOZLOWSKI ERA AND CONTINUING INTO THE BREEN ERA

### A.   The "Criminal Defendants"

8.   In May of 2002, it was first disclosed that defendant Kozlowski was indicted for tax evasion as a result of alleged dealings with certain art collectors, who participated in a scheme to ship Kozlowski empty boxes to New Hampshire to avoid New York state sales tax estimated at approximately $1 million.

9.   It was uncovered during the investigation that Kozlowski was actually a much bigger thief - it turned out that Kozlowski and his cronies were bilking Tyco out of hundreds of millions of dollars. Although his $6,000 shower curtain and vodka-spewing, life-sized, ice replica of Michelangelo's David were embarrassing enough, on September 12, 2002, Kozlowski, the former CFO Swartz, and Belnick (collectively the "Criminal Defendants") were indicted.  Kozlowski and Swartz were charged with running a criminal enterprise within Tyco's executive suite, and charged with pilfering $170 million directly from the Company and for pocketing an additional $430 million through tainted stock sales.

10.   The more that the Criminal Defendants were paid in reward for Tyco's soaring stock price, the more they spent on luxuries, and the more they allegedly stole.  Apparently, the Criminal Defendants operated under the belief that they and the Company were one, and that they could take whatever they

wanted whenever they wanted it.  Of greater concern is why the Board  did not disabuse them of this
notion.

11.     Most disturbing from the perspective of  Board oversight, Kozlowski's misdeeds were
remarkable for their absolute brazenness, not for their financial trickery.  The crimes that Kozlowski and
Swartz are charged with are not much more complicated than taking bags of cash  from the Company - -
they simply borrowed tens of millions of dollars from the Company, and forgave the loans.  This begs the
obvious question. Where was the Board?

12.     In fact, the former Board was compromised by direct financial entanglements with the
Criminal Defendants.  Throughout Kozlowski's term as Chairman and CEO, he funneled both his personal
funds and Tyco money to the Director Defendants in a series of related party transactions, including aircraft
leases, real estate purchases and professional service contracts.  As a result, the individual defendants were
personally financially beholden to Kozlowski.  In the most extreme example, Walsh, Tyco's former "lead
director," conspired with Kozlowski to receive an undisclosed $20 million finder's fee - - a transaction
which has since resulted in Walsh's criminal conviction.

13.     From 1997 through 2001, the Criminal Defendants abused Tyco loan and  relocation
programs, dipping into one or the other for hundreds of millions in interest-free funds.  As discussed herein,
the former Board was actually aware of or, in the alternative, was reckless or grossly negligent in not being
aware of such abuses.

14.      Tyco failed to disclose in any filings with the United States Securities and Exchange
Commission ("SEC") the misuse of these programs or a host of other self-dealing transactions described
herein.

15.     In the end, the former Board's failure to stop the orgy of getting and spending devastated Tyco's share price, resulting in a $90 billion drop in Tyco's stock.

16.     Numerous federal and state investigations have been instituted and numerous shareholder lawsuits have been filed against Tyco and certain of its directors and/or officers.

**B.     The Breen Era**

17.     The tale of Tyco's accounting malfeasance has still not come to a close and is continuing under the auspices of the current Board led by Tyco's Chairman and Chief Executive Officer, Breen.  On December 30, 2002, the Boies Firm reported on the conclusion of Phase 2 of its work from August 2002 to December 2002, finding no "systematic or significant fraud" at Tyco (the "Boies Report").  This conclusion cost Tyco at least $75 million.  Shortly thereafter and on the strength of this virtually clean bill of health, Tyco completed a $4.5 billion private placement of convertible debt and secured a $1.5 billion credit facility, just in time to repay almost $6 billion of debt due in February 2003.  Without the comfort which the Boies Report gave the market, Tyco would not have been able to raise $6 billion and would have been in danger of defaulting on its debt.

18.     The Boies Report was just a temporary "fix."  After convincing the market that the worst was over in order to avert an impending default, on March 12, 2003, Tyco stunned the market by announcing that it was slashing its 2003 profit forecast and had fired Jerry Boggess ("Boggess"), the veteran president of the Fire & Security Division and long time crony of defendant Kozlowski, following the discovery of more accounting problems at the division in Europe.

19.     Phase 2 of the Boies Report had not uncovered these problems and improprieties even though Boggess' long-standing connection to defendant Kozlowski was well-known, as well as the facts

that (i) Boggess was a recipient of a $5 million relocation loan which was forgiven, $8.5 million in compensation in 2001; (ii) defendant Kozlowski had used Tyco's Fire & Security business segment to finance some of his personal extravagances; and (iii) creative merger and acquisition accounting had flourished at that unit.  The charges, estimated at between $265 million and $365 million, were expected to cut profits by 9 to 11 cents a share in that quarter.  Defendant Breen and the current Board again assuaged the market's fears by reassuring it that the worst was over.

20.     Again, this was far from the truth.  On April 30, 2003, Tyco shocked the market by revealing even greater accounting problems which were also not uncovered or reported by the purportedly thorough work of the Boies Firm.  This time the new charges amounted to approximately $1.3 billion, bringing the current total  to approximately $1.6 billion in additional charges that the Boies Firm failed to uncover.  As a result, the conclusions and motives of the Boies Report were rendered highly suspect.

21.     Indeed, it appears that the Boies Firm was a vehicle used by Breen and the Board (i) to raise desperately needed funds; (ii) to avoid breaching covenants in Tyco's debt which would trigger defaults; and  (iii) to give Breen and the Board an appearance of credibility in order to deceive the market into believing that Tyco had been cleaned up and  its problems were in the past.  However, it is readily apparent that Tyco's accounting and other problems are still very much alive and Breen and the current Board are now immersed in them, preventing them from viewing claims against themselves and their predecessors with an independent,  unbiased approach.

22.     It is clear that the story is not yet over.  The current Board, having stepped into the quagmire of Tyco's ongoing problems, has placed itself in an irreconcilable conflict.  It cannot take the actions requested here -- seeking redress from **all** of the wrongdoers for **all** of the wrongdoing -- without

jeopardizing (1) Tyco's litigation stance in pending actions and negotiating position in the ongoing SEC and IRS reviews; and (2) their own financial interests in maintaining the value of their stock options and their personal interests in their own reputations.  For example, the current Board is  currently "engaged in a dialogue" with the staff of the SEC's Division of Corporate Finance and "cannot assure [shareholders that] the resolution of the remaining comments or the resolution of the Division of Enforcement's investigation will not necessitate amendments or restatements to our previously filed periodic reports or lead to some enforcement proceedings against Tyco."

23.     Tyco has been and continues to be harmed by, *inter alia*, the damages and expenses resulting from the federal securities class actions filed against the Company, investigations by the SEC, the New Hampshire Bureau of Securities, the Manhattan District Attorney's office , criminal indictments of Tyco's top executives, the downgrade of Tyco's credit rating, and its damaged reputation in the marketplace.  The current Board has not done and will not do anything to seek recovery for Tyco for its numerous injuries.

## III.    JURISDICTION AND VENUE

24.     This Court has jurisdiction in this action pursuant to 28 U.S.C. §§ 1332(a) and (c), since plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive one to confer jurisdiction on this Court.

25.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b).  Tyco conducts substantial business within this District.  Thus, many of the acts giving rise to the violations of law complained of herein occurred in this District.

## IV.    PARTIES

### A.     <u>Plaintiff</u>

26.     Plaintiff Shelley Evans, a resident of Hawaii, is and was at all relevant times, a shareholder of Tyco.  During the period when wrongs alleged herein occurred, Evans owned, and continues to own Tyco common stock.  Plaintiff brings this action derivatively on behalf of Tyco to enforce Tyco's claims against defendants, which Tyco has failed to enforce.  Plaintiff, as a current holder of Tyco stock and a holder continuously during the period of the wrongs alleged herein, has standing to assert these claims on behalf of Tyco and will fairly and adequately protect the interests of Tyco and its shareholders.

### B.     <u>Nominal Defendant Tyco</u>

27.     Since 1997, nominal defendant Tyco  has been a Bermuda corporation with its principal executive offices located at The Zurich Centre, Second Floor, 90 Pitts Bay Road, Pembroke HM 08, Bermuda.  Prior to 1997, Tyco was incorporated in Massachusetts.  Tyco maintains offices in the United States at One Tyco Park, Exeter, New Hampshire.  Tyco common stock is traded on the New York Stock Exchange under the symbol "TYC."  Tyco is a conglomerate with reported core annual sales of approximately $32 billion.

### C.     <u>Defendant Kozlowski and the Former Board of Tyco</u>

28.     Defendant Kozlowski was  the President, Chief Executive Officer, and Chairman of the Board of Tyco  from July 1997 until his resignation on or about June 3, 2002, following his indictment by the Manhattan District Attorney's Office for conspiring to avoid paying $1 million owed in sales tax.  Prior to July 1997, he was Chairman, Chief Executive Officer and President of Tyco International Ltd. ("Former Tyco"), a Massachusetts corporation, which merged with a wholly-owned subsidiary of ADT Limited ("ADT"), a Bermuda company, in July 1997.  In the merger, ADT, as the continuing public company,

10

changed its name to Tyco International Ltd.  Former Tyco became a wholly-owned subsidiary of Tyco and changed its name to Tyco International (US) Inc.  Kozlowski's reported compensation in 2001 was represented in Tyco's Proxy Statement dated January 28, 2002, as salary of $1,650,000, cash bonus of $4,000,000 and other compensation of $219,543.

29.   Defendant Swartz  was a director of Tyco until August 1, 2002, when Swartz resigned as a director and agreed to resign as Chief Financial Officer upon the selection of his successor.   On September 23, 2002, David J. Fitzpatrick was appointed Executive Vice President and Chief Financial Officer.  Swartz had been a director of Tyco since 2001, Executive Vice President and Chief Financial Officer of Tyco since July 1997, Vice President and Chief Financial Officer of Former Tyco from February 1995 until he resigned in 2002 and Director of Mergers and Acquisitions of Former Tyco from 1993 through 1995.  Swartz' reported compensation in 2001 was a salary of $968,750, a cash bonus of $2,000,000, a stock bonus of $500,014 and other compensation of $277,856.

30.   Defendant Belnick  was Executive Vice President and Chief Corporate Counsel to Tyco until June 10, 2002, when his employment was terminated. Belnick's reported starting compensation was a base salary of $700,000, a sign-on bonus of $300,000, cash bonus in the amount of $1,500,000 in the first year and $1,000,000 guaranteed for the second and third years of employment.

31.   Defendant Walsh  was a director of Tyco.  In 2001 and 2002, Walsh served as the purported independent lead director, and also served as a member of Tyco's Compensation Committee in 1999 and 2000.  On January 20, 2002, Walsh was not nominated for reelection to the Board.

32.     Defendant Michael A. Ashcroft ("Ashcroft") was a director of Tyco until his resignation on November 11, 2002..  Ashcroft was Chairman of the Board and Chief Executive Officer of ADT Limited from 1984 through July 1997.

33.     Defendant Joshua M. Berman ("Berman")  was a director of Tyco until his resignation on December 5, 2002.  Berman had been a director of Tyco and Vice President since July 1997 and was a director of Former Tyco from 1967 through 1997.  Berman was principally employed as a partner with Kramer Levin Naftalis and Frankel LLP, a New York law firm that provided legal services to Tyco.

34.     Defendant Richard S. Bodman ("Bodman")  was a director of Tyco until March 6, 2003.  Bodman had been a director of Tyco since 1997 and was a director of former Tyco from 1992 through 1997.  Bodman was also a member of the Audit Committee.

35.     Defendant John F. Fort, III, ("Fort")  was a director of Tyco until March 6, 2003.  Fort had been a director of Tyco since 1997, was Chairman of the Board and Chief Executive Officer of Former Tyco from 1982 through 1992 and was a director of Former Tyco from 1982 through 1997.  Fort was a member of the Audit Committee.  Following Kozlowski's resignation on June 3, 2002, Fort assumed primary executive responsibilities at Tyco.

36.     Defendant Stephen W. Foss ("Foss") was a director of Tyco until March 6, 2003.  Foss had been a director of Tyco since 1997 and was a director of Former Tyco from 1983 through 1997.  Foss was also a member of the Compensation Committee.

37.     Defendant Wendy E. Lane ("Lane") was a director of Tyco until March 6, 2003.  Lane had been a director of Tyco since 2000 and was a member of the Audit Committee.

38.     Defendant James S. Pasman, Jr. ("Pasman") was a director of Tyco until his resignation on November 15, 2002.   Pasman had been a director of Tyco since 1992 and was a member of the Compensation Committee.

39.     Defendant W. Peter Slusser ("Slusser") was a director of Tyco until March 6, 2003. Slusser had been a director of Tyco since 1992 and was a member of the Compensation Committee.

40.     Defendant Joseph F. Welch ("Welch") was a director of Tyco until his resignation on January 13, 2003.

**D.      Defendant Breen and the Current Board of Tyco**

41.     Defendant Edward D. Breen ("Breen") was appointed Chairman and Chief Executive Officer of Tyco on July 25, 2002.  On October 17, 2002, the Board nominated Breen for election and he was elected to the Board on March 6, 2003.  Breen's compensation at Tyco for 2002 was estimated at approximately $62 million at the time of his appointment, the fourth largest among all CEOs in the United States.

42.     On August 6, 2002, Defendant John A. Krol ("Krol") assumed the Board seat vacated by defendant Swartz.  On October 27, 2002, the Board nominated Krol for election and he was elected to the Board on March 6, 2003.  Defendant Krol was appointed by the newly elected Board on March 7, 2003 as a member of the Special Committee purportedly charged with evaluating the claims asserted in this action ("Special Committee").  Defendant Krol is Chairman of the Board's Corporate Governance and Nominating Committee.

43.     On September 12, 2002, the Board approved the nomination, appointment and election of defendant Jerome B. York ("York") to fill any vacancy on the Board between September 19, 2002 and

13

the next annual meeting.  On November 11, 2002, defendant Ashcroft resigned and defendant York filled this vacancy.  At the annual meeting on March 6, 2003, defendant York was elected to the Board. Defendant York is a member of the Board's Audit Committee and was elected Chairman in January 2003.

44.     On September 12, 2002, the Board approved the nomination, appointment and election of defendant Mackey J. McDonald ("McDonald") to fill any vacancy on the Board between September 19, 2002 and the next annual meeting.  On November 15, 2002, defendant Pasman resigned and defendant McDonald filled this vacancy.  At the annual meeting on March 6, 2003, defendant McDonald was elected to the Board.  Defendant McDonald was elected to the Board's Compensation Committee in January 2003 and serves as Chairman.

45.     On September 12, 2002, the Board approved the nomination, appointment and election of defendant George W. Buckley ("Buckley") to fill any vacancy on the Board between September 19, 2002 and the next annual meeting.  On December 5, 2002, defendant Berman resigned and defendant Buckley filled this vacancy.  At the annual meeting on March 6, 2003, defendant Buckley was elected to the Board.  Defendant Buckley was elected to the Compensation Committee in January 2003.

46.     On September 12, 2002, the Board approved the nomination, appointment and election of defendant Bruce S. Gordon ("Gordon") to fill any vacancy on the Board between September 19, 2002 and the next annual meeting.  On January 13, 2003, defendant Welch resigned and defendant Gordon filled this vacancy.  At the annual meeting on March 6, 2003, defendant Gordon was elected to the Board. Defendant Gordon is a member of the Corporate Governance and Nominating Committee.

47.     On September 12, 2002, the Board approved for nomination, appointment and election defendant Sandra S. Wijnberg ("Wijnberg") to fill any vacancy on the Board between September 19, 2002

14

and the next annual meeting.  At the annual meeting on March 6, 2003, defendant Wijnberg was elected to the Board.  Defendant Wijnberg is a member of the Audit Committee.

48.     On November 8, 2002, the Board resolved to nominate, appoint and elect defendant Dennis C. Blair ("Blair") to fill any vacancy on the Board between November 8, 2002 and the next annual meeting and also nominated defendant Blair for election at the next annual meeting.  Defendant Blair was elected to the Board on March 6, 2003 at the annual meeting.  Defendant Blair was appointed by the newly elected Board on March 7, 2003 as a member of the Special Committee.  Defendant Blair also serves on the Compensation Committee.

49.     On December 3, 2002, the Board approved the nomination, appointment and election of defendant Brendan R. O'Neill ("O'Neill") to fill any vacancy on the Board between September 19, 2002 and the next annual meeting.  On  March 6, 2003, defendant O'Neill was elected to the Board.  Defendant O'Neill is a member of the Audit Committee.

50.     On January 30, 2003, the Board nominated defendant H. Carl McCall ("McCall") for election at the next annual meeting.  Defendant McCall was elected to the Board on March 6, 2003 at the annual meeting.  Defendant McCall was appointed by the newly elected Board on March 7, 2003 as a member of the Special Committee.

**E.     The Continuing Involvement of Former Board Members
         With the Current Board**

51.     Tyco's Form 10-Q for the period ending March 31, 2003, filed with the SEC on May 15, 2003, stated that Tyco's "new executives will depend in part on advisors, **including certain former directors."**  (Emphasis added)

## V.   OVERVIEW OF SELF-DEALING TRANSACTIONS IN THE KOZLOWSKI ERA

### A.   Abuse of KELP Loans

52.   From 1996 through the first half of 2002, the former Board permitted Kozlowski and Swartz to grant to themselves and their cronies hundreds of millions of dollars of low interest and no-interest loans from Tyco.  Most of these loans were taken through abuse of Tyco's Key Employee Corporate Loan Program (the "KELP").

53.   According to Tyco's proxy statements, the KELP, established by Tyco in 1983, and subsequently amended, was "designed to encourage ownership of Tyco common shares by executives and other key employees."  The KELP ostensibly was designed to provide low interest loans to enable Tyco executives and employees to pay taxes due as a result of the vesting of ownership of shares granted under Tyco's restricted share ownership plan.  The KELP itself, as filed with the SEC, explicitly described this narrow purpose:

> Under the Program, loan proceeds may be used for the payment of federal income taxes due upon the vesting of Company common stock from time to time under the 1983 Restricted Stock Ownership Plans for Key Employees, and to refinance other existing outstanding loans for such purpose.

54.   Kozlowski and Swartz gave themselves hundreds of millions of dollars in KELP loans which they used for purposes not legitimately authorized by the KELP.

55.   From 1997 to 2002, Kozlowski took an aggregate of approximately $270 million from Tyco that he charged as KELP loans -- even though he only used approximately $29,000,000 of those funds to cover taxes due as a result of the vesting of his Tyco stock.

56.     Kozlowski improperly took and used the remaining $242 million of supposed KELP loans -- or roughly ninety percent of the approximately $270 million he had taken from Tyco -- for impermissible and unauthorized purposes, including funding his extravagant lifestyle. For example, with his KELP loans, Kozlowski amassed millions of dollars in art, yachts, and estate jewelry, as well as an apartment on Park Avenue and an estate in Nantucket.  He also used the KELP to fund his personal investments and business ventures.

57.     During that same time period, from 1997 to 2002, Swartz took an aggregate of approximately $85,000,000 dollars from Tyco that he charged as KELP loans -- even though he only used approximately $13,000,000 worth of those funds to cover taxes due from the vesting of his Tyco stock.

58.     Swartz improperly took and used the remaining $72,000,000 of supposed KELP loans -- or roughly eighty-five percent -- for impermissible and unauthorized purposes.  For example, Swartz funded millions of dollars of his personal investments, business ventures, real estate holdings and trusts.

**B.     Abuse of Tyco's RLP**

59.     The Board also permitted the Criminal Defendants to abuse Tyco's relocation loan program ("RLP").  This interest-free loan program, established by Tyco in 1995, was designed to assist Tyco employees who were required to relocate from New Hampshire to New York, when Tyco moved its corporate offices from New Hampshire to New York City, and, subsequently, to assist Tyco employees who were required to relocate to Boca Raton, Florida when Tyco moved some of its U.S. staff there.  The RLP did not provide for relocation loans for moves to any other location.

60.     From 1996 to 2002, Kozlowski received Tyco relocation loans aggregating approximately $46,000,000.  Kozlowski used $18,000,000 of those loans to purchase a waterfront compound in Boca

Raton.  Kozlowski used the remaining $28,000,000 of purported "relocation loans" for purposes which were not within the scope of the RLP.

61.     For example, Kozlowski used approximately $21,000,000 of "relocation" loans for various other purposes, including the purchase of prestigious properties in New Hampshire, Nantucket, and Connecticut.  Kozlowski even used approximately $7,000,000 of Tyco's funds to purchase a Park Avenue apartment for his estranged wife from whom he had been separated for many years and whom he subsequently divorced.

62.     Swartz borrowed more than $32,000,000 under the RLP.  With those funds, he purchased a $6,500,000 apartment on New York City's Upper East Side and a $17,000,000 waterfront compound in Boca Raton.  Swartz used the remaining $9,000,000 for purposes that were not authorized by the RLP, including the purchase of a yacht and the funding of real estate investments.

63.     From 1998 to 2002, Belnick received Tyco RLP loans of over $14 million.

64.     For years prior to his employment at Tyco, Belnick maintained his professional office in midtown Manhattan -- only blocks from Tyco's headquarters at the time.  When Belnick joined Tyco he received a loan of approximately $4 million to "relocate" to New York City -- even though he was ineligible for the plan because he had not previously worked for Tyco (let alone worked for Tyco's New Hampshire headquarters, as required by the terms of the plan) and already owned a house in Westchester County, a suburb just outside of New York City.  Belnick used the loan to buy and renovate a new apartment on Central Park West in Manhattan.

65.     Belnick used the remaining $10,000,000 dollars in loans to purchase a ski chalet in Park City, Utah, although Belnick already owned a $2,000,000 property in Utah.  In September of 2001,

Belnick received the vast majority of the loan, pursuant to a promissory note with TME, a subsidiary of Tyco. The loan was ostensibly granted under the RLP to assist Belnick with his "relocation" to Park City, Utah. Tyco never had a corporate presence in Utah -- let alone a loan program that paid for employees to relocate there.

C.   **Kozlowski and Swartz Stole Tens of Millions of Dollars Through Self-Engineered Forgiveness of Tyco Loans and Improper Bonus Plans**

66.    On numerous occasions, Kozlowski and Swartz further displayed their propensity to treat Tyco like their own private bank by arbitrarily classifying and reclassifying their indebtedness to Tyco between the KELP and the RLP, without any regard for the legitimate and authorized purposes of the two programs. For example, Kozlowski initially funded his estate in Nantucket under the RLP and subsequently reclassified the entire amount of that indebtedness to the KELP. Similarly, Swartz initially funded the purchase of his New York City apartment under the KELP and subsequently reclassified the entire amount to the RLP.

67.    The former Board knew or were reckless or grossly negligent in not knowing that the Criminal Defendants were authorizing tens of millions of dollars of their KELP and RLP loans to be forgiven and written off Tyco's books. Kozlowski and Swartz also directed the acceleration of the vesting of Tyco common stock for their benefit.

68.    In August of 1999, Kozlowski authorized, and Swartz caused to be recorded in Tyco's books and records, a $25,000,000 loan forgiveness against Kozlowski's outstanding KELP balance and a $12,500,000 credit against Swartz's outstanding KELP balance. Although the KELP loan forgiveness was tantamount to a $37,500,000 payment from Tyco to Kozlowski and Swartz, these transactions were

19

never disclosed to investors as part of Kozlowski's or Swartz's executive compensation in Tyco's Form 10-K annual reports and proxy statements.

69.     In September of 2000, the former Board knew or were reckless or grossly negligent in not knowing, that Kozlowski, though TME engineered a program whereby Tyco covertly forgave tens of millions of dollars of "relocation loans" that he, Swartz, and others owed.  To receive these benefits, all that each RLP loan recipient had to do was execute a letter agreement in which they promised not to disclose the loan forgiveness "to anyone other than [their] financial, tax or legal advisors."

70.     Under the September 2000 relocation loan forgiveness program, Kozlowski received $32,976,068 in forgiven relocation loans and Swartz received $16,610,687 in forgiven relocation loans. Although the relocation loan forgiveness was tantamount to an additional $49,586,755 payment from Tyco to Kozlowski and Swartz, these transactions were never disclosed to investors as part of Kozlowski's or Swartz's executive compensation in Tyco's annual reports on Form 10-K and proxy statements.

71.     In December of 2000, the former Board knew, or were reckless or grossly negligent in not knowing, that Kozlowski and Swartz had engineered another program whereby Tyco paid them (and certain other favored employees) bonuses comprised of cash, Tyco common stock, and/or forgiveness of relocation loans.

72.     Pursuant to that program, Kozlowski received 148,000 shares of Tyco common stock, a cash bonus of $700,000, and $16,000,000 in relocation loan forgiveness.  Swartz received 74,000 shares of Tyco common stock, a cash bonus of $350,000, and $8,000,000 in relocation loan forgiveness. These payments were nominally related to the sale of Tyco's ADT Automotive unit.

73.     In June of 2001, Kozlowski and Swartz directed the acceleration of the vesting of Tyco common stock for the benefit of themselves and certain other favored employees.  As a result, Kozlowski and Swartz realized profits of approximately $8,000,000 and $4,000,000, respectively.  These profits were never disclosed as part of Kozlowski's and Swartz's executive compensation in Tyco's Form 10-K annual reports and proxy statements.

### D.     Undisclosed Related Party Transactions With Tyco

74.     The former Board knew, or were reckless or grossly negligent, in not knowing that Kozlowski and Swartz engaged in additional self-serving, non-arm's length transactions with Tyco or its subsidiaries, which were concealed from Tyco's public shareholders.

75.     In 1996, GV Realty Trust, of which Kozlowski was the sole beneficiary ---- and of which Swartz was the trustee ---- purchased a house in New Hampshire from defendant Fort.  Although the purchase was financed through a wholly-owned Tyco subsidiary, charged to Kozlowski's KELP account and later paid by Tyco, the former Board knew, or were reckless or grossly negligent in not knowing, that Tyco's Form 10-Ks and proxy statements failed to disclose this real estate deal to investors as a related party transaction.

76.     In 2000, the former Board knew, or were reckless or grossly negligent in not knowing, that Kozlowski arranged for TME to purchase his house in New Hampshire for $4.5 million -- three times the property's apparent fair market value.  The former Board knew, or were reckless or grossly negligent in not knowing, that this self-dealing had not been disclosed to investors.

77.     In 2000, in the midst of soaring prices for residential real estate in New York City, Kozlowski purchased a Park Avenue apartment from Tyco for the same price that Tyco had paid for it eighteen months earlier, without a contemporaneous appraisal justifying the absence of any increase in

market value.  This related party transaction which the former Board should have been aware of was also concealed from investors.

78.     Swartz also engaged in undisclosed transactions with Tyco or its subsidiaries, which the former Board knew, or were reckless in not knowing, were not disclosed to Tyco shareholders.  For example, in 1995, Swartz sold his New Hampshire real estate to a Tyco subsidiary for $305,000.  When Tyco sold that property to a third party in early 1997, Tyco obtained a far lower price for it than it had paid to Swartz earlier.

79.     Kozlowski enjoyed numerous and extensive perquisites from Tyco that the Board knowingly, recklessly or in gross negligence, concealed from investors.  For example, in 2000, Kozlowski caused Tyco to purchase in Kozlowski's name (as nominee) an apartment on Fifth Avenue in New York City (for which Tyco paid over $31,000,000).  In 2001, after a major renovation to that apartment, Kozlowski moved into the Fifth Avenue apartment and lived there rent-free.

80.     Kozlowski also directed millions of dollars of charitable contributions in his own name using Tyco funds -- including contributions to Seton Hall University, Nantucket Historical Association, Berwick Academy, and Columbia University.  Moreover, Kozlowski used Tyco corporate aircraft for personal use at little to no cost.

81.     Swartz also received numerous perquisites from Tyco that the former Board knew, or were reckless or grossly negligent in not knowing, were not disclosed to investors.  In 2000, for example, Swartz caused Tyco to purchase an apartment in Swartz's name on New York City's Upper East Side.  Swartz then moved into the apartment and lived there rent-free -- a perquisite worth in excess of $18,000 a month.  Swartz also used Tyco's corporate aircraft for his own personal use at little to no cost.

82.     The former Board knew, or were reckless or grossly negligent in not knowing, that Kozlowski's and Swartz's rent-free apartments, personal use of company aircraft, and other perquisites were not disclosed to investors as executive compensation in Tyco's annual reports on Form 10-K and proxy statements, as required by the federal securities laws.

## VI.     BACKGROUND FACTS OF THE KOZLOWSKI ERA

### A.     The Kozlowski Era

83.     Kozlowski began working for a Tyco subsidiary in 1975, and became Chairman and CEO in 1992. Under Kozlowski, Tyco grew rapidly, largely by acquisition.  Between 1995 and 1999, Kozlowski aggressively pushed through nearly 400 acquisitions for the Company.   Some of these acquisitions were substantial.  For example, in May 1998 Tyco purchased U.S. Surgical for $3.3 billion.

84.     Under Kozlowski, Tyco became a Bermuda Corporation by reverse-merging with security company ADT (a Bermuda corporation headquartered in Florida).   Although Tyco's operational headquarters are in the United States, Tyco maintains its corporate office in Bermuda in order to enjoy lower tax rates.  Tyco employs 19 people in Bermuda (out of 242, 500 around the world, according to the Boston Globe).  According to *The Boston Globe*, Tyco's Bermuda office handles inquiries from individual investors, performs some administrative work, and maintains a small customer service center for TyCom Ltd., Tyco's undersea cable unit.  Tyco now has executive offices in New York, staff in Boca Raton, Florida, a corporate campus in New Hampshire, and thousands of subsidiaries.

### B.     Tyco's Relocation to New York

85.     In 1995, Kozlowski moved certain of Tyco's corporate offices from Exeter, New Hampshire to 9 West 57th Street in New York City. At Kozlowski's direction, then-Treasurer Barbara

Miller ("Miller") requested a legal opinion on a company-sponsored relocation program, concerning the form of proxy disclosure required for relocation arrangements "tailored to each individual's circumstances" for five or six contemplated executives. Miller received an unfavorable opinion advising that the benefits of an individually tailored plan would likely be characterized as, and therefore should be disclosed as, compensation for Kozlowski and other senior officers in the Company's proxy statements.

86. A more modest, generally-circulated program (the "General Relocation Program") was drafted and circulated. In August of 1995, the Compensation Committee adopted the General Relocation Program and reported it to the Board.

87. By its very terms, the General Relocation Program was "intended not to discriminate in scope, terms or operation in favor of executive officers or directors of the Company and is to be available generally to all applicable salaried employees." As such, SEC Regulation S-K Item 402(a)(3) Instruction (7)(ii) authorized public companies to omit compensation associated with the General Relocation Program from compensation proxy disclosures for Tyco.

88. However, Kozlowski also implemented the RLP, a second, more generous plan, "tailored to each individual's circumstances" - as originally contemplated – and limited to five or six executives and one assistant. The RLP differed from the General Relocation Program in several significant ways, chief among which were that it was almost twice as generous as the General Relocation Program. As described below, Kozlowski, Swartz, and Belnick were significant beneficiaries of the RLP.

### C. Tyco's Reincorporation in Bermuda

89. In 1997, Tyco executed a reverse merger with ADT, a Bermuda company that conducted its U.S. operations from Boca Raton. In connection with the Tyco International Ltd. ("Old Tyco") and

24

ADT merger, both parties jointly filed on April 2, 1997, a registration statement on Form S-4 with the SEC that included a joint proxy statement/prospectus (the "Proxy").

90.     The Proxy detailed the merger's terms and stated Old Tyco's shareholders "are being asked, at Tyco's special meeting of shareholders to approve the [merger]." Prior to the merger, Old Tyco was incorporated under the laws of Massachusetts and ADT was a Bermuda concern. Under the terms of the merger, ADT was technically the surviving entity and the combined companies would assume the "Tyco" name. Tyco, however, like ADT before it, would be a Bermuda concern, having abandoned its Massachusetts incorporation status.

91.     With respect to Tyco's foreign incorporation, the Proxy stated:

> The combined company is legally ADT, which is a Bermuda corporation and which will be renamed Tyco International Ltd. The Bermuda domicile will allow the combined company to preserve certain advantages now enjoyed by ADT. The principal business offices of the subsidiary that will conduct the North American operations of the combined company will be located at Tyco's offices in Exeter, New Hampshire.

92.     In concluding the merger was in the best interests of Old Tyco's shareholders, the Board considered, and among other things purportedly concluded that, as a result of:

> the fact that ADT will legally be the surviving public company in the merger, certain advantages enjoyed by ADT by reason of its Bermuda domicile and the prospects that those advantages will be preserved for the ADT operations within the combined company.

93.     Under the "Comparison Of Shareholders Rights" section, Old Tyco and ADT detailed how "upon consummating the merger, the rights of ADT shareholders and of [Old] Tyco shareholders who become shareholders of the combined company in the merger will be governed by Bermuda Law…"

94.     With respect to the availability of derivative actions and remedies thereunder, the Proxy stated the following:

Derivative Actions. Under Massachusetts law, a shareholder may institute a derivative suit in the right of the corporation against the shareholders, officers or directors of a corporation if he or she was a shareholder at the time of the act complained of or received his or her shares by operation of law from one who was a shareholder at such time. Under Bermuda law, subject to certain limited exceptions, minority shareholders are not permitted to bring derivative actions for wrongs done to their company.

