**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>Ballard et al.</u>

    **v.**                             **MDL Docket No. 02-MD-1335-PB
Civil No. 04-CV-1336-PB**

<u>Tyco International, Ltd. et al.</u>


<u>**MEMORANDUM AND ORDER**</u>


The plaintiffs in this action are 33 family trusts and four individuals who acquired shares of Tyco International, Ltd. in exchange for their stock in AMP, Inc. when the two companies merged on April 4, 1999.  They have sued Tyco, various former officers and directors of the company, and Pricewater-houseCoopers, LLP ("PwC"), Tyco's independent accountant and auditor.[1]  In their eight-count Complaint, plaintiffs first assert three claims for relief under §§ 10(b), 14(a), and 20(a)

---

[1]  The other defendants are L. Dennis Kozlowski, Mark H. Swartz, Mark A. Belnick, Frank E. Walsh, Jr., and Michael A. Ashcroft, collectively the "Individual Defendants."

of the Securities Exchange Act of 1934 ("Exchange Act"), 15

U.S.C. §§ 78j(b), 78n(a), and 78t(a), and Rule 10b-5 promulgated

thereunder, 17 C.F.R. § 240.10b-5 (Counts I-III).  Plaintiffs

next assert three claims for relief under §§ 11, 12(a)(2), and 15

of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§

77k, 77l(a)(2), and 77o (Counts IV-VI).  Finally, plaintiffs

bring claims for common law fraud and common law negligent

misrepresentation (Counts VII-VIII).

Tyco has moved to dismiss the Complaint (Doc. No. 213).[2]  In

so doing, it argues that the Exchange Act and Securities Act

claims are time-barred and that the common law claims have not

been pleaded with the particularity required by Fed. R. Civ. P.

9(b).  For the reasons set forth below, I reject these arguments

and deny Tyco's motion to dismiss.


## I.   BACKGROUND

Tyco International, Ltd. provides a wide range of products

---

[2]  PwC filed a separate motion to dismiss (Doc. No. 308).
On April 22, 2005 I granted that motion and dismissed the claims
against PwC.  Defendant Ashcroft has also separately moved to
dismiss the claims against him (Doc. No. 387).  I have not yet
ruled on Ashcroft's motion.

and services to consumers.  Compl. ¶ 52.  Between 1992 and 2002,
under the direction of then-CEO L. Dennis Kozlowski, Tyco pursued
a strategy of aggressive acquisition.  Id.  Throughout that
period, Tyco and the Individual Defendants touted Tyco's success
as a "turn-around specialist," able to quickly create value in
newly acquired companies.  Id.

## A.   **The AMP/Tyco Merger**

Tyco reached an agreement on November 22, 1998, under which
AMP, an international manufacturer of electronic connectors,
would merge with a Tyco subsidiary.  Compl. ¶ 53.  Under the
terms of the merger agreement, each AMP shareholder would receive
0.7839 of a share of Tyco common stock in exchange for each of
their AMP shares.  Id.  On February 12, 1999, Tyco and AMP
distributed a joint AMP/Tyco Proxy Statement and Prospectus
("AMP/Tyco Proxy"), containing financial data concerning both AMP
and Tyco, and soliciting shareholder votes in support of the
proposed merger.  Id.  The AMP/Tyco merger closed on April 4,
1999, following shareholder approval.  Id. at ¶ 57.  This
transaction was Tyco's largest acquisition up to that date, and
was valued at $11.3 billion.  See In re Tyco Int'l, Ltd., 185 F.

-3-

Supp. 2d 102, 106 (D.N.H. 2002)("Tyco I").

In Tyco's public announcement of the merger, Kozlowkski stated:

> The combination with Tyco provides AMP a clear path to becoming the lowest cost manufacturer, while providing attractive margin improvements resulting in double-digit earnings growth and strong cash flows for the foreseeable future. . . . The transaction will provide an immediate positive earnings contribution to our shareholders.

Compl. ¶ 54. In meetings with securities analysts, Kozlowski further predicted that the acquisition of AMP would add twelve cents per share to Tyco's profits for the fiscal year ending September 30, 1999. Id.

