**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>**Ezra Charitable Trust, et al.**</u>

                                  **MDL No. 02-MDL-1335-PB**
        **v.**                        **Civil No. 03-CV-1355-PB**

<u>**Tyco International, Ltd., et al.**</u>


<u>**MEMORANDUM AND ORDER**</u>

      Ezra Charitable Trust ("Ezra"), Mirror Management, Ltd. ("Mirror Management"), and Robert Bovit have filed an amended class action complaint against Tyco International, Ltd. ("Tyco"), its Chairman and Chief Executive Officer, Edward D. Breen, its Executive Vice President and Chief Financial Officer, David J. FitzPatrick, and the accounting firm PricewaterhouseCoopers, LLP ("PwC").  Plaintiffs claim that statements regarding Tyco's financial status made by the defendants in late December 2002 violated Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a). Defendants have moved to dismiss these claims (Doc. Nos. 419 and 425), arguing, among other things, that plaintiffs have failed to

allege facts sufficient to raise a "strong inference" of
scienter.  <u>See</u> 15 U.S.C. § 78u-4(b).


## I.  <u>BACKGROUND</u>

Tyco has been the subject of numerous lawsuits alleging
securities fraud against the company and its former officers,
directors, and auditors arising out of events that occurred
between 1997 and 2002.  <u>See, e.g.</u>, <u>In re Tyco Int'l Ltd. Sec.
Litig.</u>, 2004 WL 2348315 (D.N.H. Oct. 14, 2004) ("<u>Tyco II</u>").  This
action differs from the others in that it involves a later class
period and targets Tyco's current CEO and CFO, Breen and
FitzPatrick, rather than the former officers and directors who
allegedly looted the company and oversaw the accounting fraud
schemes that began the cascade of lawsuits.

By the time Breen and FitzPatrick were hired in July and
September 2002, revelations of corporate mismanagement had
imperiled Tyco, making bankruptcy a possibility if the company
failed to pay off $3.855 billion in debt that would become due in
February 2003.  Am. Compl. ¶ 5.  To generate the capital
necessary to refinance the debt, Tyco needed to assure the

investing public that it had corrected all of its accounting and financial statement problems from the past.  Id. ¶¶ 5, 10.  It therefore subjected itself to an extensive investigation of its past accounting and corporate governance practices.  Id. ¶ 32. The results of this investigation, which was the product of 15,000 lawyer hours and nearly 50,000 accountant hours, were announced in a Form 8-K and a Form 10-K, both of which were disclosed to the public on December 30, 2002.  Id. ¶ 33. Plaintiffs allege that these filings contained material misstatements which, when revealed, caused investors to suffer significant losses.

According to plaintiffs, the primary set of misstatements were contained in the Form 8-K.  In addition to identifying various other faulty accounting practices, the Form 8-K explained that Tyco had improperly recognized as income fees that one of its major division, ADT, had charged authorized dealers in the course of purchasing their customer contracts.  Id. ¶ 36. To correct these accounting misstatements, Tyco pledged that it would reduce its "reported pre-tax earnings during the fiscal year 2002 by $135 million" and "take a charge of $185.9 million

in fiscal year 2002 representing the amount of revenue effectively recognized in the fiscal years 1999 to 2001 that should have been deferred and amortized over the estimated useful life of the account." Id. ¶ 39.  The Form 10-K made similar disclosures regarding Tyco's past accounting practices, and further specified that the amortization of improperly recognized income would take place over a ten-year period.  Id. ¶ 41.

In addition to these disclosures, the Forms also contained statements about Tyco's status in the wake of the investigation. The Form 8-K stated that Tyco was "not aware of any systemic or significant fraud related to the Company's financial statements or any clear accounting errors that would materially adversely affect the Company's reported earnings or cash flow from operations for the year 2003 and thereafter."  Id. ¶ 33.

