In re Tycom Securities Litigation     MD-02-1335-PB 09/02/05

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Rosemarie Stumpf</u>

     **v.**                          **Case No.   03-CV-1352-PB**
                                   **MDL No.    02-MDL-1335-PB**
                                   **Opinion No. 2005 DNH 125**
<u>Neil R. Garvey, et al.</u>
[<u>In re TyCom Ltd. Securities Litigation</u>]

### <u>MEMORANDUM AND ORDER</u>

This class action arises from a decision by Tyco International Ltd. to sell off a minority interest in one of its subsidiaries, TyCom Ltd.  Plaintiffs purchased shares of TyCom stock, either pursuant to a July 26, 2000 Registration Statement and Prospectus ("Prospectus") for TyCom's initial public offering ("Offering"), or on the open market between July 26, 2000 ("Effective Date") and December 17, 2001 ("Class Period").  Plaintiffs claim that defendants Tyco, TyCom, L. Dennis Kozlowski, Mark H. Swartz, and Neil R. Garvey devised a scheme to fraudulently reap more than $200 million in cash from the July 26, 2000 offering of common shares in TyCom, a wholly owned

subsidiary of Tyco.  Plaintiffs also claim that analysts employed
by the Underwriters of the Offering issued false reports in
furtherance of the scheme.

Plaintiffs elaborate on their claim in their consolidated
complaint[1] ("Complaint"), by alleging that the Prospectus was
materially false and misleading because it both misrepresented
that the demand for undersea fiber-optic cable bandwidth, TyCom's
sole product, was increasing, and failed to disclose that the
market for bandwidth was already saturated with unused capacity.
Plaintiffs allege that these materially false and misleading
statements fraudulently induced them to purchase TyCom stock at
an inflated price during the Class Period.  Plaintiffs also
charge that defendants continued their misconduct during the
Class Period by engaging in fraudulent revenue swaps to

_____

[1]  This case began as two separate actions filed in the
United States District Court for the District of New Jersey:
Stumpf v. Garvey, filed on July 24, 2003, and O'Loughlin v.
Garvey, filed on September 26, 2003.  On October 30, 2003, the
Judicial Panel on Multidistrict Litigation ("MDL") issued a
Conditional Transfer Order transferring Stumpf v. Garvey to this
court pursuant to 28 U.S.C. § 1407.  By order dated November 10,
2003--prior to date on which the MDL transfer order became final-
-the New Jersey District Court consolidated the two cases,
approved the parties' selection of lead counsel, and appointed
Mark Newby as lead plaintiff.  The consolidated complaint was
filed on December 13, 2004.

artificially inflate the price of TyCom stock and boost the company's profits.  According to plaintiffs, the underwriters of the TyCom Offering, Goldman, Sachs & Co. ("Goldman Sachs"), Citigroup Global Markets, Inc. (f/k/a Salomon Smith Barney Inc.)("SSB"), and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") (collectively, "Underwriters") were complicit in this scheme, failed to disclose conflicts of interest, and issued false statements in their analysts' reports to inflate the value of TyCom stock.

In Count I, plaintiffs assert claims against all defendants based on § 11 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77(k), and against Tyco and the individual defendants based on § 15 of the Securities Act.  15 U.S.C. § 77(o).  In Count II, plaintiffs assert claims against all defendants except Merrill Lynch based on § 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and against Tyco and the individual defendants based on § 20(a) of the Exchange Act. 15 U.S.C. § 78t(a).  Defendants have moved to dismiss the Complaint on a variety of grounds.[2]

----

[2]  Tyco, TyCom, and Garvey filed a motion to dismiss the Complaint (Doc. No. 384).  Kozlowski filed a separate motion to

## I.  BACKGROUND

### A.   Tyco's Telecommunications Cable Business

Prior to April 1997, Tyco manufactured undersea fiber optic telecommunications cable in its Simplex Technologies unit. Simplex's major customer was AT&T Submarine Systems Inc. ("SSI"), whose principal business was designing and laying undersea cable systems to connect to land-based cable systems.  On April 11, 1997, Tyco and AT&T announced that they had entered into an agreement for Tyco to acquire SSI.  Tyco explained that SSI would operate in conjunction with its Simplex unit to become a fully integrated manufacturer, designer, and servicer of undersea fiber optic cable systems.  Tyco completed the purchase on July 1, 1997, and renamed the new entity Tyco Submarine Systems Ltd. Tyco Submarine was later renamed TyCom.  At the time, Tyco owned 100% of the stock in TyCom.

Tyco's merger of Simplex and SSI was perfectly timed to benefit from the growth in telecommunications companies that

_____

dismiss (Doc. No. 391), but joined in the legal arguments set forth by Tyco, TyCom and Garvey.  Goldman Sachs, SSB, and Merrill Lynch also filed a separate motion to dismiss (Doc. No. 392), joining in Tyco's arguments and setting forth additional arguments for dismissal.  I address the arguments presented in all three motions.

sought to own undersea cable systems.  TyCom's revenue thus grew
from $375.5 million in fiscal 1997 to $1.28 billion in fiscal
year 1998, and $1.63 billion in fiscal year 1999.  TyCom's
revenue in the first six months of fiscal year 2000 was $1.27
billion.  This growth was fueled primarily by contracts with four
of TyCom's largest customers, Level 3 Communications,
360networks, Global Crossing, and Flag Telecom.  These customers
raised cash to fund their operations through a series of public
offerings in which the Underwriters were participants.

**B.**   **Tyco's Decision to Sell Off a Minority Interest of TyCom**

After an open-house for telecommunications research analysts
in the fall of 1999, TyCom's management decided to sell off a
minority interest in the company and construct the TyCom Global
Network ("TGN").  The company later conducted "town hall
meetings" at TyCom's various locations to increase its employees'
awareness of the TyCom Offering.  TyCom senior marketing
director, James F. Brennan, who in 1990 had been convicted of
bank fraud, played a central role in the Offering.[3]

---

[3]  The First Circuit Court of Appeals affirmed Brennan's
bank fraud conviction.  See United States v. Brennan, 994 F.2d
918, 930 (1st Cir. 1993).

**C.**   **Pre-Offering Demand For Undersea Bandwidth**

Most of the cable that TyCom and other companies installed
in 1999 and 2000 was unused "dark fiber" at the time of the
Offering.  "Dark fiber," as opposed to "lit fiber," is fiber that
is laid undersea, but has not yet been connected to land, often
due to a lack of demand.  Based on a massive build-out of
capacity by Global Crossing, 360networks, and Level 3, there was
sufficient bandwidth capacity to meet anticipated future demand
several times over.  In fact, at the time of the Offering, the
only demand for capacity on the TGN was from companies such as
Qwest, Global Crossing, and Level 3, who themselves had excess
bandwidth capacity, but were interested in "swapping" their
excess capacity for capacity on the TGN.[4]  Furthermore, those

---

[4]  "Swaps" are reciprocal transactions in which two
telecommunications companies exchange capacity on each other's
network.  Swaps "may be entered into for legitimate reasons, i.e.
to acquire access on networks in a market that a company wishes
to enter in exchange for capacity that has yet to be sold and is
not otherwise in use ('dark fiber').  However, swap transactions
can also be [used] by a company seeking to defraud investors or
its creditors to create the impression that the company is
selling capacity when it is merely unloading useless dark fiber
on one of its networks in exchange for useless dark fiber on a
competitor's network," thereby inflating the company's bottom
line.  In re Flag Telecom Holdings, Ltd. Sec. Litig., 352 F.
Supp. 2d 429, 461 (S.D.N.Y. 2005)("Flag II").

companies treated the capacity transferred in swap transactions as revenue-producing sales, even though no money changed hands.

According to a senior director of global sales at TyCom ("Employee E"), the company's network engineers and other employees involved in designing the TGN were "queasy" about the lack of sufficient market demand to support an additional global network, and therefore strongly advised against the spin-off. Compl. ¶ 74.  According to Employee E, at the time of the Offering, bandwidth capacity had already surpassed demand and the price of bandwidth was plummeting.  Id. ¶ 75.  Another TyCom employee, a shore-end installation engineer ("Employee G"), who was responsible for installing submarine and terrestrial fiber optic cable systems, including the TGN, stated that in the late 1990s there was "more than enough capacity."  Id. ¶ 78.  He added that concerns within TyCom and Tyco about waning demand and excess bandwidth capacity were not disclosed to the public, and instead, TyCom's marketing and sales division "continued to forecast a huge market" to potential investors.  Id. ¶ 79.

A former director of technology for TyCom ("Employee I") similarly stated that concern over bandwidth demand at the time of the Offering was widely expressed among TyCom employees.

