# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN RE TYCO INTERNATIONAL, LTD., <br> SECURITIES LITIGATION | ) MDL Docket No. 02-1335-PB <br> ) <br> ) This document relates to: <br> ) Securities Action <br> ) Civil Action No. 02-266-PB <br> ) |

**LEAD PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION FOR CLASS CERTIFICATION**

Jay W. Eisenhofer
Geoffrey C. Jarvis
Sidney S. Liebesman
Russell D. Paul
GRANT & EISENHOFER P.A.
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
Telephone: (302) 622-7000

Richard S. Schiffrin
Katharine M. Ryan
Michael K. Yarnoff
Benjamin J. Sweet
SCHIFFRIN & BARROWAY, LLP
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706

Melvyn I. Weis
Sanford P. Dumain
Paul D. Young
MILBERG WEISS BERSHAD & SCHULMAN LLP
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300

*Co-Lead Counsel for the Securities Action Plaintiffs*

William L. Chapman (N.H. Bar No. 397)
ORR & RENO, P.A.
One Eagle Square, P.O. Box 3550
Concord, NH 03302-3550
Telephone: (603) 224-2381

*Local Counsel for the Securities Action Plaintiffs*

March 6, 2006

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT ........................................................................................................................... 2

I.   NOT A SINGLE CASE SUPPORTS DENIAL OF CLASS CERTIFICATION BASED UPON A PURPORTED "EQUITY CONFLICT" AMONG CLASS MEMBERS AND, IN FACT, NO SUCH EQUITY CONFLICT EXISTS .......................... 2

II.  DENIAL OF CLASS CERTIFICATION DUE TO A PURPORTED EQUITY CONFLICT IS INCONSISTENT WITH THE PSLRA'S EXPRESS PROVISIONS .......... 4

III. CREATION OF A SUBCLASS IS UNNECESSARY UNDER AND CONTRARY TO THE STRUCTURE OF THE FEDERAL RULES OF CIVIL PROCEDURE ............... 5

IV.  THE PEAVY DECLARATION IS FATALLY FLAWED..................................................... 8

CONCLUSION ...................................................................................................................... 11

## TABLE OF AUTHORITIES

### CASES

*In re DaimlerChrysler AG Sec. Litig.*,
    216 F.R.D. 291 (D. Del. 2003) ................................................................................................3

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001)....................................................................................................2

*George Lussier Enters., Inc. v. Subaru of New England, Inc.*,
    No. 99-109-PB, 2001 U.S. Dist. LEXIS 12054 (D.N.H. Aug. 3, 2001)..................................6

*In re Intelligent Elecs. Secs. Litig.*,
    No. 92-1905, 1996 U.S. Dist. LEXIS 1713 (E.D. Pa. Feb. 13, 1996) .....................................3

*In re Royal Dutch/Shell Transport Sec. Litig.*,
    404 F. Supp. 2d 605 (D.N.J. 2005) ......................................................................................4, 5

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
    No. 02-1335-PB, 2004 U.S. Dist. LEXIS 20733 (D.N.H. Oct. 14, 2004)...............................7

*Ziemack v. Centel Corp.*,
    164 F.R.D. 477 (N.D. Ill. 1995)...............................................................................................7

### STATUTES

Fed. R. Civ. P. 23(c)(2)(B) ...............................................................................................................5

Lead Plaintiffs respectfully submit this Supplemental Memorandum of Law[1] in support of their Motion for an Order pursuant to Rule 23 certifying this case as a class action.

