**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| IN RE TYCO INTERNATIONAL, LTD., SECURITIES LITIGATION | 02-MDL-1335-B<br>**SECURITIES ACTION**<br>Civil Action No.<br>02-1335-B |

**SUPPLEMENTARY DECLARATION OF CRAIG BALL**

I, CRAIG BALL, declare as follows:

**Introduction**

 1. I am over the age of eighteen and competent to make this Declaration. I am a resident of Montgomery, Texas, and am licensed and in good standing as an attorney in the State of Texas. I have been an attorney since 1982 and am Board Certified in Personal Injury Trial Law by the Texas Board of Legal Specialization. I have been admitted to practice before all Texas courts, the Fifth Circuit Court of the United States and the Federal District Courts for the Southern, Northern and Western Districts of Texas. I am familiar with the laws and rules pertaining to the discovery and production of electronic evidence in the federal system and the several states. I am widely regarded as an expert and authority in these areas and am one of only very few persons in the world to hold both a law degree and a certification in computer forensics.

**Relevant Training and Experience**

 2. I refer the court to the detailed description of my relevant training and experience set out in my Declaration of March 30, 2006.

**Native Format Documents**

 3. Based on information provided to me, I understand that Securities Plaintiffs' Document Requests requested production of electronic documents as they are maintained in the ordinary course of business; that is, in their native formats with relevant metadata (specifically file path and custodian data). I understand that Tyco has made only a limited native production,

electing instead to furnish poorer alternatives—approximations of the evidence rather than the actual evidence--at substantially greater expense.

4. Tyco seeks to substitute what it terms "industry standards" for evidence standards. We must not overlook the distinction between the evidence and approximations of the evidence. The evidence comprises the electronic documents themselves—the so-called "native files." This is the evidence, just as it's used, stored and accessed in the ordinary course of Tyco's business. By contrast, a TIFF or PDF is a picture of one view of the evidence; but by itself, a TIFF is *always* an incomplete rendering of electronic evidence. It lacks electronic searchability and metadata. It can't be loaded into the application that created it and seen as the author saw the document or (as in the case of spreadsheets and other fluid data) tested by changed parameters to assess "what if" hypotheses in the same manner available to the author.

5. In an effort to compensate for the inherent shortcomings of substituting images for evidence, TIFF production proponents resort to extracting information from the source evidence, such as its text or selected metadata fields, and conveying these in a "load" file to accompany the TIFF image. A TIFF with a load file holding the full and accurate text of the original evidence and its relevant metadata is a better approximation of the evidence than just the TIFF image alone, but it's not the evidence. Native forms aren't just the most complete iteration of the evidence, they're the most efficient as well.

6. For physical evidence, substituting photographs of the evidence for the evidence itself is a convenience because there may only be only a single instance of physical evidence, and its size, nature or location may necessitate the substitution of approximations for the real thing. By contrast, electronic evidence can be faithfully duplicated again and again and produced in its native format with greater ease and at less cost than any facsimile of same.

Acknowledging that a picture of evidence is not the same as the evidence--and that the differences between the two can be significant--the Rules of Procedure provide for a right of access to the original evidence, affording requesting parties the opportunity to inspect, photograph, measure and test the original.

7.	The court may wonder why, if native production is superior and economical, are the electronic discovery vendors promoting production of TIFF images instead of the actual evidence?  The answer hinges on several factors, some tied to the fact that many vendors are compensated per TIFF page they generate and have invested heavily in the TIFF production infrastructure.  Processing native files into TIFFs is big business, but native file production demands little or no processing.

8.	Tyco and its vendors assert five objections against native production: (A) Native files can be inadvertently altered; (B) Hash values will tell you a document's been altered but not *how* it's been altered; (C) It's difficult to redact native files for privilege and trade secrets; (D) Hash values aren't sequential; and, (E) You may need more than one application to view native files.

9.	I'm very familiar with these arguments and both the technical and practical considerations put forward to advance and refute them.  I'm also quite familiar with the standards of electronic discovery industry, both from the standpoint of the vendors who furnish e-discovery litigation support and services as well as the lawyers and litigants who purchase those services.  For the reasons addressed below, these objections don't support Tyco's refusal to furnish accurate copies of the original evidence in native formats.

