**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


**In re Tyco International, Ltd.**
**Multidistrict Litigation (MDL 1335)**

MDL DOCKET NO. 02-1335-B
All Cases


**MEMORANDUM AND ORDER**


The lead plaintiffs in this securities fraud class action
are former shareholders of Tyco International, Ltd.  They assert
securities fraud claims against Tyco, former Tyco executives and
board members L. Dennis Kozlowski, Mark H. Swartz, Mark A.
Belnick, Frank E. Walsh, Jr., Michael A. Ashcroft (the
"individual defendants"), and Tyco's independent accountant and
auditor, PricewaterhouseCoopers ("PwC"),(collectively the
"defendants").

Plaintiffs allege that defendants misrepresented the value
of several different companies Tyco acquired during the class
period and misreported Tyco's own financial condition.  They also
claim that the individual defendants looted the company by
misappropriating corporate funds in the form of undisclosed cash

bonuses and forgiven loans.  The looted proceeds were then used to reward the individual defendants for their participation in the accounting fraud scheme.  Plaintiffs contend that this looting and accounting fraud scheme defrauded the investing public in violation of the federal securities laws.  They claim that defendants made materially false and misleading statements and omitted material information in various registration statements and publications, which concealed the corporate misconduct and mismanagement, in violation of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, and Sections 10(b), 20(a) and 20(A) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  See Consolidated Compl. ¶ 2.

Plaintiffs have moved for the certification of a class "consisting of all persons and entities who purchased or otherwise acquired Tyco securities between December 13, 1999 and June 7, 2002 (the "Class Period"), and who were damaged thereby (the "Class"), excluding defendants, all of the officers, directors and partners thereof, members of their immediate

families and their legal representatives, heirs, successors or assigns, and any entity in which any of the foregoing have or had a controlling interest."  Lead Pls.' Mot. for Class Certification (Doc. No. 348) at 1.  The proposed class representatives are Plumbers and Pipefitters National Pension Fund ("P&P Pension Fund"), United Association General Officers Pension Plan ("UAGO"), United Association Office Employees Pension Plan and United Association of Local Union Officers & Employees Pension Fund ("UAOE"), Teachers Retirement System of Louisiana ("TRSL"), the Louisiana State Employees Retirement System ("LASERS"), and Voyageur Asset Management ("Voyageur").

Tyco argues that the class should not be certified because the lead plaintiffs are not adequate class representatives and the interests of the class members are too disparate to permit the case to be managed as a class action.[1]  It also contends that one of the lead plaintiffs lacks standing to sue and that two others should be barred from serving as lead plaintiffs because of improper conduct.

---

[1] PwC has joined Tyco in opposing plaintiffs' motion for class certification.  See PwC Obj. (Doc. No. 491).

## CLASS CERTIFICATION STANDARD

To prevail on their motion for class certification, plaintiffs must satisfy all four requirements of Rule 23(a) and demonstrate that the class meets one of the criteria outlined in Rule 23(b).  See <u>Amchem Prods. v. Windsor</u>, 521 U.S. 591, 613-14 (1997)(describing the characteristics of a class action); <u>Makuc v. Am. Honda Motor Co.</u>, 835 F.2d 389, 394 (1st Cir. 1987) (explaining the burden of proof).  Accordingly, they must first demonstrate that:

      (1)   the class is so numerous that joinder of all members is impracticable,
      (2)   there are questions of law or fact common to the class,
      (3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
      (4)   the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These requirements are ordinarily known as numerosity, commonality, typicality, and adequacy.

Next, plaintiffs must demonstrate that the class meets one of the criteria outlined in Rule 23(b).  See <u>Amchen</u>, 521 U.S. at 613-14.  Here, plaintiffs seek certification under Rule 23(b)(3).  Under Rule 23(b)(3), they must show that "the questions of law or fact common to the members of the class predominate over any

-4-

questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).

The class certification inquiry "'generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'"  Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 297 (1st Cir. 2000) (quoting Gen. Tel. Co. v. Falcon, 457 U.S. 147, 160 (1982)). While a motion for class certification is not a license to decide plaintiffs' claims on the merits, the "district court must formulate some prediction as to how specific issues will play out" to determine whether the motion should be granted.  Id. at 298.  Ultimately, whether or not certification is granted is within the broad discretion of the district court.  See Bowe v. PolyMedica Corp., 432 F.3d 1, 4 (1st Cir. 2005) (reviewing class certification decision "under the highly deferential 'abuse of discretion' standard"); Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985) (upholding class certification unless the district court abused its discretion or "operated under an erroneous rule of law").

