UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

IN RE TYCO INTERNATIONAL, LTD.,
MULTIDISTRICT LITIGATION              MDL Docket No. 02-md-1335-PB

Ballard et al.                        Civil No. 04-cv-1336-PB
      v.                              Opinion No. 2007 DNH 073
Tyco International, Ltd. et al.

MEMORANDUM AND ORDER

The plaintiffs in this action are 33 family trusts and four
individuals who acquired shares of Tyco International, Ltd.
("Tyco") in exchange for their stock in AMP, Inc. when the two
companies merged on April 4, 1999.  They have sued Tyco, various
former officers and directors of the company (the "Individual
Defendants"), including former director Michael A. Ashcroft, and
PricewaterhouseCoopers, LLP ("PwC"), Tyco's independent
accountant and auditor.  Plaintiffs assert three claims for
relief under the Securities Exchange Act of 1934 ("Exchange Act")
(Counts I-III) and three additional claims for relief under the
Securities Act of 1933 ("Securities Act") (Counts IV-VI).
Plaintiffs also bring claims for common law fraud and common law
negligent misrepresentations (Counts VII-VIII).  Ashcroft now

moves to dismiss the claims against him arguing that they are not pleaded with the particularity required by Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b).

## I.   BACKGROUND[1]

Tyco provides a wide range of products and services to consumers.  Compl. ¶ 52.  Between 1992 and 2002, under the direction of then-CEO L. Dennis Kozlowski, Tyco pursued a strategy of aggressive acquisition.  Id.  Throughout that period, Tyco and the Individual Defendants touted Tyco's success as a "turn-around specialist," able to quickly create value in newly acquired companies.  Id.

### A.   The AMP/Tyco Merger

Tyco reached an agreement on November 22, 1998, under which AMP, an international manufacturer of electronic connectors, would merge with a Tyco subsidiary.  Compl. ¶ 53.  Under the

---

[1]  PwC and Tyco previously filed separate motions to dismiss.  On April 22, 2005, I granted PwC's motion and dismissed the claims against it (Doc. No. 417).  On July 11, 2005, I denied Tyco's motion (Doc. No. 478).  In preparing the background section in the instant Order, I draw heavily from my comprehensive review of the Ballard complaint in these prior Orders.

terms of the merger agreement, each AMP shareholder would receive 0.7839 of a share of Tyco common stock in exchange for each of their AMP shares.  Id.

Prior to the close of the merger, on January 29, 1999, AMP announced its financial results for the quarterly period ending December 31, 1998.  Id. at ¶ 55.  Although AMP's operating income had increased from the prior quarter, the company nevertheless reported a net loss of $79 million as a result of: (a) $154 million in charges related to AMP's Profit Improvement Plan; (b) $17 million in expenses related to its defense against a hostile takeover bid; and (c) $15 million in non-refundable bank fees related to AMP's canceled offer to repurchase 30 million shares of its own stock.  Id. at ¶ 55.  The AMP Profit Improvement Plan also established an accounting reserve for anticipated expenses related to workforce reductions, facility closings, divestitures, and fixed asset adjustments.  Id.

On February 12, 1999, Tyco and AMP distributed a joint AMP/Tyco Proxy Statement and Prospectus ("AMP/Tyco Proxy"), containing financial data concerning both AMP and Tyco.  Id. AMP filed its form 10-K (annual report) for fiscal year 1998 on March 26, 1999.  Compl. ¶ 56.  In that 10-K, AMP reported

$376.7 million in charges, including a reserve of $249.9 million
related to the anticipated discharge of 6,450 employees and a
$126.8 million reserve for the consolidation and closure of
various facilities.  <u>Id.</u>  AMP also reported a one-time charge of
$38.4 million in reserves for inventory and equipment write-downs
included in the cost of sales.  <u>Id.</u>  Two days before the closing,
Tyco promised double-digit growth after the merger.  <u>Id.</u> at
¶ 57.

