**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

**In re Tyco International,
Ltd., Multidistrict
Litigation (MDL 1335)**

MDL Docket No. 02-1335-B
All Cases
Opinion No. 2007 DNH 072

**MEMORANDUM AND ORDER**

This action against Tyco International, Ltd. and some of its
former officers, directors, and accountants, involves alleged
federal securities violations, common law misrepresentation and
state statutory claims.  Plaintiffs are the State of New Jersey,
Department of Treasury, Division of Investments, by Treasurer
John E. McCormac, *on behalf of* the Common Pension Fund A, DCP
Equity Fund, DCP Small Cap Equity Fund, Supplemental Annuity
Collective Trust Fund, the N.J. Best Pooled Equity Fund, and the
Trustees for the Support of the Public Schools Fund.  These
funds, which benefit current and former New Jersey state
employees and help finance New Jersey public schools, invested
millions of dollars in Tyco stock between January 1, 1997 and

November 1, 2002.  Plaintiffs claim to have lost over $100 million following the disclosure of massive accounting fraud and securities violations at Tyco, which they now seek to recover.

The facts in the case echo the class action lawsuit, referred to by the parties in this matter as the "Securities Action," see In re Tyco Int'l Sec. Litig., No. MDL-02-1335-B, 2004 WL 2348315 (D.N.H. Oct. 14, 2004) ("Tyco II"), and are not repeated in detail here.[1]  In summary, plaintiffs base their claims on an alleged scheme to defraud the investing public by misreporting Tyco's financial condition.  This scheme purportedly involved substantial accounting fraud, which inflated the value of Tyco stock and enabled the individual defendants to reap enormous profits by looting the company through a combination of unreported bonuses, forgiven loans, excessive fees, and insider trading.  The looting, in turn, fostered continued accounting fraud to cover up the misconduct.

Based on this pattern of malefaction, plaintiffs claim defendants violated the federal securities laws, specifically: §§ 10(b), 20(a), 20A, and 14(a) of the Securities Exchange Act of

---

[1]  My Memorandum and Order disposing of motions to dismiss in the Securities Action provides a more thorough explanation of the alleged problems at Tyco during the relevant time period. See Tyco II, 2004 WL 2348315.

1934 ("The Exchange Act"), see 15 U.S.C. §§ 78j(b), 78t(a), 78t-1(a) and 78n(a); and §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 ("The Securities Act"), see 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Plaintiffs contend that this scheme also violated several provisions of state law, including: common law fraud, aiding and abetting common law fraud, conspiracy to commit common law fraud, negligent misrepresentation, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty; several provisions of the New Jersey Racketeering Influenced Corrupt Organizations Act ("NJRICO"), see N.J. Stat. Ann. ("NJSA") § 2C:41-2(a)-(d); and both the New Jersey and New Hampshire Blue Sky laws, see NJSA §49:3-71(c) and (d), and N.H. Rev. Stat. Ann. § 421-B:25 (II) and (III).

In addition to Tyco, defendants include Tyco's former Chief Executive Officer and Chairman of the Board, L. Dennis Kozlowski, its former Chief Financial Officer and Executive Vice President, Mark H. Swartz, and its former Chief Corporate Counsel and Executive Vice President, Mark A. Belnick.  Also named as defendants are the following members of the Board of Directors: Lead Director Frank E. Walsh, Jr., and Audit Committee members Richard S. Bodman, John F. Fort, III, James S. Pasman and Wendy

E. Lane ("Audit Committee defendants").[2]  Finally, Tyco's outside auditors, Pricewaterhouse-Coopers LLP ("PwC") and PricewaterhouseCoopers – Bermuda ("PwC-Bermuda"), are also defendants.  Each of the defendants, except Swartz, has filed a motion to dismiss some or all of the claims against them.

## STANDARD OF REVIEW

Defendants base their motions to dismiss on Fed. R. Civ. P. 12(b)(6).  "The degree of detail that a complaint must contain to survive a Rule 12(b)(6) challenge depends upon the nature of the claims under review."  Tyco II, 2004 WL 2348315 at *1.  Generally, Rule 12(b)(6) is an easy bar to reach, as plaintiffs need only allege "a short and plain statement of the claims" being asserted, Fed. R. Civ. P. 8(a)(2), and those allegations must be construed in favor of the plaintiff.  See United States v. Melrose-Wakefield Hosp., 360 F.3d 220, 224, 240 (1st Cir. 2004).  In cases such as this, however, where many of the claims sound in fraud, heightened pleading standards apply.  See Fed. R. Civ. P. 9(b); Melrose-Wakefield Hosp., 360 F.3d at 226.

---

[2]  Pasman also served on the Board's Compensation Committee beginning in 2000, and Fort served as interim CEO following Kozlowski's resignation in June 2002.

Claims based on averments of fraud will survive a motion to dismiss only if they are stated with particularity by specifying the time, place, and content of the purported false or fraudulent representations.  See Melrose-Wakefield Hosp., 360 F.3d at 226. If a cause of action sounding in fraud is based on "information and belief," as opposed to personal knowledge, Rule 9(b) further requires the plaintiff to plead facts which support the conclusion that the alleged belief is reasonable.  See id.  To do this, plaintiffs must allege both the source of the information and the reasons for the belief.  See id.; In re Cabletron Sys., Inc., 311 F.3d 11, 28 (1st Cir. 2002).  Finally, Rule 9(b) provides that "[m]alice, intent, knowledge, and other conditions of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).  Taken together, Rule 12(b)(6) and Rule 9(b) dictate that the court's limited inquiry must still be a rigorous one.

Even more exacting are the pleading standards established by the Private Securities Litigation Reform Act ("PSLRA") for securities fraud actions based on violations of the Exchange Act. See generally 15 U.S.C. §78u-4.  Exchange Act claims alleging that a defendant either "made an untrue statement of material fact; or omitted to state a material fact necessary in order to

-5-

make the statements made . . . not misleading," must specify each statement alleged to be misleading, state why the statement is misleading, and, if the statement is made on information and belief, further "state with particularity all facts on which that belief is formed." <u>See</u> 15 U.S.C. §78u-4(b)(1). Plaintiffs are not required to set forth literally "all" facts on which a belief is formed, but only a sufficient number of facts to make the alleged belief reasonable. <u>See</u> <u>Cabletron</u>, 311 F.3d at 30-32. For purposes of satisfying the particularity requirement, "[e]ach securities fraud complaint must be analyzed on its own facts; there is no one-size-fits-all template." <u>Id.</u> at 32.

The PSLRA also requires sufficient factual allegations to support a strong inference of scienter. <u>See</u> 15 U.S.C. §78u-4(b)(2); <u>Cabletron</u>, 311 F.3d at 38-39. While the inference must be strong, it does not have to be irrefutable. <u>Cabletron</u>, 311 F.3d at 38 (citing <u>Aldridge v. A.T. Cross Corp.</u>, 284 F.3d 72, 82 (1st Cir. 2002). Once again, the claims must be analyzed based on the specific facts asserted, considering both direct and indirect evidence of either an actual intent to deceive, or the lesser form of intent defined as extreme recklessness, which is a gross departure from the standard of ordinary care. <u>See</u> <u>Greebel</u>

<u>v. FTP Software, Inc.</u>, 194 F.3d 185, 198-200 (1st Cir. 1999).

With these pleading requirements in mind, I turn to the 34 counts set forth in the Second Amended Complaint ("Compl.").  The causes of action are asserted against various combinations of the eleven defendants.  Defendants' principal argument is that the fraud underlying the complaint has not been sufficiently pled, requiring most of the claims to be dismissed.  Although not all causes of action are asserted against each defendant, and not every defendant seeks to have each claim dismissed, many issues overlap.  Accordingly, my analysis is structured around the issues as they arise within the context of each cause of action.

## **ANALYSIS**

## I.    **THE FEDERAL SECURITIES VIOLATIONS (COUNTS 1-7)**

### A.   **Statutes of Repose**

Plaintiffs base their Exchange Act and Securities Act claims in part on certain filings and misstatements that defendants allegedly made in connection with the Raychem acquisition ("Raychem Claims").  When the acts on which the Raychem Claims are based occurred, the claims were subject to three-year statutes of repose.  <u>See</u> <u>Ballard v. Tyco Int'l, Ltd.</u>, No. MDL-02-

1335-B, 2005 WL 1683598, at *6-7 (D.N.H. July 11, 2005)
(identifying applicable statutes of repose).  Defendants rely on
these statutes in arguing that the Raychem Claims are time-barred
because they accrued more than three years before November 27,
2002, the date when plaintiffs commenced the current action.
Plaintiffs counter that the Raychem Claims remain viable, either
because the statutes of repose were tolled by a previous class
action under the rule of American Pipe & Constr. Co. v. Utah, 414
U.S. 538 (1974), or because the Sarbanes-Oxley Act ("SOX"), 28
U.S.C. § 1658, extended the repose period.  I address each
argument in turn.

       1.  Tolling the Statutes of Repose

    Plaintiffs argue that the Raychem Claims are saved from the
statutes of repose because the repose period was tolled from
December 9, 1999 until February 22, 2002, while the original Tyco
class action In re Tyco Int'l, Ltd., Sec. Litig., 185 F. Supp. 2d
102 (D.N.H. 2002)("Tyco I") was pending.  See American Pipe, 414
U.S. at 552-4 (finding "the commencement of a class action
suspends the applicable statute of limitations as to all asserted
members of the class who would have been parties had the suit
been permitted to continue"); see also Crown, Cork & Seal Co. v.

-8-

Parker, 462 U.S. 345, 350 (1983) (expanding the American Pipe tolling rule to include all putative members of the class, including those who bring separate suits).

The American Pipe doctrine can benefit certain plaintiffs but it has its limitations.  First, only those defendants who were parties in the original class action ordinarily can be deemed to have had the requisite notice of the claims asserted against them to be subject to the rule.  See American Pipe, 414 U.S. at 554-555 (discussing how the tolling rule advances the policies of both the limitations and the class action statutes). Defendants Walsh, Fort, Pasman, Bodman, and Lane, as well as both PwC and PwC-Bermuda, were not defendants in Tyco I.  These defendants, therefore, cannot be deemed to have received the "the essential information necessary to determine both the subject matter and size of the prospective litigation," id. at 555, that is required to justify the tolling rule.

The remaining defendants, Tyco, Kozlowski, and Belnick,[3] were defendants in Tyco I and, therefore, are potentially subject to the tolling doctrine.  The tolling doctrine is further limited, however, by the claims asserted.  The statutes of repose

_____

[3]  Swartz, the eleventh defendant here, was also a defendant in Tyco I, but he has elected not to file a motion to dismiss.

are tolled only for those claims that "concern the same evidence, memories, and witnesses as the subject matter of the original class suit." American Pipe, 414 U.S. at 562 (Blackmun, J., concurring); In Re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 431, 450 n.25 (S.D.N.Y. 2003); Salkind v. Wang, Civ. A. No. 93-10912-WGY, 1995 WL 170122 *3-4 (D. Ma. Mar. 30, 1995). The plaintiffs in Tyco I did not assert any claims based on the Raychem acquisition. Instead, they based their complaint primarily on two other transactions: the United States Surgical Corporation ("USSC") merger, and the AMP, Inc. ("AMP") acquisition. See Tyco I, 185 F. Supp. 2d at 105-06. While the line of cases on which plaintiffs rely demonstrates that the repose period can be tolled with respect to new claims if the facts underlying both sets of claims are the same, see, e.g., Cullen v. Margiotta, 811 F.2d 698, 719-20 (2d. Cir. 1987), the underlying facts at issue here are not the same as those challenged in Tyco I. Notifying defendants of claims based on the USSC and AMP transactions simply does not alert them to the possibility of future claims based on the Raychem acquisition. Thus, the Raychem Claims were not tolled by Tyco I.

