United States District Court
District of New Hampshire

September 17, 2007

Case No. Md-02-1335
Civil Action No. 02-266-PB

Notice Of Intention To Appear At The Fairness Hearing In
Re: Tyco International LTD. Securities Litigation and
    Second Amended Pleading/Objection

To Whom It May Concern:

                    I Chris Andrews at this moment intend to appear
on November 02, 2007 at the fairness hearing. If I am unable to attend due
to a previously scheduled event taking place in the late afternoon/early
evening on November 01, 2007, which I would have to cancel to be at the
hearing, the attached sworn pleading/objection and attachments will stand in
for me. Thank you.

Chris Andrews
29193 Northwestern Hwy. #738
Southfield, MI. 48034
Ph. 1-248-635-3810

Cc Shriffin Barroway Topaz & Kessler, Richard Schiffrin
   Bartlit Beck Herman Palemchar LLP, Jeffrey Hall
   Sent via Priority Mail September 17, 2007

United States District Court
District of New Hampshire

Chris Andrews on behalf of

himself and all others similarly situated,

Plaintiff,

vs. Tyco International LTD.

Defendant,

Case No. MD-02-1335-PB
Civil Action No. 02-266-PB
Hon. Paul J. Barbadoro

SECOND amended objection
to proposed class settlement

FRCP Rule 23(e)(1)(A)
FRCP Rule 23(e)(4)(A)
FRCP Rule 23(g)(1)(B)
FRCP Rule 23(h)(2)(3)(4)
Proof of Class Membership Attached

Come now class member Chris Andrews (Andrews Objector) 29193 Northwestern Hwy. # 738 Southfield, MI. 48034-1011. I hereby object to the $3.2 billion proposed settlement, request the proposal be rejected and include my proof of class membership attached as Exhibit "A".

I do realize this is the largest settlement by one company in history but it's not good enough. Based on my personal knowledge I believe the court should reject this settlement and launch an investigation into the actions of some of the major parties involved in this case. The proposed settlement is very low based on the content of explosive documents that I believe may no longer exist in the eighty million documents and e-mails Tyco turned over to the plaintiff's during the course of the discovery process.

Cheating Stakeholder Class Scheme Begins

I personally turned over this very valuable evidence to one of the law firm's involved in this litigation back in December 2004. This particular "bad" firm twisted the truth and used deception when they obtained the stack of

documents from me along with secretly and intentionally failing to share this blockbuster evidence with the other firms and their clients involved in this litigation like they should have over the past several years. This action may have substantially reduced the settlement amount that is due and owed the entire class. By unethically withholding this vital information from the other firm's involved in this litigation the bad firm made the court a co-conspirator in their scheme. This occurred when the court unjustly dismissed certain related cases involved in this litigation due to lack of available proof because the bad firm successfully kept the evidence secret and in their back pocket. The cases the court dismissed have cost victims and their counsel's a substantial amount of money. Seems the needs of one outweigh the needs of many.

The defendants and it's enablers have also engaged in highly questionable actions when supposedly acting in the best interests of Tyco and it's stakeholders over the past five year period that this litigation has been proceeding through your court.

II                     Tyco Smoking Gun Documents

I am enclosing what I have been told by one person are two "smoking gun" documents as Exhibit "B" and Exhibit "C" relating to the Tyco saga and this litigation that have only been seen by this particular bad firm, past/present ADT/Tyco executives and lawyers along with another party during the previous eight year period. The documents put the whole Tyco controversy into perceptive and ultimately prove all the allegations in plaintiff's complaint! So why is the proposed settlement structured like the class has no real proof at all? This is not the best settlement possible, it's a sellout.

I brought several questionable accounting, business and disclosure practices to the attention of top level executives of Tyco International, Inc. and ADT Security Services, Inc. starting in late 1998 and early 1999 when the stock was $30 a share and the fraud was only $48 million. As a result of the attached exhibits I spoke with a very high level executive at Tyco regarding the $200.00 dealer connection fee scam. He claimed the connection fee was "approved by the SEC "(United States Securities and Exchange Commission) which we all now know is false. I believed him and dropped the issue.                     2 of 19

(This connection fee scam grew to be a $567 million wash fraud that the $50 million dollar Boies investigation "missed".) Tyco and ADT management up and down the chain of command both knew the connection fee was designed to "go right to ADT's bottom line" because that's what an ADT representative inadvertently told me back in 1998. The memo's also appear to have been withheld from the SEC when they cleared Tyco of questionable accounting practices and closed their investigation in mid-2000. (Tyco paid a $50 million penalty to the SEC on 4-17-06 related to the $2 billion in accounting issues, $1 billion of which were raised in the attached memo's and other's involving ADT Security Services, Inc.) Some of the information in the attached exhibits has been redacted due to confidentiality/secrecy agreements or due to privacy/security reasons).

Tyco and ADT's old and new management have known these truths or chose not to know from 1998 on and have used smoke, mirrors, indirect, half truthful statements and feigned ignorance to successfully hide this knowledge I believe from the courts along with state and federal government entities. Well, almost successfully up until today.

