**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

|  |  |  |
|---|---|---|
| IN RE TYCO INTERNATIONAL, LTD., SECURITIES LITIGATION | ) ) ) ) ) | MDL Docket No. 02-1335-PB  This document relates to: Securities Action Civil Action No. 02-266-PB |

**SECURITIES PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION**

SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
Richard S. Schiffrin, Esquire
280 King of Prussia Road
Radnor, PA 19087
Telephone:  610-667-7706
Facsimile: 610-667-7056

GRANT & EISENHOFER P.A.
Jay W. Eisenhofer, Esquire
Chase Manhattan Centre
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Telephone:  302-622-7000
Facsimile:  302-622-7100

MILBERG WEISS LLP
Sanford P. Dumain, Esquire
One Pennsylvania Plaza
New York, NY 10119
Telephone:  212-594-5300
Facsimile: 212-868-1229

*Co-Lead Counsel for Securities Action*
*Plaintiffs*

ORR & RENO, P.A.
William L. Chapman, Esquire
N.H. Bar No. 397
One Eagle Square, P.O. Box 3550
Concord, NH 03302-3550
Telephone:  603-224-2381
Facsimile:  603-224-2318

*Local Counsel for Securities Action*
*Plaintiffs*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... iii

I.      INTRODUCTION ........................................................................................................ 1

II.     FACTUAL BACKGROUND OF THE ACTION ........................................................... 2

        A.      THE COMPLAINT ........................................................................................... 3

        B.      BRIEFING ON THE MOTION TO DISMISS ........................................................ 3

        C.      CO-LEAD COUNSEL'S ACTIONS IN PROSECUTING THE LITIGATION
                AND OBTAINING THE SETTLEMENT .............................................................. 5

        D.      OTHER SIGNIFICANT MOTIONS ..................................................................... 6

                1.      Motions For Judgment On The Pleadings And Summary
                        Judgment ............................................................................................. 6

                2.      Class Certification .............................................................................. 7

                3.      Ensuring Joint and Several Liability In The Event Tyco
                        Split into Three Separate Companies .................................................. 8

                4.      Other Matters ...................................................................................... 8

        E.      HISTORY OF SETTLEMENT NEGOTIATIONS AND ULTIMATE
                SETTLEMENT .................................................................................................. 9

        F.      THE TERMS OF THE SETTLEMENT ................................................................ 11

        G.      THE SETTLEMENT REPRESENTS A SIGNIFICANT PORTION OF THE
                TOTAL DAMAGES SUFFERED BY THE CLASS ............................................... 12

                1.      The Damages Methodology ............................................................... 12

                2.      The Settlement Represents A Significant Portion Of Total
                        Damages As Determined By Plaintiffs' Expert ................................. 16

        H.      THE PLAN OF ALLOCATION .......................................................................... 17

        I.      THE NOTICE OF THE SETTLEMENT AND THE CLASS'S AFFIRMING
                REACTION ..................................................................................................... 19

III.    THE COURT SHOULD GRANT FINAL APPROVAL TO THE  PROPOSED
        SETTLEMENT AND PLAN OF ALLOCATION .......................................................... 20

        A.      THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND
                ADEQUATE .................................................................................................... 20

        B.      THE POTENTIALLY SIGNIFICANT OBSTACLES TO A RECOVERY .................. 23

|  |  |  |  |  |
|---|---|---|---|---|
| | 1. | The Risks Of Establishing Liability | | 23 |
| | 2. | The Risks Of Establishing Loss Causation | | 25 |
| | 3. | Risks Of Establishing Damages | | 30 |
| C. | | THE RECOVERY COMPARED TO THE POTENTIAL RECOVERY | | 32 |
| D. | | THE COMPLEXITY, EXPENSE, AND LIKELY DURATION OF THE LITIGATION JUSTIFIES THE SETTLEMENT | | 33 |
| E. | | THE STAGE OF THE PROCEEDINGS AT WHICH THE SETTLEMENT WAS REACHED | | 34 |
| F. | | THE AMOUNT OF THE SETTLEMENT IN LIGHT OF THE RISKS OF LITIGATION | | 35 |
| G. | | THE SETTLEMENT WAS REACHED AFTER ARM'S-LENGTH NEGOTIATIONS | | 36 |
| H. | | THE REACTION OF THE CLASS TO THE SETTLEMENT | | 37 |
| | 1. | The Highly Favorable Reaction Of The Class To The Settlement Supports Approval | | 37 |
| | 2. | None Of The Objections To The Settlement Are Meritorious | | 38 |
| | | (a) | Objections To The Amount Of The Settlement | 39 |
| | | | (1) Resolved Objections | 39 |
| | | | (2) Unresolved Objections | 40 |
| | | (a) | Objections To The Class Period | 41 |
| | | (b) | Objections Regarding Donation Of Remaining Funds | 42 |
| | | (c) | The Sole Objection to the Plan of Allocation | 43 |
| | | (d) | Kozlowski's Reservation of Rights to File an Objection | 44 |
| IV. | | THE NOTICE TO THE CLASS SATISFIED BOTH THE PRELIMINARY APPROVAL ORDER AND APPLICABLE LAW | | 44 |
| V. | | THE PLAN OF ALLOCATION HAS A REASONABLE AND RATIONAL BASIS AND IS FAIR, REASONABLE AND EQUITABLE TO CLASS MEMBERS | | 46 |
| | | CONCLUSION | | 49 |

# TABLE OF AUTHORITIES

**Cases**

*In re AOL Time Warner, Inc., Sec. & ERISA Litig.,*
    No. 02-5575, 2006 U.S. Dist. LEXIS 17588 (Apr. 6, 2006) .................................... *passim*

*Boyd v. Bechtel Corp.,*
    485 F. Supp. 610 (N.D. Cal. 1979) .................................................................. 38

*In re BankAmerica Corp. Sec. Litig.,*
    210 F.R.D. 694 (E.D. Mo. 2002) ..................................................................... 38

*Bussie v. Allmerica Fin. Corp.,*
    50 F. Supp. 2d 59 (D. Mass. 1999) ............................................................. *passim*

*In re Cabletron Sys., Inc. Sec. Litig.,*
    239 F.R.D. 30 (D.N.H. 2006) .................................................................. 46, 48

*In re Cendant Corp. Litig.,*
    264 F.3d 201 (3d Cir. 2001).................................................................... 32, 38

*City of Detroit v. Grinnell Corp.,*
    495 F.2d 448 (2d Cir. 1974)......................................................................... 22

*City P'ship Co. v. Atlantic Acquisition Ltd. P'ship.,*
    100 F.3d 1041 (1st Cir. 1996)................................................................... 20, 36

*In re Compact Disc Minimum Advertised Price Antitrust Litig.,*
    216 F.R.D. 197 (D. Me. 2003)................................................................. *passim*

*In re Dataproducts Corp. S'holders Litig.,*
    No. 11164, 1991 WL 165301 (Del. Ch. Aug. 22, 1991) ................................................. 41

*D'Amato v. Deutsche Bank,*
    236 F.3d 78 (2d Cir. 2001)......................................................................... 37

*Duhaime v. John Hancock Mut. Life Ins. Co.,*
    183 F.3d 1 (1st Cir. 1999)......................................................................... 20

*Duhaime v. John Hancock Mut. Life Ins. Co.,*
    177 F.R.D. 54 (D. Mass. 1997)............................................................... *passim*

*Dura Pharms., Inc v. Broudo,*
    544 U.S. 336 (2005)............................................................................. 6, 25

*Eisen v. Carlisle & Jacquilin,*
    417 U.S. 156 (1974)............................................................................... 45

*In re Fleet/Norstar Sec. Litig.*,
    935 F. Supp. 99 (D.R.I. 1996)...................................................................................... 20, 35

*In re General Motors Corp. Pick-Up Truck FuelTank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995)................................................................................................ 23

*Grant v. Bethlehem Steel Corp.*,
    823 F.2d 20 (2d Cir. 1987)............................................................................................... 38

*Greebel v. FTP Software, Inc.*,
    939 F. Supp. 57 (D. Mass. 1996) ................................................................................... 21

*Greenspun v. Bogan*,
    492 F.2d 375 (1st Cir. 1974)...................................................................................... 22, 38

*Hawkins v. Comm'r of the N.H. Dept. of Health & Human Services*,
    No. 99-143, 2004 WL 166722 (D.N.H. Jan. 23, 2004) ............................................. 20, 22

*Headley v. Chrysler Motor Corp.*,
    141 F.R.D. 362 (D. Mass. 1991)..................................................................................... 33

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    205 F.R.D. 369 (D.D.C. 2002)......................................................................................... 24

*In re Lucent Techs., Inc. Sec. Litig.*,
    307 F. Supp. 2d 633 (D.N.J. 2004) ........................................................................ *passim*

*In re Lupron® Mktg. & Sales Practices Litig.*,
    228 F.R.D. 75 (D. Mass. 2005).............................................................................. *passim*

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002)............................................................................. 46

*Manchester Mfg. Acquisitions, Inc. v. Sears, Roebuck & Co.*,
    802 F. Supp. 595 (D.N.H. 1992)................................................................................. 40-41

*In re Nortel Networks Corp. Sec. Litig.*,
    No. 01-1855, 2006 U.S. Dist. LEXIS 93390 (S.D.N.Y. Dec. 26, 2006) ......................... 37

*In re Relafen Antitrust Litig.*,
    231 F.R.D. 52 (D. Mass. 2005)............................................................................. *passim*

*Robbins v. Koger Props., Inc.*
    116 F.3d 1441 (11th Cir. 1997) ...................................................................................... 34

*Rolland v. Cellucci*,
    191 F.R.D. 3 (D. Mass. 2000) ........................................................................................ 22

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
   904 F.2d 1301 (9th Cir. 1990) ................................................. 43

*Stoetzner v. U.S. Steel Corp.*,
   897 F.2d 115 (3d Cir. 1990)..................................................... 38

*Stumpf v. Garvey (In re TyCom Ltd. Sec. Litig.)*,
   No. 03-1352, 2006 WL 39237 (D.N.H. Jan. 6, 2006) .................... 25

*Thompson v. Metropolitan Life Ins. Co.*,
   216 F.R.D. 55 (S.D.N.Y. 2003) ................................................ 32

*In re Tyco Int'l, Ltd., Sec. Litig.*,
   185 F. Supp. 2d 102 (D.N.H. 2002).............................................. 2

*In re Tyco Int'l, Ltd., Sec. Litig.*,
   Nos. MDL 02-1335-PB, 02-266-PB, 2004 WL 2348315 (D.N.H. Oct. 14, 2004)....... 4, 26

*In re Tyco Int'l, Ltd., Sec. Litig.*,
   236 F.R.D. 62 (D.N.H. 2006) ..................................................... 8

*U.S. v. Davis*,
   261 F.3d 1 (1st Cir. 2001)....................................................... 20

*In re Williams Sec. Litig.*,
   496 F. Supp. 2d 1195 (N.D. Okla. 2007) ...................................... 30

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005)........................................... 46

**Unreported Opinions**

*In re Dollar General Corp. Sec. Litig.*,
   No. 01-388, slip op. (M.D. Tenn. Mar. 16, 2007)........................... 43

**Statutes & Administrative Codes**

15 U.S.C. § 78u-4(a)(7) ............................................................... 45

15 U.S.C. § 78u-4(b)(4) ............................................................... 25

28 U.S.C. § 1292(b) ..................................................................... 7

**Other**

Kevin M. Forde, "*What Can a Court Do with Leftover Class Action Funds?
   Almost Anything!*," The Judges' Journal, vol. 35, no. 3 (Summer 1996) ........ 43

Fed. R. Civ. P. 23(b)(3)................................................................ 44

Fed. R. Civ. P. 23(c)(2)(B) ............................................................................................................... 44

Fed. R. Civ. P. 23(e)(1)(B) ......................................................................................................... 44-45

Fed. R. Civ. P. 23(f) ........................................................................................................................ 8

## I.   INTRODUCTION

The Court-appointed lead plaintiffs in this action – the Plumbers and Pipefitters National Pension Fund ("Plumbers"), United Association General Officers Pension Plan ("UAGO"), United Association Office Employees Pension Fund ("UAOE") and United Association Local Union Officers & Employees Pension Fund ("UALUOE"), Teachers' Retirement System of Louisiana ("TRSL"), and Louisiana State Employees' Retirement System ("LASERS") (collectively, the "Lead Plaintiffs") – respectfully submit this memorandum of law in support of their motion for an order granting final approval of (i) the proposed settlement (the "Settlement") of the above-captioned action (the "Action"), and (ii) the proposed Plan of Allocation, both of which this Court preliminarily approved by Order dated July 13, 2007 (the "Hearing Order").[1] The Lead Plaintiffs respectfully submit that the proposed Settlement of $3,200,000,000 in cash, plus interest, with $2,975,000,000 being paid by or on behalf of Tyco International, Ltd. ("Tyco" or the "Company") and $225,000,000 being paid by its former auditor, PricewaterhouseCoopers LLP ("PwC"), is fair and in the best interests of investors who were damaged by the fraudulent conduct alleged in this Action.  This Settlement represents:

- the largest payment by a single defendant company in securities class action history and the largest settlement where the primary defendant did not go into bankruptcy;

- the largest collective payment by a company and its auditor;

- the second largest payment by an individual auditor (behind only KPMG's payment in Cendant) and the largest payment ever by PwC; and

- the third largest securities class action settlement of all time (behind only Enron and WorldCom, where in each case, the fraud was so pervasive that the companies were effectively liquidated).