95.   The Proxy, however, was false and misleading in several respects, including its effort to convince Old Tyco shareholders that they would benefit from the new entity's incorporation under Bermuda law. Specifically, while the Proxy stated that derivative litigation and associated remedies were limited under Bermuda law, Old Tyco's management failed to disclose that derivative claims then existed under Massachusetts, New Hampshire and/or New York law or how they would be affected by incorporation in Bermuda.

96.   At the time of the merger, Tyco management was already engaged in a concerted effort to breach their fiduciary duties and harm Tyco. As early as 1995, Tyco Management embarked upon a course of looting, deception and undisclosed self-dealing. For example:

(a)   In 1995, Kozlowski purchased 167 Little Harbor, New Castle, New Hampshire for his own personal use, and expensed the purchase, the cost of furnishing and the maintenance of the property to Tyco. In 1996, Kozlowski began taking Tyco relocation loans that would eventually total approximately $46,000,000, which Kozlowski used to finance his extravagant lifestyle.

(b)   In 1995, in a transaction that was not disclosed to Tyco shareholders, Swartz sold his New Hampshire real estate to a Tyco subsidiary for $305,000. When Tyco sold that property to a third party in 1997, it was for far less than Tyco had paid Swartz.

(c)   Beginning in 1996, Tyco leased an aircraft from Stockwood, Inc., in which Walsh has a controlling interest. Over the course of the lease, Tyco paid Stockwood $2,490,319. Also beginning

in 1996, another of Walsh's companies, Stockwood VII, provided Tyco with pilot services.  Tyco paid

Stockwood VII a total of $1,072,071 for these services.

(d)    In 1996, GV Realty Trust, of which Kozlowski was the sole beneficiary (and of

which Swartz was the trustee), purchased a house in New Hampshire from defendant Fort.  The purchase

was financed through a wholly-owned Tyco subsidiary, charged to Kozlowski's KELP account and later

paid by Tyco—but was never disclosed to shareholders as a related party transaction.

97.    Accordingly, at the time of the merger, Tyco stockholders possessed the right to pursue

colorable derivative claims on Tyco's behalf.  While the Proxy informed shareholders that New Tyco would

be subject to Bermuda law which limits shareholders' derivative rights, it did **not** disclose how  the

incorporation of New Tyco in Bermuda would affect  these **existing** claims.

### D.    Tyco's Relocation to Florida

98.    After the ADT merger, Kozlowski decided to relocate more than 40 corporate employees

from Tyco's Exeter, N.H. headquarters to Boca Raton, Florida, where ADT's operations had been based.

Kozlowski implemented a RLP for certain selected executives, while at the same time maintaining a more

modest program administered by Tyco's Human Resources department.  As with the move to New York,

the RLP for Florida did not condition participation in the  program upon the sale  of a principal residence

elsewhere, as the general program required.  Certain executive officers used the RLP to receive loans and

benefits unavailable under the  General Relocation Program.  As with the New York RLP, the Criminal

Defendants were significant beneficiaries of the more generous benefits offered under the RLP.

E.   **Prior Charges of Accounting Irregularities at Tyco**

99.   On October 13, 1999, money manager David Tice first publicly questioned Tyco's accounting methods.  The company's shares lost almost half their value amid allegations of questionable bookkeeping.  Tyco responded the same day, calling the allegations "unfounded and malicious" in a press release.  Two weeks later, Floyd Norris of *The New York Times* wrote an article criticizing Tyco's accounting for acquisitions.

100.   Tyco disclosed on December 9, 1999, that the SEC had begun looking at its accounting.

101.   These allegations sparked a shareholder class action lawsuit, which alleged that Tyco had improperly manipulated reserves to create a false impression of success around two major acquisitions.  That case, however, was dismissed on February 22, 2002 on technical pleading grounds.

102.   The prior case named as defendants not only Kozlowski and Swartz, but also Ashcroft.  Although the prior action was dismissed, the former Board was on notice that management, with the complicity of at least one independent outside director, and PricewaterhouseCoopers ("PwC"), may have employed accounting methodologies that violated GAAP and conducted audits that were in contravention of GAAS.

103.   The SEC has now questioned Tyco's public filings relating to the prior accounting, according to a November 25, 2002 *Wall Street Journal* article.  In short, the prior action was resolved before certain responsive documents were turned over by Tyco.  Among the documents withheld, according to the *Wall Street Journal*, were some that went to the core of the allegations of the earlier lawsuit:

> [M]emoranda between two former top Tyco financial executives discussing ways Tyco would help U.S. Surgical slow its growth after Tyco agreed to acquire that company -- but months before the $3.17 billion

<u>purchase was completed in 1998</u>, said people who have viewed them. (Such a move would have enabled U.S. Surgical to show faster growth once it was acquired.) In one, a former Tyco executive termed the Tyco plan for U.S. Surgical "financial engineering." [emphasis added.]

104.   The December 23, 2002 *Wall Street Journal* further reported that Tyco possessed

material which would have supported the lawsuit's prior allegations:

> In May 2000, two months before the SEC closed its accounting inquiry, <u>Mr. McLucas told Mr. Belnick in an e-mail: "We have found issues that will likely interest the SEC."</u> Mr. McLucas described differences between the preliminary, or "flash" numbers reported monthly by Tyco's operating units, and the final reported numbers.
> In his e-mail, Mr. McLucas said <u>Tyco executives manipulated the figures by dipping into reserves to meet earning targets</u>. Mr. McLucas described "creativeness <...> employed in hitting the forecasts" at one divisional level, "reliance on reserves" at the next level, and then further "immaterial adjustments of the reserves to hit the forecasts" at Tyco's corporate headquarters. <u>The discrepancy between the preliminary reports and the final numbers, he wrote, "suggest something funny which is likely apparent if any decent accountant looks at this.</u>"
>
> \* \* \*
>
> One document that apparently wasn't produced to the SEC in 2000 was an e-mail by Mr. McLucas to Mr. Belnick in which he referred to a "bad letter" from the chief financial officer of Sigma Circuits Inc., a company Tyco bought in 1998 for $57.8 million. Mr. McLucas said the Sigma executive wrote the June 19 letter "confirming they were asked to hold product shipment just before the closing."
>
> Such a move, accounting specialists say, would suppress sales and earnings for the old Sigma, but would allow Tyco to recognize more revenue and profit after the deal closed. Philip S. Bushnell, the former Sigma chief financial officer identified in another e-mail as the letter's author, says "it is consistent with what I might have done at the time" in response to a Tyco request. He adds that at the time, Sigma's revenue was roughly $24 million per quarter and that any sales that were hold back were "immaterial." [Emphasis added.]

105.   In the course of investigating the withheld documents, prosecutors have uncovered e-mails

showing that Tyco's lawyers at Wilmer, Cutler & Pickering feared that Kozlowski was illegally profiteering

and warned Belnick of the same.  Although, as noted below, Belnick presently claims that he was not

familiar (and indeed not responsible for) SEC filings, it appears otherwise according to a December 23,

2002 *Wall Street Journal* article:

> In one e-mail reviewed by The Wall Street Journal, Mr. Liman came
> across a document relating to Mr. Kozlowski's personal use of company
> money in a binder that was to be produced to the SEC. In a March 23,
> 2000, e-mail to Tyco's general counsel at the time, Mark Belnick, Mr.
> Liman wrote: "There are payments to a woman whom the folks in finance
> describe to be Dennis's girlfriend." The payments, totaling $100,000 in the
> form of a "loan," were to Karen Mayo, now Mr. Kozlowski's wife.
>
> In the e-mail, Mr. Liman called the payments "an embarrassing fact," but
> added that he believed they couldn't be withheld from the SEC due to
> document requests the agency had made. Mr. Belnick disagreed in an e-
> mail the following day, saying it was "non-responsive" to the SEC's
> requests and therefore didn't need to be produced.

**F.      TyCom Initial Public Offering and Bonus**

106.      In July 2000, Tyco raised $2 billion through the sale of a stake in its undersea fiber-optic

cable unit, renamed TyCom Ltd., ("Tycom") to the public.

107.      On October 4, 2001, Tyco agreed to buy back the TyCom shares for $784 million, less

than half the offering price. It later raised the offer to $863.5 million.

108.      In September 2000, Kozlowski caused Tyco to pay a bonus (the "Tycom Bonus") to 51

employees, including Kozlowski and Swartz, who had outstanding RLP loans. The bonus was calculated

to forgive the relocation loans of all 51 employees, at a total cost to the Company of $56,415,037, and to

pay compensation sufficient to discharge all of the tax liability due as a result of the forgiveness of those

loans.  This action was purportedly related to the successful completion of the TyCom initial public offering.

The total gross wages paid by the Company in this loan forgiveness program were $95,962,000, of which

amount Kozlowski received $32,976,000 and Swartz $16,611,000.   Kozlowski and his henchmen

attempted to hide the Tycom Bonus in a variety of unrelated accounts.  However, the nature of this

attempted deception was so crude and obvious as to clearly render the former Board aware, or recklessly

or grossly negligent in permitting such accounting treatment.

109.    Mark Foley, a Tyco Vice President of Finance prepared a memorandum signed by Swartz

that explained the accounting treatment for the near-$100 million charge. The memo stated:

> The sale of 14% of TyCom generated a one-time gain of approximately
> $1.76 billion on the books of Tyco. We have decided to award special
> bonuses to various Tyco employees for their efforts over the past few
> years in enhancing the value of TyCom and thereby contributing to this
> gain. Selected employees will receive their bonus in the form of cash,
> forgiveness of relocation loans, and/or Tyco Common shares under Tyco's
> restricted stock program.

110.    As a result of this accounting treatment, this extraordinary near-$100 million charge was

improperly allocated to several different accounts and appeared in the general ledger and materially

impacted the Company's financial statements as a:

(a)    $44,602,065 Tycom Offering Expense as a component of "Other (Income)

Expense" in the Company's income statement.

(b)    $11,772,973 offset to previous over accruals of General & Administrative

Expenses in the Company's balance sheet.

(c)    $40,977,616 adjustment to accrued federal income tax, a balance sheet account

used for corporate income taxes.

**G.    ADT Automotive Sale and Bonus**

111.    On January 14, 2000, Tyco announced the sale of the ADT Automotive unit for $1 billion

in cash.

112.     Beginning in November 2000, after the ADT Automotive sale was complete and immediately following the TyCom Bonus, defendants Kozlowski and Swartz caused Tyco to issue restricted shares in the aggregate value in excess of $15,000,000, as a special bonus to a handful of Tyco employees.

113.     Pursuant to that program, Kozlowski received 148,000 shares of Tyco common stock, a cash bonus of $700,000, and $16,000,000 in relocation loan forgiveness. Swartz received 74,000 shares of Tyco common stock, a cash bonus of $350,000, and $8,000,000 in relocation loan forgiveness.

114.     The net benefit to Kozlowski under the unauthorized TyCom Bonus loan forgiveness was still insufficient to fully repay earlier improper loans and, only a few short weeks later, in November 2000, Kozlowski contrived another special bonus program, also containing purported relocation benefits through the ADT Automotive unit.

115.     All of the intended recipients of the purported relocation benefits in the new program had already recovered all of the grossed-up costs associated with their recent relocations under the just completed improper TyCom Bonus.

116.     The total cost to the Company of the ADT Automotive Bonus was nearly $56 million. The benefit received by Kozlowski alone was approximately $25.6 million, of which approximately $8.3 million represented the vesting of restricted shares and another $17.3 million represented the purported relocation benefits.

**H.     Flag Telecom Purchase**

117.     On June 22, 2001, Tyco acquired 15 million shares of Flag Telecom, a telecommunications company then owned by Verizon, Inc. for $11,421,810 cash and 5,580,647 TyCom shares. Tyco reported a $79,364,700 gain associated with the swap of TyCom shares for the Flag equity.

118.    In June 2001, Kozlowski accelerated vestings of restricted shares held by certain Tyco executives, as a bonus related to the Flag Telecom transaction.  Each of the executives involved in the grant of restricted shares sold the shares back to Tyco on June 20, 2001 and received wire transfers to their personal accounts.  Kozlowski justified this bonus on the basis that the transaction resulted in a $79 million gain to TyCom.

119.    On October 1, 2001, the Compensation Committee approved and certified the vesting of 290,000 shares for Kozlowski and Swartz "in conjunction with the gain . . ." on the Flag transaction. The total cost to the Company related to the award of these shares was $15,378,700. However, prior to the October 1, 2001 certification by the Compensation Committee, the value of the Flag stock decreased substantially, to the point that it was impaired.

120.    Floyd Norris, writing in the September 25, 2002 issue of *The New York Times,* criticized the Flag Telecom deal as a money-losing transaction which produced a gain only by accounting magic, which, at a minimum, should have been apparent to the Audit Committee:

> The transaction appears to have provided a clear economic loss for Tyco, which was forced to pay an above-market price for an 11 percent stake in a small company called Flag Telecom that has since gone bankrupt.
>
> But Tyco disclosed last week that the company had managed to claim a profit of $79.4 million on the transaction, and that this profit was used to justify the bonuses.
>
> * * *
>
> The Flag transaction, however, may indicate that the company reported profits improperly, or at least in a way that bore no resemblance to economic reality, and that the executives collected bonuses based on those so-called profits.
>
> To justify the profits reported, Tyco apparently assumed that stock it obtained was worth what it had paid -- something that was clearly not the

33

case at the time -- and then exaggerated that value by using outdated valuation figures. A result was that Flag's value was overstated by 53 percent when the transaction closed.

* * *

The sale was made under an agreement negotiated the preceding April, providing for what was supposed to be an equal exchange of value, based on trading prices over the five days before Verizon forced the sale to be made.

Because Verizon had the discretion to decide when the deal closed, it could choose a date on which the movement of the shares gave it an advantage, and it did so.

Under accounting rules, Tyco could claim a profit because its cost of the TyCom shares was less than their market value at the time.
What Tyco did was to assume that the TyCom shares it gave up were worth $16.38 each, according to a person close to Tyco, and to assume that the Flag stock it bought was worth as much as it was giving up. That person said that Tyco used a 10-day moving average price of TyCom shares, but said he did not know what period was used. It appears that it was the period ending June 14 -- well before the actual transaction took place. By the time the deal happened, values had fallen. The person close to Tyco said the profit was proper.

Accounting rules permit a company to base the value of a deal on the value of either what was paid or what was received, depending on which is ascertainable. In this case, both were, but Tyco chose to use the value of what it gave up, even though the structure of the transaction -- with Verizon having the ability to choose a time opportune for it -- had made it all but certain that that figure was likely to be higher than the value Tyco received. Some accountants say the value should have been set based on prices when the deal closed, not weeks earlier.

In Tyco's financial statements for the quarter ended last June, the company disclosed a profit of $64.1 million on the sale of stock in an unnamed subsidiary, which Tyco officials confirmed yesterday was TyCom. The Boies report said the company actually computed a profit of $79.4 million. It appears the difference related to hiding the value of $15.4 million in compensation expenses reflected in the bonuses the executives were paid. By reducing the stated profit, the company could also avoid reporting the compensation costs without affecting the reported income numbers.

34

<u>In fact, a person close to Tyco said, the bonuses paid were substantially more than $15.4 million, although that fact is not reported in the Boies report.</u> That is because the bonuses to Mr. Kozlowski and Mr. Swartz were <u>"grossed up"</u> to cover taxes on them -- something not done for the other five executives, who got smaller bonuses. <u>It is not clear where the value of the additional compensation was reported.</u>

On paper, those bonuses were paid when the company gave stock to the executives and then bought it back from them. The Boies report said most of the sales were made on June 20, the day the Flag deal was announced and two days before it closed, so eager were the executives to get their cash. The remaining sales of stock by Mr. Kozlowski and Mr. Swartz were made two weeks later. All told, their bonuses on the deal totaled $20.4 million.  [emphasis added.]

## VII.   **THE FORMER BOARD'S LACK OF INDEPENDENCE**

### A.   <u>Frank Walsh</u>

121.    Walsh was a personal friend of Kozlowski and had served as a Tyco director for several years; in the late 1990s, he was the Chairman of the Board's Compensation Committee, and by early 2001 he had been appointed Lead Director, making him the principal conduit for communications between the Company's management and the Board.

122.    From 1996 to 2002, Tyco leased an aircraft from Stockwood, Inc., in which Walsh has a controlling interest.  Stockwood, Inc. submitted and was paid for invoices totaling $2,490,319 for that lease.

123.    Stockwood VII, Inc., in which Walsh also has a controlling interest, provided pilot services to the Company. For the period 1996 to 2002, Stockwood VII, Inc. submitted and was paid for invoices totaling $1,077,071.  Tyco renewed that agreement annually to October 31, 2000, and signed a new agreement beginning in January 2001, which ended in February 2002.

124.    In 2000, Walsh learned of Tyco's interest in acquiring the CIT Group ("CIT") -- a company in which Walsh held 50,000 shares. Walsh offered to assist in Tyco's acquisition by arranging a meeting between Kozlowski and Albert R. Gamper, Jr. ("Gamper"), the Chief Executive Officer of CIT.

125.    After the first meeting between Kozlowski and Gamper, Kozlowski proposed to pay Walsh an investment banking or finder's commission for his services if the transaction was successfully completed.

126.    Despite serving as the purported Lead Director and acting with independence, Walsh advocated and voted in favor of the proposed CIT transaction without disclosing his expected financial gain.

127.    The terms and conditions of the Tyco/CIT merger were set forth in the Agreement and Plan of Merger dated March 12, 2001.  In the section of the Agreement and Plan of Merger that contained the representations and warranties of Tyco, Tyco represented that, other than Lehman Brothers and Goldman, Sachs & Co. (the investment bankers that represented Tyco in the Tyco/CIT merger):

> ...there is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of [Tyco] who might be entitled to any fee or commission from [Tyco]...in connection with the transactions contemplated by this Agreement. (Emphasis added.)

128.    On April 13, 2001, Tyco filed with the SEC a registration statement on Form S-4 (the "Registration Statement") for the securities related to the contemplated merger between Tyco and CIT. The Agreement and Plan of Merger was incorporated by reference in, and attached to, the Registration Statement.

129.    In his capacity as a director of Tyco, Walsh signed the Registration Statement. At the time that he signed, Walsh knew that the Registration Statement contained a material misrepresentation regarding

the payment of a "finder's fee" because he knew that he stood to obtain a $20 million fee if the transaction was consummated.

130.    After the transaction was consummated, pursuant to his prior agreement with Kozlowski to receive a fee, Kozlowski caused Tyco to pay Walsh a $20 million "finder's fee" in the form of $10 million in cash and a $10 million charitable contribution to a foundation chosen by Walsh.

131.    Ultimately, Walsh plead guilty to criminal violations of New York's General Business Law, returned $20 million to Tyco and paid a $2.5 million fine.  Walsh, however, has not compensated Tyco for the severe damage to its business reputation or otherwise paid for the multiple criminal and civil investigations of the Company that were, in part, a direct result of his illegal actions.

132.    On January 16, 2002, the former Board met informally to discuss Kozlowski's plan to realize tens of billions of dollars in shareholder value by breaking up the Company into four parts – each a multi-billion dollar entity in its own right – and selling billions of other assets.  The Board also added Walsh's finder's fee issue to the agenda for that meeting.

133.    The directors reviewed the facts and circumstances relating to the Walsh payment at the January 16 meeting and gave Walsh the opportunity to explain himself. Walsh was then excused from the discussion, and upon his return was told that it was the unanimous view of the former Board that the money should be returned. Walsh responded by gathering up his papers, saying "adios" to the other directors, and walking out of the meeting.

**B.     John Fort**

134.     In April, 1996, Fort sold Kozlowski a property at 59 Harbor Road, Rye, New Hampshire where Fort had resided while CEO of Tyco.  Immediately prior to the closing in April 1996, Fort was notified that the actual purchaser would be the GV Realty Trust, which Kozlowski represented as his own realty trust in which he was the sole beneficiary. Although GV Realty Trust was owned by Kozlowski, he caused Tyco to book the purchase to a general ledger Tyco account. Before the end of the year, the entry was reversed and transferred to Kozlowski's personal KELP loan account.

135.     Fort received additional financial benefit in August 1999 when Tyco sold assets from its flow control products division to DLJ Merchant Banking Partners II, an investment partnership in which Fort was an equity investor.

**C.     Michael Ashcroft**

136.     On October 24, 1997, after the Tyco/ADT merger, Tyco purchased  Ashcroft's Florida residence at 471 East Alexander Palm Road for more than $2,500,000.  Ashcroft claimed that he understood at the time that he was selling the property to Kozlowski personally, and did not know until more than two years later that the purchaser of the property was the new Tyco subsidiary, ADT.  Ashcroft claims to have inquired some months later of Swartz whether the transaction should be disclosed in the Company's proxy and that Swartz informed him that because Tyco explored competitive alternatives prior to purchasing his property, it did not consider the transaction reportable.  Prosecutors investigated this activity and have recently shown renewed interest in Ashcroft's dealings with Kozlowski.

D.     **Richard Bodman**

137.     Kozlowski invested $5 million in a private stock fund managed by Richard Bodman, according to a November 6, 2002 *Wall Street Journal* article.

E.     **Stephen Foss**

138.     In May, 2001, Tyco entered into a two-year lease agreement with Foss to lease a Cessna Citation aircraft for a minimum monthly lease payment of $38,000 for 20 hours of flight time.  For the period May 2001 to May 2002, Tyco paid Foss a total of $570,000. N.H. Helicopters, Inc., of which Foss is the president, also provided pilot services to Tyco pursuant to a two-year agreement commencing on the same date.  For the period May 2001 to May 2002, Tyco paid N. H. Helicopters, Inc. a total of $181,101.24.  On July 5, 2002, after Kozlowski's resignation, both agreements were amended to terminate on September 30, 2002.

F.     **Joshua Berman**

139.     Tyco has disclosed that Berman's firm, Kramer Levin, had received fees of  $2 million per year from Tyco.  Berman, in turn, personally benefitted because the legal fees paid by Tyco enhanced his compensation at Kramer Levin.  *The Wall Street Journal* reported on June 12, 2002, that:

> Tyco International Ltd. has been paying a law firm that employs one of its veteran directors as much as $2 million annually in recent years in an arrangement that has been a source of some internal conflict at Tyco, say people familiar with the matter.
>
> <u>Meanwhile, the director, Joshua M. Berman, was compensated by the law firm on a formula that included, among other factors, the amount of business he brought to the firm from Tyco.</u>
> Tyco has never disclosed the actual amount of money it paid to the firm, Kramer Levin Naftalis & Frankel, nor has it disclosed the connection between Mr. Berman's law-firm compensation and the business it sends to the firm.

Tyco has in the past disclosed its use of Kramer Levin. Yesterday, Walter Montgomery, a Tyco spokesman, said all proper disclosures were made about the relationship between Tyco and Mr. Berman's law firm. Mr. Berman couldn't be reached to comment.

* * *

Paul S. Pearlman, managing partner of Kramer Levin, said that Mr. Bermans' compensation formula -- until 2000 --- was based on a formula that included, among other factors, how much Tyco business he brought to the law firm. [emphasis added]

### G.   **Other Benefits**

140.    Additionally, Kozlowski and Swartz gave Tyco's Senior Vice President for Human Relations, Patricia Prue, an interest free loan of over $400,000 for a New Hampshire residential property.

141.    In or about September 2000, Kozlowski caused Tyco to pay the TyCom Bonus. The Tycom Bonus was calculated to forgive the relocation loans of all 51 employees, at a total cost of $56,415,037, and to pay compensation sufficient to discharge all of the tax liability due as a result of the forgiveness of those loans. The total gross wages paid by the Company in this loan forgiveness program were $95,962,000. Distribution of this benefit is summarized in the following chart:

| EMPLOYEES | LOAN BALANCES | GROSSED UP | PERCENTAGE OF TOTAL FORGIVENESS |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Executive Officers | $29,231,392 | $49,586,754 | 52% |
| Key Managers | $13,534,523 | $22,959,339 | 24% |
| Others | $13,649,122 | $23,416,560 | 24% |
| Total | $56,415,037 | $95,962,653 | 100% |

The components of the Executive Officer totals are as follows:

| NAME | LOAN BALANCES FORGIVEN | GROSSED UP |
|---|---|---|
| <S> | <C> | <C> |
| L. D. Kozlowski | $19,439,392 | $32,976,067 |

| | | |
|---|---|---|
| Mark Swartz | $9,792,000 | $16,610,687 |
| Total | $29,231,392 | $49,586,754 |

Listed below are key managers of Tyco in addition to Kozlowski and Swartz who received unauthorized loan forgiveness and "gross-up" bonuses pursuant to the September 2000 program conceived and implemented by Kozlowski.

| NAME | LOAN BALANCES FORGIVEN | GROSSED UP |
|---|---|---|
| <S> | <C> | <C> |
| Jerry Boggess | $ 5,000,000 | $ 8,481,764 |
| Irving Gutin | $ 3,109,971 | $ 5,275,608 |
| Jeffrey Mattfolk | $ 825,000 | $ 1,399,491 |
| Brad McGee | $ 1,942,026 | $ 3,294,361 |
| Patricia Prue | $ 748,309 | $ 1,269,396 |
| Michael Robinson | $ 1,063,355 | $ 1,803,826 |
| Scott Stevenson | $ 845,869 | $ 1,434,893 |
| Total | $13,534,523 | $22,959,338 |

142.    Kozlowski's letter which announced the ADT bonus plan noted that information regarding the vested shares had already been previously communicated and that the amounts listed were reviewed and approved by the Chairman of Tyco's Compensation Committee.  The total number of shares awarded was 261,500 with a then-market value of $14,804,038.  Tyco executives Patricia Prue and Brad McGee received additional awards at the same time amounting to $5,161,776, although these benefits were accounted for differently.

143.    The distribution of this benefit is summarized in the following chart:

| EMPLOYEES | CASH BONUS | VALUE OF RESTRICTED SHARES | "RELOCATION" BENEFITS | TOTAL |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | |
| Kozlowski | $ 700,000 | $ 8,378,576 | $16,488,034 | $25,566,610 |
| Swartz | $ 350,000 | $ 4,189,288 | $ 8,305,344 | $12,844,632 |
| Foley | $ 100,000 | $ 113,224 | $ 422,180 | $ 635,404 |
| Gutin | $ 500,000 | $ 2,637,804 | | $ 3,137,804 |
| Mattfolk | $ 312,500 | $ 424,590 | $ 699,746 | $ 1,436,836 |
| McGee | $ 500,000 | $ 424,590 | $ 1,647,181 | $ 2,572,771 |
| Prue | $ 312,500 | $ 424,590 | $ 737,090 | |

41

| | | | |
|---|---|---|---|
| Robinson | $ 312,500 | $ 424,590 | $ 901,913 | $ 1,639,003 |
| Stevenson | $ 312,500 | $ 424,590 | $ 717,447 | $ 1,454,537 |
| Other Employees | $ 579,000 | $ 189,992 | $ 768,992 | |
| | $3,979,000 | $14,804,038 | $32,009,641 | $50,792,679 |

144.    Boggess served as  President of Tyco's Fire and Security Services division until March 2003, when he was terminated from his position. Boggess borrowed a total of $5,000,000 in relocation loans to purchase property in Boca Raton in 1997. Tyco forgave this loan as part of the TyCom Bonus in September 2000.  In January 2002, Kozlowski also forgave another loan  Boggess owed to Tyco.

145.    According to the *New York Times*, in an article dated August 15, 2002, a suit by Richard Power, a former Tyco executive, filed in 2002, claims that Kozlowski agreed to a severance package of twice his last year's salary if he was fired.  Power claims over $900,000 in damages.

146.    In 2000, Neil Garvey, who headed TyCom until July 2002, borrowed $5,000,000 in relocation loans related to his relocation to New Hampshire. Mr. Garvey's loan exceeded approved program guidelines by $472,703.  Mr. Garvey's entire $5,000,000 loan is outstanding, and the Company is seeking repayment of the balance.

## VIII.   KOZLOWSKI, SWARTZ AND BELNICK ABUSED TYCO FOR PERSONAL FINANCIAL GAIN

### A.      Kozlowski's Personal Gain

147.    Kozlowski's compensation was very generous.  By the end of 1998, Kozlowski  had received restricted stock grants of 1,200,000 shares (August, 1996) and an additional 760,000 shares (July, 1998).  His 1998 proxy compensation had grown to a salary of $1,250,000, a performance-based bonus of $2,500,000, grants of restricted stock valued at $21,140,000, and options grants on 3,832,000 underlying shares.  Tyco's Compensation Committee had adopted two more "top hat" plans to benefit select highly paid executives: a Supplemental Executive Retirement Plan and an Executive Retirement

Agreement, which would provide security and comfort for Kozlowski's retirement years. Kozlowski's total compensation for the year, including the value for his options, exceeded $70 million.

148.    In October 2000, the Compensation Committee expanded Kozlowski's compensation and, based upon Tyco's successful results in the millennium year, granted him another 600,000 shares on October 3, 2000.  The Compensation Committee also approved the funding of a lucrative Executive Life Insurance Program with approximately $20 million.

149.    Shortly thereafter, on January 22, 2001, Tyco signed a retention agreement ("Kozlowski Retention Agreement") "to ensure the continued leadership by Tyco's CEO [Kozlowski] until retirement and solidify his commitment towards succession planning."

150.    According to the term sheet presented at the January 22, 2001 Compensation Committee meeting, the Kozlowski Retention Agreement provided for:

(a)    ongoing compensation and benefits for three years following age 62 in the form of annual base salary and proxy bonus;

(b)    the continuation of all applicable benefits such as welfare, relocation, and other perquisites including New York City gross-up for state and city taxes;

(c)    lifetime welfare benefits and access to Company facilities and services comparable to those provided while CEO, such as financial planning, use of company planes, cars, and "services," office, secretarial and administrative support; and

(d)    an additional 800,000 shares of Company stock to vest pro rata through the age of 62.

151.    The monetary value of the compensation set forth in preceding subparagraph "a" above would have been approximately $19,950,000.  The Compensation Committee approved this plan in

principle in March 2001, and the Kozlowski Retention Agreement was then back-dated to the date of the Compensation Committee's agreement in principle.

152.    In July 2001 Kozlowski, through Tyco's Senior Vice President of Human Resources, suggested an amendment to the formula, substituting for the term "highest annual proxy bonus" the term "highest annual bonus earned (including cash, shares and other forms of consideration)." The Compensation Committee approved the amendment to the Kozlowski Retention Agreement in principle on August 1, 2001.

153.    As a result of the change, the monetary values of the compensation set forth in preceding subparagraph "a" increased nearly tenfold to an amount exceeding at least $197,667,618.

154.    In addition, in October, 2001 the Compensation Committee approved a second funding stream for Kozlowski's Executive Life Insurance Program with approximately $20 million.

155.    A study by Pearl Meyer & Partners, published in the June 5, 2002 *Seattle Times,* shows that Kozlowski received more than $325 million in total compensation from Tyco during 1998-2002. That figure included $18.1 million in salary and bonuses and $97.5 million in restricted and long-term stock grants and $203.5 million in stock options.

156.    In addition to his ordinary compensation, Kozlowski enjoyed a number of substantial perquisites. For example, in 1995, Kozlowski purchased 167 Little Harbor, New Castle, New Hampshire and then furnished it at a cost of $269,000, which he expensed to Tyco. He also charged the maintenance costs of that property to Tyco. Kozlowski continued to use this property until 2002.

**B.      The New York Relocation**

157.    As a result of the RLP, Kozlowski was able to:

(a)        Rent a lavish Fifth Avenue apartment (817 Fifth Avenue, New York City), with annual rental of $264,000, paid for by the Company, from 1997 to 2001. The General Relocation Program would not have permitted this benefit;

(b)        Purchase with interest free loans in 2000 – at depreciated book value and without appraisals – a Company-owned $7 million apartment at 610 Park Avenue, previously acquired by the Company at his behest.  Kozlowski never occupied the apartment, but rather deeded it to his ex-wife a few months after the purchase. (Kozlowski repaid $5,118,125 of the loan on this apartment and then simply forgave the remainder of his own loan balance ($1,893,544) within a few months of the purchase.)  On or about May 29, 2000, Kozlowski obtained $7,011,669 from Tyco for the purchase of property from Tyco. This purchase price was the same price Tyco had bought the apartment for 18 months earlier;

(c)        Sell his New Hampshire home to Tyco in 2000 for an amount significantly in excess of its market value.  Kozlowski sold his house at 10 Runnymede, North Hampton, New Hampshire to the Company without appraisals for $4.5 million, an amount approximately three times its market value.  After an appraisal in March 2002 valued the New Hampshire property at $1,500,000, Tyco wrote down the carrying value of the property to the appraised value and charged Kozlowski's $3,049,576 overpayment to expense.  After the sale of 10 Runnymede Drive to the Company, Kozlowski reportedly continued to make personal use of the property by permitting his ex-wife to reside there for two years, without a lease and without even reimbursement to the Company of expenses; and

(d)        Purchase a second, more extravagant apartment on Fifth Avenue (950 Fifth Avenue, New York) in 2001 for $16.8 million and expend $3 million in improvements.  Kozlowski then caused Tyco to spend $11 million in furnishings for that apartment.  He purchased and decorated the apartment with extravagant appointments and furnishings, including: a shower curtain for $6,000; a dog

umbrella stand for $15,000; a sewing basket for $6,300; a traveling toilette box for $17,100; a gilt metal

wastebasket for $2,200; coat hangers for $2,900; two sets of sheets for $5,960; a notebook for $1,650;

and a pincushion for $445.