Prior to the close of the merger, on January 29, 1999, AMP announced its financial results for the quarterly period ending December 31, 1998. Id. at ¶ 55. Although AMP's operating income had increased from the prior quarter, the company nevertheless reported a net loss of $79 million as a result of: (a) $154 million in charges related to AMP's Profit Improvement Plan; (b) $17 million in expenses related to its defense against a hostile takeover bid; and (c) $15 million in non-refundable bank fees related to AMP's canceled offer to repurchase 30 million shares of its own stock. Id. at ¶ 55. The AMP Profit Improvement Plan

-4-

also established an accounting reserve for anticipated expenses related to workforce reductions, facility closings, divestitures, and fixed asset adjustments.  <u>Id.</u>

AMP filed its form 10-K (annual report) for fiscal year 1998 on March 26, 1999.  In that 10-K, AMP reported $376.7 million in charges, including a reserve of $249.9 million related to the anticipated discharge of 6,450 employees and a $126.8 million reserve for the consolidation and closure of various facilities.  Compl. ¶ 56.  AMP also reported a one-time charge of $38.4 million in reserves for inventory and equipment write-downs included in the cost of sales.  <u>Id.</u>  Two days before the closing, Tyco again promised double-digit growth after the merger.  <u>Id.</u> at ¶ 57.

Tyco announced in a press release on July 20, 1999 that its earnings for the quarter ending June 30, 1999 had increased 71% compared with the prior year's corresponding quarter.  Compl. ¶ 58.  Tyco attributed this earnings growth to the acquisition of AMP.  <u>Id.</u>  Later that month, Kozlowski and former director Ashcroft sold hundreds of thousands of shares of Tyco stock; then, in September and October 1999, Kozlowski and Belnick sold

hundreds of thousands of shares of Tyco stock at prices ranging from $40.18 to $51.50 per share.  Id. at ¶ 59.

**B.**   **The Tice Report, The *New York Times* Article, and The First SEC Investigation**

Fund manager David W. Tice published an article in his October 13, 1999 newsletter (the "Tice Report") which questioned Tyco's accounting practices in general, and its alleged use of "cookie jar" reserves to artificially boost earnings in particular.  Compl. ¶ 60.  In response, Tyco denied Tice's allegations in a series of press releases, media interviews by Kozlowski, and conference calls with security analysts.  Id.

Several weeks later, on October 29, 1999, the *New York Times* published an article noting Tyco's reputation as a turn-around specialist and pointing out that AMP and other companies acquired by Tyco took significant losses just before the acquisitions closed.  Compl. ¶ 61.  The article further stated that the pre-merger loss charges explained why Tyco was apparently able to take no-growth companies and show positive results immediately after the mergers.  Id.  Tyco again denied any wrongdoing, as it had done in response to the Tice Report.  Id. at ¶ 62.

Shortly thereafter, Tyco announced, in a December 9, 1999 press release, that its accounting practices were under investigation by the SEC.  Compl. ¶ 63.  The press release revealed that the practices that had drawn SEC scrutiny were those connected with the reserves and charges reported prior to acquiring target companies.  Id.  In that press release, and in subsequent statements, Tyco once again denied any wrongdoing. Id.

Nearly six months later, on June 26, 2000, Tyco issued a revised Form 10-K for 1999 and revised Forms 10-Q for the first two quarters of fiscal year 1999 and fiscal year 2000.  Compl. ¶ 64.  The restated 1999 10-K reclassified certain charges and adjusted merger, restructuring, and other non-recurring charges. Id.  Among other things, Tyco reclassified $172.5 million in charges incurred by AMP prior to its merger with Tyco, reclassified $27.5 million in inventory restructuring costs, and eliminated $26 million of the merger restructuring and other non-recurring charges that were originally recorded in the 1999 fiscal year.  Id.

Less than one month later, on July 13, 2000, the SEC informed Tyco that it had completed its investigation and that no

−7−

enforcement action would be taken.  <u>Id.</u> at ¶ 65.