PwC, which served as Tyco's accountant and one of its consultants, performed an audit of Tyco's disclosures and included its endorsement of the Form 10-K as an addendum to the filing.  Id. ¶ 55.  PwC's endorsement stated that:

> In our opinion, the accompanying consolidated balance
> sheets and the related consolidated statements of
> operations, of shareholders' equity and of cash flows
> present fairly, in all material respects, the financial

position of Tyco International Ltd. and its
subsidiaries **at September 30, 2002 and 2001,** and the
results of their operations and cash flows for each of
the three years in the period ended September 30, 2002,
in conformity with accounting principles generally
accepted in the United States of America.  In addition,
in our opinion, the accompanying financial statement
schedule presents fairly, in all material respects, the
information set forth therein when read in conjunction
with the related consolidated financial statements.
These financial statements and financial statement
schedule are the responsibility of the Company's
management; our responsibility is to express an opinion
on these financial statements and financial statement
schedule based on our audits.  We conduct our audits of
these statements in accordance with auditing standards
generally accepted in the United States of America,
which require that we plan and perform the audit to
obtain reasonable assurance about whether the financial
statements are free of material misstatement.  An audit
includes examining, on a test basis, evidence
supporting the amounts and disclosures in the financial
statements, assessing the accounting principles used
and significant estimates made by management, and
evaluating the overall financial statement
presentation.  We believe that our audits provide a
reasonable basis for our opinion.

<u>Id.</u> (emphasis in original).

The market reacted favorably to this news and on December
31, 2002, Tyco's stock price rose from $15.17 per share to a
closing price of $17.08 per share.  <u>Id.</u> ¶ 10.  Starting on that
day, Tyco was also able to raise $4.375 billion from bond sales
that it then used to repay $3.855 billion in debt.  <u>Id.</u>

Tyco's fortunes changed, however, on March 12, 2003, when it issued a press release disclosing the fact that it expected to announce additional "non-cash pre-tax charges that are estimated to be between $265 million and $325 million for issues identified primarily in its Fire & Security Services business [ADT]."  Id. ¶ 46.  Tyco attributed these additional charges to the fact that it had concluded, as the product of on-going discussions with the SEC, that the income from the acquisition of customer contracts, income that it once believed it could include as amortized income over the course of a ten-year period, could not be considered income at all, whether amortized or not.  Id. ¶ 47.  That day, Tyco's stock price fell from $14.03 per share to $12.29 per share.  Id. ¶ 12.

Plaintiffs filed suit alleging securities fraud.  The defendants now challenge the sufficiency of plaintiffs' amended complaint.  I consider their challenge below.

## II.  <u>STANDARD OF REVIEW</u>

A Rule 12(b)(6) motion to dismiss argues either that the complaint fails to describe the claims for relief in sufficient

detail, or that the claims are deficient even if they are pleaded
with the requisite specificity.  The degree of detail that a
complaint must contain to survive a Rule 12(b)(6) challenge
depends upon the nature of the claims under review.  In most
cases, a plaintiff is required to provide only "a short and plain
statement of the claim showing that the pleader is entitled to
relief."  Fed. R. Civ. P. 8(a)(2).

The Private Securities Litigation Reform Act ("PSLRA")
establishes specific pleading requirements for fraud claims based
on the Exchange Act.  See In re Stone & Webster, Inc.,Sec.
Litig., 414 F.3d 187, 191 (1st Cir. 2005).  Complaints alleging
such claims must "specify each statement alleged to have been
misleading, the reason or reasons why the statement is
misleading, and, if an allegation regarding the statement or
omission is made on information and belief, the complaint shall
state with particularity all facts on which that belief is
formed."  15 U.S.C. § 78u-4(b)(1).  In addition, the PSLRA
requires that a securities fraud complaint plead facts that are
sufficient to give rise to a "strong inference" of scienter.  15
U.S.C. § 78u-4(b)(2).  The First Circuit has interpreted this
provision to demand "a recitation of facts supporting a 'highly

likely' inference that the defendant acted with the required
state of mind."  Stone & Webster, 414 F.3d at 195 (citing
Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002)).