-7-

Compl. ¶ 84.  TyCom's deputy director of global sales from 1997

to 2004 ("Employee D") stated that despite the efforts of the

sales staff, coupled with almost weekly price reductions, no

bandwidth was sold from the beginning of 2000 until the middle of

2001.  Id. ¶ 85.  TyCom's executives, including Garvey, were well

aware that no sales of bandwidth had been made immediately prior

to the Offering and that there were few expressions of interest

from potential customers.  Id. ¶ 86.  A terminal engineer

("Employee J") responsible for activating cables, and hence

available bandwidth, stated that in many of the terminals only

1/32 of the capacity was being utilized and that TyCom was

absorbing cancellations in contracts by assuming ownership of the

capacity that had been installed and completed.  Id. ¶ 87.

**D.   TyCom's Public Offering**

On January 17, 2000, Tyco announced that, in response to

rapidly increasing market demand for undersea bandwidth, it

planned to develop TyCom into a publicly traded company for the

purpose of designing, building, installing, operating, and

maintaining its own global undersea fiber-optic communications

network.  Compl. ¶ 97.  The TGN was to be the "largest and most

advanced global undersea telecommunications fiber optic network."

-8-

Id.  Tyco common stock rose by $5.125 per share the next day, in part due to investor enthusiasm for the proposed offering.  Id. ¶ 98.  On July 26, 2000, TyCom filed an amended Registration Statement and final Prospectus with the Securities and Exchange Commission ("SEC") for the initial offering of 61,130,435 shares of TyCom common stock at $32 per share.  Id. ¶ 99.  Goldman Sachs, SSB, and Merrill Lynch were the co-lead underwriters of the Offering.  Id. ¶ 101.  Tyco planned to sell 14% of its interest in TyCom.  Id. ¶ 102.

The Prospectus represented that $1,654,115,224 of the $1,854,115,000 in estimated net proceeds from the Offering would be used "toward the deployment of the first phase of the TyCom Global Network."  Compl. ¶ 100.  According to the Prospectus, the principal elements of TyCom's business strategy were to deploy the TGN to address increasing demand, transform into a provider of undersea bandwidth services, and deliver customer-driven network solutions.  Id. ¶ 108.  The Prospectus added that the TGN was likely to be successful because, based on research conducted by the Yankee Group, global demand for undersea bandwidth capacity on the transatlantic route was expected to increase "at

a compound annual growth rate of approximately 123% from 2000 through 2005," and demand on the transpacific route was expected to "increase at a compound annual growth rate of 129%" over the same period.  Id. ¶ 109.

**E.    The Yankee Group Forecasts**

Prior to the Offering, TyCom sent a Request for Quotation ("RFQ") to the Yankee Group, a telecommunications and networking research and consulting firm, asking for the preparation of "a demand analysis for various traffic destinations" for the period from 2000 through 2009.  Compl. ¶ 90.  In the RFQ, TyCom informed the Yankee Group that "[TyCom] had already completed a basic Global Supply and Demand-side analysis" and that it "would like [the Yankee Group] to use this analysis as a starting point" for its own analysis.  Id.  The RFQ emphasized that "the Yankee Group's final presentation is expected to be a validation of previous [TyCom] efforts . . . intended to serve [in anticipated SEC filings] as an objective third-party view of global demand for network capacity."[5]  Id.  The RFQ was "carbon copied" to

_____

[5]  The RFQ further stated that after the Yankee Group performed its "own demand analysis," it would be required to "evaluate the [TyCom] Demand model and projections, and then render an assessment as to its approach and consolidations" and

-10-

members of TyCom's senior management, including Andrew Kowalik,
TyCom's head of strategic information.  Id. ¶ 92.

Employee H, a former global forecast analyst who worked for
TyCom from 1998 to 2002, learned from Kowalik that the Yankee
Group's forecasts predicted much larger demand growth than
TyCom's internal analyses because the Yankee Group had relied on
TyCom's falsely inflated projections.[6]  Compl. ¶ 93.  In February
2000, TyCom's "Final View" of the market projected that demand
for the transatlantic routes would increase at an average of
51.25% per year between 2001 and 2005.  Id. ¶ 94.  Similarly,
demand for the transpacific routes for the same period was
projected to increase yearly by an average of 81.25%.  Id.  The
Yankee Group's demand projections for the same period were
significantly higher:  it projected 71% average annual growth in
the transatlantic region and 85.75% average annual growth in the

_____

"improve its own model if warranted. . . ."  Compl. ¶ 91.

[6] Employee H also alleges that Kowalik told her that the
Underwriters had explained to him and other senior TyCom
executives what the sales and revenue projections had to be in
order to induce investors to buy shares of TyCom and then
instructed Kowalik to "come back with the numbers to support
those forecasts."  According to Employee H, Kowalik then reported
these "falsely inflated demand numbers" to the Yankee Group.
Compl. ¶¶ 88-89.

transpacific region.  Id. ¶ 95.  Employee B indicated that the Yankee Group's projections were inflated by the inclusion of non-revenue-producing reciprocal bandwidth swaps and did not reflect actual end-user demand.  Id. ¶ 96.

**F.   Post-Offering Trading in TyCom Stock**

On July 27, 2000, TyCom stock rose by $4.52 per share as investors reacted positively to the Offering.  Compl. ¶ 195. Beginning on August 21, 2000, the Underwriters commenced analyst coverage of TyCom.[7]  Id. ¶ 197.  Craig Irvine of Merrill Lynch initiated coverage of TyCom with a near-term rating of "accumulate," a long-term rating of "buy," and a 12-to 18-month target price of $60 per share.  Id. ¶ 198.  Irvine reiterated this rating on October 7, 2000.  Id.  Similarly, Frank Governali of Goldman Sachs initiated coverage of TyCom with a rating of "recommend list" and a 12-month target price of $60 per share. Id. ¶ 199.  Governali reiterated his "recommend list" rating and the $60 price per share in his October 18, 2000 report.  Id. ¶ 207.

---

[7]  Under SEC regulations, the Underwriters were prohibited from issuing research reports for twenty-five days following the Offering.

Jack Grubman of SSB echoed these ratings, initiating coverage with a "Speculative Buy" rating and a 12 to 18 month target price of $75 per share.  Compl. ¶ 200.  Grubman estimated that during the fiscal year ending September 2000, TyCom's revenue would grow by 55.3% to $2.3 billion.  Id.  He added that demand for undersea bandwidth was expected to exceed supply and that TyCom was an attractive investment.  Id.

In response to the August 21, 2000 analyst coverage, TyCom stock closed on August 21, 2000 at $42.875, up from the previous day's close of $37.75, on volume that was approximately three times the prior week's average daily volume.  Compl. ¶ 206.  TyCom stock closed at a high of $45.438 on September 1, 2000.  Id. ¶ 207.

On January 16, 2001, TyCom announced a "major" $82.5 million capacity sale on the transatlantic route of the TGN to DishnetDSL Limited of India ("DishnetDSL").  Compl. ¶ 208.  The following day, TyCom announced its financial results for the quarter ending December 31, 2000, and reported that the company's "strong earnings" were "driven by the supply of third-party systems and sales of capacity on the TGN."  Id. ¶ 209.  On February 23, 2001, TyCom issued a press release stating that "the transatlantic

-13-

portion of the TyCom Global Network (TGN), scheduled to be placed in service in July 2001, will have its capacity increased sooner than planned to meet demand for larger bandwidth increments, including wavelengths."  Id. ¶ 212.

Likewise, in an April 18, 2001 press release, TyCom announced capacity sales on both the transatlantic and transpacific routes.  Compl. ¶ 214.  TyCom shares rose by $3.72, or 26%, to $18.25 per share in response to this news.  Id. ¶ 215. On April 26, 2001, Governali reiterated his "recommend list" rating of TyCom stock, but reduced the price target to $40 per share.  Id. ¶ 250.  TyCom made similar announcements related to capacity sales in May, June, July, and August 2001.  Id. ¶¶ 216-22.  TyCom attributed its strong performance during this period to its ability to generate capacity sales.  Id.  In his July 18, 2001 report, Grubman reiterated his "buy" rating for TyCom stock. Id. ¶ 190.  Several weeks later, however, in his August 8, 2001 report, Grubman downgraded TyCom to "neutral."  Id. ¶ 254.

**G.   TyCom's Swap Transactions**

According to Employee K, a senior manager of terminal commissioning and network design, TyCom was swapping capacity on the TGN with capacity on other carrier networks and recognizing

-14-

these swaps as revenue, in violation of Generally Accepted Accounting Principles ("GAAP"), particularly Accounting Principles Board Opinion No. 29 ("APB No. 29").[8]  Compl. ¶ 227. Employee H confirmed that TyCom would take a large block of dark fiber and exchange it for dark fiber on another company's proposed cable network.  Id. ¶ 228.  Similarly, Employee C, project manager at TyCom's Morristown, New Jersey facility, reported that TyCom swapped capacity without the auditors' knowledge in an effort to boost revenue.[9]  Id. ¶ 229.