## PRELIMINARY STATEMENT

Tyco International, Ltd.'s ("Tyco") Supplemental Memorandum In Opposition to Lead Plaintiffs' Motion for Class Certification ("Supp. Mem.") requests that this Court take the unprecedented action of either denying the Lead Plaintiffs' motion for class certification based upon a purported equity conflict among Class members or requiring the formation of a subclass of shareholders whose current interests in Tyco allegedly exceed their interest in damages from the class action (the "Proposed Subclass"). Tyco's position is in direct conflict with the ***entire*** body of federal securities case law addressing the issue of class certification, as well as the requirements of the Federal Rules of Civil Procedure. Further, Tyco's expert's description of and analysis of the alleged conflict is fatally flawed as shown by Lead Plaintiffs' experts: Professor Lucian Bebchuk of Harvard Law School and Professor Steven P. Feinstein, Director of the Stephen D. Cutler Investment Management Center of Babson College. Tyco's position is further eroded by the disastrous consequences that would result from certification of a Proposed Subclass. *See* Hearing Tr. at 76:3-6; Supp. Mem. at 5. The approach proposed by Tyco would result in a trial where some class members would seek to impose liability on the Company while others would be simultaneously working to avoid that result. Clearly, that is unworkable. Nor is it the approach envisioned by the Federal Rules of Civil Procedure. Those Rules provide that class members who do not wish to participate may opt out of the class. In this case, the class members Tyco seeks to "protect" are sophisticated investors who are more than capable of protecting themselves and opting

---

[1] At the February 14, 2006 oral argument on class certification ("Class Certification Hearing"), the Court invited the parties to address issues in supplemental briefing. 2/14/06 Transcript of Class Certification Hearing ("Hearing Tr.") 67:25-68:4; 85:3-23.

out if they believe it is in their interest to do so. Thus, Tyco's arguments are wholly without merit and should be rejected.

## ARGUMENT

I. **NOT A SINGLE CASE SUPPORTS DENIAL OF CLASS CERTIFICATION BASED UPON A PURPORTED "EQUITY CONFLICT" AMONG CLASS MEMBERS AND, IN FACT, NO SUCH EQUITY CONFLICT EXISTS**

Tyco has not cited a single case, either in its Opposition to Lead Plaintiffs' Motion for Class Certification ("Opp. Br.") or its Supplemental Memorandum, where a Court has denied class certification based on an equity-conflict. Indeed, defense counsel admitted at the February 14, 2006 hearing and as this Court agreed, no such case exists.

> THE COURT: Is there any case in the United States in which a court has refused to certify a class based on the equity conflict? I'm not aware of one.
>
> MR. MADSEN: I am not sure that there is, your Honor. I am not sure that there is.
>
> THE COURT: I would be the first…

*See* Hearing Tr. at 76. Furthermore, as explained in Securities Action Plaintiffs' Reply Memorandum In Support of Class Certification ("Reply Br."), cases expressly rejecting equity conflict among class members as the sole basis for denying class certification are legion. *See* Reply Br. at 11-13 (cases cited therein). Thus, this Court would indeed be the first in the nation to deny class certification on this basis.[2]

---

[2] The lone case relied upon by Tyco in its Supplemental Memorandum, *In re Cendant Corp. Litig.*, is not helpful, and actually supports Lead Plaintiffs' position. 264 F.3d 201, 244 (3d Cir. 2001). In *Cendant*, the Court of Appeals for the Third Circuit did not certify a subclass based upon a purported equity conflict among class members. *Id.* In fact, the court did not even address class certification, but reviewed approval of final settlement. *Id.* In affirming the lower court's ruling, the Circuit court, *in dicta,* noted simply that potential intra-class conflicts could arise in future cases, but that an equity conflict, standing alone, provided no basis upon which to overturn the settlement. *Id.* at 244 (holding that "the simple fact that the institutional investors who comprise Lead Plaintiff retained Cendant stock while the Settlement was negotiated is not nearly enough, standing alone, to support [defendant's] claim that Lead Plaintiff was so conflicted that the Settlement should be overturned."). Thus, the dicta in the Court's footnote is inconsistent with its holding. If the Court had accepted the argument that equity holders are conflicted, it would not have allowed such a holder to negotiate the settlement for the class.