**A.	Native files can be inadvertently altered.**

10.	It's true that if native files are produced on media that isn't write protected and such unprotected media is improperly handled, the duplicates of the native evidence might be

inadvertently altered. But raising this potential as the basis to refuse to furnish copies of the evidence is akin to saying, "We won't let you have photocopies of the documents because you might spill coffee on them." The Securities Plaintiffs appreciate the potential for data corruption and will take steps to eliminate it, as described below. The cost savings and other advantages of native production far outweigh the miniscule and manageable risk.

11. The risk of inadvertent alteration principally concerns a file's system metadata, particularly the information that the system housing the file maintains about its dates and times of creation, modification and access. This data is often important evidence and should be protected and preserved. Inadvertent alteration of metadata commonly happens in two ways. The first occurs when copying electronic evidence to new media (a disk or hard drive) serving as a successor "file cabinet" or serving as a "banker's box" to transport the data from one system ("platform") to another. The second occurs when using software tools to access the evidence because, e.g., computer operating systems will seek to update the last access date by writing the latest information to the media. You eliminate the first risk of inadvertent alteration by employing proper techniques to make the copy—techniques in widespread and common use, e.g., compression and back up software like that currently present on all Windows computers. You eliminate the second risk by preventing the operating system from writing new information to the media. To do so, you use write-protected media or examine the media in write-protected environments.

12. Certain media is inherently write-protected or "read-only." The most familiar are optical disks, like recordable CDs and DVDs (CD-R and DVD-R). These store their contents in "sessions" that can be closed, locking the contents and barring further alteration, much as we

might fire clay into pottery. Such evidence is in "read-only" format and will not change inadvertently, even by mishandling.

13. Other media—notably hard drives—aren't inherently write protected, so that their use for evidence transport or storage requires the use of data container formats (like the well-known Zip archival format) that serve as a protective "shell" for the data or steps to eliminate or intercept the computer's efforts to write new information. You eliminate the computer's efforts to alter the data by, e.g., using operating systems (like the open source and freely available Linux) that support write protection or, more commonly in the Windows world, using hardware-based write protection devices that police the data traffic to and from the hard drive and turn back efforts to write to the drive. You further eliminate the risk of inadvertent alteration by maintaining a pristine duplicate of the data under lock-and-key, like the time-honored practice of keeping a file copy of paper production. Storage is inexpensive, so it's a simple solution to set aside an extra copy of the electronic production to serve as an unblemished touchstone in the unlikely event that every other precaution went awry.

14. All of the techniques just described are effective, inexpensive and technically feasible approaches to preventing inadvertent alterations, *but they're all unnecessary here because the Securities Plaintiffs won't be reviewing the evidence by directly accessing the evidence in its native form.* Instead, the native files sought from Tyco will be duplicated and housed in a hosted review platform constructed so as to bar any alteration of the hosted data, and Tyco will retain the originals. Thus, the media that might inadvertently be altered through mishandling is only handled once and briefly (to add the data to the review system) and only by competent professionals who understand how to eliminate the risk.

**B.**     **Hash values will tell you a document's been altered but not *how* it's been altered.**

15.     The purpose of automated hashing isn't to identify *where* in an electronic document a misplaced period or changed word occurs. There are other tools that do that handily when hash values don't match. The benefit of hashing is its ability to quickly and reliably *flush out* the tiniest difference. A mismatched hash value flags a potential problem. It doesn't pinpoint the cause of that problem.

16.     Tyco argues that the potential for Securities Plaintiffs to alter the evidence demands constant vigilance, which it characterizes as an unfair burden to repeatedly hash and re-hash all of the documents produced in native format. This argument mischaracterizes the purpose of hashing and, more importantly, it ignores the realities of litigation

17.     The risk of altered evidence has always been with us, and Bates numbering doesn't eliminate it. Further, the volume of discovery doesn't operate to conceal alteration. The reality of litigation is that, in competent hands, even complex cases and mountainous discovery comes down to a small universe of key evidence the lawyers actually use in depositions and at trial. The risk of alteration isn't suffused throughout the production but adheres only to the core evidence in such frequent use and of such importance that, should any party suspect fabrication, these will be closely examined and any alteration exposed. Checking these core documents for alteration imposes no substantial burden on any party.