## ANALYSIS

Instead of addressing each of the prerequisites for certification as set forth above, Tyco has raised five arguments in opposition to class certification.  These arguments implicate both Rule 23(a)'s adequacy requirement and Rule 23(b)(3)'s predominance and manageability requirements.[2]  In keeping with

---

[2]  Tyco does not argue that plaintiffs have failed to satisfy Rule 23(a)'s numerosity requirement, nor does it explicitly assert that certification of the proposed class would be inconsistent with the rule's commonality and typicality requirements.

The numerosity requirement is satisfied when the number of potential class members and their geographic distribution are sufficiently great that joinder of all plaintiffs is not feasible.  Andrews, 780 F.2d at 131-32.  During the class period, millions of shares of Tyco were traded on the open market, rendering the group of potential purchasers who would be class members sufficiently numerous that joinder would be impracticable.

The commonality requirement "is not a high bar."  In re Chiang, 385 F.3d 256, 265 (3d Cir. 2004).  It "'will be satisfied if the named plaintiffs share at least one question of law or fact with the grievances of the prospective class.'"  Id. (quoting Johnston v. HBO Film Mgmt., 265 F.3d 178, 184 (3d Cir. 2001)).  "'The test or standard for meeting the Rule 23(a)(2) prerequisite is qualitative rather than quantitative; that is, there need be only a single issue common to all members of the class.'"  In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. 61, 78 (D. Mass. 2005) (quoting 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3.10 (4th ed. 2002)).  Plaintiffs easily satisfy this requirement because they allege that all members of the class were injured as a result of an overarching conspiracy.

Plaintiffs have likewise satisfied the typicality requirement, because the lead plaintiffs' claims arise from the

Tyco's approach, I address each of its arguments in turn and
analyze the requirements of Rule 23 in the context of each
argument as they arise.

## A.   Equity Conflict

Tyco first argues that the lead plaintiffs cannot satisfy
Rule 23(a)'s adequacy requirement because their interest in
recovering damages from Tyco on behalf of the class is in
conflict with the interest that other class members have in
preventing Tyco from paying damages.  Tyco develops this "equity
conflict"[3] argument by dividing the class into "equity holders"
and "non-equity holders."  Equity holders are class members who

---

same alleged accounting fraud scheme that injured the rest of the
class.  See, e.g., In re Pharm. Indus., 230 F.R.D. at 78 (quoting
In re Am. Med. Sys., 75 F.3d 1069, 1082 (6th Cir. 1996)) ("A
plaintiff's claim is typical if it arises from the same event or
practice or course of conduct that gives rise to the claims of
other class members, and if his or her claims are based on the
same legal theory as the other class members."); Swack v. Credit
Suisse First Boston, 230 F.R.D. 250, 260 (D. Mass. 2005)
(representatives' claims do not have to be identical with absent
class members' claims).

[3]   I follow other courts and commentators in referring to
this alleged conflict as an "equity conflict."  See, e.g., In Re
Dynegy, Inc. Sec. Litig., 226 F.R.D. 263, 277 (S.D. Tex. 2004);
In re Healthsouth Corp. Sec. Litig., 213 F.R.D. 447, 462 (N.D.
Ala. 2003); David J. Ross, Do Conflicts Between Members Vitiate
Class Action Securities Fraud Suits?, 70 St. John's L. Rev. 209,
211 (1996).

currently own a greater share of Tyco's stock than they owned
during the class period.  Non-equity holders, a group that
includes all of the lead plaintiffs, are all other class members.
Tyco argues that equity holders stand to lose more as
shareholders than they will gain as class members if Tyco is
required to pay damages to the class because any such payment
will result in a corresponding reduction in the company's stock
price that will more than offset any damages that equity holders
recover as class members.  The lead plaintiffs do not face this
problem because they do not currently own any Tyco stock.  Thus,
their unqualified interest in recovering damages from Tyco is
allegedly in conflict with the equity holders' interest in
preventing Tyco from paying damages to the class.  Tyco claims
that more than 300 institutional class members are also equity
holders.[4]  Accordingly, it argues that the equity conflict is

---

[4] Plaintiffs challenge the evidence that Tyco relies on to
prove that the proposed class includes several hundred equity
holders.  For example, plaintiffs claim that Tyco improperly
aggregated the holdings of individual mutual funds within fund
families even though the individual funds are distinct entities.
Decl. of Lucien Bebchuk ¶¶ 11-13.  Plaintiffs also complain that
Tyco has arbitrarily chosen March 31, 2005 as the date on which
to determine whether a class member is an equity holder when only
class members who are equity holders when a payment to the class
is announced will be harmed by the payment if the conflict works
in the way that Tyco suggests.  Because any current equity holder
has the power to become a non-equity holder at any time prior to

real and should prevent certification.