The AMP/Tyco merger closed on April 4, 1999, following
shareholder approval.  <u>Id.</u> at ¶ 57.  This transaction, Tyco's
largest up to that date, was valued at $11.3 billion.  <u>See</u> <u>In re
Tyco Int'l, Ltd.</u>, 185 F. Supp. 2d 102, 106 (D.N.H. 2002) ("<u>Tyco
I</u>").  In Tyco's public announcement of the merger, Kozlowkski
again predicted that the AMP/Tyco Merger would result in double-
digit earnings growth and an "immediate positive earnings
contribution."  Compl. ¶ 54.  In meetings with securities
analysts, Kozlowski further predicted that the acquisition of AMP
would add twelve cents per share to Tyco's profits for the fiscal
year ending September 30, 1999.  <u>Id.</u>

Tyco announced in a press release on July 20, 1999 that its
earnings for the quarter ending June 30, 1999 had increased 71

percent compared with the prior year's corresponding quarter.
Compl. ¶ 58.  Tyco attributed this earnings growth to the
acquisition of AMP.  Id.  Later that month, Kozlowski and former
director Ashcroft sold hundreds of thousands of shares of Tyco
stock; then, in September and October 1999, Kozlowski and Belnick
sold hundreds of thousands of shares of Tyco stock at prices
ranging from $40.18 to $51.50 per share.  Id. at ¶ 59.

**B.    The Tice Report, The New York Times Article,
       and The First SEC Investigation**

Fund manager David W. Tice published an article in his
October 13, 1999 newsletter (the "Tice Report") which questioned
Tyco's accounting practices in general, and its alleged use of
"cookie jar" reserves to artificially boost earnings in
particular.  Compl. ¶ 60.  In response, Tyco denied Tice's
allegations in a series of press releases, media interviews by
Kozlowski, and conference calls with security analysts.  Id.

Several weeks later, on October 29, 1999, the New York Times
published an article noting Tyco's reputation as a turn-around
specialist and pointing out that AMP and other companies acquired
by Tyco took significant losses just before the acquisitions
closed.  Compl. ¶ 61.  The article further stated that the pre-

merger loss charges explained why Tyco was apparently able to take no-growth companies and show positive results immediately after the mergers.  Id.  Tyco again denied any wrongdoing, as it had done in response to the Tice Report.  Id. at ¶ 62.  Shortly thereafter, Tyco announced in a December 9, 1999 press release that its accounting practices were under investigation by the Securities and Exchange Commission ("SEC").  Compl. ¶ 63.  The press release revealed that the practices that had drawn SEC scrutiny were those connected with the reserves and charges reported prior to acquiring target companies.  Id.  In that press release, and in subsequent statements, Tyco once again denied any wrongdoing.  Id.

Nearly six months later, on June 26, 2000, Tyco issued a revised Form 10-K for 1999 and revised Form 10-Qs for the first two quarters of fiscal year 1999 and fiscal year 2000.  Compl. ¶ 64.  The restated 1999 10-K reclassified certain charges and adjusted merger, restructuring, and other non-recurring charges. Id.  Among other things, Tyco reclassified $172.5 million in charges incurred by AMP prior to its merger with Tyco, reclassified $27.5 million in inventory restructuring costs, and eliminated $26 million of the merger restructuring and other

-6-

nonrecurring charges that were originally recorded in the 1999 fiscal year.  <u>Id.</u>

Less than one month later, on July 13, 2000, the SEC informed Tyco that it had completed its investigation and that no enforcement action would be taken.  <u>Id.</u> at ¶ 65.

C.    **<u>Tyco I</u>**

Plaintiff's complaint is not the first of its kind.  On December 9, 1999, the same day that the SEC announced it was conducting an informal investigation into Tyco's accounting practices, a number of individual shareholders filed suits against Tyco in federal district courts across the country.  <u>Tyco I</u>, 185 F. Supp. 2d at 109.  The Judicial Panel on Multidistrict Litigation transferred these actions to this court for consolidated pretrial proceedings on April 26, 2000.  <u>Id.</u> Defendants moved to dismiss.  I granted that motion and dismissed the complaint in its entirety on February 22, 2002.