2.  <u>The Sarbanes-Oxley Act</u>

Plaintiffs alternatively argue that the Raychem Claims are saved from the statutes of repose by SOX.  SOX became effective on July 30, 2002, and extended the repose period to five years for securities violations based on "fraud, deceit, manipulation, or contrivance."  <u>See</u> 28 U.S.C. § 1658(b).  Defendants argue that SOX is inapplicable because the Raychem Claims expired before SOX became effective.  Plaintiffs respond by claiming that SOX applies because they commenced their action after the Act's effective date.

Plaintiffs' argument is simply wrong.  The extensive weight of authority supports defendants' argument that SOX does not revive expired claims.  <u>See</u> <u>Ballard v. Tyco Int'l Ltd.</u>, No. 02-MD-1335-PB, 2005 WL 928537, at *4 (D.N.H. Apr. 22, 2005) (citing authority); <u>see also</u> <u>Foss v. Bear, Stearns & Co.</u>, 394 F.3d 540, 542 (7th Cir. 2005); <u>In re Enter. Mortgage Acceptance Co. Sec. Litig.</u>, 391 F.3d 401, 406-10 (2d Cir. 2004); <u>Quaak v. Dexia</u>, 357 F. Supp. 2d 330, 336-37 (D. Mass. 2005).  Since the Raychem Claims had already become time-barred when SOX became effective on July 30, 2002, SOX does not save the claims from the

applicable statutes of repose.[4]

**B.   Section 10(b) Claims**

Plaintiffs assert § 10(b) claims against all defendants, but only Belnick, the Audit Committee defendants, and PwC–Bermuda seek to have the § 10(b) claims dismissed.[5]  Their principal argument is that the § 10(b) claims are deficient because plaintiffs fail to plead with particularity that the defendants acted with the requisite scienter.[6]  I address this argument with

---

[4]  PwC and PwC–Bermuda specifically seek to dismiss claims based on the 1997 and 1998 audit reports that were incorporated into Tyco's 10-Ks filed on December 24, 1997 and December 10, 1998, as well as the audit report that was incorporated into the 10-Q filed on December 21, 1997, in addition to the filings outlined above made in connection with the Raychem Claims.  I dismiss these claims for the same reason that I dismiss the Raychem Claims.

[5]  Most of the federal claims raised here very closely parallel the allegations in the Securities Action and were thoroughly analyzed and upheld there.  See Tyco II, 2004 WL 2348315.  Accordingly, other than the limited statutes of repose defense analyzed above, defendants Tyco, Kozlowski, Walsh and PwC, who are all defendants in Tyco II, do not reargue claims asserted against them in this action that were upheld there.

[6]  Defendants base their argument in part on the mistaken premise that plaintiffs have relied on the "group pleading presumption" to plead scienter.  In this circuit, the presumption can be used at the pleadings stage to attribute statements in certain corporate documents to the corporation's officers where the circumstances warrant an inference that the documents represent the officers' collective work.  See Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 368 (1st Cir. 1994).  The First Circuit has not endorsed the use of the presumption to

-12-

respect to each defendant in turn.

1. <u>Belnick</u>

Plaintiffs have alleged numerous facts to support their claim that Belnick acted with scienter.[7] Plaintiffs recite more allegations against Belnick than can be enumerated here, but to summarize the general theme, plaintiffs assert that:

> Belnick exercised control over the operations of Tyco and was directly involved in its daily management, including hiding mismanagement and fraud, <u>see</u> Compl. ¶¶ 40, 162, 164-186, 187-197;

> Belnick was responsible for not adequately responding to outside legal inquiries by the SEC and the Manhattan District Attorney and the Boise firm investigation, <u>see</u> Compl. ¶¶ 178-182, 286-94, 890-97, 926-936;

> Belnick was aware of and benefited from the accounting abuses orchestrated by Kozlowski, in particular the large bonuses paid and relocation loans taken, that were improperly reported, <u>see</u> Compl. ¶¶ 97-98, 107-112, 177-184, 308-310, 899, 905, 912-13; and

---

plead scienter and plaintiffs have not relied on the presumption for that purpose.

[7] Although plaintiffs do not allege that Belnick signed any of Tyco's allegedly false and misleading disclosures, they have pleaded facts that warrant an inference that Belnick participated with other corporate officers in making the disclosures. Belnick has not challenged this limited use of the "group pleading" presumption. Whether plaintiffs will be able to prove Belnick's culpability remains to be seen. All that I need say now is that the complaint pleads sufficient facts to survive a motion to dismiss.

Belnick secretly arranged a compensation scheme with Kozlowski that depended on the continued fraud, <u>see</u> Compl. ¶¶ 164-84, 187-97.

These allegations, in conjunction with the additional facts recited in the complaint and summarized in plaintiffs' objection to Belnick's motion to dismiss, tie Belnick to the misleading information included in various SEC filings and other public statements, <u>see, e.g.</u>, Compl., Exhibits F and H, and support plaintiffs' contention that he acted with a culpable mental state.  <u>See</u> <u>In re Stone & Webster, Inc. Sec. Litig.</u>, 414 F.3d 187, 210 (1st Cir. 2005) (finding strong inference of scienter against executive who knowingly misrepresented the financial condition of the company); <u>Aldridge</u>, 284 F.3d at 83 ("[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter.").  It remains to be seen whether plaintiffs will be able to prove their allegations. All that I hold here is that the allegations are sufficient to withstand a motion to dismiss.

> 2.  <u>Audit Committee Defendants</u>

The Audit Committee defendants argue that plaintiffs' principal theory -- that defendants Kozlowski, Swartz and

Belnick, together with Walsh, committed a massive fraud that they
concealed from Tyco's board of directors –– precludes plaintiffs
from also stating viable § 10(b) claims against non-participating
board members.  Essentially, they argue that they could not have
facilitated or participated in a fraud of which they were
unaware.  Generalized allegations that the Audit Committee
defendants are liable under § 10(b) because, as directors of the
company, they "must have" or "should have" known of the purported
fraud, are not sufficiently specific in their view to satisfy the
PSLRA.

Defendants cite the following allegations to support their
thesis that the complaint shows they were duped by the fraud
rather than complicit in it:

(1)  The KEL Loan Program – as early as 1997,
Kozlowski, Swartz, and Belnick misused the "Key
Employee Loan" program by using the loans for various
personal matters rather than for their intended purpose
of covering tax liability associated with the exercise
of stock options, which neither the Board nor its
Compensation Committee knew of or approved.  See Compl.
¶¶ 152, 888, 1058(h).

(2)  Belnick's Secret Compensation – in August 1998
Kozlowski hired Belnick and arranged for a secret
compensation scheme linked to Kozlowski's compensation,
which the Board never approved.  See id. ¶ 173, 184,
186, 189, 191–93.

(3)  <u>The TyCom IPO</u> – as a reward for the successful
September 2000 TyCom IPO, Kozlowski arranged for
various relocation loans to be forgiven and for bonuses
to be awarded for the resulting tax liability; he
documented the bonuses with a memo falsely representing
Board approval.  Kozlowski hid the payments from the
Board and the public by requiring the recipients to
sign confidentiality agreements, accounting for them as
offering expenses and booking them in reserve accounts.
<u>See</u> <u>id.</u>, ¶¶ 118, 122, 1058(d) and (g).  <u>See</u> <u>generally</u>
¶¶ 114–128.

(4)  <u>The ADT Automotive Divestiture</u> – in the fall of
2000, Kozlowski again gave cash bonuses and relocation
"benefits," and hid the compensation by falsely
reporting the awards were approved by the Board's
Compensation Committee and improperly accounting for
them.  <u>See</u> <u>id.</u> ¶ 132, 134–35, 1058(d) and (g).

(5)  <u>The Flag Telecom Acquisition</u> – in June 2001 Tyco
acquired a substantial interest in Flag Telecom, by
swapping TyCom stock for Flag stock.  Kozlowski and
Swartz misrepresented the value of the acquired stock
and obtained board approval of bonuses based thereon.
<u>See</u> <u>id.</u> ¶¶ 148–49, 1058(g).

(6)  <u>The Walsh Payment</u> – as part of the CIT acquisition
in June 2001, Kozlowski and Swartz agreed to pay Walsh
a $20 million "broker" fee for introducing Kozlowski to
CIT's chief executive, which the board did not learn of
until January 2002.  When Walsh refused the board's
demand to repay the money, he was not re-elected to the
board.  The board began investigating the officer
defendants, ultimately unraveling the fraud.  Walsh,
Kozlowski, and Swartz hid the arrangement from the
board and affirmatively misrepresented the fee
arrangement in the March 2001 CIT S-4, April 2001 CIT
S-4/A, April 2001 CIT Prospectus and the 2001 10-K.
<u>See</u> Compl. ¶¶ 72, 77–78, 962.  <u>See</u> <u>generally</u> <u>id.</u>, ¶¶
68–88.

(7)  <u>The Manhattan D.A. Investigation</u> – in May 2002, Kozlowski and Belnick learned the Manhattan D.A.'s office was investigating Kozlowski for tax evasion, but again hid that from the Board.  <u>See</u> <u>id.</u> ¶¶ 291-92.

The Audit Committee defendants fortify this "ignorance" defense by citing allegations of how the PwC defendants also hid the fraud from them, by not informing the Audit Committee, the Compensation Committee, or the Board of the myriad accounting errors they discovered.  <u>See</u> <u>id.</u> ¶¶ 1032 (ADT bonuses), 1041 and 1043 (KEL program abuses), and 1114 (summarizing plaintiffs' allegations of how the PwC defendants facilitated the fraud).

Plaintiffs counter that the Audit Committee defendants, as members of the board and their respective committees, were informed of facts which they should have perceived as "red flags" and which should have alerted them to the underlying problems at Tyco, or at least should have sparked enough skepticism to have prompted them to investigate further, discover, and then stop the rampant fraud that was occurring on their watch.  Plaintiffs argue that the Audit Committee defendants' failure to do so gives rise to a strong inference that they acted with the type of extreme recklessness that is necessary to establish § 10(b) liability.

Plaintiffs cite the following allegations to support their position:

(1) <u>Audit Committee Duties</u> – each of these defendants served on the Board's Audit Committee throughout the time period of the alleged fraud, with Lane joining in April 2000.  As members of the Audit Committee, these defendants were charged with the responsibility of overseeing the company's accounting and serving as a check on its controls.  Instead, Fort, Pasman, Bodman, and Lane totally abdicated their duty to recognize and correct the systemic accounting abuses.  <u>See</u> Compl. ¶¶ 44, 314–27 (listing examples of the abuses), 840 (same), 884 (quoting 2001 Proxy Statement presentation of the Audit Committee's Charter), 885, 970–76 (specifying accounting problems defendants knew or should have known).

(2) <u>KEL Loan Abuses</u> – the directors were told at the 10/13/99 and 10/15/99 Board meetings that Kozlowski and Swartz were abusing the KEL program.  <u>See</u> <u>id.</u> ¶ 986(a).  The Audit Committee had access to the books where these loans were recorded.  <u>See</u> <u>id.</u> ¶ 889.  The Compensation Committee also was told at its 2/21/02 meeting about the outstanding loan balances of Kozlowski, Swartz, and Belnick.  <u>See</u> <u>id.</u> at 902.