III                      Hiding Additional Accounting Fraud
Starting in March of 2002 through June 14, 2002, I again brought new questionable accounting, business and disclosure practices to the attention of Tyco and ADT management through three separate letters, incurred retaliation during that ten week period and was terminated on June 14, 2002 from ADT Security Services, Inc. The firing prevented me from informing the auditors who were scheduled to arrive in our building the next business day of the above described and other malfeasance issues that were/are rampant inside the company. One ADT executive even wrote to me later that the auditor's had reviewed my correspondence and found everything was in order. That's not what the historical record now shows! How could ADT/Tyco executives know what I was going to tell the auditors when they hadn't even arrived in the building yet and didn't have time to review the last letter sent into the ADT corporate three days before my firing?

In July 2002, a month after I was terminated, I sent another letter to ADT's legal department and Tyco mentioning among other things, bad accounts that were being carried on the books (bad debt) way past Tyco's charge off period. This particular accounting issue was finally acknowledged by Tyco yco/ADT nine months later in April of 2003. Why the delay?  3 of 19

They "discovered" an additional $250 million in bad debt being carried on the books that Mr. Boie's $50 million dollar report "missed". Why weren't ADT Security Services and some of it's executives named as a defendants since over $1 billion+ of the fraud and "errors" I wrote about occurred right under their noses? Some of them knew it via my memos and covered it up thereby escaping responsibility and cheating class members in a big way.

IV        Many Knew And Continue To Remain Silent

I am 90% confident of who actually gave the gave the order within ADT to fire me ensuring the cover-up and fraud continued on instead of ending at that point. I am unsure if ADT actually sent the correspondence to the auditors and/or PWC as they claim. The auditors had ten weeks to call me and I received no contact. I am also unsure if the Tyco executive I was sending copies of the correspondence to approved of my firing or whether he even sent the information on to the auditors/PWC like he should have. What did PWC know and when? I do know that an outside law firm reviewed my proposed termination and that particular lawyer sat on the Board of Directors of ADT. Another ADT lawyer I had sent the 1999 letter to and was involved in the 3-02 through 6-02 correspondence and a high level Tyco lawyer are both listed together for the first time on the 1999 ADT Board of Directors form filed with the State of Florida. (Other top level executives of Tyco International also sat on ADT's board during the class period and knew or should have known of these documents). These lawyers, executives and others had access to the attached documents or knowledge of them from 1999 through today and/or had the opportunity to share the information among themselves along with the rest of the Board of Directors of both ADT Security Services, Inc and Tyco International, Inc. over the years. Which board members knew of this information and when? Why aren't they named as defendants? Have they been deposed? Does the class have a possible legal malpractice claim here if this settlement is approved?

V        Leaving Evidence On The Table

In November and December of 2004 I met with the bad firm involved in this litigation. I provided them with a stack of documents but nothing after that date because I soon realized that I had become a victim of a fraud. The additional information I discovered and did not provide them with after officially ending the relationship in June of 2005 could have been used to increase their bargaining power and the settlement amount in this case.

This hurts the entire class and the recovery amount. They did seemed energized though by what they saw and heard and you would have thought I was providing them with the location of a multi-billion dollar treasure...

Now that the court has proper background I am now going to skip ahead in time to focus attention on recent events that this request for settlement rejection and investigation is based upon. Months and months ago I was on the internet searching for Tyco related material and saw that a law firm that had filed a case against Tyco that was in your court had their case dismissed six months earlier due to lack of evidence. I was stunned!

How could this be when I provided proof to one of law firm's involved in the litigation back in December 2004 that backed up this particular law firm's claims? I contacted that firm and they were flabbergasted that another firm in the case had the evidence they needed and did not share with them resulting in their client's claims being dismissed by the court. Other's are also in the same boat. I felt like someone who found out an innocent man had been framed and intentionally put in prison years ago. Maybe it was a fluke. I considered the possibilities, formulated a hypothesis and made a phone call.

VI    Verifying The Hypothesis And Confirming A Class Double Cross

I made a call to another firm involved in the Tyco litigation and met with two "good" firms at an airport here in the US in January of 2007. They claimed they also had never heard about my information before which was a complete shock to all of us. I informed them that the bad firm was supposed to have shared this information with everyone else who had filed suits against Tyco, but evidently they did not. I informed them up front that I could not name the bad firm I had met with and turned over the documents to in 2004, nor did I show or provide them with Exhibits "B" or "C" per a confidentiality agreement between myself and that bad firm. I did not provide any hints, a kick under the table, a nod, nor did I use any other body language to indicate who the firm was, even though it was very tempting. They were going to have to find it all out on their own.

I explained to them the contents of the documents and story over a several hour time span. They both realized there was a traitor among one of the ther firms involved in the litigation.    5 of 19

This had and was directly affecting them, their clients, the integrity, credibility and possible settlement outcome of the entire Tyco case. If they felt foolish or angry about not knowing this information before hand, realizing they had been double crossed, which caused them to waste two years of valuable time, energy and resources chasing ghosts, they did not show it. Well, maybe just a little. They agreed that the information was valuable enough that it should have been shared with them and they could have used it over the previous two year period when they were deposing people to set an impeachment trap but now that is futile.