---

[1] All capitalized terms that are not defined herein have the same meaning as set forth in the Stipulation of Settlement with Tyco International, Ltd., Michael A. Ashcroft, Mark A. Belnick and PricewaterhouseCoopers LLP dated July 6, 2007 (the "Stipulation").

The amount of the Settlement in this case is an excellent result for the Class, especially when compared to settlements in other large securities class actions.  In light of the substantial recovery obtained on behalf of absent Class Members, as well as the potential risks and difficulties that Lead Plaintiffs and the Class would have to overcome to recover damages at trial, the Settlement is fair, reasonable and adequate, and therefore should be approved.  The proposed Plan of Allocation should also be given final approval, as it has a reasonable and rational basis and fairly allocates the recovery among Class Members.

## II.     FACTUAL BACKGROUND OF THE ACTION

The Court is familiar with the background and allegations of this case.[2]   In brief summary, on January 28, 2002, Tyco disclosed that it had paid one of its own directors – Frank E. Walsh, Jr. – $20 million as a fee to help Tyco enter into a merger with CIT Group, Inc. ("CIT Group").   Following this disclosure, beginning on February 4, 2002, more than twenty-three securities class action lawsuits were filed against Tyco and its current and former executive officers, which alleged violations of the federal securities laws.  The actions were consolidated and assigned to this Court.  By Order dated November 30, 2002, the Court appointed Lead Plaintiffs and their selected counsel, Grant & Eisenhofer, P.A., Milberg Weiss LLP and Schiffrin Barroway Topaz & Kessler, LLP ("Co-Lead Counsel") to prosecute the Action for the Class.[3]

---

[2] A prior securities fraud action against Tyco based on the Company's disclosures and accounting was dismissed by this Court.  *See In re Tyco Int'l. Ltd. Sec. Litig.*, 185 F. Supp. 2d 102, 114-115 (D.N.H. 2002) ("*Tyco I*").  *Tyco I* involved claims stemming from an informal SEC inquiry into Tyco's accounting commenced in 1999 and Tyco's restatement of its financial statements for 1999 and the first two fiscal quarters of 2000.  In their consolidated complaint, plaintiffs in *Tyco I* alleged that Tyco had created the false appearance of growth through acquisitions by using improper accounting tricks, such as the manipulation of improper "cookie-jar" reserves and "spring loading."  The SEC terminated its investigation without taking any enforcement action, and this Court dismissed the plaintiffs' fraud based claims on February 22, 2002, for failure to plead fraud with particularity as required under the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  *Tyco I*, 185 F. Supp. 2d at 114-115.  The Court also dismissed the plaintiffs' claims brought pursuant to Section 11 of the Securities Act of 1933 (the "Securities Act") as time-barred under the applicable 1 year statute of limitations.  *Tyco I*, 185 F. Supp. 2d at 115-116.

[3] At the time of the November 30, 2002 Order, Milberg Weiss LLP was known as Milberg Weiss Bershad Hynes & Lerach LLP and Schiffrin Barroway Topaz & Kessler, LLP was known as Schiffrin & Barroway, LLP.

A.     THE COMPLAINT

On January 28, 2003, Lead Plaintiffs filed their Consolidated Class Action Complaint ("Complaint") in which they asserted violations of Sections 10(b), 14(a), 20(a), and 20(A) of the Securities Exchange Act of 1934 and Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, against defendants Tyco, former Chief Executive Officer L. Dennis Kozlowski ("Kozlowski"), former Chief Financial Officer Mark H. Swartz ("Swartz") and former director Frank L. Walsh, Jr. ("Walsh"), as well as former Tyco General Counsel Mark A. Belnick ("Belnick") and former Tyco director Michael A. Ashcroft ("Ashcroft") (collectively the "Tyco Defendants").   The Complaint also asserted claims against PwC, Tyco's former independent auditor.   The Complaint alleged that, during the Class Period, the Tyco Defendants manipulated Tyco's financial statements, committed numerous deceptive acts and repeatedly made false statements falling within two general categories:  (i) executive compensation and looting by Tyco's officers; and (ii) accounting fraud in connection with Tyco's acquisition of more than 700 companies.  The Complaint also alleged that PwC failed to conduct its audits of Tyco's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS") and falsely certified that Tyco's financial statements were fairly presented in accordance with Generally Accepted Accounting Principles ("GAAP").

B.     BRIEFING ON THE MOTION TO DISMISS

In its motion to dismiss filed in late March 2003, Tyco argued that it was not liable for any violations of the securities laws.  It argued that there were no actionable false statements, that statements were not made with scienter and, in connection with the more than $500 million in "looting" by defendants Kozlowski, Swartz, Belnick, Walsh and others, the Company itself was actually the victim of corporate mismanagement and should not be held liable for their

crimes.[4]  Tyco's consistent theme was that the scandal was a failure of corporate governance, not securities fraud.

Tyco further asserted that its financial reporting was largely accurate, that its roughly $1.5 billion restatement for a period of five and a half years was immaterial and that an "unprecedented" internal investigation conducted by Boies, Schiller & Flexner LLP ("Boies Schiller") yielded no evidence of pervasive accounting fraud.  Tyco insisted that a large part of the decline in its stock price was caused by an Enron effect – as investors feared Tyco would be the next company to suddenly collapse as a result of a massive accounting and financial scandal.

PwC argued that neither the looting by Tyco management nor alleged "aggressive accounting practices" caused material misstatements in Tyco's financial statements.  It further argued that it had no knowledge of the fraud.

Tyco and PwC also raised issues relating to loss causation, arguing that the Complaint must be dismissed because plaintiffs failed to show how any specific disclosure of the fraud was linked to economic losses suffered by investors.  Ultimately, the Court rejected all of Tyco's and PwC's arguments.  It specifically held that plaintiffs' allegations of loss causation were, at the pleading stage, sufficient to state a claim.  *In re Tyco Int'l, Ltd.*, Nos. MDL 02-1335-PB, 02-266-PB, 2004 WL 2348315, at *14 (D.N.H. Oct. 14, 2004) ("Reading the complaint as a whole, it thus fairly charges that Tyco's stock price declined in part because investors concluded that they could no longer credit the company's denials of accounting misconduct.  These allegations are sufficiently particular to survive a Rule 12(b)(6) challenge.").  Although defendants' arguments

---

[4] Kozlowski, Swartz, Belnick and Walsh were criminally prosecuted for various charges, including grand larceny and conspiracy, falsifying business records and violating the Martin Act, New York's general business law.  After an initial trial resulted in a hung jury, Kozlowski and Swartz were retried and found guilty on 22 of 23 counts. Belnick was tried and acquitted on larceny charges, while Walsh pled guilty to a felony conviction of the Martin Act and agreed to repay the $20 million payment he received from Tyco and to pay a $2.5 million fine.

largely were resolved in Plaintiffs' favor at the motion to dismiss stage, it is clear that Tyco and PwC would have continued to assert these arguments at summary judgment and at trial.

### C. CO-LEAD COUNSEL'S ACTIONS IN PROSECUTING THE LITIGATION AND OBTAINING THE SETTLEMENT

Over the course of more than five years, Co-Lead Counsel extensively litigated this case, engaging in a massive and virtually unprecedented document review and deposition process.[5] Shortly after their appointment as lead counsel, Co-Lead Counsel successfully moved the Court to modify the PSLRA's discovery stay in order to obtain documents which Tyco had previously produced in connection with state and federal investigations. This Court's order was followed quickly by a request for production of documents to Tyco. From this point in 2002 through the announcement of settlement in 2007, Co-Lead Counsel's document discovery efforts continued without interruption. Co-Lead Counsel organized teams to propound and respond to discovery requests from various parties and non-parties throughout the litigation. This included, *inter alia*, the following projects:

- Propounding over seven hundred requests for admissions ("RFAs"), document requests and interrogatories;

- Drafting responses and objections to hundreds of RFAs, document requests and interrogatories from Tyco, PwC, and the Individual Defendants;

- Preparing and responding to hundreds of discovery-related letters from the parties regarding document production, production deficiencies and privilege logs; and

- Facilitating document discovery efforts on behalf of all of the other plaintiffs' counsel in shareholder litigation against Tyco also pending before the Court, including, but not limited to the ERISA action, litigation brought by former shareholders of Tycom, individual actions brought by pension funds such as New Jersey and pro se litigants.

---

[5] The work performed by Co-Lead Counsel to obtain the favorable judgment for the Class is more fully set forth in Co-Lead Counsel's Fee petition and accompanying Declaration of Richard S. Schiffrin, Jay W. Eisenhofer and Sanford P. Dumain in Support of Proposed Class Action Settlement, Plan of Allocation and Petition for an Award of Attorneys' Fees and Reimbursement of Expenses ("Joint Declaration"). Citations to the Joint Declaration are in the format: "JD at ¶ __."

As a result of Lead Plaintiffs' efforts, Defendants ultimately produced 82.5 million pages of documents, which Co-Lead Counsel undertook Herculean efforts to review.  In fact, Tyco and PwC continued to produce documents right up until the eve of settlement.

While still in the process of completing their document review, Co-Lead Counsel, on behalf of all plaintiffs, worked with defense counsel to develop an aggressive deposition protocol.  The protocol was negotiated between the parties over several months.  The protocol was ambitious, yet efficient, calling for up to 400 depositions to be taken on a three-track schedule – meaning that as many as three depositions could occur on any given day.  The deposition protocol was administered by a deposition committee with representatives from all parties.  Co-Lead Counsel worked diligently with the deposition scheduling committee of all parties to ensure that depositions were taken in accordance with Co-Lead Counsel's overall litigation strategy and with minimal delay between deponents.

Ultimately, more than 220 depositions were taken during the pendency of the Action. These depositions occurred all over the country, with many of them taking place in New York, Florida, Massachusetts and New Hampshire.  The amount of document discovery far exceeds the discovery completed in the top sixteen largest securities class action lawsuits combined.  *See* JD ¶ 212 and Ex. 11.

D.    OTHER SIGNIFICANT MOTIONS

1.    Motions For Judgment On The Pleadings And Summary Judgment

After the denial of the motion to dismiss, the issue of loss causation was thrust into the public spotlight by the Supreme Court's consideration of the issue in *Dura Pharms., Inc v. Broudo*, 544 U.S. 336 (2005).  After the *Dura* decision, Tyco filed a Motion For Revision Of Court Order Or, Alternatively, For Judgment On The Pleadings (the "Motion for Judgment on the Pleadings").  Defendants Ashcroft, Kozlowski, Walsh and Belnick also moved for judgment

on the pleadings or joined in Tyco's motion, while PwC obtained permission from the Court to file a Motion for Partial Summary Judgment on Loss Causation.  Tyco argued that (i) *Dura* represented a controlling change in law; (2) the Walsh payment did not correct any previous misrepresentations; and (3) even if it did, *Dura* mandated the dismissal of claims of investors who sold their Tyco stock prior to January 28, 2002.  PwC argued that Tyco's accounting fraud was not specifically disclosed until after the Class Period and the falsity of its audit opinions was not disclosed, if at all, until the Company restated its financial statements.

Lead Plaintiffs responded by illustrating that *Dura* did not change the law but merely invalidated the Ninth Circuit's "artificial inflation" standard, and that, in fact, *Dura* cited with approval, the same prevailing legal standard and caselaw the district court had applied to the Complaint's allegations of loss causation in its October 14, 2004 decision.  Plaintiffs also explained that, consistent with *Dura*,  artificial inflation can be removed from a company's stock price by disclosures which don't explicitly correct prior misrepresentations, and that loss causation does not require a corrective disclosure followed by an immediate stock price drop.

The Court denied the Tyco Defendants' motions on December 1, 2005, declining to reconsider its October 14, 2004 decision because *Dura* did not change the law the Court relied upon in reaching that decision.  PwC's motion was denied from the bench after oral argument on February 16, 2007.  PwC then filed a motion for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b), which plaintiffs opposed.  PwC's motion was still pending when a settlement was reached with PwC.

### 2.    Class Certification

On January 14, 2005, Lead Plaintiffs moved to certify a class of persons who purchased or acquired Tyco securities from December 13, 1999 through June 7, 2002.  Both Tyco and PwC opposed Lead Plaintiffs' motion.  Tyco and PwC again raised the issue of loss causation in

opposition to Lead Plaintiffs' motion for class certification.  Tyco also argued that there were irreconcilable conflicts among class members and that certain proposed representatives were not proper.  After extensive briefing, the Court granted Lead Plaintiffs' Motion to Certify a Class on June 12, 2006 on behalf of the following class representatives: LASERS, TRSL, Plumbers, UAGO, UAOE and UALUOE.  *See In re Tyco Int'l. Ltd*. 236 F.R.D. 62 (D.N.H. 2006).  Tyco appealed the Court's Class Certification Order to the United States Court of Appeals for the First Circuit pursuant to Fed R. Civ. P. 23(f).  The First Circuit denied Tyco's appeal.