158.    Kozlowski also used the RLP to "gross-up" benefits received under the RLP so as to

insulate Kozlowski from all state income tax liability that he incurred after relocating to New York.

159.    According to the August 8, 2002 *Union-Leader* article, the 1997 ADT merger had

another selling point for Kozlowski.  It allowed him to continue to abuse the RLP by moving to Boca Raton:

> ADT operated out of Boca Raton, Fla., a place where he and Ms. Mayo
> enjoyed spending time. Months after the deal closed, Tyco quietly moved
> its executive offices from Exeter to Boca Raton, shifting 44 people
> including top executives, secretaries and even the company doctor and
> fitness trainer. Each was offered 15-year relocation loans from Tyco to
> buy new houses, generally with zero interest and no payments due for the
> first five years.
>
> The 10-story Boca Raton office was a long way from the squat Exeter
> building. In Florida, executive-floor staffers could special-order breakfasts
> delivered to their desks on china. On Fridays, a masseur came around to
> soothe away stresses. By this year, some 80 percent of Tyco's
> headquarters staff worked in Boca Raton.
>
> But the company continued to claim in regulatory filings that the modest
> New Hampshire offices were its U.S. operating headquarters. Mr.
> Kozlowski was quoted in a Business Week cover story last year extolling
> the virtues of spartan offices. "If you build an elaborate headquarters,
> people are tempted to spend a lot of time there, and it becomes really
> unproductive," he said.
>
> While Mr. Kozlowski and Ms. Mayo waited for their Tyco-financed,
> Boca Raton mansion to be built, they lived in a $2.5 million waterfront
> house that Tyco bought from ADT's former chief, Michael A. Ashcroft --
> a Tyco board member -- a transaction now being probed by prosecutors.
> (Emphasis added.)

160.    Kozlowski used the RLP in 1998 to obtain $29,756,110 in interest- free loans, which he used to purchase five lots and build a home at 4101 Ibis Point Circle, Boca Raton, located in a development called "The Sanctuary." No mortgages were recorded on the Florida properties, as required by the purported RLP guidelines and as required to qualify for tax-exempt status for interest free loans.

161.    While The Sanctuary was under construction, Kozlowski lived in Ashcroft's old house, at 471 East Alexander Palm Road, in Boca Raton, which was purchased for Kozlowski by Tyco.

162.    In or about May 1998, defendant Kozlowski obtained in excess of $9,000,000 from Tyco for property in Boca Raton, Florida.

163.    On or about November 10, 1998, defendant Kozlowski obtained in excess of $900,000 from Tyco for "The Sanctuary – final payment lot 71."

164.    On August 7, 2002, *The Wall Street Journal* described Kozlowski's Florida Sanctuary and the circumstances of its purchase as follows:

> a 15,000-square-foot, Mediterranean-style waterfront mansion complete with pool, tennis court and fountain.
>
> Although Mr. Kozlowski was one of America's best-paid corporate executives, he didn't have to reach into his own pocket to finance the lavish spread.  Instead, he paid for it with a $19 million, no interest loan from Tyco.
>
> Two years ago, Tyco forgave the entire loan as part of a "special bonus" program, according to people familiar with the company.  <u>To cover Mr. Kozlowski's income taxes on the forgiven loan, these people say, the company kicked in an extra $13 million.  Not a penny of these deals was disclosed to Tyco shareholders.</u> (Emphasis added.)

165.    Under the TyCom Bonus, Kozlowski received $32,976,068 in forgiven relocation loans and Swartz received $16,610,687 in forgiven relocation loans.  This bonus amounted to an additional $49,586,755 payment from Tyco to Kozlowski and Swartz, but these transactions were never disclosed

to investors as part of Kozlowski's or Swartz's executive compensation in Tyco's annual reports on Form 10-K and proxy statements.

166.    The benefit received by Kozlowski alone from the ADT Automotive Bonus, given in November 2000, was approximately $25.6 million, of which approximately $8.3 million represented the vesting of restricted shares, and another $17.3 million represented purported relocation benefits.

167.    Pursuant to that program, Kozlowski received 148,000 shares of Tyco common stock, a cash bonus of $700,000, and $16,000,000 in relocation loan forgiveness.

168.    From 1997 to 2002, Kozlowski took an aggregate of approximately $270 million from Tyco that he charged as KELP loans — even though he only used approximately $29,000,000 of those funds to cover taxes due as a result of the vesting of his Tyco stock.

169.    Kozlowski improperly took and used the remaining $242 million of supposed KELP loans — or roughly ninety percent of the approximately $270 million he had taken from Tyco — for impermissible and unauthorized purposes, including funding his extravagant lifestyle. For example, with his KELP loans, Kozlowski amassed millions of dollars in fine art, yachts, and estate jewelry, as well as an apartment on Park Avenue and a Nantucket estate.  He also used the KELP to fund his personal investments and business ventures.

170.    On numerous occasions, Kozlowski and Swartz displayed their propensity to treat Tyco like their own private bank by arbitrarily classifying and reclassifying their indebtedness to Tyco between the KELP and relocation loan program, without any regard for the legitimate and authorized purposes of the two programs.  For example, Kozlowski initially funded a palatial estate in Nantucket under the relocation loan program and subsequently reclassified the entire amount of that indebtedness to the KELP.

171.    By the end of 1998, Kozlowski owed the Company $23,542,000 of relocation loans and $132,310 of KELP Loans. Eight months later, his total indebtedness had grown to more than $84.4 million – $28,541,813 in interest free "relocation loans" and $55,943,843 in KELP loans.  By August 1999, Kozlowski's KELP indebtedness had reached a level of approximately $56 million.

172.    Kozlowski achieved these extraordinary levels of indebtedness to Tyco by systematically and flagrantly violating both the purpose and the specific restrictions of the KELP program, turning it into a revolving line of credit on which he borrowed money more than two hundred times from 1997 to 2002. Some of those loans were for millions, while some were as small as $100.

173.    Moreover, Kozlowski frequently abandoned his investment in Tyco by selling substantially all of his restricted shares when they vested (or shortly thereafter), thus violating both the spirit and the letter of KELP since its terms eliminated or substantially reduced his eligibility to borrow under the KELP if he sold his Tyco stock.

174.    On or about October 2, 1997, Kozlowski obtained $200,000 dollars through the KELP for renovations to a Greenwich, Connecticut house for renovations.

175.    On or about November 10, 1997, Kozlowski obtained $100,000 through KELP loan for "Karen Mayo – Rye Beach" (Ms. Mayo is Kozlowski's second wife).

176.    On or about December 29, 1997, Kozlowski obtained in excess of $2,000,000 through the KELP for "Wentworth Land/Runneymead," and in excess of $5,000,000 through the KELP for property in Nantucket, Massachusetts.

177.    During the period December 29, 1997, through March 31, 1998, Kozlowski obtained in excess of $900,000 from Tyco for property in Greenwich, Connecticut.

178.    On or about August 31, 1998, Kozlowski obtained in excess of $60,000 through the KELP for a motor vehicle.

179.    On or about October 1, 1998, Kozlowski obtained in excess of $90,000 through the KELP for a motor vehicle.

180.    On or about December 15, 1998, Kozlowski obtained in excess of $240,000 through the KELP for "Harry Winston, Inc."

181.    On or about July 23, 1999, Kozlowski obtained $1,000,000 as borrowings from Tyco for "Karen Mayo."

182.    In or about August or September 1999, defendant Swartz told a Tyco employee in the Department of Finance that a special relocation bonus had been approved forgiving $38,500,000 in KELP loans to Kozlowski, Swartz, and another Tyco employee, including $25 million of Kozlowski's personal debt, and that the appropriate entries should be made in Tyco's books.

183.    In or about September 2000, Kozlowski and Swartz authorized a Tyco book entry forgiving loans previously booked as relocation loans to Kozlowski in excess of $19,000,000.

184.    In or about September 2000, Kozlowski and Swartz authorized Tyco funds to be used to pay "gross-up" taxes in excess of $13,000,000 on the forgiveness of relocation loans to Kozlowski.

185.    On or about December 19, 2001, Kozlowski borrowed approximately $8,800,000 through the KELP for artwork.

186.    On or about January 3, 2002, Kozlowski borrowed approximately $3,950,000 through the KELP for artwork.

187.    Kozlowski also directed millions of dollars of charitable contributions in his own name using Tyco funds — including contributions to Seton Hall University, Nantucket Historical Association, Berwick Academy, and Columbia University.

188.    In 1996 Kozlowski, after committing to a pledge of $1 million, wrote to discuss "a naming opportunity" with a hospital.

189.    In 1997, Kozlowski made a pledge to his alma mater Seton Hall University, with a $1 million Tyco check with a letter stating "I have enclosed a check for $1 million in payment toward my pledge to Seton Hall University."

190.    Kozlowski used Company money to promote his own name. Middlebury College thanked Kozlowski for his "additional commitment," suggesting that they create "The Kozlowski Fund." Kozlowski funded the "Koz Plex" at Berwick Academy by causing Tyco to donate $300,000 to the school. According to a *Financial Times* article dated November 16, 2002, Kozlowski offered Cambridge University $4 million to establish the corporate governance chair.

191.    After the 1996 purchase of 59 Harbor Road, Rye, New Hampshire, for which he used Company funds that he later reimbursed, Kozlowski made personal use of the property, while expensing its maintenance to the Company.

192.    Kozlowski used Tyco funds for a lavish $2.1 million birthday party for his wife Karen Mayo.  According to a November 17, 2002 article published in the *Chicago Tribune,* Tyco staff member Beth Pacitti sent a memo outlining the birthday party to be held by Kozlowski on June 14, 2001 on the Mediterranean island of Sardinia.  Kozlowski expensed $1 million to Tyco for this personal party.

193.    In or about May 1998, Kozlowski obtained in excess of $2,000,000 from Tyco for property in Rye, New Hampshire.

194.    On or about November 6, 1998, defendant Kozlowski obtained in excess of $8,000,000 from Tyco for "GW NJ Sports Partnership."

195.    According to an August 8, 2002 article in the *Union-Leader*, Kozlowski used Tyco funds to pursue his personal passion for sailing.

> The blurring of lines between Tyco's interests and Mr. Kozlowski's extended to one of Mr. Kozlowski's favorite hobbies. To compete effectively in round-the-world yacht races that cost millions, Tyco hired Michael Castania, an Australian yachting expert, and installed him in an office in Boca Raton. Mr. Castania helped lead Team Tyco to a fourth-place finish in the prestigious Volvo Challenge race in June. Mr. Castania also assisted with construction of an aluminum-hulled sailboat that Mr. Kozlowski was having built in Connecticut.
>
> Mr. Castania defends the Team Tyco project, saying it helped bring together employees of the global company, as Tyco would host events for workers in various overseas locations as the race came into harbor. As for Mr. Kozlowski's new boat, Mr. Castania says he was involved "only on a consulting basis," but declines to provide further details. Mr. Castania says he joined Tyco as a full-time employee in 1996. The person close to Mr. Kozlowski says the former Tyco chief paid a portion of Mr. Castania's salary and expenses for any personal work he did.

196.    In January 2002, Kozlowski expensed the $700,000 cost of a personal investment in the film "Endurance," produced by White Mountain Films, to Tyco.

197.    Kozlowski donated to the Nantucket Conservation Foundation, Inc. a total of $1,300,000 in Company money. The donation was used partially to purchase 60 acres of property called "Squam Swamp" adjacent to Kozlowski's own Nantucket estate on Squam Road. The effect of this gift was to preclude future development of the land and thereby increase the value of Kozlowski's home.

198.    Kozlowski also used Tyco corporate aircraft for personal use at little to no cost.

**C.    Swartz's Personal Financial Gain**

199.    In 1995, Swartz sold his New Hampshire real estate to a Tyco subsidiary for $305,000. When Tyco sold that property to a third party in early 1997, Tyco obtained a far lower price for it than the Company had paid to Swartz earlier.

200.     Swartz borrowed more than $32,000,000 under the RLP. With those funds, he purchased a $6,500,000 apartment on New York City's Upper East Side and a $17,000,000 waterfront compound in Boca Raton. Swartz used the remaining $9,000,000 for purposes that were not authorized by the RLP, including the purchase of a yacht and the funding of real estate investments.

201.     According to Tyco's 8-K, dated September 10, 2002, Swartz used the RLP to purchase two properties: one at 24 Straw's Points Road, Rye, New Hampshire and another in the Trump International Hotel and Tower Condominium, 1 Central Park West, New York. Swartz's New Hampshire purchase did not qualify for an RLP. The purchase price of Swartz's New York apartment exceeded the maximum amount Swartz was authorized to borrow under the RLP, and he used relocation loans to finance 100% of the purchase price, which was not permitted under the approved RLP. Swartz's New York loan also violated the RLP because Swartz did not make that property his principal residence.

202.     Swartz initially funded the purchase of his Trump Tower apartment under the KELP and subsequently reclassified the entire amount to the RLP.

203.     Between 1997 and 2002, Swartz took an aggregate of approximately $85,000,000 dollars from Tyco that he charged as KELP loans — even though he only used approximately $13,000,000 worth of those funds to cover taxes due from the vesting of his Tyco stock.

204.     Swartz improperly took and used the remaining $72,000,000 of KELP loans — or roughly eighty-five percent — for impermissible and unauthorized purposes. For example, Swartz funded millions of dollars of his personal investments, business ventures, real estate holdings, and trusts.

205.     On or about April 19, 1999, Swartz obtained in excess of $620,000 through the KELP for the "Highland Beach Project."

206.    On or about July 2, 1999, Swartz obtained $1,000,000 through the KELP for "Sirios Capital Partners II."

207.    On or about July 19, 1999, Swartz obtained $500,000 through the KELP for "KMS Family 1999 Trust."

208.    Swartz also received numerous perquisites from Tyco that he knew, or was reckless or grossly negligent in not knowing, were not disclosed to investors.  In April, 2000, for example, Swartz caused Tyco to purchase an apartment at 30 E. 85th Street, New York in Swartz's name.  Swartz then moved into the apartment and lived there rent-free — a perquisite worth in excess of $18,000 a month.  Swartz also used Tyco's corporate aircraft for his own personal use at little to no cost.  Swartz knew this was not disclosed to investors as required.

209.    On May 6, 2002, Swartz caused Tyco to enter a notation in its books and records purporting to transfer title to the Tyco-owned apartment at 30 E. 85th Street, New York apartment, in which Swartz lived, including fixtures and furniture, to himself at its depreciated book value of $9,646,975, which Swartz paid in cash.  No appraisal was performed in connection with this transfer.  The transaction was not authorized.  On July 18, 2002, after Kozlowski had resigned, Swartz agreed to reverse that transaction.  Title to the apartment was never conveyed to Swartz, and Tyco continues to hold title to the apartment.  Swartz's KELP account has been credited $9,646,975 to reflect this reversal.

210.    In or about September, 2000, Swartz obtained $12,700 through the KELP, ostensibly for "K. McRae salary."

211.    In or about September 2000, Kozlowski and Swartz authorized a Tyco book entry forgiving loans previously booked as RLP loans to defendant Swartz in excess of $9,700,000.

212.    In or about September 2000, Kozlowski and Swartz authorized Tyco funds to be used to pay "gross-up" taxes in excess of $6,800,000 on the forgiveness of RLP loans to defendant Swartz.

213.    In 2000, Swartz received 74,000 shares of Tyco common stock, a cash bonus of $350,000, and $8,000,000 in RLP loan forgiveness.

214.    On or about March 1, 2001, Swartz caused $1,200,000 in Tyco funds to be wired to an account of KMS Family Partnership, controlled by Swartz.

215.    Swartz caused Tyco to pay him a reimbursement of $1.2 million to cover lost deposits on personal real estate transactions involving apartments in Trump Tower on 5th Avenue in New York.

### D.    Belnick's Personal Financial Gain

216.    Belnick was hired as Tyco's Chief Corporate Counsel in August 1998.  Kozlowski sent Belnick a letter confirming their agreement concerning employment and compensation.  The letter described Belnick's cash compensation as "a base salary of $700,000 per year; a sign-on bonus of $300,000; a guarantee cash bonus of $1,500,000 the first year; $1,000,000 the second year; and $1,000,000 the third year, with his first bonus payable with the fiscal year end September 30, 1999."  The letter also gave Belnick 100,000 restricted Tyco shares, vesting over three years, and 500,000 options, also vesting over three years.

217.    Kozlowski submitted this letter to Tyco's Human Resources department as the actual agreement of the parties.  In fact, Kozlowski and Belnick had agreed to additional terms that tied Belnick's compensation to Kozlowski's compensation, thereby giving Belnick an incentive to aid and facilitate Kozlowski's improper diversion of Company funds to Kozlowski's personal benefit.  The terms of Kozlowski's and Belnick's agreement were incorporated in a letter also dated August 19, 1998 and signed by Kozlowski.  Belnick kept a copy of the agreement in his personal office.  Belnick's agreement with

Kozlowski included a provision that Belnick's bonus would not be less than one third of Kozlowski's bonus.

A second version also included two additional paragraphs, which provided:

> You will also be entitled to participate in and benefit from (proportionate to your position) all existing and future benefit plans and programs that are available for senior executive officers of the Company. Accordingly, among other benefits, you will be entitled to participation in Tyco's relocation program to New York City, participation in the Company's 401(k) Plan, the use of a car and either a Company loan or a re-load of restricted shares in connection with your tax liability on the same of previously restricted shares.
> If for any reason the relationship does not work out to your or the Company's satisfaction and you leave the Company prior to September 30, 2001, the Company will pay you until then your base salary and guaranteed cash bonuses, less the sign-on bonus, (regardless of your income or earnings from other employment). You would also retain in full the sign-on bonus, restricted shares (whether or not still restricted) and your stock options.

218.   Tyco's proxy statement for fiscal 2000 did not disclose Belnick's compensation.  In order to avoid disclosing his compensation, Belnick caused $1 million of his $2 million guaranteed bonus to be characterized as a special bonus, purportedly relating to a transaction with TyCom.   As a result of this reclassification, $3 million of Belnick's bonuses was considered non-recurring and was thus excluded from the computation of Tyco's four highest paid executives, dropping Belnick out of that category.

219.   Belnick's actual compensation in 2000 was as follows: $750,000 base salary; $2,000,000 guaranteed bonus (though $1,000,000 was re-classified as a "special bonus"); $2,000,000 in another "special bonus"; $231,445 in loan interest forgiveness; $197,485 in gross-up payments to compensate for taxes on the imputed income from his loan interest forgiveness; $6,035,803 in restricted stock vesting, and new options to purchase 200,000 shares of stock; total compensation (after adjustments for deferred compensation and other matters, but excluding unexercised stock options): $10,442,331.

220.    Belnick was also given 100,000 restricted shares of stock, with 50,000 shares vesting on September 30, 2000 and 50,000 shares vesting on September 30, 2001.

221.    Belnick also received an additional cash bonus of $2 million, separate from and in addition to his agreed upon bonus (which Belnick now claimed was $2 million); along with an additional grant of 200,000 shares of restricted stock, all vesting one year later.

222.    Belnick's actual compensation in 2001 was as follows: $762,500 base salary; $50,000 in an undefined "special bonus"; $300,010 in loan interest forgiveness; $255,420 in gross-up payments to compensate for taxes on the imputed income from his loan interest forgiveness; $15,592,042 in restricted stock vesting; and more options to purchase 200,000 shares of stock; total compensation (after adjustments for deferred compensation and other matters, but excluding unexercised options): $16,973,344.

223.    For years prior to his employment at Tyco, Belnick maintained his professional office in midtown Manhattan — only blocks from Tyco's headquarters at the time. When Belnick joined Tyco he demanded and received a RLP loan of approximately $4 million to "relocate" to New York City — even though he was ineligible for the plan because he had not previously worked for Tyco (let alone worked for Tyco's New Hampshire headquarters, as required by the terms of the plan) and already owned a house at 103 Pleasant Ridge Road, Harrison, New York, a suburb just outside of New York City. Belnick used the loan to buy and renovate a new apartment at 300 Central Park West in Manhattan.  This transaction was not disclosed to investors.

224.    Belnick also used the RLP to pay his rent for several months while his new apartment was being renovated.

225.     Belnick borrowed an additional $10,418,599 to purchase land and build a residence at 3468 West Crest Court, Park City, Utah.   Belnick also already owned a property in Utah worth approximately $2 million.  Belnick then charged Tyco $1,600 per month for his home office located in that house. Tyco maintains no corporate offices in Utah, and Tyco did not request Belnick to relocate to Utah. A trust agreement, not a mortgage, was recorded on the property to secure the loans made by Tyco.  In addition, Belnick executed none of the documents required by the RLP.  In short, this indebtedness was not incurred through an authorized employee relocation plan available generally to all salaried employees, and as such was not exempt from disclosure in Tyco's proxy.  There was no colorable benefit to Tyco for any of Belnick's loans.

226.     In addition to Belnick's regular salary, Belnick received cash bonuses in the amounts of $1.5 million in 1999 and $4 million in 2000.  Kozlowski also made three large awards of restricted shares to Belnick, one award of 200,000 shares in 1998 upon his arrival and two awards in the year 2000 (the first for 100,000 shares, the other for 200,000 shares), for a total of 500,000 shares in less than three years.

227.     The vesting of those restricted shares, and Belnick's immediate resale thereof, permitted him to realize income in the amounts of more than $7 million in 1999; $11 million in 2000; and $16 million in 2001.  In addition, Belnick took unauthorized RLP loans exceeding $14 million in value.

**E.     Tyco's  Former Board Knew or Acted Recklessly Or In
       Gross Negligence In Ignoring The   Facts of Kozlowski, Swartz,
       and Belnick's Wrongful Financial Gain**

228.     According to a September 24, 2002 *Associated Press* article, the Compensation Committee was aware of Belnick's relocation loan and others.  Belnick's $14.9 million loans, an $18.8 million loan to Kozlowski and a $7 million loan to Swartz, were listed among the RLP loans disclosed to

the Compensation Committee on the February 21, 2002 minutes. Foss, Pasman, and Slusser were present at that meeting in Bermuda. Also at that meeting, the Compensation Committee approved Belnick's compensation.

229.    As the *Associated Press* reported, Patricia Prue was asked by Berman to improperly doctor the February 21, 2002, minutes to remove the Board's approval of Belnick's compensation. She refused, and memorialized the incident in a June 7, 2002 memo to Swartz and Fort (then acting CEO). That memo said, in relevant part:

> As you know, I plan as always to assist you and the board with whatever request you have in conjunction with my role as head of human resources . . . However, as a result of the fact that I was recently pressured by Josh Berman to engage in conduct which I regarded as dishonest -- and which I refused to do -- I will decline to have any personal contact with him in the future. In addition, I ask that Josh not go to my staff with any requests for information or directions. [Emphasis added.]

230.    Patricia Prue, who was a beneficiary of some improper benefits, has been granted immunity from prosecution and has testified before a grand jury on behalf of the prosecution.

231.    On January 9, 2003, according to the January 10, 2003 *Union-Leader*, Belnick's attorney argued that the former Board knew of Belnick's loans. Belnick specifically claimed, through his lawyer Reid Weingarten, that the Compensation Committee knew of the RLP loans.

232.    Dartmouth Business School's Dean criticized the former Board in an August 9, 2002 article in the *Union-Leader*:

> The amounts and frequency of riches that Tyco International bestowed on its former chief executive officer should have raised red flags for the company's board of directors, the dean of the Tuck School of Business at Dartmouth said yesterday.
>
> And allegations that L. Dennis Kozlowski personally enriched himself at Tyco's expense raise serious questions about the Tyco board's oversight

of management, said Dean Paul Danos, who is the Laurence F. Whittemore professor of business administration at Tuck. The allegations were first reported in the Wall Street Journal on Wednesday.

"From what I've read, we're talking about a quarter to a half a billion dollars over a period of years," he said. "You would think that would be raising red flags in every possible way."

* * *

"If all of this is true," Danos said, "it seems to me that the board was not making independent judgments on this stuff. It seemed to me that they must have been either rubber-stamping or being extremely liberal in the way they allowed compensation to be doled out.

"Where was their independent evaluation. . . in determining that all of this was justified?" he asked.

"What was the board thinking in allowing all of these ways of aggrandizing this person as the person got more and more benefits, like art and ships and various kinds of entertainment and housing and moving expenses and forgiveness of loans?" Danos said. "It's a lot of stuff, in addition to, I'm sure, a very high salary and stock options. The question is, who were the people making all the decisions about all those payments?"

Normally, he said, corporate boards of directors set up a committee to independently review compensation.

* * *

But the magnitude of the numbers at Tyco and the frequency of the occurrences call attention to themselves, he said.

"When you see this much and no explanations to explain every one of them, it seems to point to a pretty strong case of corporate wrongdoing," Danos said.  [emphasis added.]

233.    Corporate governance expert Paul Lapides faulted the  former Board for failing to oversee

the Kozlowski management team, in a September 18, 2002 *Union Leader* article:

Paul Lapides, a corporate governance expert at Kennesaw State University in Georgia, said the unauthorized spending should have been

<u>caught by board members years ago</u> and he expects the company's management shakeup to continue.  (Emphasis added.)

234.    Institutional investors have also criticized  the former Board according to the October 6, 2002 issue of the *Union-Leader*:

> Sherwood Small, president of Boston Private Value Investors Inc., said corporate boards are in bad need of reform, with some people sitting on too many boards of directors.
>
> * * *
>
> As for the Tyco board of directors, which intentionally or unintentionally failed to catch Kozlowski's spending habits, Small said, "It's a real strange board."

235.    At the October 1, 2001 Compensation Committee meeting, Kozlowski and Swartz received approval for the TyCom Bonus.  By this time, the gain on the Flag Telecom transaction had become an unrealized loss – significantly in excess of the June 20 gain – yet the Compensation Committee awarded the Tycom Bonus "in conjunction with the gain on the sale of TyCom shares."

236.    Floyd Norris, writing for *The New York Times,* questioned how the former Board could possibly have approved the Tycom Bonus in ignorance (as they now claim) that profits from the Flag Telecom transaction were an illusion:

> <u>But if the board did not know of Flag's problems by then, it evidently was not paying much attention</u>. For those problems had had a significant and well publicized effect on TyCom. On Aug. 6, Flag announced it was unable to raise money to pay for the Pacific cable it had hired TyCom to install, and TyCom said it would go ahead with the project on its own. Flag stock was down to $2.63 and Jack B. Grubman, the Salomon Smith Barney analyst who had been a strong supporter of Flag, removed his buy recommendation.
>
> * * *

> In the end, Flag went bankrupt and Tyco wrote off its entire investment,
> which it valued at $114 million-- a value of $7.60 per share of Flag stock.
> But Flag shares were worth only $4.61 on June 20, when the deal was
> announced, and $4.96 on the day it closed. Had either of those values
> been used, Tyco's reported profits would have been far lower.
>
> The deal was a fiasco for Tyco. Flag shares would never again trade for
> as much as $6 a share, and yesterday, with the company in bankruptcy
> proceedings that are expected to end with the shares worthless, they
> closed at two-tenths of a penny. (Emphasis added)

237.    All of the forgiveness benefits given in 2000 were individually reported on separate Form W-2s. Kozlowski's confidants, personnel in the Human Resources department, and the Internal Revenue Service all knew that, in calendar year 2000 alone, Kozlowski's W-2 income was a whopping $137,491,353.39.

238.    Despite these knowing, reckless or grossly negligent derelictions of duty, neither the former Board, the current Board or the interim Board serving between July 2002 and March 6, 2003 has pursued claims against the former Board, despite the fact that this action was brought against them in June 2002 and class and ERISA actions were commenced even earlier.

## IX.    FORMER BOARD'S AUDIT COMMITTEE'S DEROGATION OF ITS RESPONSIBILITIES

239.    Since before 1999, Tyco has maintained a standing audit committee of board members (the "Audit Committee"). In 1999 the Audit Committee consisted of Pasman, Fort and Bodman. In 2000 and 2001, the Audit Committee comprised defendants Bodman, Fort, and Lane. In 2002, the Audit Committee included defendants Bodman and Lane.

240.    As reported in Tyco's annual reports, the Audit Committee's Charter specifically charges the Audit Committee with the following responsibilities:

Management is responsible for Tyco's internal controls, financial reporting process and compliance with laws and regulations and ethical business standards. The independent accounts are responsible for performing an independent audit of Tyco's consolidated financial statements in accordance with generally accepted auditing standards and to issue a report thereon. The Committee's responsibility is to monitor and oversee these processes.

241.    From 1999 through 2001, the Audit Committee purportedly met and held discussions with management in the exercise of its oversight responsibility.

242.    All of the defendants, especially defendants Bodman, Fort, Pasman, and Lane, knew or were grossly negligent in not knowing about the multi-million dollar loans, payments, and kickbacks to the Board.

243.    In addition to information learned through personal involvement, defendants were questioned about the loan practices and payments. For example, PwC spokesman David Nestor stated in a *New York Times* article dated January 3, 2003, "We did not know that the disclosure was wrong. We raised questions about it, went to the company and were told that the disclosure was appropriate." [Emphasis added.]

244.    As outlined above, there were multiple red flags warning the defendants of wrongful accounting practices that were ignored, including the Audit Committee. These include, without limitation, the facts that:

(a)    Kozlowski, Swartz, and Walsh were direct beneficiaries of the fraudulent schemes and certainly knew the accounting was improper;

(b)    The existence of the loans was brought to the attention of the Compensation Committee by Belnick;

(c)    Accounting issues concerning the illicit loans were raised by PwC representatives;

(d)      Kozlowski improperly borrowed approximately $29,756,000 in non-qualifying relocation loans to purchase land and construct a home in Boca Raton, Florida during the years 1997 to 2000;

(e)      Kozlowski improperly borrowed approximately $7,012,000 in non-qualifying interest-free Company loans to purchase from Tyco a $7 million Tyco-owned apartment at 610 Park Avenue, New York City in 2000, at depreciated book value and without appraisals, which Kozlowski deeded to his ex-wife a few months later;

(f)      Kozlowski improperly rented an apartment at 817 Fifth Avenue, New York City, with an annual rent of $264,000 paid for by the Company, from 1997 to 2001;

(g)      Kozlowski improperly sold his house at 10 Runnymede, North Hampton, New Hampshire to the Company in 2000 without appraisals for an amount approximately three times its market value; less than 24 months later, Tyco wrote down this asset by approximately $3 million;

(h)      Kozlowski improperly caused Tyco to purchase a second apartment for his use (with Kozlowski as nominee owner) at 950 Fifth Avenue, New York in 2001 for $16.8 million, and then caused Tyco to spend $3 million in improvements and $11 million in furnishings for that apartment;

(i)      Kozlowski improperly received "gross-up" benefits to avoid having to pay any state income tax liability incurred after relocating to New York;

(j)      Kozlowski improperly caused Tyco to pay for luxury hotel accommodations for his personal use, in London at a cost of approximately $110,000 for 13 days;

(k)      Kozlowski improperly caused Tyco to employ his personal assistant in London and provide her with an apartment, maintenance expenses, and other benefits from May 2001 to July 2002;

(l)      Swartz improperly used $7,668,750 in interest-free Company loans to finance 100% of the purchase price of two properties: one at 24 Straw's Points Road, Rye, New Hampshire and another in the Trump International Hotel and Tower Condominium, 1 Central Park West, New York;

(m)      Swartz improperly used $20,992,000 in interest-free Company loans under an unauthorized Florida RLP;

(n)      Swartz improperly used $4,437,175 in interest-free Company loans for the acquisition of other properties that were not authorized by any relocation program;

(o)      Belnick improperly used $4,217,000 of interest-free Company loans from September 1998 through May 2001 for the purchase and improvement of a cooperative apartment in New York City at 300 Central Park West;

(p)      Belnick improperly caused the Company to pay his rent for several months while his new apartment was being renovated;

(q)      Belnick improperly borrowed $10,418,599 in interest-free loans, from 2001 through March 2002, to purchase land and renovate a $10 million ski chalet at 3468 West Crest Court, Park City, Utah (although he already owned a $2 million home in Utah);

(r)      Belnick improperly charged Tyco $1,600 per month for his home office located in the Utah ski chalet;

(s)      Walsh improperly received a $20 million fee ($10 million of which went to Walsh with the balance going to a charity of which Walsh is trustee) for making introductions which led to a Tyco acquisition in June 2001; and

(t)      The use of Tyco assets (principally cash) to fraudulently enrich Kozlowski, Swartz, Belnick and Walsh was known, or recklessly or grossly negligently disregarded by the Audit Committee,

to have been concealed in the Company's financial statements through misclassifications and improper financial reporting.

245.    The members of the Audit Committee violated fiduciary obligations of due care and loyalty by failing to provide a reasonably prudent investigation and review of the financial accounting presented to them by fellow board members, Tyco management, and/or PwC despite clear warnings of wrongdoing.

## X.    THE FORMER BOARD'S COMPENSATION COMMITTEE'S DEROGATION OF ITS RESPONSIBILITIES

246.    Since before 1999, Tyco's Board of Directors has maintained a standing compensation committee (the "Compensation Committee"). In 1999 and 2000, the Compensation Committee included defendants Foss, Walsh, and Slusser. In 2001, the Compensation Committee consisted of defendants Foss, Slusser, and Pasman.  In 2002, the Compensation Committee consisted of defendants Foss and Slusser.