**C.   <u>Tyco I</u>**

Plaintiff's complaint is not the first of its kind.  On December 9, 1999, the same day that the SEC announced it was conducting an informal investigation into Tyco's accounting practices, a number of individual shareholders filed suits against Tyco in federal district courts across the country, claiming that Tyco's public statements and accounting practices violated federal security laws.  <u>Tyco I</u>, 185 F. Supp. 2d at 109. The Judicial Panel on Multidistrict Litigation transferred these actions to this court for consolidated pretrial proceedings on April 26, 2000.  <u>Id.</u>

Defendants moved to dismiss.  I granted that motion and dismissed the complaint in its entirety on February 22, 2002, concluding that the <u>Tyco I</u> plaintiffs' Exchange Act claims had not been pleaded with the particularity required by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), and plaintiff Farmers Company's Securities Act claims were barred by the applicable statute of limitations.  <u>Id.</u> at 116.

**D.**   **Post-Tyco I Events**

The SEC re-opened its investigation of Tyco in June 2002, following the dismissal of the complaint in Tyco I. Compl. ¶ 69. Later that year, Tyco issued several reports, including the September 17, 2002, Form 8-K (the "September Report") and the December 30, 2002, Form 8-K (the "December Report"), which revealed that it had failed to produce "[a] large quantity of documents . . . in connection with the SEC's document request" during the SEC's first investigation. Id. at ¶ 68. Tyco also identified several acts of wrongdoing in the December Report, including the fact that prior management appeared to influence acquisition targets "into adopting accounting treatments that 'over-accrued' expenses prior to an acquisition's consummation or otherwise exceeded what was permitted by GAAP."[3] Id. at ¶ 79.

On September 12, 2002, a New York grand jury indicted Tyco's former CEO Kozlowski and former Chief Financial Officer Swartz, charging them with looting the Company of more than $600 million

---

[3] GAAP stands for "Generally Accepted Accounting Principles," which "embody the prevailing principles, conventions, and procedures defined by the accounting industry from time to time." Young v. Lepone, 305 F.3d 1, 5 n.1 (1st Cir. 2002)(citing Sanders v. Jackson, 209 F.3d 998, 1001 n.3 (7th Cir. 2000)).

and reaping more than $430 million in improper profits from the sale of Tyco stock.[4]  Compl. ¶ 71.  The grand jury also indicted Tyco's former general counsel Mark Belnick on September 12, charging him with falsifying business records.[5]  Id.

On the same day, the SEC filed a civil complaint against Kozlowski, Swartz, and Belnick in the United States District Court for the Southern District of New York.  Compl. ¶ 73.  This case is currently stayed.  Id.  The SEC then filed and settled a suit against former Tyco director Frank E. Walsh on December 17, 2002.  Id. at ¶ 74.  That complaint alleged that Walsh misled Tyco investors when he failed to disclose a $20 million "finder's fee" paid to him by Tyco in connection with Tyco's 2001 merger with CIT.  Id.

As a result of the second SEC investigation, Tyco announced on June 16, 2003 that it would restate its financial results, going back to 1998, to correct $696.1 million that it mistakenly had classified as pretax charges.  Compl. ¶ 79.  Tyco announced on July 29, 2003 that it was restating its financial statements

---

[4]  Kozlowski and Swartz were convicted on most of these charges on June 17, 2005.

[5]  Belnick was acquitted of all charges on July 15, 2004.

-10-

for the fiscal years ending September 30, 2002, 2001, 2000, 1999, and 1998, the period prior to and during the AMP/Tyco merger. Id. at ¶ 80.