### III.  DISCUSSION

### A.  Claims against Tyco, Breen and FitzPatrick

Defendants argue that plaintiffs have failed to recite
sufficient facts in their complaint to support a "highly likely
inference" that Tyco, Breen and FitzPatrick acted with the
requisite scienter.  In a § 10(b) action, the requisite scienter
is "a mental state embracing intent to deceive, manipulate, or
defraud."  In re Cabletron Sys., Inc., 311 F.3d 11, 38 (1st Cir.
2002), quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193
n.12 (1976).  In determining whether a given defendant acted with
this mental state, the First Circuit has rejected any rigid
formula in favor of a "fact-specific approach."  Id. (citations
omitted).

Plaintiffs' claims rest on allegations that both Breen and
FitzPatrick knew that the Forms 8-K and 10-K contained material
misstatements and yet released those forms anyway.  They rely

most heavily on two sets of alleged misstatements.  The first are
those that relate to Tyco's attempt in the December 30, 2002 Form
8-K and Form 10-K to correct earlier misstatements concerning the
recognition of income resulting from the acquisition of customer
contracts by its ADT division.  The second are those claiming
that Tyco no longer suffered from the kind of systemic accounting
problems that could negatively impact its financial standing from
2003 onward.

Plaintiffs support their claim that the Tyco defendants
acted with scienter primarily by asserting that Breen and
FitzPatrick had "motive and opportunity" to deceive the investing
public.  According to plaintiffs, Breen and FitzPatrick had a
motive to make the misstatements because they both stood to
receive substantial salaries, bonuses, stock options, and other
employee benefits so long as Tyco remained solvent.  In addition
to a $1.5 million salary and a $1.5 million guaranteed bonus for
2003, Breen stood to receive, among other things, a total of 7.35
million stock options at an exercise price of $10 per share, and
one million deferred stock units, all of which would vest within
five years.  Am. Compl. ¶ 20.  Similarly, in addition to a
$750,000 base salary, FitzPatrick stood to receive 1.65 million

stock options at an exercise price of $16.24 per share, and 200,000 deferred share units, all of which would vest within three years.  Id. ¶ 21.  Combined with the additional fact that defendants made a massive re-restatement in March 2003, only two months after the December 30, 2002 disclosure, plaintiffs argue that this evidence is sufficient to raise a "strong inference" of scienter.  I disagree.

As an initial matter, the First Circuit has stated that "catch-all allegations" based on general assertions of financial motive and opportunity, without something more, ordinarily will not satisfy the PSLRA.  Cabletron, 311 F.3d at 39 (citing Greebel v. FTP Software, Inc., 194 F.3d 185, 197 (1st Cir. 1999); Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 660 (8th Cir. 2001)); Geffon v. Micrion Corp., 249 F.3d 29, 36 (1st Cir. 2001) (stating that "[a]t the pleading stage, an allegation that defendants had the motive and opportunity to make false or misleading statements is insufficient to support the 'strong inference' of scienter required after the PSLRA") (citation omtited).  Plaintiffs' allegations rest primarily on "catch-all allegations" that Breen's and FitzPatrick's personal and

professional fortunes were personally tied to the fortunes of
Tyco and that they therefore had the motive to commit fraud.
These types of claims have been rejected by prior courts, and I
see no reason to depart from their sound reasoning.  See, e.g.,
In re Eaton Vance Corp. Sec. Litig., 206 F. Supp. 2d 142, 154 (D.
Mass. 2002) (rejecting a securities fraud claim on the ground
that "plaintiffs make general allegations about the defendants'
presumed knowledge about market conditions based on their
positions and motive based on general financial incentives"
alone).

     What plaintiffs are left with is a claim that Breen and
FitzPatrick must have known about Tyco's misstatements in
December 2002, because that information became available in March
2003.  This type of claim, referred to by other courts as a
"fraud by hindsight" claim, has been deemed insufficient to meet
the PSLRA's heightened pleading standards.  Cf. Carney v.
Cambridge Tech. Partners, Inc., 135 F. Supp. 2d 235, 252 (D.
Mass. 2001) (rejecting the claim that defendants "'must have
known' that [a] business was declining, because, viewed in
hindsight, that business in fact was declining").  Again, I see

-12-

no reason to depart from this reasoning.  I thus hold that plaintiffs' claims with respect to Tyco, Breen and FitzPatrick have not met the standards set forth in the PLSRA.[1]  These claims are therefore dismissed.[2]

**B.   <u>Claims against PwC</u>**

The basis for plaintiffs' suit against PwC is that PwC reported in the December 20, 2002 Form 10-K that it had evaluated the results of the independent investigation of Tyco's financial status and concluded that the audit was sound.  This, plaintiffs argue, was a material and fraudulent misstatement.