An internal company document establishes that the purported sale to Dishnet announced on January 16, 2001 was in fact a swap of capacity, and indicated that DishnetDSL was not carrying traffic.  Compl. ¶ 230.  Moreover, the same document reveals that TyCom also engaged in capacity swaps with Qwest and Emergia and

---

[8]  APB No. 29 requires that exchanges of non-monetary assets be accounted for by calculating the fair value of the asset given up or the asset received, whichever is more readily determinable. See In re Flag Telecom Holdings, Ltd. Sec. Litig., 308 F. Supp. 2d 249, 263 (S.D.N.Y. 2004)("Flag I").

[9]  According to Employee B, during the fourth quarter of fiscal year 2001, TyCom discussed appropriate accounting treatment of its bandwidth swaps with its outside auditor PricewaterhouseCoopers ("PwC").  PwC informed TyCom that it would not issue an opinion letter on TyCom's financial statements classifying the swaps as revenue.  Compl. ¶ 257.

the total value of all non-swap lease transactions through mid-September 2002 was only $3,436,651.  Id. ¶¶ 231-32.

## H.   **TyCom's Stock Prices Fall**

From a high price of $45.4375 on September 1, 2000, TyCom's stock began a long decline in value to a low closing price of $7.41 on September 27, 2001, as a result of a series of partial disclosures concerning reduced demand, oversupply, and declining prices for bandwidth.  Compl. ¶ 243.  An article titled "Trouble in Octopus Garden," in the March 1, 2001 edition of America's Network, attributed the decline in the price of TyCom stock to the oversupply of bandwidth and the resulting plummeting prices, and cautioned that TyCom was running the "risk of running itself into the ground."[10]  Id. ¶ 244.  TyCom stock closed at $18.04 per share the next day, after having traded as high as $25.09 the week before, and the company announced that it would buy back as much as $500 million in common stock on the open market.  Id. ¶¶ 246-47.  TyCom's buy-back temporarily buoyed the price per share,

_____

[10]  On March 1, 2001, TyCom competitor 360networks reported that it had lost $355 million, or 55 cents per share, for the year that ended December 31, 2000.  Accordingly, 360networks announced that it was scaling back its forecasts for profit, revenue, and capital spending.  Compl. ¶ 245.

but the decline soon resumed, and TyCom stock closed at $9.99 on April 4, 2001.  Id. ¶¶ 248-49.

Similarly, a June 22, 2001 article in The Wall Street Journal Online reported that prices for bandwidth were falling "as much as 60%" and that the "amount of underused long-haul fiber capacity in the U.S. is about 97%."  Compl. ¶ 253.

On October 4, 2001, Tyco announced an initial offer to exchange the TyCom shares it did not already own at an exchange rate of .2997 shares of Tyco common stock per share of TyCom stock.  Compl. ¶ 258.  Before trading opened on October 19, 2001, Tyco and TyCom announced that they had entered into a definitive agreement whereby a Tyco subsidiary would reacquire the outstanding minority interest in TyCom at a ratio of .3133 shares of Tyco common stock for every outstanding share of TyCom stock. Id. ¶ 260.  On December 17, 2001, the date of the merger, Tyco common stock closed at $55.80 per share, making the effective acquisition price of the merger $17.48 per share.  Id. ¶ 261. Employee B suspects that Tyco acquired the minority interest in TyCom to avoid having TyCom issue separate audited financial statements that would have revealed the lack of demand for TyCom's bandwidth and the extent to which the purported swap

transactions did not qualify for revenue recognition under GAAP.
<u>Id.</u> ¶ 262.


## II.   <u>STANDARD OF REVIEW</u>

Defendants challenge the Complaint pursuant to Rules
12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the
Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §
78u-4(b).  When considering a motion to dismiss pursuant to Rule
12(b)(6), I must "accept as true all well-pleaded allegations and
give plaintiffs the benefit of all reasonable inferences."
<u>Cooperman v. Individual Inc.</u>, 171 F.3d 43, 46 (1st Cir.
1999)(citing <u>Gross v. Summa Four, Inc.</u>, 93 F.3d 987, 991 (1st
Cir. 1996)).  However, while a court "deciding a motion to
dismiss under Rule 12(b)(6) . . . must take all well-pleaded
facts as true . . . it need not credit a complaint's 'bald
assertions' or legal conclusions."  <u>Shaw v. Digital Equip. Corp.</u>,
82 F.3d 1194, 1216 (1st Cir. 1996)(quoting <u>Wash. Legal Found. v.</u>
<u>Mass. Bar Found.</u>, 993 F.2d 962, 971 (1st Cir. 1993)).  A well-
pleaded complaint must contain "factual allegations . . .
respecting each material element necessary to sustain recovery

under some actionable legal theory." <u>Glassman v. Computervision Corp.</u>, 90 F.3d 617, 628 (1st Cir. 1996)(internal quotations and citations omitted).  A motion to dismiss under Rule 12(b)(6) should not be granted unless it "presents no set of facts justifying recovery." <u>Cooperman</u>, 171 F.3d at 46 (citing <u>Dartmouth Review v. Dartmouth Coll.</u>, 889 F.2d 13, 16 (1st Cir. 1989)).

Special pleading requirements apply to fraud claims.  Fed. R. Civ. P. 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  "Rule 9(b) also requires that a plaintiff's averments of fraud specify the time, place, and content of the alleged false or fraudulent misrepresentations." <u>United States ex rel. Karvelas v. Melrose-Wakefield Hosp.</u>, 360 F.3d 220, 226 (1st Cir. 2004).  Moreover, when a cause of action sounding in fraud is based on "information and belief," Rule 9(b) requires the plaintiff to plead sufficient supporting facts to permit a conclusion that the alleged belief is reasonable. <u>See id.</u>  In contrast, "[m]alice, intent, knowledge and other conditions of minds or a person may be averred generally."  Fed. R. Civ. P. 9(b).

A plaintiff who alleges securities fraud under § 10(b) of the Exchange Act must also satisfy the heightened pleading standards of the PSLRA.  To plead a material misrepresentation or omission under the PSLRA the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement is made on 'information and belief,' the complaint shall state with particularity all facts on which the belief is formed."  15 U.S.C. § 78u-4(b)(1).  To be actionable as securities fraud, "the statements alleged to be misleading must be misleading to a material degree."  In re Cabletron Sys., Inc., 311 F.3d 11, 27 (1st Cir. 2002).  A fact is material "if it is substantially likely 'that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  Id. at 34 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)).  Finally, the PSLRA requires that a securities fraud claim plead facts with particularity that are sufficient to give rise to a "strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2).

Section 11 of the Securities Act creates a right of action for damages by securities purchasers when registration statements contain untrue statements of material fact or material omissions, and plaintiffs can trace their shares to those registration statements.  15 U.S.C. § 77k(a).  Because fraud is not an essential element of a § 11 claim, a plaintiff asserting such a claim typically need only satisfy the liberal pleading requirements of Fed. R. Civ. P. 8(a).  See Giarraputo v. Unumprovident Corp., 2000 WL 1701294, *9 (D. Me. Nov. 8, 2000).  Furthermore, unlike § 10(b), § 11 does not require an allegation of scienter.

### III.  **ANALYSIS**

Defendants have launched a multi-pronged attack on the sufficiency of the Complaint.  I evaluate the merits of each argument in turn.

**A.    Section 10(b)**

Although the Complaint includes many allegations that mirror those offered by the Lead Plaintiffs in the Tyco securities action pending in this court, see In re Tyco Int'l Ltd. Sec.

-21-

<u>Litig.</u>, 2004 DNH 154 (Oct. 14, 2004)("<u>Tyco II</u>"), the core allegations in this case, and those challenged most vigorously by defendants, are that (1) TyCom publicly represented that demand for bandwidth was "increasing" and was expected to continue to increase, even though TyCom knew that the existing supply of available bandwidth greatly exceeded demand projections; (2) TyCom failed to account for improper, non-revenue-producing swap transactions; and (3) analysts employed by the Underwriters issued materially false and misleading reports on TyCom and other telecommunications companies.  I consider these arguments in light of the PSLRA's pleading requirements.