Courts have specifically recognized that adoption of the purported "equity conflict" would subvert the future viability of all securities class actions. Faced with a defendant's challenge to class certification based upon a purported equity conflict among class members, the court in *In re DaimlerChrysler AG Secs. Litig.*, denied defendants' arguments for denial of class certification on this basis, stating:

> [T]he Court agrees … that using this ground as a basis to reject class certification would undermine the use of the class certification mechanism in securities actions and lead to the systematic disqualification of large investors and institutions from serving as lead plaintiffs, a result which is at odds with the intent of the PSLRA.

216 F.R.D. 291, 297 n.3 (D. Del. 2003); *see also In re Intelligent Elecs. Secs. Litig.*, No. 92-1905, 1996 U.S. Dist. LEXIS 1713, at *14-15 (E.D. Pa. Feb. 13, 1996) (holding that "accepting these intraclass conflicts arguments at face value would prohibit the use of the class action mechanism in the vast majority of securities fraud actions. This would be an anomalous result…").[3]

Moreover, removing the Proposed Subclass members from the Class and placing them in a subclass will only cause them further economic harm. If put into a separate subclass, as current shareholders of Tyco, these plaintiffs would still bear the costs of any settlement or verdict against Tyco to the Class members; they would no longer share, however, in any part of a monetary

---

[3] Courts' unwillingness to adopt an equity conflict argument is perfectly reasonable because, in fact, no such conflict exists. As Harvard Professor Lucian Bebchuk points out in his declaration, the class action mode of litigation is premised on the idea that it is inefficient for the court to require thousands of individuals that have essentially the same claim and motivations to proceed separately. (Declaration of Professor Lucian A. Bebchuk ("Bebchuk Decl.") attached as Exhibit A to the Declaration of Sidney. S. Liebesman In Support of Lead Plaintiffs' Supplemental Memorandum In Further Support Of Its Motion For Class Certification ("Liebesman Decl.").  The class action allows all of their separate claims to be tried together in a single action, promoting efficiency and allowing recoveries by persons who could not economically bring their own case.  Thus, Professor Bebchuk notes that, in the securities context, each individual investor has the same motivation as in an individual action – to maximize their recovery against the company that provided false or misleading information. (*Id*. ¶23). Even an investor with a very significant current stake in the company has an incentive to obtain the maximum possible recovery since most of that recovery is being paid by other shareholders.  Thus, looking at each investor in the context of his or her own case, each investor has the same motivation.  The only difference in motivation is that some investors who have large stakes would have an incentive to block litigation by other investors if they could.  Since, however, the law does not allow one plaintiff to block the claims of another plaintiff solely to benefit the first plaintiff, that motivation should not form the basis for separate treatment. Since all investors essentially have the same claim and the same motivation to pursue their individual claim, there is no actual conflict and no basis for a subclass. (*Id*. ¶¶ 20-23).

settlement.  *See generally* Bebchuk Decl. ¶¶ 22-31.

Further, these shareholders bought new Tyco stock knowing of Tyco's outstanding liability as a result of the litigation.  To the extent the value of those shares was reduced because of the pending suit, these investors purchased at a discount that took into account the pending litigation.

## II. DENIAL OF CLASS CERTIFICATION DUE TO A PURPORTED EQUITY CONFLICT IS INCONSISTENT WITH THE PSLRA'S EXPRESS PROVISIONS

Closer examination of Tyco's desired outcome here, *i.e.,* denial of class certification or creation of an equity subclass based solely upon a purported equity conflict among class members, demonstrates that either option would flout the express intent of Congress.  In fact, the PSLRA specifically contemplates that shareholders who purchased during the class period and retain their shares through the litigation will be a part of the class.  *See In re Royal Dutch/Shell Transport Sec. Litig.*, 404 F. Supp. 2d 605, 608 (D.N.J. 2005) ("the plain language of Section 21D(e) neither expressly requires shareholders to sell the subject securities nor implies that a sale is required for damages to be calculable").