**C.**     **It's difficult to redact native files for privilege and trade secrets.**

18.     For certain complex electronic formats, it's easier to redact data from a TIFF image of the native file than from the file itself. This complexity arises from the fact that native files deliver so much more information than their more limited TIFF facsimiles—a circumstance underscoring the inadequacy of TIFF production. However, even conceding that the TIFF

format facilitates redaction, the relatively small volume of items needing redaction shouldn't dictate the production format for the much, much larger universe of documents that require no redaction.

20. Currently and routinely, items in need of redaction are segregated in discovery, whether their format is TIFF, native or otherwise. If an item of electronic evidence doesn't require redaction, produce it natively. Produce only items requiring redaction as TIFF images, accompanied by a redacted load file. This is feasible, and the cost savings are huge. The hardship, if any, runs to the Securities Plaintiffs who must accept a small percentage of documents as redacted TIFFs, but that's a small price to pay for the lower costs and greater efficiencies attendant to receiving the non-redacted evidence in its native form.

**D.      Hash values aren't sequential.**

20. Indeed, hash values aren't sequential; consequently, they aren't a complete substitute for Bates numbering. That's not a hash value's purpose. Hashes are unique values, so they have a significant advantage over a Bates number. A litigant can inadvertently assign the same Bates number to two different documents, but two different documents will always have different hash values, and two identical native files will always have the same hash value, even if they derive from different sources or have different names. Moreover, Bates numbering isn't feasible for the growing roster of electronically stored evidence not suited to the printed page, including databases, most spreadsheets and all audio and video files.

21. Bates numbers have value for evidence on paper or a paper-like image format, but they aren't essential and are increasingly infeasible. To the extent that an electronic document is printed, the parties can agree upon a Bates numbering standard to manage printouts. Though the desire to affix a Bates number to every "page" of electronic evidence is understandable, nostalgic attachment to a vanishing, impractical custom shouldn't trump the enormous efficiencies of

native production nor foster the distortion of evidence that comes from forcing electronic evidence into misleading or confusing paged forms having little or no natural relevance to the evidence.

**E.**     **You may need more than one application to view native files.**

22.     It's true that TIFFs are easy to view using common applications.  But the ease with which one can view a TIFF is amply offset by the costly and time-consuming lengths one must go to convert native files into the TIFF format.  Moreover, no one familiar with electronic evidence seriously contends that TIFFs are a suitable format to, e.g., view the formulae in spreadsheets, listen to voicemail, view animations, watch video or review databases, to name just a few of the increasingly common evidentiary formats.  Those with a vested interest in promoting TIFF images as the universal production format in electronic discovery might argue, "Most e-evidence is e-mail and word processed documents, so incompatible formats are exceptional."  But the argument that a handful of common formats account for the lion's share of production signifies the need for only a handful of common applications to access the native files.

23.     Just as there are several applications that read the TIFF format, there are several inexpensive applications that serve as universal file viewers, allowing a user to see dozens or hundreds of native formats using a single application.  Stellent's Outside In products and QuickView Plus are two such programs in common use.

**Changing Industry Standards**

24.     Tyco contends that even if native production is now the wisest and most economical choice, its insistence on TIFF production going forward should be judged by the electronic discovery standards of 2002.  Though the tools to review electronic evidence have matured and the choices have grown in the last four years, the requests for discovery have

*always* been directed at the source evidence, and the tools to review native files have been available for as long as the formats themselves have existed. The option to make native production was as feasible and cost-effective in 2002 as today and, then as now, requests for production sought the original electronic evidence, not an incomplete approximation of it. For example, I understand the U.S. government sought native formats in its discovery requests. Tyco had cause to anticipate and prepare for native electronic production and, even if it made uninformed decisions three or four years ago, it's feasible and far less costly to employ more sensible and efficient approaches today.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 24, 2006                              _____
                                                                        Craig Ball