Tyco has produced expert testimony to support the claimed
equity conflict.  See Decl. of John W. Peavy, III.  Plaintiffs,
however, have countered with their own experts who have called
into question the assumptions on which the equity conflict is
based.  Among other things, plaintiffs challenge Tyco's
contention that any payment that it makes to the class will
produce a corresponding drop in the company's stock price.
According to plaintiffs, this assumption is incorrect because
historical data demonstrates that a company's stock price more
often than not rises after it announces a payment to a securities
fraud class.  Decl. of Steven Feinstein ¶ 12 (analyzing
securities class action settlements greater than $25 million paid
by solvent companies since 2002).  Plaintiffs' data, however,
does not necessarily undermine Tyco's equity conflict argument.
It is conceivable that a company's stock price could rise after a
settlement payment is announced because the payment is lower than
the payment anticipated by the market.  An equity conflict might
still exist in such cases if the company's stock price would have

_____

the announcement of a payment to the class, plaintiffs argue that
Tyco's methodology is fatally flawed.  I do not need to evaluate
these arguments because I dispose of Tyco's equity conflict
argument for other reasons.

risen even higher if the case had been dismissed without a
payment.  The parties have not adequately explored this
possibility.  Thus, I cannot determine on the present record
whether the economic assumptions on which the equity conflict is
based are valid.

I need not determine whether Tyco's equity conflict argument
can withstand plaintiffs' challenges, however, because the
conflict is not a bar to certification for other reasons.  First,
it is important to bear in mind when considering the equity
conflict that equity holders have a strong interest in recovering
on their own claims against Tyco even if they have reason to
oppose efforts by other class members to recover on their claims.
This is because any adverse impact on Tyco's stock price that
results from a payment to an individual class member must be
borne by all of Tyco's current shareholders.  Decl. of Lucien
Bebchuk ¶¶ 20-22.  Thus, if an equity holder owns 1% of Tyco's
stock, the equity conflict will cost it only 1¢ as a shareholder
for every dollar that it receives as a class member.  This is
significant because it means that the lead plaintiffs'
unqualified interest in maximizing the recovery that they obtain
from Tyco on behalf of the class is directly aligned with the

interest that equity holders have in recovering on their own claims against Tyco.

More fundamentally, Tyco cannot rely on the equity conflict to prevent the certification of a class because its argument fails to properly account for the interests of non-equity holders.  The proposed class includes thousands of class members who are unaffected by an equity conflict and who will have no practical way to pursue their claims against Tyco unless a class is certified.  While equity holders may have an interest in preventing non-equity holders from recovering damages from Tyco, no subgroup of class members can prevent the remaining class members from proceeding as a class simply because that subgroup's members will be harmed if a payment is ultimately made to the other class members.  At most, such conflicts entitle the subgroup to alternative relief, such as the substitution of class representatives, the redefinition of the class to exclude the subgroup, or notice of the conflict and an opportunity to opt out.

Tyco does not claim that the equity conflict can be remedied by either substituting class representatives or redefining the class.  Changing class representatives will not cure the conflict

because it is based on an alleged antagonism of interests between
two substantial subgroups of class members rather than between
the named class representatives and the rest of the class.  Thus,
if Tyco's objection is valid, no one can adequately represent a
class that includes both equity holders and non-equity holders.

Redefining the class to exclude equity holders is
problematic for two related reasons.  First, because equity
holders retain an interest in recovering on their own claims
against Tyco even if the equity conflict is valid, it is unclear
how equity holders would benefit if the class were redefined to
exclude them.  Second, while the categorical exclusion of equity
holders would free the lead plaintiffs from the equity conflict,
it would do so by denying equity holders their right under Rule
23 to decide individually whether to remain as class members or
to opt out of the litigation.  See Fed. R. Civ. P. 23(c)(2)(B).
Because the benefits to equity holders of opting out of the class
are by no means clear cut, I am unwilling to deny them their
right to choose whether to remain in the class.