D.    **<u>Post–Tyco I Events</u>**

The SEC re-opened its investigation of Tyco in June 2002, following the dismissal of the complaint in <u>Tyco I</u>.  Compl. ¶ 69. Later that year, Tyco issued several reports, including the September 17, 2002, Form 8-K (the "September Report") and the

December 30, 2002, Form 8-K (the "December Report"), which
revealed that it had failed to produce "[a] large quantity of
documents . . . in connection with the SEC's document request"
during the SEC's first investigation.  Id. at ¶ 67-68.  Tyco also
identified several acts of wrongdoing in the December Report,
including the fact that prior management appeared to influence
acquisition targets "into adopting accounting treatments that
'over-accrued' expenses prior to an acquisition's consummation or
otherwise exceeded what was permitted by GAAP."[2]  Id. at ¶ 79.

On September 12, 2002, a New York grand jury indicted Tyco's
former CEO Kozlowski and former Chief Financial Officer Mark H.
Swartz, charging them with looting the Company of more than $600
million and reaping more than $430 million in improper profits
from the sale of Tyco stock.[3]  Compl. ¶ 71.  The grand jury also
indicted Tyco's former general counsel, Mark Belnick, on

---

[2]  GAAP stands for "Generally Accepted Accounting
Principles," which "embody the prevailing principles,
conventions, and procedures defined by the accounting industry
from time to time."  Young v. Lepone, 305 F.3d 1, 5 n.1 (1st Cir.
2002)(citing Sanders v. Jackson, 209 F.3d 998, 1001 n.3 (7th Cir.
2000)).

[3]  Kozlowski and Swartz were convicted on most of these
charges on June 17, 2005.

September 12, charging him with falsifying business records.[4]
Id.

On the same day, the SEC filed a civil complaint against
Kozlowski, Swartz, and Belnick in the United States District
Court for the Southern District of New York.  Compl. ¶ 73.  This
case was stayed pending conclusion of the criminal case against
Kozlowski and Swartz.  Id.  The SEC then filed and settled a
suit against former Tyco director Frank E. Walsh on December 17,
2002.  Id. at ¶ 74.  That complaint alleged that Walsh misled
Tyco investors when he failed to disclose a $20 million "finder's
fee" paid to him by Tyco in connection with Tyco's 2001 merger
with CIT.  Id.

As a result of the second SEC investigation, Tyco announced
on June 16, 2003 that it would restate its financial results,
going back to 1998, to correct $696.1 million that it mistakenly
had classified as pretax charges.  Compl. ¶ 80.  Tyco announced
on July 29, 2003 that it was restating its financial statements
for the fiscal years ending September 30, 2002, 2001, 2000, 1999,
and 1998, the period prior to and during the AMP/Tyco merger.
Id. at ¶ 81.

––––––––––––––––––––

[4]  Belnick was acquitted of all charges on July 15, 2004.

**E.**   **Tyco II**

On January 28, 2003, a putative class of plaintiffs filed a Consolidated Complaint, alleging multiple securities law violations against Tyco, former officers and directors including Kozlowski, Swartz, Belnick, Walsh, and Ashcroft, and PwC.[5]   In re Tyco Int'l, Ltd., 2004 WL 2348315, *1 (D.N.H. Oct. 14, 2004)("Tyco II").   In the Consolidated Complaint, these plaintiffs alleged that the defendants perpetrated a massive fraud during the class period of December 13, 1999 through June 7, 2002.   They charged both that Tyco employed a variety of fraudulent accounting practices to inflate its stock price during the class period and that senior management systematically looted the company of hundreds of millions of dollars in undisclosed and unauthorized compensation.   All defendants challenged the sufficiency of the allegations and moved to dismiss the Consolidated Complaint.   Id. at *1.