(3) <u>TyCom Bonus Accounting and Payment</u> – at the 9/28/00 and 11/00 Compensation Committee meetings (Pasman was a member) and the 12/00 Audit Committee meeting, the TyCom bonuses that were accounted for as a direct and incremental cost of the IPO were specifically discussed, yet they were not disclosed in Tyco's SEC filings.  <u>See</u> <u>id.</u> ¶ 986(b),(c) and (e), 987–88.

(4) <u>ADT Bonus Accounting and Payment</u> – on several different occasions Swartz informed the Board about the ADT bonus payments, including a 9/20/00 Board meeting, 9/28/00 and 11/00 Compensation Committee meetings, and a 3/21/01 Audit Committee meeting.  <u>See</u> <u>id.</u> ¶¶ 986(d)

-18-

and (e).  PwC partner Richard Scalzo outlined the
incorrect accounting treatment of the ADT bonuses as
"direct and incremental costs" of the transaction at
the 3/21/01 Audit Committee meeting, but no director
inquired further regarding the recipients or the
accounting of the bonuses.  See id. ¶¶ 987-88, 1032.

(5) Flag Telecom Bonus Accounting and Payment - Scalzo
told the Audit Committee at an 8/01 meeting that the
bonuses were being improperly recorded as direct and
incremental costs, but the Audit Committee declined to
correct that or investigate why or by whom this was
being done; Swartz also told the Committee at this
meeting that PwC did not approve of the accounting, yet
the full Board approved these bonuses at its 10/1/01
meeting.  See id. ¶¶ 985 (a) and (b), 987-88.

(6) Belnick Compensation - at the 2/21/02 Compensation
Committee meeting, Kozlowski told directors that he had
a private agreement with Belnick that tied Belnick's
bonus to his own.  Despite that fact, and despite its
knowledge of both the improper Walsh payment and
Belnick's $15 million in outstanding loans, in 2/02 the
Board approved Belnick's compensation package.  See id.
¶¶ 983-84, 899, 902.

(7) Swartz's Severance Package - in June 2002 the Board
approved a $44.8 million severance package for Swartz,
although it knew his indictment was imminent.  See id.
¶¶  872-74.

These allegations support the plaintiffs' position that

defendants were given enough information about Tyco's operations

that they should have questioned the veracity of the allegedly

false and misleading financial statements set forth in the

various SEC filings.  If true, these detailed examples of

information conveyed to the Audit Committee support a strong

-19-

inference that the Audit Committee defendants either in fact knew of, or were recklessly indifferent to, the red flags warning them of the excessive accounting abuses at Tyco.  See Aldridge, 284 F.3d at 82-83 (finding scienter where facts indicated defendants knew information that was inaccurately reported); Greebel, 194 F.3d at 198-200 (describing scienter as intentional conduct or recklessness which is a highly unreasonable omission involving an extreme departure from the standards of ordinary care).  The examples of specific reports of accounting problems that the complaint charges were made to the Audit Committee defendants are not merely conclusory allegations that defendants "must have known" of the fraud based on their positions with the company. Cf. Maldonado v. Dominguez, 137 F.3d 1, 10 (1st Cir. 1998) (rejecting bald inference that defendant "must have had knowledge" when complaint failed to allege specific facts that showed defendants understood the risks of the mortgage financing they managed); In re Cendant Corp. Sec. Litig., 190 F.R.D. 331, 335 (D.N.J. 1999) (rejecting allegation of knowledge based on defendants' position in the company); In re Oak Tech. Sec. Litig., No. 96-20552 SW, 1997 WL 448168 at *11 (N.D. Cal. Aug. 1, 1997) (same).

In addition to this direct evidence of scienter, plaintiffs cite circumstantial evidence that bolsters their contention. First, plaintiffs argue that the Audit Committee defendants' pecuniary self-interest, stemming from either their personal stock holdings or business dealings, motivated them to turn a blind eye on the blatant abuses before them.[8]  Second, plaintiffs point to the magnitude and obviousness of the fraud as further support for plaintiffs' contention that the Audit Committee defendants were reckless.[9]  Third, plaintiffs contend that the board awarded Belnick and Swartz the 2002 financial packages to buy their silence about the financial problems plaguing Tyco.[10] While none of these allegations standing alone would support a strong inference of scienter, they substantiate plaintiffs' contention that the Audit Committee defendants "acted either with knowing, intentional falsity or reckless disregard for the

---

[8]  See, e.g., Compl. ¶ 856 (listing Fort's stock sales); ¶ 870 (describing Kozlowski's $5 million investment in a $43 million fund Bodman managed); ¶ 877 (describing the sale of Fort's home to Kozlowski, through a realty trust and with Tyco funds).

[9]  Plaintiffs argue, for example, that the KEL loan balances grossly exceeded any reasonable tax liability, and there were clear violations of Tyco's accounting procedures and GAAP.

[10]  See id., ¶¶ 872, 984.

truthfulness of the statements." Stone & Webster, 414 F.3d at
199; Cabletron, 311 F.3d at 39–41 (adopting a "fact-specific"
approach that considers multiple examples of possible
wrongdoing); Aldridge, 284 F.3d at 82–84 (assessing multiple
sources of alleged evidence that defendants knew of the fraud and
were motivated to cover it up); Greebel, 194 F.3d at 196 (listing
examples of evidence that support an inference of scienter).

In summary, plaintiffs have made the requisite showing of
scienter to support their § 10(b) claims against the Audit
Committee defendants. While defendants correctly point out that
the complaint inconsistently alleges both that Kozlowski, Swartz,
Belnick, and Walsh hid their fraudulent scheme from the Board and
that the Board was told of the accounting abuses as they were
occurring, the resolution of this apparent inconsistency is a
factual matter not appropriate for disposition at this
preliminary stage of review. See Stone & Webster, 414 F.3d at
200 n.8 (allowing plaintiff to plead in the alternative and
reading the complaint at the motion to dismiss stage most
favorably to plaintiff).

Two final issues remain pertaining to the § 10(b) claims
against defendants Fort and Lane. First, plaintiffs allege that

Fort's public statements regarding the condition of Tyco in June 2002, when he became interim CEO following Kozlowski's departure, give rise to § 10(b) liability.  See Compl. ¶¶ 500-01, 540 (Fort's representations about Tyco's accounting and liquidity being sound and Kozlowski not affecting Tyco's financials).  Fort counters that his alleged statements were merely forward-looking statements of optimism typical of corporate officials and protected by the PSLRA's safe-harbor provision.  See 15 U.S.C. § 78u-5(i)(1) (defining "forward-looking" statements); Stone & Webster, 414 F.3d at 211-212 (explaining the limited safe harbor for statements about expectations for the company's financial future).  Fort's argument is unavailing.

The challenged statements focus primarily on Tyco's condition when the statements were made, not its projected revenues, income, earnings, management plans, or objectives for future operations, which the statute requires to invoke its shield to liability.  See id. at 212.  Accepting as true Fort's alleged knowledge of Tyco's management and accounting problems, these statements fall squarely within plaintiffs' theory that Fort intended to hide the true financial condition of Tyco from the public.  They simply do not constitute the cautionary

-23-

projections of Tyco's anticipated economic performance that enjoy safe harbor protection.  See id. at 213 (concluding "where the falsehood relates to a representation of present fact in the statement, it will not necessarily come within the statute's safe harbor, even though the statement might also contain a projection of future financial experience"); Greebel, 194 F.3d at 201 (denying safe-harbor protection if "the maker of the statement had actual knowledge it was false or misleading").

Second, defendant Lane moved to dismiss all § 10(b) claims against her based on incidents that occurred before she joined the Board in April 2000.  Plaintiffs have not alleged a single fact that can be construed, however generously, as indicating that she in any way acted to further the purported fraudulent scheme before she became a director.  Because she can only be liable for her actions as a director, I dismiss all § 10(b) claims against her based on any fraudulent activity that occurred before April 19, 2000.  See In re Raytheon Sec. Litig., 157 F. Supp. 2d 131, 153 (D. Mass. 2001) (dismissing claims against a defendant based on a document prepared and distributed before he joined the company).

In summary, plaintiffs' § 10(b) claims against defendants Fort, Pasman and Bodman are sufficiently particularized to survive defendants' motions to dismiss.  Likewise, the claims against defendant Lane based on allegations after April 19, 2000, are also viable at this preliminary stage of review.

        3.  <u>PwC–Bermuda</u>

The final defendant to move for dismissal of the § 10(b) claims against it is PwC–Bermuda.  Plaintiffs attribute the false statements of Tyco's financial condition set forth in the various SEC filings to PwC–Bermuda because it signed the audit letters that were part of Tyco's 10-K reports for 1999, 2000, and 2001, and were incorporated by reference into all the documents listed. Compl., Exhibit F.

While plaintiffs have pleaded PwC–Bermuda's allegedly false statements with particularity, they have failed to allege sufficient facts to demonstrate that it acted with the requisite scienter.  The complaint is replete with references to the "PwC Defendants" and reiterates their role in the fraud as if the two defendants were one entity, jointly liable for the other's actions.  <u>See, e.g.</u>, Compl. ¶ 8 (identifying the accountants "collectively" as the "PWC Defendants").  <u>See generally id.</u> ¶¶

-25-

989–1073 (alleging facts to show the PwC Defendants' scienter).
The auditors, however, are distinct legal entities.  See id. ¶¶
47–48, and plaintiffs must establish scienter with respect to
each individual defendant against whom a § 10(b) claim is
asserted.  Only six of the complaint's 1343 paragraphs refer
specifically to PwC–Bermuda.  See Compl. ¶¶ 47, 49, 53, 62, 63
and 1060.  Rather than providing detailed facts establishing PwC–
Bermuda's knowledge of the underlying fraud, the complaint limits
its particular responsibility for the fraud by alleging:

> While PWC–Bermuda signed all of the audit opinions
> attached to Tyco's financial statements for the 1997–
> 2001 fiscal years, and was therefore responsible for
> the content of those reports, PWC LLP actually
> performed the overwhelming majority of Tyco's audit
> work.  Id. at ¶ 49.

> Most of Tyco's accounting services were performed by
> PWC LLP's Boston office, where the Tyco account was
> headed by partners Rick Scalzo and John O'Connor.
> Nevertheless, PWC–Bermuda played a significant role in
> performing those accounting services.  Indeed, PWC–
> Bermuda signed all of the audit reports issued by the
> PWC Defendants between 1997 and 2002.  Id. at ¶ 62.

> Even with respect to those audit reports, however, PWC
> LLP maintained control over the content of the PWC
> Defendants' public statements concerning Tyco's
> operations.  PWC–Bermuda issued audit reports only
> after lengthy consultation with PWC LLP and only after
> PWC LLP directed PWC–Bermuda to do so.  In the absence
> of either the auditing work performed by PWC LLP or PWC
> LLP's express instructions to issue those audit
> reports, PWC–Bermuda would not have done so.  Id. ¶ 63.

(emphasis added).

Plaintiffs explicitly ascribe the audit work on which their claims are based solely to PwC LLP and thereby undermine their pleading efforts to hold the "PwC Defendants" jointly responsible for misrepresenting Tyco's finances in the audit reports that were incorporated into the SEC filings.

As alleged, PwC–Bermuda relied on PwC LLP to perform the audits and provide it with the information needed to issue the reports.  Such reliance is not sufficient by itself to support a strong inference that PwC–Bermuda acted with extreme recklessness.