While speaking with them I did remember hearing a speech from one of the lawyers from the bad firm months before my first meeting with them in November of 2004. They were handling a case where the company lost $100 billion in market cap and a one billion settlement figure had been discussed. The only company I know of that fits that description, did not end up in bankruptcy court and could afford that sum is Tyco. I could be wrong but I don't think so. Tyco should have settled in 2003 which a Tyco director suggested and possibly saved current stakeholders two billion dollars. I informed the good firm that they should be able to recover at least $3.5B- to $4.0B in cash for the class based on the verbal information I was providing them with just like I told the bad firm several years before, and that was an old estimate. That amount still only equals a miniscule recovery amount compared to the multiple stock drops and market cap loss due to the ongoing malfeasance disclosures that occurred. Three billion dollars divided into two billion shares equals approximately $1.43 per share recovery. This amount doesn't quite cut it considering a $100 billion in market cap losses.

I believe the two good firm's told me the truth when one said they wished they had known about this information sooner since 198 depositions had already been taken with two more to go. I knew the names of the employees that were to be deposed, were copied some of the documents so they should have known of the fraud but remained silent over the years. I believe the verbal information I provided to the good firm's that day helped them better prepare questions for their opponent's depositions and hopefully surprised the heck out of those people. Maybe our meeting got us to where we are today in terms of a dollar figure, which is a good starting point.

The question we all had that went unanswered was this. Why would the bad firm knowingly sabotage the other firms who had also filed suits against the defendants by hiding sensational evidence that has proven so elusive over the past eight years? It might have been a long plane ride home for both them trying to figure out who the Judas was and what to do next. If they did investigate, called around and asked direct questions of the rest of the firm's involved, it would not have been happy conversation when they confronted those responsible for this subversive, obstructive and disruptive scheme.

VII  Treasonous Acts Against The Class Create Counsel Credibility Issues

By being victims of this bad firm's intentional and traitorous hiding of the long sought after proof, plaintiff's counsel would be negotiating from a weaker position then they should have been in because they lacked and continue to lack all the necessary material information to properly advise their clients and each other if the amount is fair, adequate and reasonable.

Here are some questions off the top of my head that I believe need answers prior to approving this proposed settlement agreement. Did the bad firm share with the defendants all the intelligence and when? Did they inform some of the firm's and client's and not others about the sensational information? Would the other firm's and their client's have pushed for a larger settlement had they been made aware of this knowledge sooner? Did a side deal occur somewhere? Would the stakeholders think this is a fair settlement if they were to read this letter? Is there a quid quo pro in effect relating to who knew what and when among the plaintiff's firms, and between the plaintiff's and defendants when settling this case? Is someone being paid off here to remain silent? It may all come down to arrogance, greed, bending and breaking the rules if they think no one else is looking. More business as usual for some. Is there a grassy knoll in this story?

By obscuring this valuable intelligence the bad firm may have caused this case to drag out unnecessarily over the years thereby substantially and intentionally helping to artificially increase their billable hours and attorney fees that class members have to pay, which would decrease the net amount to be divided among the class.

VIII                    Billing Fraud And Wasting Time?
Was another possible reason for keeping the evidence secret so the bad firm could build up a large bank of billable hours so the bad firm could use the multiplier times the lodestar formula and artificially increase their fees because they knew they had the proof they needed to settle this case at any time and couldn't lose? It's like a player who is on a winning streak on "The Wheel of Fortune" that already knows the hidden phrase's before the show begins, so he names every letter to build up the pot. The player then wins the pot and game at the expense of the others.

If this case had settled sooner the attorney fees for the defendants could have also been reduced, thereby saving stakeholders hundreds of millions of dollars in wasted money, resources, time and attention dealing with this issue. If this case had settled sooner management could have spent more time focused on running the business and maybe Tyco management might not have had to break the company up.

IX                     Boies Fiasco Cover-up?

Below are more examples of questionable behavior that may have had a direct bearing on this settlement amount along with additional actors that could or /should be named as additional defendants/witnesses. These additional potential defendants/witnesses can bolster the plaintiff's claims and the amount that stakeholders are entitled to will increase.

The Boies's firm did not bother contacting me even though they had my name, address and phone number to follow up with me after I personally spoke to Mr. Boies, Mr. Breen, Chairman and Chief Executive Officer, Mr. Fitzpatrick, ex-Chief Financial Officer, Mr. Bill Lytton, Executive Vice President and General Counsel, and several other past and present top level Tyco officials on a recorded Tyco conference call that took place on September 25, 2002.

My call was an attempt to alert them to past and ongoing issues inside the company which were and are still being covered up today. I was placed in "q" for eighty minutes while the conference call took place and spent one minute speaking on the phone making a statement and asking the last question of the day. Some truth was uncovered but most of it was not. Were these individuals deposed about their knowledge of Exhibit "B" and "C"?

The Boies report issued on December 31, 2002 stated there was "no systemic fraud" just "aggressive errors" which I and many others inside ADT and Tyco knew at the time was false. Unbeknownst to the SEC and contrary to the spin in the Boies report, the ADT dealer connection fee was not an "error" but was now a $567 million fraud, was ongoing, was systemic and was "only" a $48 million fraud at that time I wrote the first letter. Had it not been for that part of the fraud, Tyco would have missed their numbers in at least one quarter (per an SEC filing) and maybe the stock would not have risen as high as it did over the years. It took it's dramatic fall from $61 a share on 12-01-01 down to $10 on 06-07-02 in that seven month period.