### 3. Ensuring Joint and Several Liability In The Event Tyco Split into Three Separate Companies

On January 13, 2006, Tyco filed with the U.S. Securities & Exchange Commission ("SEC") a Board-approved plan to divide into three separate public companies.  Since the plan did not provide that the separate successor entities would be jointly and severally liable for any contingent liabilities represented by the claims asserted in this Action, Lead Plaintiffs took action to ensure that the Class would be able to enforce a potential judgment against any and all successor entities.  On February 14, 2006, Lead Plaintiffs filed a Complaint in the District of New Hampshire and moved – on an expedited basis – for an injunction mandating that Tyco's successor companies would be jointly and severally liable for damages arising out of the alleged fraud in this Action.  Following a hearing before this Court on March 2, 2006, the parties entered into a stipulation addressing the Tyco successor companies' joint and several liability.

### 4. Other Matters

In addition to the foregoing examples, the parties engaged in motion practice over a host of additional issues.  For example, Lead Plaintiffs filed a motion for partial summary judgment on the issue of Section 11 liability for false and misleading statements contained in registration statements disseminated to investors in connection with enumerated public offerings conducted

by Tyco throughout the Class Period. Lead Plaintiffs also engaged in extensive motion practice regarding a host of discovery issues. For example, Lead Plaintiffs sought access to draft reports prepared by Boies Schiller in the course of their investigation of Tyco, sought to depose forensic accountants who participated in Boies Schiller's investigation and sought to compel the production of documents from outside the Class Period and other materials. Lead Plaintiffs also opposed motions by Tyco seeking to shift the costs of document production to the Class.

In addition to the significant motion practice described in part above, Lead Plaintiffs and Co-Lead Counsel undertook a variety of other actions to obtain the Settlement, including:

- Interviewing, retaining and working with experts in preparation for depositions, trial and mediation sessions (JD ¶¶ 61, 85-87);

- Preparing detailed mediation statements and Power-Point presentations for lengthy mediation sessions, attending those sessions and engaging in countless other discussions with Defendants' counsel over terms of settlement (JD ¶¶ 88-97); and

- Negotiating and drafting the final settlement papers now being presented to the Court, and the Settlement Notice and proof of claim that was mailed to Class Members (JD ¶¶ 10-11, 96-97, 102-05).

Lead Plaintiffs respectfully refer the Court to the Joint Declaration submitted herewith for additional details regarding the procedural history and discovery undertaken in this Action.

### E. HISTORY OF SETTLEMENT NEGOTIATIONS AND ULTIMATE SETTLEMENT

The Settling Parties engaged in numerous formal and informal negotiations and mediation sessions over the course of several years. The first mediation attempt between the Lead Plaintiffs and Tyco was held on January 13, 2004 with the assistance of Judge Donald E. Ziegler, a retired district court judge. After approximately 90 minutes of presentations by both sides, Defendants walked out of the mediation.

The parties did not meet again until almost two years later when both sides agreed to a new mediator and a new mediation process. Beginning in the fall of 2005 and continuing

through March of 2007, the parties participated in no fewer than seven formal (and numerous informal) mediation sessions facilitated by retired Judge Stanley Sporkin. Judge Sporkin spent twenty years with the SEC, the last seven as the Director of the Division of Enforcement. Judge Sporkin was also a United States District Judge for the District of Columbia for fourteen years. Judge Sporkin quickly assessed that Tyco was not prepared to pay anywhere near the amount that Lead Plaintiffs were seeking to resolve the Class's claims. *See* Ex. 2 (Statement of Stanley Sporkin). Needless to say, Lead Plaintiffs faced an incredibly difficult challenge thereafter. After the first few sessions with Judge Sporkin were unsuccessful in materially bridging the chasm between the two sides, Judge Sporkin appointed Chief Judge Eugene R. Sullivan, a former chief judge of the United States Court of Appeals (Armed Forces) as an "advocate" for Tyco and Marvin Jacob, a certified mediator in the United States District and Bankruptcy Court for the Southern District of New York who was Associate Regional Administrator for the New York Regional Office of the SEC from 1964 to 1979, as "advocate" for Plaintiffs. Multiple mediation sessions (some lasting multiple days at a time) ensued with both sides being given the opportunity to make presentations through damage experts and having the opportunity to "cross-examine" the other side's experts. In addition to damage experts, Co-Lead Counsel prepared and presented detailed Power Point presentations designed to demonstrate how the discovery supported our allegations. During these sessions, Tyco consistently presented numerous defenses which primarily centered upon the issues of loss causation and damages.

After several relatively small moves by each side over time, a serious push was made in March of 2007 to resolve the case as merits discovery started to wind down, wherein each side brought its decision makers, including Tyco's Chief Executive Officer, Ed Breen, for a full day session. While the gap was significantly bridged during this session, the parties were still unable to reach an overall resolution. Both sides continued to compromise in private telephone

conversations in April and May, as further progress on settlement talks was made.  Finally, a settlement was reached with Tyco, Ashcroft and Belnick for $2.975 billion on May 15, 2007. The settlement terms included:  (i) a cash payment by Tyco of $2.975 billion; (ii) the assignment of Tyco's potential claims (including malpractice claims for professional negligence) against PwC to the Class; and (iii) the assignment of the Class's claims against Kozlowski, Swartz and Walsh to Tyco in return for Tyco's agreement to pay 50% of any net recovery obtained against those individuals to the Class.

Armed with the additional leverage of Tyco's potential claims against PwC, Lead Plaintiffs again commenced negotiations with PwC in earnest, this time with the assistance of retired Judge Nicholas Politan.  The parties had conducted an initial mediation session approximately one year earlier with hardly any progress.  The negotiations were difficult, but significant strides were made quickly as both sides were extremely interested in resolving the entirety of the Action in one single settlement.  Ultimately, an agreement in principle was reached with PwC in the last week of June of 2007, for the sum of $225 million.

F.    THE TERMS OF THE SETTLEMENT

The Settlement provides for the payment by Tyco of $2.975 billion in cash, plus interest, and the payment by PwC of $225 million in cash, plus interest.  As Co-Lead Counsel insisted upon the immediate funding of the Settlement by Tyco and PwC, rather than allowing the Settlement to be funded in multiple stages or at final approval, the Class has already earned an additional $52,296,940.61 in interest, bringing the overall Settlement Fund to $3,252,296,940.61 as of October 18, 2007.  JD ¶ 11.  Additionally, the Settlement provides for the assignment of the Class's claims against non-settling defendants Kozlowski, Swartz and Walsh to Tyco.  In return, Tyco agreed to pay to the Class, 50% of any net recovery obtained against those individuals (both on Tyco's own claims against those individuals and on claims assigned to Tyco by the

11

Class).  These amounts obtained from Tyco shall be added to the Settlement Fund (the "Officer Assigned Claims").

As set forth above, the process by which the Settlement was reached leaves no doubt that the negotiations were conducted at arm's length.  Furthermore, the settlement amounts obtained by Lead Plaintiffs are staggering.  As noted above, the $2.975 billion settlement with Tyco represents the largest cash payment in the history of securities litigation by a single corporate defendant.  The $225 million settlement with PwC represents the largest settlement payment PwC has ever paid to resolve a securities class action and is the second largest auditor settlement in securities class action history.  *See* JD Ex. 11.

### G.   THE SETTLEMENT REPRESENTS A SIGNIFICANT PORTION OF THE TOTAL DAMAGES SUFFERED BY THE CLASS

#### 1.   The Damages Methodology

To establish damages, Lead Plaintiffs retained Professor Mark Zmijewski, the Leon Carroll Marshall Professor of Accounting and Deputy Dean at the University of Chicago, Graduate School of Business.  He also is a principal of the damages consulting firm known as Chicago Partners, a consulting firm that primarily works on behalf of defendants in securities litigation.  Professor Zmijewski and his team primarily employed an event study methodology to calculate the damages suffered by investors as a result of the fraud.[6]  Professor Zmijewski's report is attached as "Exhibit 1" (with accompanying Exhibits A-1 through A-11) to the Joint Declaration.

Under a plaintiffs'-style event study methodology, Professor Zmijewski calculated damages for Tyco stock at $10.83 billion and for bonds at $900 million.  In calculating this

---

[6] As discussed below (*see* p. 17, *infra*) Professor Zmijewski also prepared a second model that measured the impact Tyco's restatement would have had on Tyco's stock price had the information that was disclosed in the restatement been made in a timely fashion (in anticipation that Defendants would argue that such a model should be applied to measure damages).

damages amount, he concluded that there were eight (8) days on which there were "corrective disclosures"[7] that caused Tyco's stock price to decline as a result of information that could be causally related to the fraud that was alleged in the Action.  Although there were many more days upon which Tyco's stock price moved downward as a result of company-specific information, it was only these eight days that he concluded could be causally linked to the fraud. The eight days identified by Professor Zmijewski upon which there were corrective disclosures related to the fraud are:

- January 2, 2002 – a research firm called "SEC Insight" reported that Tyco was the subject of a renewed SEC investigation into its accounting.  Following that report, Tyco shares immediately fell by 2.8% from $58.90 to $57.25.[8]

- January 23, 2002 – Tyco's stock price declined more than 5%, from $47.55 to $45.10, after the company announced a plan to split into four separate companies. News articles again suggested that the stock price drop was attributed, at least partially to "renewed worries about the company's accounting practices," although there were no announcements or events that specifically revealed that Tyco's accounting was improper.

- January 29, 2002 – Tyco's stock price declined by almost 20%, from $42.00 to $33.65, after Tyco filed a Proxy Statement which (i) acknowledged that a Tyco director, Frank Walsh and a charity under his control were paid a previously undisclosed $20 million fee in connection with Tyco's acquisition of CIT Group on June 1, 2001; and (ii) disclosed for the first time that Tyco's auditor, PwC received three times as much ($39 million) from Tyco in non-audit fees than it did for audit fees ($13 million) in 2001.

- April 25, 2002 –  Tyco's stock price declined by almost 20%, from $25.90 to 20.75, after Tyco: (i) lowered its forecast for fiscal 2002; (ii) reported that it was abandoning a plan to split itself into four companies; and (iii) announced plans for an initial public offering of CIT Group after unsuccessfully trying to sell the finance subsidiary, and various credit rating agencies downgraded Tyco's senior unsecured debt rating.

---

[7] A corrective disclosure day is a day in which information allegedly fraudulently withheld from the market by Defendants made its way into the market and there is a corresponding negative statistically significant movement in the stock price.  An inflation creating day is one in which information that is alleged to be false or would not have reached the market but-for Defendants' fraud corresponds to a statistically significant positive change in the stock price.

[8] Unless otherwise noted, Tyco's historical stock prices set forth herein refer to the stock's closing price.

- May 28, 2002 – Tyco's stock price declined by 6.3% from $23.70 to $22.20, after it was revealed that Lehman Brothers Holdings Inc. abandoned a $5 billion bid to buy CIT Group.

- June 3, 2002 – Tyco's stock price declined by almost 27%, from $21.95 to $16.05, after it was revealed that Dennis Kozlowski had resigned as chairman and left the Tyco board for "personal reasons."

- June 6, 2002 – Tyco's stock price declined by more than 15% from $17.30 to $14.60, after it was revealed that the New York prosecutors were investigating whether Kozlowski had engaged in improper uses of Tyco funds, including the use of company funds to purchase his $18 million New York apartment, and Tyco's new CEO announced that Tyco might take as much as a $6 billion charge against earnings following the disposal of its CIT Group.

- June 7, 2002 – Tyco's stock price declined by more than 30% from $14.60 to $10.10, after it was revealed that Tyco was conducting an internal investigation into Kozlowski's use of company funds to purchase his New York apartment and other matters, and Standard & Poor's again lowered Tyco's senior unsecured debt rating.

Although all of these above dates were determined by Professor Zmijewski and his team to be related to the fraud, some of these dates are more clearly related to the alleged fraud and/or less confounded by unrelated information than others. In order to reflect the relative strength or weakness of including each corrective disclosure, Professor Zmijewski's model weighted each by a factor to reflect the probability they would be included in any damages analysis adopted by the jury. The weights utilized are based upon the concept that confounded[9] days receive less weight than un-confounded days and days that more clearly reveal previously withheld information receive greater weight than others. For example, the January 28, 2002 disclosure of the Walsh payment and PwC non-audit fees, which clearly revealed critical information related to the fraud was assigned a weight of 90% while the April 24, 2002 revelations concerning Tyco's abandonment of its split-up plan, Tyco's IPO for CIT Group and the downgrade of Tyco's long-term debt rating, revealed information which less clearly related to the fraud, was

---

[9] On a "confounded" day, information that is both related to and unrelated to the fraud reaches the market.

assigned a weight of 10%.  This damages methodology underlies the proposed Plan of Allocation that we have submitted to the Court.