247.    At a February 21, 2002 meeting, the Compensation Committee reviewed its roles and responsibilities and resolved that:

> . . . the primary responsibilities of the Compensation Committee of the Board of Directors of Tyco International Ltd. Are to recommend for board approval: (1) the overall compensation philosophy of the company (i.e. pay for performance), (2) Board remuneration, (3) compensation, including salary, bonus, equity plan awards, and perquisites for L. Dennis Kozlowski, Mark H. Swartz, all other executive officers, and those senior officers reporting directly to Mr Kozlowski; and (4) any major policy change to the equity or cash compensation plans; and further

> RESOLVED, that appropriate officers of the Company be and they hereby are authorized to take such action as they deem necessary or desirable to carry out the intent of the foregoing resolution.

248.    Further, according to each Tyco's annual reports from 1999 through 2002, the Compensation Committee was specifically charged with administering the KELP and authorizing the loans made.

249.     On February 21, 2002, the Compensation Committee met with Patricia Prue to consider Belnick's retention agreement. Minutes of that meeting state that "Ms. Prue presented a summary of loans outstanding under the company's relocation and Key Employee Loan Programs."

250.     As demonstrated from the Compensation Committee minutes, defendants, especially Foss, Slusser, and Pasman, either knew through active participation in the authorization of the loans  were reckless or grossly negligent in not knowing of the illicit loans but for willful blindness to the issue.

251.     As outlined above, there were numerous red flags warning the defendants of wrongful accounting practices that were ignored by the defendants, including the Compensation Committee. These include, without limitation, the facts that:

(a)     Kozlowski, Swartz, and Walsh were direct beneficiaries of the fraudulent schemes and certainly knew the accounting was improper;

(b)     The existence of the loans were brought to the attention of the Compensation Committee by Belnick;

(c)     Accounting issues concerning the illicit loans were raised by PwC representatives;

(d)     Kozlowski improperly borrowed approximately $29,756,000 in non-qualifying relocation loans to purchase land and construct a home in Boca Raton, Florida during the years 1997 to 2000;

(e)     Kozlowski improperly borrowed approximately $7,012,000 in non-qualifying interest-free Company loans to purchase from Tyco a $7 million Tyco-owned apartment at 610 Park Avenue, New York City in 2000, at depreciated book value and without appraisals, which Kozlowski deeded to his ex-wife a few months later;

(f)      Kozlowski improperly rented an apartment at 817 Fifth Avenue, New York City, with an annual rent of $264,000 paid for by the Company, from 1997 to 2001;

(g)      Kozlowski improperly sold his house at 10 Runnymede, North Hampton, New Hampshire to the Company in 2000 without appraisals for an amount approximately three times its market value; less than 24 months later, Tyco wrote down this asset by approximately $3 million;

(h)      Kozlowski improperly caused Tyco to purchase a second apartment for his use (with Kozlowski as nominee owner) at 950 Fifth Avenue, New York in 2001 for $16.8 million, and then caused Tyco to spend $3 million in improvements and $11 million in furnishings for that apartment;

(i)      Kozlowski improperly received "gross-up" benefits to avoid having to pay any state income tax liability incurred after relocating to New York;

(j)      Kozlowski improperly caused Tyco to pay for luxury hotel accommodations for his personal use, in London at a cost of approximately $110,000 for 13 days;

(k)      Kozlowski improperly caused Tyco to employ his personal assistant in London and provide her with an apartment, maintenance expenses, and other benefits from May 2001 to July 2002;

(l)      Swartz improperly used $7,668,750 in interest-free Company loans to finance 100% of the purchase price of two properties: one at 24 Straw's Points Road, Rye, New Hampshire and another in the Trump International Hotel and Tower Condominium, 1 Central Park West, New York;

(m)      Swartz improperly used $20,992,000 in interest-free Company loans under an unauthorized Florida RLP;

(n)      Swartz improperly used $4,437,175 in interest-free Company loans for the acquisition of other properties that were not authorized by any relocation program;

(o)     Belnick improperly used $4,217,000 of interest- free Company loans from September 1998 through May 2001 for the purchase and improvement of a cooperative apartment in New York City at 300 Central Park West;

(p)     Belnick improperly caused the Company to pay his rent for several months while his new apartment was being renovated;

(q)     Belnick improperly borrowed $10,418,599 in interest-free loans, from 2001 through March 2002, to purchase land and renovate a $10 million ski chalet at 3468 West Crest Court, Park City, Utah (although he already owned a $2 million home in Utah);

(r)     Belnick improperly charged Tyco $1,600 per month for his home office located in the Utah ski chalet;

(s)     Walsh improperly received a $20 million fee ($10 million of which went to Walsh with the balance going to a charity of which Walsh is trustee) for making introductions which led to a Tyco acquisition in June 2001; and

(t)     The use of Tyco assets (principally cash) to fraudulently enrich Kozlowski, Swartz, Belnick and Walsh was known, or recklessly or grossly negligently disregarded by the Compensation Committee, to have been concealed in the Company's financial statements through misclassifications and improper financial reporting.

252.    The members of the Compensation Committee violated fiduciary obligations of due care and loyalty by failing to provide a reasonably prudent investigation and review of the compensation being paid to fellow board members, and Tyco management, despite plain indications of wrongdoing and improper compensation.

## XI.   FALSE ACCOUNTING TO HIDE BONUSES

253.    According to another *Wall Street Journal* article, published on September 30, 2002, the

TyCom Bonus was hidden by falsifying Tyco's accounting:

> Typically, accounting experts say, employee bonuses are accounted for as part of general and administrative expenses. But Tyco's filing says the TyCom bonus was booked in three different accounts totaling $97.4 million -- a slightly larger figure than the bonus payments, which Tyco didn't explain. About $44.6 million of the total was booked as part of the TyCom offering expense, which some accounting experts said was incorrect but at least resulted in a similar bottom-line effect as the proper accounting treatment.

> The other $52.8 million, however, doesn't appear to have been counted as an expense at all, according to three accounting experts who reviewed Tyco's filing. Instead, Tyco seems to have hidden the sum in two different reserve accounts that had been previously established on the balance sheet for unrelated purposes. The majority of the money, $41 million, was booked against "Accrued Federal Income Tax," the filing says, in effect reducing sums that Tyco had put aside to pay its federal corporate taxes.

> "This looks like blatant misstatement of both the income statement and the balance sheet," said Charles Mulford, an accounting professor at Georgia Institute of Technology in Atlanta, who reviewed the Tyco report but isn't involved in the case. Based on the filing, Mr. Mulford said the maneuver appears to have improperly inflated Tyco's pretax income by $52.8 million in the period, the fourth quarter of fiscal 2000. For that quarter, Tyco reported net income of $1.1 billion before the TyCom gain.

> Mr. Mulford called dipping into the income-tax kitty particularly "egregious," and said "it would be very surprising if it wasn't picked up by the auditors."

> Lynn Turner, a former chief accountant at the Securities and Exchange Commission who also reviewed the filing, went even further, saying "this is called fraud." [Emphasis added.]

70

254.    Kozlowski, Swartz and possibly others, directed management to falsify Tyco's books and records to bury their personal gain from the TyCom bonus by offsetting the cost of the relocation loan forgiveness program against the gain from an unrelated initial public offering of TyCom.

255.    In addition, Kozlowski and Swartz directed others to falsify Tyco's books and records to bury their compensation from the ADT Automotive bonus by offsetting the costs of the December 2000 program against the gain related to that transaction.

256.    In June, 2001, Kozlowski and Swartz once again directed others to falsify Tyco's books and records to bury their participation in the June 2001 Flag Telecom bonus by offsetting the cost against the claimed gain on the Flag Telecom transaction.

## XII.    FALSE ACCOUNTING IN THE ADT UNIT

257.    The *Wall Street Journal* reported on November 15, 2002, that ADT's accounting was improper.  After Tyco acquired the ADT, it began pressing ADT's network of dealers to go into very poor crime-ridden neighborhoods, sometimes exaggerating the crime rates, and make high-pressure sales at no-money-down to homeowners who were unlikely to continue making payments.  The article further noted:

> Many ADT customers, predictably, did stop paying or failed to renew their service contracts. And now the issue of whether Tyco accounted for cancelled alarm contracts as if they were valuable assets could come back to haunt the troubled company. An internal investigation under way at Tyco has undercovered dubious accounting practices at ADT, including the way the unit handled cancelled accounts, according to people familiar with the situation. Investigators are still looking into whether the problems will require a restatement of past financial results, but one person close to the probe says the bookkeeping issues at ADT are the most severe discovered at any Tyco unit. [Emphasis added.]

258.     According to the *Wall Street Journal* article, Tyco created financial incentives to make these sales without regard to whether customers stopped paying.  These customers were of measurably poor credit-worthiness, and non-payments skyrocketed.  The article stated:

> Eight months ago, Mr. Swartz, then Tyco's chief financial officer, justified the way Tyco wrote off cancelled alarms by telling investors the attrition rate for such customers was a low 8.5%. But now, ADT officials say the actual attrition rate has been about 14% for several years. Mr. Swartz's figure was at odds with internal calculations, they say. The officials defend the way Tyco has written off cancelled contracts as proper. [Emphasis added.]

259.     On or about October 25, 2002, Tyco restated ADT's results from the first three quarters of 2002, saying that some income had been incorrectly recognized upfront instead of over 10 years.

260.     The accounting change added $135 million to the unit's pretax loss for the year 2002, with $90 million of that reflected in the restatement for the first three quarters.

261.     On June 11, 2002, Tyco fired Belnick.  As reported in the June 22, 2002 *Wall Street Journal*, his then-lawyer Stanley Arkin called the termination an "opportunistic assault" by Berman and an "entrenched faction" of the former Board, who were trying "to protect their undeserved entitlements and prerogatives."  Firing Belnick, Arkin said, would enable the Berman faction to "take control of Tyco's ongoing legal business."  Indeed, a June 4, 2003 *Wall Street Journal* article noted Berman's displeasure with Belnick's decision to farm out work to four firms other than Berman's.

262.     On June 13, 2002, Tyco further expanded the scope of the Boies Firm's work to include "the use of company funds" and "the Company's accounting and disclosures."

263.     On June 17, 2002, Tyco filed a civil complaint in the United States District Court for the Southern District of New York against Walsh alleging breach of fiduciary duty, inducing breaches of fiduciary duty, and related wrongful conduct involving the $20 million payments made to him and on his

behalf during the time he served as a director without authorization by the Company, as required by law. Tyco also filed a separate action against Belnick, to recover certain payments. Belnick is presently arguing, consistent with his position in parallel litigation, that the former Board was aware of the payments.

264.   On June 26, 2002, Kozlowski was indicted for evidence tampering for allegedly removing a key invoice from his production to New York prosecutors investigating him for sales tax evasion.

265.   On August 1, 2002, the former Board agreed to pay Swartz $44.8 million in severance and agreed not to sue him for return of the money. The deal was approved by Foss and Slusser. As reported in the *New York Times* on September 24, 2002, Tyco's reason for according Swartz this treatment was his cooperation with the investigation. Prosecutors were outraged, however:

> "<u>To make a cash settlement of $44 million plus stock to somebody known to be under criminal investigation is highly questionable</u>," Mr. Morgenthau said. "It is also inconsistent with what the company did with Kozlowski -- they are not paying him anything. Kozlowski and Swartz were 2-to-1 partners on all deals, so why is Swartz being treated differently?"
>
> He was referring to the routine arrangement at Tyco in which Mr. Kozlowski got bonuses or other remuneration twice as large as Mr. Swartz's. (Emphasis added)

266.   According to an August 8, 2002 *Wall Street Journal* article, the New Hampshire Bureau of Securities served a subpoena on Tyco on August 1, 2002, investigating "the conduct of the company under" Kozlowski. Tyco quickly settled with New Hampshire, agreeing to pay $5 million.

267.   On August 2, 2002, Tyco hired Professor Michael Useem to advise on corporate governance. Tyco also announced the retirement of Irving Gutin, who had replaced Belnick as interim General Counsel. Remarkably, Gutin was a recipient under the TyCom Bonus scheme.

268.   Tyco also announced the appointment of Krol, former Chairman and CEO of E. I. DuPont, to the Board. Also, as previously reported in Tyco's Quarterly Report Form 10-Q for the period ended

June 30, 2002, Tyco announced the appointment on August 6, 2002 of Eric M. Pillmore as Senior Vice

President of Corporate Governance.

269.    Ashcroft and Pasman resigned on November 19, 2002 and were replaced by York and

McDonald.

## XIII.    THE FORMER BOARD'S ATTEMPTS TO PROTECT THEMSELVES

270.    In the summer of 2002, Tyco floated a plan to expand its board with four new independent

directors:

> Tyco International Ltd. wants to increase the size of its board of directors
> from 11 to 15 members and plans to hold a special shareholder meeting
> Sept. 5 to vote on the proposal.
>
> The company said one of the new positions will be filled by the new chief
> executive officer after that person is named. The remaining positions will
> be filled by independent directors chosen by the current board members.

271.    The *Wall Street Journal* reported on August 7, 2002, that, under pressure, Tyco had

abandoned its planned expansion of the Board of Directors:

272.    On September 12, 2002, the *Wall Street Journal* reported that, while Ashcroft recognized

the need for all Kozlowski-era directors to resign, others wanted to retain their jobs, including Lane.

273.    Meanwhile, Tyco deliberated on firing Patricia Prue, drawing the ire of prosecutors who

were concerned that firing her would have a chilling effect on cooperative witnesses.  These efforts were

unsuccessful.  Prue has since been replaced, and her replacement was named on December 11, 2002.

274.    The *Associated Press* reported on September 24, 2002, that the copy of the February

21, 2002 Compensation Committee minutes provided to it (presumably by Tyco) did not have the $18.8

million loan to Kozlowski or the $7 million loan to Swartz -- these entries had been removed from the

minutes.

74

275.     On or about September 12, 2002, the Board voted to replace all Kozlowski-era directors. The vote was contested, coming down 8-3 in favor of mass resignation. Lane, Foss, and Bodman voted to keep their jobs.

276.     Together with Lane, Bodman then retained Weil Gotshal & Manges attorney, Ira Millstein, to save his and Ashcroft's seats, according to a November 6, 2002 *Wall Street Journal* article:

> The compromise, reached after tense discussions between Mr. Millstein and David Boies, the outside lawyer who is leading Tyco's internal investigation, calls for Richard Bodman, a director who is one of Mr. Millstein's clients, and another director who isn't, Michael Ashcroft, to remain on the Tyco board.
>
> Mr. Millstein is said to have first asked that four old directors remain . . .

* * *

> Mr. Millstein says his argument for "continuity" is supported by a soon-to-be-issued report from a panel -- that he co-chairs -- of the National Association of Corporate Directors ["NACD"] that concludes that "in times of crisis, it is a good idea for directors to stay with the ship."

277.     The NACD, however, immediately disavowed Millstein's interpretation, according to the same *Wall Street Journal* article:

> An official of the NACD declines to comment because Mr. Millstein sits on the organization's board. But Charles Elson, director of the Center for Corporate Governance at the University of Delaware's business school, says he was on a prior NACD commission that wrote the rules on continuity. "Our definition of continuity and this situation aren't in sync," says Mr. Elson, who supports new directors for Tyco. "This rule was never written for a disaster like Tyco."

278.     This plan to preserve two Kozlowski-era directors was almost immediately abandoned, however, after the New Hampshire Bureau of Securities said the plan was contrary to its $5 million dollar settlement with Tyco. Nevertheless, Tyco's Form 10-Q for the quarter ending March 31, 2003, filed with

the SEC on May 15, 2003, states that Tyco's new executives will depending in part on advisors **including certain former directors.**"  (Emphasis added)

## XIV.   VIOLATIONS OF SECTION 84 OF THE BERMUDA COMPANIES ACT OF 1981 BY THE FORMER BOARD

279.     In accordance with Section 84 of the Bermuda Companies Act of 1981 ("Section 84"), Tyco's directors are required to approve the audited consolidated financial statements of Tyco. According to the Annual Reports from 1999-2001, it was reported that the financial statements were approved by the former Board of Tyco.

280.     The former Board breached its fiduciary duty of due care and prudence by signing off on financial statements under Section 84 even though the financial statements failed to account for hundreds of millions in loans, payments, and kickbacks and combined material accounting errors and irregularities that defendants either knew or were reckless or grossly negligent in not knowing.  The current Board has breached and is continuing to breach its fiduciary duties by failing to seek recovery from the former Board for such breaches of duty and violations of Section 84.

## XV.   VIOLATIONS OF SECTION 96 OF THE COMPANIES ACT 1981 OF BERMUDA

281.     Section 96(1) of the Companies Act 1981 of Bermuda ("Section 96(1)") sets forth the procedure under which loans may be made to directors of a Bermudan company. For loans to be validly issued to directors of a company, there must be consent of not less than nine-tenths of the total voting rights. The loans given to Tyco's directors were not made in accordance with Section 96(1) as there was never a shareholder vote on whether or not to permit Tyco to make such loans.

282.     The former Board failed to exercise care, diligence, and skill that a reasonably prudent person would exercise in preventing the loans  to be made. Despite knowing about the existence of such

loans and that they were invalid under Bermuda law, including Section 96(1), the former Board took no steps to prevent such loans from continuing and the current Board has failed to seek redress from the former Board for such wrongdoing.

## XVI.  DAMAGES TO TYCO CAUSED BY THE FORMER BOARD'S CONDUCT, CAUSATION OF ULTRA VIRES ACT AND THE AFTERMATH

283.    The SEC has opened an investigation into Kozlowski's conduct and has reportedly reopened an investigation of Tyco's accounting, including the use of reserves and other bookkeeping strategies to boost financial results following its acquisition binge, thereby exposing Tyco to expenses, losses and damages.  Allegations of accounting fraud and violations of the federal securities laws have also been asserted in class action lawsuits pending in the United States District Courts, thereby exposing Tyco to additional liability and expenses.

284.    The  former Board's gross mismanagement, breaches of fiduciary duty, equitable fraud and waste of corporate assets has exposed Tyco to class action lawsuits by shareholders alleging violations of the federal securities laws, including accounting improprieties, an SEC investigation which presents a serious threat that Tyco will be required to restate prior financial periods, possible indictment by the Manhattan District Attorney's Office for income tax evasion and keeping false books and records, and a reduction in Tyco's credit rating to junk status by Moody's Investors Service, Inc.

285.    The  former Board engaged in a course of conduct that constituted equitable fraud, corporate waste and breaches of fiduciary duty by acquiescing in and/or permitting the Criminal Defendants and other Tyco executives to use Tyco's funds for their own personal purposes, by misrepresenting to Tyco's shareholders the manner in which the RLP was being used and the extent of defendant Kozlowski's

compensation and by exposing Tyco to shareholder lawsuits, including suits alleging accounting improprieties, an SEC investigation and possible indictment.

286.    Beyond the looting, the Kozlowski era has left Tyco a damaged company.  Concerns remain about Tyco's accounting for mergers, the overall lack of transparency and accuracy of its accounting, and how much of the apparent success of Tyco under Kozlowski was a mere illusion.  Media analysis and reports concerning Tyco and its future prospects has been bleak and, at times, understandably brutal.  The current Board has failed to seek redress against the former Board for any of these injuries.

287.    In July, 2002, long-time Tyco investment bankers Goldman Sachs declined to issue a rating for Tyco.

288.    Also in July, Tyco held an IPO of CIT, raising $4.6 billion.  It had been expected to fetch from $5 billion to $5.8 billion, but Tyco's troubles reduced interest in the deal.  The spin-off was a fall-back plan, after Tyco's public problems thwarted attempts to sell the unit outright.  Tyco was forced to sell CIT because CIT could only profit if it has access to cheap capital -- something lenders would not extend to Tyco because of the perceived risk.

289.    According to an October 13, 2002 *New York Times* article, Tyco was in danger of violating its lending covenants with J.P. Morgan, which lent Tyco $5.8 billion over varying terms, on the condition that its debt not exceed 52.5% of its total capitalization.  By June 30, 2002, Tyco's debt was at 49% of its capitalization. The *New York Times* predicted that a write-down of $4.8 billion in intangibles would put Tyco in violation of its lending covenants, and that several lenders with equal priority might become nervous and call in non-conforming loans at the same time.  Indeed, as discussed in greater detail below, Tyco's continuing revelations of accounting errors (presently totaling approximately $1.6 billion)

appear to be an attempt to forestall triggering defaults which would occur if Tyco exceeds its debt/capitalization ratio of 52.5%.

290.     Though Tyco denies that its goodwill is impaired, according to an October 25, 2002 *Wall Street Journal* article, Prudential analyst Nicholas Heymann expressed disbelief, telling the *Wall Street Journal* that  "half the goodwill has to be smoke." Mr. Heymann also said the fall in Tyco's margins, while revenues continued to grow, raised further questions about whether Tyco had previously been inflating its margins with fancy acquisition accounting.

291.     The *Wall Street Journal's* allegations of improper accounting at the ADT unit forced Tyco to hire Ernst & Young LLP as auditors to review ADT's practices, and ultimately in October, 2002 to restate ADT's accounting for long-term contracts.

292.     The Boies Firm released  a report, on September 17, 2002 ("Phase 1 of the Boies Firm's work").  This report has been questioned because it excluded reference to the disclosure of Belnick's compensation and  Kozlowski's, Swartz's and Belnick's loans in the February 21, 2002 Compensation Committee minutes, and made no mention of Berman's improper instruction to Patricia Prue to doctor those minutes.

293.     On September 23, 2002, the *New York Times* questioned the reliability of Phase 1 of the Boies Firm's work , over its failure to disclose the Compensation Committee's knowledge of Belnick's loan, and of the Patricia Prue incident:

> . . . [T]he compensation committee minutes and the accusations from the executive, Patricia Prue, Tyco's vice president for human resources, may undermine the credibility of the board and the Boies report, which makes no mention of either.

294.    In its December 13, 2002 issue, the *Wall Street Journal* criticized the Boies "inquiry," which was expected not to resolve acquisition-related accounting issues:

> The way Tyco booked its acquisitions has long been questioned by critics. One concern has centered on so-called spring-loading, in which the acquisitive conglomerate supposedly induced its targets to write off large amounts of assets or suppress sales just ahead of being gobbled up by Tyco, improving Tyco's results after the deals closed. Critics also have questioned whether Tyco was manipulating results through the large one-time charges it recorded after concluding many deals, supposedly to set up reserves for closing factories and the like. The company has long defended its accounting as proper.
>
> It is now clear that Tyco will not voluntarily make any substantial revisions to its past accounting and that this decision has been blessed both by David Boies, the lawyer it hired to conduct an investigation into a fraction of its past transactions, and by auditors from PricewaterhouseCoopers.  (Emphasis added)

## XVII.    PHASE 2 OF THE BOIES FIRM'S WORK AND THE AFTERMATH

### A.    The Purportedly Thorough Review Conducted By The Boies Firm and the Extensive Resources Devoted to Such Review

295.    In July, 2002, when defendant Breen became the Chief Executive Officer of Tyco, the work of the Boies Firm was "expanded to include a review and analysis of, and litigation concerning, selected accounting and corporate governance issues and transactions in addition to the conduct and compensation of senior corporate executives and directors addressed in the September 2002 report." The purported purpose of Phase 2 of the Boies Firm's work, as set forth in Tyco's Form 8-K filed with the SEC on December 30, 2002, was:

> to review Tyco's 1999-2002 reported revenues, profits, cash flow, internal auditing and control procedures, accounting for major acquisitions and reserves, the use of non-recurring charges, the personal use of corporate assets, the use of corporate funds to pay personal expenses, employee loan and loan forgiveness programs, and corporate governance issues, and to advise the Company concerning:

a)  the integrity of the company's financial and the possible existence of systemic or significant fraud, or other improper accounting that would materially adversely affect the Company's reported earnings or cash flow from operations in 2003 or thereafter;

b)  corporate governance issues at the segment level including an examination of the post-acquisition integration of acquired companies;

c)  revenue recognition procedures and practices;

d)  acquisition accounting and reserves;

e)  significant corporate level adjusting journal entries;

f)  unreconciled inter-company transactions, if any, between Tyco International Group, S.A. ("TIGSA") and other Tyco subsidiaries; and

g)  recommendations and conclusions concerning the Company's accounting and corporate governance for the future.

296.    The Form 8-K represented that the Boies Firm was given unfettered access to all of Tyco's records and personnel:

> To maximize the effectiveness of the Boies Firm's work and the likelihood that the Firm would have full and complete access to all information available to the Company, the Company's management and Board did not limit the work of the Boies Firm in connection with its review of Tyco's accounting and corporate governance.  The Boies Firm was given unfettered access to all Company records and personnel, was given unfettered access to the Company's independent outside auditors, had no fixed or limited budget, and was free to, and in fact did, expand the scope of its review when it believed it appropriate to do so.  (Emphasis added)

297.    Under the direction of defendant Breen and the Board, Tyco purportedly engaged in its own efforts to uncover additional accounting and corporate governance problems, as set forth in the Form 8-K:

... without attempting to duplicate the efforts of the Boies Firm, the Company's management undertook additional efforts which identified potential accounting and corporate governance problems and possible solutions to those problems.  <u>Those efforts include additional audits of selected business units by the Company's regular outside auditors and a controllership risk analysis undertaken by the Company's Senior Vice President of Corporate Governance with the assistance of Deloitte & Touche</u>.  (Emphasis added)

298.    As stated in the December 30, 2002 Form 8-K, the Boies Firm was assisted in its work by forensic accountants from Ernst & Young, KPMG, and Urbach, Kahn & Werlin and it had "complete access to all information available to the Company" and was given "unfettered access" to all Company records, Company personnel, and the Company's independent outside auditors.  The Form 8-K emphasized the allegedly thorough, exhaustive nature of the Phase 2 work of the Boies Firm:

> During the months of August through December 2002, approximately 25 lawyers and approximately 100 accountants were engaged in the Phase 2 work of the Boies Firm.  <u>In total, more than 15,000 lawyer hours and about 50,000 accountant hours were devoted to the Boies Firm's Phase 2 review and analysis</u>.  The review team examined documents and interviewed Tyco personnel at more than 45 operating units in 15 states in the United States and in 12 foreign countries.  (Emphasis added)

The accounting investigation and related legal work are estimated to have cost Tyco between $75 and $100 million.

299.    Defendant Breen's publicly stated goal, as set forth in the Form 8-K, was "to make Tyco's corporate governance and accounting practices not just acceptable but consistent with best practices under applicable rules and regulations."  Accordingly, the Form 8-K explained that:

> As part of the review, members of the team were asked to raise for consideration any potential problem they could identify concerning the subjects under review and to identify transactions that presented any potential accounting problem concerning the subjects under review.  Once raised, the potential problems and related transactions were analyzed to determine which of them could be concluded, based

82

on the evidence available, to have been actual errors and what action, if any, should be taken. Where it was concluded that there was no clear error, the issue was further analyzed to consider whether there were recommendations concerning future practices, procedures, or disclosures that were appropriate.

**B.  Boies' Reassurances to the Market That No "Large Fraud" Would Be Uncovered**

300.    On September 25, 2002, during his first conference call since becoming CEO, defendant Breen stated that the forensic review of Tyco's former accounting practices was about 40% complete and, so far, nothing had surfaced that would require additional disclosure. According to an article in the September 26, 2002 *Wall Street Journal*:

> Mr. Breen said an internal accounting probe, using a forensic auditing firm, was now 40% complete and had found no such issues. David Boies, an outside attorney helping oversee the investigation, also told investors <u>the auditors had looked at the major transactions, and "if something in here was serious or material, we would have an indication of it by now</u>." (Emphasis added)

301.    On October 24, 2002, Tyco announced that it restated earnings for its first three fiscal quarters ending June 30, 2002 and suffered a $1.75 billion loss on a one time charge in its fiscal fourth quarter due to an assert writedown for Tyco Telecommunications (formerly TyCom, the Company's undersea fiber-optic cable unit). Tyco also announced that it was extending to 10 years the length of time for recognizing revenue from security-alarm installations by ADT.

302.    It was reported on October 25, 2002 in *The Patriot* when the Boies investigation was about 60% complete, that David Boies stated in a conference call with investors: "<u>I would be very, very surprised if we uncovered a very large fraud at this stage ... we have not found anything at this time that would meaningfully diminish current earnings. The work that we have done thus far, I believe, would have been sufficient to uncover any large fraud that existed there</u>." (Emphasis added) Boies added that any

"material restatement" would be announced promptly, and the company isn't "sitting on anything."

Defendant Breen was reported as stating during the conference call that financing continues to be a "top

priority" at Tyco and he was "fully confident" that the new management would reach a debt-restructuring

agreement "well in advance" of the February maturity of some of Tyco's debt.  He stated that bankers are

treating Tyco like an investment grade company even though some rating agencies classified Tyco's debt

as junk or below investment grade.

303.    Defendant Breen was also reported as stating: "We do intend to establish a capital structure

that merits an investment grade rating."  He dismissed speculation that Tyco would violate its bank

agreements which require a debt-to-capital ratio of under 52.5%, by representing that Tyco had a cash

cushion of $8.5 billion.

304.    Despite the loss announced on October 24, 2002, the price of Tyco stock jumped 11%

or $1.55 per share to $15.49 as a result of the news that the Boies Firm's investigation had not uncovered

any significant items that could affect current or past results.

305.    As reported in *The New York Times* on December 31, 2002, defendant Breen told

investors on December 30, 2002: "I am extremely pleased with our fourth-quarter free cash flow and

revenues, both of which exceeded the revenues we discussed on our September 24 conference call.  Free

cash flow for the quarter came in at $1.3 billion, significantly above our previous estimate [of $800 to $900

million]."  Although defendant Breen attributed the improvement in cash flow to a decrease in the

Company's inventory levels and more aggressive collecting of overdue bills, he did not disclose that on

September 30, 2002, the last day of the quarter, Tyco had sold $350 million in receivables to CIT, a

finance company that Tyco owned until early July.  Under the typical definition of free cash flow, the $350

million sale accounted for about 1/4 of all the cash Tyco brought in during the quarter, but Tyco wanted to move the receivables off its books, thereby buttressing its cash position. Lawrence Kam, an analyst at Sonic Capital, a Boston hedge fund, stated: "My belief is that, under both old and new management, Tyco is engaging in aggressive end-of-quarter balance sheet management. They have a funding gap, a liquidity crisis, and no one is particularly willing to hold their obligations, even relatively safe ones like factored receivables." (Emphasis added)

### C. The Conclusions of Phase 2 of the Boies Firm's Work

306. The conclusions of Phase 2 of the Boies Firm's work, as reported in the December 30, 2002 Form 8-K, were as follows:

> 1) There was no significant or systemic fraud affecting the Company's prior financial statements;
>
> 2) There were a number of accounting entries and treatments that were incorrect and were required to be corrected;
>
> 3) The incorrect accounting entries and treatments are not individually or in the aggregate material to the overall financial statements of the Company;
>
> 4) The Company's prior management engaged in a pattern of aggressive accounting which, even when in accordance with Generally Accepted Accounting Principles, was intended to increase reported earnings above what they would have been if more conservative accounting had been employed; and
>
> 5) Reversal or restatement of prior accounting entries and treatments resulting from prior management's aggressive accounting would not adversely affect the Company's reported cash flow for 2003 and thereafter. Reversal or restatement of prior accounting entries and treatments resulting from prior management's aggressive accounting would not materially adversely affect the Company's reported revenue and earnings for 2003 and thereafter. (Emphasis added)

The reported stated that "[f]ew if any major companies have ever been subjected to the corporate governance and accounting scrutiny entailed" in the investigation, in which 125 lawyers and accountants spent more than 65,000 hours between August and December, 2002.  (Emphasis added)

307.     Among the areas subject to the scrutiny of the army of lawyers and accountants conducting Phase 2 of the Boies firm's work was Tyco's Fire & Security Services Segment.   The results of this purportedly thorough review and analysis were as follows:

> Fire & Security Services Segment.  Although not revenue recognition per se, there were analogous issues at ADT, including with regard to fees charged to dealers when service contracts were purchased.  These fees were charged to dealers at the time of a customer account purchase and were recorded as a reimbursement of selling, general, and administrative expenses.  In October 2002, the Company determined that the fees recorded as a reimbursement of costs were in excess of reimbursable costs incurred and should be deferred and amortized over the estimated useful life of an acquired customer relationship.  The first three quarters of 2002 were restated to give effect to such changes.  The result of the Company's decision was to reduce reported pre-tax earnings during fiscal year 2002 by $135 million.  In addition, the Company is taking a charge of $185.9 million in fiscal year 2002 representing the amount of revenue effectively recognized in the fiscal years 1999 to 2002 that should have been deferred and amortized over the estimated useful life of the account.

308.     In a conference call with analysts and the media on December 31, 2002, Boies was reported as stating that most of the aggressive accounting practices committed by Tyco simply amounted to moving expenses from one quarter to the next and had little long-term effect.  He said: "They have for the most part run their course."  (Emphasis added)  An analyst with UBS Warburg, David Bleustein, stated that Tyco is on its way to recovery following a year of scandals and "[m]ost of the big hurdles have been cleared."  (Emphasis added)

309.     Tyco shares increased 12% as investors were encouraged by the conclusion of the Boies's

Firm's work that there was no significant or systematic fraud affecting Tyco's prior financial statements.

Glenn Reynolds, a credit analyst at Creditsights Inc. said: "The lawyers and forensic (accounting) teams

were playing the role of bomb-sniffing dogs, and they confirmed that there are not any bombs to diffuse."