**E.   Tyco II**

On January 28, 2003, a putative class of plaintiffs filed a Consolidated Complaint, alleging multiple securities law violations against Tyco, former officers and directors including Kozlowski, Swartz, Belnick, Walsh, and Ashcroft, and PwC.[6] In re Tyco International, Ltd., 2004 WL 2348315, *1 (D.N.H. Oct. 14, 2004)("Tyco II").  In the Consolidated Complaint, these plaintiffs alleged that a massive fraud was perpetuated by the defendants during the December 13, 1999 through June 7, 2002 class period.  They charged both that Tyco employed a variety of fraudulent accounting practices to inflate its stock price during the class period and that senior management systematically looted the company of hundreds of millions of dollars in undisclosed and unauthorized compensation.  All defendants challenged the sufficiency of the allegations and moved to dismiss the

---

[6]  The plaintiffs in Tyco II, like the plaintiffs here, asserted claims based on §§ 10(b), 14(a), 20(a), and 20(A) or the Exchange Act of 1934 and §§ 11, 12(a)(2) and 15 of the Securities Act of 1933.

Consolidated Complaint.  Id. at *1.

I denied defendants' motion to dismiss except to the extent they sought dismissal of plaintiffs' claims under § 14(a) of the Exchange Act and their claims against defendant Ashcroft under § 10(b), § 20(a), and § 20A of the Exchange Act, and § 15 of the Securities Act.  Id. at *19.

**F.   Plaintiff's Claims**

Echoing the allegations in Tyco II, plaintiffs in the current action charge defendants with massive accounting fraud and looting.  The only significant difference between the two complaints is that the plaintiffs in the current action also claim that defendants' fraudulent accounting practices predated the class period in Tyco II and extended to Tyco's accounting for the AMP merger.

**II.   STANDARD OF REVIEW**

Tyco challenges the Complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.  Tyco argues that the federal claims must be dismissed as time-barred and the common law claims must be dismissed because they have not been

properly pleaded.

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), I must "accept as true all well-pleaded allegations and give plaintiffs the benefit of all reasonable inferences." Cooperman v. Individual Inc., 171 F.3d 43, 46 (1st Cir. 1999)(citing Gross v. Summa Four, Inc., 93 F.3d 987, 991 (1st Cir. 1996)).  However, while a court "deciding a motion to dismiss under Rule 12(b)(6) . . . must take all well-pleaded facts as true . . . it need not credit a complaint's 'bald assertions' or legal conclusions." Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1216 (1st Cir. 1996)(quoting Wash. Legal Found. v. Mass. Bar Found., 993 F.2d 962, 971 (1st Cir. 1993)).  A complaint must contain "factual allegations . . . respecting each material element necessary to sustain recovery under some actionable legal theory." Glassman v. Computervision Corp., 90 F.3d 617, 628 (1st Cir. 1996)(internal quotations and citations omitted).  A motion to dismiss under Rule 12(b)(6) should not be granted unless it "presents no set of facts justifying recovery." Cooperman, 171 F.3d at 46 (citing Dartmouth Review v. Dartmouth College, 889 F.2d 13, 16 (1st Cir. 1989)).

Special pleading requirements apply to fraud claims.  Fed.
R. Civ. P. 9(b) states that "[i]n all averments of fraud or
mistake, the circumstances constituting fraud or mistake shall be
stated with particularity."  Rule 9(b) also requires that the
plaintiff's averments of fraud specify the time, place, and
content of the alleged false or fraudulent misrepresentations."
United States ex rel. Karvelas v. Wakefield-Melrose Hosp., 360
F.3d 220, 226 (1st Cir. 2004).  Furthermore, when a cause of
action sounding in fraud is based on "information and belief,"
Rule 9(b) requires the plaintiff to plead sufficient supporting
facts to permit a conclusion that the alleged belief is
reasonable.  See id.  In contrast, "[m]alice, intent, knowledge
and other conditions of minds of a person may be averred
generally."  Fed. R. Civ. P. 9(b).

### III.  **ANALYSIS**

In its motion to dismiss, Tyco argues that plaintiffs'
Exchange Act claims and Securities Act claims are barred by the
applicable statutes of limitations and repose, and cannot be
saved by the Sarbanes-Oxley Act.[7]  Tyco also argues that the

_____

[7]  In its memorandum of law in support of its motion to
dismiss, Tyco posits in two footnotes that an alternative ground

common law fraud and misrepresentation claims must be dismissed
because plaintiffs' allegations fail to satisfy the heightened
pleading requirements of Fed. R. Civ. P. 9(b).  I analyze and
reject each argument in turn.