---

[1]  Other than to argue that Breen's and FitzPatrick's scienter may be attributed to Tyco, <u>see</u> <u>Tyco II</u>, 2004 WL 2348315, at *12, plaintiffs make no independent claims regarding Tyco's scienter.  Their claims against Tyco therefore also fail to meet the PSLRA's heightened scienter pleading requirement.

[2]  Plaintiffs also charge that the individual defendants violated § 20(a) of the Exchange Act.  Section 20(a) imposes derivative liability on defendants who "control" the primary violators of securities laws.  <u>See</u> 15 U.S.C. § 78t(a).  A necessary element of a control-person claim under § 20(a) is a primary violation of the securities laws.  <u>See, e.g.,</u> <u>Greebel</u>, 194 F.3d at 207; <u>Suna v. Bailey Corp.</u>, 107 F.3d 64, 72 (1st Cir. 1997).  Plaintiffs' § 20(a) claim depends in its entirety on the existence of an underlying violation of § 10(b).  Because plaintiffs' § 10(b) claim is dismissed, so too is their § 20(a) claim.

Plaintiffs' scienter argument rests on the assertion that PwC should have more carefully reviewed Tyco's financials, and that its failure to do so constitutes a form of "extreme recklessness" sufficient to support a viable claim for securities fraud.  See Cabletron, 311 F.3d at 38 (citing Greebel, 194 F.3d at 196-97, 98-99, for the propositions that "[s]cienter may be demonstrated by indirect evidence" and "may extend to a form of extreme recklessness that 'is closer to a lesser form of intent'").

As evidence of scienter, plaintiffs note that (1) PwC draws a large amount of revenue from Tyco for its accounting and consulting services; (2) the engagement partner in charge of the Tyco account at PwC, Richard Scalzo, was found by the SEC to be "reckless" in his handling of Tyco's account from 1997-2002; (3) PwC's prior experiences with ADT should have placed it on heightened notice that ADT's accounting problems likely persisted, see, e.g., Tyco II, 2004 WL 2348315, at *13 (stating the factual basis upon which claims against PwC for malfeasance that occurred between 1997 and 2002 survived motions to dismiss); (4) PwC itself had engaged in questionable accounting practices

-14-

with respect to Tyco in the past, <u>id.</u>; and (5) PwC's audit was inconsistent with various Generally Accepted Accounting Principles and Standards.

The problem with plaintiffs' position, however, is that it lacks a clear factual basis.  Plaintiffs rely primarily on claims about PwC's behavior with respect to Tyco's past accounting malfeasance.  Plaintiffs cite no cases, however, suggesting that a strong inference of scienter as to one set of transactions is warranted by on assertions that the targeted defendant acted improperly with respect to matters that are unrelated to the claims at issue.  Nor have plaintiffs provided a convincing argument that PwC's financial stake in maintaining its business relationship with Tyco is sufficient by itself to raise a "highly likely" inference that it acted with "extreme recklessness."

To the degree that plaintiffs' claims rely on the SEC's ruling with respect to Scalzo, plaintiffs fail to plead with particularity the details of the SEC's findings, making it impossible to determine whether the decision pertained to the accounting failures at issue in this case or to other behavior. In their totality, then, plaintiffs' assertions are too vague to

give rise to a "highly likely" inference of scienter.

Plaintiffs' claims against PwC must therefore also be dismissed.

### III. <u>CONCLUSION</u>

Defendants' motions to dismiss are granted (Doc. Nos. 419 and 425). The clerk is instructed to enter judgment accordingly.

SO ORDERED.

<u>/s/Paul Barbadoro</u>
Paul Barbadoro
United States District Judge

September 2, 2005

cc:  Counsel of Record