     1.   *The Tyco Defendants*[11]

        a.   *Failure to Plead False Statements or Omissions*

          (i)   Statements Concerning Demand for Bandwidth

    The Tyco Defendants, in an argument joined by the Underwriters, first contend that the § 10(b) claim premised on the demand for bandwidth demand should be dismissed because plaintiffs have failed to plead facts demonstrating that the statements in the Prospectus concerning bandwidth were untrue

---

[11]   The Tyco Defendants include Tyco, TyCom, Garvey, Kozlowski, and Swartz.

when they were made.  They further argue that, even if plaintiffs adequately alleged that the statements were false when made, such statements are not actionable.  Neither argument is persuasive.

First, plaintiffs have adequately alleged that the statement in the Prospectus that TyCom would deploy the TGN to "address the increasing demand for undersea fiber optic bandwidth" and other statements related to bandwidth demand were materially false and misleading.  The Complaint charges that TyCom knew at the time of the Offering both that any anticipated increase in bandwidth demand would be insignificant when compared to the market's already-existing oversupply, and that the gap between demand and supply would be more pronounced if TyCom were to complete the TGN.

Plaintiffs support their position by citing to the statements of several former TyCom employees who were involved with the Offering and development of the TGN.  For example, these former employees state that "most of the fiber that was laid by TyCom and other companies in 1999 and 2000 was dark at the time of the Offering and awaiting demand for capacity," that "the only demand that TyCom experienced for the TGN at the time of the Offering was from companies . . . [that] themselves had excess

capacity and were interested in 'swapping' their excess capacity

for capacity on the TGN," and that "there were multiples of

sufficient bandwidth capacity to meet future demand."  Compl. ¶¶

70-71, 73.  The former employees add that only 1/32 of the

capacity was being used and the price of bandwidth was rapidly

declining.  These allegations are more than sufficient to

establish that at the time of the Offering, statements that

demand was increasing were materially false and misleading.

　　　Furthermore, I am not persuaded by the argument that

defendants' statements concerning the demand for bandwidth are

non-actionable "puffery," and are further rendered immaterial by

the "bespeaks caution" doctrine, such that a reasonable investor

would not have relied on the identified statements concerning the

demand for bandwidth in light of the extensive and detailed

cautionary language in the Prospectus.  Although courts have

refused to find "material" as a matter of law "loosely optimistic

statements that are so vague, so lacking in specificity . . .

that no reasonable investor" would rely on them, Shaw, 82 F.3d at

1217, the statements at issue here are not merely vague

statements of hope.  See In re Boston Tech. Inc. Sec. Litig., 8

F. Supp. 2d 43, 60 (D. Mass. 1998).  Rather, they are specific

and concrete statements concerning the market for bandwidth demand.  See id.  They are therefore actionable under § 10(b).  See id.  Additionally, the First Circuit has held that the "bespeaks caution" defense applies only to forward-looking statements and is inapplicable where, as in this case, the statements at issue include false or misleading representations of present fact.  See In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 213 (1st Cir. 2005).  Here, the Prospectus falsely represented that the TyCom Offering and related implementation of the TGN was undertaken to "address the increasing demand for undersea fiber optic bandwidth" existing in the telecommunications market at the time of the Offering.  Compl. ¶ 108.  This statement and other similar statements in the Prospectus are representations of the then-existing state of the bandwidth market and are conceivably in direct contradiction to TyCom's alleged knowledge that bandwidth capacity already far exceeded demand.  Id. ¶¶ 117-19.

    I thus conclude that TyCom represented in the Prospectus that demand for bandwidth capacity was growing at the time of the Offering and that plaintiffs have adequately pleaded facts demonstrating that these statements were false when made.  I

-25-

further conclude that the cautionary language in the Prospectus
is insufficient to have rendered the statements concerning
bandwidth non-actionable.

(ii) Improper Swap Transactions

The Tyco Defendants similarly challenge the § 10(b) claims
based on reciprocal swap transactions, arguing that these claims
should be dismissed because plaintiffs have failed to plead facts
showing that these transactions were improper.

As the court in Flag II explained, reciprocal swap
transactions are improper when a company "is merely unloading
useless dark fiber on one of its networks in exchange for useless
dark fiber on a competitor's network," thereby falsely inflating
the company's bottom line.  352 F. Supp. 2d at 461.  Plaintiffs
allege that after the Offering, defendants misrepresented that
TyCom had entered into contracts for sale of capacity on the TGN
totaling approximately $560 million.  Compl. ¶¶ 208-22.
According to plaintiffs, these contracts consisted almost
entirely of reciprocal swaps with other telecommunications
companies that did not qualify for revenue recognition.  Id. 226-
29.  In particular, plaintiffs identify three separate improper
swaps that TyCom misrepresented as "sales" qualifying for revenue

-26-

recognition:  DishnetDSL ($82.5 million); Qwest ($140 million);
and Emergia ($40 million).  Id.

        Plaintiffs support these allegations with statements from
four former TyCom employees and an internal TyCom document,
Exhibit B, which identifies three multi-million-dollar
transactions as improper swaps.  For example, with respect to the
DishnetDSL and Qwest transactions, Exhibit B indicates
"[c]ustomer not carrying traffic."   Likewise, with respect to
the Qwest and Emergia transactions, Exhibit B notes that the
deals involved exchanges for capacity.  Moreover, Exhibit B
indicates that the DishnetDSL transaction was a "swap type deal
to show revenue."  Plaintiffs further allege that during the
fourth quarter of fiscal 2001, TyCom's auditor, PwC, refused to
issue an opinion letter on TyCom financial statements that
classified TyCom's reciprocal swap transactions as revenue.
Compl. ¶ 257; see also Compl. ¶ 234 (pointing to an e-mail quoted
in the Global Crossing complaint, 02 Civ. 910(GEL)(S.D.N.Y.),
indicating TyCom's willingness to participate in fraudulent
transactions intended to inflate its reported financial results).
Finally, as plaintiffs point out, TyCom acknowledged in its Form
10-K for the year ending September 30, 2003 that total TyCom net

revenue for its TGN business in fiscal year 2001 was only $1.7 million--substantially below defendants' representation during the Class Period.

I therefore conclude that the plaintiffs have met the PSLRA's requirement that a claimant plead with particularity defendants' false and misleading statements by describing the improper reciprocal swaps entered into to artificially inflate revenue.  See Flag II, 352 F. Supp. 2d at 463 (noting also that plaintiff pled facts demonstrating that many companies were inflating revenues by entering into improper reciprocal swap transactions).

            b.  *Scienter*

The Tyco Defendants, joined by the Underwriters, next argue that plaintiffs' § 10(b) claim concerning the demand for bandwidth and swap transactions should be dismissed for failure to plead facts giving rise to a "strong" inference of scienter, as is required by the PSLRA.

"Liability under section 10(b) and Rule 10b-5 . . . requires scienter, a mental state embracing intent to deceive, manipulate or defraud." Cabletron, 311 F.3d at 38 (internal quotation marks omitted).  To prove scienter, "a plaintiff must show either that

the defendant[s] consciously intended to defraud, or that they acted with a high degree of recklessness." Stone & Webster, 414 F.3d at 193 (internal quotation marks omitted); see Cabletron, 311 F.3d at 38 (explaining that scienter also "may extend to a form of extreme recklessness that 'is closer to a lesser form of intent'") (citation omitted).  In the First Circuit, there is no "rigid formula for pleading scienter," and courts employ a "'fact-specific approach' that proceeds case by case." Id. (citation omitted).   Accordingly, while scienter can be established through direct evidence of "conscious wrongdoing," a plaintiff may also "combine various facts and circumstances indicating fraudulent intent--including those demonstrating motive and opportunity--to satisfy the scienter requirement." Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002).

The Complaint's allegations concerning demand for bandwidth and those concerning the improper reciprocal swap transactions are interrelated and interdependent.  In effect, plaintiffs allege that the improper swap transactions were used to falsely inflate TyCom's revenue, thus propping up stock prices, in order to perpetuate the fraudulent scheme that was initiated when defendants misrepresented the market for undersea bandwidth prior

to the Offering.  As a result, the facts plaintiffs offer to
support a strong inference of scienter with respect to the claims
premised on demand for bandwidth apply with equal force to
support a strong inference of scienter with respect to the
improper swap transactions.[12]

Plaintiffs have identified several factors that, taken
together, are sufficient to support a strong inference that Tyco,
TyCom, and the individual defendants acted with scienter.  First,
plaintiffs allege that the underlying motive for the TyCom
Offering was to allow Kozlowski and Swartz to personally profit
and to generate funds to forgive unauthorized, interest-free
loans that they had obtained from Tyco.  Plaintiffs combine these
allegations of motive and opportunity with claims that
defendants, armed with knowledge of the imbalance between the
demand for and supply of bandwidth, falsified internal demand
projections and enlisted the Yankee Group to use these
artificially inflated projections to provide an "objective third-

---

[12]   The Underwriters are in a different position.
Plaintiffs have not provided sufficient facts to support a strong
inference that the Underwriters acted with scienter with respect
to the improper swap transactions.  In fact, plaintiffs fail to
allege that the Underwriters were aware of these transactions at
all.

party view of global demand for network capacity" intended for
use in SEC filings that themselves were false.  They add that
TyCom engaged in improper swap transactions with other bandwidth
providers to further perpetuate the fraud.  Finally, plaintiffs
allege that the individual defendants engaged in unusual trading
of Tyco stock at suspicious times.  Collectively, these
allegations plead enough culpable facts to support the strong
inference that the individual defendants acted with scienter.
This inference can be imputed to Tyco and TyCom as well.