In *Royal Dutch/Shell Transport Secs. Litig.*, Judge Pisano analyzed the PSLRA's limitation-on-damages provision, Section 21D(e), to determine whether holder plaintiffs were envisioned by Congress when it enacted the PSLRA.  *Id.* at 608-610.  In analyzing the statutory language, the court found that:

> [B]y its plain terms, Subsection (2) applies '*if* the plaintiff sells' during that period.  Second, Subsection (2) is an exception to the general rule prescribed in Subsection (1). … If a plaintiff has not sold by the expiration of the 90-day period to qualify for the exception in Subsection (2), the general rule is Subsection (1) applies.  The default scenario established in Section 21D(e) is, therefore, that a shareholder will retain the subject security beyond the end of the 90-day period. … **An interpretation of Section 21D(e) requiring sale prior to the expiration of the 90-day period would render Subsection (1) superfluous.**  Principles of statutory construction do not permit an exception to render superfluous the general rule.

*Id.* at 609 (internal citations omitted)(emphasis added). Thus, the court concluded: "Congress ***must have contemplated*** that allegedly defrauded shareholders who continued to retain the subject securities after the 90-day period expires would bring an action and potentially be eligible for damages under the calculation set forth in Subsection (1)." *Id.* (emphasis added).

Moreover, the PSLRA's codified preference for large institutional shareholders to lead federal securities suits – the very large-scale investors Tyco claims comprise the purported retention subclass – militates against any interpretation of the PSLRA that would carve them out of the litigation process. This is precisely the reason why the Third Circuit in *Cendant* rejected a challenge to settlement premised upon the status of the lead plaintiff, a large institutional investor, as holder of the securities: "We must presume that Congress was aware that an institutional investor with enormous stakes in a company is highly unlikely to divest all of its holdings in that company, even after a securities class action is filed in which it is a class member." 264 F.3d at 244. The presence of retention plaintiffs is in full accordance with the PSLRA; conversely, creation of the Proposed Subclass would in fact violate the PSLRA.

### III. CREATION OF A SUBCLASS IS UNNECESSARY UNDER AND CONTRARY TO THE STRUCTURE OF THE FEDERAL RULES OF CIVIL PROCEDURE

Tyco argues that the existence of a purported equity conflict requires the creation of a separate subclass of persons – primarily sophisticated institutional investors – who have a current interest in Tyco that somehow exceeds their economic interest in the class action. (Supp. Mem. at 8-9). Tyco's paternalistic effort to "protect" investors who need no such protection is also at odds with the requirements of the Federal Rules of Civil Procedure. The Federal Rules provide a mechanism that allows class members to make this decision for themselves. Such class members can voluntarily opt out of the class under Fed. R. Civ. P. 23(c)(2)(B). They may then choose to bring their own cases against the defendants they designate or to not pursue recovery at all.

The position taken by Tyco that there should be a mandatory subclass that would not pursue claims against Tyco is directly contrary to the structure established by the Federal Rules. Mandating such a subclass would effectively require certain shareholders to opt-out of a claim against Tyco by assigning them to a subclass that would not pursue claims against the company. This takes the decision as to whether to remain in the class against Tyco away from the class members themselves based upon an unproven assumption that they would not wish to pursue such claims (not because they are legally unable to do so). But this turns the Federal Rules on their head. Under the Federal Rules, entities are "in" the class unless they affirmatively opt-out. Moreover, this result would substitute Tyco's judgment for the judgment of the investors themselves.[4] *See George Lussier Enters., Inc. v. Subaru of New England, Inc.*, No. 99-109-PB, 2001 U.S. Dist. LEXIS 12054, at *13-14 (D.N.H. Aug. 3, 2001) (C.J. Barbadoro) (where this Court expressed deference for the economic judgment of individual class members, as well as for the class action vehicle, in the context of an antitrust class action suit, when confronted with defendant's argument that one of plaintiffs was alleged to have benefited from the anticompetitive conduct while another was allegedly harmed, this Court stated that "they [the plaintiff class members] should be able to decide among themselves what remedy would adequately and fairly represent the interests of both groups within the class.").