While neither the substitution of class representatives nor
the categorical exclusion of equity holders is an adequate
response to the equity conflict, equity holders can address the

conflict in other ways.  First, an equity holder can become a
non-equity holder at any time by selling enough stock.  Thus,
equity holders who fear that Tyco's stock price will fall if a
payment is announced to the class can avoid further losses by
divesting themselves of their stock in Tyco.  Second, equity
holders who fear that the lead plaintiffs will focus only on Tyco
without vigorously pursuing claims against other defendants can
seek the certification of a subclass of equity holders.  Finally,
equity holders who do not want to be a part of the class can
exercise their right under Rule 23(c)(2)(B) to opt out of the
litigation.  Because equity holders can protect themselves from
the equity conflict in several different ways, any equity holders
who remain in the class after being notified of the equity
conflict have little reason to complain of the adequacy of their
class representatives.  See Larry James Oldsmobile-Pontiac-GMC
Truck Co. v. Gen. Motors Corp., 164 F.R.D. 428, 437 (N.D. Miss.
1996) (rejecting adequacy challenge where dissident class members
have the right to opt out); In re Potash Antitrust Litig., 159
F.R.D. 682, 692 (D. Minn. 1995) (same).  Accordingly, the
possible existence of an equity conflict does not prevent the
lead plaintiffs from serving as adequate representatives of a

class that includes only those equity holders who elect to remain
in the class after receiving notice of the conflict.

Tyco alternatively argues that I must certify a subclass of
equity holders immediately because they claim that the lead
plaintiffs' interest in recovering damages from Tyco will cause
them to neglect their claims against other defendants.  This
request is premature.  The lead plaintiffs are pursuing a
litigation strategy that is predicated on the theory that Tyco is
liable for the wrongdoing of the individual defendants and that
PwC aided the individual defendants in committing the fraud.
They thus have a strong interest in demonstrating that all of the
defendants are liable for damages.  Further, Tyco itself has
obvious interests in both avoiding liability and in seeing that
any resulting liability is shared with its codefendants.
Accordingly, equity holders will not go unprotected if I decline
to certify a subclass immediately.  See Dierks v. Thompson, 414
F.2d 453, 457 (1st Cir. 1969) (allowing class to be certified
where interest of dissident class members was represented by
defendants); see also Horton v. Goose Creek Indep. School Dist.,
690 F.2d 470, 487 (5th Cir. 1982) (same).  If any member of the
class steps forward during the course of the litigation and seeks

to represent a subclass of equity holders, I will address the issue again at that time.

**B.**   **Loss Causation**

Tyco next argues that the proposed class is unmanageable and its designated representatives are inadequate because the evidence that class members must rely on to prove loss causation will differ depending on when they sold their Tyco stock.

Loss causation is an element of a securities fraud class action claim under § 10(b) of the Exchange Act.  15 U.S.C. § 78u-4(b)(4).  In Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342 (2005), the Supreme Court explained that loss causation cannot be proved merely by establishing that the defendants' misconduct artificially inflated the price of the target company's stock on the date of purchase.  Id.  Instead, as other courts have recognized, a plaintiff must also prove that the company's stock price later declined because the misconduct was disclosed to the market.  See, e.g., Takara Trust v. Molex, Inc., No. 05 C 1245, 2006 U.S. Dist. LEXIS 29655, at *62 (N.D. Ill. Apr. 28, 2006); In Re Teco Energy Inc. Sec. Litig., No. 8:04-cv-1948-T-27EAJ, 2006 U.S. Dist. LEXIS 18101, at *12 (M.D. Fla. Mar. 30, 2006); In Re Initial Public Offering Sec. Litig., 399 F. Supp. 2d 261, 265-66

(S.D.N.Y. 2005).  Courts sometimes refer to such disclosures as
"corrective disclosures."  See, e.g., In re CornerStone Propane
Ptnrs. L.P. Sec. Litig., No. C 03-2522 MHP, 2006 U.S. Dist. LEXIS
25819, at *30 (N.D. Cal. May 3, 2006).