I denied defendants' motion to dismiss except to the extent that they sought dismissal of plaintiffs' claims under § 14(a) of

---

[5]   The plaintiffs in Tyco II, like the plaintiffs here, asserted claims based on §§ 10(b), 14(a) and 20(a) of the Exchange Act of 1934 and §§ 11, 12(a)(2) and 15 of the Securities Act of 1933.   The Tyco II complaint also contained a claim under § 20A of the Exchange Act.

the Exchange Act and their claims against Ashcroft under §§
10(b), 20(a), and 20A of the Exchange Act, and § 15 of the
Securities Act.  Id. at *19.

**F.   <u>Plaintiffs' Claims</u>**

Echoing the allegations in <u>Tyco II</u>, plaintiffs in the
instant action charge defendants with massive accounting fraud
and looting.  The only significant difference between the two
complaints is that the plaintiffs in the current action claim
that defendants' fraudulent accounting practices predated the
class period in <u>Tyco II</u> and extended to Tyco's accounting for the
AMP merger.  The Ballard plaintiffs also allege two common law
claims.

**G.   <u>Procedural History</u>**

On March 3, 2005, Ashcroft moved to dismiss the claims
against him (Doc. No. 387), arguing that he had not been properly
served with the Summons and Complaint, and, alternatively,
challenging the substance of the claims.  In my August 4, 2005
Memorandum and Order, I agreed that Ashcroft had not been
properly served but I declined to dismiss the Complaint.  (Doc.
No. 499).  Instead, I granted plaintiffs leave to re-serve
Ashcroft in accordance with the Hague Convention and Fed. R. Civ.

–11–

P. 4(f) and to renew his substantive challenge at an appropriate
time.  On December 8, 2005, plaintiffs properly served Ashcroft.
He now renews his substantive motion to dismiss, arguing that the
claims against him were not pleaded with the particularity
required by Fed. R. Civ. P. 9(b) and the PSLRA, and that the
Complaint's few allegations that specifically concern him do not
create a strong inference of scienter.  (Doc. No. 606).

## II.   <u>STANDARD OF REVIEW</u>

Ashcroft challenges the sufficiency of the Complaint
pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil
Procedure and the PSLRA.  "The degree of detail that a complaint
must contain to survive a Rule 12(b)(6) motion depends upon the
nature of the claims under review."  <u>Tyco II</u>, 2004 WL 2348315 at
*1.  Generally, Rule 12(b)(6) is an easy bar to reach, as
plaintiffs need only allege "a short and plain statement of the
claims" being asserted, Fed. R. Civ. P. 8(a)(2), and those
allegations must be construed in favor of the plaintiff.  <u>See</u>,
<u>e.g.</u>, <u>Lalonde v. Textron, Inc.</u>, 369 F.3d 1, 6-7 (1st Cir. 2004);
<u>United States v. Melrose-Wakefield Hosp.</u>, 360 F.3d 220, 224, 240
(1st Cir. 2004).  In cases such as this, however, where many of

the claims sound in fraud, heightened pleading standards apply.
See Fed. R. Civ. P. 9(b); Melrose-Wakefield, 360 F.3d at 226.

Rule 9(b) states that "[i]n all averments of fraud or
mistake, the circumstances constituting fraud or mistake shall be
stated with particularity."  Rule 9(b) also "requires that a
plaintiff's averments of fraud specify the time, place, and
content of the alleged false or fraudulent representations."
Melrose-Wakefield, 360 F.3d at 226.  Furthermore, when a cause of
action sounding in fraud is based on "information and belief,"
Rule 9(b) requires the plaintiff to plead sufficient supporting
facts to permit a conclusion that the alleged belief is
reasonable.  See id.  To do this, plaintiffs must allege both the
source of the information and the reasons for the belief.  See
id.; In re Cabletron Sys., Inc., 311 F.3d 11, 28 (1st Cir. 2002).
Taken together, Rule 12(b)(6) and Rule 9(b) dictate that the
court's limited inquiry must still be a rigorous one.