> For recklessness on the part of a non–fiduciary
> accountant to satisfy securities fraud scienter, such
> recklessness must be conduct that is highly
> unreasonable, representing an extreme departure from
> the standards of ordinary care.  It must, in fact,
> approximate an actual intent to aid in the fraud being
> perpetrated by the audited company.

In re Raytheon, 157 F. Supp. 2d at 154 (quoting Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000)); see also In re Suprema Sec. Litig., 224 F. Supp. 2d 637, 658 (D.N.J. 2004) (explaining that an auditor's scienter depends on "the knowledge that [it] had, not what it would have had if the audit were conducted differently").  Merely following PwC LLP's lead on the audits (¶

-27-

63) or desiring to maintain a profitable business relationship (¶ 1060) is not sufficient evidence that PwC–Bermuda acted with a culpable mental state.  See Stone & Webster, 414 F.3d at 214–15 (dismissing § 10(b) claim against PwC where circumstantial evidence alleged to establish scienter failed to show particularized facts about what PwC knew during the audits); In re Raytheon, 157 F. Supp. 2d at 154–55 (explaining "in the wake of the PSLRA, 'red flags' generally constitute something more than the accounting violation itself").

Without the requisite strong inference that PwC–Bermuda acted with scienter when it issued the challenged audit reports, PwC–Bermuda cannot be held liable under § 10(b).  Accordingly, plaintiffs' § 10(b) claims against PwC–Bermuda are dismissed.

**C.  Control Person Claims**

Plaintiffs assert control person claims against all of the individual defendants pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and § 15 of the Securities Act, 15 U.S.C. § 77o. Belnick and the Audit Committee defendants challenge the sufficiency of the pleading supporting these claims.

The elements of a control person claim are generally considered to be (1) "an underlying violation of the same chapter

of the securities law by the controlled entity" and (2) "control of the primary violator by the defendant."[11] Stone & Webster, 414 F.3d at 194.  To satisfy the control requirement, a defendant must have the general power to control the primary violator and must actually exercise that power.  Whether sufficient control has been exercised to support a control person claim ordinarily "raises a number of complexities that should not be resolved on [] an undeveloped record."  Cabletron, 311 F.3d at 41.

Belnick and the Audit Committee defendants have not argued that the control person claims are deficient because they fail to sufficiently plead primary violations of the Exchange Act and the Securities Act.  Instead, they argue that the claims are deficient because plaintiffs have not adequately pleaded that defendants controlled Tyco.  I am unpersuaded by this argument.  Plaintiffs have alleged that Belnick and the Audit Committee defendants exercised control over Tyco and they have cited

---

[11] Some courts require proof that the defendant was a "culpable participant" in the underlying securities violations. See, e.g., In re Daou Sys., Inc., Sec. Litig., 397 F.3d 704, 725 (9th Cir. 2005).  The First Circuit has not yet determined whether "culpable participation" is an element of a control person claim.  See Stone & Webster, 414 F.3d at 196 n.6.  I need not determine whether culpable participation is an element of a control person claim because my analysis would remain the same even if plaintiffs were required to prove culpable participation.

numerous specific facts in the complaint to support their allegations. Whether the evidence will ultimately support their allegations cannot be determined on a motion to dismiss. Accordingly, I decline to dismiss plaintiffs' control person claims against Belnick and the Audit Committee defendants.

    D.   **Insider Trading Claims**

Plaintiffs assert that Kozlowski, Swartz, Walsh, and Fort are liable for insider trading pursuant to § 20A of the Exchange Act, 15 U.S.C. § 78t-1(a). Relying on the fact that § 20A authorizes only contemporaneous traders to recover for insider trading, Fort argues that the plaintiffs' claim against him is defective because their alleged stock purchases were not contemporaneous with any of his stock sales.

Plaintiffs attached a trading schedule to their complaint that lists the stock trades on which their insider trading claims are based. The only trades listed in the schedule that plaintiffs attribute to Fort are two stock sales that Fort allegedly made on October 25, 2000. The only stock purchases that plaintiffs associate with these sales are purchases that plaintiffs allegedly made on or after October 18, 2000, a week before Fort's alleged stock sales. Plaintiffs have failed to

present a persuasive argument to support their conclusory assertion that these purchases satisfy § 20A's contemporaneous trading requirement.  According, I grant Fort's motion to dismiss plaintiffs' insider trading claim against him.

### E.  The § 14(a) Claims

Plaintiffs assert claims based on § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), against Tyco, Kozlowski, Walsh, Belnick, Fort, Pasman, Bodman, and Lane.  To state a claim for § 14(a) liability, plaintiffs must allege that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) the proxy solicitation itself, rather than the particular defect in the solicitation materials, was 'an essential link in the accomplishment of the transaction.'"  Gen. Elec. Co. v. Cathcart, 980 F.2d 927, 932 (3d Cir. 1992) (quoting Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 385 (1970)).  "'The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation.'"  Id. (quoting J.I. Case Co. v. Borak, 377 U.S. 426, 431 (1964)).  Because § 14(a) is intended to protect the integrity of the shareholder voting process to ensure that an

informed vote is cast, see Royal Bus. Group, Inc. v. Realist,
Inc., 933 F.2d 1056, 1061 (1st Cir. 1991) (explaining that the
statutory purpose is to safeguard the corporate voting process),
plaintiffs must establish a "causal nexus" between their alleged
injury and the corporate transaction authorized, or defeated, by
the allegedly false and misleading proxy statements.  See Tyco
II, 2004 WL 2348315 at *14 (citing Royal Bus. Group, 933 F.2d at
1063).

     Plaintiffs assert that defendants violated § 14(a) because
the challenged proxy statements contained materially false and
misleading representations and failed to disclose material
information about the officer defendants' compensation, Tyco's
related-party transactions and the Tyco KEL program.  See Compl.
¶ 1147.  Plaintiffs also contend that defendants used the
misrepresentations and omissions to solicit and obtain
shareholder votes approving "among other matters, the election of
directors to the Tyco Board and the selection of the PWC
Defendants as Tyco's auditors."  Id. ¶ 1148.  Plaintiffs now
argue that because the proxy statements did not accurately report
Kozlowski and Swartz's compensation (including both their KEL
balances and hidden bonuses), the votes to re-elect directors who

allowed the problems to continue were obtained in violation of §
14(a).  They claim that when the truth about the compensation was
revealed, the stock price fell, directly causing plaintiffs'
financial injuries.  See Plaintiffs' Memorandum in Opposition to
Tyco's Motion to Dismiss at 47 (Doc. No. 559) ("Pls.' Opp'n Mem.
I").

    The Tyco defendants challenge plaintiffs' § 14(a) claims by
arguing that the claims must be dismissed because plaintiffs have
failed to properly plead that their alleged damages were caused
by misrepresentations in the proxy statements.  I found an
identical argument persuasive in Tyco II, and plaintiffs have
failed to present a convincing argument that a different result
is warranted in this case.  Accordingly, I dismiss plaintiffs'
claims under § 14(a).

    **F.    The §§ 11 and 12(a) Claims**

    The Audit Committee defendants argue that plaintiffs' claims
against them under §§ 11 and 12(a) of the Securities Act, 15
U.S.C. §§ 77k and 77l (a)(2), must be dismissed because the
claims sound in fraud and have not been pleaded with the
particularity required by Rule 9.  I addressed a comparable
argument in Tyco II and found it wanting in that case.  Tyco II,

2004 WL 2348315 at *15–16.  Here, as I have explained in rejecting the Audit Committee defendants' challenge to plaintiffs' § 10(b) claims, the complaint pleads the Audit Committee defendants' culpability with particularity.  The same reasoning applies with equal force to the §§ 11 and 12(a) claims.

## II.   **THE COMMON LAW CLAIMS (COUNTS 8–13)**

Plaintiffs next assert several state common law claims based on the same alleged systemic accounting abuses, corporate governance problems, illicit compensation schemes, and artificial stock inflation that support their federal claims.  Plaintiffs argue that defendants were corporate fiduciaries who should have acted to preserve Tyco's value and protect its shareholders.  They contend Tyco enabled the alleged fraud by giving the individual defendants the apparent authority to act on its behalf and to engage in the misdeeds that inured to Tyco's benefit.  Based on these allegations, plaintiffs assert claims of common law fraud, aiding and abetting common law fraud, conspiracy to commit common law fraud, negligent misrepresentation, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty.

### A.   **Choice of Law**

The parties disagree as to whether the law of New Jersey,

Massachusetts, or Bermuda governs plaintiffs' common law claims.
Choice of law problems that are before the court on the basis of
its diversity or supplemental jurisdiction ordinarily are
resolved by using the forum state's choice of law rules.  See
Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).
Because this case was transferred here from the Federal District
Court in New Jersey, however, New Jersey's choice of law rules
apply.  Van Dusen v. Barrack, 376 U.S. 612, 639 (1964); In re Air
Disaster at Ramstein Air Base Germany, 81 F.3d 570, 576-77 (5th
Cir. 1996).

        New Jersey employs a two-part test to resolve choice of law
problems of the type presented in this case.  First, it requires
the court to determine on an issue-by-issue basis whether any
actual conflicts exist between competing state laws.  See Nelson
v. Sandoz Pharm. Corp., 288 F.3d 954, 963 (7th Cir. 2002).
Actual choice of law problems are then addressed using a
"flexible governmental interest test."  See Warriner v. Stanton,
475 F.3d 497, 500 (3d Cir. 2007)(internal quotations omitted).
The court must consider the factors listed in § 145 of the
Restatement (Second) of Conflicts of Laws (1970) when applying
the test in tort cases.  Id.

Guided by these principles, I will apply New Jersey law in resolving defendants' challenges to the common law claims because I dispose of the claims on the basis of legal principles that are applied in the same way in all three jurisdictions.

**B.   <u>Application</u>**

Defendants have moved to dismiss the common law claims on the ground that plaintiffs have failed to plead reliance with the particularity required by Rule 9(b).

Rule 9(b) provides "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other conditions of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).  Because the rule applies to all "averments of fraud," claims that are based on "a unified course of fraudulent conduct" are subject to the rule even if they purport to be based on alternative theories of liability.  <u>See</u> <u>Borsellino v. Goldman Sachs Group, Inc.</u>, 477 F.3d 502, 507 (7th Cir. 2007); <u>Shaw v. Digital Equip. Corp.</u>, 82 F.3d 1194, 1123 (1st Cir. 1996).  In this case, all of plaintiffs' common law claims arise from a unified course of allegedly fraudulent conduct.  Accordingly, they are subject to Rule 9(b) even though several of the claims are nominally based on alternative theories of liability and even

though plaintiffs expressly disclaim any intent to base their negligent misrepresentation claims on fraud.  <u>See</u> <u>Rombach v. Chang</u>, 355 F.3d 164, 172 (2d Cir. 2004) (conclusory statements that § 11 claims do not sound in fraud are "unconvincing where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims leveled at the Prospectus").

Reliance is an element of all of plaintiffs' common law claims.  <u>Kaufman v. i-Stat. Corp.</u>, 754 A.2d 1188, 1194 (N.J. 2000)(fraud); <u>H. Rosenblum, Inc. v. Adler</u>, 461 A.2d 138, 142–43 (N.J. 1983)(negligent misrepresentation).[12]  Accordingly, reliance is included within the "circumstances constituting fraud" that Rule 9(b) explicitly states must be pleaded with particularity.  <u>See, e.g.</u>, <u>Evans v. Pearson Enters., Inc.</u>, 434 F.3d 839, 852–53 (6th Cir. 2006); <u>Learning Works, Inc. v. The Learning Annex, Inc.</u>, 830 F.2d 541, 546 (4th Cir. 1987); <u>Bank of America Corp. v. Lemgruber</u>, 385 F. Supp. 2d. 200, 230 (S.D.N.Y. 2005); <u>Wells v. Monarch Capital Corp.</u>, No. 91-10575-MA, 1991 WL 354938 at *12 (D. Mass. Aug. 23, 1991).  Plaintiffs have failed

---

[12]  Plaintiffs' breach of fiduciary duty claims seek to hold defendants liable for damages caused by misrepresentations and omissions.  Thus, these claims also require proof of reliance.

to present any persuasive argument or cite any controlling authority that requires a different result.[13]  Thus, I agree with defendants that plaintiffs' must plead reliance with particularity to survive defendants' motion to dismiss the common law claims.