I knew the famous Boies report that cost stakeholders $50+ million was a false conclusion relating to the "no systemic fraud" or "only aggressive accounting" statement. Inside and outside Tyco lawyers, auditors, accounting firms, accountants, former and current executives at Tyco and ADT all disagreed, even though I had sent in the proof to Tyco/ADT three years earlier and many of them knew it! If Mr. Boies or his representatives had contacted me and asked me what I knew, I would have told them everything but they chose not to ask. Dialing a ten digit phone number and asking me questions that I had the answers to must have been too much truth for the Boies firm and it's client to handle. (A phone call from a top Tyco lawyer to me two weeks after my conference call apologizing on behalf of Tyco was accepted, but that does not address why that lawyer abruptly terminated the call when I started to bring up issues he obviously didn't want to know about.) It seems many chose once again to remain silent, not dig for the truth and not open Pandora's Truth Box.

Victimized stakeholders should be entitled to a refund of the $50 million spent by Tyco on this flawed report that "missed" $1 billion in accounting issues. Does a warranty come with this report? Does something seem wrong when the firm that was paid $50 million for a flawed investigation and report that backs management, is defending and being paid possibly many times that amount by Tyco to defend this class action, sue ex-ADT dealers, is involved in settling this case in management's favor which would also cover up their highly questionable role in this whole affair? All of this is occurring while one bad law firm is working behind the scenes to sacrifice the other firm's, their clients and class member claims by keeping material evidence secret. All a coincidence?

X        Obstructing The SEC and Playing The Numbers Game

Meanwhile Tyco and it's lawyers were still denying and covering up the fact to the SEC that the dealer connection fee was a fraud until the SEC received documents and other information detailing how the fraud worked on or about October 2003, per an SEC filing. Tyco clearly had not been telling the truth up to that point, fourteen months after Mr. Breen took over, ten months after the Boies report came out and six months after another billion dollars was restated. I'm reminded of a game show called "To Tell The Truth" which played on TV a long time ago. Same game different faces?

The insurance companies don't appear to be chipping in even a dollar when there should be liability coverage, including D & O, why? This $3.2 billion proposed settlement is a steal for the defendants. (Pun intended)

I do believe Tyco's own investigation was also flawed towards the "don't ask, don't know" philosophy. The proof of that are the four major restatements that occurred totaling over $1 billion after the debt refinancing occurred in January 2003. They all knew about these issues during the class period but remained silent. That information could have been disclosed starting in March 2002 and included in the misleading December 31, 2002 Boies report but because of ostrich type behavior it was covered up until April 2003, why? Did the $4 billion Tyco debt offering in January 2003 have something to do with it? Some inquiring class members want to know.

Shouldn't others have been added on as additional defendant's by the bad firm and the class period extended when they found out all this information from publicly available sources starting on December 31, 2002, and from me in December 2004? If not why not? Even the Geico caveman could see something is wrong here.

Despite continued correspondence I have occasionally sent into Tyco and ADT Security Services dating from 2002 through last month attempting to nudge them into disclosing what I believe are ongoing material issues that should be investigated, explained and disclosed to stakeholders, they continue to play dumb even though they have the proof right in front of them. Maybe it's not "material" enough to disclose. For example is a $400+ million questionable business practice that has been ongoing inside ADT for the past nine years including the class period, seem immaterial? What about "absorbed money" which was an issue when I left there?

Here is just one of a few examples. Absorbed money are refunds that ex-customers are owed but never received by them when they stopped their security service. Instead of refunding the cash to the ex-customers like they are supposed to, ADT "absorbs" the money internally and never tells anyone. If customers are owed money and can't be located, many states treasury's require that the unlocatable customer's refund be sent directly to them to try locate the customer. It's not Tyco's/ADT's money to keep, pocket, boost results and bonuses with. This was going on for years before, during and after the class period that I am aware of. I don't know if it's still going on as of today's date or if those customers who were owed money ever received it. Knowing how ADT operates I would have to say no. Tyco and ADT management continue to act like "mime's" regarding explanations for this and other ongoing questionable accounting, business and disclosure practices which affects the proposed settlement.

XII      Secrecy Agreements And Deceit Cheat Class Members

Since the attached evidence was cleverly concealed over the years, your court unfortunately dismissed the 38 consolidated lawsuits in Tyco's favor back in March of 2002 along with dismissing several other suits involved in this current litigation, even though the evidence or knowledge of it existed back then proving the plaintiffs claims!      11 of 19

It seems Tyco and their accomplices were successful in duping the SEC the first time in 2000, almost successfully the second time, this US District Court once in 2002, maybe again this second time around with help from a plaintiff's firm. Were Exhibit's B and C shredded never to be found or are they just buried too deep to find? Who shredded or buried them and when? That question needs an answer from the actors before approval.

Since I am unable to tell you the name of the "bad" firm due to a confidentiality agreement that is in place between us, (unless by order of court process) the court should schedule a hearing and ask them under oath who I provided the documents to. The bad firm is not supposed to divulge my name per the confidentiality agreement but everything is subject to change. I am not disparaging ADT Security Services, Inc. and their past or present employees prior to April 1999. There are various confidentiality and secrecy agreements in effect which I continue to honor, even though I believe they violate public standards. In addition there is a fourteen page protective order I signed involving this case. I have advised the bad firm in the past, in writing, that I have not and will not violate the protective order now or in the future.