Aggregate damages are then determined using a two-part model – one for institutions and one for individuals.   For institutions, Professor Zmijewski obtained quarterly holdings information and estimated damages for each institution independently.   For individuals, he applied what he calls an "actual trader model."   This model uses empirical trading data from brokerage accounts of individual traders to estimate a propensity to sell that varies based on length of holding.   He used this empirical trading propensity information along with the total non-institutional volume observed on each day to simulate the trading pattern that occurred.   The total of $10.83 billion is based upon $7.11 billion from institutional traders and $3.72 billion from individuals.

The overall approach for estimating bond inflation mirrors the methodology for common equity in that it is based upon an event study methodology.   The price series for most Tyco bonds, however, has missing information.   As a result, plaintiffs' expert conducted the event study on representative bonds and applied those results to Tyco's other debt securities.   There are two broad types of Tyco debt instruments that traded during the Class Period: coupon debt and zero-coupon debt.    Professor Zmijewski selected the bond from each of these two groups that had the most complete information to conduct the study and then used that information for the remaining bonds in each group.   He used inflation measure in constant percentage terms to properly account for the difference in price level for some of the bond issues to which the inflation is applied.   Finally, Professor Zmijewski treated one bond separately from the remainder.  Tyco's Liquid Yield Option Note was a convertible offering issued prior to the Class Period.  Because Tyco's stock price had risen so dramatically prior to the Class Period, this

instrument was "in the money" and its price tracked Tyco's stock price rather than debt prices. As a result, inflation for the Liquid Yield Option Note is based on Tyco's equity inflation.

### 2.   The Settlement Represents A Significant Portion Of Total Damages As Determined By Plaintiffs' Expert

The Settlement represents a recovery of approximately 27% of total damages as calculated by Lead Plaintiffs' expert.  However, depending on the number of valid claims filed, Class Members that file valid Proofs of Claims could recover more than 27% of their losses that are attributable to the alleged fraud.  In order to fairly present the maximum recovery per share under the Settlement in the Notice, as required by the PSLRA, Co-Lead Counsel applied 92% of the Settlement Amount ($2.944 billion) to reflect the portion of the damages attributable to Tyco stock ($10.8 billion in stock damages / $11.7 billion overall damages) and compared that figure to the overall damages ($11.7 billion) to result in a recovery for class members who purchased Tyco stock during the Class Period of approximately 27% of recoverable damages, presuming that 100% of possible claimants were to file valid claims.

Furthermore, Professor Zmijewski has not discounted his damages analysis to account for the fact that most large institutional investors typically have holdings purchased prior to the commencement of a class period that are subsequently sold during the class period.  Tyco argued vigorously throughout the case that an "offset" should be applied against any Class Period losses to account for sales of pre-Class Period purchases at allegedly inflated prices.[10]  It is both our experience and the opinion of Professor Zmijewski that such "offsets" can reduce overall damages by approximately 25% and thus, if Tyco was successful with this argument, our expert's overall damage figure of $11.7 billion would have to be reduced to $9 billion.  Under

---

[10] The term "offset" refers to the reduction or disallowance of an investor's otherwise cognizable losses (due to the purchase of artificially inflated Tyco securities during the class period) to the extent the investor also has ascertainable gains (due to the sale of artificially inflated Tyco securities during the class period that the investor purchased prior to the class period before the securities were artificially inflated due to fraud).

such an analysis, the $3.2 billion settlement becomes even more impressive, potentially representing a recovery in excess of 45% of recoverable damages, even presuming a 100% claims filing rate.

Professor Zmijewski also prepared a second model, based strictly on Tyco's reported restatement. To calculate inflation based on the earnings restatement, he used what is known as an Earnings Response Coefficient ("ERC") Methodology. This method, which was intended to estimate damages defendants might seek at trial, involves using the restated earnings information to create a "but-for" path for earnings expectations and actual earnings reports. In each quarter, he calculated the level of the "unexpected restatement" which is then treated as an earnings surprise. This model reflected damages of $2 to $3 billion, without offsets. Thus, the recovery of $3.2 billion for the Class may exceed actual, provable damages.

### H.    THE PLAN OF ALLOCATION

Upon final approval of the Settlement, the $3,200,000,000 cash settlement amount, which was paid into escrow accounts at a number of major banks starting on May 31, 2007, plus interest earned since that date, less administrative and notice costs, taxes and related expenses, and any award of attorneys' fees and expenses to Co-Lead Counsel (the "Net Settlement Fund"), will be distributed pursuant to the proposed Plan of Allocation described in the Notice to Class Members who submit timely and valid Proof of Claim forms ("Authorized Claimants").[11]

Under the proposed Plan of Allocation, an independent claims administrator, The Garden City Group, Inc. ("GCG"), will calculate each Authorized Claimant's "Recognized Claim," based on the information supplied in the Proof of Claim with respect to each claimant's

---

[11] As explained above, the Net Settlement will also include amounts received arising from the Officer Assigned Claims.

purchases or acquisitions of Tyco securities.  These Recognized Claim calculations will be used to proportionately allocate the Net Settlement Fund among all Authorized Claimants.

The proposed Plan of Allocation allocates the Net Settlement Fund among Class Members based upon the damages analysis prepared by Professor Zmijewski.  Utilizing universally accepted techniques and models, Professor Zmijewski estimated the amount by which the market prices of Tyco common stock and notes were artificially inflated on each day of the Class Period, thereby allowing the amount of damages in each purchase of Tyco securities to be measured as a basis for allocating the Net Settlement Fund.  The estimate of daily inflation is the result of the damages analysis described above.

Additionally, Co-Lead Counsel took the extraordinary step of retaining two additional independent experts, R. Alan Miller and Dr. Kenneth D. Gartrell, to review the proposed Plan of Allocation and to opine on its reasonableness and fairness from the perspective of purchasers of (i) Tyco stock and (ii) Tyco bonds and Tyco options, respectively.  Mr. Miller has opined that the proposed Plan of Allocation is reasonable and fair from the perspective of investors who purchased (or otherwise acquired) Tyco stock during the Class Period.  *See* Ex. 4 (Affidavit of R. Alan Miller).  Dr. Gartrell has opined that the proposed Plan of Allocation is reasonable and fair from the perspective of investors who purchased (or otherwise acquired) Tyco bonds and/or Tyco options during the Class Period.  *See* Ex. 5 (Affidavit of Dr. Kenneth D. Gartrell).[12]

Upon the Court's approval of the Settlement, the Plaintiffs and members of the Class will release, and shall be enjoined from prosecuting, settling Defendants and their related parties for all claims that were or could have been asserted in the Action.

---

[12] R. Alan Miller, President of Philadelphia Investment Banking Company, and Dr. Kenneth D. Gartrell, Managing Director at LECG, LLC are independent financial and economic consultants, with extensive experience in damages computation and analyses.  Messrs. Miller and Gartrell's relevant qualifications and experience are, in each case, set forth in detail in their respective reports and attached resumes.

I.    THE NOTICE OF THE SETTLEMENT AND THE CLASS'S AFFIRMING REACTION

Pursuant to the Hearing Order, more than 2.4 million copies of the Notice of Proposed Settlement of Class Action, Motion for Attorneys' Fees and Fairness Hearing (the "Notice") were mailed to Class Members or their nominees.[13]  In addition, a summary notice was published on at least one occasion in *USA Today, The New York Times, The Wall Street Journal, The Financial Times, The Sun Sentinel, Palm Beach Post, Chicago Times, The Union Leader* (New Hampshire) and over the *PR Newswire* on August 10, 2007.[14]  The Notice contained a detailed description of the history of the Action, the terms of the proposed Settlement, the manner in which the Settlement Fund will be allocated among participating Class Members, a description of the claims to be released, a statement of the attorneys' fees and costs that will be sought, the deadline and procedure for filing objections and proof of claim forms, and the time and place of the Fairness Hearing.  A copy of the Plan of Allocation was attached to the Notice.

Despite this extensive Notice Program, only five objections to the adequacy of the Settlement itself or Settlement Administration procedures and only one objection to the Plan of Allocation were received.[15]  These objections, which are addressed in full below, represent a *de minimus* number (.0005% of the 2.4 million notice packages disseminated in accordance with the Hearing Order), and thus provide overwhelming support for the Settlement's approval by this

---

[13]  The Notice is attached as Exhibit A to the Affidavit of Stephen J. Cirami, Assistant Vice President of Operations of The Garden City Group, Inc., the Claims Administrator in this Action (the "GCG Affidavit").  The GCG Affidavit is included as Exhibit 3 to the Joint Declaration.

[14]  The Summary Notice is attached as Exhibit A to the Affidavit of George Bauer, III Re: Publication Of The Summary Notice Of Proposed Settlement Of Class Action And Settlement Hearing (the "Bauer Affidavit").  The Bauer Affidavit is included as Exhibit 12 to the Joint Declaration.  The process of disseminating the Claim Packet and the publication of the summary notice are jointly referred to as the Notice Program.

[15]  Objections from 20 persons, entities or groups were received, four of which raised multiple issues, resulting in twenty-four total objections.  Of these objectors, five challenged the size of the settlement, while eight challenged some other aspect of the settlement.  All thirteen objections challenging any aspect of the settlement are addressed below.  *See* Section III(H)(2), *infra*.  Co-Lead Counsel also have received 290 requests for exclusion.

Court.  In addition to being *de minimus*, as explained in section III(H)(2), *infra*,  the objections

lack merit.

## III.    THE COURT SHOULD GRANT FINAL APPROVAL TO THE PROPOSED SETTLEMENT AND PLAN OF ALLOCATION

The proposed Settlement is fair, reasonable, and adequate and should be approved by the

Court.  In addition, the proposed Plan of Allocation has a reasonable and rational basis and is fair

and equitable to Class Members and should be approved by the Court.[16]

### A.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

Settlement approval is within the Court's discretion, which should be exercised in light of

the longstanding and "strong public policy in favor of settlements."  *U.S. v. Davis*, 261 F.3d 1, 27

(1st Cir. 2001) (citation omitted).  *See also In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99, 105

(D.R.I. 1996) ("The district court's discretion is circumscribed by the long-recognized policy of

encouraging settlements").  In evaluating whether final approval should be granted to a class

action settlement under Rule 23(e) of the Federal Rules of Civil Procedure, the Court must

determine whether the proposed settlement is fair, reasonable and adequate.  *See Duhaime v.*

*John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 7 (1st Cir. 1999).

A proposed class action settlement enjoys a strong presumption that it is fair, reasonable

and adequate if, as is the case here, it was the product of arm's-length negotiations conducted by

experienced and capable counsel after "sufficient discovery has been provided."  *City P'ship Co.*

*v. Atlantic Acquisition Ltd. P'ship.*, 100 F.3d 1041, 1043 (1st Cir. 1996); *see also Hawkins v.*

*Comm'r of the N.H. Dept. of Health & Human Services*, No. 99-143, 2004 WL 166722, at *5

(D.N.H. Jan. 23, 2004) ("A presumption in favor of the proposed settlement arises when

---

[16]    The various facts supporting final approval of the proposed Settlement and Plan of Allocation are only summarized herein.  The Class Representatives respectfully refer the Court to the Joint Declaration for a detailed discussion of the litigation risks and other factors supporting final approval of the Settlement and the proposed Plan of Allocation.

sufficient discovery has been provided, counsel have experience in similar cases, and the parties have bargained at arms-length").

Moreover, under the PSLRA, a settlement reached under the supervision of certified representatives who are institutional investors, as in this case, is entitled to an even greater presumption of reasonableness.  As stated in the Senate Committee Report issued in support of the PSLRA:  "'Institutions with large stakes in class actions have much the same interests as the plaintiff class generally; thus, courts [can] be more confident settlements negotiated under the supervision of institutional plaintiffs [are] fair and reasonable . . . .'"  *See also Greebel v. FTP Software, Inc.*, 939 F. Supp. 57, 63-64 (D. Mass. 1996) (quoting Senate Committee Report).  In the instant Action, the Class received the dual benefit of institutional investors serving as Lead Plaintiffs and the Settlement being reached in the context of a formal mediation process presided over by several former federal judges.

The First Circuit has not established a formal set of factors to guide a court's assessment of a proposed settlement.  *See In re Lupron® Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 93 (D. Mass. 2005) ("the First Circuit has not established a formal protocol for assessing the fairness of a settlement"); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 206 (D. Me. 2003) ("There is no single test in the First Circuit for determining the fairness, reasonableness and adequacy of a proposed class action settlement").  Rather than applying "a single inflexible litmus test," in making the fairness determination the Court should engage in a "studied review of a wide variety of factors bearing on the central question of whether the settlement is reasonable in light of the uncertainty of litigation." *Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 72 (D. Mass. 1999).  Courts in this Circuit have considered the following factors in evaluating the fairness of a class action settlement: (1) the potentially significant obstacles to a recovery; (2) the complexity and likely duration of the litigation; (3) the

stage of the proceedings at which the settlement was reached; (4) the amount of the settlement in light of the risks of litigation; (5) whether the settlement was reached after arm's-length negotiations and the opinion of qualified counsel; and (6) the reaction of the Class to the proposed settlement. *See, e.g., Hawkins*, 2004 WL 166722, at *5; *Rolland v. Cellucci*, 191 F.R.D. 3, 8 (D. Mass. 2000).[17]

Moreover, "[i]n evaluating the substantive fairness of a class action settlement, the court cannot, and should not, use as a benchmark the highest award that could be made to the plaintiff[s] after full and successful litigation of the claim[s]." *Duhaime v. John Hancock Mut. Life Ins. Co*., 177 F.R.D. 54, 68 (D. Mass. 1997).  As the First Circuit has observed:

> [A]ny settlement is the result of a compromise – each party surrendering something in order to prevent unprofitable litigation, and the risks and costs inherent in taking litigation to completion. A district court, in reviewing a settlement proposal, need not engage in a trial of the merits, for the purpose of settlement is precisely to avoid such a trial.