(Emphasis added)

### D.   Breen's and the Board's Use of the "Clean Bill of Health" From Phase 2 of the Boies Report To Obtain Financing

310.     While the market was buoyed by the Phase 2 findings of no significant or systematic fraud,

Tyco's most pressing concern was to pay off or refinance almost $6 billion in debt which would become

due in February 2003 and to deal with a cash crunch in the first quarter of fiscal 2004, beginning October

1, 2003, when a $3.6 billion funding shortfall could emerge.

311.     In the January 2, 2003 edition of *The Financial Times*, defendant Breen was reported as

stating: "We have been negotiating with a group of banks over the last few months.  We remain confident

we will be able to obtain a bank facility in advance of our February obligations."

312.     On the strength of the positive conclusions of the Phase 2 Boies Report, Tyco announced

on January 6, 2003 that it had obtained commitment letters from various banks for a new $1.5 billion credit

facility, which it expected to be in place prior to the February 2003 expiration of its exiting 364-Day Credit

Agreement.  It also announced on January 7, 2003 that it had agreed to privately place $2.5 billion principal

amount of 2.75% Series A Convertible Senior Debentures due 2018 and $1.25 billion principal amount

3.125% Series B Convertible Senior Debentures due 2023.  The offering was increased to $4.5 billion

after the exercise of overallotment options.  The notes include covenants requiring Tyco to maintain its

credit ratings at current levels and the interest rate on the new bank loans increases if Tyco's bond yields

rise above their interest rate.  Therefore, any new crisis could result in devastating interest costs.  An analyst from National Life Capital was reported as stating on CBS MarketWatch on January 9, 2003 that "[f]our months ago Tyco couldn't have gotten this deal done.  The demand for income is high, and <u>most of the low-hanging fruit of corporate malfeasance has already been plucked off the tree</u>."  (Emphasis added)  Following the financing announced on January 6, 2003, Moody's raised its outlook on Tyco's debt to "stable," but pointed out that the SEC was and is still investigating Tyco's accounting.

313.    Defendant Breen was a direct beneficiary of the perception which he fostered that Phase 2 of the Boies Report gave Tyco a virtually "clean bill of health."  On January 24, 2003, it was reported in *The Boston Globe* that after less than six months on the job, defendant Breen earned more than $49 million in paper profits in his Tyco stock options, according to Tyco's proxy statement.  The options have an exercise price of $10 and if the price of Tyco's stock fell below $10 per share, Breen's profits would evaporate.  Similarly, the value of the options granted to all of the current directors as part of their compensation was increased and/or maintained as a result of the mistaken perception of the market that Tyco's credibility had been restored.

314.    On January 31, 2003, Tyco announced that its wholly-owned subsidiary Tyco International Group, S.A. ("TIG") had entered into a new 364-day unsecured revolving bank credit facility from Banc of America Securities LLC and Morgan Stanley Senior funding Inc., which provides for borrowing availability of $1.5 billion for general corporate purposes.  The facility has a variable interest rate based on LIBOR and the margin over LIBOR payable by TIG can vary depending on changes in its credit rating and in the market price of one of its outstanding debt securities.  Defendant Breen stated:

> The closing of this bank credit facility, combined with our recently announced placement of $4.5 billion in convertible debentures, eliminates the liquidity gap that the company would have faced later this year.  With

these liquidity issues behind us, we can now focus all our attention on strengthening the operation of Tyco's solid businesses.

315.    The $47.6 million Boies report[2] produced precisely the result which Breen and the Board sought in order to artificially inflate the price of Tyco's stock and permit Tyco to obtain the needed financing before February 2003.

316.    Boies' lack of independence is evidenced by his willingness to provide statements of assurance to the investment community, including that most of the aggressive accounting practices amounted to nothing more than moving expenses from one quarter to the next and had little long-term effect: "They have for the most part run their course." In fact, his review encompassed only a smattering of the Company's acquisitions and, as later revealed, failed to address the then-existing serious accounting irregularities at the Fire & Security Services segment and the reconciliation of balance sheet accounts.

317.    Boies' non-independence at the direction of Breen and the Board is also evidenced by the fact that his report states that (i) "there was no significant or systemic fraud affecting the Company's prior financial statements;" that (ii) "the Company's prior management engaged in a pattern of aggressive accounting;" (iii) that "aggressive accounting is not necessarily improper accounting;" and (iv) that "reversal or restatement of prior accounting entries and treatments resulting from prior management's aggressive accounting would not materially adversely affect the Company's reported revenue and earnings for 2003 and thereafter." The veracity and objectivity of these statements is, at a minimum, highly suspect as a result of the following:

---

[2]    "The total costs incurred for the internal investigation were <u>$9.1 million</u> in fiscal 2002." (September 30, 2002 Form 10-K)  These costs were <u>$38.5 million</u>...in the quarter ended December 31, 2002..." (December 31, 2002 Form 10-Q)

(a) There is no question that there was, in fact, significant fraud at Tyco as evidenced by numerous documents, including the Company's September 17, 2002 Form 8-K which stated:

Also on June 17, 2002, Tyco filed a civil complaint in the United States District Court for the Southern District of New York against Mark A. Belnick, its former Executive Vice President and Chief Corporate Counsel, alleging breach of fiduciary duty and other wrongful conduct. The suit alleges and seeks to recover unapproved compensation and profits received from his employment at the Company, repayment of all loans fraudulently procured, with interest, damages for the harm caused to the Company, and punitive damages.   TYCO INTERNATIONAL LTD. V. MARK A. BELNICK, No. 02-CV-4644 (SWK).

*   *   *

On September 12, 2002, the Company filed a civil complaint in the United States District Court for the Southern District of New York against its former Chairman and Chief Executive Officer, L. Dennis Kozlowski, alleging breach of fiduciary duty (including his own breaches, inducing the breaches of others, and conspiring to breach fiduciary duties), fraud, and other wrongful conduct.   TYCO INTERNATIONAL LTD. AND TYCO INTERNATIONAL (US) INC. V. L. DENNIS KOZLOWSKI, No. 02-CV-7317 (TPG). The suit seeks to recover actual and consequential damages, including misappropriated or otherwise unauthorized payments fraudulently made at Mr. Kozlowski's direction to himself, to Frank Walsh, and other senior executives and key managers; repayment of outstanding loans made to Mr. Kozlowski by a Company subsidiary; disgorgement of all compensation paid to Mr. Kozlowski from 1997 through 2002; forfeiture of all benefits awarded to Mr. Kozlowski from 1997 through 2002; and compensatory, consequential, special, and punitive damages suffered by Tyco as a result of Mr. Kozlowski's wrongful conduct, including his breaches of fiduciary duty and misappropriations of Tyco funds and assets.

*   *   *

On September 12, 2002, indictments were filed in the Supreme Court of the State of New York against Mr. Kozlowski and Mr. Swartz alleging enterprise corruption, fraud, conspiracy, grand larceny, falsifying certain business records and other crimes, and against Mr. Belnick alleging falsification of business records. THE PEOPLE OF THE STATE OF

90

NEW YORK V. L. DENNIS KOZLOWSKI AND MARK H. SWARTZ (Indictment No. 5259/02) and THE PEOPLE OF THE STATE OF NEW YORK V. MARK A. BELNICK (Indictment No. 5258/02).

Also on September 12, 2002, the Securities and Exchange Commission filed a civil fraud enforcement action in the United States District Court for the Southern District of New York against Messrs. Kozlowski, Swartz and Belnick alleging violation of certain of the antifraud, proxy, periodic reporting and record keeping provisions of the federal securities laws and seeking injunctions, penalties and other equitable relief. SECURITIES AND EXCHANGE COMMISSION V. L. DENNIS KOZLOWSKI, MARK H. SWARTZ AND MARK A. BELNICK, No. 02-CV-7312 (RWS).

(b) Despite the euphemistic nomenclature, the fact remains that the "aggressive accounting" was, in fact, "improper accounting" as evidenced by numerous documents, including Tyco's March 31, 2003 Form 10-Q, which stated:

> Operating income and margins significantly decreased in the quarter ended March 31, 2003 over the quarter ended March 31, 2002 due to charges recorded in the current year's quarter of $270.4 million related to prior periods, which includes $170.4 million of capitalized costs related to improper capitalization of selling expenses, $76.9 million ($2.5 million is included in impairment of long-lived assets) of other accounting adjustments primarily related to the improper use of purchase accounting reserves, adjustments of accrual balances, such as dismantlement provision and vacation accruals, and improper accounting for leases and $23.1 million primarily of reconciling items mostly due to inter-company amounts in the European and Asian operations, and charges of $294.9 million related to current period changes in estimates, which includes $167.1 million (also includes impairment of property, plant and equipment of $10.2 million) primarily related to the adjustments of accrual balances such as workers compensation, professional fees, and environmental exposure (includes $2.0 million restructuring credit due to costs being less than anticipated), $89.4 million primarily due to adjusting reserves for doubtful accounts and slow and non-moving inventory, and $38.4 million of other accounting adjustments primarily related to deferred commissions. (Emphasis added)

(c) There is no question that the "reversal" of prior accounting entries and treatments resulting from prior management's and the former Board's direction, approval or tortious

failure to uncover "aggressive," *i.e.*, improper, accounting has already had a materially adverse affect on the Company's reported revenue and earnings for 2003 as evidenced by the above excerpt from the March 31, 2003 Form 10-Q, and numerous other documents, including the September 3, 2002 Form 10-K which states:

> We learned of instances of breakdowns of certain internal controls during fiscal 2002. This began in January 2002 when our Board of Directors learned of an unauthorized payment to our former Lead Director, Frank E. Walsh, and eventually led to the Board replacing our senior management team. These instances included abuse of our employee relocation loan programs, unapproved bonuses, attempted unauthorized credits to employee loans, undisclosed compensation arrangements, unreported perquisites, self-dealing transactions and other misuses of corporate trust, and have been widely reported in the press. We believe the publicity resulting from such instances negatively impacted our results of operations and cash flow in fiscal 2002. In addition, such publicity contributed to a deterioration in our financial condition as we lost access to the commercial paper market and credit ratings on our term debt declined during fiscal 2002 from ratings as of the end of fiscal 2001.

> \* \* \*

> As a result of this negative publicity, the prices of our publicly traded securities have declined significantly and we have experienced reluctance on the part of certain customers and suppliers to continue working with us on customary terms. A number of suppliers have requested letters of credit to support our purchase orders. (Emphasis added)

318.    During May 2003, former Merrill Lynch & Co. analyst Phua Young was charged with issuing misleading reports on Tyco and was accused of improper conduct, including flying on Tyco corporate jets. According to published news articles, Young told investors that Tyco's sale of CIT could fetch as much as $8 billion while, at the same time, he was warning the Company's management that CIT would not fetch that amount and that the Company was facing a liquidity crunch. Purportedly an independent analyst, according to recently published reports, Young once described himself in an e-mail as a "loyal Tyco employee." According to Mary Schapiro, NASD vice chairman of regulatory policy and oversight: "The conduct of this analyst, as evidenced by his own e-mails, gifts to the CEO of Tyco, and

favors he received from the company amounted to a betrayal of objectivity and honesty in research."

Reuters, May 30, 2003, byline by Tim McLaughlin.

319.     Kozlowski and the former Board may have been replaced by Breen and the current Board, while Young may have been replaced by Boies, but the game plan has not changed.  The current  Board, like the former Board, still engages in the dissemination of materially false and misleading information designed to deceive the investing public about the true financial condition of Tyco through purportedly independent third parties who have, in fact, been bought.  Further, the current Board, like the former Board, knowingly, recklessly or with gross negligence allowed such dissemination to continue.

**E.     The February 7, 2003 Proxy Statement**

320.     On February 7, 2003, Tyco filed with the SEC a Form 14-A Proxy Statement, giving notice of the Annual General Meeting on May 6, 2003 in Pembroke, Bermuda.  Tyco's Board nominated for election at the 2003 Annual General Meeting a slate of ten nominees: defendants Breen, Krol, York, McDonald, Buckley and Gordon, all of whom were  already serving on the Board, and defendants Blair, O'Neill, McCall and Wijnberg.

**1.     The Board's Materially False and Misleading Recommendation
To Vote Against Reincorporation in the United States**

321.     The Proxy Statement set forth a shareholder proposal regarding changing Tyco's jurisdiction of incorporation from Bermuda to Delaware.  Among the reasons supporting its proposal, the shareholder stated:

> Tyco and its shareholders would benefit if Tyco changed its jurisdiction of incorporation from Bermuda to Delaware.  First, Delaware's corporate laws are updated to meet changing business needs and are more responsive than Bermuda law to the needs of shareholders.  Delaware is the state of incorporation for 60% of Fortune 500 companies, according to the Delaware Division of Corporations.  We believe that so many companies choose to incorporate in Delaware because it has an advanced and flexible corporate law, expert specialized courts dealing with

corporate-law issues, a responsive state legislature and a highly-developed body of case law that allows corporations and shareholders to understand the consequences of their actions and plan accordingly. We believe the stability, transparency and predictability of Delaware's corporate-law framework are superior to Bermuda's and provide advantages to shareholders.

Second, incorporation in Bermuda makes it more difficult for shareholders to hold companies, their officers and directors legally accountable in the event of wrongdoing. Recent events, we think, demonstrate how crucial it is that, in the event of legal violations by officers or directors, shareholders have the ability to pursue legal remedies. Unlike both U.S. federal and Delaware law, class actions are generally not available under Bermuda law. Under Bermuda law, shareholders have extremely limited ability to sue officers and directors derivatively, on behalf of the corporation. By contrast, under Delaware law, shareholders may sue derivatively for, among other things, breach of fiduciary duty, corporate waste and actions taken in violation of applicable law.

322.     However, despite these advantages to Tyco and its shareholders, the Board recommended that shareholders vote against this proposal, stating:

> The Board believes that it is appropriate to evaluate periodically whether to reincorporate Tyco from Bermuda and into a different jurisdiction, such as Delaware or another state in the U.S. To this end, the Board intends to evaluate the potential benefits, costs and disadvantages of such a move. However, because the Board presently is newly constituted and has not had the opportunity to undertake this review, the Board is not in a position to endorse this proposal to reincorporate into Delaware. Accordingly, the Board recommends that shareholders vote "AGAINST" this proposal.

> Tyco became a Bermuda company in July 1997 when its shareholders approved its business combination with ADT Limited. ADT Limited was incorporated in Bermuda in 1984. Although it is domiciled in Bermuda, Tyco is fully subject to the U.S. securities laws and the rules and regulations of the SEC. Tyco is also subject to the New York Stock Exchange requirements for listed companies, including its corporate governance provisions. Tyco's extensive facilities and operations in the U.S mean that Tyco is not removed from the U.S. legal system in the U.S. Likewise, Tyco's jurisdiction of incorporation has not prevented class action lawsuits from being asserted against Tyco.

> A part of any review on whether to reincorporate into a different jurisdiction would include evaluating the potential benefits, costs and disadvantages of remaining a Bermuda company or reincorporating into a different jurisdiction, the effect that jurisdiction of incorporation has on overall cost and financial structure, as well as the costs involved in reincorporating into another jurisdiction.   Additional factors for review include any non-financial implications of its state of incorporation, including the similarities and differences, if any, of the rights and protections afforded shareholders under Bermuda law and the laws of U.S.-based jurisdictions, including Delaware.

> For the reasons discussed above, the Board recommends that you vote against the resolution requesting Tyco to change Tyco's jurisdiction of incorporation.

323.   However, as had been the case with Tyco's initial incorporation in Bermuda, the Proxy Statement failed to inform shareholders that, in voting against the resolution, they would be affecting their rights to pursue existing derivative claims against the former Board, including the criminal defendants. Moreover, despite the fact that the current Board knew or was reckless or grossly negligent in not knowing that they faced liability for permitting the Boies Report to be issued while over $1.6 billion more in accounting charges need to be taken, the Proxy Statement failed to advise shareholders how their vote would affect their right to pursue any new claims as well.

324.   Further, Tyco knew that it intended to assert that under Bermuda law, the existing derivative claims asserted in this action should be dismissed, yet failed to disclose this material fact to shareholders in recommending that they vote against reincorporation in the U.S.  The Proxy omitted material facts by failing to disclose the claims made in this action and Tyco's intention to assert that Bermuda law precludes the assertion of such claims.

325.   The Board's recommendation against reincorporation in the U.S. was also materially misleading and omitted material facts because the Board members serving at the time of the issuance of the Proxy Statement knew or were reckless or grossly negligent in not knowing the following facts which were

belatedly disclosed in the March 31, 2003 Form 10-Q filed on May 15, 2003, only **after** the shareholders

accepted the Board's recommendation and voted against the shareholder proposal to reincorporate in the

U.S.:

> RISKS RELATING TO OUR JURISDICTIONS OF
>  INCORPORATION
>
> PROPOSED LEGISLATION AND NEGATIVE PUBLICITY REGARDING
> BERMUDA COMPANIES COULD INCREASE OUR TAX BURDEN AND
> AFFECT OUR OPERATING RESULTS.
>
> Several members of the U.S. Congress have introduced legislation relating to the
> tax treatment of U.S. companies that have undertaken certain types of expatriation
> transactions, which could be deemed to cover the combination in 1997 with ADT,
> as a result of which ADT, a Bermuda company, changed its name to Tyco and
> became the parent of the Tyco group.  Any such legislation, if enacted, could have
> the effect of substantially reducing or eliminating the tax benefits of our structure
> and materially increasing our future tax burden or otherwise adversely affecting our
> business.  In addition, even if no tax legislation is ultimately enacted that specifically
> covers our 1997 combination, the enactment of other tax proposals that have been
> or may be made in the future to address expatriation transactions could have a
> material impact on our future tax burden.   Other federal and state legislative
> proposals, if enacted, could limit or even prohibit our eligibility to be awarded U.S.
> or state government contracts.  We are unable to predict the likelihood or final
> form in which any proposed legislation might become law or the nature of
> regulations that may be promulgated under any such future legislative enactments.
> As a result of these uncertainties, we are unable to assess the impact on us of any
> proposed legislation in this area.  There has recently been negative publicity
> regarding, and criticism of, U.S. companies' use of, or relocation to, offshore
> jurisdictions, including Bermuda.  <u>As a Bermuda company, this negative publicity
> could harm our reputation and impair our ability to generate new business if
> companies or government agencies decline to do business with us as a result of the
> negative public image of Bermuda companies or the possibility of our clients
> receiving negative media attention from doing business with a Bermuda company</u>.
>
> BERMUDA LAW DIFFERS FROM THE LAWS IN EFFECT IN THE
> UNITED STATES AND MAY AFFORD LESS PROTECTION TO
> HOLDERS OF OUR SECURITIES.

Holders of Tyco common shares may have more difficulty protecting their interest than would holders of securities of a corporation incorporated in a jurisdiction of the United States.

As a Bermuda company, Tyco is governed by the Companies Act 1981 of Bermuda, which differs in some material respects from laws generally applicable to United States corporations and shareholders, including differences relating to interested director and officer transactions, shareholder lawsuits and indemnification. Under Bermuda law, directors and officers may have a personal interest in contracts or arrangements with a company or its subsidiaries' transactions so long as such personal interest is first disclosed to the company. Likewise, the duties of directors and officers of a Bermuda company are generally owed to the company only. Shareholders of Bermuda companies do not generally have a personal right of action against directors or officers of the company and may only do so on behalf of the company in limited circumstances. Under Bermuda law, a company may also agree to indemnify directors and officers for any personal liability, not involving fraud or dishonesty, incurred in relation to the company. (Emphasis added)

326.    The Board's recommendation also failed to disclose material information about an IRS review of Tyco's tax returns, relating in part to its avoidance of U.S. taxes through its Bermuda incorporation. The following was disclosed in the March 31, 2003 Form 10-Q filed on May 15, 2003:

The Company and its subsidiaries' income tax returns are routinely examined by various regulatory tax authorities. In connection with such examinations, tax authorities, including the Internal Revenue Service, have raised issues and proposed tax deficiencies. We are reviewing the issues raised by the tax authorities and are contesting the proposed deficiencies. Amounts related to these tax deficiencies and other tax contingencies that management has assessed as probable and estimable have been accrued through the income tax provision. We cannot assure you that the ultimate resolution of these tax deficiencies and contingencies will not have a material adverse effect on our results of operations, financial position or cash flow.

### 2.    The Compensation of Breen and the Current Board, Including Stock Options

327.    The Proxy Statement also set forth the Board's remuneration for fiscal 2003:

> Board remuneration for fiscal 2003 was set at $80,000, payable at the monthly rate of $6,666.66 for each full month on the Board and pro-rated for the number of days on the Board if the director begins or ends Board service during the month, and 20,000 stock options that will vest one year after issuance. On October 2, 2002, Mr. Krol was granted a stock option with respect to compensation for fiscal 2003 at an exercise price of $13.45 per share. On January 15, 2003, Messrs. York, McDonald, Buckley and Gordon received stock options for fiscal 2003 on the date they become Board members. All options granted to Board members will have an exercise price equal to the average of the high and low sale price of a Tyco common share reported for the date of grant.

It also set forth defendant Fort's remuneration of $600,000 for the approximate month and a half of work he performed from June 3, 2002 through July 2002, when defendant Breen was appointed Chairman and CEO, and unspecified "transition" work:

> For the period from June 3, 2002 through the appointment of Tyco's new Chairman and Chief Executive Officer in July 2002, Mr. Fort assumed responsibility for the duties of an interim chief executive officer. Mr. Fort was not an employee on Tyco's payroll, but the Board voted to pay Mr. Fort $600,00 for his service and for his on-going work during a transition period after Mr. Breen was named Chief Executive officer.

328.    Defendant Breen's compensation which included valuable options, was valued at approximately $62 million when he was hired and approximately $121 million in January 2003 after Tyco completed the $4.5 billion private placement and obtained a $1.5 billion credit facility. The Proxy stated as follows:

> Our employment agreement with Mr. Breen is dated as of July 25, 2002 and is filed as an exhibit to our Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2002. The agreement provides for Mr. Breen to serve as our President, Chief Executive Officer and Chairman for an initial term of three years and, thereafter, for additional successive terms of one year each unless terminated by us or Mr. Breen at the end of the initial term or any additional term. Under the agreement, Mr. Breen is entitled to an annual base salary of at least $1,500,000, a sign-on bonus of $3,500,000, a guaranteed pro-rated annual bonus for fiscal 2002 based upon his base salary and a guaranteed annual bonus for fiscal 2003 of at least 100% of his base salary. Thereafter, Mr. Breen is eligible to

earn an annual bonus of at least 100% of his base salary, based upon Tyco's satisfaction of objective financial performance criteria to be determined by the Board.  Mr. Breen is required to return a pro rata portion of the net after-tax amount of his sign-on bonus in the event that his employment is terminated by us for cause or by him without good reason (each as defined in the agreement) prior to the one year anniversary of the agreement.  Under the agreement, Mr. Breen is entitled to receive a sign-on option to purchase 3,350,000 common shares of Tyco at an exercise price of $10 per share and a sign-on grant of 350,000 deferred share units, both of which vest in three equal annual installments over the first three anniversaries of the agreement, as well as an option to purchase 4,000,000 common shares of Tyco at an exercise price of $10 per share and a grant of 1,000,000 deferred share units, both of which vest in five equal annual installments over the first five anniversaries of the agreement.

### 3.    The Board's Recommendation to Vote Against An Independent Board Chairman

329.    The Proxy Statement contained a shareholder proposal that would preclude combining the positions of Chief Executive Officer and Chairman of the Board in one individual.  Among the shareholder's reasons for its proposal were the following:

> We believe that formally separating the two positions will help enhance investor confidence in Tyco, which we view as vital in light of the pending criminal indictments of Mr. Kozlowski and Tyco's former chief financial and legal officers, as well as a pending SEC civil fraud suit.
>
> *    *    *
>
> We believe that these events call into question the effectiveness of a governance structure that combined the roles of CEO and chairman in one person and that a bylaw creating an independent chairman will strengthen the board's integrity and effectiveness.

330.    However, the Board recommended that shareholders vote against this proposal, asserting that the Board structure had not caused Tyco's problems:

> The Board also does not believe that Tyco's past Board structure caused, or even necessarily contributed to, the irresponsible and deplorable conduct of Tyco's former executives.  (Emphasis added)

331.    A majority of the current Board members were serving on the Board at the time of the February 7, 2003 Proxy Statement (defendants Breen, Krol, York, McDonald, Buckley, Gordon.) Former Board members Bodman, Fort, Foss, Lane and Slusser were still serving at the time.  It is clear from the Board's statement that the former and current Board members had decided in tandem that the former Board was not responsible for the egregious wrongdoing committed against Tyco.  They publicly confirmed their intention to transfer all culpability to the several individuals who were  made scapegoats ("the irresponsible and deplorable conduct of Tyco's former executives") for the entire scheme and its continuing ramifications.  Such statement constitutes an admission that the current Board will not take any action to seek redress from the former Board or from itself, but instead places the blame entirely on "Tyco's former executives."

### F.    The March 6, 2003 Annual Meeting Held in Pembroke, Bermuda and the Committee Appointments

332.    At the Annual General Meeting on March 6, 2003, in Pembroke, Bermuda, defendant Breen claimed that Tyco had put the scandals of the past 12 months behind it.   Also, the new ten member current Board was elected and shareholder proposals were defeated, including the shareholder proposal to reincorporate in a jurisdiction other than Bermuda.  Defendant Breen stated:

> Among the priority issues that will be reviewed by the Board over the next year is the question of whether Tyco should be reincorporated in the U.S.  I am gratified that the majority of Tyco shareholders voted with management's recommendations that the new Board be given the time and responsibility to study this question seriously.  The Board is committed to looking closely at Tyco's jurisdiction of incorporation, and we will make a decision based on what is best for overall shareholder value.

333.    It was reported in the March 7, 2003 *Palm Beach Post* that after defendant Breen stated that a review of the reincorporation issue would be done, a consultant who represents pension funds, Greg Kinczewski, stated: "They knew about this proposal in September.  They could have studied the issue and

found out what the tax impact was, and they did nothing of the sort."  However, defendant Breen and the

current Board intended to buy time and delay any decision on reincorporation in order to serve their own

personal interests in preserving for themselves any protections provided by Bermuda law, at the expense

and to the detriment of Tyco and its shareholders.

334.     The following Board Committee appointments were also announced:

Board Reorganization
In organizing its committees, the Board appointed the following members:

--     John A. Krol is to chair the Corporate Governance and Nominating Committee.
       Bruce S. Gordon and H. Carl McCall were also appointed as committee
       members.  The Senior Vice President for Corporate Governance reports to Mr.
       Krol as Chairman of this committee.

--     Jerome B. York is to chair the Audit Committee.  Brendan O'NEILL and Sandra
       Wijnberg were also appointed as committee members.  Additionally, all three of
       these directors were determined by the Board to be "financial experts" according
       to SEC regulations.  The Vice President of Corporate Audit and the Corporate
       Ombudsman report to Mr. York as Chairman of this committee.

--     Mackey J. McDonald is to chair the Compensation Committee.  Adm. Dennis C.
       Blair (U.S. Navy, Ret.) and George W. Buckley were also appointed as
       committee members.

335.     On March 7, 2003, the newly elected Board appointed a "Special Committee" purportedly

to evaluate the claims asserted in this Action and to make recommendations to the Board as to whether

Tyco should pursue any legal action beyond that already taken against defendants Kozlowski, Swartz,

Belnick and Walsh.  A committee to evaluate claims was not appointed until approximately nine months

after shareholder derivative claims were first asserted.  Further, in light of the Boies Report's conclusion

of "no significant or systematic fraud," which was the product of over  65,000 hours of work at a cost of

approximately $75 million, the Special Committee is nothing more than an ineffectual afterthought, which cannot, as a practical matter, redo the work of the Boies Firm and, therefore, will not disagree with or take action contrary to its conclusion.  Further, the members of the Special Committee – Krol, Blair and McCall – are named as defendants in this Action and cannot independently or in good faith evaluate whether to sue themselves.

## G.   The Additional Charges Relating to the Fire & Security Services Unit, Particularly ADT

336.    After the market had settled into a false sense of security on the strength of the Boies Report, Tyco shocked the market on March 12, 2003 by announcing that in the quarter ending March 31, 2003, it expected to take non-cash, pre-tax charges between $265 and $325 million for issues primarily in its Fire & Security Services business, which would lower expected fiscal 2003 earnings by $.09 to $.11 per share from the $1.50 to $1.75 range to the $1.40 to $1.50 range.  Tyco fired Boggess, who had served as President of Tyco Fire & Security Services, and stated that the charges resulted from "conforming certain accounting policies across a number of Fire & Security European businesses that were recently reorganized under a single management team, improving compliance with other existing policies, conducting additional account reconciliation procedures, as well as other matters."  The problems involved ADT's Asian and European operations which were not adhering to the division's accounting controls, the European operations, in which operating companies were carrying bad debt on the books far too long, and the Asian operations where there was inappropriate use of reserves and assets the Company could not account for.

337.    Although the accounting problems in the Asian and European operations of Tyco's Fire and Security Unit date back as much as six years, they were not detected by the much-touted and costly Boies review.  As one former SEC attorney was quoted in the April 13, 2003 *Palm Beach Post*: "The

facts were the same before, why didn't they come up before?  It certainly raises questions."  As a result

of this announcement, Tyco stock plunged $1.74 or 12 %, to $12.29, reaching its lowest level in six

months.

338.     Boggess had joined Grinnell Fire Protection Systems, a predecessor of Tyco, in 1968 and

spent his entire career at the Company.  He was among Tyco's most highly compensated managers under

defendant Kozlowski, earning $8.55 million in salary and bonus in 2001 and $2.85 million in 2002.

Although it later dropped the idea, Tyco had announced plans in early 2002 to split into several companies

and Boggess was picked to run one of them.  Defendant Kozlowski stated at the time that he had known

Boggess for 27 years because defendant Kozlowski had run the security business before Boggess.  It was

reported in the May 13, 2003 edition of *The New York Times* that, at the time, defendant Kozlowski had

stated: "Handing the reins off to Jerry was clearly one of the best things I ever did."  In 1997, Tyco gave

Boggess an interest-free mortgage for $5 million, which defendant Kozlowski later forgave in 2000, to buy

an expensive home in Boca Raton, Florida.

339.     Despite Boggess' close ties to defendant Kozlowski and the facts set forth above, all of

which were known during the course of the Phase 2 work of the Boies Firm, the Boies Firm did not

investigate ADT or Boggess sufficiently to uncover these accounting improprieties, even though the Boies

Firm "had no fixed or limited budget, and was free to, and in fact did, expand the scope of its review when

it believed it appropriate to do so."

340.     It was reported in *The Times* (London) on March 14, 2003, that the SEC would launch

a fresh inquiry into Tyco's conduct as a result of the new allegations of accounting irregularities and the

firing of Boggess.

341.     In order to avoid further Tyco stock price deterioration, which would impact the value of

defendant Breen's and the current Board's lucrative options, defendant Breen assured the market on

March 13, 2003, at a conference of about 300 institutional investors and analysts in New York, that "I'm not tolerating anything.  Hopefully, we're at the end of it."  Yet, no action was taken by the current Board to seek redress for Tyco.

342.     On March 13, 2003, defendant Breen was reported on Forbes.com as stating that the current Board had taken up the issue of reincorporating in the U.S. at its March 7, 2003 meeting and expected to make a decision before next year's annual meeting.  He said:  "We will lay out the economics of it."  Yet, the "economics of it" had long been available to defendant Breen and the current Board, who sought to delay consideration of the issue as long as possible, at least in part to  preserve for themselves the perceived protections of Bermuda law in the face of their potential personal liability.

343.     It was reported in the April 28, 2003 issue of *Fortune* that the IRS is looking at, among other things, whether Tyco used its incorporation in Bermuda as well as hundreds of offshore entities to improperly shield income from U.S. taxation.  Since Tyco merged with the Bermuda-incorporated ADT in 1997, it saved between $400 million and $800 million per year in income tax.  Tyco executives had reported that the Internal Revenue Service is auditing the company's tax filings from 1997 to 2000, but said the audit was "nothing unusual."  In an interview with *Business Week* Boston Bureau Manager William Symondson on May 9, 2003, as reported on BusinessWeek Online, defendant Breen stated that the tax audit started about 60 days ago and will be fairly lengthy.  They're looking at our taxes from 1997 [when Tyco moved to Bermuda] forward."  Yet, he failed to disclose this material information to shareholders when the Board recommended against voting for reincorporation in the U.S.

### H.   An Additional $1.36 Billion in Pre-Tax Charges Announced On April 30, 2003

344.     On April 30, 2003, Tyco again stunned the market by announcing a staggering $1.36 billion in pre-tax charges related to its ongoing accounting review, expecting a loss of $.23 per share and charges of $.55 per share.   Tyco said its latest results included $1.37 billion in "notable items," with $936.8 million at the fire-and-security segment and $178.3 million at the engineered-products segment.   On a pre-tax basis, Tyco recorded $997.4 million in charges related to its ongoing internal audit, with nearly 52% of the amount being the result of management changing estimates of reserves, accruals and valuations of investments.   The rest was made up of "account-reconciliation discrepancies, inappropriate capitalization of expenses and other accounting adjustments, of which 44% related to prior periods from 1997 through the first quarter of fiscal 2003."