A.   **Federal Claims**

At the time of the AMP/Tyco merger on April 4, 1999, claims
brought under §§ 10(b), 14(a), and 20(a) of the Exchange Act had
to be commenced within "one year after the discovery of the facts
constituting the violation *and* within three years after such
violation."  Lampf, Pleva, Lipkind, Prupis & Petigrow v.
Gilbertson, 501 U.S. 350, 364 (1991)(§ 10(b) claims)(emphasis
added); Westinghouse Elec. Corp. v. Franklin, 993 F.2d 349, 353
(3d Cir. 1993)(§ 14(a) claims); Dodds v. Cigna Sec., Inc., 12
F.3d 346, 350 (2d Cir. 1993)(§ 20(a) claims).  Similarly, claims
brought under §§ 11, 12(a)(2), and 15 of the Securities Act had
to be commenced "within one year after the discovery of the
untrue statement or the omission, or after such discovery should

_____

for dismissal of the federal claims is that plaintiffs' failed to
plead with particularity scienter or the existence of actionable
misrepresentations.  See Tyco's Mem. in Supp. of Def.'s Mot. to
Dismiss, at 19 n.16 & 23 n.20.  I do not address this argument
because Tyco has not adequately briefed it.

have been made by the exercise of reasonable diligence" _and_ "no later than three years after the security was bona fide offered to the public, or under section 12(a)(2) of this title more than three years after the sale."  15 U.S.C. § 77m (emphasis added).

The Sarbanes-Oxley Act of 2002 ("SOX") extended the periods of limitation and repose for certain private securities claims to two and five years, respectively.  Pursuant to Section 804 of SOX, a claim involving "fraud, deceit, manipulation, or contrivance" must be commenced within the shorter of "2 years after the discovery of the facts constituting the violation" or "5 years after such violation."  Pub. L. No. 107-204 § 804, 116 Stat. 801, codified at 28 U.S.C. § 1658(b).  The extended limitations and repose periods apply to actions that were commenced after the SOX's July 30, 2002 effective date.  Id.

1.  _Statute of Repose_

It is undisputed that the repose period in this case began to run on plaintiffs' federal claims on April 4, 1999, the date they acquired their Tyco stock.  It is also undisputed that plaintiffs filed their Complaint on January 20, 2004.  Tyco thus argues that plaintiffs' federal claims must be dismissed because

-17-

the applicable three-year repose period expired on April 4, 2002, nearly two years before plaintiffs' filed suit.

Plaintiffs counter that the three-year repose period was tolled from December 9, 1999 until February 22, 2002, while Tyco I was pending, pursuant to the class action tolling doctrine articulated by the Supreme Court in American Pipe & Constr. Co. v. Utah, 414 U.S. 538, 551 (1974).  According to plaintiffs' calculation, the statute of repose ran from April 4, 1999, until the complaint in Tyco I was filed on December 9, 1999, a period of eight months and five days.  The statute of repose was then tolled until February 22, 2002, when the complaint in Tyco I was dismissed.  The statute ran again from February 22, 2002, until plaintiffs filed their Complaint on January 20, 2004, a period of almost 23 months.  Hence, the total running time of the three-year statute of repose was just over 31 months.  Thus, the Complaint is not time-barred, plaintiffs argue, because they filed suit before June 2004 when the three-year repose period would have expired.

Plaintiffs' argument thus hinges on whether the statute of repose was tolled while Tyco I was pending.  In American Pipe,

the Supreme Court held that in certain situations, the filing of a class action pursuant to Fed. R. Civ. P. 23 suspends the applicable limitation and repose periods for all putative members of that class while the case is pending.  414 U.S. at 554.  The Court explained that the class-action tolling rule is necessary to eliminate the incentive for each individual class member to file a separate action, thus defeating the purpose of Rule 23. Id.; see also Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 350-51 (1983)(same); Rodriquez v. Banco Central, 790 F.2d 172, 179 (1st Cir. 1986)(pendency of class action tolls statute of limitation until decision on certification).  Tyco contends, however, that American Pipe is inapplicable here because "class action tolling" is indistinguishable from the "equitable tolling" rejected by the Supreme Court in Lampf.  501 U.S. at 363 (concluding that equitable tolling principles do not apply to the repose period for § 10(b) claims).  I disagree.