     The Underwriters, however, are in a different position.
First, plaintiffs impermissibly group together Merrill Lynch,
Goldman Sachs, and SSB in their allegations, claiming that the
"Underwriter Defendants" instructed Kowalik to falsify TyCom's
projections of market demand.  Compl. ¶¶ 88-89. 123, 204.  Under
the PSLRA, a plaintiff is required to plead particularized facts
that support a strong inference of scienter with respect to each
defendant.  See In re Cross Media Mktg. Corp. Sec. Litig., 314 F.
Supp. 2d 256, 263 (S.D.N.Y. 2004)(dismissing claim where
complaint "d[id] not adequately plead that each Defendant acted
with 'the required state of mind'"); Tyco II, 2004 DNH 154
(noting that the group pleading doctrine "does not relieve a

                              -31-

plaintiff of the duty to plead sufficient facts <u>as to each</u>
<u>defendant</u> to support a strong inference that the defendant acted
with scienter")(emphasis added).

Second, plaintiffs allege that Goldman Sachs analyst
Governali and SSB analyst Grubman knew that there was no demand
for bandwidth "by virtue of their access to senior TyCom
management prior to and after the Offering, and their
relationship with the other large bandwidth companies in the
industry."  Compl. ¶ 204.  However, sweeping and conclusory
allegations that a defendant "must have known" the facts giving
rise to an alleged fraud are insufficient to sustain an inference
of scienter.  <u>See, e.g.</u>, <u>Maldonado v. Dominguez</u>, 137 F.3d 1, 10
(1st Cir. 1998)(finding generalized imputations of knowledge
insufficient); <u>Orton v. Parametric Tech. Corp.</u>, 344 F. Supp. 2d
290, 306 (D. Mass. 2004)(rejecting "vague assertion that a
defendant must have known about the fraud by virtue of his
position of authority" to plead a strong inference of scienter).

Finally, plaintiffs' unsubstantiated and conclusory
assertions that Grubman was the "engineer" of TyCom's "scheme,"
Compl. ¶ 7, and that he worked with TyCom executives to "devise[]
a new business plan" for TyCom, <u>id.</u> ¶ 8, are similarly

-32-

insufficient to support a strong inference of scienter.

Plaintiffs' allegations that at an open-house Grubman told Garvey

that Tyco could sell off a minority interest in TyCom and "retain

the profit" from a fiber-optics network and that they should "get

a handle on the company's hidden value" and "turn all of it into

gold," id. ¶ 54, demonstrate only that Grubman was optimistic

about TyCom's ability to succeed and be profitable in the

telecommunications market.  I therefore conclude that plaintiffs

have not pleaded sufficient facts to demonstrate that the

Underwriters acted with scienter with respect to the claims

involving the demand for bandwidth.

      c.  *Loss Causation*

The Tyco Defendants' next argument in favor of dismissal of

the § 10(b) claim is that even if plaintiffs have adequately

pleaded actionable misstatements and scienter, their § 10(b)

claim must nevertheless be dismissed because they have failed to

adequately plead loss causation.[13]  To survive a Rule 12(b)(6)

---

[13] Defendants also contend that plaintiffs' failure to properly plead loss causation with respect to the Exchange Act claims establishes their affirmative defense of "no loss causation" with respect to the § 11 and §15 claims.  See, e.g., In re DNAP Sec. Litig., 2000 WL 1358619, at *3 (N.D. Cal. Sep. 14, 2000)(dismissing claim, noting loss causation is an

challenge to a § 10(b) claim, a plaintiff must allege that "the act or omission of the defendant alleged to violate [§ 10(b)] caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4); see Dura Pharms., Inc. v. Broudo, 125 S. Ct. 1627, 1631 (2005)(defining loss causation as a "causal connection between the material misrepresentation and the loss").  Hence, to properly plead loss causation, a plaintiff must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005).

As the Supreme Court recently explained, plaintiffs cannot adequately plead loss causation merely by alleging that they purchased securities at artificially inflated prices.  Dura Pharms., 125 S. Ct. at 1630.  Rather, a plaintiff must show that he "suffered an economic loss fairly attributable to the public airing of the alleged fraud."  D.E. & J L.P. v. Conaway, 284 F. Supp. 2d 719, 748-49 (E.D. Mich. 2003), aff'd, 2005 WL 1386448 (6th Cir. June 10, 2005)(unpublished).

—————————————————

affirmative defense that may be raised on a motion to dismiss).

-34-

Defendants argue that plaintiffs have failed to point to any corrective disclosure followed by an immediate drop in the price of TyCom stock, and, as a result, the only reasonable inference that can be drawn from the Complaint is that any decline in price during the class period was caused by the crash of the telecommunications market.  Plaintiffs respond that they have satisfied the pleading requirement by alleging that "defendants' fraudulent misrepresentations and omissions caused the price of TyCom stock to be artificially inflated, so that when, over time, the true facts came out regarding TyCom's prospects and the state of demand for bandwidth generally, facts that were at odds with defendants' prior representations, the stock lost value and investors suffered a loss."  Pls.' Opp. to Issuer Defs.' Mot. to Dismiss at 51.  I agree.

In Dura, the Supreme Court explained that a plaintiff's allegations of loss causation under § 10(b) are only subject to the pleading standards of Fed. R. Civ. P. 8(a)(2) requiring "a short and plain statement of the claim showing that the pleader is entitled to relief."  125 S. Ct. at 1634.  The Court further explained that because "ordinary pleading rules are not meant to impose a great burden upon a plaintiff," it "should not prove

burdensome . . . to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."   Id.

Here, plaintiffs allege that, based on defendants' fraudulent misrepresentations, they purchased TyCom stock at an artificially high price.  They further allege that when the truth surfaced regarding the glut of bandwidth supply that was swamping market demand and driving bandwidth prices down, stock prices dropped and they suffered losses.  Plaintiffs contend that these losses were caused by defendants' material misstatements regarding the demand for and supply of undersea bandwidth.[14]

_____

[14]   The Complaint's remaining allegations, those that mirror the claims asserted by the plaintiffs in Tyco II, include claims that the Prospectus was materially false and misleading because it failed to disclose:  (1) that Tyco's executives were engaged in systematic looting of the company; (2) that Tyco's executives were financially motivated to use the proceeds of the Offering to satisfy unauthorized loans; (3) that Tyco's reported success was the result of systematic accounting fraud; (4) pervasive analysts' conflicts; and (5) that defendants failed to notify investors of James Brennan's participation in the TyCom offering and his criminal record.  Plaintiffs have not pleaded any facts that during the class period these alleged misrepresentations or omissions were disclosed to the market and that there was a resultant drop in the value TyCom stock following the disclosure. Hence, plaintiffs have not sufficiently alleged that their losses were caused by these purportedly fraudulent statements and omissions, and therefore cannot be the basis for plaintiffs' § 10(b) claim here.

Hence, plaintiffs' economic loss was the decline in the value of their stock that was the result of TyCom's misrepresentation of the market for bandwidth.  What was initially concealed from TyCom investors, and what ultimately resulted in plaintiffs' losses, was the knowledge that, at the time of the Offering, the demand for bandwidth would not, and in fact could not, keep pace with the supply, which was increasingly flooding the market with capacity.  When this information was disclosed, the price of TyCom stock, like the prices of other telecommunications stock, declined.  In this case, the entire market for telecommunications stock reacted negatively to the revelation.  Consequently, plaintiffs' showing that their loss was fairly attributable to the public airing of the true state of the bandwidth market, which had been falsely misrepresented to them by defendants, provides the causal link required by Dura.[15]

---

[15]  This case is distinguishable from Lentell.  In Lentell, the Second Circuit explained that "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, . . . a plaintiff's claim fails when it has not adequately pleaded facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events."  396 F.3d at 174 (internal quotations omitted).  Here, the collapse of the market for telecommunications stock was arguably not an intervening event, but rather the proximate result of defendants' misrepresentation

I therefore conclude that these allegations, if assumed to be true, are sufficient at this stage of the proceedings establish that the drop in TyCom's stock price was causally related to defendants' misrepresentation both with respect to the projected market demand for bandwidth and the significant excess of bandwidth supply.  Dura Pharms., 125 S. Ct. at 1634.  Even if, as defendants maintain, there had been an intervening event that interrupted the chain of causation, such a determination is a matter of proof after discovery, either at summary judgment or at trial, and is not to be decided here on a Rule 12(b)(6) motion to dismiss.  Lentell, 396 F.3d at 174.  Accordingly, the Tyco Defendants' motion to dismiss for failure to plead loss causation is denied.[16]

---

of the demand for and supply of bandwidth capacity.