Creation of an equity subclass with interests in direct conflict with the Class would pose very real practical difficulties. For example, which equity holders, if any, will be excluded? Who will represent these holders' interests? How would a subclass representative be selected? Which equity holders are included? What date determines whether to include or exclude a retention

---

[4] There are many other reasons besides economics why a holder might want to remain part of the class and seek a recovery from Tyco. Holders may desire to participate in a public airing of a major corporate fraud, or they may desire to be viewed as standing up to corporate fraud, or they may believe that the litigation surrounding Tyco's fraud and any resulting payouts will only improve Tyco's corporate practices and value in the long run.

6

plaintiff? What would happen to the equity subclass if the case settles for billions of dollars – would they receive less or even nothing? Tyco provides no answers to these fundamental questions. *See Ziemack v. Centel Corp.*, 164 F.R.D. 477, 480-81 (N.D. Ill. 1995) (stating that practical considerations preclude exclusion of equity holders).

In addition, the creation of a subclass of holders would be a waste of resources. According to defendants, the Court should create a separate subclass of entities with large current holdings in Tyco that would seek to recover only against Tyco's former officers, directors and accountants. (Supp. Mem. at 2). Defendants acknowledge, however, the remainder of the class would seek to recover against all defendants. Thus, the two classes would be asserting different facts and legal theories and would necessarily have to take different strategic positions at trial. For example, the subclass would want to show that only the director and officer defendants[5] and PricewaterhouseCoopers were at fault to maximize the recovery from them. The rest of the class would want to prove that Tyco and perhaps some employees of Tyco were at fault and would seek to apportion liability among the various defendants to maximize the total recovery. By having two sets of plaintiffs with differing interests as to the liability of particular defendants, plaintiffs would have differing interests at trial, which arguably would require two separate trials in this case (as well as virtually every other securities fraud case). This would ultimately result in an enormous waste of judicial and non-judicial resources as every securities case potentially would have to be tried at least twice.

---

[5] Tyco maintains that the Proposed Subclass is necessary so that these plaintiffs are not "deprived" of their opportunity to seek a recovery against "other defendants." Supp. Mem. at 2. This is a classic red herring. As Tyco is no doubt aware, the Court has already ruled that the actions of the individual defendants are attributable to the corporation under the doctrine of apparent authority; the very parties an equity subclass would pursue under Tyco's theory – the individual defendants – "are" Tyco, for purposes of liability. Thus, in practice, Tyco's directors and officers are not "other parties" from whom the Proposed Subclass could reasonably seek a recovery that would be distinct from the Class. *In re Tyco Int'l, Ltd. Multidistrict Litig.*, No. 02-1335-PB, 2004 U.S. Dist. LEXIS 20733, at *20 (D.N.H. Oct. 14, 2004).

## IV. THE PEAVY DECLARATION IS FATALLY FLAWED

Tyco submits the Declaration of John W. Peavy III ("Peavy Decl.") in support of its contention that "putative class members now holding a majority of Tyco's stock might, if they are economically rational, actually want this case to be dismissed." (Opp. Br. at 10). As shown through data obtained by Lead Plaintiffs' counsel and by analysis from Lead Plaintiffs' experts, however, Peavy's assumptions underlying his findings are wholly inaccurate. As a result, his report is deeply flawed and should be ignored.