Tyco contends that plaintiffs have effectively divided the
class into several distinct subgroups by pleading three different
corrective disclosures in the consolidated complaint.  One
subgroup consists of class members who sold their Tyco stock
before the first corrective disclosure.  The remaining subgroups
consist of class members who sold their stock after the first
disclosure but before the second disclosure, class members who
sold their stock after the second disclosure but before the third
disclosure, and class members who continued to hold their stock
after the third disclosure.  Tyco argues that class members in
the first subgroup must be excluded from the class immediately
because they cannot prove under any circumstances that their
losses were caused by a corrective disclosure.  It also argues
that the remaining subgroups cannot be included in a single class
because each subgroup must rely on different corrective
disclosures to prove loss causation.  As a result, the inclusion
of these subgroups in a single class is improper because it

"will inject disparate issues, render the proposed class unmanageable and raise substantial questions about adequacy of representation."  Tyco Mem. in Opp. at 12.  I reject both arguments.

Tyco's argument for the immediate exclusion of class members who sold their stock before the first corrective disclosure alleged in the complaint is based on the faulty premise that loss causation must be pleaded with particularity.  Disputes about loss causation turn primarily on questions of fact.  Wortley v. Camplin, 333 F.3d 284, 295 (1st Cir. 2003).  Moreover, unlike elements of a § 10(b) claim such as fraud and scienter, neither Federal Rule of Civil Procedure 9(b) nor the Private Securities Litigation Reform Act require that securities fraud plaintiffs plead loss causation with specificity.  Dura, 544 U.S. at 347.  Instead, the complaint need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  Id.  The plaintiffs have satisfied this requirement by pleading that their claimed losses were caused by corrective disclosures.  That they have specifically identified certain corrective disclosures in the complaint does not preclude them from later identifying additional disclosures.  Thus, it is

-17-

too early in the litigation to exclude former shareholders from
the class simply because their losses were caused by corrective
disclosures that have not yet been specifically identified.  Tyco
remains free to develop the issue further during discovery and to
renew its argument in a properly supported motion for summary
judgment at the appropriate time.

I also am unpersuaded by Tyco's assertion that the proposed
class is unmanageable because some class members will have
stronger loss causation arguments than others based upon when
they sold their Tyco stock.  As the First Circuit has recognized,
classes are routinely certified where common issues predominate
even though individual issues exist with respect to other matters
such as affirmative defenses or damages.  Smilow v. Southwestern
Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003).  There
is no reason why this principle should not also apply to the
subject of loss causation.  Here, the need to make different loss
causation determinations for class members depending on when they
sold their stock does not alter the "sufficient constellation of
common issues [that] binds class members together" into a single
class.  Waste Mgmt. Holdings, 208 F.3d at 296.

Finally, Tyco has failed to properly develop its argument that the lead plaintiffs cannot adequately represent the class on the issue of loss causation.  If the lead plaintiffs purchased their stock before the first possible corrective disclosure and held it until after the final possible corrective disclosure, they have good reason to argue for every disclosure that the evidence in the case will support because they can only recover damages for changes in Tyco's stock price that are tied to corrective disclosures.  While the lead plaintiffs lack similar incentives to argue for corrective disclosures that may have occurred either before they purchased their stock or after they sold it, their interests would not be harmed if such disclosures are recognized unless the recognition of a disclosure that does not benefit them undermines their argument for the recognition of beneficial disclosures.  Thus, the interests of the lead plaintiffs are not necessarily in conflict with the interests of other class members on the issue of loss causation simply because all members of the class will not benefit from all possible corrective disclosures.  Since Tyco has failed to better develop its argument, I cannot credit its contention that the lead plaintiffs are inadequate class representatives on this issue.

-19-

C.   **Exchange Act Claims and Securities Act Claims**

Tyco's third argument is that the conspiracy alleged in the consolidated complaint is so vast, and the legal theories on which the complaint is based are so disparate, that the case cannot be effectively managed as a class action.  To support this argument, Tyco notes that the class period encompasses more than two years and that the defendants' alleged fraud scheme involved some 56 different registration statements and prospectuses and an even larger number of other public statements.  It also specifically argues that differences between plaintiffs' Exchange Act claims and their Securities Act claims make it impossible to litigate a class action that combines both types of claims.

I hold no illusions about the complexity of this case.  More than 70 million pages of documents have been produced in discovery, at least 200 depositions are anticipated and I have already issued many orders addressing a wide variety of difficult legal questions.  Complexity alone, however, cannot be the basis for refusing to certify a class where common issues predominate and alternatives to class certification do not exist for the vast majority of the allegedly injured parties.  Plaintiffs base their case against the defendants on the premise that the individual

defendants operated Tyco as a criminal enterprise over a substantial period of time.  The statements that form the basis for their claims allegedly are part of a common scheme of acquisition accounting fraud and undisclosed looting that remained consistent through the life of the conspiracy.  While some class members undoubtedly will have stronger claims than others based upon when they purchased their stock, the challenges that such individual differences present are inconsequential when weighed against the common interests that unite the entire class. Thus, I am unpersuaded that the case cannot be managed as a class action merely because it encompasses many different misstatements and omissions over a period of more than two years.