Even more exacting are the pleading standards for securities
fraud actions based on violations of the Exchange Act, as set
forth in the PSLRA.  See 15 U.S.C. § 78u-4(b).  With respect to
Exchange Act claims alleging that the defendant either "made an
untrue statement of material fact; or omitted to state a material

fact necessary in order to make the statements made . . . not misleading," the PSLRA requires private plaintiffs to specify each statement alleged to be misleading, to state why the statement is misleading, and, if the statement is made on information and belief, to further "state with particularity all facts on which that belief is formed." See 15 U.S.C. § 78u-4(b)(1). Plaintiffs are not required to set forth literally "all" the facts on which a belief is formed, but only a sufficient number of facts to make the alleged misrepresentation reasonable. See Cabletron, 311 F.3d at 30-32 (discussing how different sources of information can corroborate each other to provide an adequate basis for believing the professed falsity of the statements). For purposes of satisfying the particularity requirement, "[e]ach securities fraud complaint must be analyzed on its own facts; there is no one-size-fits-all template." Id. at 32. The PSLRA also requires sufficient factual allegations to support a strong inference of scienter. See 15 U.S.C. § 78u-4(b)(2); Cabletron, 311 F.3d at 38-39; infra Part III(A).

### III.  ANALYSIS

Ashcroft argues that plaintiffs' claims must be dismissed

because the Complaint fails to plead the claims with the
particularity required by Rule 9(b) and the PSLRA.  In support of
this position, he notes that in <u>Tyco II</u> I dismissed the claims
brought against him pursuant to §§ 10(b), 14(a), 20(a) and 20A of
the Exchange Act, and § 15 of the Securities Act because the
complaint was insufficiently pled as to those claims.[6]  Ashcroft
now urges that because the allegations against him in this case
are similar to, and at times mirror, the allegations brought in
<u>Tyco II</u>, and because the instant Complaint contains even fewer
allegations that relate to him specifically, the claims against
him must be dismissed.[7]  I evaluate the sufficiency of each claim
in turn.

**A.   <u>Section 10(b) Claim</u>**

    To properly plead a § 10(b) claim, plaintiffs must allege
"that the defendant made a false statement or omitted a material
fact, with the requisite scienter, and that the plaintiff's
reliance on this statement or omission caused the plaintiff's

---

[6]  In <u>Tyco II</u>, I allowed plaintiffs' claims against Ashcroft
under §§ 11 and 12(a)(2) of the Securities Act to proceed.  <u>Tyco
II</u>, 2004 WL 2348315 at *16.

[7]  Unlike in <u>Tyco II</u>, Ashcroft has not moved to dismiss the
claim based on § 14(a) of the Exchange Act.  I therefore need not
determine whether this claim has been properly pleaded.

injury." <u>Gross v. Summa Four, Inc.</u>, 93 F.3d 987, 992 (1st Cir.

1996)).   Plaintiffs' § 10(b) claims are subject to the heightened

pleading requirements of the PSLRA.  <u>E.g.</u>, <u>Aldridge v. A.T. Cross

Corp.</u>, 284 F.3d 72, 78 (1st Cir. 2002).

Ashcroft argues that plaintiffs' § 10(b) claim against him

must be dismissed because the few allegations directed at him

specifically do not create a strong inference of scienter.[8]   I

agree and therefore dismiss the § 10(b) claim.

"Liability under section 10(b) and Rule 10b-5 . . . requires

scienter, 'a mental state embracing intent to deceive,

manipulate, or defraud.'"  <u>Cabletron</u>, 311 F.3d at 38 (quoting

<u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n. 12 (1976)).

Scienter also "may extend to a form of extreme recklessness that

'is closer to a lesser form of intent.'"  <u>Cabletron</u>, 311 F.3d at

38 (quoting <u>Greebel v. FTP Software, Inc.</u>, 194 F.3d 185, 198-99

(1st Cir. 1999) (concluding that PSLRA did not alter the

definition of scienter)); <u>see also</u> <u>Aldridge</u>, 284 F.3d at 82.