Although plaintiffs allege that they "directly relied upon the foregoing misrepresentations in purchasing Tyco securities," Compl. ¶ 833, they have failed to plead any facts to substantiate their conclusory assertion.[14]  Accordingly, they have failed to plead reliance with particularity and their common law claims must be dismissed.

---

[13]  Plaintiffs cite <u>Rodi v S. New Eng. Sch. of Law</u>, 389 F.3d 5, 15 (1st Cir. 2004), and <u>Cooper v. R.J. Reynolds Tobacco Co.</u>, 234 F.2d 170, 173-74 (1st Cir. 1956), but neither case supports their argument.  In <u>Rodi</u>, the defendants did not base their argument for dismissal on a claim that the plaintiffs had failed to plead reliance with particularity.  <u>Cooper</u> does not even refer to Rule 9(b).

[14]  Plaintiffs correctly note that New Jersey law permits "a plaintiff to prove a fraud action when he or she heard a statement not from the party that defrauded him or her, but from that party's agent or from someone to whom the party communicated a false statement with the intention that the victim hear it, rely on it, and act to his or her detriment."  <u>Kaufman</u>, 754 A.2d at 1195.  However, plaintiffs must still plead indirect reliance with particularity.  Their failure to do so dooms their common law claims.

## III. __THE NJ RICO CLAIMS (COUNTS 14-30)__

Plaintiffs plead seventeen counts under the New Jersey Racketeer Influenced and Corrupt Organizations Act ("NJRICO"), N.J. Stat. Ann. ("NJSA") § 2C:41-1, et seq.  "The gravamen of a [NJRICO] violation . . . is the involvement in the affairs of an enterprise through a pattern of racketeering activity."  State v. Ball, 661 A.2d 251, 257 (N.J. 1995) ("Ball II").  Racketeering activity includes crimes such as theft, fraudulent practices, and securities fraud.  NJSA § 2C:41-1.

NJRICO has four substantive sections designed to combat racketeering activity:

> Section (a) forbids a person from investing racketeering income in an enterprise.  Section (b) prohibits any person from acquiring or maintaining control of an enterprise through a pattern of racketeering activity.  Section (c) forbids any person employed by or associated with an enterprise from conducting the affairs of the enterprise through a pattern of racketeering activity.  Section (d) prohibits any person from conspiring to violate subsections (a), (b), and (c).

Goody Products, Inc. v. Dun & Bradstreet, Inc., 574 A.2d 1032, 1034 (N.J. Super. Ct. Law Div. 1990).  There are criminal penalties for violation of NJRICO, and the statute also provides civil remedies, which plaintiffs invoke in this case.  The civil remedial scheme permits "[a]ny person damaged in his business or property" as a result of an NJRICO violation to bring a civil

-39-

action for treble damages, costs, and attorneys' fees.  NJSA §
2C:41-4(c).

NJRICO is patterned on the federal Racketeer Influenced and
Corrupt Organizations Act ("federal RICO"), 18 U.S.C. § 1961, et
seq., however, there are notable differences between NJRICO and
federal RICO.  See, e.g., Shan Indus. LLC v. Tyco Int'l (U.S.),
Inc., No. 04-1018 (HAA), 2005 U.S. Dist. LEXIS 37983, at *48, 51
n.10 (D.N.J. Sep. 12, 2005) (definition of "enterprise" is
broader under NJRICO than under federal RICO); Ball II, 661 A.2d
at 258 ("[I]n many respects [the New Jersey] Legislature departed
from the federal example.").  Despite these differences, the New
Jersey Supreme Court has directed courts to examine federal
legislative history and case law for guidance when they tackle
NJRICO issues.  Ball II, 661 A.2d at 258.  This is helpful in
light of the dearth of state and federal case law interpreting
NJRICO.  See State v. Ball, 632 A.2d 1222, 1235 (N.J. Super. Ct.
App. Div. 1993) ("Ball I").

Tyco is named as a defendant or co-defendant in fourteen of
the seventeen NJRICO counts.  Other NJRICO defendants include
Kozlowski, Swartz, Belnick, and Walsh (the "individual NJRICO

defendants") and PwC and PwC-Bermuda (the "PwC defendants").[15]
Nine of the NJRICO counts allege that defendants are primarily
liable for NJRICO violations; four allege that defendants aided
and abetted NJRICO violations; three allege that Tyco is
vicariously liable for its officers' NJRICO violations; and the
remaining count alleges that the NJRICO defendants are liable as
conspirators.[16]  I discuss plaintiffs' allegations that the
NJRICO defendants are primarily liable for violations of NJRICO's
substantive provisions before turning to plaintiffs' aiding and
abetting, vicarious liability, and conspiracy claims.

### A.   NJSA § 2C:41-2(a)

Counts 14 through 16 arise under NJSA § 2C:41-2(a) ("NJRICO
part (a)"), which provides that:

> It shall be unlawful for any person who has received
> any income derived, directly or indirectly, from a
> pattern of racketeering activity . . . in which he has
> participated as a principal within the meaning of
> N.J.S. 2C:2-6 to use or invest, directly or indirectly,

---

[15]  I refer to Tyco, the individual NJRICO defendants, and
the PwC defendants collectively as "the NJRICO defendants."

[16]  In its reply brief, Tyco argued for the first time that
vicarious liability is necessary in order to reach Tyco on all of
plaintiffs' claims.  This position hinges on Tyco's contention
that Tyco is the victim of the accounting fraud at the company.
Tyco's Reply Br. at 8.  I have previously rejected a similar
argument in the securities action.  See Tyco II, 2004 WL 2348315.
I explore the issue in greater detail below.

> any part of the income, or the proceeds of the income,
> in acquisition of any interest in, or the establishment
> or operation of any enterprise which is engaged in or
> the activities of which affect trade or commerce.

Count 14 alleges that Tyco used income received from a pattern of racketeering activity ("racketeering income") to acquire numerous other business enterprises.  Compl. ¶ 1217.  Count 15 alleges that Tyco re-invested racketeering income in itself.  Id. ¶ 1225.  Count 16 alleges that Tyco and the individual NJRICO defendants as an "association in fact" invested racketeering income in Tyco and the association in fact.  Id. ¶ 1232.

Tyco and the individual NJRICO defendants contend that plaintiffs' NJRICO part (a) claims should be dismissed because: (1) plaintiffs have not pled that Tyco received income derived from racketeering activity; and (2) plaintiffs have not pled that they suffered an "investment injury" apart from any injury suffered as a result of the predicate racketeering acts.[17]  I discuss each argument in turn.

---

[17] I take Tyco's additional argument that plaintiffs have not pled that Tyco participated as a principal in the alleged pattern of racketeering activity to be a rehashing of its position that the company is a victim, rather than a perpetrator, of wrongdoing at the company.  This argument is discussed below.

### 1.  Income

Plaintiffs contend that Tyco received racketeering income in the following ways: (1) the accounting fraud at Tyco inflated the value of Tyco stock, which allowed Tyco to acquire assets at a discount; (2) Tyco used its inflated stock to pay employees, which lowered Tyco's compensation costs; and (3) Tyco sold inflated stock to investors, producing "massive cash windfalls." Pls.' Opp'n Mem. at 25.  Tyco relies on definitions drawn from several leading dictionaries for the proposition that the inflated price of its stock and its concomitant benefits do not constitute income.[18]  In addition, the Tyco and individual NJRICO defendants argue that plaintiffs have failed to allege that any income received by Tyco was "derived . . . from" racketeering activity.  See NJSA § 2C:41-2(a).

---

[18]  Tyco sets out the following dictionary definitions for the term "income": (1) "that which comes in as the periodical produce of one's work, business, lands, or investments (considered in reference to its amount, and commonly expressed in terms of money); annual or periodical receipts accruing to a person or corporation; revenue," The Compact Oxford English Dictionary (2d ed. 1998); (2) "[t]he amount of money or its equivalent received during a period of time for labor or services, from the sale of goods or property, or as profit from financial investments," The American Heritage College Dictionary (4th ed. 2004); and (3) "[t]he money or other form of payment that one receives, usu. periodically, from employment, business, investments, royalties, gifts, and the like." Black's Law Dictionary (8th ed. 2004).

### a.   Definition of "Income"

Neither NJRICO nor federal RICO define the term "income."
New Jersey courts adhere to the familiar principle that statutory
language should be given its "ordinary meaning and significance,"
DiProspero v. Penn, 874 A.2d 1039, 1048 (N.J. 2005), and the New
Jersey Supreme Court has relied on dictionary definitions to
determine the ordinary meaning of a term.  State v. S.R., 811
A.2d 439, 444 (N.J. 2002) (using Webster's New Collegiate
Dictionary); State v. Zeidell, 713 A.2d 401, 410 (N.J. 1998)
(using Black's Law Dictionary); State v. N.G., 886 A.2d 1865, 191
(N.J. Super. Ct. App. Div. 2005) ("To ascertain the ordinary
meaning of words used in a statute, courts typically look to a
dictionary.").  If the ordinary meaning of a term is clear,
"'resort to extrinsic interpretative aids'" such as legislative
history is inappropriate.  DiProspero, 874 A.2d at 1048 (quoting
Lozano v. Frank DeLuca Const., 842 A.2d 156, 161 (N.J. 2004)).
If the statutory language is ambiguous, on the other hand, it is
proper to examine extrinsic sources.  Id. at 1048–49.

I agree with Tyco that the ordinary meaning of "income," as
revealed by the various dictionary definitions, is money received
from employment, business, or investments.  See Creative
Dimensions in Mgmt., Inc. v. Thomas Group, Inc., No. 96–6318,

1997 U.S. Dist. LEXIS 15368, at *6 (E.D. Pa. Sep. 30, 1997)
(Under federal RICO, "[i]ncome generally means money or at least
something readily measurable in terms of dollar market value").
It is easy to conclude, therefore, that, in the corporate
context, the cash that Tyco received for its inflated stock falls
within the ordinary meaning of income and constitutes income for
purposes of NJRICO.

The other two sources of "income" that plaintiffs identify –
acquisition of assets at a discount and reduction in compensation
costs – are somewhat further afield of the term's ordinary
meaning.  Nevertheless, courts have suggested that the definition
of income under federal RICO is broad.  See, e.g., Creative
Dimensions, 1997 U.S. Dist. LEXIS 15368, at *7 ("[T]he court will
assume that a trade secret or confidential business information
might constitute 'income.'"); Azurite Corp., Ltd. v. Amster &
Co., 730 F. Supp. 571, 578–579 (S.D.N.Y. 1990) (concluding that
the ability to purchase stock at less than true market value was
income under 18 U.S.C. § 1962(a), and stating that "the Court
cannot find that savings, which are the direct result of
fraudulent or otherwise illegal activity, are not income").  I
can discern no reason that the New Jersey Supreme Court would
interpret the term "income" more narrowly.  Accordingly, I

conclude that acquisition of assets at a discount and reduction in compensation costs also constitute income under NJRICO.