I didn't see or learn anything from them or the handful of documents I reviewed that fell under the order, except for one very small item that was not even worth the time it took me to read it, let alone disclose it. All the information I have written or spoken about to anyone was in no way shape or form, acquired directly, indirectly, by association with those documents, or conversations I had with the bad firm. I have been intimately involved and invested thousands of  hours in this case over the past five years. It's a heck of a true crime story with many twists and turns.

XII                     The Material Truth Is Out There

I am requesting that as an officer of the court or the court's appointed representative refer these issues to the appropriate US Attorneys Office and Attorney Generals Office for investigation in the event I sent a copy to the wrong places. The court should reject the settlement, remove the particular bad law firm from it's position and eliminate any fees that might be transferred into their coffers. The court should also institute sanctions against all those on both sides of this case who gamed the system by wasting the court's, plaintiff's, and the defendant's time and money by unethically hiding the truth all these years along with contributing to class member losses.                     12 of 19

The court should quiz those who knew and hid the truth and require them to perform a mea culpa in open court and lift the cleverly designed veil of legal secrecy that shrouds the truth in this case. The class representatives should be required to see this amended objection summarizing what has occurred during this five year truth test, which many failed miserably. They might suddenly realize the settlement amount is too low and maybe it really is being settled for the wrong reasons. The class representatives associated with the bad firm should fire them and hire a firm with real gravitas.

Referrals should also be made to applicable state bar associations for disciplinary action related to individual conduct violations in this case for any past and present lawyers involved on both sides of this litigation. I also request that the court contact those "dismissed" cases and inform the appropriate counsel, who ever they are, that an error was made and they get a "do-over" on their claims. The bad firm can pay the costs involved. The bad firm obviously hid the evidence from the other various law firm's who had their cases dismissed. I have no doubt at all that the attached exhibits and other evidence not revealed here would have changed  the court's mind about lack of available proof and the valid claims would not have been dismissed. There are possible violations of criminal and civil law here that need to be looked into further prior to settlement approval.

XIII                       Feeble Settlement Proposal

The proposed settlement is completely inadequate because of the likelihood of success at trial is very high based on the attached and other non disclosed exhibits. A proposed settlement is evaluated upon how well it achieves the objectives of the class and how it compares with the chances of success of the class at trial. The court should treat this settlement proposal as a leaking trial balloon with a clown face painted on it. Plaintiff's counsel states that the class representatives believe that if the case went to trial recoverable damages would only be a maximum of $5.42 per share. Since they were able to recover $1.43 per share they now proclaim they did terrific job and want to be paid $500+ million? Who says $5.42 per share is the maximum, the bad firm? Total recoverable damages are really $50.00 per share not the $5.42. Isn't this settlement really about certain counsel using subterfuge to prematurely grab an Inca's treasure before time runs out? Does the court see where I'm going with this regarding some counsel's possible own self interest vs. the class interest? The class comes out the biggest loser.

Do they think we just fell off the tulip truck? I propose an additional 20% equity stake in the three split firms as an alternative to this weak settlement proposal to help offset the huge losses incurred by the class members. Let's not forget about the unbelievable questionable, deceptive and shifty legal tactics employed by this bad law firm along with some of the defendants and their representatives in this case. Trickery and deceit thrive in this case.

It appears that the bad law firm continues to put their own best interests ahead of everyone else's and effectively sabotages any attempt at sound, fair, honest representation, negotiation and settlement of this case by selling out the class. They can not be trusted and are a black eye towards your profession. In fact, calling the bad firm and some of the defendant's past and present employees and representatives ambulance chasers, is an insult to ambulance chasers everywhere. All of this could have been avoided if management for ADT Security Services, Inc. and the bad firm had simply apologized for their unethical and other actions that were directed towards me in the past. This could be the most expensive apology refusal in US corporate history. I am one disgusted class member who believes something stinks here and it's not me.

XIV     Rejection Summary and Investigation Request
The fact that best practical notice has not been given to alert class members of this settlement should by itself doom this settlement which will also draw very few objectors. This does not indicate an acceptance of this proposal by the class. The court should look at the importance and quality of the objection issues raised rather then the total number of objectors. What other possible objectors would possess the information I am presenting in this pleading? Who else has put in so many hours assisting those who are in search of the truth, attempting to, making sure and forcing people do the right thing even when they think no one else is looking? Unless a member of the plaintiff's or defense counsel comes forward with the truth there may be no other objections filed.

Plaintiffs and defendants attorneys state in the notice that they settled "to avoid the risk of dismissal of some or all of the claims against the settling defendants." How can the class and the court trust that statement based on the treacherous and double-dealing atmosphere that some class counsel and defendants have created?

This appears to be a self serving, truth twisting argument when the attached documents are reviewed and it is also intended to mislead the court into approving this settlement. A third year law class could have come up with this settlement amount based on the attached evidence. In fact the settlement amount represents a 20% recovery of just the one day market cap loss of $16 billion when the Walsh disclosure was finally made public. On going denials, malfeanse disclosures and well placed leaks continued to drop the market cap from 12-01-01 through the end of the class period.

While Rule 23 does not elaborate specific factors necessary for settlement approval, The United States Court of Appeals for the Fifth Circuit has sited six factors that a district court should take into consideration when evaluating a proposed class action settlement.