*Greenspun v. Bogan*, 492 F.2d 375, 381 (1st Cir. 1974).  *See also Compact Disc*, 216 F.R.D. at 211 ("As supervising judge, I am not to prejudge the merits of the case . . . and I am not to second-guess the settlement; I am only to determine if the parties' conclusion is reasonable"); *In re Lupron® Mktg.*, 228 F.R.D. at 97 (the court should not "hypothesize about larger amounts that might have been recovered").

---

[17]  Two recent district court decisions in this Circuit have applied the factors as articulated by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) which are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*See In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 72 (D. Mass. 2005); *In re Lupron® Mktg.*, 228 F.R.D. at 93-94. While stated somewhat differently, both analyses support the Settlement's approval.

As set forth below, when assessed in light of the foregoing criteria, the proposed Settlement is fair, reasonable and adequate and should be granted final approval.

### B.    THE POTENTIALLY SIGNIFICANT OBSTACLES TO A RECOVERY

In assessing whether a proposed settlement is fair, reasonable and adequate, the Court must balance the immediacy and certainty of a recovery for the Class against the risks of continuing litigation.   *See Compact Disc*, 216 F.R.D. at 207 (approving settlement after comparing "the value of the settlement . . . [with] the relief the plaintiffs might recover after a successful trial and appeal, discounted for risk, delay and expense"); *Duhaime*, 177 F.R.D. at 69 (approving settlement which "provide[d] class members with timely relief without having to risk the uncertainty of outcome, duration, and expense inherent in continuing the litigation"); *see also In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 74 (D. Mass. 2005) ("'[T]he present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement'") (quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods.*, 55 F.3d 768, 806 (3d Cir. 1995)). While the Lead Plaintiffs believe that the claims asserted in the Action are meritorious, there were substantial risks to achieving a better result for the Class through continued litigation, as discussed below.

### 1.    The Risks Of Establishing Liability

As explained above, Tyco argued throughout the Action that the alleged improper actions were all the product of a failure of corporate governance, not securities fraud, and that in connection with the more than $500 million in looting by certain Individual Defendants, the Company itself was actually the victim of corporate mismanagement and should not be held liable for the crimes of these individuals.  Similarly, PwC argued that it had been deceived by wrongdoers at Tyco and could not be blamed for failing to discover the looting and accounting

irregularities.  Both Tyco and PwC took the position that Tyco's accounting was predominantly proper or, at the very least, the applicable accounting concepts were unclear; that the Defendants operated in good faith and Lead Plaintiffs could not prove Defendants' scienter; and that the alleged misstatements were not material.  Both Tyco and PwC also challenged the causal connection between the alleged misstatements and the decreases in stock price and argued that Tyco's stock price decline was merely an irrational overreaction by stockholders in the wake of Enron's historic collapse.

If Defendants prevailed on any of their defenses and arguments, Lead Plaintiffs' ability to recover on behalf of the Class would have been substantially impaired or eliminated.  While Lead Plaintiffs were confident that they could meet their burden of proving liability, there was no guarantee that a jury would not sympathize with the Defendants under these facts and circumstances.  These risks demonstrate that the Settlement is reasonable under the circumstances.  *See In re Lupron® Mktg.*, 228 F.R.D. at 97 (approving class action settlement in light of "plaintiffs' principle risks" with respect to establishing liability, including the "formidable, albeit not insurmountable obstacles in presenting to a lay jury a clear, and yet legally sufficient, narrative of the evidence"); *Duhaime*, 177 F.R.D. at 68-69 (approving class action settlement where "plaintiffs would face substantial obstacles to success if litigation were to proceed on the merits as . . . a class action").  As the court noted in granting final approval in *In re Relafen*, 231 F.R.D. at 74, "'[a]lthough fully litigating the claims through trial could possibly result in a higher recovery, the settlement represents a necessary compromise between inherent risks of doing so and a guaranteed cash recovery.'"  (quoting *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 394 (D.D.C. 2002)).

### 2.     The Risks Of Establishing Loss Causation

Another significant risk confronting Lead Plaintiffs was the requirement that they prove loss causation.   Loss causation is a required element that must be pled and proved as a prerequisite to recovery under a Section 10(b) claim.  15 U.S.C. § 78u-4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages"); *Dura Pharms., Inc. v. Broudo*, 544 U.S. at 338 ("A private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss").  In addition, "the absence of loss causation is an affirmative defense to liability in a Section 11 claim."  *Stumpf v. Garvey (In re TyCom Ltd. Sec. Litig.)*, No. 03-1352, 2006 WL 39237, at *1 (D.N.H. Jan. 6, 2006).

Loss causation became the primary issue for all of Lead Plaintiffs' claims in this Action. While, as explained above,  Lead Plaintiffs repeatedly prevailed on this issue on Defendants' motions to dismiss, for judgment on the pleadings and for partial summary judgment, and on Lead Plaintiffs' motion for class certification, the issue of whether Lead Plaintiffs could actually prove that misstatements by Tyco and PwC were a proximate cause of investors' economic losses was far from resolved at the time of the Settlement.  It was clear that the Defendants intended to aggressively argue the absence of proof of loss causation, and clear that the Court intended to carefully consider such arguments as the case progressed through summary judgment and trial.

Defendants had a number of seemingly attractive arguments at their disposal.  First, none of the disclosure events tied to eight (8) corrective disclosures identified by Professor Zmijewski in his report involved an explicit admission of fraud by Tyco or PwC.  Thus, the Defendants have consistently argued that Tyco's stock price declines were the result of other market factors

unrelated to the fraud at Tyco and were the result of the market's reaction to the growing corporate governance scandal engulfing and disrupting Tyco management, and constituted an overreaction by investors who feared (incorrectly) that Tyco could be the next Enron or WorldCom.  Defendants almost certainly would argue that each of the eight (8) corrective disclosure days identified by Professor Zmijewski were not in fact disclosures of fraud at Tyco.

For instance, the 2.8% drop in Tyco's stock price on January 2, 2002 arguably did not reflect any revelation of fraud but instead was due only to a false rumor of a renewed SEC investigation.  The 5% drop in Tyco's stock price on January 23, 2002 may have reflected changed investor expectations based on Tyco's sudden announcement of a plan to break-up the company.  The link between the 20% decline in Tyco's stock price on January 29, 2002 and the alleged accounting fraud is also difficult to conclusively establish, because the exposure of Walsh's $20 million payment did not reveal anything concrete about a systemic fraud, but undoubtedly caused deep investor distrust, particularly given the post-Enron market environment.[18]  The 20% decline in Tyco's stock price on April 25, 2002 is subject to similarly differing interpretations as Tyco's long-term debt was downgraded and Tyco lowered its earning guidance, announced the abandonment of its break-up plan which months before had been touted by Tyco's management as the best way to realize value for Tyco's stockholders, and revealed

[18] Perhaps more than any other single date, the ultimate success (or failure) of the Class's claims hinged on proving that the sharp decline in Tyco's stock price which occurred on January 29, 2002 was due to the market's understanding of the disclosure of the Walsh payment as an admission that Tyco's management had engaged in illegal behavior – and that therefore, Tyco's previous denials of accounting misconduct could no longer be believed. *See, e.g., In re Tyco Int'l*, 2004 WL 2348315, at *14 ("Reading the complaint as a whole, it thus fairly charges that Tyco's stock price declined in part because investors concluded that they could no longer credit the company's denials of accounting misconduct.")  If Lead Plaintiffs could prove this theory, then the stock price drop (and subsequent drops) could be attributed to the dissipation of artificial inflation in Tyco's stock price which had accumulated during the Class Period due to false statements by the defendants.  Conversely, if Lead Plaintiffs were unsuccessful in establishing the causal link between the Walsh disclosure and the accounting fraud (the details of which were subsequently revealed), then the drop in Tyco's stock price would likely have been considered by the Court to be merely an overreaction by the market to the Walsh payment – which would not constitute recoverable damages.  Additionally, if the disclosure of the Walsh payment was deemed to only be "corrective" of false statements related to Tyco's June 2001 acquisition of CIT Group, then only investors who purchased Tyco stock after the first such false statement was made (April 13, 2001) could potentially recover damages.

that CIT Group would be spun-off in an IPO.  The relationship between the 6.3% decline in

Tyco's stock price on May 28, 2002 and fraud is even harder to establish as there were no

explicit revelations of fraud on that date, but instead it was revealed that Lehman Brothers

Holdings Inc. abandoned a $5 billion bid to buy CIT Group.  Similarly, the 27% decline in

Tyco's stock price on June 3, 2002 after Kozlowski's resignation was announced is difficult to

attribute solely to fraud because it failed to reveal virtually any facts regarding

misrepresentations by Kozlowski during the Class Period.  Finally, while the large stock price

declines on June 6, 2002 and June 7, 2002, were undoubtedly in response to disclosures related

to the looting of the Company by its most senior officers, such disclosures only revealed that

investigations had begun, and the details regarding these investigations and their findings were

not disclosed until much later.  They also did not reveal the falsity of statements made to

investors during the Class Period.  Moreover, Defendants' argument that the huge stock price

declines on these dates could be, at least in part, attributed to investor overreaction and the

prevailing market distrust in the wake of recent spectacular accounting frauds, could be accepted

by a jury.

Second, Defendants likely would argue at summary judgment and to a jury that much of

the drop in the price of Tyco's securities (and therefore much of the investors' alleged losses)

resulted from factors that clearly are unrelated to the alleged fraud.[19]  For example, Tyco's stock

dropped 8.5% following a January 15, 2002 Tyco conference call with investors, but that was not

a corrective disclosure of fraud because the lower than expected revenue disclosed that day

resulted from problems in Tyco's computer and consumer electronics businesses that were not

involved in the fraud or subject to any later restatement.  On February 4, 2002, Tyco's shares

---

[19] As the Court is aware, between January 2 and June 6, 2002, Tyco's 2 billion outstanding shares declined by more than $50 per share, resulting in a loss of market capitalization of nearly $100 billion.

dropped 19%, but that was primarily in response to the downgrade in the Company's senior unsecured debt due to the Company's plans to repurchase all of its $4.5 billion commercial paper (although there also was an announcement that Tyco had engaged in 700 undisclosed, albeit minor, transactions).  On February 5, 2002, Tyco's shares dropped again, but that was in response to the Company's disclosure that it would have to resort to higher-cost bank loans after being shut out of the corporate bond market.  The $1.60 drop in Tyco's stock price on February 13, 2002 resulted from the Company's disclosure of a disappointing second quarter earnings forecast and not as a result of any disclosure of fraud.  Likewise, the $2.90 stock price drop on April 29, 2002 resulted from the Company's announcement of a weak earnings report and its abandonment of its plan to split into four units.  None of these announcements had anything to do with the fraud, nor did any concern information that was later subject to a restatement or other admission of wrongdoing.

Finally, when the specifics of the fraud came to light in the latter half of 2002 and 2003, through a series of reports issued by Boies Schiller (following that firm's investigation into executive compensation and accounting fraud at Tyco) and then through a restatement of Tyco's financial statements, Tyco's share price declined only moderately.  For example, on June 12, 2002, Tyco filed a Form 10-Q/A which restated its financial statements for the quarter ended March 31, 2002 and took a charge to earnings of $4.5 billion to reflect the impaired value of CIT Group.  In response, Tyco's stock price declined by 8.1% on June 12, 2002 from $11.05 to $10.15, and then increased by almost 36% from $10.15 to $13.80 on June 13, 2002.[20]  On September 17, 2002, Tyco filed an 8-K which revealed many details regarding Kozlowski's, Swartz's and other Tyco officers' misuse of loan and relocation programs and other unauthorized

---

[20] Tyco's restatement of CIT Group's value, constituting the largest portion of Tyco's aggregate restatements corrected its 10-Q filed May 15, 2002 and only related to alleged misstatements which occurred at the very end of the Class Period.

compensation received by, and other misdeeds committed by, such officers.  On September 18, 2002, Tyco's stock price declined 5.7% from $16.89 to $15.92.  On December 30, 2002, Tyco filed a second 8-K related to Boies Schiller's investigation which revealed "a number of accounting entries and treatments that were incorrect," including instances where Tyco had engaged in "spring-loading" in connection with acquisitions and other instances where Tyco had employed aggressive accounting.  Tyco also announced that it would take a $382.2 million pre-tax adjustment to the Company's fiscal 2002 results, but concluded that "[t]he Company is not aware of any systemic or significant fraud related to the Company's financial statements or of any clear accounting errors that would materially adversely affect the Company's reported earnings or cash flow from operations for the year 2003 and thereafter."[21]  In response to this report, Tyco's stock increased by 11% on December 31, 2002 (on more than three times the volume of the previous day) from $15.35 to $17.08, and increased again on the next trading day, from 17.08 to $17.25.  Finally, on July 29, 2003, Tyco announced a $974.3 million restatement of its financial statements for fiscal years 1998, 1999, 2000, 2001 and 2002.  In response, Tyco's stock price dropped on July 30, 2003 from $19.75 to $19.00.