345.     Tyco also stated that it and its external auditors did not believe a restatement of results because of these latest charges was warranted because they "are not material individually or in the aggregate to any prior year." Thus, despite the fresh discoveries of approximately $1.3 billion in accounting problems, defendant Breen continued to defend Phase 2 of the Boies Firm's work, which essentially declared Tyco "fraud-free," just prior to a crucial securities offering.   Defendant Breen described the latest accounting changes as "minimal," despite their size, and predicted they would require no restatement of past results.   The roughly $1.3 billion in fresh problems was in addition to the $265 million to $325 million in charges Tyco announced in March, bringing the total accounting problems identified in the quarter to approximately $1.6 billion.   Astonishingly, none of these accounting charges was identified by the Boies Firm, despite its "blank check" to investigate as fully as possible.

346.     Rik Fennema, a credit analyst at Dresdner Kleinwort Wasserstein in London, stated that the new accounting issues put a big question mark generally above reported figures. "<u>You're to a certain</u>

extent going to feel in the blind as to what's going on.  It makes lenders uneasy and new buyers more hesitant." (Emphasis added)

347.    These new accounting problems, amounting to over $1.6 billion since the conclusion of the Phase 2 report by the Boies Firm, precipitated an editorial in *The Wall Street Journal* on May 1, 2003 called "Tyco's Bad Odor," which questioned whether Tyco was a "criminal enterprise" and, if so, what kind:

> The conglomerate disclosed yesterday that it plans to take another $1 billion charge against earnings, after having found still more accounting problems.  We've lost track of how many earnings restatements or accounting-related charges that makes for Tyco, but our reporters yesterday put the total shareholder punishment at about $2 billion.
>
> All of this has an especially bad odor because it comes after the company was supposed to have been hosed down.  Prosecutors last year indicted former CEO Dennis Kozlowski and other Tyco officials for running a "criminal enterprise" that looted the company.  (They have all pleaded not guilty.)  But new CEO Ed Breen promised better days and directors anointed attorney David Boies to do what was advertised at the time as a thorough scrubbing.
>
> The latest news raises the question of whether the Tyco scandal has far deeper roots than Mr. Kozlowski's now-famous greed.  More than one expert in these business cases is surprised that Mr. Kozlowski and his co-indictees aren't cooperating at all with prosecutors.  That silence, combined with the growing extent of the write-offs, ought to motivate prosecutors to see what else is rotting in the Tyco cellar and who else may have been in on the "enterprise." Mr. Kozlowski was a facile deal-maker, but no one has ever mistaken him for a criminal genius.
>
> Certainly Tyco's accountants at PriceWaterhouseCoopers have some heavy explaining to do.  A chunk of the newly exposed accounting problems took place at the company's ADT unit that specializes in security services.  The security business by its very nature often presents more than the typical opportunities for corruption, and ADT needs to be turned upside down to see who and what falls out.
>
> Mr. Breen's own credibility is also clearly on the line.  Only this March (after seven months on the job) did he finally get around to sacking the head of the fire and security services unit that includes ADT, Jerry

<u>Boggess, who everybody knew was a Kozlowski intimate</u>.  Mr. Breen also vouched for the conclusions of Mr. Boies's probe last December, though Mr. Boies now defends himself by saying it was never intended to be "a clean bill of health."

That will surprise anyone who heard the company hail the Boies report for finding no "systemic or significant fraud."  Tyco's shares jumped nearly 12% on that Boies news last December and a month later it raised about $4.5 billion in a convertible bond private placement.  Investors willing to take a flyer on that Tyco paper weren't amateurs, but even they deserved better than Mr. Breen's premature cheerleading.  Here's an issue where SEC scrutiny might even be useful.

<u>The entire Tyco tale is smelly enough that it more than warrants Manhattan District Attorney Robert Morgenthau's aggressive prosecution</u>.  The media have understandably focused on the garish bits, such as Mr. Kozlowski's $6,000 shower curtain.  But <u>the far more important question for the credibility of financial markets is whether Tyco really was a "criminal enterprise," and if so what kind</u>.  (Emphasis added)

**I.    The Board's Payment of $92 Million To Save the Liability Insurance Of Tyco's Former Officers and Directors Who Were Named As <u>Defendants in Various Civil and Criminal Actions</u>**

348.    On May 14, 2003, Tyco also announced that it paid $92 million to protect the Criminal Defendants and prevent them from losing their directors and officers insurance coverage.  Tyco's current Board authorized the payment of $92 million as part of a settlement with Federal Insurance Co., a subsidiary of Tyco's primary provider, Chubb Corp.  On February 13, 2003, a Chubb unit sued Tyco and 15 former or then current Tyco officers or directors in New York State Supreme Court in Manhattan, seeking to rescind their liability coverage on the basis of alleged misrepresentations made by Tyco's former senior corporate management.  Citing the discovery of "massive misappropriation of funds" by Tyco's top executives, Chubb claimed that it should no longer be bound by the policy, because it had been given false and misleading information.  The payment maintained, in part, Tyco's directors and officers liability insurance coverage and fiduciary insurance coverage for the two years ended March 15, 2003 for claims made during the 2001-2003 policy period.  Tyco stated in its Form 10-Q filed on May 15, 2003 that

"since Tyco's agreement with its carriers reduced the overall limits of coverage available to Tyco and other insureds, we may be required to pay judgments or settlements and incur expenses in aggregate amounts that would have a material, adverse effect on our financial position, results of operations and liquidity."

## XVIII.  DEFENDANT BREEN AND THE CURRENT BOARD HAD NO INTEREST IN EXPEDITIOUSLY AND DECISIVELY ADDRESSING THE COMPANY'S FINANCIAL STATEMENT FRAUDS

349.    On August 14, 2002, Tyco filed its Form 10-Q for the quarterly period ended June 30, 2002 with the SEC ("the June 30, 2002 Form 10-Q").  A July 25, 2002 employment agreement between Tyco and Edward D. Breen ("Breen") was appended to this document as Exhibit 10.1.  The agreement provided, among other things, that Breen would receive:

(a)  A "sign-on bonus" of $3.5 million.

(b)  A "sign-on option" to purchase 3,350,000 shares of the Company's common stock at an exercise price of $10.00; said options vesting and becoming exercisable in three equal amounts on the July 25, 2003, July 25, 2004 and July 25, 2004.

(c)  350,000 "sign-on deferred stock units"; said deferred stock units vesting in three equal amounts on the July 25, 2003, July 25, 2004 and July 25, 2005.

(d)  A 2002/2003 "option grant" under the Company's Long Term Incentive Plan to purchase 4 million shares of the Company's common Stock at an exercise price of $10.00; said options vesting and becoming exercisable in five equal amounts on the July 25, 2003, July 25, 2004, July 25, 2005, July 25, 2006 and July 25, 2007.

(e)  1 million 2002/2003 "deferred stock units"; said deferred stock units vesting and becoming exercisable in five equal amounts on the July 25, 2003, July 25, 2004, July 25, 2005, July 25, 2006 and July 25, 2007.

(f)  A base salary of not less than $1.5 million per annum.

(g)  A "Guaranteed 2002 Bonus" based upon a daily pro- rata annual bonus of $1.5 million.

(h)  A "Guaranteed 2003 Bonus" of $1.5 million.

(i)  A participation in the Company's bonus and other incentive compensation plans and programs for the Company's senior executives.

(j)  An annual target bonus measured against objective financial criteria to be determined by the Board (or a committee thereof) of at least 100% of the $1.5 million Base Salary.

350.    With a personal fortune tied to his 7.35 million options and the 1.35 million deferred stock units, Breen had no interest in expeditiously and decisively addressing the fraudulent accounting which materially impacted Tyco's financial statements.  Such an action would have severely depressed the price of the Company's stock, thereby causing Breen to sustain huge personal losses, and (as explained below) it would have resulted in the Company's failure to comply with loan covenants, posing a serious threat to the very existence of Tyco.

351.    Therefore, Breen and the current Board contrived and executed a plan whereby the Company's prior accounting frauds would be disclosed and rectified slowly over time in order to maintain an artificial inflation of Tyco's stock price, which would serve the personal financial interests of defendant Breen and the current Board in maintaining the value of their stock options.  This deliberate foot-dragging

scheme has already cost the stockholders of Tyco more than $139.1 million,[3] and is certain to cost the stockholders of Tyco many millions more.

352.     Further, defendant Breen had a personal financial interest in avoiding any restatement of financial results which he had certified as accurate pursuant to the Sarbanes-Oxley Act of 2002 because, pursuant to that Act, he would be required to return any bonus or incentive or equity-based compensation received from Tyco during the 12-month period following the issuance of a financial statement that must be restated as a result of misconduct.  See Section XXI, *infra*

353.     As noted below, Breen knew by no later than early September 2002[4] that Phase 1 of the Boies Report had revealed the fact that Kozlowski had  fraudulently (through an "unauthorized forgiveness and gross-up of Florida relocation loan liability") granted a:

---

[3]  "The total costs incurred for the internal investigation were $9.1 million in fiscal 2002. An additional expense of approximately $40 million is estimated to conclude this process in 2003." (September 30, 2002 Form 10-K.)  "Corporate expenses were $26.7 million (excluding unusual charges of $38.5 million related to the internal investigation fees, and $3.0 million of severance associated with corporate employees) in the quarter ended December 31, 2002..." (December 31, 2002 Form 10-Q.)  "The Company also recorded an expense of $91.5 million for a retroactive, incremental premium on prior period directors and officers insurance coverage negotiated with its third party insurance carriers during the quarter."  The Company has not disclosed the amount that has been, and continues to be, spent in connection with current management's efforts to impede and defend ongoing investigations.

[4]   The findings of  Phase 1 of the Boies Firm's work were reported on September 17, 2002 in a Form 8-K, which stated, in relevant part: "In September 2000, Mr. Kozlowski caused Tyco to pay a special, unapproved bonus to 51 employees who had relocation loans with the Company. (The entire list is set forth in Exhibit 99.8 to this report at 115.) The bonus was calculated to forgive the relocation loans of all 51 employees, at a total cost of $56,415,037, and to pay compensation sufficient to discharge all of the tax liability due as a result of the forgiveness of those loans. This action was purportedly related to the successful completion of the TyCom Initial Public Offering. The total gross wages paid by the Company in this loan forgiveness program were $95,962,000, of which amount Mr. Kozlowski received $32,976,000 and Mr. Swartz $16,611,000."  On September 12, 2002, Tyco filed a civil complaint in the United States District Court for the Southern District of New York against Kozlowski, which detailed the wrongful ADT and TyCom bonuses.

(a)     $5,000,000 tax free gift to Jerry Boggess (President of Tyco Fire and Security Services and one of Kozlowski's "key managers") for no valid business reason.

(b)     $3,109,971 tax free gift to Irving Gutin (Senior Vice President and General Counsel and one of Kozlowski's "key managers") for no valid business reason.  Similarly, the Board knew or was reckless or grossly negligent in not knowing (by no later than September 10, 2002) that "only a few weeks after the unauthorized forgiveness and gross-up of Florida relocation loan liability," Kozlowski had granted Irving Gutin a $500,000 cash bonus and a $2,637,804 "relocation" benefit for a total second-wave-gratuity of $3,137,804; that Gutin had to have known, in any event, that the payment of the second "relocation" benefit was duplicative and did not return it immediately to the Company.

(c)     $825,000 tax free gift to Jeffrey Mattfolk (Senior Vice President of Tyco International Inc. and Director Mergers & Acquisitions and one of Kozlowski's "key managers") for no valid business reason.  Similarly, the current Board knew or was reckless or grossly negligent in not knowing (by no later than September 10, 2002) that "only a few weeks after the unauthorized forgiveness and gross-up of Florida relocation loan liability" Kozlowski had granted Jeffrey Mattfolk a $312,500 cash bonus, restricted shares of stock valued at $424,590, and a $699,746 "relocation" benefit for a total second-wave-gratuity of $1,436,836; that Mattfolk had to have known, in any event, that the payment of the second "relocation" benefit was duplicative and did not return it immediately to the Company.

(d)     $1,942,026 tax free gift to Brad McGee (Senior Vice President of Tyco International Inc. - Media Relations and one of Kozlowski's "key managers") for no valid business reason. Similarly, the Board knew or was reckless or grossly negligent in not knowing (by no later than September 10, 2002) that "only a few weeks after the unauthorized forgiveness and gross-up of Florida relocation loan liability" Kozlowski had granted Brad McGee a $500,000 cash bonus, restricted shares of stock valued at $424,590, and a $1,647,181 "relocation" benefit for a total second-wave-gratuity of $2,571,771; that

McGee had to have known, in any event, that the payment of the second "relocation" benefit was duplicative and did not return it immediately to the Company.

(e)    $748,309 tax free gift to Patricia Prue (Senior Vice President of Human Resources and one of Kozlowski's "key managers") for no valid business reason.  Similarly, the Board knew or was reckless or grossly negligent in not knowing (by no later than September 10, 2002) that "only a few weeks after the unauthorized forgiveness and gross-up of Florida relocation loan liability" Kozlowski had granted Patricia Prue a $312,500 cash bonus and restricted shares of stock valued at $424,590 for a total second-wave-gratuity of $737,090.

(f)    $1,063,355 tax free gift to Michael Robinson (Senior Vice President and Treasurer and one of Kozlowski's "key managers") for no valid business reason.  Similarly, the Board knew or was reckless or grossly negligent in not knowing (by no later than September 10, 2002) that "only a few weeks after the unauthorized forgiveness and gross-up of Florida relocation loan liability," Kozlowski had granted Michael Robinson a $312,500 cash bonus, restricted shares of stock valued at $424,590, and a $901,913 "relocation" benefit for a total second-wave-gratuity of $1,639,003; that Robinson had to have known, in any event, that the payment of the second "relocation" benefit was duplicative and did not return it immediately to the Company.

(g) $845,869 tax free gift to Scott Stevenson (Vice President of Sensormatic and one of Kozlowski's "key managers") for no valid business reason.  Similarly, the Board knew or was reckless or grossly negligent in not knowing (by no later than September 10, 2002) that "only a few weeks after the unauthorized forgiveness and gross-up of Florida relocation loan liability," Kozlowski had granted Scott Stevenson a $312,500 cash bonus, restricted shares of stock valued at $424,590, and a $717,447 "relocation" benefit for a total second-wave-gratuity of $1,454,537; that Stevenson had to have known,

in any event, that the payment of the second "relocation" benefit was duplicative and did not return it immediately to the Company.

354.    As known co-conspirators to the  fleecing of Tyco, the actions of each of the foregoing individuals should have been put under a microscope during the Boies Firm's forensic investigation.  In addition, the Company's mergers & acquisitions (Jeffrey Mattfolk Senior Vice President of Tyco International Inc. and Director - Mergers & Acquisitions) and the books and records of Tyco Fire and Security Services (Jerry Boggess, President[5]) should have been scrutinized with a critical eye.  This is particularly true, given the fact that Breen's "first priority" as Chief Executive Officer was purportedly to ascertain:  "whether the same management mind-set that had led executives to seek personal benefit at the expense of the Company might have led those same executives to attempt to fraudulently or improperly inflate the Company's reported financial results."[6]

_____

[5]    Tyco's September 17, 2002 Form 8-K states: "Mr. Boggess is currently President of Tyco's Fire and Security Services division. Mr. Boggess borrowed a total of $5,000,000 in relocation loans to purchase property in Boca Raton in 1997. This loan was forgiven and grossed-up as part of the TyCom Bonus in September 2000 discussed in the next section, which had not been approved by the Compensation Committee. Mr. Boggess also borrowed an additional amount which was purportedly forgiven by Mr. Kozlowski in January 2002. Upon learning that Mr. Kozlowski was not authorized to have forgiven this loan, Mr. Boggess requested the reinstatement of the loan, with reversal of the related gross-up as if the loan had not been forgiven and he has now repaid this loan."  The actions by Boggess in belatedly acknowledging the inappropriateness of the transaction may be viewed as preemptive and motivated by a desire to avoid possible criminal charges.

[6]    Tyco's December 30, 2002 Form 8-K stated: "As discussed in the September 2002 Report, prior senior management's stewardship of Tyco was characterized by serious abuses of trust and self-dealing by the highest officers of Tyco.  As also discussed in the September 2002 Report, during at least 1999 to 2002, Tyco's prior senior management from time to time failed to properly report and account for their compensation and conduct. At the time that the misconduct of prior senior management was discovered, there was the inevitable question of whether the same management mind-set that had led executives to seek personal benefit at the expense of the Company might have led those same executives to attempt to fraudulently or improperly inflate the Company's reported financial results, and the new Chairman and CEO asked that this be investigated.  Determining whether significant undisclosed fraud or other improper accounting existed which could materially affect the Company's current reported earnings and cash flow from operations was a first priority of Chief

355.     This was not done.  Instead of addressing the elephants which were prancing through the Company's headquarters, Breen and his hand picked group of current directors breached their fiduciary duties by focusing on a few mice.

356.     The Boies Firm, under the direction of Breen and the current Board did not undertake a review of the actions of the above noted individuals, nor did they undertake a critical scrutiny of the books and records of Tyco Fire and Security Services.[7]  Additionally, although Tyco had made more than 700 acquisitions during the period 1999-2002 (all of which should have been suspect due to Jeffrey Mattfolk's involvement), the Boies Firm elected to cursorily review the accounting for only fifteen acquisitions (AMP, Surgical, Keystone, Sherwood, Mallinckrodt, Carlisle Plastics, Thomas & Betts, SSI, Raychem, Central Sprinkler, AFC Cable, Scott Tech, Simplex, Sensormatic, and Wells Fargo) during this time period.

357.     The egregiousness of this glaring breach of fiduciary duty is amplified by the fact that the Company's December 30, 2002 Form 8-K describes how Kozlowski used the Company's Fire and Security business segment to finance his personal (non-business) extravagances ("rent expensive hotel accommodations for him in London, which cost about $110,000, for 13 days; an instance in which Mr. Kozlowski caused the same segment to employ his personal assistant in London and provide her with an apartment, maintenance expenses, and other benefits from May 2001 to July 2002"), and how creative

---

Executive Officer Ed Breen and his new senior management team."  (Emphasis added)

[7] Tyco's March 31, 2003 Form 10-Q discloses the fact that, during the quarter ended March 31, 2003, "the Company identified and recorded pre-tax charges of $434.5 million for charges related to prior periods. These charges resulted from capitalizing certain selling expenses to property, plant and equipment and other non-current assets, mostly in the Fire and Security Services segment and reconciliation items relating to balance sheet accounts where certain account analysis or periodic reconciliations were deficient, resulting in adjustments primarily related to the Engineered Products and Services segment. Additionally, charges related to the correction of balances primarily related to corporate pension and deferred compensation accruals as of September 30, 2002 and other accounting adjustments (e.g. purchase price accounting accruals, deferred commissions, accounting related to leases in the Fire and Security Services and Engineered Products and Services segments)."

merger and acquisition accounting was known to have flourished (particularly in the Company's Fire and

Security business segment):

> For example, in 1999 a controller for one of the Fire & Security business
> units prepared and gave a presentation to the subsidiary's operating
> managers relating to what was entitled "Acquisition Balance Sheet
> Opportunities." It urged its audience to "be aggressive in determining
> exposures; determine reserves with worst case scenario; have a strong
> story to tell regarding each reserve; book the reserves on the acquired
> company's financial system; use the owner for ideas; improve on your
> estimates." <u>The presentation also told its audience to "be aggressive in
> determining the reductions of the asset," and "create stories to back the
> reductions.</u>"  With respect to "transitioning the acquired company" by
> creating reserves to cover one-time costs, the document provided "being
> aggressive in our estimates will allow us to be aggressive in the cost we
> apply." It also provided, "keep the reserve descriptions within the
> accounting rules but stretch the expenditures that go in." (December 30,
> 2002 Form 8-K.)
>
> *   *   *
>
> For example, during the Company's review and analysis of accounting
> issues related to acquisitions, an issue was also identified concerning
> Tyco's acquisitions of Sigma Circuits, Inc. (a $71 million acquisition,
> inclusive of debt assumption, completed on July 8, 1998) that illustrates
> prior management's efforts to increase Tyco's reported earnings (in this
> case by delaying Sigma shipments until after the Sigma acquisition was
> completed so that Tyco rather than Sigma would be credited with the
> revenue).  The Sigma acquisition was not one of the 15 transactions that
> were the initial focus of the Boies Firm's examinations of the Company's
> acquisition accounting.  However, during that examination, a June 19, 1998
> letter from the Sigma Chief Financial Officer was identified in which the
> Sigma CFO indicated that he was "prepared to delay shipment of certain
> product until early July" as requested by Tyco and, as a result of which,
> Sigma would not achieve its anticipated revenue minimum established in
> the June 1, 1998 Merger Agreement.  (December 30, 2001 Form 8-K.)
>
> *   *   *
>
> Similarly, Tyco's acquisition of Raychem was announced May 19, 1999
> and consummated August 12, 1999. Internal Tyco documents raise issues
> whether actions taken by Raychem, even if consistent with GAAP,
> artificially reduced revenue or increased expenses in the quarter
> immediately prior to the consummation of the acquisition, and artificially
> inflated earnings and cash flow in subsequent quarters.  These actions
> included directions from Raychem management to hold back shipments
> and pay all bills received whether due or not, prior to the consummation

of the acquisition. These documents fit the pattern discussed above of the Company's aggressive use of numerous accounting opportunities where available to enhance earnings in the first few quarters after companies were acquired, compared to the period just before acquisition. (December 30, 2001 Form 8-K.)

\*   \*   \*

The Surgical merger presents similar issues.  Surgical's reported results also declined during the quarter immediately prior to the merger, as compared with quarters prior to and after the consummation of the merger.  In the quarter ended September 30, 1998, immediately prior to the merger, revenues decreased to $242.2 million, a 33% decline from the previous quarter. The following quarter, the first quarter following the merger, revenues increased 47%, to $355.2 million. A factor resulting in the decrease in revenues was that historically, Surgical gave customers more favorable credit terms and cash and volume discounts near the end of the quarters, which resulted in an increase in demand. Segment management has explained that in the quarter prior to the merger, Tyco and Surgical agreed that Surgical would avoid extraordinary discounts and maintain standard pricing terms throughout the quarter in order to contract inventory levels in the distribution channel and avoid the related distribution strain. This resulted in a decrease in revenues during the quarter ended September 30, 1998 as compared to the prior quarter.

In September 1998, Surgical accrued $132.1 million related to changes in the contractual terms of long-term contributions granted to hospitals and academic institutions under a program called the Centers of Excellence. Prior to September 1998, Surgical's grants and contributions to these institutions extended over a period of years but were cancelable at any time by either party.  Effective September 30, 1998, the Company amended certain agreements by committing itself to contributions over a long-term period, generally five years. The change in the terms of the grants resulted in the Company accruing future grant awards, and therefore immediately recognizing the expenses associated with them.  This in turn had the effect of accelerating expenses just prior to the merger and accordingly, reducing expenses (and thereby increasing earnings) subsequent to the merger.  The stated business purpose for such amendments was to alleviate the concern of grant recipients that the Tyco/Surgical merger would ultimately result in eliminating the grants. (December 30, 2001 Form 8-K.)[8]  (Emphasis added)

---

[8]   The token review of Tyco's acquisition accounting apparently was never expanded.

Thus, the Boies Firm reviewed only as much as would permit it to reach the conclusion that there was "no significant or systematic fraud."

## XIX. THE PROVISIONS OF TYCO'S LOAN COVENANTS WERE NOT CONSIDERED TO BE SIGNIFICANT PRIOR TO THE DISCOVERY OF TYCO'S FINANCIAL STATEMENT FRAUDS

358.    On May 11, 2001, Tyco filed its Form 10-Q for the quarterly period ended March 31, 2001 with the SEC ("the March 31, 2001 Form 10-Q").  This document disclosed the fact that, as of February 7, 2001, Tyco had entered into a $2 billion five-year credit agreement which included a restrictive covenant stating that Tyco's "Consolidated Debt will at no time exceed 52.5% of Consolidated Total Capitalization" [with Consolidated Total Capitalization defined as "the sum of Consolidated Debt and Consolidated Net Worth"].

359.    As of December 28, 2001, the Company did not consider the foregoing provision of its loan agreement to be significant, as evidenced by the following representation which appeared in the Company's September 30, 2001 Form 10-Q (as filed with the SEC on December 28, 2001):

> In February 2001, TIG replaced its $4.5 billion and $0.5 billion revolving credit facilities with a $3.855 billion facility expiring on February 6, 2002, with an option to extend to February 6, 2003, and a $2.0 billion facility expiring on February 6, 2006.  These credit facilities are guaranteed by Tyco.  Under the terms of the facilities, the Company is required to meet certain covenants, none of which is considered restrictive to its operations.  (Emphasis added)

## XX. BREEN AND THE CURRENT BOARD KNOWINGLY, RECKLESSLY OR WITH GROSS NEGLIGENCE CONCEALED THE TRUTH ABOUT THE SUBSTANCE OF AN ONGOING SEC INVESTIGATION

360.    The September 30, 2002 Form 10-K contained the following representation by management:

> As of the filing date of this Form 10-K, we continue to be engaged in a dialogue with the SEC's Division of Corporation Finance, as part of a routine review of our periodic filings.  While we believe that we have resolved the material accounting issues prior to filings there can be no assurance that the resolution of the remaining

comments issued by the Staff will not necessitate one or more amendments to this
or prior periodic reports.

361.     The falsity of the foregoing representation became apparent on April 30, 2003 when Tyco

issued a press release describing massive charges to earnings as a result of "ongoing process of responding

to the SEC's Division of Corporation Finance inquiries regarding the dealer program", stating that: "The

Company has not completed its discussions with the SEC on these matters or the other accounting items

announced today...The Company hopes to resolve all issues raised by the ongoing SEC Division of

Corporation Finance review during its fiscal third quarter."

362.     Tyco's March 31, 2003 Form 10-Q filed with the SEC on May 15, 2003 also disclosed

the fact that Tyco had not been involved in "routine" dialogue with the SEC and that "material accounting

issues" had not been "resolved."  Instead, it disclosed the fact that Tyco had been engaged in "an ongoing

process of responding to the Staff of the SEC Division of Corporation Finance inquiries regarding the

dealer program and certain other accounting matters" which resulted in the recordation of material charges

to earnings and equity during the quarter ended March 31, 2003 and the likelihood of additional material

charges to earnings and equity in succeeding quarters.  As stated in the March 31, 2003 Form 10-Q, which

echoed the comments in the April 30, 2003 press release:

> The Company has not completed such discussions. The Company cannot
> predict the outcome of its discussions with the SEC or that such outcome
> will not necessitate further amendments or restatements of the Company's
> previously filed periodic reports. The Company hopes to resolve all issues
> raised by the ongoing SEC Division of Corporation Finance review during
> its fiscal third quarter.

363.     The material charges to earnings and equity during the quarter ended March 31, 2003 which

resulted from the "ongoing" dialogue with the SEC  as set forth in the Form 10-Q, are summarized as

follows:

**$ In Millions**

| | |
|---|---|
| Increased cost estimates for environmental, legal and product liability, workers compensation and general liability insurance accruals | 165.0 |
| Accounts receivable and inventory reserve valuations | 107.8 |
| Other than temporary decline in the value of investments | 84.1 |
| Account write-offs | 36.6 |
| Accounting estimate changes | 77.9 |
| Improper capitalization of selling expenses | 70.4 |
| Improper use of purchase accounting reserves, adjustments of accrual balances, such as dismantlement provision and vacation accruals, and improper accounting for leases | 76.9 |
| Reconciling items mostly due to inter-company amounts in the European and Asian operations | 23.1 |
| Impairment of property, plant and equipment | 10.2 |
| Adjustments of accrual balances such as workers compensation, professional fees, and environmental exposure | 156.9 |
| Reserves for doubtful accounts and slow and non-moving inventory, | 89.4 |
| Deferred commissions | 38.4 |
| Retroactive, incremental premium on prior period directors and officers insurance coverage | 91.5 |

| | | |
|---|---|---|
| Liability for the guarantee of equity investee experiencing financial difficulties | | 8.5 |
| Change in the method of amortization used for ADT dealer program account assets from a 10 year straight line method to a 200% declining balance | | 364.5 |
| | Total | 1,501.2 |

364.     As noted above, during the quarter ended March 31, 2003, Tyco established accruals aggregating $165 million for environmental liabilities, legal liabilities, product liabilities, workers compensation and general liability insurance.  All of these accruals were forced upon Tyco by the SEC during the "ongoing" discussions discussed above.  These charges were required to have been recognized in the Company's financial statements as of September 30, 2002.  However, they were improperly deferred while defendants presented arguments to the SEC opposing such loss recognition.

365.     Each of the above noted accruals was required to have been recorded as of September 30, 2002 in compliance with GAAP (FASB Statement No. 5, Accounting for Contingencies, and FASB Interpretation No. 14, Reasonable Estimation of the Amount of a Loss — An Interpretation of FASB Statement No. 5).  This accounting literature provides that an estimated loss from a loss contingency "shall be accrued by a charge to income" if information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements (it is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss) and the amount of loss can be reasonably estimated.  It further provides that the inability to reasonably estimate the amount of the loss does not delay accrual until only a single amount can be reasonably estimated.  It states that:

o   When some amount within the range appears at the time to be a better estimate than any other amount within the range, that amount (the best estimate) shall be accrued.

o   When no amount within the range is a better estimate than any other amount (within the range), however, the minimum amount in the range shall be accrued.

366.   The essence of the foregoing GAAP was incorporated into GAAP that specifically addresses environmental liabilities (AICPA Statement Of Position 96-1).

A.   **Failure To Adequately Provide for Environmental Remediation Liabilities**

367.   The September 30, 2002 Form 10-K discloses the existence of environmental liabilities and its accrual for associated reserves as follows:

> Tyco is involved in various stages of investigation and cleanup related to environmental remediation matters at a number of sites. The ultimate cost of site cleanup is difficult to predict given the uncertainties regarding the extent of the required cleanup, the interpretation of applicable laws and regulations and alternative cleanup methods.  Based upon Tyco's experience with environmental remediation matters, Tyco has concluded that it is probable that we will incur remedial costs in the range of approximately $160 million to $460 million. As of September 30, 2002, Tyco concluded that the best estimate within this range is approximately $248 million, of which $221 million is included in accrued expenses and other current liabilities and $27 million is included in other long-term liabilities on the Consolidated Balance Sheet. Included within the $248 million is $193 million related to the acquisition of Mallinckrodt.

368.   Tyco's assertion that $248 million was the "best estimate" within the computed range of probable loss was contested by the SEC , particularly in view of the fact that the amount attributed to one specific remediation liability (the liability associated with Mallinckrodt) was set at $193 million when the bottom end of the "range" for all of the Company's remediation liabilities was said to be $160 million.  The SEC's "ongoing" discussions with Tyco regarding the reasonableness of the $248 million "best estimate" ultimately led to the admission that the figure was woefully inadequate and the "additional" $165 million accrual noted above.

**B.      Failure To Adequately Provide For Legal Liabilities, Product Liabilities,
Workers Compensation And General Liability Insurance**

369.      FASB Statement No. 5 states that warranty claim obligations are required to be accrued

through a charge to earnings when it is probable that a liability for future claims has been incurred at the

date of the financial statements.  Similarly, FASB Statement No. 5 states that probable and estimable losses

associated with "claims resulting from injury or damage caused by product defects" and "other litigation,

claims, or assessments" are required to be accrued through a charge to earnings.

370.      The September 30, 2002 Form 10-K represented that: "The Company accrues estimated

product warranty costs at the time of sale and any additional amounts are recorded when such costs are

probable and can be reasonably estimated."  It further represented that: "...we believe that we have

adequate amounts accrued for potential settlements and judgments in asbestos- related litigation."

371.      The SEC's "ongoing" discussions with Tyco regarding the reasonableness of the Company's

accruals for legal and product liability, workers compensation and general liability insurance accruals

ultimately led to the admission that  Tyco was, indeed, able to "reasonably estimate" the Company's

probable losses associated with legal, product liability, workers compensation, and general liability issues

and elected not to do so in order to understate expenses.

**C.      Failure To Adequately Provide For Uncollectible Receivables**

372.      GAAP requires the recognition of a provision for non-collectible receivables and an

associated allowance when evidence of impairment exists.  In this regard, GAAP (FASB No. 5, paragraph

23) states:

> If, based on available information, it is probable that the enterprise will be
> unable to collect all amounts due and, therefore, that at the date of its
> financial statements the net realizable value of the receivables through
> collection in the ordinary course of business is less than the total amount
> receivable, the condition in paragraph 8(a) is met because it is probable that
> an asset has been impaired.  Whether the amount of loss can be reasonably

estimated (the condition in paragraph 8(b)) will normally depend on, among other things, the experience of the enterprise, information about the ability of individual debtors to pay, <u>and appraisal of the receivables</u> in light of the current economic environment.  (Emphasis added)

373.     The objective of this requirement is to assure that the income statement reflects losses in the period in which they are incurred (FASB Statement No. 5, paragraph 8) and that the balance sheet appropriately reflect: "[a]ccounts receivable net of allowances for uncollectible accounts... effectively stated at the amount of cash estimated as realizable." (Accounting Research Bulletin 43 Chapter 3, Section A, paragraph 9).

374.     The September 30, 2002 Form 10-K stated that the Company had recorded "a write-off of an uncollectible receivable of $60.7 million as a result of the downturn in the tele-communications industry" and that "...as a result of the uncertainty related to the continued financial viability of a certain customer in the telecommunications industry, a bad debt provision of $115.0 million was recorded to selling, general and administrative expenses."