Statutes of limitations and repose are intended to prevent plaintiffs from sleeping on their rights and to protect defendants from being unfairly surprised by the appearance of stale claims.  Crown, Cork & Seal, 462 U.S. at 352.  Where a

-19-

class action is commenced, these ends are met.  <u>Id.</u>  When the
<u>Tyco I</u> complaint was filed, Tyco was put on notice of the
substantive claims, as well as the number and generic identity of
potential plaintiffs, and cannot now assert that plaintiffs'
claims are stale or that they slept on their rights.[8]  <u>See id.</u>;
<u>Joseph v. Wiles</u>, 223 F.3d 1155, 1168 (10th Cir. 2000).  Legally
tolling the repose period while a class action is pending
therefore does not compromise the purpose served by statutes of
limitations and repose.  <u>See Joseph</u>, 223 F.3d at 1167-68 (holding
that <u>Lampf</u> does not bar tolling for a pending class action,
because this tolling is legal, not equitable and applying
<u>American Pipe</u> to Securities Act claims); <u>Official Comm. of</u>
<u>Asbestos Claimants of G-I Holding, Inc. v. Heyman</u>, 277 B.R. 20,
31 (S.D.N.Y. 2002)("The <u>American Pipe</u> rule has been extended to
statutes of repose," because class action tolling "is legal
rather than equitable in nature"); <u>Salkind v. Wang</u>, 1995 WL
170122, *2-*3 (D. Mass. Mar. 30, 1995)(noting that "[a]lthough

---

      [8]  In a sense, as the Tenth Circuit explained in <u>Joseph</u>,
application of the <u>American Pipe</u> tolling doctrine to cases such
as this one does not involve "tolling" at all.  223 F.3d at 1168.
Rather, plaintiffs have effectively been parties to an action
against Tyco since the complaint in <u>Tyco I</u> was filed.  <u>See id.</u>

equitable tolling is inapplicable, American Pipe does toll the
Lampf bar of repose for as many of [plaintiff's] claims which are
part of a class action against the same defendant(s).").
Consequently, I find defendants' argument against the application
of American Pipe tolling in this case unpersuasive.  I thus
conclude that plaintiffs' claims were tolled while Tyco I was
pending and, as a result, their claims are timely under the
three-year statute of repose.

     2.   *Statute of Limitations*

     Plaintiffs' claims based on the Exchange Act and the
Securities Act are also subject to a one-year statute of
limitations that began to run from the date that the plaintiffs
knew, or reasonably should have known, of the facts on which the
claims are based.  See Lampf, 501 U.S. at 364 n.9 (§ 10(b)
claims); Westinghouse Elec. Corp., 993 F.2d at 353 (§ 14(a)
claims); Dodds, 12 F.3d at 350 n.2 (§ 20(a) claims); Short v.
Belleville Shoe Mfg. Co., 908 F.2d 1385, 1390 (7th Cir. 1990)(§§
11 and 12(a)(2) claims); Tracinda Corp. v. DaimlerChrysler AG,
197 F. Supp. 2d 42, 55 n.5 (D. Del. 2002)(§ 15 claims).  SOX
extended the limitations period to two-years for claims commenced

after July 30, 2002.  Plaintiffs argue that their federal claims are timely because they filed their Complaint within one year of July 29, 2003, the earliest date on which they reasonably could have learned of the fraudulent scheme.[9]