[16]  Plaintiffs also charge that the individual defendants, Kozlowski, Swartz, and Garvey, violated § 20(a) of the Exchange Act.  Section 20(a) imposes derivative liability on defendants who "control" primary violators of securities laws.  See 15 U.S.C. § 78t(a).  A necessary element of a control person claim under § 20(a) is a primary violation of the securities laws. See, e.g., Greebel, 194 F.3d at 207; Suna v. Bailey Corp., 107 F.3d 64, 72 (1st Cir. 1997).  The Tyco Defendants have not challenged the sufficiency of the § 20(a) claim except to the extent that this claim depends on the existence of an underlying violation of § 10(b).  Hence, because the Tyco Defendants' motion to dismiss the § 10(b) claim is denied, the § 20(a) claim remains

2.   *The Underwriter Defendants*

    a.   *Analyst Conflicts*

In addition to joining the Tyco Defendants in their arguments in favor of dismissal of the § 10(b) claim, the Underwriters add that plaintiffs' claim that the Prospectus failed to disclose analyst conflicts must be dismissed.  The crux of this allegation is that defendants had a duty to disclose in the Prospectus that there was a conflict of interest between the Underwriters' investment banking and research departments.  <u>See</u> Compl. ¶¶ 164-94.

In response, the Underwriters argue that plaintiffs have failed to plead a single fact showing that conflicts existed concerning TyCom.[17]  Although plaintiffs devote nearly thirty

---

viable.

    [17]   The Tyco Defendants also argue that there was no obligation on the part of TyCom or Tyco to disclose analyst conflicts in the Prospectus, and that any duty to disclose a conflict resides with the analyst or underwriter.  <u>See, e.g.</u>, <u>Fogarazzo v. Lehman Bros., Inc.</u>, 341 F. Supp. 2d 274, _ (S.D.N.Y. 2004).  I agree.  Item 508(l)(1) of Regulation S-K (17 C.F.R. § 229.508(l)(1)), cited by plaintiffs require that <u>underwriters</u> of securities disclose "any transaction that the underwriter intends to conduct during the offering that stabilizes, maintains, or otherwise affects the market price of the offered securities." Similarly, Regulation M, Item 101 (17 C.F.R. § 242.101(a)) makes it "unlawful" for an <u>underwriter</u> of a security to "attempt to

-39-

paragraphs in the Complaint to allegations that conflicts of
interest between the investment banking and research divisions of
Goldman Sachs and SSB resulted in the publication of biased
research reports on companies in the telecommunications industry,
they offer no facts connecting these alleged conflicts to TyCom.
In fact, as the Underwriters argue, plaintiffs' only allegations
related to TyCom are the general assertions that Goldman Sachs
and SSB were the underwriters of the TyCom Offering and that
their analysts later issued positive research reports on TyCom.
Such conclusory allegations are insufficient under the PSLRA and
Rule 9(b).  See Podany v. Robertson Stephens, Inc., 318 F. Supp.
2d 146, 156 (S.D.N.Y. 2004); In re Merrill Lynch & Co. Research
Reports Sec. Litig., 272 F. Supp. 2d 243, 252-53 (S.D.N.Y.
2003)("Merrill II")(dismissing claim that mutual fund purchased
securities to obtain investment banking business where plaintiffs
alleged only that defendants performed investment banking
services for, and issued analyst reports on, companies whose
securities were held by the fund).  Moreover, virtually all of

---

induce any person to bid for or purchase" a covered security
during the applicable restricted period.  These regulations
impose no duty to disclose on issuers.

plaintiffs' allegations that there were conflicts at Goldman

Sachs and SSB are based on documents or communications that post-

date the TyCom Offering.  They therefore cannot support a claim

that the Prospectus for the Offering was false and misleading.

See, e.g., Compl. ¶ 173 (e-mails from "August 2000"); id. ¶ 179

(communications in "December 2000," "early 2001," and "February

2001"); id. ¶ 187 (e-mail from "June 2001").

Finally, plaintiffs' attempt to rely on Rule 508(l)(1) of

Regulation S-K and Rule 101 of Regulation M is unavailing.  Rule

508(l)(1) requires that the Prospectus disclose any transaction

that the underwriter intends to conduct during the offering that

stabilizes, maintains, or otherwise affects the market price of

the offered securities."  17 C.F.R. § 229.508(l)(1). (Emphasis

added).  Likewise, Rule 101 prohibits an "attempt to induce" the

purchase of "a covered security" (i.e., the security being

offered, see 17 C.F.R. § 242.100(b)).  17 C.F.R. § 242.101(a).

Plaintiffs' strained attempt to characterize research published

on other companies in the telecommunications industry as a

"transaction" intended to affect the market price of TyCom or an

"attempt to induce" the purchase of TyCom stock is unpersuasive.

See In re Salomon Analyst Level 3 Litig., 350 F. Supp. 2d 477,

-41-

493 n.13 (S.D.N.Y. 2004)("<u>Level 3</u>")("The Level 3 Complaint also alleges that SSB's policies induced Grubman to issue 'inflated recommendations' on other companies besides Level 3. . . .  As with the conflicts allegations generally . . . they cannot satisfy the particularity requirements of Rule 9(b) and the PSLRA for fraud or false statement of opinion as to the Level 3 reports."); <u>Podany</u>, 318 F. Supp. 2d at 157-58.

I therefore conclude that plaintiffs' allegations regarding the Underwriters' duty to disclose analyst conflicts are insufficient to satisfy the pleading requirements of a § 10(b) claim.

b.   *Statements Contained In Analyst Reports*[18]

The Underwriters next argue that the § 10(b) claim against

---

[18]   The Complaint points to three research reports authored by Goldman Sachs analyst Governali: (1) an August 21, 2000 report in which Governali included TyCom on a "recommend list," with a 12-month price target of $60 per share, Compl. ¶ 199; (2) an October 18, 2000 report reiterating the "recommend list" rating and the $60 price target, <u>id.</u> ¶ 207; and (3) an April 26, 2001 report reiterating the "recommend list" rating, but reducing the price target to $40 per share.  <u>Id.</u> ¶ 250.

The Complaint also identifies three reports authored by SSB analyst Grubman: (1) an August 21, 2000 report rating TyCom as a "Speculative Buy" and setting a 12-18 month price target of $75 per share, Compl. ¶ 200; (2) a July 18, 2001 report reiterating the "buy" rating, <u>id.</u> ¶ 190; and (3) an August 8, 2001 report downgrading Tycom to "neutral."  <u>Id.</u> ¶ 254.

Goldman Sachs and SSB must fail because plaintiffs have failed to plead a false statement in the TyCom analyst reports and have also failed to plead with particularity facts creating a strong inference of scienter or loss causation.

Plaintiffs' § 10(b) theory against Goldman Sachs and SSB is based on allegations that their analysts, Governali and Grubman, issued materially false and misleading reports concerning TyCom after the Offering, and on other companies prior to the Offering, in an attempt to inflate the value of companies in the telecommunications market.  In their opposition to the Underwriters' motion to dismiss, plaintiffs add that the analysts' biased research reports on securities in TyCom's industry "had the effect of inflating the public's perception of the value of . . . the securities of issuers, such as TyCom, that competed in the same market."  Pls.' Opp. To Underwriters' Mot. to Dismiss at 20-21.  At the heart of this theory is the claim that the Governali and Grubman were motivated to falsify their research reports and ratings to make them appear more favorable than their honestly-held opinions about the companies and their stocks.  See Level 3, 350 F. Supp. 2d at 483.

-43-

The Underwriters first argue that plaintiffs have failed to plead a false statement in the TyCom analyst reports as required by Rule 9(b) and the PSLRA.  The Underwriters also argue that plaintiffs cannot base a claim on analyst reports concerning other issuers and other securities.  I agree with both arguments.