First, Peavy's methodology for measuring the potential conflict of interest among class members assumes that the market value of a company's stock declines by the amount of damages that the company pays out to class members" (Peavy Decl. ¶ 19). This assumption, on which his methodology is based, is empirically false. As the data set forth in the report of Plaintiffs' expert Professor Steven Feinstein shows, over the last four years there have been 67 settlements of cases with a solvent defendant and a settlement value greater than $25 million. In more than 55 percent of those cases, a company's stock price has increased as a result of the announcement of a settlement. (*See* Declaration of Professor Steven P. Feinstein ("Feinstein Decl.") ¶ 12, attached as Ex. B to Liebesman Decl.). In the 25 cases with settlements over $100 million, 17 of 25 (68%) exhibited a share price increase. *Id*. Moreover, in the four cash settlements against solvent issuers since enactment of the PSLRA that were at or above $1 billion (AOL Time Warner, Royal Ahold, McKesson/HBOC and Cendant), 3 of the 4 resulted in a price increase upon announcement of the settlement. *Id*.[6] Professor Feinstein explains in his affidavit why such price increases occur: the market may have already priced into the stock the expected costs of the litigation; the resolution of the litigation could remove risk and uncertainty; the end of the litigation might allow management

---

[6] Cendant (which is not included in Feinstein Decl. Ex. 2 because it is prior to 2002) announced a settlement of $2.83 billion on December 7, 1999. Cendant's stock price increased from $17.19 at the close on December 6, 1999 to $18.50 at the close on December 7, 1999.

8

to then focus on future business; or the litigation may cause management and corporate governance changes that improve the company's performance. (Feinstein Decl. ¶13).[7] This directly contradicts Peavy's assumptions and is exactly what Your Honor predicted. Hearing Tr. 78-79 ("I think there is a very good argument here . . . that the Tyco stock will increase in value upon the announcement of the settlement rather than the decrease").

Second, Peavy's estimate of equity ratios ("ER") is unreliable. Peavy assumes that the net increase in an institution's holdings from one quarter to the next accurately reflects that institution's trading during the quarter, and therefore is the basis for his estimate of the institution's claim on aggregate damages and hence its interest in the class action. This use of holdings data is flawed, however. An investor can buy 100,000 shares, and then sell 99,000 shares during a quarter. Its increase is 1,000 shares, but the actual purchases were far greater. (Feinstein Decl. ¶¶ 23-27). Thus, Peavy's estimated numerators are unreliable, which renders useless his attempt to estimate damages.

Third, Peavy implicitly assumes that all damaged shares are damaged the same amount. As Professor Feinstein points out, however, although an institution may have purchased few shares during the class period relative to how many shares it currently owns, its claim on the aggregate damages can be very high because the value of that institution's purchased shares was greatly damaged. (Feinstein Decl. ¶¶ 28-30).

Fourth, an institution's equity ratio cannot be used to accurately indicate the extent to which its interests diverge, if at all, within the class of damaged investors. As Professor Feinstein notes, suppose one investor buys 0.01% of all shares traded during the class period, but after the class period accumulates a 50% ownership stake in the entire company. That investor's ER would be 50

---

[7] Peavy improperly relies upon a dividend example as support for his claim that a class action settlement reduces stock price dollar-for-dollar. In fact, Peavy's dividend example proves the opposite and ultimately undercuts his own thesis. (Feinstein Decl. ¶¶ 15-22).

divided by .01, or 5,000.  This is a very large ER, but that investor represents a very small fraction of the plaintiff class.  In fact, by the very nature of the ER computation, the highest ER values are assigned to the most minimal or marginal members of the class.  Thus, the ER methodology exaggerates the extent of the potential conflict problem.  (Feinstein Decl. ¶¶ 31-33).

Fifth, Peavy presents no credible evidence that a sizable portion of the class members have ER's greater than one.[8]  While Peavy presents tables showing the ER's for largest current holders of the stock, he does not present the ERs for the largest members **of the class**.  Consequently, Peavy's analysis does not indicate to what extent class members have divided interests.  Further, selecting the institutions based on whether or not the institutions own Tyco stock currently introduces selection bias into the analysis.  This approach necessarily eliminates the possibility of a zero ER, and will also necessarily identify high ER investors even if those investors represent a minimal component of the class.  Again, this fact shows how the ER methodology fails to accurately reflect the extent of divergence of interests within the class.  (Feinstein Decl. ¶¶ 41-43).