I also find no merit in Tyco's argument that I cannot certify a class that includes both Securities Act claims and Exchange Act claims.  The sole example that Tyco cites to support this argument again concerns the subject of loss causation.  Tyco argues that Exchange Act claimants have an interest in proving that Tyco's stock price fell in part because of the disclosure to the market of the New York District Attorney's investigation of Kozlowski's alleged violations of New York's sales tax laws.  It then claims that the Securities Act claimants will be harmed by

such evidence because it undermines their argument that their
damages are caused by the disclosure to the market of the
different misrepresentations that serve as the basis for their
Securities Act claims.  This argument overlooks the fact that
plaintiffs base both their Exchange Act claims and their
Securities Act claims on the premise that Kozlowski led an
overarching conspiracy that encompassed all of the misstatements
and omissions on which both types of claims are based.  As a
result, evidence that Tyco's stock price declined after it became
clear to the market that Kozlowski could no longer be trusted
might actually support rather than undermine plaintiffs'
Securities Act claims.  Accordingly, I reject Tyco's contention
that a class that includes both Securities Act claims and
Exchange Act claims is unmanageable.

**D.   <u>Voyageur</u>**

Tyco next argues that Voyageur lacks standing to sue because
it did not suffer any losses as a result of the alleged fraud.
Voyageur responds by claiming that it has derivative standing to
sue on behalf of its clients because it purchased Tyco stock for
them pursuant to an agreement that granted it discretionary
authority to "buy, sell, or otherwise effect transactions" for

its clients.  P&P Pension Fund Investment Manager Agr., May 1, 1996, ¶6.

The United States Supreme Court has repeatedly recognized that "[i]n the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties."  Powers v. Ohio, 499 U.S. 400, 410 (1991); see also Kowalski v. Tesmer, 543 U.S. 125, 129 (2004); Warth v. Seldin, 422 U.S. 490, 498-99 (1975).  Three requirements must be met to warrant an exception to the general rule: "[t]he litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests."  Powers, 499 U.S. at 411 (citations omitted).  Injury in fact is an "irreducible constitutional minimum" aspect of standing.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  Moreover, it requires an actual injury to the litigant that is before the court.  Vt. Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000).

Voyageur does not even attempt to satisfy the Constitution's injury in fact requirement.  Instead, relying on the Supreme Court's decision in <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723 (1975), it argues that it has standing because it was a "purchaser" of the securities at issue.  <u>Blue Chip Stamps</u>, however, does not address injury in fact.  Instead, it merely holds that only purchasers or sellers of securities can sue to recover for their losses under § 10(b).  <u>Id</u>. at 749.  It does not grant standing to purchasers to recover for damages that were suffered by third parties.  Because Voyageur does not allege that it was directly injured by the defendants' alleged misconduct, it lacks standing to sue on its clients' behalf.

**E.    <u>UAGO and UAOE</u>**

Tyco's last argument is that UAGO and UAOE are inadequate class representatives because they failed to produce certain investment management agreements pursuant to defendants' discovery request.  I disagree.  The record indicates that plaintiffs have substantially complied with the discovery requests.  <u>See, e.g.</u>, Dep. of Ernest H. Soderstrom at 103:13–23 (noting that UAGO and UAOE had produced all but two or three of the investment management agreements); Tr. of Jun. 28, 2005 Tel.

-24-

Conf. at 21:18-24 (additional discovery requests unnecessary for certification determination).  Neither plaintiff is an inadequate class representative simply because it may have inadvertently failed to timely produce a few documents in an otherwise substantial discovery request.  Thus, I decline to remove them as lead plaintiffs based on their alleged failure to fully comply with Tyco's discovery requests.

<u>**CONCLUSION**</u>

For the reasons set forth above, plaintiffs' motion for class certification (Doc. No. 348) is granted.  Voyageur, however, is removed as a lead plaintiff because it lacks standing to sue.

SO ORDERED.

<u>/s/Paul Barbadoro</u>
Paul Barbadoro
United States District Judge

June 12, 2006

cc:  Counsel of Record

-25-