Under the PSLRA, "the plaintiff must . . . show that the

inferences of scienter are both reasonable and strong."

---

[8]   Plaintiffs may not rely on "group pleading" to plead
scienter.  <u>Tyco II</u>, 2004 WL 2348315 at *2.  Thus, the doctrine
has no bearing on Ashcroft's argument that plaintiffs have failed
to plead scienter with particularity.

Aldridge, 284 F.3d at 78 (quotations omitted).  The First

Circuit, however, has "rejected any rigid formula for pleading

scienter, preferring to rely on a 'fact-specific approach' that

proceeds case by case." Cabletron, 311 F.3d at 38 (quoting

Aldridge, 284 F.3d at 82); see also Greebel, 194 F.3d at 196.

Although insider trading may be sufficient to support a

strong inference of scienter in some cases, merely pleading that

a defendant made insider trades

> without regard to either context or the strength of the
> inferences to be drawn, is not enough.  At a minimum,
> the trading must be in a context where defendants have
> incentives to withhold material, non-public
> information, and it must be unusual, well beyond the
> normal patterns of trading by those defendants.

Greebel, 194 F.3d at 198 (citing Maldonado v. Dominguez, 137 F.3d

1, 9-10 (1st Cir. 1998); see also In re Enron Corp. Sec., Deriv.

& ERISA Litig., 258 F. Supp. 2d 576, 593-94 (S.D. Tex. 2003)

(noting that a suspicious pattern of insider trading may be

gauged by the timing of the sales, the amount and percentage of

the seller's holdings sold, the amount of profit received).

Moreover, scienter is not pleaded sufficiently by an allegation

"that a defendant must have had knowledge of the facts,"

Maldonado, 137 F.3d at 9-10 (internal quotations omitted); must

have known facts solely by virtue of his position as a director

-17-

of the company that issued the securities, <u>In re Peritus Software</u> <u>Servs., Inc. Sec. Litig.</u>, 52 F. Supp. 2d 211, 227–28 (D. Mass. 1999); <u>Lirette v. Shiva Corp.</u>, 27 F. Supp. 2d 268, 283 (D. Mass. 1998); or "must have known the facts because [he was] privy to internal corporate information not specified in the complaint." <u>In re Galileo Corp. S'holders Litig.</u>, 127 F. Supp. 2d 251, 261 (D. Mass. 2001).

Here, plaintiffs' § 10(b) claims against Ashcroft must be dismissed because they do not reach the requisite threshold to support a strong inference that he acted with fraudulent intent. First, the Complaint's only particularized allegation against Ashcroft is that in July 1999, he sold "hundreds of thousands of shares of Tyco." Compl. ¶ 59. Plaintiffs have not, however, described how Ashcroft's trading was unusual in either the number of shares sold or the timing of the sale, nor have they set forth his trading history. Moreover, the claims against Ashcroft are based primarily on the sweeping allegations that Ashcroft, as a Tyco Defendant and as an Individual Defendant, "knew or recklessly disregarded" or was "aware of or recklessly disregarded," material misstatements and omissions and fraudulent conduct. Such conclusory allegations, without more, are simply

-18-

insufficient to properly allege scienter.[9]  Accordingly, as in
Tyco II, the Complaint's "allegations that [Ashcroft] signed
corporate filings and sold large amounts of stock are not
sufficient, by themselves, to establish scienter."  2004 WL
2348315, at *12.

**B.    Section 11 and Section 12(a)(2) Claims**

     Ashcroft challenges plaintiffs' claims under §§ 11 and
12(a)(2) of the Securities Act by arguing that plaintiffs have
failed to plead these claims with the particularity required by
Rule 9(b).  Specifically, he argues that plaintiffs' Complaint is
so rooted in fraud that it is impossible to differentiate the
allegations supporting the §§ 11 and 12(a)(2) claims from the
Exchange Act claims, and that plaintiffs cannot avoid the
particularity requirements of Rule 9(b) simply by disavowing the
presence of fraud.