### b.   Causation

Tyco and the individual NJRICO defendants next contend that plaintiffs have failed to plead that Tyco's income was derived from racketeering activity.  I disagree.  Defendants rely on Nat'l Org. for Women, Inc. v. Scheidler, 968 F.2d 612, 625 (7th Cir. 1992), rev'd on other grounds, 510 U.S. 249 (1994), in which the Seventh Circuit held, in the federal RICO context, that racketeering income "is only income that the defendants would not have received 'but for' their racketeering conduct."  While defendants are correct that NJRICO part (a) requires plaintiffs to plead a causal relationship between a defendant's income and its racketeering activity, plaintiffs have in fact pled such a relationship.  They allege that Tyco received substantially more cash for its stock than it would have received if Tyco's accounting fraud had not caused dramatic inflation in its stock price.  This allegation is sufficient to survive a motion to dismiss.[19]

---

[19]   Scheidler is not to the contrary.  In Scheidler, the causal relationship between the income and the alleged racketeering activity was particularly attenuated.  The plaintiffs in that case pled the following cause and effect

2.   <u>Investment Injury</u>[20]

Finally, Tyco and the individual NJRICO defendants contend that in order to state a claim under NJRICO part (a), plaintiffs must allege that they were injured by the <u>investment</u> of racketeering income rather than the predicate racketeering acts. Plaintiffs respond that "investment injury" is not an element of NJRICO part (a).  I agree with defendants.  In <u>Shan</u>, the New Jersey Federal District Court held that a claim under NJRICO part (a) requires a plaintiff to "plead that it has been injured specifically by the use or investment of proceeds from racketeering activity."  2005 U.S. Dist. LEXIS 37983, at *56.

Review of the case law interpreting the corresponding federal RICO provision, 18 U.S.C. § 1962(a), supports the district court's conclusion in <u>Shan</u>.  The majority of courts

_____

chain: "[anti-abortion activist] defendants invade health centers . . .; potential contributors see media coverage and are favorably impressed; contributor sends donation; defendants receive income."  968 F.2d at 625.  In this case, by contrast, plaintiffs allege that Tyco's racketeering activity inflated the value of Tyco stock so that Tyco was able to sell it for larger amounts of cash.  The causal relationship is direct.

[20]  Courts alternatively characterize the "investment injury" issue as one of standing, <u>see</u> <u>Larsen v. Lauriel Invs., Inc.</u>, 161 F. Supp. 2d 1029, 1045 (D. Ariz. 2001), and one of causation, <u>see</u> <u>Brittingham v. Mobil Corp.</u>, 943 F.2d 297, 304 (3d Cir. 1991).

-47-

interpreting § 1962(a) agree that plaintiffs must plead an
investment injury distinct from any injury sustained as a result
of the predicate acts.  See, e.g., Wagh v. Metris Direct, Inc.,
348 F.3d 1102, 1109 (9th Cir. 2003) (eight circuits require
investment injury under § 1962(a)); Rose v. Bartle, 871 F.2d 331,
357 (3d Cir. 1989); Eli Lilly & Co. v. Roussel Corp., 23 F. Supp.
2d 460, 487 (D.N.J. 1998) ("[T]he plaintiff must allege an injury
resulting from the investment of racketeering income distinct
from an injury caused by the predicate acts themselves.").  But
see Busby v. Crown Supply, Inc., 896 F.2d 833, 836-40 (4th Cir.
1990) (plaintiffs need only plead injuries resulting from the
underlying racketeering acts).  Plaintiffs have failed to present
a persuasive argument that New Jersey courts would depart from
the majority position.[21]  Thus, plaintiffs must plead a distinct

_____

[21]  Plaintiffs contend that Sedima, S.P.R.L. v. Imrex Co.,
Inc., 473 U.S. 479 (1985), supports their position that there is
no separate investment injury requirement.  See also Am. Nat'l
Bank & Trust Co. of Chi. v. Haroco, Inc., 473 U.S. 606, 609
(1985) (reaffirming Sedima).  I disagree.  In Sedima, the Court
held that plaintiffs need not plead "an additional, amorphous
'racketeering injury'" in order to have standing to pursue a
civil action under 18 U.S.C. § 1964(c).  473 U.S. at 495.  First,
Sedima is inapposite because it involved a § 1962(c) claim, not a
§ 1962(a) claim.  Second, the Court did not hold that plaintiffs
are excused from pleading that they were injured under the
particular RICO provision they invoke as required by federal
RICO's civil remedial scheme.  Therefore, plaintiffs must plead
that they were injured by the investment of racketeering income

-48-

investment injury in order to make out a claim under NJRICO part
(a).

Courts are generally in agreement that "the 'mere
reinvestment of the racketeering proceeds into a business
activity is not sufficient for § 1962(a) standing.'" <u>Lockheed
Martin</u>, 357 F. Supp. 2d at 1371 (quoting <u>Vicom v. Harbridge
Merch. Servs., Inc.</u>, 20 F.3d 771, 778 n.6 (7th Cir. 1994)); <u>see
also</u> <u>Brittingham</u>, 943 F.2d at 304 (holding that reinvestment of

_____

in an enterprise to make a claim under § 1962(a).  <u>See</u> <u>Wagh</u>, 348
F.3d at 1109 (federal RICO's private right of action and §
1962(a), in combination, "require that 'a plaintiff seeking civil
damages for a violation of § 1962(a) must allege facts tending to
show that he or she was injured by the use or investment of
racketeering income.'") (quoting <u>Nugget Hydroelec. L.P. v.
Pacific Gas & Elec. Co.</u>, 981 F.2d 429, 437 (9th Cir. 1992));
<u>Lockheed Martin Corp. v. Boeing Co.</u>, 357 F. Supp. 2d 1350, 1371
(M.D. Fla. 2005) ("[T]he relatively precise language of §
1962(a), prohibiting the use or investment of racketeering income
in an enterprise, provides a firm foundation for a standing
requirement tailored to the conduct which the subsection
specifically proscribes.").  Other courts have reached the same
conclusion with respect to the impact of <u>Sedima</u>.  <u>See</u> <u>Glessner v.
Kenny</u>, 952 F.2d 702, 709 (3d Cir. 1991); <u>Ouaknine v. MacFarlane</u>,
897 F.2d 75, 83 (2d Cir. 1990) (rejecting the argument that
<u>Sedima</u> permits recovery under § 1962(a) without allegation of
investment injury).  As the Third Circuit pointed out in
<u>Brittingham</u>, 943 F.2d at 305, "the proper avenue to redress
injuries caused by the racketeering acts themselves" is 18 U.S.C.
§ 1962(c).  <u>See also</u> <u>St. Paul Mercury Ins. Co. v. Williamson</u>, 224
F.3d 425, 443 (5th Cir. 2000) ("If allegations sufficient to base
a § 1962(c) action meet all the requirements of a § 1962(a)
allegation, then there is no real rationale for Congress having
passed both.").

racketeering income into a fraudulent scheme is insufficient to establish investment injury, and noting that "most other district courts have reached similar conclusions").  New Jersey courts would likely reach the same conclusion in developing the contours of NJRICO part (a)'s investment injury requirement.  Thus, plaintiffs' claims under NJRICO part (a) will fail to the extent they merely allege that a NJRICO violator reinvested racketeering income in its own business activities.  See Allstate Ins. Co. v. Siegel, 312 F. Supp. 2d 260, 271 (D. Conn. 2004) ("While 'investment' might appear to contemplate a channeling of fraud-derived profits back to a RICO violator, case law squarely rejects such an interpretation.  For when racketeering proceeds are merely reinvested back into the same RICO enterprise, the plaintiff's injuries derive proximately not from the investment but rather from the predicate acts themselves . . . .").

Count 15 alleges that Tyco reinvested racketeering income in itself.  Compl. ¶ 1225.  Similarly, Count 16 alleges that an association-in-fact consisting of Tyco and the individual NJRICO defendants reinvested its racketeering income in either Tyco or the association-in-fact itself.  Id. ¶ 1232.  Neither of these claims is cognizable under NJRICO part (a) because both allege that a NJRICO violator merely reinvested racketeering income in

-50-

itself.  Accordingly, defendants' motions to dismiss Counts 15
and 16 are granted.

Count 14, on the other hand, alleges that Tyco used
racketeering income to acquire other companies in which
plaintiffs held stock.  Id. ¶ 1217.  Plaintiffs contend that they
sustained an investment injury as a result of Tyco's investment
in these companies because they received inflated Tyco stock in
exchange for the acquired companies' stock.  I agree with
plaintiffs that this alleged investment by Tyco is not ordinary
reinvestment of racketeering income in business activities.[22]
Accordingly, Count 14 presents a viable cause of action under
NJRICO part (a).

**B.    NJSA § 2C:41-2(b)**

Counts 19, 20, and 21 arise under NJSA § 2C:41-2(b) ("NJRICO
part (b)"), which provides that:

> It shall be unlawful for any person through a pattern
> of racketeering activity . . . to acquire or maintain,

---

[22]  Courts have held that "§ 1962(a) requires the plaintiff
to demonstrate that the use or investment of racketeering income
was a 'substantial factor' in causing the injury."  Brittingham,
943 F.2d at 304; see also Shan, 2005 U.S. Dist. LEXIS 37983, at
*57 ("tenuous and generalized" assertion of injury is
insufficient under NJRICO part (a)).  I conclude that Tyco's
acquisition of companies in which plaintiffs held stock, using
racketeering income, was a "substantial factor" in plaintiffs'
ensuing losses.

directly or indirectly, any interest in or control of
any enterprise which is engaged in or activities of
which affect trade or commerce.

Count 19 alleges that Tyco acquired or maintained control of

several enterprises through a pattern of racketeering activity.

Compl. ¶ 1250.  Count 20 alleges that Tyco and the individual

NJRICO defendants, as an association in fact, acquired or

maintained control of the same enterprises.[23]  Count 21 alleges

that the individual NJRICO defendants caused Tyco to acquire the

enterprises.  Id. ¶ 1257.

Tyco and the individual NJRICO defendants argue that Counts

19, 20, and 21 should be dismissed because (1) plaintiffs have

failed to plead that they suffered an "acquisition injury;" and

(2) plaintiffs have failed to plead a causal nexus between the

predicate racketeering activity and the acquisition or

---

[23]  Under federal RICO, an "association in fact" is a
specific type of RICO enterprise that may be acquired, rather
than a specific type of person who may violate RICO.  See 18
U.S.C. § 1961(4) (defining "enterprise" as including "any union
or group of individuals associated in fact although not a legal
entity").  Plaintiffs use the term in this way but also contend
in Count 20 that the person who violated NJRICO is an association
in fact consisting of Tyco and the individual NJRICO defendants.
This theory appears to be cognizable under NJRICO.  Unlike
federal RICO, NJRICO defines the term "person" to include
"enterprise[s]."  NJSA 2c:41-1(b).  The definition of
"enterprise," in turn, includes associations in fact.  NJSA
2c:41-1(c).

maintenance of control of an enterprise.