These factors or "focal facets" include: (1) The existence of fraud or collusion behind the settlement; (2) the complexity, expense and likely duration of the litigation; (3) the stage of the proceeding and the amount of discovery; (4) the probability of plaintiff's success on the merits; (5) the range of possible recovery; (6) the opinions of class counsel, class representatives and absent class members. Allow me to address these factors as they apply to this proposed settlement rejection request one at a time.

(1) Based on personal knowledge and tangible evidence gained verbally and in writing, and attached herein and dealing directly/indirectly with many parties in this case over the past five year period, the conclusion any reasonable person would come to is that fraud and/or collusion is involved in the discovery process and settlement negotiations so the proposed settlement must be rejected so the class does not become a victim of a fraud itself.

(2) Some of plaintiff's counsel should be allowed to proceed to trial and might be able to wrap up it up within forty five days from it's start.

(3) Based on statements made by two of the plaintiff's counsel I met with in January of this year, 198 depositions were performed WITHOUT the attached blockbuster evidence along with other still unreleased evidence in my possession. The values of the depositions are worth far less then they should be, wasted class counsel and class member's time and money while reducing the settlement amount substantially.      15 of 19

This seriously weakens plaintiff's claims, their negotiating ability and the depositions really should be retaken or a counterbalanced in some other way. More critical discovery is obviously needed which will only further strengthen plaintiff's position and increase the size of the settlement.

(4) Based on the attached evidence and other unrevealed evidence I believe the probability of success at trial is 90%. The evidence clearly shows a conspiracy among numerous employees of ADT Security Services and Tyco International and others to sanction by their silence and/or directly commit questionable accounting, business and disclosure practices to make their internal, external and Wall Street numbers before, during and after the class period. The result was class members ended up paying a very high price because defendants, some unnamed, caused multiple share drop losses by hiding and carrying on a five year long fraud. Only a few of the many actors that knew what was ongoing can claim they didn't know, I made sure of that. It is apparent that some parties involved in this case and settlement engaged in a brazen and premeditated game of "Three Card Monte Accounting and Legal Practices" hoping to score the "The Perfect Con."

(5) The range of possible recovery is the market cap loss from beginning to the end of the class period. That long and largest drop started on December 01, 2001 to June 07, 2002 ($50 million of stock was sold by major insiders/holders in the first two weeks of December of 01.) The stock went from $60 a share down to a mid day low of $9.45 a share, due to repeated denials of malfeanse and subsequent disclosures confirming it. Two billion shares multiplied by $50 a share is the $100 billion loss. The market cap loss the day the Walsh payment was announced was $16 billion. 20% of that number is the same as the proposed settlement. The ongoing drop in the share price was not due to market forces but rather to Tyco/ADT management's continued plan to remain silent on some issues but they also issued false statements regarding other issues claiming nothing nefarious was going on but then subsequent disclosures made those denials false. Does the phrase "Pay no attention to that man behind the curtain" mean anything?

16 of 19

(6) The opinion of some class counsel is tainted by the fraudulent actions of one or more of their own and therefore have to be discounted. Any affidavits submitted by class counsel and some of the defendant's cannot be relied upon to present a fair, accurate and truthful picture of these negotiations.

The proposed settlement is not fair, adequate or equitable based on the attached documents which should enable plaintiff's to recover substantially more than just 7% of class losses at trial, which is my recovery amount using the proposed settlement figures before attorney fees are deducted. More discovery is needed to bring hidden material issues to light.

Attorney fees and expenses should be rejected as to the bad law firm. The court should audit their invoices (and bill them) so the class does not pay $200 an hour for "of counsel" lawyer invoices when the firm may have paid far less an hour an hour to an employment agency to rent out those same attorney's. (This from a contract attorney who used to work on this case with them and posted his story on the internet twice in six months, once in a comment section of a prominent news site). A 7% attorney fee award would equal the average maximum recovery per share to the class before fees. The fees should be held until class members receive their compensation. Who do I submit my invoice to for assisting and then guarding the guardians?

The claims against the settling defendants should not be dismissed with prejudice because undisclosed new proof will allow other individuals and entities to be named as defendants which will raise the settlement amount.

The settlement will not resolve all plaintiff's pending claims in this litigation because previously undisclosed material evidence I am in possession of along with some questionable accounting issues are still ongoing and remain unresolved from the start of the class period forward.

If you are bothered by what you have just read I would urge the court or other entity to immediately harness all available public, private and governmental resources to investigate this sordid, cesspool of a mess regardless of where it leads or how long it takes to uncover all material hidden truth that is short changing the class in this proposed settlement.

17 of 19

The court should act as a very skeptical "class fiduciary" because some of parties have not adequately pursued the interests of the class as a whole in this deeply flawed and unreasonable settlement proposal.

There are many undisputed facts that should lead any reasonable class member and the court to conclude that this case and settlement proposal is contaminated by unprofessional, unethical and possible illegal actions of certain plaintiff's and defendant's representatives. The settlement is grossly inadequate and it should be disapproved. A lawyer within a branch of the government has contacted me regarding my first letter to you and it's response and another official entity is in possession of the undisclosed material evidence. A rejection of this proposal and not a postponement of this decision is requested from the court on November 02, 2007. An appeal by others and myself is very likely if this proposal is approved.

As someone famous and associated with this case once told me:
"The lawyers always win in the end." Does that include the bad one's too?