While Lead Plaintiffs repeatedly overcame Defendants' loss causation challenges, it is clear that such challenges were not over in this case.  This Action presented unique circumstances, including the fact that questions about Tyco's accounting had existed ever since a prior SEC investigation, but had been consistently denied by Tyco.  Moreover, the First Circuit has not yet issued any post-*Dura* decisions on loss causation, thereby raising the possibility that it could interpret – as some courts have done – *Dura* more strictly (for instance by requiring the identification of disclosures which are explicitly corrective of specific misrepresentations).

---

[21] Tyco's $382.2 million pre-tax adjustment included a cumulative adjustment of $185.9 million related to improper revenue recognition at its ADT Securities subsidiary.  Additionally, Tyco restated its financial results for the first three fiscal quarters of 2002 in the amount of $135 million.

Indeed, Defendants presented that very argument to this Court, and PwC's motion to this Court seeking leave for interlocutory appeal on the issue of loss causation was pending.[22]   Therefore, while Lead Plaintiffs were confident that they could meet their burden of proving the causal connection between false statements and the economic damages suffered by class members, there was no guarantee that Lead Plaintiffs would be able to do so.

Courts have dismissed entire cases for failure to prove loss causation.  *See, e.g., In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1295 (N.D. Ok. 2007) (granting summary judgment for defendant based on plaintiffs' failure to prove loss causation).  Accordingly, the difficulty of proving loss causation in this Action, and the risk of Lead Plaintiffs obtaining little or nothing on behalf of the Class were they unable to prove that required element of their claims, show the fairness and reasonableness of the Settlement.  *See Duhaime*, 177 F.R.D. at 69 (approving class action settlement, noting that "the 'economic loss doctrine' [raised by defendant] would bar the plaintiffs' tort claims" and so "plaintiffs' recovery after trial is far from assured").

### 3.     Risks Of Establishing Damages

Even if Lead Plaintiffs succeeded on all the liability issues and overcame all the defenses and were able to establish loss causation, Lead Plaintiffs faced substantial risks in proving damages.  In fact, Lead Plaintiffs expected the Defendants to attack Lead Plaintiffs' damage calculations on many levels.

As described above, Lead Plaintiffs' expert, Professor Mark Zmijewski, employed a plaintiffs'-style, event study methodology which included eight (8) corrective disclosures to calculate damages for Tyco stock at $10.83 billion and for bonds at approximately $900 million.

---

[22] Additionally, even if Lead Plaintiffs succeeded in proving PwC's liability, there would be an issue at trial as to the apportionment of liability among the Defendants, so that a jury could find PwC liable for only a small percentage of the damages.

However, in the event this Action proceeded to trial, Defendants would likely attack Lead Plaintiffs' damage analysis on many fronts.  First, assuming Defendants did not prevail on the loss causation arguments outlined above pursuant to which they would seek to exclude from damages some or all of the declines associated with the eight (8) corrective disclosures identified by Professor Zmijewski, Defendants also would argue that Lead Plaintiffs' damage model apportioned too much weight to each of the various alleged corrective disclosures.  Second, Defendants would likely argue that Professor Zmijewski's analysis is flawed for failing to account for the fact that large institutional investors typically have holdings purchased prior to the commencement of a class period that are subsequently sold during the class period. Throughout the case, Tyco argued vigorously that an offset should be applied against any Class Period losses to account for sales of pre-Class Period purchases at allegedly inflated prices.  As noted above, such "offsets" can reduce overall damages by approximately 25% and thus, if Tyco were successful with the argument, Professor Zmijewski's overall damage figure of $11.7 billion would be reduced to less than $9 billion.  Third, Defendants would also present an alternative economic model for determining the amount by which Tyco securities were allegedly artificially inflated (if at all) during the Class Period, and such model would likely be based on Tyco's restatement.  Professor Zmijewski prepared a damage calculation using a model based strictly on Tyco's reported restatement (so that Co-Lead Counsel would be informed of the result of the most conservative damage calculation) which produced a figure of $2 to $3 billion, without offsets.

Although Lead Plaintiffs would present expert testimony to sustain Lead Plaintiffs' burden on the damage issues and to rebut any arguments made by the Defendants, the ultimate decision would rest with a jury which would be charged with weighing competing experts' testimony.  Thus, the crucial element of damages would likely be reduced at trial to a "battle of

the experts." There exists the substantial possibility that a trier of fact could be swayed by Defendants' experts, who would seek to minimize or eliminate the amount of the Class's losses and recoverable damages. This risk confronting the Lead Plaintiffs favors final approval of the Settlement. *See Relafen*, 231 F.R.D. at 73 (noting that a trial "'would undoubtedly become a battle of experts, with conflicting testimony,' … [and] that it is possible 'the jury might reject their claims.'") (internal citation omitted); *Compact Disc*, 216 F.R.D. at 207 (approving class action settlement where there were "a host of difficult issues in the calculation and proof of damages").[23]

### C.   THE RECOVERY COMPARED TO THE POTENTIAL RECOVERY

As noted above, Co-Lead Counsel concluded that the Settlement provides a 27% recovery, even presuming that all eligible shareholders file claims. Moreover, under the second damages model prepared by Professor Zmijewski (based strictly on Tyco's reported restatement), damages were $2 to $3 billion, without offsets. Thus, the recovery of $3.2 billion for the Class may exceed actual, provable damages. Based upon the damage report, it is clear that the recovery in this Action is exceptional, even prior to considering any additional recoveries arising from the Officer Assigned Claims.

Moreover, as explained above, the Defendants were prepared to challenge Lead Plaintiffs' damage theory as well as the amount of damages allegedly suffered by the Class. *See*

---

[23] *See also In re Cendant Corp. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001), *cert. denied, sub nom, Mark v. Cal. Pub. Employees' Ret. Sys.*, 535 U.S. 929 (2002) ("[E]stablishing damages at trial would lead to a 'battle of experts,' with each side presenting its figures to the jury and with no guarantee whom the jury would believe."); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. 02-5575-SWK, 2006 U.S. Dist. LEXIS 17588, at *32 (S.D.N.Y. Apr. 6, 2006) ("There is no question that the presentation of these transactions, and the conflicting interpretations which they would be subject to, would stretch the patience, attention, and understanding of even the most exemplary jury."); *In re Lucent Techs., Inc. Sec. Litig.*, 307 F. Supp. 2d 633, 646 (D.N.J. 2004) ("The outcome of [a battle of experts] is never predictable, and the Court recognizes the very real possibility that a jury could be swayed by defense experts, who would seek to minimize the Class Members' losses or to show that the losses were attributable to factors other than the alleged misstatements and omissions."); *Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 63 (S.D.N.Y. 2003) (expert testimony about complex subjects adds element of uncertainty to outcome – a factor that weighs in favor of settlement).

*Relafen*, 231 F.R.D. at 74 (approving class action settlement, noting that plaintiffs' damage amount "was vigorously attacked by SmithKline, both in a challenge that the Plaintiffs would not be able to prove any damages, as well as contentions that the [Plaintiffs' expert] report overstated the figure by $79,400,000"). Thus, a recovery of the full amount of damages estimated by Professor Zmijewski under any method was by no means assured, as the jury's verdict with respect to damages would depend on its reaction to the complex testimony of the parties' competing experts. *See Headley v. Chrysler Motor Corp.*, 141 F.R.D. 362, 366 (D. Mass. 1991) ("As any practicing lawyer worth his or her salt well knows, the proverbial battle of the experts produces uncertain results."). This factor therefore favors approval of the Settlement.

### D. THE COMPLEXITY, EXPENSE, AND LIKELY DURATION OF THE LITIGATION JUSTIFIES THE SETTLEMENT

The complexity of the facts and issues in this case, particularly with respect to proving loss causation and damages, and the attendant risks that Lead Plaintiffs would fail to establish these necessary elements of their case, support approval of the Settlement. *See Bussie*, 50 F. Supp. 2d at 76 ("[T]he reality that the Class would encounter significant, and potentially insurmountable obstacles to a litigated recovery underscores the reasonableness of the compromise set forth in the Settlement Agreement."). *See also In re AOL Time Warner*, 2006 U.S. Dist. LEXIS 17588, at *31 ("Due to its notorious complexity, securities class action litigation is often resolved by settlement, which circumvents the difficulty and uncertainty inherent in long, costly trials."). Because this Action presented many complex and novel issues, continued litigation would have been both lengthy and expensive, with no guarantee of recovery for the Class. Completion of pre-trial proceedings and trial of these claims would have required thousands of hours of additional work by Co-Lead Counsel. While the Lead Plaintiffs were fully prepared to go to trial and were confident of their ability to present a *prima facie* case, there was

a risk here (as in any case) that Lead Plaintiffs could have recovered nothing or substantially less than the amount of the proposed Settlement.

Further, winning a jury verdict does not provide absolute assurance of recovery. Defendants would have surely appealed any sizeable verdict in the Lead Plaintiffs' favor.  *See, e.g., Robbins v. Koger Props.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (reversing on appeal $81 million jury verdict and dismissing case with prejudice in securities action).  All of the foregoing would have significantly added to the expense of this Action and delayed, potentially for years, any recovery to Class Members (with no assurance, of course, that the Lead Plaintiffs would ultimately prevail).  Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay of trial and post-trial proceedings.  Thus, the complexity, expense and likely duration of continued litigation all weigh heavily in favor of approving the proposed Settlement.  JD ¶¶ 124-49.

### E.    THE STAGE OF THE PROCEEDINGS AT WHICH THE SETTLEMENT WAS REACHED

"The stage of the proceedings at which settlement is reached is important because it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims."  *Duhaime*, 177 F.R.D. at 67.  Having prosecuted this Action for more than five years, after 83.5 million pages of documents were reviewed and/or analyzed, after over 220 depositions were taken, more than 80 separate motions were litigated and more than 40 in person or telephonic hearings were conducted by the Court, and after the Court rendered numerous important decisions including certifying the Class and substantially denying motions to dismiss the claims, and after multiple mediation sessions, the Lead Plaintiffs and Co-Lead Counsel are well informed of the strengths and weaknesses of their claims and Defendants' defenses.  *See* JD ¶¶34-49, 150; *Bussie*, 50 F. Supp. 2d at 77 ("The parties' enormous discovery effort . . . enabled

Lead Counsel to assess the merits of the Class's litigation position and, in turn, to negotiate a principled compromise.  The Court finds that this extensive discovery and also Lead Counsel's retention of expert consultants, is probative of the Settlement's fairness"); *In re Fleet/Norstar*, 935 F. Supp. at 106 (approving class action settlement where "[t]he timing of the agreement indicate[d] that counsel for both sides were sufficiently apprised of all proffered theories and defenses"); *Relafen*, 231 F.R.D. at 73 (finding this factor supported settlement where the action had been litigated for nearly 4 years and extensive discovery and motion practice had been undertaken prior to settlement, including review of 1 million pages and about 75 depositions). "Indeed, far less discovery has been deemed ample to support a settlement."  *Duhaime*, 177 F.R.D. at 67 (3.75 million pages produced and 14 depositions).  Accordingly, this Court should find that this factor also weighs heavily in favor of the Settlement.

## F.   THE AMOUNT OF THE SETTLEMENT IN LIGHT OF THE RISKS OF LITIGATION

The amount of the recovery being provided to the Class in the Settlement must be weighed against the obstacles to any recovery in the litigation.  *See Bussie*, 50 F. Supp. 2d at 76 (approving settlement where plaintiffs faced several significant, viable legal defenses "any one of which, if successful, could result in entry of a judgment *with prejudice* against the Class.") (emphasis in original); *Duhaime*, 177 F.R.D. at 68 (same).  However, "a fine-tuned equation by which to determine the reasonableness of the size of a settlement fund does not exist."  *Relafen*, 231 F.R.D. at 73.  The fact that the Class could have theoretically received more if the Action had been successfully litigated through trial is not a reason to deny approval of the Settlement. *Duhaime*, 177 F.R.D. at 68.  *See In re Lupron®  Mktg.*, 228 F.R.D. at 97-98 ("While it is possible to hypothesize about larger amounts that might have been recovered,…[…]…'[t]he evaluating court must . . . guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes

in exchange for certainty and resolution.'") (internal quotations omitted).  The Court need only determine whether the Settlement falls within a "range of reasonableness."   *See AOL Time Warner*, 2006 U.S. Dist. LEXIS 17588, at *44.