375.     The SEC's "ongoing" discussions with Tyco regarding the reasonableness of the Company's provision for uncollectible receivables ultimately led to the admission that Tyco had made only a token gesture in recognizing losses on certain telecommunications-related receivables, and failed to utilize available "information about the ability of individual debtors to pay" or make a fair "appraisal of the receivables in light of the current economic environment."  As a result, the SEC forced Tyco to take additional charges to earnings in order to effectively state the Company's accounts receivable (net of allowances for uncollectible accounts) at the amount of cash reasonably estimated as realizable.

**D.      Failure To Adequately Provide For Excess, Obsolete, Or Otherwise
Worthless Inventory**

376.      GAAP (ARB No. 43) provides that: "The primary basis of accounting for inventory is cost."

GAAP also provides (ARB No. 43) that:

> A departure from the cost basis of pricing the inventory is required when the
> utility of the goods is no longer as great as the cost.  Where there is evidence
> that the utility of goods, in their disposal in the ordinary course of business,
> will be less than cost, whether due to physical deterioration, obsolescence,
> changes in price levels, or other causes, the difference should be recognized
> as a loss of the current period.  This is generally accomplished by stating
> such goods at a lower level commonly designated as market.

377.      The September 30, 2002 Form 10-K reflected a $943.6 million inventory charge, which

included $608.2 million of inventory write-downs and $335.4 million of supplier contract termination fees.

As stated in the September 30, 2002 Form 10-K:

> The inventory write-downs and the supplier contract termination fees are
> primarily the result of the sudden and significant decrease in demand for our
> products and services, primarily in the telecommunications end markets. As
> a result, the Company determined that its current and committed inventory
> levels are in excess of forecasted needs. There were no significant sales of
> previously written-down or written-off inventory during the year ended
> September 30, 2002.

378.      The "sudden and significant decrease" in Tyco's earnings was,  in large part,  caused by a

cessation of the Company's "creative" accounting.  As noted in the Company's December 30, 2002 Form

8-K, there was "pressure on, and inducements to, segment and unit managers to increase current earnings,

including by decisions as to what accounting treatment to employ; and a lack of a stated and demonstrable

commitment by former senior corporate management to set appropriate standards of ethics, integrity,

accounting, and corporate governance."

379.      During  the  quarter  ended  March  31,  2003,  the  SEC  raised  questions  regarding  the

purported "sudden and significant decrease in demand" for Tyco's products.  As a consequence of the

SEC's "ongoing" discussions with Tyco regarding the issue, Tyco was forced to state excess, obsolete, or otherwise non-saleable products at their net realizable value. The provisions for uncollectible receivables and the provisions for inventory losses aggregated $107.8 million, as noted above.

**E.      Failure To Adequately Provide For Other Than Temporary Declines**
**In The Value Of Investments**

380.      The September 30, 2002 Form 10-K described Tyco's accounting policy with respect to the recognition of losses on investments as follows:

> INVESTMENTS--The Company invests in both debt and equity securities. The Company accounts for its long-term investments in marketable equity securities that represent less than twenty percent ownership by adjusting the securities to market value at the end of each accounting period. <u>Unrealized gains and losses are credited or charged to shareholders' equity for available for sale securities unless an unrealized loss is deemed to be other than temporary, in which case such loss is charged to earnings</u>....During fiscal 2002, the Company recognized a $270.8 million loss on equity investments, primarily related to its investments in FLAG Telecom Holdings Ltd. when it became evident that the declines in the fair value of FLAG and other investments were other than temporary. (Emphasis added)

381.      During the quarter ended March 31, 2003, Tyco recognized $84.1 million of losses on investments stating that "it became evident that the declines in the fair value of the investments were other than temporary, primarily due to the continuing depressed economic conditions specifically within the telecommunications industry." These telecommunications-related investment losses were "evident" at the date of issuance of the September 30, 2002 Form 10-K but were not "deemed to be other than temporary" by Tyco in order to avoid an $84.1 million charge to earnings. Based upon the "ongoing" discussions between Tyco and the SEC, Tyco revisited its definition of "other than temporary" and recognized the $84.1 million loss.

**F.      Failure To Write Off Non-Existent Or Worthless Assets And Failure
To Make Good Faith Estimates Of Charges To Earnings**

382.      According to GAAP (FASB Statement of Accounting Concepts No. 6), assets are probable future economic benefits obtained or controlled by an entity as a result of a transaction or events. An essential characteristic of an asset is that "it embodies a probable future benefit that involves a capacity...to contribute directly or indirectly to future net cash inflows." Expenses are "outflows or other using up of assets." They are recognized when economic benefits (assets) are used up in delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations or when previously recognized assets are expected to provide reduced or no further benefits. (FASB Statement of Financial Accounting Concepts No. 6.)

383.      As noted above, Tyco stated that a primary objective of the Phase 2 review was to establish the integrity of Tyco's financial statements. The identification and write-off of non-existent and worthless assets should have been accomplished by the Boies review which was aimed specifically at detecting illusory financial statement representations. Similarly, given the fact that the Boies Report repeatedly noted the use of "aggressive accounting judgments," the identification and correction of non-good-faith accounting estimates should have been accomplished.

384.      In this regard, the March 31, 2003 Form 10-Q states that the purchase price of ADT's customer contracts were "historically" recorded as an intangible asset (i.e., contracts and related customer relationships), which was amortized on a straight-line method generally over a ten-year period. It further states that, during the quarter ended March 31, 2003, the Company concluded a comprehensive review of its amortization policy with respect to these dealer customer account costs and "concluded that the most appropriate amortization method would be an accelerated method that approximates the allocation of costs to the revenue curve generated by our actual attrition data."

385.     GAAP (APB Opinion No. 17) states that "intangible assets should be amortized by systematic charges to income over the periods estimated to be benefited" and that:

> A company should evaluate the periods of amortization continually to determine whether later events and circumstances warrant revised estimates of useful lives.  If estimates are changed, the unamortized cost should be allocated to the increased or reduced number of remaining periods in the revised useful lives..... (Emphasis added)

386.      Tyco failed to comply with the above GAAP and failed to address the arbitrary and unsupported nature of ten-year straight-line amortization which had "historically" been used by Tyco to amortize  ADT intangibles, even though the Company's December 30, 2002 Form 8-K admitted that: "During fiscal years 2001 and 2002, the attrition rate of dealer accounts has increased significantly.  This raises the issue of whether the estimated useful life should now be estimated at less than 10 years."

387.     When the SEC forced the Company to address the issue, it resulted in "increased amortization expense of $364.5 million, $315.5 million of which related "to the cumulative adjustment" for prior periods' erroneous accounting.

388.     Similarly, corrections were required because Tyco failed to utilize available information to properly record expenses associated with the Company's pension obligations, deferred compensation, and insurance.

**G.     Improper Capitalization Of Selling Expenses As A Component Of Property, Plant, Equipment And Other Non-Current Assets**

389.     GAAP requires that assets be recognized when future economic benefits can be reasonably expected based on available evidence or logic.  FASB Statement of Concepts No. 6 defines assets as "probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events."  "Probable" is defined as "that which can reasonably be expected or believed on the basis of available evidence or logic but is neither certain nor proved."  Since Tyco's selling expenses

127

related to past services which had no future economic benefit[9], they could not, by any stretch of the imagination, be confused with Tyco's "Property, Plant, Equipment And Other Non-Current Assets."

## H.      Failure To Reconcile Balance Sheet Accounts

390.      The reconciliation of financial data is a basic accounting procedure.  Businesses periodically reconcile physical inventory counts to perpetual inventory records and general ledger balances to written confirmations (i.e. accounts payable confirmation responses) received from third parties.  They also reconcile supporting schedules (i.e. schedules of individual customer receivables) to the totals presented in the general ledger.

391.      GAAP (FASB Statement No. 131) requires that public business enterprises report financial and descriptive information about their operating segments including factors used to identify reportable segments; a measure of profit or loss, certain revenue and expense items, and assets of reportable operating segments and the basis of measurement of these items; and reconciliations of these measures and any other significant operating segment items to enterprise totals.

392.      Accordingly, in connection with preparation of the Company's September 30, 2002 financial statements, Tyco was required to reconcile segment data to the consolidated totals in the financial statements.  Given the fact that, as noted above, one of the stated focuses of Phase 2 of the Boies Firm's work was to advise Tyco of unreconciled inter-company transactions, if any, between Tyco International Group, S.A. and other Tyco subsidiaries, a simple reconciliation of subsidiary data with consolidated corporate data should have been performed (i.e. verifying that a loan recorded as receivable from a Tyco

---

[9]      GAAP (FASB Statement Of Financial Accounting Concepts No. 5) states that "expenses, such as selling and administrative salaries, are recognized during the period in which cash is spent or liabilities are incurred for goods and services that are used up either simultaneously with acquisition or soon after."

subsidiary on Tyco's books was in agreement with the amount reflected on the subsidiaries' books as payable to Tyco). Astonishingly, this was not the case.

393.     After an SEC review of documents obtained through subpoena, during the quarter ended March 31, 2003, Tyco was forced to record a $23.1 million charge to earnings in recognition of the fact during "prior years and quarters," the inter-company balances did not balance.

## I.     Failure To Adequately Provide For Losses Associated With The Guarantee Of An Equity Investee

394.     Fibercore, Inc. ("Fibercore"), a publicly held company, filed a Form DEF 14A with the SEC on August 1, 2002. This document noted that the following individuals were directors:

> Mohd A. Aslami       Charles De Luca
> Steven Phillips      Hedayat Amin-Arsala
> Javad K. Hassan      Michael A. Robinson

395.     Of these six individuals, Javad K. Hassan was a Tyco corporate Vice President until 1998 and Michael A. Robinson ("Robinson"), who became a director of Fibercore in October 2000, was Senior Vice President and Treasurer of Tyco. Robinson, joined Tyco in March 1998, after leaving Merrill Lynch where he held the position of Vice President - Investment Banking Department.     As noted above, Robinson was part of the Kozlowski inner circle  and received a $1,063,355 tax free gift, a duplicate "relocation" benefit of $1,639,003, and other  compensation. Ironically, he also came to Tyco from the same company as Phua Young: Merrill Lynch & Co.

396.     Significantly, the August 1, 2002 Fibercore Form DEF 14A stated:

> In December of 2000, the Company executed a loan agreement with Fleet National Bank. The Company's repayment obligations under the loan agreement are guaranteed (the "Guaranty") by TIGSA, a wholly owned subsidiary of Tyco International Ltd., which owns approximately 19.5% of the Common Stock, which is out-standing. In connection with the Guaranty, the Company issued to TIGSA one share of the Company's Series A Preferred Stock entitling TIGSA to certain rights and privileges. In the event the Company breaches certain covenants, TIGSA's ownership of the share

entitles TIGSA to elect a number of individuals to the Registrant's board of directors sufficient to give TIGSA control of the board until the termination of the agreement pursuant to which the Company must indemnify TIGSA.

397.     On November 14, 2002, Fibercore filed its Form 10-Q for the quarterly period ended September 30, 2002.  The document stated:

> The Company did not have sufficient funds to make the October 1, 2002 and November 1, 2002 monthly redemptions of the Debentures and received a waiver with respect to such redemptions. Such waiver, however, is conditioned on the Company reaching an agreement with the holders of the Debentures on or prior to December 2, 2002 with respect to re-scheduling redemption payments and collateralizing the Company's obligations. The Company is currently engaged in discussions with the holders of the Debentures. In the event that we do not reach agreement, there will be a default on the Debentures and this would cause a cross-default on the Fleet credit facility of $9,250,000 and Fleet could accelerate the maturity date and the entire balance could become immediately due.  (Emphasis added)

398.     Based upon the foregoing, Breen and the Board knew or was reckless or grossly negligent in not knowing, as of the date of the filing of the September 30, 2002 Form 10-K, that Fibercore was teetering on bankruptcy and was unable to honor its debt obligations.  However, in violation of GAAP (FASB Statement No. 5), Tyco did not recognize or disclose the $8.5 million contingency in the financial statements contained therein.

399.     Tyco's December 31, 2002 Form 10-Q  belatedly disclosed the existence of the loan guarantee, but failed to provide for the $8.5 million loss until it was compelled to do so by the SEC during the quarter ended March 31, 2003.

**J.**    **Intentional, Reckless or Grossly Negligent Failure Of Breen and the Current Board To Insure That Tyco Complied With SEC Rules Requiring Corporations To Make And Keep Books, Records And Accounts Which, In Reasonable Detail, Accurately And Fairly Reflect Their Transactions And The Dispositions Of Their Assets**

400.    Section 13(b)(2) of the Exchange Act requires issuers to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect their transactions and the dispositions of their assets, and to devise and maintain a system of internal accounting control which provides reasonable assurances that, among other things, transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP or any other criteria applicable to such statements. Rule 13b2-l states that no person shall, directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Exchange Act. Section 13(b)(5) of the Exchange Act prohibits persons from knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying any book, record, or account described in Section 13(b)(2).

401.    SEC Financial Reporting Release No. 36 (FRR 36) provides in relevant part that the Management's Discussion and Analysis ("MDA") in Forms 10-K and 10-Q filed with the SEC should "give investors an opportunity to look at the registrant through the eyes of management by providing an historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future." Defendants failed to comply with the MDA reporting requirements because Tyco's true financial condition, both historical and in the future, was concealed from investors for those books were marked by a discrete and known group of high level executives and Kozlowski's "key managers." The former Board knew or were reckless or grossly negligent in not knowing of this wrongdoing. Breen and the current Board were well aware of this as evidenced by the fact that, on September 12, 2002, Tyco filed a civil complaint in the United States

131

District Court for the Southern District of New York against Kozlowski, alleging breach of fiduciary duty (including his own breaches, <u>inducing the breaches of others, and conspiring to breach fiduciary duties</u>), fraud, and other wrongful conduct [Tyco International Ltd. And Tyco International (US) Inc. V. L. Dennis Kozlowski, No. 02-CV-7317 (TPG)].

403.     While Breen and the current Board have taken a few "public relations" steps to obtain the return of some of the monies which were wrongfully taken from Tyco, they have apparently adopted a hands-off policy with regard to any investigation of the SEC-reporting and accounting ramifications of the actions of Kozlowski's inner circle, because such an investigation would open a Pandora's box that would adversely impact the Company's debt covenants and credit rating, thus Breen's personal fortune tied to stock options and the stock options of all current Board members as well.

404.     Significantly, a Form S-3 which Tyco recently (April 11, 2003) filed with the SEC noted that "press reports have suggested that the accounting treatment of several of our prior acquisitions was improper[10], that certain of our operating companies improperly conducted business[11] or recorded revenues and assets[12] and that information was withheld from the SEC in connection with an inquiry into our

---

[10]    The December Boies report as reflected in the December 30, 2002 Form 8-K is replete with illustrations of the Company's improper acquisition accounting.

[11]    The Company's April 11, 2003 Form S-3 states, for example: "One of our subsidiaries in our Electronics segment was advised by the U.S. Attorney for the District of Connecticut that it is the target of a federal grand jury investigation concerning alleged Clean Water Act violations at two manufacturing plants. We understand that employees at these plants are subjects of the investigation relating to violations of applicable permits, and that a former supervisor at one of these plants who is no longer an employee has pleaded guilty to a felony violation of the Clean Water Act."

[12]    Tyco's improper recordation of revenues and assets is well documented in the December 30, 2002 Form 8-K. The Company's non-compliance with GAAP was flagrant as ultimately admitted through revision of prior published financial information and results of operations. As noted in the Company's April 11, 2003 Form S-3 there was "a pattern of aggressive accounting that, <u>even when in accordance with GAAP</u> [admitting to the Company's non-GAAP accounting], was intended to increase reported earnings." (Emphasis added)

accounting practices," but remained mute with regard to any actions by Breen and the current Board to address these allegations. Unwilling to engage in any meaningful investigation, Tyco's only comment was that "the Phase 2 review was not an <u>exhaustive review</u>" of the Company's accounting and governance because "it did not seek to go back and identify every accounting decision and every corporate act that was wrong or questionable over a multi-year period." (Emphasis added)

405.     Based upon all of the foregoing, Breen and the current Board have failed to take any action to correct these known deficiencies and violations of SEC Rules.

**K.     Breen and the Current Board Intentionally Avoided Areas Of Investigation That Were likely To Result In Material Charges To Earnings In Order To Avoid Non-Compliance With The Critical Debt Covenant Ratio Or The Dissemination Of Information That Might Trigger A Downgrade By Credit Rating Organizations**

406.     The performance of Phase 1 and Phase 2 of the Boies Firm's work and the controllership risk analysis undertaken by the Company's Senior Vice President of Corporate Governance with the assistance of Deloitte & Touche, caused Breen and the current Board to focus on the loan covenant provision which stated that: "Consolidated Debt will at no time exceed 52.5% of Consolidated Total Capitalization." Accordingly, commencing with the Company's Form 10-Q filed with the SEC on August 14, 2002, each of the Company's periodic filings with the SEC (i.e. the Company's Form 10-K for the fiscal year ended September 30, 2002, the Company's Form 10-Q for the quarterly period ended December 31, 2002, and the Company's Form 10-Q for the quarterly period ended March 31, 2003) contained the following caveat:

> Some of our debt agreements, including our bank credit agreements, contain covenants that would result in a default if our total debt as a percentage of total capitalization is greater than 52.5%. A significant decline in our shareholders' equity, including a decline due to a significant impairment of goodwill or other assets, could cause a default under this covenant.

407.     The importance of this restrictive covenant, and Breen's and the current Board's need to

engineer compliance with it in order to preserve the value of their Tyco securities, is evident from the

consequences of non-compliance, which Tyco outlined in the Company's April 11, 2003 Form S-3 as

follows:

> Upon the occurrence of an event of default under any of our credit
> agreements, the lenders could elect to declare all amounts outstanding
> thereunder to be immediately due and payable, and terminate all
> commitments to extend further credit. If the lenders under our credit
> agreements accelerate the repayment of borrowings, we cannot assure
> you that we will have sufficient assets to repay our credit facilities and our
> other indebtedness, including the debentures. Acceleration of any
> obligation under any of our material debt instruments will permit the
> holders of our other material debt to accelerate their obligations.
>
> <u>Downgrades of our ratings would adversely affect us and the trading
> prices of our securities</u>.
>
> <u>Certain downgrades by Moody's and S&P would permit the providers of
> our receivables facilities to cease further purchases under the facilities and
> would increase the interest cost of our credit facility borrowings</u>. It may
> also increase our cost of capital and make it harder for us to obtain new
> financing and <u>would likely negatively impact the trading price of our
> securities</u>. (Emphasis added)

408.     Although failure to comply with the requirement that "Consolidated Debt will at no time

exceed 52.5% of Consolidated Total Capitalization" would certainly be lethal to Tyco, any significant

occurrence causing Tyco to approach this percentage threshold would, as a practical matter, be equally

as lethal due to the certainty of the ensuing downgrades to Tyco's long-term debt and commercial paper

ratings by Moody's, Standard & Poor's and Fitch. The downgrades would cause a domino effect by

adversely affecting Tyco's operations as well as the worth of Breen's and the current Board's stock

options. As described in the Form 10-Q filed on May 15, 2003:

> Certain downgrades by Moody's and S&P would permit the providers
> of our receivables facilities to cease further purchases under the facilities
> and would increase the interest cost of our credit facility borrowings. It

may also increase our cost of capital and make it harder for us to obtain new financing and would likely negatively impact the trading price of our securities.

As described in the September 30, 2002 Form 10-K:

As a result of the rating agencies' downgrade of Tyco's debt to below investment grade status in June 2002, TIG was required to pay $256.7 million to repurchase its $30 billion 3.5% notes due 2030 in July 2002. In addition, the rating of below investment grade status caused the interest rate on our $400 million 7.2% notes due 2008 to increase to 8.2%, until such time that the rating by Moody's returns to investment grade. The downgrade also gave the investors in two of our accounts receivable programs the option to discontinue reinvestment in new receivables and terminate the programs. The investors did not exercise this option and one program was subsequently amended to continue reinvestment.

409.    The critical importance of Tyco's debt rating increased subsequent to June 2002.  As admitted by Tyco in the March 31, 2003 Form 10-Q:  "We have substantial cash needs and will need to obtain additional funding to satisfy those needs." Elaborating on this statement, the March 31, 2003 Form 10-Q notes that Tyco has:

(a)  Approximately $4.4 billion of debt payable "during calendar year 2003" at the option of the holder thereof.

(b)  Commitments requiring approximately $700-750 million of cash to acquire ADT accounts from dealers.

(c)  Requires the use of approximately $600 million of cash to pay for previously announced restructuring expenditures.

(d)  Requires approximately $400 million of cash to honor acquisition-related commitments, including, earn-out payments, holdbacks of purchase price and the cost of executing announced exit plans.

(e)  Requires $808.4 million to honor operating lease commitments.

(f)   "...experienced reluctance on the part of certain customers and suppliers to continue working with us on customary terms. A number of suppliers have requested letters of credit to support our purchase orders."

It also stated that "[a]s a result of the rating agencies' downgrade of Tyco's debt below investment grade status in fiscal 2002, investors in one of our accounts receivable programs have the option to discontinue investment in new receivables.  The amount outstanding under this program was $139.1 million at March 31, 2003."

410.      Therefore, in order to avoid non-compliance with the debt/capitalization covenant and to avoid downgrades of Tyco's debt by rating agencies, Breen and the current Board intentionally, recklessly or with gross negligence delayed making charges and disclosing accounting improprieties in order to artificially inflate Tyco's stock price and preserve the value of their stock options.

## L.    Breen and the Current Board Intentionally, Recklessly or With Gross Negligence Failed To Write Off Goodwill

411.      Between 1999 and 2002, Tyco  had engaged in a scheme  to purchase a company using stock with a grossly inflated value as currency, and then further inflate Tyco's earnings (and hence the price of Tyco's stock) through fraudulent acquisition accounting.  The Boies Firm's work concluded   that there was a pattern whereby acquired companies (i.e. Sigma, Raychem and Surgical) would hold back shipments, record liabilities, and pay all bills received whether due or not, prior to the consummation of the acquisition so that Tyco, rather than the acquired company, would be credited with the revenue and would avoid recognition of expenses.  This  scenario was carried out over and over again as Tyco acquired more than 1,100 companies between 1999 and 2002.

412.      According to the Company's December 30, 2002 Form 8-K: "During the fiscal years 1999-2002, Tyco completed mergers and acquisitions with a total value of $40.4 billion excluding debt

assumed in connection with purchase accounting transactions, and $44 billion including debt assumed." The fact that Tyco made a material number of these acquisitions using vastly overvalued Tyco stock as currency in its ongoing scheme, supports a conclusion that Tyco vastly overpaid for these companies. This conclusion is also supported by the fact that Tyco, in recognizing billion of dollars of goodwill (excess of cost of acquiring these company's over the value of the net assets acquired) in connection with these acquisitions, paid amounts which were inordinately high.

413.     Tyco's September 30, 2002 balance sheet reported tangible assets of $33,758,600,000 and total liabilities of $41,581,000,000, or a negative tangible net asset position. In this regard, Tyco's balance sheet was nothing more than a highly leveraged empty box. "We are highly leveraged. As stated in the September 30, 2002 Form 10-K: As of September 30, 2002, our total indebtedness was $24,205.8 million, our shareholders' equity was $24,790.6 million...." Also, as admitted in Tyco's September 30, 2002 Form 10-K, Tyco stated: "there were no new contracts for undersea cable communication systems signed in fiscal 2002, and there was a "decline in the Company's total market capitalization." There was a "sudden and significant decrease in demand" for the Company's products and services, as well as an observed "reluctance" on the part of certain customers and suppliers to continue working with Tyco "on customary terms" and "a number of suppliers have requested letters of credit to support our [Tyco's] purchase orders." Further, in addition to experiencing a decrease in revenue due to the cessation of the fraudulent acquisition accounting described above, Tyco experienced a drop in its legitimate revenue. For example, as noted in the September 30, 2002 Form 10-K:

> Net revenues for the Electronics segment decreased 22.4% in fiscal 2002 compared with fiscal 2001, including a 23.3% decrease in product revenue and a 4.5% increase in service revenue, as a result of a severe decline in demand for undersea telecommunications systems and surplus capacity available and a decline in demand for our electronics components group products in the communications, computer and consumer electronics industries across all geographic regions.... We expect our

> Electronics segment to continue to experience a significant decrease in
> demand for the next fiscal year as a result of our undersea fiber optic
> installation business not anticipating any major third-party system builds.
> Furthermore, an industry-wide surplus of telecommunication capacity
> available for sales continues to exist.... (Emphasis added)

414.    As expected, the December 31, 2002 Form 10-Q stated that: "Operating income and

margins declined in each of our business segments, most notably in Electronics, Fire and Security Services

and Plastics and Adhesives."  It stated:

> Net revenues for the Electronics segment decreased 10.3% in the quarter
> ended December 31, 2002 compared with the quarter ended December
> 31, 2001, including a 9.7% decrease in product revenue and a 21.9%
> decrease in service revenue, as a result of further softening in the customer
> demand in the markets we serve, including undersea fiber optic system
> installations...  Revenues at the segment's Telecommunications business
> declined $379.2 million, or 93.6% ....

415.    Standards for recognizing and measuring impairment of the carrying amount of long-lived

assets, certain identifiable intangibles, and goodwill related to those assets to be held and used are found

in Statement of Financial Accounting Standards No. 121, Accounting for the Impairment of Long-Lived

Assets and for Long-Lived Assets to Be Disposed Of (FASB Statement No. 121). Additional guidance

related to goodwill impairment is also provided in Accounting Principles Board Opinion No. 17, Intangible

Assets (APB Opinion No. 17).

416.    The SEC has noted in its Staff Accounting Bulletin No. 100 ("Restructuring And

Impairment Charges") that "registrants must continually evaluate the appropriateness of useful lives assigned

to long-lived assets, including identifiable intangible assets and goodwill" and that "[c]ompanies are required

by paragraph 31 of APB 17 to evaluate continually whether events and circumstances warrant revised

estimates of useful lives or recognition of a charge-off of carrying amounts."

417.    FASB Statement No. 121 "requires that long-lived assets and certain identifiable intangibles to be held and used by an entity be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable."  It cites the following as examples of events or changes in circumstances that indicate that the recoverability of the carrying amount of an asset should be assessed:

(a)  A significant decrease in the market value of an asset.

(b)  A significant change in the extent or manner in which an asset is used or a significant physical change in an asset.

(c)  A significant adverse change in legal factors or in the business climate that could affect the value of an asset or an adverse action or assessment by a regulator.

(d)  An accumulation of costs significantly in excess of the amount originally expected to acquire or construct an asset.

(e)  A current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with an asset used for the purpose of producing revenue.

418.    There is no question, based upon the above, that the recoverability of the carrying amount of Tyco's asset base should have been assessed as of September 30, 2002 because:

(a)  There was an across-the-board decrease in the market value of Tyco's assets as evidenced by huge write-downs and an inordinate drop in the Company's total market capitalization.

(b)  There was, among other things as noted above, an increased cost of doing business due to the Company's diminished credit quality, a "sudden and significant decrease in demand" for the Company's products and services, an observed "reluctance" on the part of certain customers and suppliers

to continue working with Tyco "on customary terms," and a number of suppliers requesting letters of credit to support Tyco's purchase orders.

(c)  There was, as noted above, a plethora of investigations by governmental and regulatory agencies and related "legal factors" that were adversely impacting and were virtually certain to continue to adversely affect the value of the Company.  For example, Tyco's September 30, 2002 Form 10-K states: "It is possible that we will be required to pay material fines, consent to injunctions on future conduct, lose the ability to conduct business with government instrumentalities or suffer other penalties, each of which could have a material adverse effect on our business."

(d)  There was a $1,579,000,000 operating loss.

419.     Based upon the foregoing, FASB Statement No. 121 provides that an impairment loss was required to have been recognized as the amount by which the carrying amount exceeds the fair value ("the amount at which the asset could be bought or sold in a current transaction between willing parties, that is, other than in a forced or liquidation sale...the estimate of fair value shall be based on the best information available in the circumstances.")

420.     As of September 30, 2002, Tyco's business had materially contracted and its expected future cash flows, based on reasonable and supportable assumptions and projections, indicated that additional borrowings and asset sales would be required for Tyco to survive.  As noted in Tyco's March 31, 2003 Form 10-Q:

> ...[W]e have significant amounts of debt which mature in fiscal 2003 as well as future periods, including, without limitation approximately $1.9 billion which matures in February 2003. In addition, we have outstanding approximately $3.9 billion under our existing credit facility which expires in February 2003. We intend to enter into a new credit facility to refinance a portion of the $3.9 billion outstanding under our existing credit facility. We believe that our cash flow from our operations, together with proceeds from the CIT IPO, is adequate to fund our operations and

service our debt through the end of fiscal 2003." (September 30, 2002 Form 10-K)

"We have approximately $4.4 billion of debt payable at maturity or upon the option of the holder thereof through March 31, 2004. In addition, we have other substantial capital commitments in fiscal 2003, including the following:

  - approximately $650-$700 million of cash to acquire ADT accounts from dealers, of which approximately $360 million has been spent through March 31, 2003;

  - approximately $500 million of cash restructuring expenses relating to restructuring charges we have previously recorded, of which approximately $290 million has been spent through March 31, 2003;

  - approximately $350 million of cash purchase accounting spending, including earn-out payments, holdbacks of purchase price and the cost of exit plans, of which approximately $190 million has been spent through March 31, 2003; and

  - minimum operating lease payments of $808.4 million.

421.    The SEC is currently evaluating the carrying value of Tyco's goodwill, and one of the world's foremost accounting authorities has  stated that this goodwill is grossly overstated.  In an April 21, 2003 "*Accounting Today*" commentary editorial article, <u>Boies and Tyco Int'l— "they still don't get it</u>," Abraham J. Briloff, Ph.D., CPA  (Emanuel Saxe Distinguished Professor Emeritus of Accounting at New York's Baruch College) stated:

> Aside from its takeover of CIT, which, Abe notes, has its "own accounting rhythm," Tyco made a vast slew of acquisitions in fiscal 2001, shelling out $11.4 billion ($7.6 billion in cash and the rest in stock) in the process.  In return, as he puts it, Tyco got nothing it "could count, weigh, measure or smell" in the way of net tangible assets.  Meanwhile, identifiable liabilities of the outfits it scooped up exceeded their identifiable assets by $1.9 billion.  That $1.9 billion, plus the $11.4 billion cost of the acquisitions, ended up as a $13.3 billion addition to goodwill ... <u>the Boies report should not have led to a "let bygones be bygones" conclusion and summary</u>.

But then, <u>even accepting the Boies conclusion at face value, he is wrong — the sins of the past are still very much in the Tyco balance sheets in September 2002, and undoubtedly beyond</u>. Thus, as Boies and his sleuths are aware, the "black hole" of net asset values booked on the acquisitions ended up in the goodwill hopper of Sept. 30, 2002. It then stood at $26.1 billion; that represents over 100 percent of the $24.8 billion in shareholder's equity. "<u>That $26.1 billion will have to be weighed and held in the balance regularly to determine its continuing validity or lack thereof</u>. Who will be there when the deluge is booked? Remember AOL?

The devil in the details.

And it appears that the day of judgement is closer than might have been anticipated.  (Emphasis added)

422.    The September 30, 2002 Form 10-K reported a total indebtedness of $24,205.8 million and a shareholders' equity of $24,790.6 million.  Accordingly, the Company's reported total debt as a percentage of total capitalization was 49.4%, a percentage which was below the 52.5% which would have triggered a default (24,205.8 / 48,996.4 = 49.4%).

423.    If the September 30, 2002 Form 10-K had reflected the above noted $1,501,200,000 charges to earnings and the write-off of only that portion of Tyco's goodwill which exceeded shareholder's equity (an extremely conservative write-off), the Consolidated Debt would have exceeded 52.5% of Consolidated Total Capitalization and Tyco would have been in default of its debt covenants.

## XXI.    THE CURRENT BOARD'S INTENTIONAL, RECKLESS OR GROSSLY NEGLIGENT FAILURE TO INSURE THAT BREEN AND FITZPATRICK COMPLY WITH THE SARBANES-OXLEY ACT'S CERTIFICATION REQUIREMENTS CONSTITUTED A SERIOUS BREACH OF FIDUCIARY DUTY

424.    In SEC Release No. 33-8124, dated August 29, 2002, the SEC adopted rules implementing the certification requirement set forth in Section 302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes").  The new rules require the principal executive officer or officers and the principal financial

officer or officers, or persons performing similar functions for the company to execute a certification and include it in each annual and quarterly report filed with the SEC under the Securities Exchange Act of 1934, as amended.

425.     An officer providing a false certification could be subject to SEC action for violating Section 13(a) or 15(d) of the Exchange Act and to both SEC and private actions for violating Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.  Such officers already are responsible as signatories for the issuer's disclosures under the Exchange Act liability provisions and can be liable for material misstatements or omissions under general antifraud standards and under the SEC's authority to seek redress against those who cause or aid or abet securities law violations.