A two-part test is used in the First Circuit to determine when a plaintiff has sufficient notice of a securities fraud claim to trigger the one-year limitations period.  Young, 305 F.3d at 8.  First, the party invoking the statute of limitations defense "must demonstrate that sufficient 'storm warnings'[10] of fraud were on the horizon to trigger a duty to inquire further."  Tyco II, 2004 WL 2348315, at *18 (citing Young, 305 F.3d at 8).  If the defendant meets this burden, the plaintiff must then produce evidence establishing that even a reasonably diligent investigation would not earlier have produced sufficient evidence to permit the filing of a legally viable complaint.  Id.  Because

---

[9]  Plaintiffs also argue that their Exchange Act claims are timely under SOX's five-year statute of repose.  Because I hold that the federal claims are timely under the three-year repose period, I need not consider this argument.

[10]  "Storm warnings" exist "[w]hen telltale warning signs augur that fraud is afoot," such that if the warning signs are "sufficiently portentous," they may, "as a matter of law be deemed to alert a reasonable investor to the possibility of fraudulent conduct."  Young, 305 F.3d at 8.

"[t]he multifaceted question of whether storm warnings were apparent involves issues of fact," and the "circumstances of each case must be explored independently," it may not be appropriate to resolve this issue on a motion to dismiss in certain cases. Young, 305 F.3d at 9 (also noting that "[i]n the archetypical case . . . it is for the factfinder to determine whether a particular collection of data was sufficiently aposematic to place an investor on inquiry notice").

Plaintiffs concede that in Tyco I I held that storm warnings of Tyco's alleged fraud were present as early as October 1999, when the Tice Report and the *New York Times* article questioned Tyco's accounting practices.  Notwithstanding this holding, they argue that these articles now must be viewed in light of Tyco's persistent denial of the allegations against it, its failure to produce responsive documents that may have hamstrung the SEC's initial investigation, and the ultimate dismissal of the complaint in Tyco I.  Plaintiffs contend that all of these factors mitigated the October 1999 storm warnings and effectively

prevented them from having sufficient information to assert viable claims based on these allegations until new information later emerged.

Plaintiffs therefore contend that after the <u>Tyco I</u> complaint was dismissed, the earliest time in which a reasonable investigation could have uncovered enough information for them to file a legally sufficient complaint was on July 29, 2003, when Tyco announced it was restating its financial results for several fiscal years, including 1998 and 1999. Only on that date, plaintiffs argue, did they first become aware of sufficient information. If plaintiffs are correct, and at this stage I must accept as true all well-pleaded facts, I agree that their Complaint, filed approximately six months later, on January 20, 2004, is not time-barred. I thus deny Tyco's motion to dismiss the federal claims.[11]

**B.    <u>Common Law Claims</u>**

Tyco next charges that plaintiffs allegations of common law

---

[11]    Plaintiffs also argue that their Exchange Act claims are timely under SOX's two-year statute of limitations. Because I conclude that I cannot credit Tyco's statute of limitations argument even if plaintiffs' claims are subject to a one-year statute of limitations, I decline to reach this argument.

fraud and negligent misrepresentation are insufficient to satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b) and therefore must be dismissed.  I disagree.  Unlike the complaint in Tyco I, which was based on the limited information then available, the plaintiffs in this case have the benefit of additional information disclosed after Tyco I was dismissed. Relying on that information, they have specifically identified the time, place, and content of the allegedly fraudulent statements on which their common law claims are based; they have cited to specific evidence to support their assertions that the statements were fraudulent; they have specifically pleaded reliance; and they have pleaded that the allegedly fraudulent statements were made with a culpable mens rea.  No more is required to satisfy Rule 9(b).  I thus conclude that this plaintiffs' allegations, when viewed in the context of the Complaint as a whole, are sufficient to cure the deficiencies that doomed the complaint in Tyco I, and to survive Tyco's Rule 12(b)(6) challenge.

## IV.  **CONCLUSION**

For the reasons set forth above, Tyco's motion to dismiss

(Doc. No. 213) is denied.

    SO ORDERED.


                                  /s/Paul Barbadoro
                                  Paul Barbadoro
                                  United States District Judge

July 11, 2005

cc:  Counsel of Record