Liability under § 10(b) can be predicated on statements of opinion where "it can be shown not merely that a proffered opinion was incorrect or doubtful, but that the speaker deliberately misrepresented his actual opinions." Level 3, 350 F. Supp. 2d at 489 (internal citations omitted).  To survive a motion to dismiss on a false statement of opinion claim, however, "a plaintiff must allege with particularity 'provable facts' to demonstrate that the statement of opinion is both objectively and subjectively false."[19]  Id.; see Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1095-96 (1991).  Hence, the fatal flaw in plaintiffs' allegations that Governali and Grubman issued false and misleading reports with respect to other telecommunications companies prior to the TyCom Offering, and

_____

[19]  Plaintiffs do not dispute that the ratings and other statements in the analyst reports are recommendations, or, in essence, expressions of the analysts' opinions.

-44-

with respect to TyCom after the Offering, is that plaintiffs have failed to plead facts showing that either Governali or Grubman did not believe the recommendations and other statements in the reports at the time they were made.[20]   See also In re Credit Suisse First Boston Corp. (Agilent Techs., Inc.) Analyst Reports Sec. Litig., 2005 WL 852455, at *6 (D. Mass. Mar. 31, 2005)("Agilent Techs.")(applying Virginia Bankshares and noting that what was missing were "specific allegations of 'provable facts' that would support the twin inferences required: (1) that the analysts did not believe that Agilent merited a 'Buy' rating and (2) that the 'Buy' rating was objectively unsupportable").

     With respect to Governali, plaintiffs allege that his reports did not reflect his true opinion, and were thus false and misleading, because he had "private misgivings about the telecommunications market" and because he "knew that there was no demand for the [TGN]" by virtue of his "access to senior TyCom management . . . and [his] relationship with other large

---

     [20]   Indeed, it is not enough to allege only "that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight."  Level 3, 350 F. Supp. 2d at 489.

bandwidth companies."  Compl. ¶¶ 199, 204.  In support of these allegations, plaintiffs point to a March 2000 e-mail in which Governali purportedly questioned Global Crossing's earnings guidance and to his August 2000 statement that he was considering a downgrade of a number of Competitive Local Exchange Carriers ("CLECs").  Id. ¶¶ 170-71, 173.  Unfortunately for plaintiffs, these allegations offer no insight as to what Governali believed about TyCom at the time he published his three reports, and are therefore inadequate to satisfy the pleading requirements of Rule 9(b) and the PSLRA.  See Level 3, 350 F. Supp. 2d at 492; Podany, 318 F. Supp. 2d at 153-54; In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351, 355 (S.D.N.Y. 2003), aff'd, 396 F.3d 161 (2d Cir. 2005)("Merrill I")(noting that "e-mails concerning securities other than 24/7 and Interliant fail to meet the Rule 9(b)(let alone the PSLRA) pleading requirements necessary to allege that Merrill Lynch made fraudulent statements in reports concerning 24/7 or Interliant").  Likewise, plaintiffs' attempt to impute to Governali knowledge that there was no demand for the TGN on the basis of his "access to Tycom management" is inadequate to establish that he did not believe

his reports on TyCom when he issued them.  See <u>Maldonado</u>, 137 F. 3d at 10.

Plaintiffs' attempt to plead that Grubman's three reports did not reflect his honest opinion regarding TyCom suffers from similar defects and is therefore equally inadequate.  Here, plaintiffs seek to support their charge that Grubman did not believe his TyCom reports by citing two e-mails authored by other SSB employees.  This pleading approach is insufficient.  <u>Level 3</u>, 350 F. Supp. 2d at 491 (noting that reliance on "mischaracteri-zations of e-mails written by <u>other</u> SSB employees" is "plainly insufficient" to plead falsity of analyst report).

First, plaintiffs cite an e-mail from an SSB investment banker, stating that "TyCom gives the appearance of being conservative with respect to multiples relative to the comps despite a very aggressive mode" to support their charge that Grubman concealed his use of aggressive assumptions.  Compl. ¶ 203.  Yet, the e-mail refers only to TyCom's assumptions, not Grubman's.  Plaintiffs have not pleaded any facts concerning Grubman's assumptions, aggressive or otherwise, nor have they explained how the use of aggressive assumptions could be misleading if the report disclosed the assumption on which it was

based.

Plaintiffs also rely on a February 28, 2001 e-mail in which
another SSB employee allegedly noted that in addition to the
securities of several other issuers, "[I] [a]lso don't like TyCom
or 360 (Tsix)."  Compl. ¶ 255.  Again, plaintiffs' reliance is
misplaced.  This e-mail reveals nothing about what Grubman
believed with respect to his TyCom recommendations and there is
no indication that Grubman authorized, approved, agreed with, or
even was aware of this communication.  See Nolte v. Capital One
Fin. Corp., 390 F.3d 311, 315-16 (4th Cir. 2004).  These e-mails
thus cannot support plaintiffs' claim.

Plaintiffs also rely on the bald assertion that the
analysts' positive buy ratings on TyCom common stock were the
undisclosed quid pro quo for the underwriting retention, but fail
to offer a single fact in support of this claim.  Moreover, the
remainder of plaintiffs' allegations are derived from regulatory
investigations concerning telecommunications companies other than
TyCom.

In fact, plaintiffs have not pointed to a single
contemporaneous fact to support their contention that the
analysts' reports were not reflective of their authors' true

-48-

opinions.  Rather, plaintiffs rely on general allegations that
Governali and Grubman had "private misgivings" about the
telecommunications industry, as well as e-mails written by other
SSB employees that purport to represent Grubman's true opinion
about TyCom.  These allegations are insufficient under Rule 9(b)
and the PSLRA.

Finally, to adequately plead a § 10(b) claim, a plaintiff
must state with particularity facts sufficient to raise a
"strong" inference of scienter.  15 U.S.C. § 78u-4(b)(2); Greebel
v. FTP Software, Inc., 194 F.3d 185, 196 (1st Cir. 1999).
Although in the typical case, falsity and scienter are different
elements, under a false-statement-of-opinion theory, the two
requirements are essentially identical.  Level 3, 350 F. Supp. 2d
at 490.  Consequently, where, as here, "the facts alleged are
insufficient to support an inference of subjective disbelief in
the opinions expressed, they are likewise insufficient to support
any inference of scienter, let alone a strong one."  Agilent
Techs., 2005 WL 852455, at *8.  Plaintiffs' § 10(b) claim
premised on false analyst reports is thus dismissed.[21]

_____

[21]  As I noted above, the Underwriters also challenge the §
10(b) claim premised on false analyst report on the alternative

**B.**   **Section 11**

Section 11 of the Securities Act "imposes liability on signers of a registration statement and on underwriters, among others, if the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" <u>Glassman</u>, 90 F.3d at 623 (quoting 15 U.S.C. § 77k(a)).  Typically, fraud is not an element of a claim under § 11, and a plaintiff asserting such a claim "may avoid altogether any allegations of scienter or reliance." <u>Shaw</u>, 82 F.3d at 1223.  Consequently, claims asserted under § 11 need only satisfy the pleading standards of Rule 8(a), requiring "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  If, however, a complaint attempts to establish violations of § 11 and § 10(b) through allegations of a unified course of fraudulent conduct, the complaint is said to "sound in fraud," and the more rigorous pleading requirements of Rule 9(b) will apply to the § 11 and §

---

ground that plaintiffs' have failed to plead loss causation as to these reports.  I need not address this argument, however, because I conclude that plaintiffs have failed to establish that the statements in the report were false when they were made.

10(b) claims alike.  See id.; Giarraputo, 2000 WL 1701294, at *9.

_____In this case, plaintiffs urge that their § 11 claims do not "sound in fraud," and therefore should not be subjected to the pleading requirements of Rule 9(b).  The Underwriters counter that with respect to plaintiffs' claims based on demand for bandwidth and failure to disclose analyst conflicts and false statements in analyst reports, fraud is at the very heart of the allegations.  I find the Underwriters' argument on this point persuasive.

Despite plaintiffs' boilerplate disclaimer excluding those allegations that sound in fraud from their § 11 claim, they cannot avoid the strictures of Rule 9(b) where their core allegations allege a fraudulent scheme.  Here, the specific factual allegations on which Count I is based aver that defendants "deliberately misrepresented TyCom's projections of market demand in the [P]rospectus in order to defraud investors," Compl. ¶ 142, and that the Underwriters "specifically directed Andrew Kowalik to falsify his projections."  Id. ¶ 204. Likewise, predictive statements and projections are actionable only if the speaker did not believe the statements when they were made.  See Boston Tech., 8 F. Supp. 2d at 54 (noting that

"optimistic predictions 'that prove to be off the mark'—even the most specific ones—are not actionable . . . unless there was intentional deception on the part of the defendant").  I therefore conclude that, at least as to these allegations, fraud plainly lies at the core of the claim.  See Hayduk v. Lanna, 775 F.2d 441, 443 (1st Cir. 1985).