Sixth, as explained by Professor Bebchuk, Peavy's analysis is unsupported because, while Peavy tries to argue that Tyco is different from other cases such that adopting the equity conflict here will not have significant impacts elsewhere, he offers no comparison data for any other case.  Thus, there is no basis for Peavy, or the Court, to conclude that finding an equity conflict and requiring a subclass would be limited to this case.  (Bebchuk Decl. ¶¶ 14-17).  Further, as also explained by Professor Bebchuk, Peavy essentially is arguing that the holdings in Tyco by institutional investors of more than 60% of the stock is a special situation that would not be

---

[8] Furthermore, Tyco's assertion that "all seven Lead Plaintiffs are non-equity plaintiffs" (Supp. Mem. at 6, n.5) is flat out wrong.  At least two of the Lead Plaintiffs (Teachers Retirement System of Louisiana and Louisiana State Employees Retirement System) still had an equity interest in Tyco as of June 2005.  *See* Excerpt of June 7, 2005 deposition transcript of Robert Beale at p. 71, attached as Ex. C to Liebesman Decl.; Excerpt of June 8, 2005 deposition transcript of Dan H. Bryant at p. 72, attached as Ex. D to Liebesman Decl.

duplicated elsewhere. Peavy is wrong, since institutional holdings in most major companies are 60% or greater. *See generally* (Bebchuk Decl. ¶¶ 14-16).

Finally, Peavy's report appears to have significant computational errors. As Professor Feinstein explains, while Peavy's declaration did not provide his source data, Professor Feinstein was able to check the data and computations Peavy provided in Exhibit-3, and found numerous errors. For example, according to FT Interactive, the market capitalization of Tyco (the sum value of all outstanding Tyco shares) as of March 31, 2005, was $68.0464 billion. However, the market value of the shares owned by institutions on March 31, 2005, according to Peavy's Exhibit-3, sum to $153.95 billion. Clearly Peavy erred. The value of the shares owned by institutions cannot exceed the value of all shares outstanding. (Feinstein Decl. ¶ 48). In addition, the current holdings by institutions reported in Peavy's Table 2 do not match the current holdings for the same institutions reported in Exhibit-3. For example, in Table 2, Peavy reports that Capital Research and Management owned 133,195,000 shares of Tyco on March 31, 2005, but in Exhibit-3 he reports that the number is 85,965,000. (Feinstein Decl. ¶¶ 49-51). Clearly, at least one of these two numbers must be incorrect.

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs' Motion for Class Certification should be granted

11

| | |
|---|---|
| Dated:  March 6, 2006 | Respectfully submitted,<br><br>**GRANT & EISENHOFER P.A.**<br><br>/s/ Sidney S. Liebesman<br>Jay W. Eisenhofer<br>Geoffrey C. Jarvis<br>Sidney S. Liebesman<br>Russell D. Paul<br>Chase Manhattan Centre<br>1201 North Market Street<br>Wilmington, DE 19801<br>Telephone: (302) 622-7000<br><br>Melvyn I. Weiss<br>Sanford P. Dumain<br>Paul D. Young<br>MILBERG WEISS BERSHAD &<br>SCHULMAN LLP<br>One Pennsylvania Plaza<br>New York, NY 10119<br>Telephone: (212) 594-5300<br><br>Richard S. Schiffrin<br>Katharine M. Ryan<br>Michael K. Yarnoff<br>Benjamin J. Sweet<br>SCHIFFRIN & BARROWAY, LLP<br>280 King of Prussia Road<br>Radnor, PA  19087<br>Telephone: (610) 667-7706<br><br>*Co-Lead Counsel for the Securities Action Plaintiffs* |
| William L. Chapman (N.H. Bar No. 397)<br>ORR & RENO, P.A.<br>One Eagle Square, P.O. Box 3550<br>Concord, NH 03302-3550<br>Telephone: (603) 224-2381<br>Fax: (603) 224-2318<br>*Local Counsel for the Securities Action Plaintiffs* | |