     Section 11 creates a cause of action for damages by
securities purchasers when registration statements contain false

---

     [9]  If plaintiffs wish to prove scienter by "recklessness,"
they still must allege, with sufficient particularity, that the
defendants had full knowledge of the dangers of their actions and
elected not to disclose those dangers to investors.  Maldonado,
137 F.3d at 9 n.4; see also Tyco II, 2004 WL 2348315, at *11
(noting that "scienter may extend to a form of extreme
recklessness").

statements of material fact or material omissions, and plaintiffs can trace their shares to those registration statements.  15 U.S.C. § 77k(a).  Similarly, § 12(a)(2) requires a plaintiff to show that he purchased a security pursuant to an oral communication or a prospectus that contained an untrue statement of material fact or a material omission.  15 U.S.C. § 77l(a)(2).  If claims asserting violations of §§ 11 and 12(a)(2) sound in fraud, such that fraud lies at the core of the action, the claims may be subject to the more rigorous pleading requirements of Rule 9(b).  See Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1223 (1st Cir. 1996) ("For example, if a plaintiff were to attempt to establish violations of Sections 11 and 12[(a)(2)] as well as the anti-fraud provisions of the Exchange Act through allegations in a single complaint of a unified course of fraudulent conduct, fraud might be said to `lie[] at the core of the action.'").

Assuming without deciding that plaintiffs' claims under §§ 11 and 12(a)(2) are subject to Rule 9(b) because they sound in fraud, I nevertheless decline to dismiss them.  A defendant seeking dismissal for failure to state a claim must explain why a challenged cause of action fails to state a claim for relief. Ashcroft has alleged in a conclusory fashion that plaintiffs'

claims under §§ 11 and 12(a)(2) fail to satisfy Rule 9(b) but he

has otherwise failed to explain why the claims are deficient.

Accordingly, I decline to grant his request to have these claims

dismissed.

**C.   "Control Person" Claims**

Ashcroft next argues that the plaintiffs' claims against him

under § 20(a) of the Exchange Act and § 15 of the Securities Act

must fail because plaintiffs have not sufficiently alleged that

he was a control person.   See Tyco II, 2004 WL 2348315 at *16-17.

Section 20(a) of the Exchange Act and § 15 of the Securities

Act impose derivative liability on defendants who "control"

primary violators of the securities laws.[10]   See 14 U.S.C. §

78t(a); 15 U.S.C. § 77o.   A necessary element of a control person

claim under these sections is a primary violation of the

securities laws.   See, e.g., Greebel, 194 F.3d at 207.   As the

First Circuit has explained, "[t]o meet the control element, the

alleged controlling person must not only have the general power

---

[10]   Section 20(a) of the Exchange Act and § 15 of the
Securities Act are analogous, and the two provisions are
interpreted in the same manner and use the same test for control
person liability.   Maher v. Durango Metals, Inc., 144 F.3d 1302,
1305 nn. 5-7 (10th Cir. 1998); Farley v. Henson, 11 F.3d 827, 835
(8th Cir. 1993).

to control the company, but must also actually exercise control over the company." Aldridge, 284 F.3d at 85.  However, the mere "assertion that a person was a member of the corporation's board of directors, without any allegation that the person individually exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person." Tyco II, 2004 WL 2348315 at *17 (quoting Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1108 (10th Cir. 2003)).  This is especially true, Ashcroft argues, where, as here, the person is an outside director.  See In re Lernout & Hauspie Sec. Litig., 286 B.R. 33, 39 (D. Mass. 2002).