      1.   <u>Acquisition Injury</u>

     Tyco and the individual NJRICO defendants contend that in order to make out a claim under NJRICO part (b), plaintiffs must plead that they suffered an acquisition injury distinct from any injury sustained as a result of the predicate racketeering activity.  Plaintiffs respond that there is "nothing in the text of [part (b)] or any decision interpreting the NJRICO statute that supports imposing such a rule."  Pls.' Opp'n Mem. at 36.  I agree with defendants.  As I have determined in the context of NJRICO part (a), the combination of NJRICO's civil enforcement scheme and part (b) plainly creates an acquisition injury requirement.  In addition, courts addressing the federal counterpart to NJRICO part (b), 18 U.S.C. § 1962(b), have interpreted the statute to contain such a requirement.  <u>See, e.g.</u>, <u>Allstate</u>, 312 F. Supp. 2d at 273 ("Allstate's claim under § 1962(b) is thus deficient for the same reason that its § 1962(a) claim is deficient – Allstate has failed to specify an injury that resulted from the acquisition or maintenance of a RICO enterprise that is distinct from the injuries incurred as a consequence of the predicate acts themselves."); <u>U.S. Fire Ins. Co. v. United Limousine Serv.</u>, 303 F. Supp. 2d 432, 450 (S.D.N.Y.

2004) ("To state a claim under Section 1962(b), the plaintiff
must allege 'an acquisition or maintenance injury' separate and
apart from the injury suffered as a result of the predicate acts
of racketeering.'") (quoting <u>Katzman v. Victoria's Secret
Catalogue</u>, 167 F.R.D 649, 657 (S.D.N.Y. 1996)).[24]

Thus, plaintiffs may maintain a claim under NJRICO part (b)
only if they have adequately alleged an acquisition injury.
Plaintiffs argue that their NJRICO part (a) investment injury –
the receipt of inflated Tyco stock in exchange for shares of the
companies that Tyco acquired – is also an acquisition injury.[25]
I agree that plaintiffs' alleged acquisition injury, although
duplicative of their alleged investment injury, is sufficient to
survive a Rule 12(b)(6) motion to dismiss.  Plaintiffs charge
that they were injured when Tyco acquired companies in which they

---

[24]  Plaintiffs' reliance on <u>Sedima</u> and <u>Haroco</u> is misplaced
for the reasons described above in my discussion of NJRICO part
(a).

[25]  Plaintiffs also contend that they suffered an
acquisition injury as a result of unauthorized compensation to
the individual NJRICO defendants and other Tyco employees because
plaintiffs' stock lost value when the unauthorized compensation
was disclosed to the public.  This type of injury is not
cognizable under NJRICO part (b).  Any injury plaintiffs suffered
as a result of the unauthorized compensation derived from either
the predicate racketeering activity (the payment of the
unauthorized compensation) or the disclosure of that activity to
the market.

held shares.  This injury is distinct from the underlying

predicate acts (i.e., the fraud that permitted Tyco to make the

acquisitions in the first place).

      2.  <u>Causation</u>

Next, defendants allege that plaintiffs have failed to plead

that the there was "'a specific nexus between control of any

enterprise and the alleged racketeering activity.'"  <u>Lightning

Lube, Inc. v. Witco Corp.</u>, 4 F.3d 1153, 1191 (3d Cir. 1993)

(quoting <u>Banks v. Wolk</u>, 918 F.2d 418, 421 (3d Cir. 1990)).

Plaintiffs do not dispute that causation is an element of a claim

under NJRICO part (b).  Instead, they contend that they have

satisfied their pleading burden as to causation.  I agree with

plaintiffs.  Contrary to defendants' assertions, plaintiffs do

not rely exclusively on Tyco's use of inflated stock to purchase

other companies.  Rather, they allege that Tyco acquired other

companies by making false misrepresentations, <u>see, e.g.</u>, Compl. ¶

1168–70, and that the individual NJRICO defendants acquired

interests in Tyco itself by committing securities, mail, and wire

fraud.  <u>See, e.g.</u>, <u>id.</u> at ¶ 202 (describing Kozlowksi's unlawful

diversion of Tyco stock to himself and others).  These

allegations are adequate to support plaintiffs' NJRICO part (b)

claims.  Accordingly, defendants' motions to dismiss Counts 19,

20, and 21 are denied.

C.   **NJSA § 2C:41-2(c)**

Counts 24, 25 and 26 arise under NJSA § 2C:41-2(c) ("NJRICO part (c)").[26]   NJRICO part (c) provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Count 24 alleges that the individual NJRICO defendants participated in Tyco's affairs through a pattern of racketeering activity.   Count 25 alleges that the NJRICO defendants participated in the affairs of an association in fact comprised of Tyco and the other NJRICO defendants through a pattern of racketeering activity.   Compl. ¶ 1280.   Count 26 alleges that the NJRICO defendants, as an association in fact, participated in the

---

[26]   Count 25 is lodged against all of the RICO defendants, while Count 26 is lodged against all of the RICO defendants as an association in fact.   PwC and PwC-Bermuda argue that both counts should be dismissed against them because: (1) plaintiffs have not sufficiently alleged a single, coherent enterprise; and (2) the complaint does not sufficiently allege their "purposeful and knowing participation."   I reject the first argument as unfounded and determine that the second argument should be addressed in a motion for summary judgment rather than a motion to dismiss.

affairs of Tyco through a pattern of racketeering activity.[27]
Id. ¶ 1285.

According to the New Jersey Supreme Court, "to conduct or
participate in the affairs of an enterprise means to act
purposefully and knowingly in the affairs of the enterprise in
the sense of engaging in activities that seek to further, assist
or help effectuate the goals of the enterprise."  Ball II, 661
A.2d at 268.  Tyco contends that it cannot be held liable under
this formulation because its interests were not aligned with
those of the individual NJRICO defendants, who wished to enrich
themselves at Tyco's expense.  I disagree.

As noted above, I have already rejected the argument that
Tyco cannot be a defendant in the securities case because it was
merely a victim of a fraud perpetrated by its officers and
directors.  See Tyco II, 2004 WL 2348315.  The same result is
appropriate here.  Like the plaintiffs in the securities case,
the plaintiffs here allege that Tyco derived substantial benefit
from the racketeering activity, namely the inflation of its stock
price.  The fact that the individual NJRICO defendants may also

---

[27]  Under NJRICO part (c), "there is no requirement . . .
that the enterprise and the defendant persons [alleged to have
violated NJRICO] be distinct as required under federal RICO."
Eli Lilly, 23 F. Supp. 2d at 490.

have obtained additional benefits for their participation in the
alleged criminal scheme does not establish that Tyco did not
intend to further the fraud as a whole.  See Handeen v. Lemaire,
112 F.3d 1339, 1351 (8th Cir. 1997) (Under federal RICO, "the
enterprise *itself*, broadly speaking, must be marked by a common
purpose, but it is not necessary that every single person who
associates with the entity gain some discrete advantage as a
result of that particular motivation.  Prospective benefit to an
individual collaborator is simply impertinent; it is sufficient
if a RICO defendant shared in the *general* purpose and to some
extent facilitated its commission.") (emphasis in original).

This argument is the only one that Tyco has raised in
opposition to plaintiffs' NJRICO part (c) claims.  Accordingly,
Tyco's motion to dismiss Counts 24, 25, and 26 is denied.
Defendants are free to renew their argument that Tyco was a
victim of the racketeering activity, rather than a participant,
at summary judgment.

### D.   NJSA § 2C:41-2(d)

Count 30 alleges that defendants conspired to violate NJRICO
in contravention of NJSA § 2C:41-2(d) ("NJRICO part (d)").
Compl. ¶ 1306.  Part (d) provides that "[i]t shall be unlawful
for any person to conspire . . . to violate any of the provisions

of [NJRICO parts (a)-(c)]." Tyco contends that (1) plaintiffs have not properly alleged that Tyco agreed to violate NJRICO; and (2) a corporation cannot conspire with its officers. I address each argument in turn.

### 1.  Sufficiency of Plaintiffs' Allegations

In Ball II, the New Jersey Supreme Court summarized NJRICO conspiracy law as follows:

> [A] RICO conspiracy has two separate elements: an agreement
> to violate RICO and the existence of an enterprise.  The
> agreement to violate RICO itself has two aspects.  One
> involves the agreement proper, that is, an agreement to
> conduct or participate in the conduct of the affairs of the
> enterprise.  The other involves an agreement to the
> commission of at least two predicate acts.  If either
> agreement is lacking, the defendant has not embraced the
> objective of the conspiracy – the substantive violation of
> the RICO Act – that is required for any conspiracy
> conviction under classic conspiracy law.

661 A.2d at 268.  Tyco claims that plaintiffs have failed to allege that it agreed to violate RICO. I disagree.

Plaintiffs have made a variety of allegations tending to show that Tyco's officers agreed to conduct the company's affairs through a pattern of racketeering activity.  See, e.g., Compl. ¶ 68 (Tyco's officers conspired to make the $20 million payment to Walsh); id. at ¶ 160 (Kozlowski and Swartz conspired to misuse the KEL loan program); id. at ¶ 172 (Belnick conspired with other

defendants to hide his year 2000 compensation); <u>id.</u> at ¶ 148
(Kozlowski, Swartz, and the PwC defendants conspired to obtain
approval of the Flag Telecom bonuses); <u>id.</u> at ¶ 1094 (the PwC
defendants and the individual NJRICO defendants conspired to
produce clean audit opinions concealing theft from Tyco).  Given
Tyco's alleged liability for the individual NJRICO defendants'
conduct, plaintiffs have adequately pled that Tyco agreed to
violate NJRICO.

> 2.   <u>Intracorporate Conspiracy Doctrine</u>

Tyco next invokes the intracorporate conspiracy doctrine,
arguing that plaintiffs' conspiracy claim should be dismissed
because a corporation is incapable of conspiring with its
employees and officers.  The intracorporate conspiracy doctrine,
which arose in the antitrust context, is based on the principle
that "'[a] corporation cannot conspire with itself any more than
a private individual can, and it is the general rule that the
acts of the agent are the acts of the corporation.'"  <u>Buschi v.
Kirven</u>, 775 F.2d 1240, 1251 (4th Cir. 1985) (quoting <u>Nelson Radio
& Supply Co. v. Motorola, Inc.</u>, 200 F.3d 911, 914 (5th Cir.
1952)).  District courts are split on the applicability of the
doctrine in the federal RICO context, <u>Bowman v. W. Auto Supply</u>

Co., 773 F. Supp. 174, 179 (W.D. Mo. 1991), rev'd on other
grounds, 985 F.2d 383 (8th Cir. 1993) (collecting cases), as are
the courts of appeal.  Kirwin v. Price Communs. Corp., 391 F.3d
1323, 1326-27 (11th Cir. 2004) (noting a split of authority and
ultimately concluding that the intracorporate conspiracy doctrine
does not preclude claims under § 1962(d)).

I need not determine whether the intracorporate conspiracy
doctrine bars plaintiffs' NJRICO part (d) claim.  Plaintiffs have
alleged a conspiracy between Tyco, the individual NJRICO
defendants, and the PwC defendants.  Thus, Tyco is not alleged to
have been conspiring solely with its agents.  See Mid-Atlantic
Exporters, Ltd. v. Krick, No. 92-1577, 1992 U.S. Dist. LEXIS
11931, at *25 (E.D. Pa. Aug. 7, 1992) ("[T]he courts
[interpreting federal RICO] consistently hold that an employee,
employer and outside party can constitute a conspiracy.").
Accordingly, Tyco's motion to dismiss Count 30 is denied.

### E.  Aiding and Abetting Liability

Count 17 alleges that Tyco aided and abetted the individual
NJRICO defendants' violations of NJRICO part (a).  Compl. ¶ 1238.
Count 22 alleges that Tyco aided and abetted the individual
NJRICO defendants' violations of NJRICO part (b).  Id. at ¶ 1266.