Based on the content of this objection, attachments, undisclosed material evidence and the documented actions of some of the parties in this case, the court is presented with a "Hopson's Choice" in this settlement proposal.

I make the above pleading/objection based on my personal knowledge except as to those matters made on information and belief, and, as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the above is true and correct. Executed September 17, 2007 in Southfield Michigan.

Respectfully Submitted,

Chris Andrews 09.17.07
29193 Northwestern Hwy. # 738
Southfield, MI. 48034
Caaloa@gmail.com
Phone 1-248-635-3810

Three enclosures totaling twelve pages, exhibit's "A", "B" and "C".

18 of 19

## Certificate of Service

The undersigned hereby certifies that the foregoing document was mailed on September 17, 2007 via Priority Mail upon the following counsel:

Jeffery Hall
Bartlit Beck Herman Palenchar LLP
Courthouse Place Suite 300
54 W. Hubbard
Chicago, IL. 60610

Richard Schiffrin
Schriffin Barroway Topaz & Kessler
280 King of Prussia Road
Randor, PA. 19087

Chris Andrews

19 of 19

/ YA517 A

 **WATERHOUSE**

TD Waterhouse Investor Services, Inc.
Member NYSE/SIPC
100 Wall Street
New York, NY 10005-3701
www.tdwaterhouse.com

ACCOUNT
STATEMENT

ACCOUNT NO.

**409-052**

LAST STATEMENT

**02/28/2002**

PERIOD ENDING

**03/28/2002**

CHRIS ANDREWS

BRANCH INFORMATION

CU

TO

TO

AC

CA

MR

MO
TA
NO
TA

| | | | FUNDS REDEEMED | | | | | |
|---|---|---|---|---|---|---|---|---|
| CASH | 03/28 | DIV | CMF MONEY MARKET PORTFOLIO | | | | 30.25 | 0.58 |
| | | | MONTHLY DIVIDEND | | | | | |
| MRGN | 03/28 | TRF | TRNSFR FROM CASH TO MARGIN | | | | 3,335.95 | 3,336.53 |
| MRGN | 03/28 | BGHT | TYCO INTERNATIONAL LTD | 100 | 33.2600 | 3,335.95 | | 0.58 |
| | | | TOTAL DEBITS AND CREDITS | | | | | |
| | | | CLOSING BALANCE | | | | | 0.58 |

Reminder: Please do not share your account password or account number with anyone. TD Waterhouse Customer Service
Representatives will never ask you for your password by e-mail, telephone, or in person.

(C CONFUSION)



_EXHIBIT B_

# GREAT LAKES ALARM

December 9, 1998

_FAXED 12-9-983:15pm_

ADT Security Services
Joseph Cohen
14200 E. Exposition Ave.
Aurora, Co. 80012

Dear Mr. Cohen,

     I am in receipt of your letter dated December 3,1998 received on December 8,1998. How can you claim my assertions are baseless when you have 120 pages of proof in front of you, unless you didn't review them?

    prior to ADT skewing the numbers.

     Your letter fails to address my main issue throughout my letter to you. The main issue is why ADT through intent or accident caused funding and attrition problems to rise and you are now using that as an excuse                   In addition to that main issue, several other issues were "Forgotten" in your letter:

- The failure of the ADT Dealer Group to refund to me as well as all other ADT Dealers, the amount of money we and ADT collected prior to charging us back the full amount on bad contracts. My estimate is that I and all Dealers past and present are owed $1,500,000.00, with that amount increasing $60,000.00 a month. Why do you feel you are entitled to unjustly enrich yourselves at the Dealer's expense?

- The misleading cash flow model which was used as a carrot to entice Dealers to switch Dealer Agreements that saves ADT millions of dollars a month at the direct expense of the Dealer's income. Dealer's who find out about this should be let out of these agreements without penalty.

- Artificially inflating the ADT Authorized Dealer Program Revenue numbers by $60,000,000.00 a year which artificially inflates Tyco's stock price. This I believe is a violation of U.S. Securities laws.

-                              I believe based on what I have been told recently, that a class action suit should be filed in federal court. In addition I will make it a huge public relations problem for ADT which you will not be able to explain away like you attempted to do with your letter to me.

- Finally I did not request to be released from charge-backs after November 6,1998, that is a statement of fact.

_(SIGNATURE)_

You have until December 15,1998 to settle this problem ADT created and so far has *failed to* fix. After December 15,1998 this problem will become public and grow at the same rate the ADT Dealer Groups revenues allegedly have.

Respectfully,

Chris Andrews

cc. ADT Boca – Legal Department
    Tyco International LTD. – L. Dennis Kozlowski

**Great Lakes Alarm**
**23800 W. 10 Mile Rd.**
**Suite # 250**
**Southfield, Mi. 48034**
**248 –**
**248 –**

**To:** Mr. Joseph Cohen

**Company:** ADT Security Services,Inc.

**Fax:** 1-303-306-5887

**From:** Chris Andrews

**RE:** Your last letter

**Date:** 12-09-98   2.15 PM

**Number of pages including cover sheet ( 3 )**

**Message:** For your reading and review.

Chris Andrews
President

This facsimile may contain confidential and / or attorney client privileged information belonging to the sender. This information is intended only for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, you should return to sender immediately. You are hereby notified that any disclosure, copying, distribution is strictly prohibited.