By any measure, the $3,200,000,000 cash Settlement plus interest (with the potential for an additional recovery from the Officer Assigned Claims) is an outstanding recovery.[24]  In fact, given the litigation risks discussed above, the amount of the Settlement represents a potentially greater damages amount than a jury might have awarded after trial, even if it found for the Lead Plaintiffs on the issue of liability.  *See In re Lupron® Mktg.*, 228 F.R.D. at 98 (finding settlement amount reasonable based on the plaintiffs' experts' "analysis of the likely damages, the opinions of experienced . . . counsel, and my own determination that the risks plaintiffs face . . . outweigh any potential benefit to be gained by further litigation").  Accordingly, this factor weighs heavily in favor of approving the Settlement.  (JD ¶¶124-49).

## G.    THE SETTLEMENT WAS REACHED AFTER ARM'S-LENGTH NEGOTIATIONS

As set forth above this Settlement was reached following a lengthy and strenuous negotiation process.  Where, as here, a settlement is reached after arm's-length negotiations among experienced counsel, there is an initial presumption that the proposed settlement is fair and reasonable.  *See City P'ship Co*., 100 F.3d at 1043; *Bussie*, 50 F. Supp. 2d at 77; *Duhaime*, 177 F.R.D. at 68.

Furthermore, the Settling Parties are not accused of engaging in collusion, and no hint of collusion exists.  In fact, the Honorable Stanley Sporkin has agreed to submit a statement detailing the rigorous process undertaken by the Settling Parties and stating his support for the

---

[24] Even if it were to be assumed that no additional value will ultimately be realized from the Officer Assigned Claims, the Settlement would still constitute an extraordinary and fair recovery.  As discussed above, and as illustrated by Professor Zmijewski's damages analysis, the $3,200,000,000 cash settlement represents a substantial portion of the actual damages suffered by the Class and constitutes one of the largest recoveries in securities class action history.

outcome.  *See* Ex. 2 (Statement of Stanley Sporkin).  *See also D'Amato v. Deutsche* Bank, 236

F.3d 78, 85 (2d Cir. 2001) (noting that "mediator's involvement in . . . settlement negotiations

helps to ensure that the proceedings were free of collusion and undue pressure").  Qualified and

experienced counsel for both sides, who are intimately familiar with all facets of this Action, and

the Lead Plaintiffs, recommend final approval of the Settlement.  *See* Exs. 6-8 (Declarations of

Patrick Perno, Maureen H. Westgard and Cynthia Y. Rougeou).  The Settlement is, therefore,

clearly entitled to a presumption of fairness based on the negotiations.

### H.     THE REACTION OF THE CLASS TO THE SETTLEMENT

#### 1.     The Highly Favorable Reaction Of The Class To The Settlement Supports Approval

The reaction of the Class is relevant to the Court's assessment of the Settlement, and

"[c]ourts [have] construe[d] class members's failure to object to proposed settlement terms as

evidence that the settlement is fair and reasonable." *Lucent Techs., Inc.*, 307 F. Supp. 2d at 643.

*See also Bussie*, 50 F. Supp. 2d at 77-78 (noting that favorable reaction of class to settlement,

albeit not dispositive, constitutes strong evidence of fairness of proposed settlement and supports

judicial approval).

Pursuant to the Hearing Order, more than 2.4 million copies of the Notice were mailed to

potential Class Members or their nominees.  *See* Ex. 3 (GCG Affidavit).  ***Significantly, only five***

***class members have objected to the Settlement as being inadequate***.  JD ¶¶ 163-83.  In cases

such as this, involving a large class and an extensive notice campaign, it is extremely unusual to

receive such a limited number of objections.  To the contrary, a certain number of objections are

to be expected.  *See, e.g., Duhaime*, 177 F.R.D. at 71 (approval despite 77 objections, comprising

.002% of the class, and 4,400 requests for exclusion); *In re Nortel Networks Corp. Sec. Litig.*,

No. 01-1855, 2006 U.S. Dist. LEXIS 93390, at *17 (S.D.N.Y. Dec. 26, 2006) (approval despite

35 objections received representing approximately 0.0025% of the class); *Bussie*, 50 F. Supp. 2d at 77 (approval despite 13 objections representing .003% of the class); *Relafen*, 231 F.R.D. at 72 (approval despite 10 objections and 140 requests for exclusions); *Cendant Corp.*, 264 F.3d at 234 (receipt of only 4 objections by class members "cut strongly in favor of the Settlement, as the number of objectors was quite small in light of the number of notices sent and claims filed").[25]

Further, although Tyco common stock was widely held by institutions during the Class Period, no institutional investor has objected to the Settlement (though a few have objected to the proposed amount of the attorney fee award).  *See Greenspun*, 492 F.2d at 379 (noting absence of objection by "large, institutional investors, who could be expected to safeguard their interests with a modicum of diligence"); *In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 702-703 (D. Mo. 2002) (taking "particular note" that no objections were filed by institutional investors "who comprise a large part of the plaintiff classes and who will be greatly affected by the outcome of this case").  Indeed, the Lead Plaintiffs, as institutional investors, strongly support the Settlement.  *See* Exs. 6-8 (Declarations of Patrick Perno, Maureen H. Westgard and Cynthia Y. Rougeou).

## 2.    None Of The Objections To The Settlement Are Meritorious

Twenty total objections have been filed in connection with the Settlement.  Of these objections (four of which address multiple issues), five objections challenge the Class Period, one objection addresses the Plan of Allocation, five objections challenge the amount of the Settlement, eleven objections challenge the requested award of attorneys' fee and reimbursement of expenses, and two objections challenge the manner in which any settlement funds remaining

---

[25] *See also Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (directing approval of settlement where "only" 10% of class objected); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 24 (2d Cir. 1987) (affirming settlement approval despite opposition by 36% of class; "[w]e perceive no reason why a settlement cannot be considered fair despite opposition from . . . significantly less than half of the class"); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (objections from 16% of class was "persuasive" of settlement's adequacy).

after funds are disbursed to class members are distributed to charity.  Of the thirteen objections

that relate to the Settlement or the Plan of Allocation, eight (8) have been resolved.  None of the

substantive objections to the adequacy of the $3.2 billion Settlement has merit.[26]

**(a)      Objections To The Amount Of The Settlement**

Five persons objected to the amount of the Settlement:  Chris Andrews (Docket No.

1108), James Hill (Docket No. 1130), Peter and Rita Carfagna and Barry Friedman (Docket No.

1121), James Hayes (Docket. No. 1134) and Ronald Wronko (Docket No. 1132).  Of these five,

three (Andrews, Hill and Carfagna/Friedman) have withdrawn their objections.  In any event, it

is clear that none of the objections to the amount of the Settlement have merit.

**(1)      Resolved Objections**

Chris Andrews raised an objection principally based on a dispute concerning Andrews'

role as a consultant and the provision of information to Co-Lead Counsel regarding ADT

Security Services ("ADT").  Andrews and Co-Lead Counsel have since resolved their dispute.

*See* Ex. 13 (Andrews Stipulation).  With respect to the objection filed by Andrews, it is

respectfully submitted that Co-Lead Counsel have fully litigated all the issues relating to Tyco's

accounting for dealer connection fees charged by ADT, including the review of millions of pages

of documents and the depositions of more than 20 witnesses on this issue alone.

James Hill raised an objection that asserted that the Settlement was insufficient because it

failed to provide compensation in connection with an alleged stock market manipulation scheme

involving Tyco securities traded on the Boston Stock Exchange.  Hill, in his objection,

interpreted the release language in the Settlement Agreement as potentially serving to

inadvertently release claims against the Boston Stock Exchange.  Based upon this objection, Co-

---

[26] The eleven objections that raise issues regarding the fee are addressed in the accompanying fee petition and brief, although to the extent they raise non-fee related issues they are addressed herein.

39

Lead Counsel were able to clarify the terms of the Release to specifically carve out any potential claims against the Boston Stock Exchange relating to the trading of Tyco common stock. In light of the benefit to the Class and the work performed by Hill in connection with this issue, Hill will be seeking an incentive award, subject to Court approval and has withdrawn his objection, which is now completely obviated by virtue of the fact that he will receive the entirety of the relief he requested in his objection upon the Court's approval of the amendment to the Stipulation of Settlement. *See* Ex. 17 (Hill Stipulation).

Peter and Rita Carfagna objected to the Settlement solely on the basis of the percentage recovery that will be received by the Class due to the successful prosecution by Tyco of any Officer Assigned Claims. Co-Lead Counsel and Mr. and Mrs. Carfagna have entered into a stipulation withdrawing their objection. *See* Ex. 14 (Joint Objector Stipulation). Co-Lead Counsel, in consultation with the Lead Plaintiffs, weighed the opportunity, together with the attendant risks, of continuing to prosecute the Officer Assigned Claims against the opportunity to share in any recovery that Tyco may achieve against these individual defendants on its own claims. Despite the tremendous volume of discovery Lead Plaintiffs received, Tyco remains the entity with the most information concerning the fraud these Non-Settling Defendants perpetrated. In addition, the difficulties of collecting judgments on assets of individuals, especially in situations in which individuals are already serving time in jail and subject to criminal forfeiture of assets, are substantially exacerbated. As a result, the Lead Plaintiffs determined that it was in the interests of the Class to proceed in this fashion.

### (2)    Unresolved Objections

Ronald Wronko claims that the likely recovery to Class Members under the Settlement is "grossly inadequate" since there is no provision for the recovery of punitive damages. However, punitive damages are not an available remedy. *See Manchester Mfg. Acquisitions, Inc. v. Sears,*

*Roebuck & Co.*, 802 F. Supp. 595, 605 (D.N.H. 1992) ("On its face . . . section 28(a) of the Securities Exchange Act of 1934, precludes recovery of punitive damages for the violation of the federal law").[27]

James Hayes argues that Tyco's stock was artificially inflated by $51 per share on a split adjusted basis. This objection also is without merit. Mr. Hayes (apparently looking at prices that were unadjusted for certain stock splits) argues that virtually all of Tyco's share price decline from January 1, 2002 to June 6, 2002, is due to the revelation of fraud. Although he makes some effort to adjust for changes in the stock market generally, he fails to acknowledge that the majority of the decline in Tyco's stock price during the Spring of 2002, was arguably due to: (1) the poor results from Tyco electronics, CIT Group and Tycom; (2) the market's dislike of the Tyco split plan; and (3) Tyco's credit problems, caused by a downgrade in its bond rating and an exclusion for the commercial paper market – both for reasons unrelated to fraud. Lead Plaintiffs' expert looked at these and other data and concluded that, at its peak, Tyco's share price was inflated due to fraud by only $8.29 per share. Mr. Hayes provides no basis for the Court to reject the conclusion of the Lead Plaintiffs' expert in this regard.

### (a)       Objections To The Class Period

Five of the objections – filed by Joel Douglas (Docket No. 1105), David Kaiser (Docket No. 1109), Richard Dayton (Docket. No. 1115), Marvin and Sonia Greenbaum (Docket No. 1136) and Susan Schaffer (Docket No. 1138) – claim only that the Class Period should start

---

[27] Mr. Wronko also complains that: (i) if PwC pulls out of the Settlement, Tyco must still bear the costs of notice and administration and (ii) that his receipt of the Notice Packet was untimely. These objections have no merit. First, if Tyco remains in the Settlement, such expenses will be necessary; otherwise no Class Member will receive notice of the Settlement or be paid their pro rata share. Second, Notice was sent separately to Mr. Wronko and his spouse on or about August 2 in response to the receipt of their names from Citigroup. Though the first address received for Mr. Wronko needed to be updated, all reasonable efforts were made to provide timely notice. *See In re Dataproducts Corp. S'holders Litig.*, No. 11164, 1991 WL165301, at *10 n.6 (Del. Ch. Aug. 22, 1991) ("stockholders who choose to hold stock in street name must bear the risks (which accompany the advantages) associated with that decision, including the risk that they may not receive information as promptly as stockholders who choose to hold shares in their own name").

earlier or end later in order for their transactions in Tyco securities to be covered.  After being contacted by Co-lead Counsel, who explained the basis for the existing Class Period, Joel Douglas, Susan Schaffer, Richard Dayton and Marvin and Sonia Greenbaum have withdrawn their objections.  *See* JD ¶ 15.  In any event, none of these objectors offered any explanation (other than their own self-interest) for why the Class Period should be broadened, nor did they identify any misrepresentations or improper actions of the Defendants which occurred outside the Class Period but which should be addressed in this Action.  As this Court is aware, the Class Period began with the December 1999 publication of Tyco's Form 10-K (the first misstatement) and ends with the June 6, 2002 announcement that Kozlowski was the subject of criminal investigations.  Thus, the Class Period is proper and the remaining objection – by Mr. Kaiser – should be rejected.