426.     Sarbanes's certification requirements (Rules 13a-14 and 15d-14) require an issuer's principal executive and financial officers each to certify, with respect to the issuer's quarterly and annual reports filed or submitted under Section 13(a) or 15(d) of the Securities Exchange Act of 1934, that:

I.     he or she has reviewed the report;

II.     based on his or her knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading;

III.     based on his or her knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report;

IV.     he or she and the other certifying officers:

(A)     are responsible for establishing and maintaining "disclosure controls and procedures" (a newly-defined term reflecting the concept of controls and procedures related to disclosure) for the issuer;

(B)     have designed such disclosure controls and procedures to ensure that material information is made known to them, particularly during the period in which the periodic report is being prepared;

(C)     have evaluated the effectiveness of the issuer's disclosure controls and procedures within 90 days of the date of the report; and

(D)     have presented in the report their conclusions about the effectiveness of the disclosure controls and procedures based on the required evaluation;

V.   he or she and the other certifying officers have disclosed to the issuer's auditors and to the audit committee of the board of directors (or persons fulfilling the equivalent function):

(A)     all significant deficiencies in the design or operation of internal controls (a pre-existing term relating to internal controls regarding financial reporting) which could adversely affect the issuer's ability to record, process, summarize and report financial data and have identified for the issuer's auditors any material weaknesses in internal controls; and

(B)     any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and

VI.     he or she and the other certifying officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

144

427.     These rules apply to the principal executive and financial officers of any issuer that files quarterly and annual reports with the Commission under either Section 13(a) or 15(d) of the Exchange Act, including foreign private issuers and small business issuers. The rules require that the certification be included in annual reports on Forms 10-K, 10-KSB, 20-F and 40-F, quarterly reports on Forms 10-Q and 10-QSB and amendments to any of the foregoing reports.

428.     Specifically, Sec. 302(b) states that the above provisions found at Sec. 302(a) apply even where a company has reincorporated into a foreign jurisdiction or engaged in any other transaction that results in foreign incorporation.

429.     Pursuant to Sarbanes's mandates, Breen and Fitzpatrick each certified Tyco's Form 10 Q, filed on February 14, 2003 for the quarterly period ended December 31, 2002 and Tyco's Form 10 K-A, filed on January 28, 2003 for the fiscal year ended September 30, 2002. Shortly thereafter, on or about April 30, 2003, Tyco announced the approximately $1.3 billion charge against earnings, after revealing the additional accounting problems set forth above.

430.     In short, Breen and Fitzpatrick certified Tyco's quarterly and year end results, pursuant to Sec. 302 of Sarbanes, just a few months prior to taking a massive charge. Both the magnitude of the write-down and temporal proximity to the certifications calls into question the validity of the certifications and whether Breen and Fitzpatrick exercised that degree of diligence necessary to comply with the Sarbanes mandates.

431.     Their certifications, in the face of the massive charge, constitute a breach of duty to comply with the mandates of federal law and the corporate governance mandates imposed by Sarbanes.

432.     Breen's and Fitzpatrick's violations of Sec. 302(a) expose the Company to the risk of shareholder suits and discredit the Company's reputation in the capital markets, thereby making it more difficult and costly to raise capital, rendering it more difficult and costly to secure directors and officers

insurance without requiring Tyco to pay supplemental premiums and exposing the Company to additional and more rigorous prosecutorial scrutiny and SEC sanctions.

433.    Breen's and Fitzpatrick's failure to comply with Sarbanes certification requirements and the current Board's knowing, reckless or grossly negligent failure to insure compliance is especially egregious given that numerous published reports indicate that Sarbanes's enactment was, in large part, a result of the Tyco scandal.

434.    Furthermore, Sec. 304 requires CEOs and CFOs of public companies to repay both: (i) any bonus, incentive-based or equity-based compensation received from the company; and (ii) any profits realized from the sale of any company securities, during the 12-month period following the issuance of a financial statement that must be restated due to material noncompliance with a financial reporting requirement of the issuer as a result of misconduct.  Breen and Fitzpatrick had strong personal motives to avoid restatements.

## XXII.    VIOLATIONS OF SECTION 84 OF THE BERMUDA COMPANIES ACT OF 1981 BY MEMBERS OF THE CURRENT BOARD AND FORMER BOARD

435.    In accordance with Section 84 of the Bermuda Companies Act of 1981, members of the current Board and the former Board approved the consolidated financial statements of Tyco for the fiscal year ending September 30, 2002.  According to the February 7, 2003 Proxy Statement, the financial statements for the fiscal year ending September 30, 2002 were approved by Tyco's directors.

436.    The former and current Board members who approved Tyco's financial statements for the fiscal year ending September 30, 2002 breached their fiduciary duties of due care, prudence and candor and committed equitable fraud because those financial statements failed to reflect almost $1.6 billion in charges which had not been recorded in a timely and appropriate manner.

## XXIII.   THE CURRENT BOARD IS ENGAGED IN A CONTINUING COURSE OF WRONGDOING, THEREBY DISABLING THEM FROM DETERMINING INDEPENDENTLY AND IN GOOD FAITH WHETHER THE CLAIMS ASSERTED HEREIN SHOULD PROCEED AND RENDERING <u>DEMAND FUTILE</u>

437.        There is and has been no independent organ within Tyco to evaluate whether plaintiff should be permitted to prosecute the claims asserted herein on behalf of Tyco.  The current Board cannot and will not assert claims against itself or the former Board.  Rather, the current Board, like the former Board, has established through the following wrongful conduct that it is not acting in the best interests of Tyco and its shareholders and has perpetrated an equitable fraud on Tyco and its shareholders in order (i) to protect the current Board's own financial interests in maintaining an artificially inflated value for their stock options, (ii) to avoid personal liability, (iii) to avoid damage to their personal reputations, and (iv) to perpetuate the myth that they are "cleaning up" Tyco and restoring its credibility and integrity.    The current Board will not seek redress for the wrongs alleged herein for the following reasons:

(a)        Despite Tyco's representations of the comprehensive nature of Phase 2 of the Boies Firm's work with an unlimited budget, as described in the December 30, 2002 Form 8-K, in which the Boies Firm was given "unfettered access to all Company records and personnel," all under the direction of defendant Breen and the Board, including newly appointed directors Krol, York, McDonald and Buckley, the Boies Firm's work was far from comprehensive or thorough.  The conclusion of Phase 2 of the Boies Firm's work that there was "no significant nor systematic fraud," a conclusion which was untrue and incorrect at the time, was designed to prime the market for a $4.5 billion private placement and to obtain a $1.5 billion credit facility, both of which Tyco desperately needed to pay off or refinance approximately $6 billion in debt by February 2003.  The Boies Firm, under the direction of defendant Breen and the Board, knew or recklessly or with gross negligence failed to report at least $1.6 billion in additional accounting problems in the Phase 2 report.  Instead, these material charges have been dribbled

out piecemeal since the conclusion of Phase 2 of the Boies Firm's work at the end of 2002 in an effort to minimize their impact and direct attention away from the failure of the Boies Firm, under defendant Breen's and the Board's direction, to accomplish his clearly stated mission to unearth the material accounting issues then existing.  It is unlikely that the $4.5 billion private placement could have been completed or the $1.5 billion credit facility could have been obtained if the Boies Firm had revealed these material, then existing additional accounting problems, primarily centered at Tyco's fire and security unit, including the ADT unit. Breen and the Board, along with the Boies Firm, materially misrepresented the financial condition of Tyco by omitting the material facts set forth herein in order to deceive the market and the investing public so that Tyco could obtain $6 billion in financing.

          (b)      At the time of the filing of the February 7, 2003 Proxy Statement, when the Board consisted of new members Breen, Krol, York, McDonald, Buckley and Gordon and former Board members who were not nominated for reelection, Bodman, Fort, Foss, Lane and Slusser, the Board recommended that shareholders vote against a shareholder proposal to reincorporate from Bermuda to Delaware.  At the time of the Board's recommendation to maintain Tyco's Bermuda incorporation, they knew or were reckless or grossly negligent in not knowing of the following material facts, but failed to disclose them, thus fraudulently inducing Tyco's shareholders to vote against reincorporation in the U.S. Defendants knew or were reckless or grossly negligent in not knowing of  the existence of additional accounting problems amounting to charges of more than $1.6 billion, but did not disclose them or the impact which the application of Bermuda law would have on shareholders' rights to redress the continuing damage then being caused to Tyco at the hands of the  former and  current Boards.  Nor did the Board disclose the possibility or existence of an IRS  review of Tyco since its 1997 incorporation in Bermuda to determine  whether  Tyco's use of offshore incorporation to shield it from $400-$800 million in U.S. tax annually was appropriate.  The existence of more than $1.6 billion in additional charges due to accounting

improprieties and the possibility of an IRS audit were material facts which were not disclosed to shareholders at the time they were asked to vote against reincorporation.  Nor was there any disclosure of the impact of Bermuda law on shareholders' rights to redress those claims on behalf of Tyco,  the existence and substance of the claims asserted in this Action or Tyco's intention to assert that Bermuda law requires the dismissal of this Action.

(c)     At the March 7, 2003 Board meeting, the  current Board determined to study the issue of reincorporating in the United States and stated that it expects to make a decision before the next annual meeting in March 2004.  Any such study cannot be made by the current Board independently or in good faith because the current Board, like the former Board, is interested in preserving any protections from shareholder derivative litigation which it might obtain under Bermuda law and, therefore, has a personal interest in maintaining Tyco's incorporation in Bermuda as long as possible.  There has been no disclosure of the impact on shareholder rights under Bermuda law of the continuing stream of disclosures of accounting irregularities.  Further, defendant Breen's statement as reported on March 13, 2003 that the new Board would study the "economics" of reincorporation failed to disclose the IRS  review of Tyco's tax avoidance using its offshore incorporation and the uncertainty of any continuing economic or tax benefit arising from Tyco's Bermuda incorporation.  The current Board's foot-dragging and excuses for delay amount to a refusal to make a good faith, independent study of the issue.

(d)     The current Board has not pursued and will not pursue the claims asserted herein against the former Board members (except Kozlowski, Swartz, Belnick and Walsh) named as defendants in this derivative action.  Rather than investigating and pursing the claims against those former Board members, as alleged herein, the current Board, under the direction of defendant Breen, has caused Tyco to pay $92 million to Federal Insurance Co. in settlement of a lawsuit seeking recission of the Executive Protection Policy and non-coverage for Kozlowski, Swartz, Belnick and Walsh.  Defendant Breen and the

current Board, instead of constituting an independent organ to evaluate causes of action on behalf of Tyco, have caused Tyco to pay $92 million to protect the interests of the Criminal Defendants.

(e)     The current Board has not pursued and will not pursue the claims asserted herein against the former Board members named herein.  Although the claims asserted herein were first asserted in June 2002 and the Consolidated Amended Complaint was filed on January 29, 2003, the "Special Committee" to evaluate the claims was not appointed until March 7, 2003.  This lengthy delay in investigating the claims against the former non-indicted Board members has resulted in prejudice to Tyco due to the passage of time, fading memories and the well-publicized unavailability of documentation.  Also, the overlapping Board membership of former and current Board members prior to March 6, 2003 aligns their interests and also disables the current Board from independently investigating those claims which implicate a majority of the current Board in a continuing course of wrongdoing.

(f)     The current Board has not pursued and will not pursue the claims asserted herein as evidenced in part by their claim that a restatement of prior financial statements is not necessary.   This position, which continues the pattern set by the former Board of disseminating materially false and misleading information about Tyco's financial condition, establishes the current Board's lack of independence based upon (1) their interest in avoiding shareholder suits naming the current Board and alleging fraud; (2) their financial interest in avoiding action which will negatively affect the value of their stock options; and (3) their interest in avoiding the return of bonus or incentive-based compensation by Breen and Fitzpatrick pursuant to the Sarbanes-Oxley Act of 2002.

(g)     The Board Committees established to study Tyco's reincorporation in the U.S. and whether to pursue any claims in addition to the actions already filed against Kozlowski, Swartz, Belnick and Walsh do not constitute independent organs of Tyco which are capable of  independently evaluating those issues or the claims asserted herein.  With respect to reincorporation in the U.S., the current Board,

along with some former Board members, has fraudulently misrepresented and omitted material facts in Tyco's Proxy Statement in order to deceive Tyco's shareholders into voting against reincorporation in the U.S. With respect to evaluating whether any additional claims should be pursued, including the claims asserted herein, the Special Committee will not sue itself and the current Board and, in view of the extensive resources already spent on the Boies review, which resulted in the four civil actions set forth above, it is improbable that the Special Committee will add anything to this body of work or take any additional action, particularly in view of the passage of time, the unavailability of documents and the fading of memories. Therefore, the Special Committees are nothing more than an afterthought and sham to create the false perception that the Board is considering the claims asserted herein.

(h)    The violation of the federal securities laws, SEC rules and other laws and rules, as alleged herein, including income-tax evasion or keeping false books and records, cannot constitute legitimate business judgments or good faith conduct of the Company's business. Since these acts constitute violations of the federal securities and other laws, including the Bermuda Companies Act of 1981, and breaches of the fiduciary duties owed by Tyco's Board of Directors, these acts are *ultra vires* and incapable of ratification by the current Board. The acts of the current Board in failing to seek redress for the former Board's violations of these laws and rules and in causing Tyco to violate the laws and rules set forth herein are *per se* not defensible by any alleged independent business judgment since they constitute illegal acts under such laws;

(i)    The current Board has demonstrated conclusively that they will not take any action against the former Board . Demands to prosecute the claims stated herein were sent to the Tyco Board on February 18, 2002 and June 24, 2002. On March 7, 2003, the Special Committee comprised of purportedly new independent members of the current Board was established and yet no action has been taken by the Special Committee or the current Board to address the breaches of fiduciary duty at the Board

level.  No action has been taken despite the fact that, as set forth in Tyco's from 10-Q filed on May 15, 2003:

> New Management has determined that, in the past, Tyco in general suffered from: poor documentation, inadequate policies and procedures to prevent the misconduct of senior corporate executives, inadequate procedures for proper corporate authorizations, inadequate approval procedures and documentation, a lack of oversight by senior management at the corporate level, a pattern of using aggressive accounting that, even when in accordance with GAAP, was intended to increase reported earnings above what they would have been if more conservative accounting had been employed, pressure on, and inducements to, segment and unit managers to increase current earnings, including by decisions as to what accounting treatment to employ, and a lack of a stated and demonstrable commitment by former senior corporate management to set high standards of ethics, integrity, accounting, and corporate governance. We cannot assure you that we will not discover that there have been further instances of breakdowns in our internal controls and procedures.

The current Board's failure to take action promptly compounds the damage to Tyco.  With respect to the Boies investigation, documentation was not always available ... "in part because of the passage of time ...."  Now, approximately six months after the completion of the Boies report, the current Board's inaction has further jeopardized the availability of documentation and permitted the lapse of memories.  Under these circumstances, the current Board's continued inaction amounts to a refusal to take action and a condoning of past known instances of wrongdoing, as alleged herein.

        (j)      The current Board cannot defend its actions by any alleged "independent" business judgment in seeking to have this action dismissed or by not bringing this action against themselves, because it would undoubtedly be to the benefit of Tyco to seek recovery of the enormous amount of damages caused to Tyco by the widespread and continuing wrongdoing alleged herein;

        (k)      The current Board sanctioned the issuance of the Boies Firm report in December 2002 in advance of the Company's issuance of over $4.5 billion in convertible debt securities in January 2003.  Since October, however, Tyco has either restated results or taken an accounting-related charge,

which have cumulatively totaled nearly $2 billion.  Over $1.3 billion in charges were announced on April 30, 2003.  Demand is futile because a majority of the current Board cannot be presumed to exercise independent judgment in assessing the merits of a demand due to their personal and financial interest in the subject matter of many of the claims raised in this Complaint.   The current Board would thus be required to  investigate and bring claims against themselves for their own misconduct.  Their actions to date prove conclusively that they will not do so;

(l)        Tyco has agreed to indemnify its directors and officers against liability for acts and omissions in the performance of their duties and maintains insurance policies to cover the costs of indemnification, which policies exclude claims brought by Tyco against its directors.  Therefore, the Director Defendants are disabled from complying with any demand to sue themselves because it would result in the loss of their insurance coverage;

(m)        The Director Defendants participated in, acquiesced in and/or approved the wrongs alleged herein and did so in affirmative violation of their duties to Tyco and its stockholders and have permitted the wrongs alleged and/or have remained inactive although they have long had knowledge of or were reckless or grossly negligent in ignoring those wrongs.   The Director Defendants, therefore, participated in a long-term continuing course of equitable fraud, corporate misconduct, mismanagement and waste of corporate assets;

(n)        The current Board will not take action against the former Board because their terms of service overlapped until March 6, 2003.  Former Board members Bodman, Fort, Foss, Lane and Slusser served concurrently with current Board members Breen, Krol, York, McDonald, Buckley and Gordon.  In addition, two former Board members have been authorized to serve as consultants to the current Board.  The continuing influence and entanglement of the former Board and the current Board

precludes the current Board from reaching any independent, good faith decision to take action against the former Board.

(o)     The current Board has not pursued and will not pursue the claims asserted herein, as evidenced by the limited redress Tyco has sought thus far against only four individuals who have been made the scapegoats for the entire scheme of past and continuing wrongdoing.  Even the relief sought to date is no more than a drop in the bucket because Tyco has not sought any recovery from those individuals of the monumental costs Tyco has incurred in connection with the ongoing investigations, the Boies firm's work, the civil and criminal litigations, or the potential liability from the class action lawsuit and the SEC and IRS investigations.

(p)     The current Board has not pursued and will not pursue the claims asserted herein because the statement in the February 7, 2003 Proxy Statement that the Board structure was not responsible for the deplorable conduct of former management apparently places the entire blame for the wrongdoing on the Criminal Defendants and does not acknowledge the potential culpability of anyone else, including former or current Boards.   The Board has taken this position despite its knowledge, recklessness or gross negligence in not knowing of the multitude of instances of wrongdoing and accounting improprieties alleged herein.  This statement constitutes an admission that the current Board will not independently review the claims asserted herein.

(q)     The current Board will not take the action requested herein in order to protect their own financial interests in preserving the value of their stock options and their personal interests in protecting their reputations.

**COUNT I**
**CLAIM FOR BREACH OF FIDUCIARY DUTY AND EQUITABLE FRAUD**
**(Against All Individual Defendants)**

438.     Plaintiff hereby incorporates by reference all paragraphs set forth above.

439.     The individual defendants owed to Tyco and its shareholders the duty to exercise due care,
loyalty, candor and diligence in the management and administration of Tyco and to act in good faith in the
execution of their duties, as well as not to engage intentionally, recklessly or with gross negligence in any
misconduct with regard to their responsibilities. The individual defendants have engaged in a continuing
course of conduct constituting breaches of fiduciary duty amount to equitable fraud, including engaging in
*ultra vires* acts by (a) allowing defendant Kozlowski and other Tyco executives to use Tyco as a vehicle
for their own personal financial benefit and to permit and encourage widespread accounting irregularities;
(b) by failing to seek redress for Tyco from the former Board as a result of such conduct; (c) by
disseminating materially false and misleading statements which omitted material facts in connection with the
Board's recommendation to shareholders to vote against reincorporation in the U.S.; (d) by disseminating
to the investing public and filing with the SEC materially false and misleading documents, including financial
statements which did not reflect the true financial condition of Tyco; (e) by failing to take accounting
charges and restatements when appropriate in order to artificially inflate the price of Tyco's stock and
thereby maintain the value of their stock options; (f) by causing Tyco to pay $92 million to maintain
directors and officers liability insurance for the wrongdoers; (g) by causing Tyco to pay approximately $75
million for the work of the Boies Firm, knowingly, recklessly or with gross negligence disregarding that it
did not report on material then-existing accounting improprieties and problems in order to obtain $6 billion
in financing and deceive the market into believing that Tyco's accounting problems had been uncovered
and taken care of; and (h) by failing to seek recovery for Tyco for the costs it has incurred in investigating
the wrongdoing and defending claims against Tyco and various officers and directors. The current Board

has committed this conduct to protect their own personal interests, both financial, in terms of artificially

inflating Tyco's stock price in order to maintain the value of their stock options, and professional, in

maintaining an appearance of credibility and integrity which they were elected to provide.

440.     To discharge these duties, the individual defendants were required to exercise reasonable

and prudent oversight of the management, policies, practices, and controls of Tyco, and to ensure that Tyco

conducted its business in compliance with all applicable laws and professional guidelines.  By reason of their

positions and because of their ability to control the business and corporate affairs of Tyco at all relevant

times, the individual defendants owed to the Company and to its stockholders fiduciary obligations of due

care, loyalty, prudence, candor and diligence, and to act in furtherance of the best interests of the Company

and its stockholders.  By virtue of this obligation of due care, loyalty, prudence, candor and diligence, the

individual defendants were required, among other duties and obligations:

(a)  to act honestly, candidly and in good faith with a view to the best interests of

the Company;

(b)  to exercise the care, diligence and skill that a reasonably prudent person would

exercise in comparable circumstances;

(c)  to manage, conduct, oversee and direct the employees, business, and affairs

of Tyco in accordance with state and federal laws and regulations;

(d)  to exercise reasonable control and oversee the officers,

employees and agents of Tyco;

(e)  to ensure the prudence and soundness of the policies and practices undertaken

or proposed to be undertaken by Tyco;

(f)  to remain informed as to how Tyco was, in fact, operating, and, upon receiving notice or information of an imprudent or unsound decision, condition, or practice, to make a reasonable investigation in connection therewith and to take steps to correct that decision, condition, or practice;

(g)  to conduct the affairs of the Company in an efficient manner in order to maximize profits to Tyco's stockholders;

(h)  to execute their duties as officers and directors of Tyco in accordance with their duty of loyalty to the Company and its shareholders; and

(i)  not to engage in any intentional, reckless, illegal, fraudulent or ultra vires misconduct or acts in their capacity as directors of Tyco.

441.  The individual defendants did, in fact, engage in conduct specifically in violation of their duties set forth above by, among other things, the following:

(a)  knowingly, recklessly or in gross negligence causing Tyco to engage in ultra vires acts;

(b)  knowingly, recklessly or in gross negligence causing Tyco to engage in fraudulent acts;

(c)  knowingly, recklessly or in gross negligence violating federal securities laws and regulations by permitting Tyco to make filings with the SEC which were materially false and misleading. The individual defendants, by not ensuring that the Company's SEC filings were in compliance with federal laws and regulations, have acted illegally and damaged Tyco. Further, this conduct may also subject Tyco to indictment for income-tax evasion and keeping false books and records, as well as SEC action against Tyco;

(d)  failing to oversee adequately the operations of Tyco in a manner consistent with preventing the Company from violating the federal securities and other laws;

(e)      failing to oversee adequately the use of Company funds to ensure that they were not used for the personal benefit of defendant Kozlowski, other Tyco executives or any individual defendants;

(f)      failing to take action to correct the improper practices complained of herein, and/or concealing, directing and/or encouraging such practices;

(g)      failing to oversee adequately the operations of Tyco by selling its CIT unit at a liquidation sale price;

(h)      failing to disclose to Tyco shareholders in 1997 at the time of Tyco's reincorporation in Bermuda and in 2003 in response to a shareholder proposal to reincorporate in the U.S. the impact of Bermuda law on then-existing shareholder derivative claims and the IRS review of Tyco's tax avoidance through offshore incorporation;

(i)      endorsing Phase 2 of the Boies Firm's work for the purpose of obtaining approximately $6 billion to pay off debt, knowing or recklessly ignoring that the Boies Firm failed to report approximately $1.6 billion in additional charges which, if reported, would have prevented Tyco from obtaining the $6 billion; and

(j)      knowingly, recklessly or in gross negligence exposing Tyco and its shareholders to millions of dollars of losses and damages, from, among other things, the resultant drop in the Company's stock price, the SEC investigation and the Manhattan District Attorney's investigation and legal costs associated with them, and exposure to shareholder class actions, including suits alleging accounting improprieties.

442.      Each of the individual defendants, individually or jointly, as herein alleged, by acquiescing, approving and/or directing decisions to further their own personal financial interests and by concealing the true financial condition of Tyco, committed one or more of the acts or omissions to act, which constituted

equitable fraud, waste of corporate assets, mismanagement, gross negligence, and/or violations of their fiduciary duties. Each of the individual defendants knowingly, recklessly, or in gross negligence, ignored information giving rise to an obligation to seek information regarding (among other things) defendant Kozlowski's and other Tyco executives' personal use of Tyco's funds and the accurate reporting of Tyco's financial condition and to take affirmative steps in a good faith effort to remedy this improper conduct.

443.    As a direct and proximate result of defendants' failures to exercise due care, candor and loyalty in the performance of their duties, as alleged herein, Tyco has engaged in imprudent, unlawful, fraudulent, ultra vires activities, all of which have caused and will continue to cause significant losses to Tyco.

444.    By reason of defendants' misconduct as set forth above, Tyco has suffered and will suffer damages, in an amount not presently determinable, but which is expected to be at least in the tens of millions of dollars.

445.    The individual defendants have acted in bad faith by violating the federal securities laws, including but not limited to 15 U.S.C. §78j(b) and 15 U.S.C. §78n(a) and other laws. The individual defendants' conduct has also exposed Tyco to indictment by the Manhattan District Attorney's Office on charges of income tax evasion and keeping false books and records, and the assessment of tax deficiencies by the IRS and enforcement action by the SEC. The individual defendants can not defend their actions as within their business judgment because engaging in illegal activity is *per se* not in a Company's best interest. In addition, the individual defendants have acted in bad faith in causing Tyco to commit ultra vires acts, including without limitation, violations of the Bermuda Companies Act of 1981.

446.    The allegations herein demonstrate a sustained and systematic failure by the individual defendants to fulfill their fiduciary duties. There is no independent organ within Tyco to which plaintiff can turn to obtain redress for the claims asserted herein. The wrongdoers have been and continue to be in

control of Tyco and will not permit Tyco to pursue the claims alleged herein against Tyco's former and current Board of Directors in order to protect their own personal interests, including the avoidance of personal liability and the preservation of the appearance of credibility which the individual defendants would sacrifice if they permitted Tyco to prosecute the claims alleged herein.

447.     As a result of the misconduct alleged, the individual defendants are liable to the Company in damages.  Further, Plaintiff has no adequate remedy at law and seeks injunctive and declaratory relief.

## COUNT II

### CLAIM FOR WASTE OF CORPORATE ASSETS AND EQUITABLE FRAUD
### (Against all Individual Defendants)

448.     Plaintiff hereby incorporates by reference all paragraphs set forth above.

449.     At the direction of, or with the approval of the individual defendants who have been and continue to be in control of Tyco, Tyco has engaged in a continuing pattern and practice of wasting corporate assets, as alleged herein.

450.     Corporate waste occurs when a corporation is caused to effect a transaction on terms that no person of ordinary, sound business judgment could conclude represents a fair exchange.  Indeed, given that Tyco stands to receive no benefit whatsoever from the transactions alleged herein and its incurrence of expenses and obligations in connection with those transactions, the individual defendants have engaged in a continuing course of corporate waste, including failing to seek recovery for Tyco of, among other things, (1) the waste of corporate assets which occurred under defendant Kozlowski and the former Board; (2) paying $92 million to preserve directors and officers liability insurance for the wrongdoers; and (3) paying approximately $75 million for the Boies Firm's work, the conclusions and motives of which are highly suspect.  By reason of the individual defendants' misconduct, Tyco has incurred significant expenses, liabilities, and obligations for the benefit of the individual defendants  and has been injured thereby.

**WHEREFORE**, plaintiff demands judgment as follows:

A.          Against all defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the breaches of fiduciary duty and waste of corporate assets by the individual defendants;

B.          Injunctive and declaratory relief precluding the continuation of the wrongs alleged herein;

C.          Awarding to plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs and expenses; and

D.          Granting such other and further relief as the Court may deem just and proper.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff hereby demands a trial by jury.


Dated:          June 12, 2003                    **UPSHALL, COOPER & TEMPLE, P.A.**


By:    _____
                    Frederick E. Upshall, Jr. (No. 2593)
                    Charles S. Temple (No. 2529)
                    10 Green Street, PO Box 867
                    Concord, NH 03302-0867
                    (603) 225-2791

                    **SHAHEEN & GORDON, P.A.**
                    Steven Gordon
                    Lucy J. Karl
                    2 Capital Plaza
                    P.O. Box 2703
                    Concord, NH 03302-2703
                    (603) 225-7262

                    **Co-Liaison Counsel for**
                    **Derivative Plaintiff**

**BERGER & MONTAGUE, P.C.**
Sherrie R. Savett
Barbara A. Podell
Robert A. Kauffman
1622 Locust Street
Philadelphia, PA  19103
(215) 875-3000

**WECHSLER HARWOOD LLP**
Robert I. Harwood
Matthew M. Houston
Joshua David Glatter
488 Madison Avenue
New York, NY 10027
(212) 935-7400

**Co-Lead Counsel for Derivative Plaintiff**

**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
Gregory M. Nespole
Stacey T. Kelly
270 Madison Avenue
New York, NY 10016
(212) 545-4600

**FARUQI & FARUQI LLP**
Nadeem Faruqi
320 East 9th Street, 3rd Fl.
New York, NY 10016
(212) 983-9330

**Counsel for Derivative Plaintiff**

06 12 03 Motion for Leave to File a Second Amended Derivative Complaint 2.wpd

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

```
————————————————————————
                                  )
IN RE TYCO INTERNATIONAL, LTD.,   )   MDL Docket No. 02-1335-B
SECURITIES LITIGATION             )   This Document Relates to:
                                  )   Derivation Action
                                  )
————————————————————————          )
```

**CERTIFICATE OF SERVICE**

    I hereby certify that on June 12, 2003 I caused true and correct copies of the attached Verified Stockholders' Second Consolidated and Amended Derivative Complaint, dated June 12, 2003, to be served upon each of the following counsel in the manner indicated below:

**BY E-MAIL & U.S. MAIL**

William Chapman, Esquire
On & Reno
One Eagle Square, P0 Box 3550
Concord NH 03302-3550
wlc@orr-reno.com
for Securities Action

Edward Haffer, Esquire
Sheehan Phinney Bass & Green
1000 Elm Street, P0 Box 3701
Manchester NH 03105-3701
ehaffer@sheehan.com
*for Tyco International*

William Hassler, Esquire
Steptoe & Johnson LLP
1330 Connecticut Ave. NW
Washington DC 20036
whassler@steprne.com
*for Mark Belnick*

Kenneth Bouchard, Esquire Bouchard &
Kleinman, PA
369 Lafayette Road
Hampton NH 03842-2223
kbouchard@bestnhlaw.com
*for ERISA Action*

Richard McNamara, Esquire
Wiggin & Nourie, PA
20 Market Street, P0 Box 808
Manchester NH 03105-0808
rmcnamara@wiggin-nourie.com
*for L. Dennis Kozlowski*

Marc Frazier Scholl, Asst. District Attorney of
Counsel
New York County
One Hogan Place
New York NY 10013
scho1lm@dany.nyc.gov

Robert N. Shwartz, Esquire
Debevoise & Plimpton
919 Third Avenue
New York NY 10022-3904
*Attorneys for Defendant*
*L. Dennis Kozlowski*
rnshwartz@dehevoise.com

Arnold Rosenblatt, Esquire Cook Little
Rosenblatt & Manson PLLC
650 Elm Street
Manchester NH 03101
*for PricewaterhouseCoopers*
a.rosenblatt@clrm.com

James Townsend, Esquire
Townsend Law Office
P0 Box 1067
Londonderry NH 03053
*for PricewaterhouseCoopers-Bermuda*
jetnhlaw@ionet.net

Gregory A. Markel, Esquire
Cadwalader Wickersham & Taft LLP
100 Maiden Lane
New York NY 10038
for Michael Ashcroft, John Fort, James Pasman
& Joseph Welch
greg.markel@cwt.com

JaneAnne Murray, Esquire
O'Melveny & Meyers LLP
153 East 53rd Street
New York NY 10022
*for W. Peter Slusser*
jmurray@omrn.com

Jody King, Esquire
Stillman & Friedman, PC
425 Park Avenue
New York NY 10022
*for Mark Swartz*
jking@stillmanfriedman.com

Michael Potenza, Esquire
Debevoise & Plimpton
919 Third Avenue
New York NY 10022
*C.03-1339-B*
mpotenza@debevoise.com

**VIA U.S. MAIL ONLY**
Christopher Reynolds, Esquire
Morgan Lewis & Bockius LLP
101 Park Avenue
New York NY 10178
*C. 03-1343-B*

Miranda Schiller, Esquire
Weil Gotshal & Manges LLP
767 Fifth Avenue
New York NY 10153
*for Richard Bodman & Wendy Lane*
miranda.shiller@weil.com

Laurie Smilan, Esquire
Latham & Watkins
Two Freedom Square
11955 Freedom Dr., Suite 500
Reston VA 20190-5651
*for Stephen Foss*
laurie.smilan@lw.com

Michele L. Pahmer, Esquire
Stroock Stroock & Lavan LLP
180 Maiden Lane
New York NY 10038
*for Frank Walsh*
rnpahmer@stroock.com

Francis P. Barron, Esquire
Cravath, Swaine & Moore
825 Eighth Avenue
New York NY 10019
*Attorneys for Defendants Tyco International,*
*Ltd.& Michael A. Ashcroft*
fbarron@cravath.com

Marshall R. King, Esquire
Gibson Dunn & Crutcher
200 Park Avenue
New York NY 10166-0193
*C. 03-1339-B*

Alan Friedman, Esquire
Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York NY 10022
*for Joshua Berman*

Ann Galvani, Esquire
Bois Schiller & Flexner LLP
570 Lexington Avenue
New York NY 10022
*C. 03-1343-B*

Michael Beck, Esquire
Judicial Panel on Multidistrict Litigation
Thurgood Marshall Federal Judiciary Bldg.
Room G-255, North Lobby
One Columbus Circle, NE
Washington DC 20002-8004

_____
Frederick E. Upshall, Jr.