Moreover, as to the allegations concerning analyst conflicts and false statements in analyst reports, plaintiffs must establish that the analysts knowingly misrepresented their actual opinions when they issued the reports.  See Level 3, 350 F. Supp. 2d at 490 (explaining that "[a]dequately alleging the falsity of a statement [of opinion] . . . is the same as adequately alleging scienter.").  Accordingly, plaintiffs' § 11 claims concerning demand for bandwidth, analyst conflicts, and false reports must satisfy Rule 9(b).

      1.   *Tyco Defendants*

      The Tyco Defendants challenge the sufficiency of plaintiffs' § 11 claim based on statements in the Prospectus concerning the demand for bandwidth.  As I explained in Part III.A.1.a. above, plaintiffs' allegations concerning bandwidth demand and improper swap transactions are sufficient to satisfy the strict and

rigorous pleading requirements of Rule 9(b) and the PSLRA.  It
therefore follows that these allegations also satisfy the
requirements of Rule 9(b) in the context of a § 11 claim.  I thus
decline to dismiss plaintiffs' § 11 claim premised on demand for
bandwidth.[22]

    2.  *Underwriter Defendants*

As I explained in Part III.A.2. above, plaintiffs'
allegations concerning the failure to disclose analyst conflicts
and false statements in analyst reports are insufficient under
Rule 9(b) in the § 10(b) context.  Accordingly, they are also
insufficient to satisfy Rule 9(b)'s requirements as to
plaintiffs' § 11 claim.  Moreover, even under the much less
demanding requirements of Rule 8(a), plaintiffs' vague and
conclusory allegations concerning analyst conflicts and false

---

[22]  Plaintiffs also charge Kozlowski, Swartz, and Garvey
with violation of § 15 of the Securities Act.  Like § 20(a) of
the Exchange Act, § 15 imposes derivative liability on defendants
who "control" primary violators of securities laws.  See 15
U.S.C. § 77o.  Hence, a necessary element of a control-person
claim under § 15 is a primary violation of the securities laws.
See, e.g., Greebel, 194 F.3d at 207; Suna v. Bailey Corp., 107
F.3d 64, 72 (1st Cir. 1997).  The Tyco Defendants challenge the §
15 claim only to the extent that it depends on the existence of
an underlying violation of § 11.  Thus, because the Tyco
Defendants' motion to dismiss the § 11 claim is denied, the § 15
claim remains viable.

statements in the reports would be insufficient to support their
§ 11 claim.

## C.   <u>**Statute of Limitations**</u>

As an alternative ground for dismissal of the claims based
on demand for bandwidth, defendants argue that these claims are
time-barred.  Claims brought under § 11 and § 15 of the
Securities Act must be brought "within one year after discovery
of the untrue statement or the omission, or after such discovery
should have been made through the exercise of reasonable
diligence," and "no later than three years after the security was
bona fide offered to the public. . . ."  15 U.S.C. § 77m; <u>see</u>
<u>Dodds v. Cigna Sec., Inc.</u>, 12 F.3d 346, 349 (2d Cir. 1993); <u>In re</u>
<u>Tyco Int'l, Ltd., Sec. Litig.</u>, 185 F. Supp. 2d 102, 115 (D.N.H.
2002).  Similarly, claims brought under § 10(b) and § 20(a) of
the Exchange Act prior to July 30, 2002 had to have been
commenced within "one year after the discovery of the facts
constituting the violation and within three years after such
violation."[23]  <u>Lampf, Pleva, Lipkind, Prupis & Petigrow v.</u>

---

[23]   Under Section 804 of the Sarbanes-Oxley Act of 2002
("SOX"), Pub. L. No. 107-204, 116 Stat. 745 (2002), § 10(b)
claims commenced after July 30, 2002 are subject to a two-year
statute of limitations.  The Tyco Defendants argue that SOX's

<u>Gilbertson</u>, 501 U.S. 350, 364 (1991)(§ 10(b) claims); <u>Dodds</u>, 12 F.3d at 350 (§ 20(a) claims).

A two-part test is used in the First Circuit to determine when a plaintiff has sufficient notice of a securities fraud claim to trigger the one-year limitations period.  <u>Young v. Lepone</u>, 305 F.3d 1, 8 (1st Cir. 2002).  First, the party invoking the statute of limitations defense "must demonstrate that sufficient 'storm warnings'[24] of fraud were on the horizon to trigger a duty to inquire further."  <u>Tyco II</u>, 2004 WL 2348315, at *18 (citing <u>Young</u>, 305 F.3d at 8).  If the defendant meets this burden, the plaintiff must then produce evidence establishing that even a reasonably diligent investigation would not earlier have produced sufficient evidence to permit the filing of a

---

two-year limitation period does not apply retroactively to revive already time-barred claims such as the § 10(b) claim here.  <u>See</u> <u>Foss v. Bear, Stearns & Co.</u>, 394 F.3d 540, 542 (7th Cir. 2005); <u>In re Enter. Mortgage Acceptance Co., Sec. Litig.</u>, 391 F.3d 401, 410 (2d Cir. 2004).  Because I conclude that plaintiffs' § 10(b) claim based on the demand for bandwidth was timely under the pre-SOX one-year statute of limitations, I need not determine if the SOX two-year limitations period applies to this case.

[24] "Storm warnings" exist "[w]hen telltale warning signs augur that fraud is afoot," such that if the warning signs are "sufficiently portentous," they may, "as a matter of law be deemed to alert a reasonable investor to the possibility of fraudulent conduct."  <u>Young</u>, 305 F.3d at 8.

legally viable complaint.  Id.  Because "[t]he multifaceted
question of whether storm warnings were apparent involves issues
of fact," and the "circumstances of each case must be explored
independently," in certain cases it may not be appropriate to
resolve this issue on a motion to dismiss."  Id. (also noting
that "[i]n the archetypical case . . . it is for the factfinder
to determine whether a particular collection of data was
sufficiently aposematic to place an investor on inquiry notice").

The original complaint in this action was filed on July 24,
2003.[25]  Defendants argue that the original complaint is untimely
because it was filed more than one year after plaintiffs could
have discovered the fact giving rise to their claims related to
the demand for bandwidth.  Plaintiffs dispute defendants'
assertion that a March 1, 2001 article in America's Network, an
April 12, 2001 article in Business Wire, and an April 17, 2001
Tyco press release put investors on notice that statements in the
July 26, 2000 Prospectus may have been false such that they could
have filed a viable claim within one year.

---

[25]  A second, similar complaint was filed in a separate
action on September 23, 2003.  After the two related cases were
consolidated, the consolidated Complaint was filed on December
13, 2004.

Plaintiffs urge that these articles, which did not mention
TyCom by name, merely notified TyCom investors that the market
for undersea bandwidth was not then as robust as defendants had
projected, and thus could not have alerted investors to the fact
that statements in the Prospectus were false at the time they
were made.  Such generalized statements, plaintiffs argue, were
insufficient to have put them on inquiry notice.  See In re
DaimlerChrysler AG Sec. Litig., 269 F. Supp. 2d 508, 515 (D. Del.
2003)(rejecting notice inquiry where the articles cited by
defendants did not discuss "lawsuits that had been previously
filed, official investigations that were being conducted, or
allegations and incontrovertible objective evidence of fraud");
Thompson v. Metro. Life Ins. Co., 149 F. Supp. 2d 38, 51
(S.D.N.Y. 2001)(two dozen articles reflecting "general public
awareness" of industry wrongdoing insufficient to put plaintiffs
on inquiry notice).

Plaintiffs further argue that it was not until September
2002, when Tyco issued a press release detailing Kozlowski and
Swartz's misconduct and announcing that it had filed suit against
them, that they had reason to suspect that the statements in the
Prospectus were false at the time they were issued.  According to

plaintiffs, this was the first "storm cloud" to cast a pall over the statements in the Prospectus.  Following this disclosure, plaintiffs assert that they timely launched an investigation into statements contained in the TyCom Prospectus and filed their initial complaint on July 24, 2003, well within one year of the storm warnings.  If plaintiffs are correct, and at this juncture I must accept as true their well-pleaded facts, I agree that their claims are not barred by the one-year statute of limitations.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, the motions to dismiss as to Tyco, TyCom, Garvey, Kozlowski, and Swartz are denied (Doc. Nos. 384 & 391).  The Underwriters' motion to dismiss (Doc. No. 392) is granted.

SO ORDERED.

<pre>
                              /s/Paul Barbadoro
                              Paul Barbadoro
                              United States District Judge
</pre>

September 2, 2005

cc: Counsel of Record

-58-