In this case, as in Tyco II, plaintiffs allege that Ashcroft was a director and major shareholder.  Plaintiffs also allege that he signed false SEC filings on Tyco's behalf and, by virtue of his position with the company, possessed the power and authority to control the contents of Tyco's publicly filed financial reports, press releases, and presentations to securities analysts.  Compl. ¶ 258-59.  Although plaintiffs conclusorily state that "each of the Individuals Defendants had direct involvement in the day-to-day operations of the Company," they do not allege how Ashcroft exercised any control at Tyco or

explain why his position as an outside director establishes him as a control person.  Compl. ¶ 231-32.  These bare assertions and generalized allegations are simply insufficient to establish that Ashcroft exercised control over the company to sustain plaintiffs' control person claims against him.  I therefore grant Ashcroft's motion to dismiss the § 20(a) and § 15 claims.

**D.    Common Law Claims:  Fraud and Negligent Misrepresentation**

Finally, Ashcroft argues that plaintiffs' common law fraud and negligent misrepresentation claims are insufficient to satisfy the heightened pleading requirements of Rule 9(b).  I agree.

Where fraud "lies at the core" of a common law negligence claim, both that claim and any associated fraud claims must satisfy Rule 9(b)'s heightened pleading requirements.  See Hayduk v. Lanna, 775 F.2d 441, 443 (1st Cir. 1985) (holding Rule 9(b)'s pleading standard applies to conspiracy claim where "the conspiracy alleged is directly linked to the fraud allegations"); OSRecovery, Inc. v. One Groupe Int'l, Inc., 354 F. Supp. 2d 357, 379-80 (S.D.N.Y. 2005) (negligent misrepresentation claim that sounds in fraud is subject to Rule 9(b)).  Although plaintiffs style Count VIII as a negligent misrepresentation claim, the

allegations in that count quintessentially sound in fraud.
Compl. ¶ 267 ("defendants knowingly made material, false
representations and/or omitted to state material facts necessary
to make the statements made not misleading"); ¶ 269
("[d]efendants made the misstatements and omissions described
herein with the intent to induce and the expectation of inducing
investors, including Plaintiffs, to rely upon those statements
and with the knowledge that investors, including the Plaintiffs
would rely upon those statements in deciding whether to buy, sell
or retain their Tyco shares").  Accordingly, both plaintiffs'
common law fraud claim and their negligence claim are subject to
Rule 9(b).

     Plaintiffs group Ashcroft together with the other individual
defendants in seeking to hold him liable for common law fraud and
negligence.  They argue that they have sufficiently pleaded his
interest in making the misstatements and omissions on which the
claims are based because they have alleged that:

          (1)  As a director of the company, he "possessed
               the power and authority to control the
               contents of Tyco's publicly filed financial
               reports, press releases and presentations to
               securities analysts. . . ."  (Compl. ¶ 48).

          (2)  He was "provided with copies of the Company's
               reports alleged herein to be misleading prior

-24-

> to or shortly after the issuance of these
> reports and had the ability and opportunity
> to prevent their issuance or cause them to be
> corrected." <u>Id.</u>

(3)  He was "involved in drafting, producing,
reviewing, approving and/or disseminating the
materially false and misleading statements
and information alleged [in the Ballard
Complaint] . . . ." (Compl. ¶ 50).

(4)  He signed two Form 10-Ks containing mis-
statements and omissions. (Compl. ¶ 109,
123).

I am unpersuaded, however, that these allegations are
sufficiently specific to subject Ashcroft to liability for the
misstatements and omissions on which the claims against him are
based.  Ashcroft was an outside director, and the complaint does
not charge that he was involved in the day-to-day management of
the company.  Under these circumstances, the complaint does not
include enough specific information to plead with particularity
that Ashcroft was responsible for the fraudulent statements of
others.  Accordingly, plaintiffs' common law fraud and negligent
misrepresentation claims against Ashcroft are dismissed.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, I grant Ashcroft's motion
to dismiss (Doc. No. 606) with respect to plaintiffs' claims

under §§ 10(b) and 20(a) of the Exchange Act, § 15 of the

Securities Act, and their common law fraud and negligent

misrepresentation claims.  In all other respects, the motion is

denied.

SO ORDERED.


/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

June 11, 2007

cc:  Counsel of Record