-61-

Count 27 alleges that Tyco aided and abetted the individual NJRICO defendants' violations of NJRICO part (c).  <u>Id.</u> at ¶ 1293. Count 29 alleges that the PwC defendants and the individual NJRICO defendants aided and abetted NJRICO violations of other defendants.  <u>Id.</u> at ¶ 1302.  Defendants contend that these counts must be dismissed because there is no aiding and abetting liability under NJRICO.

The "conventional wisdom" is that there is no cause of action for aiding and abetting under federal RICO.  <u>In re Am. Honda Motor Co., Inc. Dealerships Relations Litig.</u>, 958 F. Supp. 1045, 1057 (D. Md. 1997);[28] <u>see also</u> <u>Rolo v. City Investing Co. Liquidating Trust</u>, 155 F.3d 644, 656 (3d Cir. 1998); <u>Heffernan v. HSBC Bank USA</u>, No. 99-CV-7891 (EHN), 2001 U.S. Dist. LEXIS 10996, at *18 (E.D.N.Y. Mar. 29, 2001); <u>Strain v. Kaufman County Dist. Atty's Office</u>, 23 F. Supp. 2d 685, 697 (N.D. Tex. 1998); <u>Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison</u>, 955 F. Supp. 248, 256 (S.D.N.Y. 1997).  This principle derives from the Supreme

---

[28]  The court in <u>In re Am. Honda</u> held that "aiding and abetting principles do . . . apply in considering whether a defendant has participated in the enterprise 'through a pattern of racketeering activity,'" but did not disagree that there is no cause of action for aiding and abetting a federal RICO violation. <u>In re Am. Honda</u>, 958 F. Supp. at 1058.

Court's seminal decision in <u>Central Bank of Denver v. First Interstate Bank</u>, 511 U.S. 164, 177 (1994), which declined to imply a cause of action for aiding and abetting securities fraud under § 10(b) of the Exchange Act and SEC Rule 10b-5.  In <u>Central Bank</u>, the Supreme Court determined that the language of § 10(b), which does not use the words "aid" and "abet," foreclosed the imposition of aiding and abetting liability.  511 U.S. at 177.  Courts have readily applied <u>Central Bank</u>'s reasoning in the RICO context.  <u>See, e.g.</u>, <u>Rolo</u>, 155 F.3d at 657 ("Because the text of the RICO statute does not encompass a private cause of action for aiding and abetting a RICO violation, 'in accordance with the policies articulated in <u>Central Bank of Denver</u>,' we have no authority to imply one.") (quoting <u>Hayden</u>, 955 F. Supp. at 255–56).[29]

---

[29]  In <u>Am. Auto Accessories v. Fishman</u>, No. 95 C 5156, 1996 U.S. Dist. LEXIS 12207, at *18 (N.D. Ill. Aug. 21, 1996), the District Court for the Northern District of Illinois concluded that aiding and abetting liability is permissible under federal RICO, noting that "[t]he language of Section 1962(c), especially that forbidding 'indirect participation,' appears to permit aider and abettor liability."  The Supreme Court directly rejected this argument in <u>Central Bank</u>.  511 U.S. at 176 ("The federal courts have not relied on the 'directly or indirectly' language when imposing aiding and abetting liability under § 10(b), and with good reason.  There is a basic flaw with this interpretation . . . . [A]iding and abetting liability extends beyond persons who

There is no binding New Jersey precedent with respect to aiding and abetting liability under NJRICO, as the New Jersey Supreme Court has not considered the issue.  However, New Jersey courts are not altogether silent on the availability of aiding and abetting liability under the statute.  In <u>Bondi v. CitiGroup, Inc.</u>, No. BER-L-10902-04, 2005 WL 975856 at *24 (N.J. Super. Ct. Law. Div. Feb. 28, 2005), the court concluded that there is a cause of action for aiding and abetting under NJRICO "because of [New Jersey's] expansive adherence to aiding and abetting liability in other tort contexts and its liberal interpretation of the elements of [NJRICO]."  <u>See also</u> <u>Franklin Med. Assocs. v. Newark Pub. Schls.</u>, 828 A.2d 966, 974 (N.J. Super. Ct. App. Div. 2003) (leaving a lower court's imposition of aiding and abetting liability under NJRICO intact, without substantive analysis).  Plaintiffs also point out that courts have not uniformly adhered to <u>Central Bank</u> outside the RICO context.  <u>See</u> <u>Boim v. Quranic Literacy Inst.</u>, 291 F.3d 1000, 1019 (7th Cir. 2001) (implying a cause of action for aiding and abetting under an anti-terrorism

---

engage, even indirectly, in a proscribed activity; aiding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do.").

statute).

I will follow the line of federal cases in concluding that there is no cause of action for aiding and abetting under NJRICO. The sole New Jersey authority that reached the opposite conclusion did so without reference to the language of the statute or legislative history, instead relying on a vague conception that NJRICO is broader in scope than federal RICO. Plaintiffs have not identified any language in NJRICO (or any differences between NJRICO and federal RICO) suggesting that the state statute provides for aiding and abetting liability.  As the New Jersey Supreme Court has instructed courts to consider federal RICO case law, <u>see</u> <u>Ball II</u>, 661 A.2d at 258, it is appropriate to adopt the federal position in the absence of binding New Jersey precedent.  Accordingly, defendants' motions to dismiss Counts 17, 22, 27, and 29 are granted.

### F.   <u>Vicarious Liability</u>

Count 18 alleges that Tyco is vicariously liable for the individual NJRICO defendants' violations of NJRICO part (a). Compl. ¶ 1246-47.  Count 23 alleges that Tyco is vicariously liable for the individual NJRICO defendants' violations of NJRICO part (b).  <u>Id.</u> ¶ 1272-73.  Count 28 alleges that Tyco is

vicariously liable for the individual NJRICO defendants'
violations of NJRICO part (c).  Id. ¶ 1299–1300.

Tyco contends that "the imposition of vicarious liability on
Tyco would be inconsistent with the purpose of RICO" because Tyco
was victimized by the accounting fraud at the company.  Tyco Br.
at 38.  Specifically, Tyco argues that the individual NJRICO
defendants' alleged RICO violations were not committed in
furtherance of Tyco's business and that Tyco did not authorize or
acquiesce in the individual NJRICO defendants' wrongful conduct.
See Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386, 1406–07
(11th Cir. 1994) (in order to impose vicarious liability for RICO
violations on an employer, employees' wrongful acts must be: "(1)
related to and committed within the course of employment; (2)
committed in furtherance [of the business] of the corporation;
and (3) authorized or subsequently acquiesced in by the
corporation") (quoting Quick v. People's Bank of Cullman County,
993 F.2d 793, 797 (11th Cir. 1993)).

I disagree.  Plaintiffs allege that the individual NJRICO
defendants' wrongful conduct worked a fraud that artificially
inflated the price of Tyco stock, which benefited Tyco in a
variety of ways.  Although Tyco ultimately pursued civil claims

against its former officers, the alleged fraud spanned a considerable length of time, and plaintiffs allege that during that time Tyco failed to take measures to prevent or remedy the fraud.  See, e.g., Compl. ¶ 880, 904.  Accordingly, Tyco's motion to dismiss Counts 18, 23, and 28 is denied.

## IV.  **THE BLUE SKY CLAIMS (COUNTS 31-34)**

The final four counts assert claims under the New Jersey and New Hampshire Uniform Securities Laws against Tyco as the primary violator (Counts 31 and 33) and the individual defendants as control persons liable for the primary violations pursuant to NJSA § 49:3-71(d) and N.H. Rev. Stat. Ann. 421-B:25(III) (Counts 32 and 34).  Defendants Belnick, Fort, Passman, Bodman and Lane seek to dismiss the claims asserted in Counts 32 and 34 against them.  They argue plaintiffs cannot proceed under both the New Jersey and New Hampshire statutes, and that the complaint fails to allege with particularity their culpable participation in Tyco's primary violations.  Both arguments fail for the following reasons.

First, there is no need to pursue a choice-of-law analysis, because the relevant provisions of the New Jersey and New Hampshire securities laws are substantively identical.  See NJSA

§ 49:3-71(d); N.H. Rev. Stat. Ann. § 421-B:25(III).  Both statutes provide liability to persons who control primary violators of the securities laws.  Both provisions allow those persons to assert good faith defenses that they did not know and in the exercise of due care could not have known of the primary violator's conduct.  When there is no conflict between the laws, a choice of law analysis is not warranted.  See Royal Bus. Group, 933 F.2d at 1064 (declining to make a formal choice of law when the result would not vary).  At this stage in the proceedings, plaintiffs are free to proceed on alternative theories of recovery.  See Stone & Webster, 414 F.3d at 200 n.8 (allowing plaintiff to plead in the alternative and reading the complaint at the motion to dismiss stage most favorably to plaintiff); Simms Inv. Co. v. E.F. Hutton & Co., 699 F. Supp. 543, 545 (M.D.N.C. 1988) (citing authority and concluding more than one state's securities laws can apply to a single transaction).

Second, none of the law that defendants cite to support their position that plaintiffs must plead culpable participation in the underlying violation is persuasive.  The plain language of the statutes does not include a culpable participation element. The cases on which defendants rely were not at the motion to

-68-

dismiss stage, where plaintiffs need only allege facts to state a claim, not to prove it, and where all reasonable inferences must be read in favor of plaintiffs.  As discussed above regarding the control person liability under the federal securities provisions, §§ 20 and 15, plaintiffs have alleged the minimal facts necessary to state a claim.  That same analysis applies equally here.  <u>See</u> <u>Abrams v. Ohio Cas. Ins. Co.</u>, 731 A.2d 48, 51-52 (N.J. Super. Ct. App. Div. 1999) (applying federal securities law concepts regarding "control persons" to state law claims); <u>see also</u> <u>Dinco v. Dylex Ltd.</u>, 111 F.3d 964, 968 (1st Cir. 1997) (comparing New Hampshire law to federal law).

Accordingly, defendants Belnick, Fort, Passman, Bodman and Lane's motions to dismiss the NJSA § 49:3-71(d) and N.H. Rev. Stat. Ann. § 421-B:25(III) claims against them are denied.

## **CONCLUSION**

In summary, I dismiss the following claims against the following defendants:

1)   All Exchange Act and Securities Act claims
     (Counts 1-7) against all defendants to the
     extent that they are based on the Raychem
     Claims transaction.

-69-

2)   All Exchange Act and Securities Act claims
     (Counts 1 and 5) against PwC and PwC-Bermuda
     to the extent that they are based on audit
     reports incorporated into Tyco's 10-Ks filed
     on December 24, 1997 and December 10, 1998 or
     its 10-Q filed on December 21, 1997.

3)   All claims against defendant Lane to the
     extent that they accrued before April 19,
     2000.

4)   Plaintiffs' § 10(b) claim (Count 1) against
     PwC-Bermuda.

5)   Plaintiffs' § 20A claim (Count 3) against
     Fort.

6)   Plaintiffs' claims for violations of § 14(a)
     and Rule 14a-9 (Count 4) against all
     defendants.

7)   Plaintiffs' common law claims (Counts 8-13)
     against all defendants.

8)   Plaintiffs' NJRICO claims alleged in Counts
     15, 16, 17, 22, 27, and 29.

In all other respects, the defendants' motions to dismiss

(Doc Nos. 454, 459, 460, 461, 462, 465, 466 and 471) are denied.

SO ORDERED.


                              /s/Paul Barbadoro
                              Paul Barbadoro
                              United States District Judge

June 11, 2007
cc:  Counsel of Record

                              -70-