**IF THIS TRANSMISSION IS NOT COMPLETE PLEASE CALL IMMEDIATELY!**

CHCUL ANDREWS

**Great Lakes Alarm**
**23800 W. 10 Mile Rd.**
**Suite # 250**
**Southfield, Mi.  48034**

**To:** ADT Legal Dept.

**Company:** ADT Security Services,Inc.

**Fax:** 1-561-988-3892

**From:** Chris Andrews

**RE:** Expired Dealer Agreement

**Date:** 12-09-98   3:15 pm

**Number of pages including cover sheet ( 9)**

**Message:** Maybe you can help.

Chris Andrews
President

This facsimile may contain confidential and / or attorney client privileged information belonging to the sender. This information is intended only for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, you should return to sender immediately. You are hereby notified that any disclosure, copying, distribution is strictly prohibited.

**IF THIS TRANSMISSION IS NOT COMPLETE PLEASE CALL IMMEDIATELY!**

**Great Lakes Alarm**
**23800 W. 10 Mile Rd.**
**Suite # 250**
**Southfield, Mi.  48034**

**To:** L. Dennis Kozlowski

**Company:** Tyco Intrenational LTD.

**Fax:** 1-603-778-7330

**From:** Chris Andrews

**RE:** Expired ADT Dealer Agreement

**Date:** 12-09-98  3:15 pm

**Number of pages including cover sheet ( )**

**Message:** Dear Mr. Kozlowski,

Maybe you or someone on your staff can help solve this problem. Thank You.

Respectfully Submitted,

Chris Andrews
President

This facsimile may contain confidential and / or attorney client privileged information belonging to the sender. This information is intended only for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, you should return to sender immediately. You are hereby notified that any disclosure, copying, distribution is strictly prohibited.

**IF THIS TRANSMISSION IS NOT COMPLETE PLEASE CALL IMMEDIATELY!**

*EXHIBIT C*

# GREAT LAKES ALARM

March 05, 1999                                          Page 1
ADT Security Services,Inc.
One Town Center Road
Boca Raton,Florida 33486-1010

Via Facimile 1-561-988-3892
and U.S.Mail

Att. P. Gary Finney
Vice President and General Counsel

Dear Mr. Finney,





Page 3



The 48 million dollar phantom profit

The second reason was to attempt to confirm what an ADT representative told me about an artificial profit ADT was generating.

I was curious as to why starting on 09-01-98, ADT started paying my firm several hundred dollars more on each account purchased from my firm than they were legally obligated to. In the same transaction, a "Connection Fee" of $200.00 was charged to my firm without my approval or authorization. This is not in our guidelines or dealer agreement. I was told that this $200.00 connection fee that was, and still is charged today on every account the ADT Dealer Group purchases, was "TO GO RIGHT TO ADT 'S BOTTOM LINE"(profit)

Since Tyco had purchased ADT, a push had been on to please Tyco by boosting earnings. In addition, attrition rates were higher than expected, so a new dealer agreement was drawn up to help solve both problems. (Obviously, bonus levels to ADT representatives came into play at this point). Translated, that means I originally estimated that that the ADT Dealer Group would purchase 300,000 accounts in 1998 multiplied by $200.00 per account equals a 60 million dollar paper profit.

My estimate were sent to Mr. Gribbon, your legal department, and to Mr. Kozlowski on 12-09-98,In reality, the ADT Dealer Group purchased 240,000 accounts in 1998 multiplied by $200.00 for each account totals a $48 million dollar paper profit. According to the attached Wall Street Journal article dated 01-28-99, ADT exceeded it's profit goal by 50 million dollars for 1998, earning bonuses for several ADT representatives. My projection was off by 4%, just a coincidence I guess or is it ?

Here is how the 200.00 profit works. An existing dealer would sign and switch to a new agreement that was first unveiled on 02-04-98. The dealer would be paid an average of $210.00 more on each account purchased by ADT than charged a $200.00 "Connection Fee" in the same transaction. This created the profit.Some dealers switched and signed new agreements would eventually find out that ADT would charge them back $210.00 more than ADT originally paid them for the account! Once an existing dealer signed a new agreement, ADT would backdate and recalculate the previously purchased account as if it had been purchased under the new agreement. This would allow ADT to count this $200.00 connection fee profit all the way back to the beginning of the year! From an accounting and reporting point of view it doesn't sound right, does it?



I am outraged that ADT and Tyco have involved my firm into unwittingly becoming a pawn in your "Three Card Monte Accounting Practices".

The following quote comes from the attached Wall Street Journal article.Your CEO is quoted as follows:Delve far beyond audited financial statements when conducting due diligence." "PEOPLE LIE,PEOPLE PUFF THINGS UP,PEOPLE EXAGGERATE" Do other units inside ADT and other divisions in Tyco also engage in this sort of conduct ?Since this is exactly what has happened to my firm in dealing with ADT the past six months

Page 5

You may wish to contact AMP, Allied Signal, their legal departments and your accountants. an/inform them there is reason to believe that ADT may have engaged in some questionable accounting practices. Tyco may have to audit and restate earnings for 1998 and the first quarter of 1999.

Respectfully Submitted;

Chris Andrews
President

enclosures 8 pages
cc. L. Dennis Kozlowski-fax only
Mark Swartz