<b>(b)      Objections Regarding Donation Of Remaining Funds</b>

Two objections – filed by Robert and Patricia Weinberg (Docket No. 1110) and Lynne Sell (Docket No. 1126) – complain that Co-Lead Counsel have authority to donate any remaining funds (following distributions to Class Members) to a non-profit entity approved by Tyco and PwC.[28]  In particular, the Weinbergs request that Co-Lead Counsel "take into account the proposals made by class members."  The request should be rejected since having millions of Class Members submitting such proposals and having Co-Lead Counsel distill them would invite chaos.  Co-Lead Counsel have prosecuted this Action with the consent and under the supervision of the Lead Plaintiffs who will be involved, as they should, in the identification of the

---

[28] Ms. Sell has withdrawn her objection.  *See* Joint Decl., Ex. 14 (Joint Objector Stipulation).  Prior to withdrawing her objection, Ms. Sell contended that Co-Lead Counsel should not have the authority or discretion to donate any remaining funds (following distributions to Class Members) to a non-profit entity approved by Tyco and PwC. However, courts routinely permit settlement agreements to specify charities as recipients of unclaimed funds and generally leave the designation of the charities to the parties or the Court.  In resolution of this objection, Co-Lead Counsel have agreed to keep counsel for Ms. Sell advised of the identities of such charities prior to making any distributions in this respect.

appropriate charity.[29]  Moreover, the designation of the charities is routinely left to the parties or

the court.[30]  *See* Kevin M. Forde, "What Can a Court Do with Leftover Class Action Funds?

Almost Anything!," The Judges' Journal, vol. 35, no. 3 (Summer 1996) ("To expedite the

distribution of undistributable or unclaimed funds, the parties can include in their settlement

agreement a provision that unclaimed funds will go to a designated charity or to a charitable

purpose to be designated later, by the parties or the court.  This provision of the agreement

should be respected by the courts.").

(c)   **The Sole Objection to the Plan of Allocation**

One objection includes criticism of the Plan of Allocation.  John Nemfakos (Docket No.

1137), in his objection, expresses displeasure as to how the 25% call option trading loss will be

considered in the loss calculation and as to the reason for the "disparity between writers of put

options . . . and call option traders."  He also objects to the provision that losses from option

trading are limited to only 1% of the total Settlement amount.  He proposes that "the allocation

plan be simplified" and that "loss calculations . . . be based solely on actual loss suffered,

regardless of whether it was from shares, options or bonds."  This objection should be rejected

for several reasons.  First, as explained in the Plan of Allocation, Tyco call options are

discounted as opposed to put options because the purchase of a call option includes a time

premium which is a wasting asset that the purchaser pays that will evaporate even if the stock

price remains the same.  The difference in recognized claims of (25% versus 50%) accounts for

this difference.  Second, overall recoveries by options holders are limited to 1% of the total net

---

[29] The Weinbergs propose that the funds be donated to charities that would use the funds to provide pro bono legal services, and the Lead Plaintiffs may share similar views.

[30] It is undisputed that courts routinely permit the settlement agreement to specify charities as recipients of unclaimed funds.  *See In re Dollar General Corp. Sec. Litig.*, No. 01-388, slip op. (M.D. Tenn. Mar. 16, 2007) (permitting distribution of unclaimed funds to three law schools); *Six (6) Mexican Workers v. Arizona Citrus* Growers, 904 F.2d 1301, 1307 (9th  Cir. 1990) (permitting distribution of unclaimed funds through *cy pres* doctrine).

43

settlement amount because the expected additional volatility of such derivative securities, makes it more difficult to prove that losses on such securities are causally related to the alleged wrongdoing, as opposed to non-actionable causes.  Thus, in Co-Lead Counsel's view, the equity and debt damages thus were the most significant part of the Class and deserved the overwhelming majority of the recovery.

### (d)    Kozlowski's Reservation of Rights to File an Objection

Finally, although not yet an objector, Defendant Kozlowski has filed a reservation to file an objection with respect to the Settling Parties' agreement that Lead Plaintiffs will assign their claims against the Non-Settling Defendants to Tyco.  Co-Lead Counsel respectfully submit that the Court should overrule this objection because: (i) a failure to pursue this issue at this stage will not divest Mr. Kozlowski of any defenses or rights he has to try to prevent the assignment at a later date; and (ii) even if the Court determines that Lead Plaintiffs cannot assign these claims to Tyco and/or the Class ultimately does not receive any recovery from such assignment, the Settlement is fair, reasonable and adequate without any additional recovery.

In short, there are very few objections, none of the objections has any merit and all the factors to be considered by the Court in determining the fairness, adequacy and reasonableness of the Settlement weigh heavily in favor of approval of the Settlement.  Accordingly, Lead Plaintiffs respectfully submit that the Settlement should be given final approval.

## IV.    THE NOTICE TO THE CLASS SATISFIED BOTH THE PRELIMINARY APPROVAL ORDER AND APPLICABLE LAW

When a court certifies a class under Rule 23(b)(3), notice must be served on all class members who can be identified through reasonable efforts.  Fed. R. Civ. P. 23(c)(2)(B).  Rule 23(e) also instructs courts to "direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal or compromise."  Fed. R. Civ. P.

23(e)(1)(B).  Furthermore, in order to comport with the Due Process Clause of the Constitution, the notice "must be reasonably calculated to reach potential class members."  *Compact Disc*, 216 F.R.D. at 203.  *See also Eisen v. Carlisle & Jacquilin*, 417 U.S. 156, 173-74 (1974).  Such notice to class members "must describe fairly, accurately and neutrally the claims and parties in the litigation, the terms of the proposed settlement, and the options available to individuals entitled to participate, including the right to exclude themselves from the class."  *Compact Disc*, 216 F.R.D. at 203.

In addition to the requirements of the Federal Rules and Due Process, the PSLRA imposes certain additional notice requirements: (1) the amount of the settlement and proposed distribution to plaintiffs; (2) if the parties to settlement disagree on the average amount of damages per share, a statement from each settling party concerning the issue or issues on which the parties disagree; (3) a statement of attorneys' fees or costs sought; (4) the name, address and telephone number of plaintiffs' representatives; and (5) a brief statement explaining why the parties are proposing the settlement.  15 U.S.C. § 78u-4(a)(7).

Here, the Notice program far exceeded the requirements of Due Process and the PSLRA, as well as the Court's directives set forth in the Hearing Order.  A copy of the Notice concerning the Fairness Hearing was mailed to Class Members who could be identified with reasonable effort and all legal counsel known by Co-Lead Counsel or the Defendants' counsel to represent a Class Member.  *See* JD ¶¶ 102-04.  In fact, Co-Lead Counsel and GCG took extra measures to ensure compliance with the Notice Program by the largest brokers, banks and other financial institutions acting as nominees for purchasers of Tyco common stock.  *See* Ex. 3 (GCG Affidavit). Additionally, a Summary Notice of the Settlement was published on August 10, 2007 in eight newspapers across the country and over the *PR Newswire.  See* JD ¶ 107.  Both the

Notice and Summary Notice described the history of the Action, Settlement terms and the rights of Class Members to share in recovery or object or request exclusion, the process and deadline for filing objections, requests for exclusions and claim forms, the date, time and place of the Fairness Hearing, the right of Class Members to be heard at the hearing, the manner in which the Settlement Fund will be allocated among participating Class Members, the claims to be released, and the attorneys' fees and costs that will be sought.  Additionally, the Notice was published on the Co-Lead Counsels' and the Claims Administrators' websites and is available to investors on the internet.  Thus, the Notice program comports with all applicable requirements and should be approved.  *See In re Cabletron Sys., Inc. Sec. Litig.*, 239 F.R.D. 30, 35 (D.N.H. 2006) (approving settlement where notice was achieved through mailing of claim packets, publication in one national newspaper and on a website); *Relafen*, 231 F.R.D. at 64 (notice through mailing, placement in "targeted business publications" and on a website); *Compact Disc*, 216 F.R.D. at 203 (notice through "print, broadcast and electronic publication").

## V.   THE PLAN OF ALLOCATION HAS A REASONABLE AND RATIONALE BASIS AND IS FAIR, REASONABLE AND EQUITABLE TO CLASS MEMBERS

The standard for approval of a plan of allocation is the same as the standard for approving a settlement: it must be fair, reasonable and adequate.  *AOL Time Warner*, 2006 U.S. Dist. LEXIS 17588, at *58.  To meet this standard, "'an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel.'"  *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) (quoting *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002)).  Further, "a plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable."  *Lucent Techs., Inc.*, 307 F. Supp. 2d at 649.

The proposed Plan of Allocation was contained in the Notice that was mailed to potential members of the Class.  It reflects Co-Lead Counsel's evaluation of the strengths and weaknesses of the claims of Class Members and fairly allocates the recovery among Class Members in accordance with Lead Plaintiffs' theories of damages in the Action.  Thus, as set forth in the Plan of Allocation, a claimant's Recognized Claim is based upon Plaintiffs' contention, based upon the work of Plaintiffs' damages expert, Professor Zmijewski, of the estimated artificial inflation in the price paid for Tyco securities on each day during the Class Period, taking into account the limitations on damages imposed under the PSLRA.  This estimated inflation equals the excess amount that Class Members allegedly paid over fair market value for their securities.  To the extent that Class Members sold their Tyco securities at a still inflated price, the Recognized Claim is reduced under the Plan of Allocation.  The alleged amount of artificial inflation for each day of the Class Period is set forth in an appendix to the Notice.  *See* Ex. 3 (GCG Aff. Ex. A). *See AOL Time Warner*, 2006 U.S. Dist. LEXIS 17588, at *59 (noting that plans of allocation which calculate claims according to inflationary loss have been found to be a reasonable approach to the calculation of damages).

Additionally, as noted above, Co-Lead Counsel retained two additional independent experts, R. Alan Miller and Dr. Kenneth D. Gartrell, to opine on the fairness of the proposed Plan of Allocation.  Messrs. Miller and Gartrell have both opined that that the proposed Plan of Allocation is fair and reasonable from the perspective of: (i) investors who purchased (or otherwise acquired) Tyco stock during the Class Period; and (ii) investors who purchased (or otherwise acquired) Tyco bonds and/or options during the Class Period.  *See* Ex. 4 (Miller Affidavit) and Ex. 5 (Gartrell Affidavit).

Under the Plan of Allocation, the Court-appointed claims administrator, GCG, will calculate each Authorized Claimant's "Recognized Claim," based on the information supplied

47

with the Class Member's Proof of Claim.  Each claimant's *pro rata* share of the Net Settlement

Fund shall be based upon the claimant's Recognized Claim from transactions in Tyco securities

during the Class Period.  To the extent a Claimant had a gain from his, her or its overall

transactions in Tyco securities during the Class Period, the value of the Recognized Claim will

be zero.  To the extent that the Claimant suffered an overall loss on his, her or its overall

transactions in Tyco common stock during the Class Period, but that loss was less than the

Recognized Claim calculated under the Plan of Allocation formula, then the Recognized Claim

shall be limited to the amount of the actual loss.[31]  The Plan of Allocation also provides for a

10% "kicker" for purchases or exchanges of shares or purchases of notes pursuant to a false and

misleading registration statement as such purchases provide the Authorized Claimants with

Section 11 claims, which have a lesser standard of proof.  As a result, although there is no

scientific precision to the increase, these purchases are provided with a 10% "kicker" to account

for the lower standard of proof.  The Plan of Allocation is similar in structure to numerous other

such plans which have been utilized in securities class action cases.  *See, e.g., Cabletron*, 239

F.R.D. at 35; *Relafen*, 231 F.R.D. at 66; *Lucent Techs., Inc.*, 307 F. Supp. 2d at 649.  Moreover,

the interests of the Lead Plaintiffs were not taken into account in developing this Plan of

Allocation.  The Lead Plaintiffs submit that the Plan of Allocation has a reasonable and rationale

basis and is fair and equitable to Class Members and should be approved by the Court.  *See* JD

¶¶ 110-114, 292; *Compact Disc*, 216 F.R.D. at 213 ("I find the distribution plan for the cash to

be fair, adequate and reasonable").

---

[31]   The Plan of Allocation does not "offset" losses for those institutions or individuals who have holdings in Tyco purchased prior to the commencement of the Class Period that were subsequently sold during the Class Period.

## **CONCLUSION**

For the foregoing reasons and for the reasons set forth in the Joint Declaration, the Lead Plaintiffs respectfully submit that the proposed Settlement is fair, reasonable, and adequate and that the proposed Plan of Allocation has a reasonable, rational basis and fairly allocates the recovery among Class Members, and request that this Court grant final approval to the Settlement and the Plan of Allocation.

Dated: October 22, 2007

Respectfully submitted,

Jay W. Eisenhofer
GRANT & EISENHOFER P.A.
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
Telephone: (302) 622-7000

Sanford P. Dumain
MILBERG WEISS LLP
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300

Richard S. Schiffrin
SCHIFFRIN BARROWAY TOPAZ
   & KESSLER LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706

William L. Chapman (N.H. Bar N. 397)
ORR & RENO, P.A.
One Eagle Square, P.O. Box 3550
Concord, NH 03302-3550
Telephone: (603) 224-2381
Fax: (603) 224-2318

*Local Counsel for Securities Action Plaintiffs*

*Co-Lead Counsel for Securities Action
 Plaintiffs*

49