## DEMAND FOR JURY TRIAL

Franklin hereby demands trial by jury for all issues so triable.

Dated:  June 23, 2008

> **LAW OFFICES OF MARC B. KRAMER**
> A Professional Corporation
> 150 JFK Parkway, Suite 100
> Short Hills, New Jersey 07078
> 973.847.5924
>
> Attorneys for Plaintiffs
>
> *s/ Marc B. Kramer*
> Marc B. Kramer (MK-8473)

## CERTIFICATION IN ACCORDANCE WITH LOCAL CIVIL RULE 11.2

I certify that the matter in controversy is not the subject of any other action, arbitration or administrative proceeding, pending or contemplated, except as follows:  the allegations in this matter are related to the matters at issue in In re Tyco International, Ltd. Securities Litigation, MDL Docket No. 02-1335-B pending in the United States District Court for the District of New Hampshire.

Dated:  June 23, 2008

> **LAW OFFICES OF MARC B. KRAMER**
> A Professional Corporation
> 150 JFK Parkway, Suite 100
> Short Hills, New Jersey 07078
> 973.847.5924
>
> Attorneys for Plaintiffs
>
> *s/ Marc B. Kramer*
> Marc B. Kramer (MK-8473)

Tyco agreed to the commission of numerous predicate acts of racketeering in connection therewith.

555.     PwC agreed to assist and did assist Tyco and its employees in perpetrating thefts by providing clean audit opinions with respect to accounting statements that fraudulently concealed the thefts.  According the SEC, as found in its August 13, 2003 filing instituting public cease-and-desist proceedings against PwC partner Richard P. Scalzo, PwC was aware of but failed to require Tyco to properly account for and/or disclose: (i) the improper bonus payments in connection with the TyCom IPO, the ADT Automotive divestiture and the Flag Telecom transaction; (ii) the $20 million CIT payment to Walsh; (iii) the improper relocation loans; (iv) the improper KEL Program loans; and (v) Tyco's use of post-period adjustments to off-set charges so that Tyco could make its earnings forecasts.

556.     As a direct and proximate result of the assistance of Tyco and its employees to one another and their conspiracy with PwC in connection with the violations of the New Jersey RICO Act alleged above, Plaintiffs were injured.

## PRAYER FOR RELIEF

**WHEREFORE,** Franklin prays for judgment as follows:

1.     Awarding Franklin compensatory damages as a result of the wrongs alleged in the Complaint together with interest thereon;

2.     Awarding Franklin costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements;

3.     Awarding Franklin rescissory damages;

4.     Awarding Franklin prejudgment interest and/or opportunity cost damages in favor of Plaintiffs;

5.     Awarding Franklin _____ damages; and

6.     Awarding Franklin such other and further relief as the Court may deem just and proper.

549.    Tyco constitutes an enterprise under N.J.S.A. 2C:41-1c and, during the relevant period, was engaged in and its activities affected trade or commerce.  Kozlowski, Walsh, Swartz and Belnick were employed by and/or associated with Tyco during the relevant period.

550.    Plaintiffs were injured by the aforesaid pattern of racketeering activity as a result of Plaintiffs' ownership and acquisition of Tyco stock.

551.    The racketeering activities of Kozlowski, Walsh, Swartz and Belnick and their conducting or participating, directly or indirectly, in the conduct of Tyco's affairs, were carried out in the scope of their employment activities, arose from the types of activities that they were employed to perform, were substantially within the limits of their authority and were carried out in part to serve Tyco's interests.

552.    Tyco intended that its employees' racketeering activities, and their conducting or participating, directly or indirectly, in the conduct of Tyco's affairs, take place; Tyco was reckless or failed to exercise reasonable care with respect to its employees' racketeering activities and their conducting or participating, directly or indirectly, in the conduct of Tyco's affairs; and/or Tyco knew or should have known of its employees' unfitness or dangerous attributes, as manifested by their acts of malfeasance, misrepresentation and defalcation, and could reasonably have foreseen the risk of harm created by its employees and Plaintiffs' losses arose from those qualities.

## COUNT XI

(Against Tyco For Violations of N.J.S.A. 2C:41-2(d))

553.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

554.    Tyco, Kozlowski, Walsh and Swartz agreed with one another, as well as others including Belnick and PwC, that they would engage in the violations of the New Jersey RICO Act as set forth in the previous Counts of this Complaint.  Tyco along with the other co-conspirators, agreed to assist one another in the planning and/or commission of said violations.

(Against Tyco As An Association In Fact For Liability Under N.J.S.A. 2C:41-2(c))

541.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

542.    Tyco, Kozlowski, Walsh, Swartz and Belnick constituted an association in fact that is a liable person under N.J.S.A. 2C:41-2(c).  This association in fact conducted and participated in Tyco's affairs through a pattern of racketeering activity.  Tyco constitutes an enterprise under N.J.S.A. 2C:41-1c and, during the relevant period, was engaged in and its activities affected trade or commerce.  The association in fact was associated with Tyco.

543.    As is set forth above, the association in fact conducted or participated, directly or indirectly, in the conduct of Tyco's affairs through a pattern of racketeering activity.   In connection therewith, the market price of Tyco's stock was artificially and fraudulently inflated.

544.    As is set forth more fully above, Tyco, Kozlowski, Walsh, Swartz and Belnick operating as an association in fact, benefited from the conduct of Tyco's affairs through a pattern of racketeering activity.

545.    Further, in concealing their own defalcations and in effectuating fraudulent accounting manipulations, they were not simply engaged in carrying out their normal corporate functions.

546.    Plaintiffs were injured by the aforesaid pattern of racketeering activity as a result of Plaintiffs' ownership and acquisition of Tyco stock.

## COUNT X

(Against Tyco For Vicarious Liability Under N.J.S.A. 2C:41-2(c))

547.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

548.    Kozlowski, Walsh, Swartz and Belnick are liable persons under N.J.S.A. 2C:41-2(c).  They conducted and participated in Tyco's affairs through a pattern of racketeering activity.  In connection therewith, the market price of Tyco's stock was artificially and fraudulently inflated.

the scope of their employment activities, arose from the types of activities that they were employed to perform, were substantially within the limits of their authority and were carried out in part to serve Tyco's interests.

535.    Tyco intended that the racketeering activities take place and that, through them, said enterprises be acquired; Tyco was reckless or failed to exercise reasonable care with respect to its employees racketeering activities and the acquisition of said enterprises through those activities; and/or Tyco knew or should have known of its employees' unfitness or dangerous attributes, as manifested by their acts of malfeasance, misrepresentation and defalcation, and could reasonable have foreseen the risk of harm created by its employees in causing said entities to be acquired and in maintaining control over said entities, and Plaintiffs' losses arose from those qualities of the Individual Defendants.

## COUNT VIII

### (Against Tyco For Liability Under N.J.S.A. 2C:41-2(c))

536.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

537.    Tyco is a liable persons under N.J.S.A. 2C:41-2(c).   Tyco conducted and participated, through a pattern of racketeering activity, in the affairs of an enterprise comprised of an association in fact of Tyco, Kozlowski, Walsh, Swartz and Belnick.  During the Relevant Period, said enterprise was engaged in and its activities affected trade or commerce.  Tyco was associated with said association in fact.

538.    As is set forth above, Tyco conducted or participated, directly or indirectly, in the conduct of the association in fact's affairs through a patters of racketeering activity.   In connection therewith, the market price of Tyco's stock was artificially and fraudulently inflated.

539.    For the reasons set forth more fully above, this pattern of racketeering activity benefited Tyco.

540.    Plaintiffs were injured by the aforesaid pattern of racketeering activity as a result of Plaintiffs' ownership and acquisition of Tyco stock.

## COUNT IX

purported but false method of increasing earnings. As is described more fully above, said acquisitions were "spring-loaded" through accounting machinations to artificially inflate Tyco's earnings in the post-acquisition periods.

528. Plaintiffs were injured by Tyco's investments in these enterprises because they contributed to and perpetuated the artificial inflation of the market price of Tyco stock owned or purchased by Plaintiffs and because they contributed to the false impression that Tyco's strategy of pursuing earnings' growth through acquisitions was more successful than it actually was.

529. In addition, Plaintiffs tendered shares of stock owned by Plaintiffs in CIT in exchange for shares of falsely inflated Tyco stock in connection with Tyco's acquisitions of CIT.

530. Plaintiffs would not have purchased all or some their shares of Tyco stock at the prices at which they were purchased, would have sold their Tyco stock without suffering the massive losses that they eventually suffered or would otherwise have avoided those losses if Tyco did not engage in the conduct described above.

531. Plaintiffs were injured by the afore-stated conduct and said conduct proximately caused Plaintiffs' injuries for the reasons previously stated.

## COUNT VII

(Against Tyco For Vicarious Liability Under N.J.S.A. 2C:41-2(b))

532. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

533. Kozlowski, Walsh, Swartz and Belnick are liable persons under N.J.S.A. 2C:41-2(b). As is set forth above, they caused to be acquired and/or maintained the acquired companies through a pattern of racketeering activity using, in part, Tyco stock whose market value was artificially and fraudulently inflated as a result of the pattern of racketeering activity. The Acquired Companies enterprises constitute enterprises under N.J.S.A. 2C:41-1c, which were engaged in or whose activities affected commerce or trade.

534. The racketeering activities of Koslowski, Walsh, Swartz and Belnick, and the use thereof to cause the acquisition of an maintain control over said enterprises, were carried out in

521.    Tyco, and its counsel and its Board of Directors, either knew or were grossly reckless in ignoring facts that demonstrated the existence of fraudulent conduct long before Tyco disclosed its agents' misconduct.

522.    Despite red flags known to them, the members of the Audit Committee, the Compensation Committee and others at Tyco failed to investigate; (a) the propriety of the loans made to the Company's officers; (b) the adequacy of Tyco's disclosures concerning compensation; and (c) the self-dealing transactions.

523.    Further, Tyco was motivated to conceal the depth of the Company's accounting fraud by the cash crunch that affected Tyco following the revelation of the criminal conduct undertaken by Kozlowski, Swartz, Belnick and Walsh and others.  By claiming that the Company had not engaged in systemic accounting improprieties, Tyco was able to complete a $6 billion refinancing in January of 2003.  Without that refinancing, the persistent market rumors that Tyco would be forced to file for bankruptcy could well have become a reality.

524.    Plaintiffs were injured by the conduct of Tyco and said conduct proximately caused Plaintiffs' injuries for the reasons previously stated.

## COUNT VI

(Against Tyco For Liability Under N.J.S.A. 2C:41-2(b))

525.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

526.    Tyco is a liable person under N.J.S.A. 2C:41-2(b).  Tyco acquired and/or maintained control over numerous other enterprises through a pattern of racketeering activity. As set forth above, Tyco purchased companies that constitute enterprises under N.J.S.A. 2C:41-1c, which were engaged in or whose activities affected commerce or trade, using, in part, Tyco stock whose market value was artificially and fraudulently inflated as a result of Defendants' pattern of racketeering activity.

527.    Tyco's acquisitions of said entities contributed to and perpetuated the artificial inflation of the market price of Tyco's stock because said acquisitions were part of Tyco's

reserves by Tyco in his testimony.  In addition, he authenticated a May 2000 e-mail sent to Belnick during the course of McLucas's work on the SEC's investigation in which McLucas told Belnick that Tyco needed to change certain accounting practices that McLucas considered worrisome, particularly the use of accounting reserves to meet projected financial results.

517.   With reference to that practice, the e-mail stated, "The cost of this kind of fooling around can destroy a corporate franchise, and it's all so these guys can squeeze a couple of more pennies" out of earnings.  The e-mail further stated: "If we escape this process without a crippling broadside, the toughest challenge here seems to me to involve how one changes the culture."

518.   Tyco's Audit Committee and Board of Directors also either knew or were reckless in not knowing of the foregoing facts.  Once Tyco's counsel began an inquiry concerning the compensation paid to the Company's officers (including Walsh, Swartz and Kozlowski), counsel determined in short order that these officers had engaged in the fraudulent schemes to inflate their compensation that are alleged herein. It should have been equally easy for the Audit Committee, particularly with the assistance of PwC, to learn the same information.  This is particularly true in light of facts then known to the members of the Audit Committee and Board of Directors.

519.   According to a September 24, 2002 Associated Press article, the Tyco Board's Compensation Committee was also apprized of several of the improper relocation loans taken by the Company's officers, including Kozlowski, Swartz, Belnick and Walsh.  And, minutes from the February 21, 2002 Tyco Compensation Committee meeting specifically mention improper loans to Belnick ($14.9 million), Kozlowski ($18.8 million) and Swartz ($7 million).

520.   PwC has also claimed in public statements that it raised questions with Tyco's management concerning the propriety of the compensation paid Tyco's officers.  For example, PwC LLP spokesman David Nestor was quoted in a January 2, 2003 article in *The New York Times* article as stating:  "We did not know that the disclosure was wrong.  We raised questions about it, went to the company and were told that the disclosure was appropriate."

Audit Committee is charged under its charter with supervising Tyco's litigation, including the SEC's investigation of Tyco's financial statements, the Company's Audit Committee either knew or should have known about those adverse facts as well. *The Wall Street Journal* article states:

> Newly discovered e-mails written by attorneys at Tyco International Ltd.'s former outside law firm reveal that they knew about personal use of corporate funds by former Tyco Chairman L. Dennis Kozlowski and a host of accounting problems at the company in early 2000.
>
> The e-mails - written by Wilmer, Cutler & Pickering partners Lewis Liman and William McLucas - have been obtained by the Manhattan district attorney's office and the Securities and Exchange Commission in their continuing investigation into Tyco and some of its former top executives, according to people familiar with the matter.  Part of the SEC's probe involves whether the conglomerate and Wilmer Cutler withheld relevant information that would have helped the SEC in an informal inquiry it launched in 1999 into Tyco's accounting practices…

513.    One e-mail mentioned in *The Wall Street Journal* article, a March 23, 2000 communication from a Wilmer Cutler partner to Belnick, states:  "There are payments to a woman whom the folks in finance describe to be Dennis's girlfriend [now wife, Karen Mayo].  I do not know Dennis's situation, but this is an embarrassing fact."

514.    In addition, a May 25, 2000 e-mail from another Wilmer Cutler partner to Belnick states, "We have found issues that will likely interest the SEC…creativeness is employed in hitting the forecasts…"

515.    The same document acknowledges that "[t]here is a bad letter from the Sigma people just before the acquisition confirming that they were asked to hold product shipment just before the closing…"  In addition, Wilmer partner McLucas stated that the company's financial reports suggest "something funny which is likely apparent if any decent accountant looks at this."

516.    The facts set forth in *The Wall Street Journal* articles were verified by McLucas in his testimony in Belnick's criminal trial.  McLucas acknowledged the use of cookie jar

activity (i) in other companies, (ii) Tyco, and/or (iii) an association in fact of Tyco and themselves whose purpose was to artificially and fraudulently inflate the market price of Tyco's stock.  Each of said entities constituted enterprises engaged in or whose activities affected commerce or trade.

508.    Tyco benefited from said investment and/or use of income derived, directly or indirectly, from a pattern of racketeering activity.

509.    The racketeering activities by Kozlowski, Walsh, Schwartz and Belnick and the use of the income derived therefrom were carried out in the scope of their employment activities, arose from the types of activities that they were employed to perform, were substantially within the limits of their authority and were carried out in part to serve Tyco's interests.

510.    Tyco intended that the racketeering activities take place, that the income derived from said activities be used or invested as aforesaid; was reckless or failed to exercise reasonable care with respect to the racketeering activities; and/or Tyco knew or should have known of its employees' and agents' unfitness or dangerous attributes, as manifested by their acts of malfeasance, misrepresentation and defalcation, and could reasonably have foreseen the risk of harm created by its agents from which qualities Plaintiffs' losses arose.

511.    Tyco failed to take measures to prevent or remedy the fraud.  For instance, Tyco's Board of Directors failed to correct Defendant Kozlowski's false statements to investors stating that the Board of Directors had approved the Company's payment of $20 million to Walsh as part of the CIT acquisition.  Given the size of the Company's stock price drop on that date, the Kozlowski's clear response in a Company press release, the Board of Directors either knew or was reckless in not knowing that Kozlowski's statements were false and misleading and an attempt to conceal the criminal nature of the payment to Walsh.

512.    Similarly, an article in the December 27, 2002 edition of *The Wall Street Journal* shows that Tyco's outside counsel and certain of the Company's Board of Directors knew in early 2000 that the Company had serious accounting problems and that corporate funds were being misused by the Company's senior executives, including Kozlowski and Walsh.  Because the

misstatements and omissions contained in the Registration Statements/Prospectuses as set forth above.

502.    Plaintiffs purchased or otherwise acquired Tyco shares pursuant to or traceable to the defective Registration Statements/Prospectuses filed in connection with the CIT acquisition. Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statements/Prospectuses filed in connection with the CIT acquisition.

503.    Plaintiffs offer to tender to Defendants those Tyco securities that Plaintiffs continue to own in return for the consideration paid for those securities together with interest thereon.

504.    By reason of the conduct alleged herein, Tyco violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiffs who hold Tyco shares purchased or acquired pursuant or traceable to Registration Statements/Prospectuses filed in connection with the CIT acquisition and have the right to rescind and recover the consideration paid for their Tyco shares and, hereby elect to rescind and tender its Tyco shares to Defendants sued herein.  To the extent Plaintiffs have sold their Tyco shares, they are entitled to rescissory damages.

505.    Any applicable statute of limitations has been tolled since the filing of the first complaint in the consolidated federal securities class action against Defendants styled *In re Tyco International Ltd., Securities Litigation*, MDL Docket No. 02-1335-PB, Civil Action No. 02-266-PB (D.N.H.), until, at the earliest, the Plaintiffs were excluded from such litigation by the order entered December 19, 2007.

## COUNT V

(Against Tyco For Vicarious Liability In Violation Of N.J.S.A. 2C:41-2(a))

506.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

507.    Kozlowski, Walsh, Schwartz and Belnick are liable persons under N.J.S.A. 2C:41-2(a).  They used income derived, directly or indirectly, from a pattern of racketeering

shares of falsely inflated Tyco stock.  Plaintiffs suffered significant losses as a result of these violations.

496.    Plaintiffs would not have purchased their shares of Tyco stock at the prices at which they were purchased, would have sold their Tyco stock without suffering the massive losses that they eventually suffered or would otherwise have avoided those losses if Tyco had not engaged in the conduct alleged herein.

## COUNT IV

(Against Tyco For Violations Of Section 12(a)(2) Of The Securities Act)

497.    Plaintiffs bring claims against Tyco pursuant to Section 12(a)(2) of the Securities Act.

498.    This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

499.    Tyco was a seller, offeror, and/or solicitor of sales of the shares offered pursuant to the Registration Statements/Prospectuses filed in connection with the CIT acquisition.

500.    The Registration Statements/Prospectuses filed in connection with the CIT acquisition contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  Tyco's actions of solicitation included participating in the preparation of the materially false and misleading Registration Statements/Prospectuses.

501.    Tyco owed to Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements/Prospectuses filed in connection with the CIT acquisition to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Tyco knew of, or in the exercise of reasonable care should have known of, the

above, through accounting machinations to artificially inflated Tyco's earnings in the post-acquisition periods.

492.    Not only was the fraudulent increase in the market price of its stock a benefit *per se* to Tyco, but Tyco also benefited from the fraudulent increase in the market price of its stock because the stock was used by the Company to fund various activities that served Tyco's interests, including, among other things, (i) using the stock to acquire other companies, and (ii) compensating officers and employees with stock and stock options the value of which were artificially and fraudulently inflated.

493.    The executive officers and directors of Tyco were benefited from these activities because (i) their embezzlement was concealed, (ii) their ability to continue pillaging Tyco was preserved, (iii) they were enriched by the fraudulent and artificial inflation in the price of Tyco stock due to their ownership of shares of Tyco stock, and (iv) the fraudulent inflation of Tyco's ostensible earnings entitled then to enhanced compensation based on Tyco's compensation incentives program.

**Plaintiffs' Injuries Arising From Defendants'     Violations Of The New Jersey RICO Act**

494.    Plaintiffs were injured by Defendant's violations of the New Jersey RICO Act because such violations resulted in, preserved and perpetuated the artificial and fraudulent inflation of the market price of Tyco stock that Plaintiffs purchased, acquired or held during the Relevant Period.

495.    Plaintiffs were injured by Tyco's investments in various other enterprises because they contributed to and perpetuated the artificial inflation of the price of Tyco stock owned or purchased by Plaintiffs and contributed to the false impression that Tyco's strategy of pursuing earnings growth through acquisitions was more successful than it actually was.  Defendant's violations of the New Jersey RICO Act directly caused injury to Plaintiffs because, among other things, they caused Plaintiffs to tender shares of stock owned by Plaintiffs in CIT in exchange for

487.    Tyco engaged in such conduct in order to enrich itself at the expense of Tyco investors, including Plaintiffs.  Each of the instructions to sell shares in Tyco and transfers of the proceeds of those sales constitutes a separate act of wire fraud and of fraud in the offering, sale or purchase of securities.  Such actions constitute racketeering activity under N.J.S.A. 2C:41-1a(2) and under N.J.S.A. 2C:41-1a(1)(p).

**Violations Of The New Jersey RICO Act**

488.    Tyco violated the New Jersey RICO Act in a number of ways, which are set forth more fully below.

489.    By way of summary, Tyco conducted or participated, directly or indirectly, in the conduct of the affairs of two distinct enterprises as defined herein, which were engaged in or whose activities affected commerce or trade in New Jersey, through a pattern of racketeering activity, as set forth in the previous sections.  In connection therewith, among other things (i) embezzlement was effectuated and concealed, (ii) Tyco's reported earnings were fraudulently increased, and (iii) the market price of Tyco's stock was artificially and fraudulently inflated.  Such activities violated N.J.S.A. 2C:41-2(c).

490.    In addition, using income derived from racketeering activity and/or through a pattern of racketeering activity, Tyco and/or an association in fact of Tyco, Kozlowski, Walsh, Swartz and Belnick acquired and/or acquired control over numerous other business entities, including but not limited to ADT Automotive, Flag Telecom, Carlisle Plastics, U.S. Surgical Corp., Keystone International, Inc., Raychem Corp., Mallinckrodt and CIT (collectively "the Acquired Companies Enterprises"), each of which constituted enterprises under N.J.S.A. 2C:41-1c, and which engaged in commerce or trade in New Jersey.  Such actions violated N.J.S.A. 2C:41-2(a) and (b).

491.    Tyco's acquisitions of said entities contributed to and perpetuated the artificial and fraudulent inflation of the price of Tyco's stock via the acquisitions scheme set forth herein.  The acquisitions were part of Tyco's false method of increasing earnings, as is described more fully

1a(1)(p).  In particular, as is alleged in detail herein, Tyco violated §10(b) of the Exchange and §18 of the Exchange Act.

483.    In addition, Tyco offered, purchased or sole securities in violation of N.J.S.A. 49:3-71, as is alleged more fully above and in the RICO Counts alleged herein, by offering and selling those shares (i) by employing devices, schemes and artifices to defraud, and (ii) by engaging in acts, practices and courses of business that operated as a fraud and deceit.  Such actions constitute racketeering activity under N.J.S.A. 2C:41-1a(1)(p).

## Mail And Wire Fraud

484.    Tyco committed mail fraud and wire fraud in violation of 18 U.S.C. §1341 and §1343, respectively.  Among other things, Tyco committed wire fraud by causing numerous documents to be filed with the SEC, knowing that they contained materially false and misleading statements using the SEC's EDGAR system.  Tyco also committed mail fraud by causing the numerous materially false and misleading disclosures contained in Press Releases, Proxy Statements and Annual Reports, as set forth above, to be mailed to Tyco's shareholders.  In addition, Tyco's policy was to mail SEC filings to any shareholder or potential investor who requested them.  As set forth above, those filings contained materially false and misleading statements.  Such actions constitute racketeering activity under N.J.S.A. 2C:41-1a(2).

485.    These acts of wire fraud and mail fraud were made with the knowledge, approval or acquiescence of Tyco.

486.    In addition, in connection with the insider sales of the Tyco stock, use was made of telephonic or wire instructions to initiate the sales on or about the dates of such sales.  At the time of giving those instructions, Tyco's officer and directors failed to disclose adverse material information about Tyco that was in their possession.  With respect to each of these transactions, individuals caused the proceeds of the sales to be transferred to them by wire or other electronic means.  Though they knew that these proceeds were generated through fraudulent means, they failed to disclose said adverse material information.

two reserve accounts), the ADT acquisition bonuses (also improperly offset against the unrelated gain accrued by Tyco on the disposition of the ADT Automotive business), the improper undervaluation of Flag Telecom Stock in order to accelerate vesting of shares of restricted Tyco stock owned by Kozlowski and Swartz, the concealment of Kozlowski's abuse of the KEL Program loans in Tyco's SEC filings, the concealment of Belnick's side agreement guaranteeing an annual cash bonus at least equal to one-third of Kozlowski's, the concealment of Belnick's year 2000 compensation in Tyco's 2001 Proxy Statement and other SEC filings, the concealment of the true terms of Belnick's Retention Agreement, the concealment of income received by Kozlowski and Swartz through improper transactions with Tyco and Tyco's payment of various personal expenses incurred by them.   Such actions constitute "fraudulent practices" under N.J.S.A. 2C:41-1a(l)(o).

480.   In addition, as is set forth more fully in the RICO causes of action alleged herein, such actions were intended to constitute false statements of material fact or omissions of material fact, to be relied upon by Tyco's shareholders, including Plaintiffs, were reasonably relied upon by Tyco's shareholders, including Plaintiffs insofar as, had they known the truth, they would have sold or not purchases their Tyco stock in light of, at the very least, the rampant and manifest corruption of the Individual Defendants and the Company's inadequate oversight of those Defendants.  Such acts of fraudulent concealment constitute racketeering activity under N.J.S.A. 2C:41-1a(1)(o).

481.   As set forth more fully above, Tyco also engaged in fraudulent disclosures and accounting practices in order to artificially inflate its earnings and the market price of its stock. Such actions constitute "fraudulent practices" and racketeering activity under N.J.S.A. 2C:41-1a(1)(o).

**Securities Violations**

482.   As set forth at length herein, Tyco committed fraud in the offering, sale and purchase of securities.  Such actions constitute racketeering activity under N.J.S.A. 2C:41-

also prevented others from acquiring information that would affect their judgment of the particular transactions involved, failed to correct false impressions that they had created or reinforced with regard to those transactions and failed to correct false impressions held by Tyco's shareholders, even though they knew that such impressions influenced Tyco's shareholders, and even though, as employees, officers and/or directors of Tyco, they stood in a fiduciary relationship to the company and its shareholders, including Plaintiffs.  Such actions constitute racketeering activity under N.J.S.A. 2C:41-1a(l)(n).

477.   Tyco, Kozlowski and Walsh engaged in theft and theft by deception by, among other means, engaging in schemes (i) to abuse the Company's "relocation loans" program and KEL Programs, (ii) to pay themselves secret, unapproved bonuses, (iii) the payment of the secret Walsh finder's fee, (iv) selling stock to the Company at artificially inflated prices, and (v) other fraudulent schemes detailed herein in § V and § VI, including §V.E. detailing Defendants' looting of the Company.

478.   Tyco, Kozlowski and Walsh substantially assisted, cooperated and participated with one another in the perpetration of these thefts by orchestrating them and by aiding and abetting in their concealment through improper and misleading accounting practices and misrepresentations and omissions contained in Tyco's disclosures to shareholders and SEC filings.

## Fraudulent Practices And Violations Of Chapter 21 Of Title 2C Of The New Jersey Statutes

479.   As is set forth more fully above, Tyco, Kozlowski and Walsh also engaged in various fraudulent practices for both self-enrichment and to artificially inflate the market price of Tyco stock and assisted one another in the perpetration of their fraud.  Such actions are alleged more fully above, and in the RICO causes of action alleged herein, and include the fraudulent concealment of "relocation" loans, the unauthorized Walsh bonus, the TyCom Bonus (which was improperly concealed by being accounted for, in part, as an offering expense and booked against

damaged as a result of Defendant's schemes, and Defendant is liable therefore, under the New Jersey RICO Act, as is set forth in detail below.

**Defendant's Pattern Of Racketeering Conduct**

474.    The Predicate acts constituting Defendant's pattern of racketeering activity shared common purposes, results, participants, victims and methods.  In addition, as set forth above, they were carried out during an extended period of time and were interrelated by distinguishing characteristics and were not disconnected or isolated acts.  They were oriented toward common goals, objectives and schemes, including (i) the artificial and fraudulent inflation of Tyco's reported earnings; (ii) the artificial and fraudulent inflation of Tyco's stock price; (iii) Tyco's acquisition of other companies, in part, through the exchange of its artificially and fraudulently priced stock for the ownership of said companies; (iv) enabling Tyco to compensate its employees with the artificially and fraudulently inflated stock; and (v) the enrichment of Kozlowski, Swartz, and Walsh through unauthorized compensation and financial benefits.

475.    Tyco committed at least two predicate acts of racketeering conduct during the Relevant Period, which lasted from at least 1997 to at least 2002.

**Theft And Violations Of Chapter 20       Of Title 2C Of The New Jersey Statutes**

476.    Tyco is liable for the conduct of Kozlowski and Walsh, who engaged in theft and theft by deception, in violation of N.J.S.A. 2C:20-3 and -4, by wrongfully and intentionally obtaining millions of dollars of income and property from Tyco to which they knew they were not lawfully entitled.  As is set forth at length above, in violation of N.J.S.A. 2C:20-4, Tyco, Kozlowski and Walsh concealed their wrongful activities through, among other things, their misleading accounting practices, and created and reinforced numerous false impressions regarding illicit income and financial benefits that they received.  Tyco, Kozlowski and Walsh

contained in the 1934 Act documents it relied upon in connection with the CIT Exchange, the Fall 2001 Purchases, the 1/18/02 Purchase and, in addition, relied upon the following misstatements and omissions:

a.      The false statements and omissions contained in the 8-K filed January 24, 2002 as identified in paragraph 290;

b.      The false statements and omissions contained in the January 28, 2002 Proxy Statement, identified in paragraphs 296-302.

467.    Franklin actually read, reviewed and relied on the false and materially misleading statements contained in the 1934 Act Documents identified above in making the decision to purchase Tyco securities.

468.    In ignorance of the falsity of the statements contained in the 1934 Act Documents identified above, and after reading and actually relying thereon, Franklin purchased Tyco securities in actual eyeball reliance upon Tyco's representations.

469.    Tyco's materially false or misleading statements contained in the 1934 Act Documents identified above, artificially inflated the price of Tyco securities.

470.    Had it known the true facts, Franklin would not have purchased the Tyco securities, and/or would not have purchased them at the inflated price.

471.    Upon disclosure of the true facts, the price of Tyco securities purchased by Franklin dropped, and Franklin suffered damages if an amount to be proven at trial.

472.    By reason of the foregoing, Tyco is liable to Franklin for violation of Section 18 of the Exchange Act, 15 U.S.C. §78(r).

## PLAINTIFFS' NEW JERSEY RICO ALLEGATIONS

473.    Plaintiffs bring claims against Tyco pursuant to the New Jersey RICO Statute, N.J.S.A. 2C:41-1, *et seq.*  Through the misconduct described in detail above, Defendant engaged in a pattern of racketeering activity, as that term is defined in N.J.S.A. 2C:41-1.  Plaintiffs were

463.    On September 26, 2001 through November 27, 2001 Franklin purchased Tyco stock on the open market (the "Fall 2001 Purchases").  In making the Fall 2001 Purchases, Franklin read, reviewed and actually relied upon the false statements in the 1934 Act document identified above in connection with the CIT Exchange.  In addition, in making the Fall 2001 Purchases, Franklin also read, reviewed and actually relied upon the following 1934 Act Documents:

a.    The 8-K filed on July 25, 2001 (the "7/25/01 8-K"); and

b.    The 10-Q for the Quarter ended June 30, 2001, filed on 8/13/01 (the "8/31/01 10-Q").

464.    In connection with the Fall 2001 Purchases, Franklin read, reviewed and actually relied upon the following misrepresentations and omissions in 1934 Act Documents:

a.    For the 7/25/01 8-K, the statements identified in paragraph 251; and

b.    For the 8/13/01 10-Q, the statements identified in paragraphs 255-258.

465.    On January 28, 2002, Franklin made open marked purchases of Tyco common stock (the "1/18/02 Purchases").  In making the 1/18/02 Purchases, Franklin read, reviewed and actually relied upon 1934 Act misrepresentations and omissions it relied upon in connection with both the CIT Exchange and the Fall 2001 Purchases and, in addition, relied upon:

a.    The false and misleading statements contained in the 10-K for the fiscal year ended September 30, 2001 (the "2001 10-K") identified in Paragraphs 271-278; and

b.    The false and misleading statements contained in the 2001 Annual Report, released on or about January 11, 2002 (the "2001 Annual Report") identified in Paragraphs 279-285.

466.    On January 28, 2002 through February 1, 2002, Franklin purchased Tyco stocks on the open market (the "Late-January 2002 Purchases").  In making the Late-January 2002 Purchases, Franklin read, reviewed and actually relied upon the false and misleading statements

-182-

claim is based solely on claims of strict liability and/or negligence under Section 18 of the Securities Exchange Act, 15 U.S.C. ¶78(r).

461.    As set forth in Exhibit A hereto, Franklin acquired Tyco stock on two separate and discreet occasions.  First, Franklin acquired approximately 6.82 million shares of Tyco stock in exchange for its CIT stock (the "CIT Exchange").  Thereafter, Franklin acquired Tyco stock on the open market after reading reviewing and actually relying upon documents filed by Tyco with the SEC pursuant to the Securities and Exchange Act of 1934 ("1934 Act Documents").  When Franklin acquired Tyco stock in the CIT Exchange, it read, reviewed and actually relied upon the following 1934 Act Documents:

a.    The 2000 10-K filed on 21/21/00 (the "2000 10-K");

b.    The 2000 Annual Report released on or about 1/30/01 (the "2000 Annual Report");

c.    The 2001 Proxy Statement, filed on 1/29/01 (the "2001 Proxy Statement");

d.    The 10-Q for the Quarter ended December 31, 2000, filed on 2/13/01 (the "2/13/01 10-Q");

e.    The 10-Q for the Quarter ended March 31, 2001, filed on 5/11/01 (the "5/11/01 10-Q").

462.    In connection with the CIT Exchange, Franklin actually read, reviewed and relied upon the following misrepresentations and omissions in the following 1934 Act Documents:

a.    For the 2000 10-K, the statements identified in paragraphs 201-208;

b.    For the 2000 Annual Report, the statements identified in paragraphs 209-215;

c.    For the 2001 Proxy Statement, the statements identified in paragraphs 219-225;

d.    For the 2/13/01 10-Q, the statements identified in paragraphs 226-228;

e.    For the 5/11/01 10-Q, the statements identified in paragraphs 245-248.

indirectly on the materially false and misleading statements made by Tyco, or upon the integrity of the market in which the securities trade, and the truth of any representations made to appropriate agencies as to the investing public, at the times at which any statements were made, and/or on the absence of material adverse information that was known to or recklessly disregarded by Tyco but not disclosed in public statements by Tyco, Franklin purchased or otherwise acquired for value Tyco securities at artificially high prices and was damaged thereby.

455. At the time of such misstatements and omissions, Franklin was ignorant of their falsity, and believed them to be true.  Had Franklin or the marketplace known of the true financial condition of the Company, which was not disclosed by Tyco, Franklin would not have purchased or otherwise acquired Tyco securities, or, if it had purchased or otherwise acquired such securities, Franklin would not have done so at artificially inflated prices.

456. By virtue of the foregoing, Tyco has violated Section 10(b) of the 1934 Act, and Rule 10b-5 promulgated thereunder.

457. As a direct and proximate result of Tyco's wrongful conduct, Franklin suffered damages.

458. Franklin commenced this action within two years of having discovered the basis for its claim and within five years of the alleged violations (as tolled during the pendency of various class actions against Tyco).  Consequently, this action is timely.


## COUNT III

## VIOLATION OF SECTION 18 OF THE EXCHANGE ACT

459. Except as described below, Franklin repeats and realleges each and every allegation contained in the foregoing paragraphs as fully set forth herein.

460. For purposes of this claim, Franklin expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this

and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

452.    Tyco, directly and indirectly, by the use of means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial results, businesses, operations, and prospects as specified herein.  Tyco employed devices, schemes, and artifices to defraud, while in possession of material, adverse, non-public information, and engaged in acts, practices, and a course of conduct as alleged herein, in an effort to assure investors of Tyco's earnings, assets, revenues expenses and the accuracy of the Company's financial reporting of performance, which included the making of, or the participation in the making of, untrue statements of material facts and omissions to state the material facts necessary in order to make the statements made about the Company's financial and business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein.

453.    Tyco had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that it failed to ascertain and to disclose such facts, even though such facts were available to them.  Tyco's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Tyco's accounting irregularities and the Undisclosed Acquisitions from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Tyco's statements set forth above, if it did not have actual knowledge of the misrepresentations and omissions alleged, Tyco was reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

454.    As a result of the dissemination of the materially false and misleading information and/or Tyco's failure to disclose material facts, as set forth herein, the market price of Tyco securities was artificially inflated at all relevant times.  In ignorance of the fact that the market price of Tyco's publicly-traded securities was artificially inflated, and relying directly or

plaintiffs filed their Complaint (excluding periods tolled by virtue of the pendency of various class actions against Tyco).

## COUNT II

### VIOLATION OF SECTION 10(b) OF THE 1934 ACT AND RULE 10b-5 PROMULGATED THEREUNDER

447.    Franklin repeats and realleges each and every allegation above as if set forth in full herein.

448.    Franklin brings this Count against Tyco for violations of Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

449.    Tyco carried out a scheme, plan and course of conduct that was intended to and did:  (i) deceive the investing public, including Franklin; (ii) artificially inflate and maintain the market price of Tyco securities; and (iii) cause Franklin to purchase or otherwise acquire Tyco securities at inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Tyco took the actions set forth herein.

450.    Tyco:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and/or acquirers of the Company's stock in an effort to maintain artificially high market prices for Tyco securities in violation of Section 10(b) of the 1934 Act, 15 U.S.C. 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5.

451.    In addition to the duties of full disclosure imposed on Tyco as a result of its making affirmative statements and reports to the investing public, Tyco had a duty to promptly disseminate truthful information that would be material to investors, in compliance with GAAP and the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including truthful, complete and accurate information with respect to the Company's operations

Amendment No. 1 to Form S-4, dated April 13, 2001

Prospectus relating to the proposed merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV), dated April 24, 2001

Post-Effective Amendment No. 1 to Form S-4 relating to the proposed merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV), dated May 24, 2001

Prospectus relating to Tyco's proposed offer to exchange up to 7,141,083 common shares of Tyco stock for exchangeable shares of Tyco's direct subsidiary, CIT Exchangeco, Inc., dated June 5, 2001

Form S-8 in connection with the issuance of securities to The CIT Group, Inc. Savings Incentive Plan, relating to the proposed merger between The CIT Group, Inc. and Tyco, dated June 7, 2001

441.    The Company is the registrant and issuer for these offerings.

442.    As issuer of the shares, Tyco is strictly liable to Franklin for the material misstatements and omissions in the Registration statements/Prospectuses.

443.    By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, Section 11 of the 1933 Act.

444.    Franklin acquired Tyco shares issued pursuant to, or traceable to, the Registration Statements/Prospectuses.

445.    Franklin has sustained damages.   The value of Tyco shares has declined substantially subsequent to and due to Tyco's violations.

446.    At the time they acquired Tyco shares, Franklin was without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered such facts or wrongful conduct.   Less than one year elapsed from the time that Franklin discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that plaintiffs filed their Complaint (excluding periods tolled by virtue of the pendency of various class actions against Tyco).   Less than three years elapsed from the time that the securities upon which this Count is brought were *bona fide* offered to the public to the time

the entire week.  Much of the decline was the result of investor concerns that Tyco was facing a liquidity crisis, which Defendants had previously assured investors was not the case.  On April 30, *The New York Times* reported on Tyco's decline the previous day:  "Tyco International tumbled nearly 15 percent, sinking to 1997 levels, as investors worried about a cash shortage after Fitch Ratings cut its ratings on Tyco's debt, making it more expensive for Tyco to raise money.  The shares slumped $2.90, to $17, and [Tyco] was among the most active issues on the Big Board."  Also on April 29, *Barron's* issued an article stating:  "Liquidity fears continued to batter Tyco International . . . .  'If they don't refinance or sell assets, they'll run out of cash in the second quarter of next year,' predicts Glenn Reynolds, a fixed-income analyst at CreditSights."  Shares of Tyco only rebounded after Tyco assured investors on April 30 there was not a liquidity issue.  *See supra* ¶468.

437.    On April 30, Franklin sold its remaining Tyco stock at prices of approximately $15 per share, fully liquidating its more than $120 million in losses over a period of less then 10 months.

## COUNT I

## VIOLATION OF SECTION 11 OF THE 1933 ACT

438.    Franklin brings this Count against Tyco pursuant to Section 11 of the 1933 Act, 15 U.S.C. § 77k.

439.    This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

440.    The following registration statements and prospectuses (the "Registration Statements/Prospectuses") were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above:

> Form S-4 relating to a proposed merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV), a direct wholly-owned subsidiary of Tyco, dated March 29, 2001

misleading press reports during the past quarter, as well as from uncertainties arising from our announced break-up plan, which distracted employees, customers, and vendors, and increased our borrowing costs."

433.    On April 25, 2002, the Company also disclosed it would sell CIT via an initial public offering for *up to* $7.15 billion.  The Company had paid almost $10 billion for CIT only eleven months prior.  Indeed, many were skeptical that Tyco could even get $7 billion for CIT. The Company's inability to sell CIT for a price close to what Tyco paid for it was a strong indication to investors that (i) Tyco's acquisition of CIT was at too high a price and was promoted and approved by Walsh because he had an undisclosed financial interest in the acquisition, (ii) Tyco's accounting for acquisitions, such as CIT, was in fact false and misleading, and (iii) Tyco was suffering a severe liquidity crisis and was trying to raise capital via a fire sale.

434.    The stock price of Tyco fell 19.9% to close at $20.75 on reported volume of 110.8 million shares, which was almost 13 times its average volume over a period through April 24, 2002.

435.    On April 26, 2002, after the close of trading, Fitch Ratings downgraded the senior unsecured debt of Tyco to BBB from A-.   These downgrades were attributed to the "…continuous revisions to the company's restructuring plans which have delayed debt reduction anticipated from the divestiture of assets, resulting in heightened concern surrounding the company's maturity schedule."  A *Barron's* article released on April 29, 2002, was very critical of Tyco's acquisition accounting practices.  The article stated that "…Tyco's woes largely spring from its pell-mell acquisition sprees, which both diverted vast amounts of resources and inspired 'astute accounting practices' that enabled it to inflate, possibly quite substantially, reported earnings."  The stock price of Tyco fell 14.6% to close at $17.00 on reported volume of 99.8 million shares, which was over 11 times its average volume over a period through April 26, 2002.

436.    Tyco shares continued to fall over the next several trading days (there was no trading on April 27 and 28), reaching as low as $15.25 by April 30 on extremely heavy volume

The plan at Tyco was to break up, not break.  But the stock hit a new low yesterday at the company analysts are calling Enron II. What's going on:

*A string of red flags are popping up.  They include conflicts of interest on Tyco's board, questionable accounting methods and $8 billion in unreported acquisitions.

*Shares plunged 23 percent yesterday, the biggest fall in at least two decades.  Tyco's market value is down $61 billion in just the last month.

*Tyco's credit rating has been trashed repeatedly and was hit again yesterday when Fitch Ratings and Standard & Poor's said the company won't be able to borrow enough money to stay afloat.

431.    After the February 2002 disclosures, Tyco shares fluctuated without significant movement until April 25, 2002, when the Company announced (among other things) financial results for its fiscal second quarter.  The Company's financial results were below analysts' expectations and partially revealed the true financial condition of the Company, which Defendants had previously concealed.  For the period ending March 31, 2002, Tyco reported a net income loss of over $6 billion, which was in stark contrast to its March 31, 2001 reported net income of over $1 billion.  The Company attributed the loss to a number of factors, all related to Defendants' fraudulent activities.  For instance, the Company was forced to take a $2.41 billion write down on the value of its TyCom Global Network, about which Defendants had previously made false and misleading statements.  Tyco also took a charge of $180.6 million in connection with its investment in Flag Telecom, which had been falsely inflated as part of Defendants' scheme to loot the Company.  Tyco's poor performance in the quarter was the result of Defendants' prior fraudulent conduct catching up with the Company and Defendants' inability to continue to hide Tyco's business units' poor performance via accounting tricks and other misleading measures.

432.    A reason given for the shortfall was that the "…results were negatively impacted by reduced revenues and substantial costs incurred as a result of the wave of rumors and

**Kozlowski has overseen $64 billion in acquisitions during his seven-year watch, but at least $8 billion of them weren't publicly disclosed.**

**Among several red flags that have been raised over Tyco in recent weeks is the disclosure that the company paid one of its board members $20 million to help engineer a key acquisition.**

**Kozlowski hasn't made headway in calming angry investors who've unloaded Tyco stock en masse.  Tyco fell 23 percent yesterday, the largest drop in two decades, closing at $23.10 in huge volume of 175 million shares.**

"The first thing they have to do is try to regain some credibility with the investor community, which they can do by making their financial statements less complex," said Rob Plaza, an analyst at Morningstar.

Kozlowski had hoped his break-up plan would allay concerns, but it raised more questions than it answered.  Analysts called that an unexplained U-turn from Tyco's pattern of growth through acquisitions.

The downgrades raised concerns that Tyco won't be able to repay $11 billion in debt of piled onto the units it wants to spin off.

*       *       *

But nagging suspicions in recent months about its accounting have come to a head.  Two days ago, Tyco said it would replace $4.5 billion of its short-term debt with $5.9 billion in bank loans to give it more flexibility and shore up its balance sheet.  The move came as ratings agencies Standard & Poor's and Fitch downgraded the debt of Tyco and its wholly-owned financial subsidiary, Tyco Capital.

*Tyco Capital officials acknowledged they have been shut out of the corporate bond market in recent days because of accounting worries.*

*       *       *

Coming Apart

-173-

capital markets."  On February 5, 2002, Egan-Jones cut Tyco's credit ratings to junk status
stating that the tenth largest corporate borrower would have trouble paying its $17 billion worth
of debt due over the next year.  The stock price drop on February 5, 2002 was attributed to the
"…investor concern [that] the conglomerate faces a credit crunch after its debt was downgraded
by debt-rating agencies."  The stock price of Tyco fell 22.7% to close at $23.10 on reported
volume of 174.7 million shares, which was over 22 times its average volume over a period
through February 1, 2002.

430.  On February 6, 2002, *The New York Post* ran an article titled "TYCO IS ENRON
II; STOCK PLUNGES; BREAK-UP PLAN IN TROUBLE" commenting on Tyco's stock drop:

> One of America's highest paid CEOs watched helplessly
> yesterday as his company - Tyco International - crumbled amid the
> taint of skullduggery.
>
> Dennis Kozlowski, 55, in embroiled in what Wall Street is
> calling "Enron II" - the sad saga of a powerhouse collapsing due to
> **insider conflicts, over inflated stock and concerns about its
> accounting practices**.
>
> Shares of Tyco, a maker of products ranging from medical
> supplies to fire extinguishers, plunged again yesterday to a new
> low in a downward spiral that's already wiped out more than half
> its market value in the past month, or $61 billion.
>
> Credit-rating agencies also continued to trash Tyco's credit
> worthiness, saying it may not be able to borrow any more money
> to carry out its rescue break-up plan.
>
> Analysts and investors say they're concerned particularly
> about the company's accounting.
>
> "There's a fear that this is Enron II," said Bruce Bartlett of
> Oppenheimer.
>
> **What's spooking investors is that Tyco's chief wants to
> split up the company into four units as a way to prove that it
> wasn't covering up slow growth by making huge acquisitions.**

Tyco Capital, which is set to be spun off or sold as part of a radical restructuring plan announced by Tyco last month, has said it is gravely concerned by sever restrictions on its access to credit markets.

\*      \*      \*

Tyco, whose product line ranges from diapers to security systems, has become the biggest corporate casualty from investors' increasing concerns about opaque accounting practices and questionable corporate ethics in the fallout from the collapse of energy trader Enron Corp.

Tyco stock closed down $6.80, or about 23 percent, at $23.10 yesterday on the New York Stock Exchange.  It is now declined more than 60 percent this year for a loss of more than $70 billion in market value.  The company's bonds also suffered, with notes due in 2011 falling to 74.75 cents, a loss of 16 cents in the past week.

"There are no buyers for the debt," said Jim McDonald, vice president at T. Rowe Price Associates Inc. in Baltimore, who helps invest $15 billion in money-markets assets.  He said liquidity for Tyco has dried up.

Investors and some analysts said there was no sign of a rebound anytime soon as the questions about Tyco's strategy and disclosure policies continue to mount.

\*      \*      \*

"There's no reason to believe this name has bottomed out," said Carol Levenson, a bond analyst at Gimme Credit, who raised questions in a research note yesterday about how Tyco would refinance an estimated $11 billion in maturities coming due over the next 18 months.

Through Tyco's bonds remain investment-grade, bond investors are treating them like junk, quoting the bonds by price rather than by their yield margin over U.S. Treasuries.

429.    On February 4, 2002, Fitch Ratings downgraded its ratings on Tyco's unsecured senior debt from A to A- to reflect "…the recent events on the company's ability to access the

427.    On February 4, 2002, *The Wall Street Journal* reported that Tyco had paid over $8 billion in the last three fiscal years for nearly 700 transactions that were never disclosed to the public.  The article stated that this news "…raises new questions about the completeness of financial disclosures by the conglomerate, which has come under close investor scrutiny in recent weeks for its complex accounting practices.  Also on February 4, 2002, Tyco announced that it was repurchasing its $4.5 billion outstanding Commercial Paper using funds it borrowed under its existing bank facilities.  Later on February 4, 2002, Standard & Poor's cut the credit ratings of Tyco's senior unsecured debt three levels from A to BBB and the story stated that use of credit lines to pay down the commercial paper could be a "…sign that the company's access to day-to-day funding is limited."  The stock price of Tyco fell 16.1% to close at $29.90 on reported volume of 75.9 million shares, which was over 9 times its average volume over a period through February 1, 2002.

428.    On February 5, 2002, the Company's share price continued to fall as investors' concerns were heightened by the Company's inability to obtain financing and growing awareness that Tyco faced a liquidity crisis that Defendants had previously concealed from investors.  Tyco shares reached a low of $22 on February 5 before closing at $23.10, significantly lower that the close on February 4 at $22.90.  Reuters reported (as printed in the *San Diego Union Tribune* on February 6):

> Tyco International Ltd.'s stock market value plunged $13.6 billion yesterday as concerns mounted about the conglomerate's ability to raise cash amid increasing signs it can no longer easily access debt markets.
>
> Investor confidence in Tyco, already badly damages by concerns about its complex accounting for acquisitions, was hurt further by downgrades in its credit ratings when the company decided to use lines of credit from banks to pay off short-term debt.
>
> Yesterday, its financing unit, Tyco Capital, said it will draw from $8.5 billion in bank credits to pay off short-term commercial paper, after a similar move by the Bermuda-based parent company on Monday.

stock price of Tyco fell 19.9% to close at $33.65 on reported volume of 170.3 million shares, which was almost 23 times its average volume for a period through through January 25, 2002.

424.    Tyco shares would have dropped even more on January 29 had Tyco and Defendant Kozlowski not lied to the marketplace concerning Board of Director approval of the payment.

425.    Quick on the heels of the news about the $20 million Walsh payment, *The New York Times* reported on January 30, 2002 that Defendants Kozlowski and Swartz had engaged in massive, hidden insider selling - surreptitiously disposing of over $100 million in Tyco shares during the fiscal year by selling their personal Tyco holdings back to the Company.  *The New York Times* article also discussed market rumors concerning Defendants' acquisitions scheme, as detailed herein.  In response, on January 30, 186 million shares of Tyco traded.  Tyco's stock price dropped from its January 29 close of $33.65 to as low as $27.48 before rebounding to close at $34.85 because of Defendants' false reassurances responding to *The New York Times* article.  Tyco issued a press release during the trading day on January 30 stating:

> Tyco International Chairman and Chief Executive Officer, L. Dennis Kozlowski, announced today that he intends to purchase, in the open market, with his own funds, 500,000 shares of Tyco common stock, and Tyco Chief Financial Officer Mark Swartz, intends to purchase, also with his own funds, 500,000 Tyco shares. Mr. Kozlowski further announced that the window is open for other Tyco officers and directors to purchase shares as well.  In making this announcement, Mr. Kozlowski reaffirmed his belief that the company substantially undervalued by the marketplace, and his complete confidence in the long-term investment value of Tyco shares.

426.    Tyco shares started 2002 trading at $58 before being driven down to $27.48 on January 30, 2002--erasing half Tyco's market capitalization in one month.  Plaintiffs' losses in the month of January 2002 can be directly linked to and were caused by the partial disclosure of Defendants' fraud, and therefore are compensable.

as 5% to a company's stock value in the days following the announcement.

"It's surprising the reaction isn't more favorable," said Stuart Gilson, a finance professor at Harvard Business School, whose research has shown that breakups of diversified companies such as Tyco (TYC) tend to increase shareholder value. ***The stock decline is a bearish sign, he said, suggesting that investors fear the company is trying to hide something, or hasn't put its controversial accounting issues behind it.***

422.    On January 28, 2002, Tyco filed its 2002 Proxy with the SEC.  The 2002 Proxy disclosed that Defendant Walsh, the Company's lead independent director, had been paid $10 million (with an additional $10 million being donated to a charity he headed) for his role in the Company's acquisition of CIT.  The trading day before the 2002 Proxy was filed, January 25, Tyco closed at $45.  On January 28, Tyco closed at $42.

423.    Although there are some new stories during the day regarding information contained in the proxy statement, it was not until after the close of trading on January 28, 2002, that it was widely reported that Tyco had made a $10 million payment to one of its Directors, Frank E. Walsh, Jr. and contributed $10 million to the Community Foundation of New Jersey, a charity for which Mr. Walsh was a trustee, for his assistance with Tyco's acquisition of CIT Group in 2001.  The disclosure of this payment by Tyco to one of its Directors raised concerns over the corporate governance at Tyco.  A *Wall Street Journal* article reported comments from corporate governance experts.  One corporate governance expert claimed he had never heard of a payment to a director of that size and called the payment "highly inappropriate."  A professor who researched corporate governance stated that "$20 million is a lot of money for a company to be paying a director for doing what may be his fiduciary duty…"  A news story later in the day attributed the stock price drop to the disclosure of the payment to Walsh, and stated that the "…payment raised questions about the conflicts of interest on Tyco's board as Chief Executive Dennis Kozlowski prepares to break up the company amid questions about its accounting."  The

33.9 million shares, which was almost 5 times its average volume for a period through December 31, 2001.

419.    Defendants' manipulation of the Company's financial results could not hide the Company's true financial condition indefinitely.  On January 15, 2002, Tyco partially revealed its true financial condition, which Defendants had previously concealed, when the Company announced financial results for the quarter ended December 31, 2001 that were below analysts' expectations.  In addition, Defendant Kozlowski attempted to address market concerns about Tyco's accounting in a conference call on January 15, 2002, but only fed investor speculation of impropriety when he could not adequately address investors' questions.  As a result, Tyco's stock price dropped from a close on January 14 at $52.40 to a close on January 15 at $47.95--a drop of 8.5%.

420.    On January 22, 2002, Tyco announced plans to split the Company into four separate pieces.  Investors were surprised by the Company's sudden reversal of strategy, fueling investors' concerns that Tyco was hiding something and causing Tyco's shares to drop 5%, or $2.86, on January 23.  On January 24 the *Financial Times* reported:

> Yesterday's share price drop reflects skepticism in the wake of the Enron collapse and growing fears about companies keeping bad news out of accounts.
>
> Tyco has suffered for the past two years from suspicions about its accounting policies, but repeatedly denied that it has been less than transparent.  Its decision to split fuelled some investors' belief that the company was attempting to pre-empt poor results.

421.    Similarly, on January 24, 2002, Dow Jones published an article also attributing the stock's decline to investor concerns the Company was splitting in an effort to conceal accounting improprieties:

> [T]he stock closed Wednesday below its level before the breakup announcement.  That's highly unusual, say academic researchers who have studied corporate breakups, which tend to add as much

-167-

financial statements and the integrity of its management, the price of Tyco common stock slid down to $20 per share.  Subsequently, by April 30, 2002, Tyco shares fell to $15.59.  Finally, on June 7, 2002, Tyco stock fell to a six-year low, down $4.50 to $10.10 per share, on news that: (1) the Manhattan DA's office and the SEC broadened their investigations beyond Kozlowski to determine if Tyco executives used the company's cash to buy and art and homes; (2) S&P and Moody's reduced Tyco's debt to lowest investment-grade rating (just above junk bond status), forcing Tyco to repay at least $530 million in debt; (3) the sale of CIT was delayed by the SEC while its fraud investigation continues; and (4) Tyco confirmed that it was launching its own "comprehensive internal investigation" into Kozlowski's and other executives' use of company funds.  The stock continued to trade at low levels during the 90 days thereafter.

417.    Beginning January 2002, Tyco shares traded at $58 before beginning a steep decline to as low as $8.25.  Tyco shares began to drop in early January 2002 because of investor concerns related to Tyco's accounting.  As reported in *The Wall Street Journal* on January 7, 2002, Tyco stock dropped on January 2, 2002 and January 3, 2002 on rumors that the Company was being investigated by the SEC.  The article highlighted concerns over the Company's accounting for the CIT acquisition and the Company's accounting for "installations of security alarms, mostly through its ADT unit."  Commenting on the accounting for the ADT alarm installations, Lynn Turner, a former chief accountant at the SEC, is quoted in the article as stating:  "In my experience, when you're not forthcoming about something like this, people get nervous about financial reporting and your credibility."

418.    On January 3, 2002, in response to renewed allegations, Dennis Kozlowski, stated that an analyst was "trying to develop a theory that there may or may not be an SEC review of Tyco.  There isn't."  SEC Insight, a research firm, indicated that it had been refused information regarding Tyco by the SEC, which it concluded could mean that Tyco was under investigation. Despite the denial from Dennis Kozlowski regarding the alleged SEC investigation, the stock price of Tyco continued to fall, closing down 4.0% to $54.98 per share on reported volume of

Tyco stock was heavily traded, with volume averaging at least several million shares daily.  Tyco filed periodic public reports with the SEC, and was followed by analysts from major brokerages, including Goldman Sachs, Salomon Smith Barney, and T. Rowe Price.  The reports of these analysts were redistributed to their customers and the public at large, and Tyco regularly issued press releases, which were carried by national newswires.  Thus, the analyst reports and Tyco's press releases entered the public marketplace.  As a result, the market for Tyco securities promptly digested current information with respect to Tyco from all publicly available sources, and reflected such information in Tyco's stock price.  Franklin relied on the integrity of the market price of Tyco's securities.

414.    Based upon the foregoing, Franklin is entitled to a presumption of reliance upon the integrity of the market for ultimate proof of its claims on the merits.  Franklin will also rely, in part, upon the presumption of reliance established by material omissions and upon its actual reliance on Tyco's materially false and misleading statements.

## LOSS CAUSATION

415.    The vast preponderance of Plaintiff's losses resulted from shares issued in connection with the CIT merger, in which newly-issued Tyco shares were issued to Plaintiffs.  To the extent that Plaintiffs have the ability to recover these losses under Section 11 of the 1933 Act, it is not necessary to plead or prove loss causation.  However, in connection with certain of Plaintiff's claims other than Section 11, Plaintiffs allege the following as loss causation:

416.    Franklin was damaged as a result of Tyco's fraudulent conduct set forth herein.  The price of Tyco's common stock steadily rose and stayed in the $50s for much of the period during and following the June 4, 2001 CIT acquisition and the period during which Franklin made additional acquisitions.  On January 29, 2002, the day after the improperly-concealed Walsh payment was disclosed in the Company's 2002 Proxy Statement, Tyco's shares fell from $42 to $33.65, reducing the company's market capitalization - according to Tyco - by almost $17 billion in one day.  Subsequently, as Tyco fought off attacks on the credibility of the Company's

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

410.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements complained of concerned Tyco's financial statements and historical and/or current condition affecting the Company.   Many of the statements pleaded herein were not specifically identified as "forward-looking statements" when made.    To the extent of any forward-looking statements, there were no meaningful cautionary statements identifying the important then-present factors that could and did cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Tyco is liable for those false forward-looking statements because at the time each of those statements was made, Tyco knew or recklessly disregarded that the statement was false or misleading, knew of or recklessly disregarded and failed to disclose adverse information relating to the statement, and/or the statement was authorized and/or approved by an executive officer of Tyco who knew or recklessly disregarded that the statement was materially false and misleading when made.

411.    Any warnings contained in the press releases and the financial statements quoted herein were generic statements of the kind of risks that affect any company and misleadingly contained no specific factual disclosure of any of Tyco's accounting irregularities or the Undisclosed Acquisitions.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

412.    At all relevant times, the market for Tyco's securities was efficient in that it promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the price.

413.    As an illustration, the common stock of Tyco met the requirements for listing, and was listed and traded on the New York Stock Exchange, a highly developed and efficient market, under the ticker symbol "TYC."   During the period when Franklin purchased Tyco securities,

Kozlowski and Swartz hid their private sales to the Company from public scrutiny for over thirteen months while they continued making false and materially misleading statements on Tyco's behalf, and while secretly pocketing $105 million from the Undisclosed Insider Sales alone. Indeed, Kozlowski and Swartz even received new stock options from the Company to replace the Tyco shares they sold through the Undisclosed Insider Sales.

409.    Furthermore, the Company's incentive plan (the "Plan") for additional payments to Kozlowski and Swartz was directly tied to the Company's reported earnings growth and free cash flow. Under the Plan, in fiscal 2000-2001 alone, Kozlowski and Swartz received 10,278,007 shares of restricted stock, worth $51,606,420 and $25,803,210, respectively, and were also each paid a cash bonus of $6.8 million and $3.4 million, respectively, based upon certain performance criteria. According to the Company's Schedule 14A, filed on January 29, 2001 (the "2001 Proxy Statement"), the incentive compensation to Kozlowski and Swartz was based upon, inter alia, (i) an increase in earnings for the Company, and (ii) an improvement in operating cash flow for the Company. Tyco's 2001 Proxy Statement also explicitly admitted that Kozlowski's and Swartz's incentive compensation "is in direct correlation to Tyco's performance and . . . ultimately determined by the future performance of Tyco as reflected by its share price." Further, the Company's Schedule 14A filed on January 28, 2002 stated:

> **[I]n order for Mr. Kozlowski and Mr. Swartz to have earned a cash bonus in fiscal 2001, the Company had to achieve a minimum of 15% growth in net income and at least a 10% growth in operating cash flow over fiscal 2000.** The performance criterion required to vest the minimum number of restricted shares granted to these executives was a growth rate in earnings per share before non-recurring items of at least 15% over fiscal 2000.

(Emphasis added.) As such, compensation to Kozlowski and Swartz under Tyco's incentive plan was inextricably linked to Tyco's materially false and misleading statements during the relevant period.

company executives - regardless of their magnitude - when the sale is made to the issuing company, these sales were not reported until the filing of a Form F-5, up to thirteen months after the sales. Although the proceeds from these sales are not disclosed in the Form F-5, plaintiffs estimate that the proceeds exceed $38 million.

407. According to a February 13, 2002 article in THE NEW YORK TIMES, although Kozlowski and Swartz publicly stated that they rarely if ever sold their Tyco shares, late in fiscal 2000 and during fiscal 2001, and unknown to the investing public, Kozlowski and Swartz secretly sold approximately **$105 million** of Tyco stock directly to the Company. These sales were not disclosed to investors until November 13, 2001 - **thirteen months after the first of those sales were made** (the "Undisclosed Insider Sales"). The Undisclosed Insider Sales are especially suspect because, by making them directly to the Company, Kozlowski and Swartz did not have to disclose them in SEC Form 4 within 10 days after the month of the sales, as would be required with open-market sales. By selling their shares back to the Company, Kozlowski and Swartz were able to hide such sales from investors for thirteen months.

408. A February 11, 2002 article in THE NEW YORK TIMES discussed the Undisclosed Insider Sales:

> Two top executives at Tyco International sold more than $100 million in Tyco shares in late 2000 and 2001, but the sales did not become public for as long as a year. Today, Tyco shares are worth about half what they were at the time of the transactions. . . .
>
> [T]hese sellers . . . have taken advantage of an 11-year old loophole in federal securities laws that allows executives to wait as long as 13 months to disclose their sales when the buyer of the their shares is the company itself. The loophole is the same one that enabled Kenneth L. Lay, the former chief executive of Enron, to sell millions of dollars of Enron shares in the months that the stock was plummeting, without filing the usual federal disclosure forms for insider sales.
>
> In the wake of Enron's collapse and new questions about Tyco's accounting methods, corporate governance experts say the rule should be changed so that investors can have a clear, prompt picture of executive stock sales.

| | | | | | |
|---|---|---|---|---|---|
| RICHARD J. MEELIA | O,OX | 10/24/00 | 14,607.00 | | 793,342.69 |
| RICHARD J. MEELIA | O,OS | 10/26/01 | 96,970.00 | | 4,905,712.30 |
| RICHARD J. MEELIA | O,OX | 10/26/01 | 96,970.00 | | 4,905,712.30 |
| **TOTAL** | | | **333,547.00** | | **$17,402,267.29** |
| | | | | | |
| WILLIAM PETER SLUSSER | D | 12/13/01 | 2,467.00 | | 134,081.45 |
| WILLIAM PETER SLUSSER | D | 12/13/01 | 2,467.00 | | 134,081.45 |
| WILLIAM PETER SLUSSER | D | 12/14/01 | 4,533.00 | | 249,315.00 |
| **TOTAL** | | | **9,467.00** | | **$517,477.90** |
| | | | | | |
| JOSEPH F. WELCH | D | 02/04/02 | 1,800.00 | | 57,600.00 |
| **TOTAL** | | | **1,800.00** | | **$57,600.00** |
| | | | | | |
| **Total Insider Selling by Other Tyco Insiders** | | | **1,321,501.50** | | **$65,689,089.25** |
| | | | | | |
| **GRAND TOTAL** | | | **16,403,010.50** | | **$902,055,506.72** |

405.    In addition to his open market sales, Kozlowski sold numerous Tyco shares to the Company.  Due to a loophole that does not require immediate disclosure of sales of stock by company executives - regardless of their magnitude - when the sale is made to the issuing company, these sales were not reported until the filing of a Form F-5, up to thirteen months after the sales.  Although the proceeds from these sales are not disclosed in the Form F-5, plaintiffs estimate that the proceeds exceed $65 million.

406.    In addition to his open market sales, Swartz sold numerous Tyco shares directly to the Company.  Due to a loophole that does not require immediate disclosure of sales of stock by

| STEPHEN W. FOSS | D | 09/21/01 | 2,201.00 | | 89,756.78 |
|---|---|---|---|---|---|
| STEPHEN W. FOSS | D | 09/21/01 | 894.00 | | 36,457.32 |
| **TOTAL** | | | **15,471.00** | | **$682,007.38** |
| | | | | | |
| ALBERT R. GAMPER | CEO,P,O | 06/04/01 | 44,794.00 | | 2,392,895.48 |
| ALBERT R. GAMPER | CEO,P,O | 06/07/01 | 310,815.00 | | 17,349,693.30 |
| ALBERT R. GAMPER | CEO,P,O | 06/14/01 | 207,210.00 | | 11,464,929.30 |
| ALBERT R. GAMPER | O,OS | 10/26/01 | 8,994.00 | | 454,197.00 |
| **TOTAL** | | | **571,813.00** | | **$31,661,715.08** |
| | | | | | |
| NEIL R. GARVEY | O,OS | 10/24/00 | 26,528.00 | | 1,440,802.00 |
| NEIL R. GARVEY | O,OS | 06/18/01 | 75,000.00 | | 4,185,000.00 |
| **TOTAL** | | | **101,528.00** | | **$5,625,802.00** |
| | | | | | |
| PHILIP M. HAMPTON | D | 02/02/00 | 3,276.00 | | 133,988.40 |
| PHILIP M. HAMPTON | D | 02/02/00 | 2,193.00 | | 89,737.56 |
| PHILIP M. HAMPTON | D | 02/02/00 | 892 | | 36,500.64 |
| **TOTAL** | | | **6,361.00** | | **$260,226.60** |
| | | | | | |
| STEPHEN P. MCDONOUGH | O,OX | 01/29/01 | 8,000.00 | | 497,680.00 |
| STEPHEN P. MCDONOUGH | O,OX | 01/30/01 | 10,000.00 | | 622,100.00 |
| **TOTAL** | | | **18,000.00** | | **$1,119,780.00** |
| | | | | | |
| RICHARD J. MEELIA | O,OS | 08/07/00 | 125,000.00 | | 6,797,500.00 |

| | | | | | |
|---|---|---|---|---|---|
| JOHN F. FORT | D | | 07/25/00 | 10,000.00 | | 550,000.00 |
| JOHN F. FORT | D | | 07/26/00 | 7,500.00 | | 414,375.00 |
| JOHN F. FORT | D | | 07/26/00 | 2,500.00 | | 137,500.00 |
| JOHN F. FORT | D | | 07/27/00 | 10,000.00 | | 545,600.00 |
| JOHN F. FORT | D | | 07/27/00 | 5,000.00 | | 274,050.00 |
| JOHN F. FORT | D | | 07/28/00 | 5,000.00 | | 262,800.00 |
| JOHN F. FORT | D | | 07/28/00 | 5,000.00 | | 266,550.00 |
| JOHN F. FORT | D | | 07/28/00 | 5,000.00 | | 267,150.00 |
| JOHN F. FORT | D | | 07/28/00 | 5,000.00 | | 267,500.00 |
| JOHN F. FORT | D | | 07/28/00 | 500.00 | | 26,340.00 |
| JOHN F. FORT | D | | 07/31/00 | 10,000.00 | | 536,200.00 |
| JOHN F. FORT | D | | 08/01/00 | 10,000.00 | | 545,000.00 |
| JOHN F. FORT | D | | 08/01/00 | 5,000.00 | | 270,000.00 |
| JOHN F. FORT | D | | 08/02/00 | 5,000.00 | | 270,000.00 |
| JOHN F. FORT | D | | 08/02/00 | 5,000.00 | | 270,300.00 |
| JOHN F. FORT | D | | 08/03/00 | 5,000.00 | | 266,250.00 |
| JOHN F. FORT | D | | 10/25/00 | 10,000.00 | | 540,600.00 |
| JOHN F. FORT | D | | 10/25/00 | 10,000.00 | | 541,300.00 |
| **TOTAL** | | | | **115,500.00** | | **$6,251,515.00** |
| | | | | | |
| STEPHEN W. FOSS | D | | 12/22/00 | 5,000.00 | | 255,000.00 |
| STEPHEN W. FOSS | D | | 09/21/00 | 4,088.00 | | 166,708.64 |
| STEPHEN W. FOSS | D | | 09/21/01 | 3,288.00 | | 134,084.64 |

| | | | | | |
|---|---|---|---|---|---|
| MICHAEL A. ASHCROFT | D | 08/02/00 | 75,000.00 | | 4,078,500.00 |
| MICHAEL A. ASHCROFT | D | 08/03/00 | 50,000.00 | | 2,669,000.00 |
| MICHAEL A. ASHCROFT | D | 08/04/00 | 25,000.00 | | 1,336,250.00 |
| MICHAEL A. ASHCROFT | D | 08/07/00 | 275,000.00 | | 14,839,000.00 |
| MICHAEL A. ASHCROFT | D | 08/08/00 | 25,000.00 | | 1,362,500.00 |
| MICHAEL A. ASHCROFT | D | 08/09/00 | 78,500.00 | | 4,230,365.00 |
| MICHAEL A. ASHCROFT | D | 08/10/00 | 100,000.00 | | 5,381,000.00 |
| MICHAEL A. ASHCROFT | D | 08/11/00 | 196,500.00 | | 10,695,495.00 |
| MICHAEL A. ASHCROFT | D | 02/06/01 | 228,300.00 | | 13,994,790.00 |
| MICHAEL A. ASHCROFT | D | 02/09/01 | 271,700.00 | | 16,302,000.00 |
| MICHAEL A. ASHCROFT | D | 12/05/01 | 247,400.00 | | 14,839,052.00 |
| MICHAEL A. ASHCROFT | D | 12/07/01 | 252,600.00 | | 14,688,690.00 |
| **TOTAL** | | | **2,000,000.00** | | **$113,933,142.00** |
| **Total Insider Selling by Senior Executives** | | | **15,081,509.00** | | **$836,366,417.47** |

404.   Other insiders in the Company similarly sold their Tyco stock at artificially inflated prices, without disclosing the truth to other investors.

| SELLING BY OTHER TYCO INSIDERS | | | | | |
|---|---|---|---|---|---|
| **Name** | **Position** | **Date** | **Shares** | **Price** | **$ Value** |
| JERRY R. BOGGESS | P,O | 07/24/00 | 100,000.00 | | 5,631,250.00 |
| JERRY R. BOGGESS | O,OX | 10/24/00 | 6,218.50 | | 337,742.28 |
| JERRY R. BOGGESS | O,OX | 10/26/01 | 41,796.00 | | 2,110,698.00 |
| **TOTAL** | | | **148,014.50** | | **$2,110,698.00** |

| | | | | | |
|---|---|---|---|---|---|
| MARK H. SWARTZ | CFO,O,EVP | 09/12/00 | 205,404.00 | | 11,348,571.00 |
| MARK H. SWARTZ | CFO,O,EVP | 09/12/00 | 205,404.00 | | 11,348,571.00 |
| MARK H. SWARTZ | CFO,OD,EVP | 10/24/00 | 300,000.00 | | 16,293,750.00 |
| MARK H. SWARTZ | CFO,OD,EVP | 10/31/00 | 74,000.00 | | 4,194,875.00 |
| MARK H. SWARTZ | CFO,OD,EVP | 01/30/01 | 175,000.00 | | 10,990,000.00 |
| MARK H. SWARTZ | CFO,O,EVP | 02/01/01 | 107,958.00 | | 6,581,119.68 |
| MARK H. SWARTZ | CFO,OD,EVP | 06/20/01 | 53,967.00 | | 2,861,870.01 |
| MARK H. SWARTZ | CFO,OD,EVP | 07/03/01 | 77,500.00 | | 4,260,950.00 |
| **TOTAL** | | | **4,196,423.00** | | **$231,287,225.69** |
| | | | | | |
| MARK A. BELNICK | O,EVP | 10/25/00 | 116,717.00 | | 6,343,568.95 |
| MARK A. BELNICK | O,EVP | 07/19/01 | 200,000.00 | | 10,770,000.00 |
| MARK A. BELNICK | GC,O,EVP | 12/04/01 | 116,666.00 | | 6,766,628.00 |
| MARK A. BELNICK | GC,O,EVP | 12/04/01 | 116,666.00 | | 6,781,794.58 |
| **TOTAL** | | | **550,049.00** | | **$30,661,991.53** |
| | | | | | |
| FRANK E. WALSH | D | 11/30/00 | 15,147.00 | | 801,124.83 |
| FRANK E. WALSH | D | 11/30/00 | 15,147.00 | | 802,185.12 |
| FRANK E. WALSH | D | 12/18/01 | 9,032.00 | | 506,604.88 |
| FRANK E. WALSH | D | 12/18/01 | 6,691.00 | | 375,298.19 |
| FRANK E. WALSH | D | 12/18/01 | 4,073.00 | | 228,454.57 |
| **TOTAL** | | | **50,090.00** | | **$2,713,667.59** |
| | | | | | |
| MICHAEL A. ASHCROFT | D | 08/01/00 | 175,000.00 | | 9,516,500.00 |

| | | | | | |
|---|---|---|---|---|---|
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/11/00 | 240,501.00 | | 13,667,671.83 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/11/00 | 7,700.00 | | 437,591.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/11/00 | 7,700.00 | | 437,591.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/12/00 | 219,107.00 | | 12,105,661.75 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/12/00 | 219,107.00 | | 12,105,661.75 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/12/00 | 52,308.00 | | 2,890,017.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/12/00 | 52,308.00 | | 2,890,017.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/12/00 | 1,674.00 | | 92,488.50 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/12/00 | 1,674.00 | | 92,488.50 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/14/00 | 86,233.00 | | 5,027,383.90 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/14/00 | 86,233.00 | | 5,027,383.90 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 10/24/00 | 600,000.00 | | 32,587,500.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 10/31/00 | 148,000.00 | | 8,389,750.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 01/30/01 | 350,000.00 | | 21,980,000.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 06/20/01 | 107,935.00 | | 5,716,237.60 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 07/03/01 | 155,000.00 | | 8,521,900.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 08/01/01 | 117,696.00 | | 6,255,542.40 |
| **TOTAL** | | | **8,284,947.00** | | **$457,770,390.66** |
| | | | | | |
| MARK H. SWARTZ | CFO,O,EVP | 01/05/00 | 372,000.00 | | 13,150,200.00 |
| MARK H. SWARTZ | CFO,O,EVP | 09/07/00 | 368,197.00 | | 21,458,521.16 |
| MARK H. SWARTZ | CFO,O,EVP | 09/07/00 | 368,197.00 | | 21,458,521.16 |
| MARK H. SWARTZ | CFO,O,EVP | 09/11/00 | 944,398.00 | | 53,670,138.34 |
| MARK H. SWARTZ | CFO,O,EVP | 09/11/00 | 944,398.00 | | 53,670,138.34 |

## ADDITIONAL SCIENTER ALLEGATIONS

**Insider Selling During the Relevant Period**

402.   While Tyco was issuing materially false favorable statements about the Company's financial condition and business prospects, and concealing or obscuring negative information, its executives, who had access to confidential information and were aware of the truth about the Company and its financial condition, were benefitting from the illegal course of business or course of conduct described in this complaint by selling large blocks of the Company's stock at artificially inflated prices without disclosing the material adverse facts about the Company to which they were privy.  Such sales were unusual in their amount and in their timing.

403.   The following table shows the heavy insider selling (*totaling more than $836 million*) by Tyco's senior executives during the relevant period:

| SENIOR EXECUTIVE INSIDER SALES | | | | | |
|---|---|---|---|---|---|
| **Name** | **Position** | **Date** | **Shares** | **Price** | **$ Value** |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 01/05/00 | 744,000.00 | | 26,300,400.00 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/07/00 | 934,417.00 | | 54,457,822.76 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/07/00 | 934,417.00 | | 54,457,822.76 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/07/00 | 451,191.00 | | 26,295,411.48 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/07/00 | 451,191.00 | | 26,295,411.48 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/07/00 | 30,626.00 | | 1,784,883.28 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/07/00 | 30,626.00 | | 1,784,883.28 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/11/00 | 1,007,401.00 | | 57,250,598.83 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/11/00 | 1,007,401.00 | | 57,250,598.83 |
| L. DENNIS KOZLOWSKI | CEO,P,CB,OD | 09/11/00 | 240,501.00 | | 13,667,671.83 |

396.    The same day Kozlowski was indicted for the second time, Tyco filed a lawsuit against Kozlowski in federal court in New York seeking the return of his income and benefits since 1997 and the forfeiture of all his severance pay.

397.    Among the perks enjoyed by Kozlowski at Tyco's expense was the rent of a Fifth Avenue apartment from 1997 to 2001 at an annual rate of $264,000; the purchase of a $7 million Park Avenue apartment, purchased below market value in 2000 with interest free loans; the sale of his New Hampshire home to Tyco at higher than market value; the purchase of an apartment on Fifth Avenue in 2001 for $16.8 million and another $3 million in improvements and $11 million in furnishings; and the gross-up of benefits to insulate Kozlowski from tax liability.

398.    Kozlowski also abused Tyco's KELP, borrowing more than $274.2 million to pay for artwork, real estate maintenance fees, construction and remodeling costs for his homes, a yacht, investment property, antiques and furniture.  Tyco's Complaint against Kozlowski also disclosed several charitable contributions made by Tyco at Kozlowski's direction.

399.    On September 12, 2002, the SEC filed an action against Kozlowski, Swartz and Belnick for fraud, making false and misleading proxy statements, fraudulent stock sales, reporting violations, and record-keeping violations.

400.    On December 17, 2002, the SEC filed a settled civil action in federal court for the Southern District of New York, alleging that Walsh violated the federal securities laws by signing a Tyco registration statement that failed to disclose his $20 million finder's fee.

401.    Walsh's case was the first of the four criminal cases brought by the New York County District Attorney over the last few months involving Tyco executives to be resolved.  On December 17, 2002, Walsh entered a guilty plea, agreed to pay $20 million in restitution to Tyco (which was paid on that date) and a $2.5 million fine, and resigned from the three for-profit Boards on which he sat.  Separately, Walsh entered into a consent agreement with the SEC which bars him from serving on a public for-profit Board.

393.     According to the Enterprise Corruption Indictment, Kozlowski and Swartz exercised control over Tyco's flow of information and funds by:  (1) granting themselves excess compensation in the form of improper bonuses; (2) forgiving the payment of personal expenses and unapproved loans; and (3) concealing these payments from the Company's shareholders. Then, the indictment alleges that "[a]s part of a scheme constituting a systematic on-going course of conduct the defendants and others . . . falsely represented and materially omitted to represent accurately and in a timely fashion:

> (1)   The compensation paid to executive officers.
> (2)   The loans extended to executive officers.
> (3)   The extent of stock sales by corporate insiders.
> (4)   The earnings per share of Tyco stock before non-recurring charges.
> (5)   The level of spending by the executive officers in managing the money and property of Tyco's owners and investors.
> (6)   Related party transactions."

394.     The Enterprise Corruption Indictment charges that Kozlowski and Swartz concealed from Tyco's shareholders that:  (1) tens of millions of dollars worth of payments and forgiven loans were made to Tyco executives; (2) tens of millions of dollars worth of credit lines and loans were given to Tyco executives; (3) Kozlowski and Swartz sold substantial amounts of Tyco stock to Tyco; (4) Tyco's reported earnings were artificially inflated; (5) Tyco executives used corporate resources to fund personal ventures and property acquisitions; (6) Tyco purchased properties from members of Tyco's Board; and (7) Tyco gifted residences, money and other property to employees.

395.     Also according to the Enterprise Corruption Indictment, while Kozlowski was giving speeches to Tyco's investors about his confidence in the Company, he misrepresented the number of Tyco stock sales he made, which had exceeded 5.5 million shares.  During the time period covered by the indictment, Kozlowski received proceeds of more than $280 million in insider sales and Swartz received proceeds of more than $125 million in insider sales.

391.    On September 12, 2002, the New York County District Attorney charged Kozlowski and Swartz with "Enterprise Corruption," grand larceny, conspiracy and falsifying business records relating to the theft of more than $170 million from Tyco and fraudulent sales of more than $430 million of Tyco securities.  The indictment alleges that from January 1, 1995 through September 9, 2002, Kozlowski and Swartz created and operated a criminal enterprise for the purpose of stealing money from Tyco and defrauding investors by falsifying records, concealing material information and providing false information to Tyco shareholders.

392.    The Enterprise Corruption Indictment noted that Kozlowski and Swartz did not act alone and described their roles in the criminal enterprise:

> Defendant Kozlowski was the boss of the criminal enterprise, and set its policies.  He decided what bonuses would be paid, to whom, and when, without regard for the restrictions that the Board had put on executive officers' compensation.  He entered into private deals with executive officers and directors of Tyco, which he sought to keep secret even when they were required to be disclosed.  He caused Internal Audit to report to the Board through himself, and ensured that they would not audit TME [Management, Inc., a Tyco subsidiary].  Working with personnel from Investor Relations, defendant Kozlowski met with and defrauded investors, analysts and journalists to manipulate Tyco's stock price.  He used the personnel in Executive Treasury to pay his bills from the Tyco "concentration account."  He established a system of internal controls in which his assistant's authorization was sufficient to warrant expenditures of many millions of dollars.

> Defendant Swartz was chief of operations of [the criminal enterprise]; he was the second-in-command to defendant Kozlowski.  Defendant Swartz exercised control over the transfer of funds, the booking of accounting entries, and the operations of those portions of Tyco's Human Resources department dealing with certain compensation, bonuses, and loans.  Defendant Swartz established a system by which the Finance Department, and not the Tyco Legal Department, controlled the data going into Tyco's filings with the [SEC] and caused Tyco's filings to be false and deceptive.  Defendant Swartz deceived investors and the Board by misallocating substantial personnel costs resulting in falsely enhanced operating performance.

387.    On July 1, 2002, Tyco priced the CIT shares at $23, well below the $25-$29 share estimated range announced on June 12, 2002.  Thus, the CIT IPO grossed proceeds of $4.6 billion, well below the reduced $5.0-$5.8 billion estimated range that was announced on June 12, 2002.  Given the announcement of the diminished proceeds Tyco would receive from the CIT IPO, Tyco's shares declined by 6.2% on July 1, 2002.

388.    During a conference call on July 2, 2002, Tyco stated that it was satisfied with the CIT IPO, and that it expected to beat Wall Street forecasts for the fiscal third-Quarter and year end September 30, 2002.  Tyco did not announce any extraordinary events or charges.  Yet the very next day, after having deluded investors into thinking that Tyco was on the road to recovery, THE WALL STREET JOURNAL reported that Tyco planned to take a $2.4 billion charge for the third quarter to "reflect the diminished value of its former CIT Group finance unit."

389.    On July 2, 2002, The Committee on Energy and Commerce of the United States Congress sent a letter to the SEC concerning accounting at five companies, including Tyco.  The Committee made a specific request for "all records" in the SEC's 1999-2000 investigation of Tyco's accounting, which was, at that time, found not to be improper by the SEC.

390.    On September 10, 2002, Belnick was indicted by a New York County Supreme Court Grand Jury for failing to disclose two relocation loans that Belnick obtained from Tyco in six Director and Officer Questionnaires he completed between November 1998 and January 2002.  According to an Omnibus Pretrial Motion (the "Pretrial Motion") filed by Belnick in the case, Belnick "regularly completed disclosure forms for PricewaterhouseCoopers confirming the balance of his outstanding New York (and subsequently Utah) relocation loans (and on two occasions advised the auditors that he actually owed more on the relocation loans than they calculated)."  Belnick specifically alleged that on October 17, 2001, he "confirmed the Utah (and reconfirmed the New York) relocation loans" to PwC.  Still, those loans were not publicly disclosed and Belnick knew they were not publicly disclosed.

-151-

383.    On June 17, 2002, Tyco filed a lawsuit against Belnick in federal court in New York.  In the Complaint, Tyco charged that Belnick had improperly used Tyco funds to buy a $2.75 million apartment in New York City and a $10 million resort property in Utah; concealed an additional $35 million of his compensation and unpaid loans from September 1998 to March 2002 which were not approved by the Company's board of directors and which were never disclosed to shareholders in violation of SEC Regulation S-K, Item 402; failed to disclose the criminal investigation of Kozlowski; failed to cooperate with the Company's own internal investigation; and attempted to destroy documents.  Tyco's allegations were primarily based on an internal investigation it had conducted.

384.    In its Complaint, Tyco admitted that numerous payments and benefits paid to Belnick were never disclosed to the public.  These included:  the $15 million in interest free loans to buy homes in New York and Utah; the grant of 100,000 shares of restricted stock with a market value of over $5 million in April 2000; an additional $2 million cash bonus in July 2000; and a subsequent grant of 200,000 shares of restricted stock with a total market value of over $10 million.  In addition, in a retention agreement Belnick signed when he joined Tyco, he and Kozlowski agreed that Tyco would pay Belnick $20 million by October 1, 2002 if he were to stay with the Company.  This agreement was not disclosed to the public or the Board.

385.    On June 17, 2002, Tyco filed a lawsuit against Walsh in federal court in New York, seeking restitution and damages resulting from Walsh's breach of fiduciary duty and violation of the Company's By Laws relating to Walsh's taking of the $20 million fee without the requisite Board approval and without making a full disclosure of his interest in a transaction being contemplated by the Company.

386.    In addition to being sued by the Company, Walsh was criminally charged by the New York County District Attorney for intentionally concealing information from Tyco's directors and shareholders about the $20 million finder's fee "while engaged in inducing and promoting the issuance, distribution, exchange, sale, negotiation and purchase" of Tyco securities.

381.    On June 14, 2002, Dow Jones Business News discussed the impact of the recent

Tyco debt downgrades:

> The rating downgrades trigger the termination of a program under which Tyco securitizes its accounts receivables.  Tyco will have to come up with $530 million to buy back those receivables.  But on the call, Mr. Swartz said the banks holding the securitizations are still buying receivables from the company, based on the fundamentals of the business.
>
> The official said management doesn't know yet if it has to repay $225 million under a yen-denominated facility due to the credit rating downgrades.
>
> Mr. Swartz also said Tyco isn't in danger of going above the 52.5% debt-to- capital ratio governing its bank debt covenant.  "We're not facing any issues related to debt covenants," he said.
>
> On the call, Mr. Swartz outlined Tyco's debt obligations and suggested management should encounter little problem meeting its obligations.
>
> Tyco should have $10 billion in the next six months to pay down debt, said the CFO.  He cited, among other things, the expected proceeds from CIT monetization and cash flow generation.  The $10 billion paydown would cut Tyco's debt to $17 billion from $27 billion, according to the official.
>
> Tyco is counting on the $5 billion to $5.8 billion from the CIT IPO proceeds to pay down a good chunk of its debt, though some company observers think that projection is aggressive.
>
> Mr. Swartz added that management is "comfortable" with the performance of CIT, which should get an upgrade from credit rating agencies once it's separated from Tyco.
>
> Mr. Fort said getting SEC approval of CIT IPO prospectus has had a "substantial" impact on the company.  "CIT is a very important step," he said."  The roadshow is under way."

382.    On June 17, 2002, Tyco filed a complaint in the United States District Court,

Southern District of New York, alleging that Kozlowski approved a $20 million "fee" to Walsh,

who served as a member of Tyco's Board of Directors from 1997 though February 2002.  This

fee was to compensate Walsh in connection with Tyco's acquisition of CIT.

downgraded its ratings on CIT's senior debt to BBB from A, citing concerns about the chaos surrounding Tyco.   Among other reasons cited by Fitch was "short comings in corporate governance."  Fitch warned that it may cut the long-term rating again.  "It may be more difficult" to unload CIT amid an "erosion in investor confidence" S&P analyst Werneth said in a conference call.  "The longer [CIT] is out there, the worse it is for [Tyco]" said S&P managing director Kelly.

379.    On June 12, 2002, Tyco announced that it had restated previously issued financial statements for the second quarter of fiscal 2002 to report a $4.5 billion estimated goodwill impairment related to CIT Group Inc., then a wholly-owned subsidiary of Tyco.  The Company filed amendments to both its and CIT's Forms 10-Q for the quarter ended March 31, 2002.  An amendment to the Registration Statement on Form S-1 relating to the proposed IPO of CIT Group Inc. was also filed to reflect this change.  Tyco later re-sold CIT in a public offering that generated billions of dollars less than Tyco had paid for CIT only eighteen months earlier.

380.    Similarly, on June 12, 2002, the NEW YORK DAILY NEWS reported that the SEC was again looking into Tyco's accounting for acquisitions:

> . . . The original inquiry got its start in 1999 after a Dallas investment manager began warning clients that cash flow from Tyco acquisitions appeared inflated.  One theory was that Tyco was aggressively undervaluing the assets of acquisition targets before the new companies joined Tyco's balance sheet.  The practice, detractors said, allowed Tyco to build a pool of assets from which it could then unlock value at a later point.

> Though the SEC gave Tyco a clean bill of health two years ago, **at least one New York businessman with close ties to Simplex Time Recorder, a December 2000 Tyco acquisition, told the Daily News he witnessed such dealings first-hand.**

> **"think it's fair and accurate to say they made [Simplex] writedowns on the value of their receivables to a level that, if it didn't break the law, certainly bordered on breaking the law,"** **the businessman said.**

[Emphasis added].

375.    On June 7, 2002, J.P. Morgan Securities cut its rating on Tyco to "market perform" from "buy," citing corporate governance issues and the Company's potential legal problems.

376.    During a conference call held that same day, Swartz tried to downplay the crisis at Tyco as "a credibility and a perception issue."  Similarly, John Fort, who was chosen by the Board to assume control of the Company, tried to reassure analysts and investors, falsely, that all was fundamentally well at Tyco.  According to Fort:

> FORT:    **We are . . . we expect nothing related to Dennis to be material to our financials, and I think that's worth repeating.  They're just not material.  They're not going to affect either our historic or expected financials.**
>
> * * *
>
> **. . . we do not have a liquidity issue at this point even in spite of recent developments.**
>
> * * *
>
> **Now just look at this company and just take a look at it.  I mean our accounting is sound**, even though we have tough economic times, **our earnings and cash flows are strong and real.**  We're built on real hard assets factories and products and customers.  **We're committed to solid organic growth going forward.**  We have competent excellent employees and **we have our liquidity issues under control** and with all that, **I think it's very difficult to forecast that we're not going to be successful going forward.**  [Emphasis added.]

377.    On June 10, 2002, Tyco announced that it had fired Belnick because it had lost confidence in Belnick's willingness and ability to conduct a fair investigation of company executives, including Belnick himself.

378.    Additionally, on June 10, 2002, Fitch Investors Services cut Tyco's corporate credit rating to junk status, BB, from BBB and its commercial paper rating to B from F2, and

proceeds from the (IPO) will fall short of expectations and Tyco will face a significant debt burden with sizable maturities over the next 18 months."

371.    On the same day, S&P cut Tyco's long-term rating to BBB- and left its short term rating unchanged at A2.  S&P said Tyco faced an erosion in management credibility and investor confidence, and was "concerned about the Company's ability to access capital markets or bank financing."  S&P changed its CreditWatch implication to "negative."  S&P stated that its ratings could be lowered further in the coming days or weeks if there were further developments in the criminal investigation or if the CIT IPO was not launched within the next two weeks; did not close within a month of the launch; or if proceeds from the offering were insufficient to improve Tyco's liquidity.

372.    Tyco also confirmed on June 7, 2002 that it was launching its own "comprehensive internal investigation," with the assistance of the Boies firm, into Kozlowski's and other executives' use of company funds.

373.    That same day, there were also numerous reports that the Manhattan District Attorney's Office and the SEC had broadened their investigations beyond Kozlowski to determine if executives used the Company's cash to buy any art and homes.

374.    Tyco's shares plunged $4.50 per share on June 7, to close at $10.10 (a six-year low) on volume of 199.8 million shares.  According to Reuters Business Report, on that date, "[t]he downgrades.  . . , which are likely to make borrowing more expensive, could reduce [Tyco's] cash flow by $635 million in its third and fourth quarter, [Tyco] Chief Financial Officer Mark Swartz said.  Reuters further reported:

> "If the CEO would take those kinds of risks in his personal life, then you could make the assumption that he was acting that way at the company," Plaza said.
>
> "Kozlowski was so hands-on and so aggressive throughout all parts of the company that it has to touch other management.  You could assume that type of behavior was either allowed or encouraged."

art work was to be shipped out of New York and therefore not covered by New York State sales tax provisions.

367.    An article in the June 4, 2002 edition of THE NEW YORK TIMES, entitled "Tyco Chief Out As Tax Inquiry Picks Up Speed," reported:

> Two weeks ago, with the investigation of his art purchases accelerating, Mr. Kozlowski offered a more modest speech to the graduates of St. Anselm's College in Manchester, N.H.
>
> "As you go forward in life, you will become leaders of families, communities, and even companies," Mr. Kozlowski said in the text of his May 18 commencement address.  "You will be confronted with questions every day that test your morals.  The questions will get tougher and the consequences will become more severe.  Think carefully, and for your sake, do the right thing, not the easy thing."

368.    Upon the news of Kozlowski's indictment and forced resignation, the price of Tyco shares dropped $5.90, or 27%, to $16.05 from the previous closing price of $21.95 on May 31, 2002.

369.    As reported by Reuters Business Report on June 6, 2002:

> "The Company has a duty to disclose to its shareholders these types of loan arrangements, and if there was some misrepresentation regarding the nature of the loan, that could rise to a criminal violation of the securities laws," said Robert Mintz, a former federal prosecutor who is a partner with McCarter & English.

370.    On June 7, 2002, Tyco announced that it may delay the public offering of CIT and that two major agencies, Moody's Investors Services ("Moody's") and Standard & Poor's ("S&P"), had cut their ratings on Tyco's debt to one notch above junk status.  Thus, Moody's cut Tyco's long-term credit rating to Baa3 from Baa2 and lowered its short-term rating to Prime 3 from Prime 2.  Moody's warned that "Absent significant near-term debt reduction with proceeds from a successful sale of CIT, Tyco's ratings would likely fall into speculative grade."  Moody's further warned that it may cut the Company's debt to junk status if a sale is not completed "in the very near future, as early as the end of June."  Moody's also stated that it "believes that potential

b.    *TheStreet.com* (June 3, 2002):

"The market is taking this as an indication that if [Kozlowski] were somewhat devious as a person, then they're extending that to the company," said Brett Gallagher, head of U.S. equities at Julius Baer Investment Management;

c.    *Wall Street Journal Online News Roundup* (June 4, 2002):

Mr. Kozlowski resigned Monday amid an investigation into possible sales-tax evasion involving millions of dollars in artwork. Although the investigation appeared to focus on how he managed his vast personal fortune, much of it from sales of company stock, analysts said it raised serious concerns about his oversight of Tyco and its finances.

Investors already worried about the company's future sold Tyco stock with a vengeance, sending its shares down nearly 27% Monday in extremely heavy trading.  Tyco stock has fallen 73% since Jan. 1; and

d.    *Forbes.com* (June 4, 2002):

Tyco's diminishing credibility took another big hit on the news as did its stock - which fell 27% to $16.05 on Monday.   Why? Similarities between Kozlowski's personal dealings and Tyco's corporate strategy keep coming to light.

366.    On June 4, 2002, Kozlowski was indicted by the District Attorney of the County of New York for conspiring with executives and employees of art galleries and art consultants in New York and London to avoid paying more than $1 million in New York State and City sales taxes on millions of dollars in artwork purchased by Kozlowski and his wife (Kozlowski Indictment).  The Kozlowski Indictment alleges that from August 11, 2001 through June 3, 2002, Kozlowski and his co-conspirators avoided having either the customer pay or the vendor collect the sales taxes due on the sale of at least six expensive paintings valued at $13,175,000. According to an article in the NEW YORK POST, dated July 12, 2002, the paintings were paid for with Tyco funds and then repaid without interest.   Kozlowski and his co-conspirators generated false documents, such as invoices and shipping documents, to make it appear that the

> We maintain our fiscal 2002 earnings estimate of $2.60 per share
> and our fiscal 2003 earnings estimate of $2.95 per share.

* * *

> We believe Tyco's accounting policies are consistent with industry
> standards:   Our analytical conclusion remains that Tyco's
> accounting and disclosures are in accordance with GAAP and in
> accordance with industry practice.   Our investment conclusion
> remains that Tyco's stock should appreciate over time as investors
> regain comfort with its accounting policies.

362.   Tyco announced on June 1, 2002 that Kozlowski was the target of a criminal investigation being undertaken by the District Attorney of the County of New York into possible violations of state sales tax laws.

363.   According to the Company's December Report, the Board was then informed on June 1 and June 2, 2002:  (1) that Kozlowski and Belnick had been aware of the investigation since on or about May 3, 2002; (2) that the Company itself had received a subpoena in connection with the investigation; (3) that Belnick had retained counsel to represent the Company in the investigation; (4) that the Company's counsel had met with prosecutors and had furnished prosecutors with data and documents; and (5) that it was now expected that Kozlowski would be indicted.

364.   According to the December Report, on June 2, 2002, Tyco requested that the Boies firm represent it in connection with negotiating the terms of Kozlowski's resignation. Those negotiations led to Kozlowski resigning from the Tyco Board and from his position as the Company's Chief Executive Officer on June 3, 2002.

365.   In light of this the market also immediately began to question all aspects of the Company's performance.  For example:

> a.   *Reuters Business Report* (June 3, 2002):

> "This is one more piece of uncertainty and the share price is telling
> you what shareholders think," said John Maack, director of
> equities at money manager Crabbe Huson Group.   "What we
> needed here were signs of stability and that things were going to be
> OK, not this";

-143-

right now is stronger than it was a year ago today." As a result of the positive statements, the Company's stock rose $1.14, or 5.87 percent, to close at $20.56. These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1.

360.     On May 17, 2002, numerous media outlets reported on the Company's positive statements from May 16, particularly focusing on the expected sale or IPO of CIT by the end of June 2002. For example, THE WALL STREET JOURNAL reported:

> [Tyco's] chief financial officer said the company is confident it can complete a sale or initial public offering of its CIT Group finance unit by the end of June.
>
> **Mark Swartz also told an investor conference call that the company plans to pay off at least $10 billion of the $27 billion in debt being shouldered by its industrial arm, using the proceeds from the CIT deal, along with cash on hand from operations.** [Emphasis added].
>
> An IPO or sale of CIT is considered critical to investor confidence in Tyco, which has lost credibility this year amid abrupt changes in strategic direction and questions about its liquidity and heavy debt load. To raise cash, the company has been trying to unload CIT, which it bought last June for $9.5 billion, but which is probably worth much less now. Mr. Swartz said the company continues to pursue both an IPO of the unit and an outright sale.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1.

361.     On May 31, 2002, UBS Warburg, reporting materially false and misleading information received from Tyco, issued an analyst report entitled, "Tyco Int'l: SIA Reports Semiconductor Shipments Down 8% in April." The report stated:

> Over the last few months, earnings estimates for Tyco have dropped from just under $3.70 per share (the center of management's range) to $2.58 per share.

* * *

-142-

31, 2002, we assumed pre-existing put option rights of $105.9 million, of which $22.2 million has been paid in cash. Certain acquisitions have provisions which require Tyco to make additional "earn-out" payments to the sellers if the acquired company achieves certain milestones subsequent to its acquisition by Tyco. Also, in the six months ended March 31, 2002, we determined that $47.3 million of purchase accounting reserves related to acquisitions prior to fiscal 2002 were not needed and reversed that amount against goodwill. At March 31, 2002, there remained $880.3 million in purchase accounting reserves on Tyco Industrial's Consolidated Balance Sheet, of which $600.3 million is included in accrued expenses and other current liabilities and $280.0 million is included in other long-term liabilities.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1.

**5/16/02 Conference Call**

358. During a conference call on May 16, 2002, Swartz, on Tyco's behalf, continued to reassure investors and analysts that Tyco was "comfortable with the guidance that we gave for the quarter and for the year," and that "there is no real liquidity issue going on here at Tyco." These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1. Tyco's 10-Q/A (filed on December 31, 2002) later revealed that *during the quarter ended June 30, 2002, Tyco's reported pre-tax income of $150.6 million was restated to a **loss** of $236.1 million* because of an improper failure to timely record an impairment in the value of goodwill at Tyco Telecommunications and Tyco Infrastructure Services. As a result, *Tyco's reported pre-tax earnings during that quarter were overstated by approximately $387 million.*

359. On May 16, 2002, AP, Dow Jones, and Reuters reported that Swartz reiterated that the Company planned to pay off about $10 billion of its $27 billion in debt after spinning-off CIT, and that the Company was on course to do so by the end of June. According to Swartz, the Company was "not worried" about a potential debt downgrade to junk status given the Company's cash and cash-flow levels as well as the benefit from the expected sale or initial public offering of CIT. Swartz further stated that the Company's "financial position as we sit

The Company periodically reviews and evaluates its goodwill and other intangible assets for potential impairment.  Effective October 1, 2001, the beginning of Tyco's fiscal year 2002, the Company adopted SFAS No. 142, "Goodwill and Other Intangible Assets," under which goodwill is no longer amortized but instead is assessed for impairment at least annually.  Under the transition provisions of SFAS No. 142, there was no goodwill impairment at October 1, 2001.  ***Updated valuations were completed as of March 31, 2002 for our Tyco Telecommunications (formerly TyCom) reporting unit and Tyco Capital, which resulted in no impairment of goodwill at that date.***

* * *

However, during the quarter ended March 31, 2002, circumstances developed that could potentially impair the value of goodwill with respect to our Tyco Telecommunications reporting unit and Tyco Capital.  Updated valuations were completed as of March 31, 2002, ***which resulted in no impairment of goodwill at that date.*** [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1.

## Tyco's Reserves

357.   The 5/15/02 10-Q also gives materially false and misleading information regarding Tyco's reserves.  For example:

at the beginning of fiscal 2002, purchase accounting reserves were $732.1 million as a result of purchase accounting transactions in prior years.  In connection with fiscal 2002 acquisitions, we established purchase accounting reserves of $182.2 million for transaction and integration costs.  In addition, purchase accounting liabilities of $355.7 million and a corresponding increase to goodwill and deferred tax assets were recorded during the six months ended March 31, 2002 relating to fiscal 2001 acquisitions.  These reserves related primarily to revisions associated with finalizing the exit plans of LPS, Tyco Capital and SecurityLink, all acquired during fiscal 2001.  During the six months ended March 31, 2002, we paid out $318.4 million in cash for purchase accounting liabilities, plus $58.0 million relating to earn-out liabilities, and incurred $26.3 million in non-cash charges and reclassifications (including $2.3 million relating to earn-out liabilities) against the reserves established during and prior to this six-month period.  In addition, during the six months ended March

|  | TYCO INTERNATIONAL LTD. AND CONSOLIDATED SUBSIDIARIES | |
|  | FOR THE QUARTERS ENDED DECEMBER 31, | |
|  | 2002 | 2001 |
| INCOME BEFORE INCOME TAXES, MINORITY INTEREST, AND EXTRAORDINARY ITEMS | | |
| Income taxes.................................................................. | (1,803 | 1,488 |
| Minority interest .......................................................... | (97 | (366 |
|  | (4 | (11 |
| (Loss) income before extraordinary items ..................... | (1,904 | 1,110 |
| Extraordinary items, net of tax.................................... | (0 | (10 |
| NET (LOSS) INCOME................................................. | $ (1,905 | $1,100 |

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1.

355.   In addition, these statements are false and misleading and omit material information because Tyco has admitted that during the quarter ended March 31, 2002, it understated its reported loss by more than **71%**.  As both the December Report and Tyco's 10-Q/A for the quarter ended March 31, 2002 (filed on December 31, 2002) reflect, during the second quarter of fiscal 2002 Tyco failed to timely record a loss due to an impairment in the value of its CIT subsidiary, **despite its contemporaneous analysis that an impairment charge was necessary.**[24]  When Tyco ultimately restated its March 31, 2002 financial statements, it reported a **$4.5 billion impairment** in the value of CIT's goodwill.  The effect of this charge eliminated almost **40%** of the earnings Tyco accumulated over its corporate life.

356.   Thus, the following additional statements in the 5/15/02 Tyco's 10-Q were materially false and misleading and omitted material information (as the Company has effectively admitted):

---

[24]   Tyco's 10-K for the year ended September 30, 2002 states that "the Company performed a SFAS 142 first step impairment analysis as of March 31, 2002 and concluded that an impairment charge was warranted at that time."  Nonetheless, the Company failed to record the charge.

* * *

**We are continuing to run these businesses without a liquidity issue** in that we do not believe there is one right now and its not that our heads are in the sand but on the contrary it's an issue next February, we've got a plan in place to go ahead and raise the cash proceeds that are necessary to overcome that . . .

* * *

**I do want to make clear though, you know, I am not changing any guidance as far as the balance of the year, we do think where we are currently, that that is the right level that people should factor in.**

* * *

SWARTZ:         . . . **there is no liquidity issue**, for those of you looking at next February.  [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1.

## SUBSEQUENT EVENTS

### 5/15/02 10-Q for the quarter ended 3/31/02

353.    On May 15, 2002, Tyco filed its Form 10-Q for the quarter ended March 31, 2002 (the "5/15/02 10-Q"), in which Tyco set out numerous materially false and misleading statements, as evidenced by (among other things) its restatement of its operating results in a June 12, 2002 10-Q/A for the same period.  These false and misleading statements addressed a variety of topics, including the following:

### Tyco's Operating Results

354.    The 5/15/02 10-Q also gives favorable, purportedly accurate information concerning Tyco's operating results.  For example, Tyco provided the following summary information:

350.   That same day, April 25, 2002, Tyco publicly announced its plans for a 100% public offering of CIT in the amount of approximately $7.2 billion.  By selling-off CIT, either through an outright sale or via an IPO, Tyco, as it informed investors, would improve its liquidity and reduce its debt by at least $10 billion.  CIT filed an S-1 registration statement with the SEC that day.  This statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1.e.

351.   On April 26, 2002, Deutsche Bank Alex Brown, reporting materially false and misleading information received from Tyco, issued an analyst report entitled, TYC "It Was A Mistake" - Upside Remains - Lower Target On Conservative Guidance."  The report stated:

> EPS met:  TYC reported $0.65 in line with DB, $0.02 better than consensus.  Credibility lower:  TYC terminated its break-up plan.  While the reversal is a less-bad plan than breaking up in our view, investors justifiably punished TYC for changing its strategy (again).  To its credit, TYC admitted "it was a mistake" and has conservative EPS.

**4/30/02 Conference Call**

352.   During a conference call on April 30, 2002, Swartz, on Tyco's behalf, once again specifically addressed the question of Tyco's liquidity and earnings power, falsely attempting to reassure investors and analysts:

> SWARTZ:          . . . **we continue to feel extremely comfortable as to the earnings power**, the cash flow generation from every one of our businesses in which we participate.
>
> * * *
>
> Two other points related to liquidity, just some misconceptions in the marketplace, we did not head the monetization route because we weren't in a position to spin CIT.  From a debt perspective, we very well could have gone ahead and spun it. . . . **we feel good about the liquidity**, we have a plan in place to do it with minimal execution risk, there are plenty of assets with strong cash flows that we have that we can rely on,

with a series of weekly conference calls to answer questions from any and all. **We are proud of our company and we believe that our openness will allow rationality ultimately to return.**

\* \* \*

On an all end basis Tyco lost 96 cents per share, this includes one dollar and 61 cents per share of impairment and other unusual charges. I will highlight these items to you to help you analyze the underlying performance of the business, but I do want to stress that I see them as real costs and that it will be included in our compensation calculations. As a result, senior corporate management will not receive bonuses this year although operating managers may depending upon the results of their specific units.

\* \* \*

SWARTZ:              **I'd like to stress that there are no liquidity issues**, next February is a reasonable roll forward with the reasonable amounts of debt that we would be in a position to go ahead and refinance, the only significance put that we have after that time period is not until our first fiscal quarter of 2004.

\* \* \*

KOZLOWSKI:       . . . I think on a going forward basis the press reports really had no accounting issues and they were getting more into the rumors and things on our sale of assets or our overall strategic direction which is probably a fair criticism because there was a lot of uncertainty as to where Tyco was going and by providing this clarity in our comprehensive letter to shareholders, our press release and this conference call today, hopefully we will clear that up but if conference calls are needed, then we will certainly re-institute them at a moments notice. [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and B.3.

> **companies.  That some in the media would compare us to companies that may have intentionally misled investors through the use of financial chicanery is insulting and inaccurate.  To be thrown into stories about "accounting scandals" damages our reputation and casts aspersions on our employees.**
>
> \* \* \*
>
> By fully monetizing CIT, we can eliminate any lingering perceptions about the company's short-term financial position and create a strong foundation for the future.
>
> \* \* \*
>
> **We will continue to drive organic growth through product innovation, superior service, and geographic expansion.**
>
> \* \* \*
>
> In addition, the senior corporate management team will not receive bonuses this year.  [Emphasis added].

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and B.3.

**4/25/02 Conference Call**

349.    Tyco elaborated on its announcement during a conference call with analysts on April 25, 2002:

> KOZLOWSKI:        Finally, **Tyco was the subject of a wave of some incorrect rumors and some misleading press reports**.  These shook investors' confidence and also scared our employees, suppliers and customers.  In a melee we lost some customers and we confused employees.  In doing so the rumors became partially self-fulfilling.  To prevent any risk of a liquidity squeeze we drew our backup bank lines and then triggered a debt rating downgrade from Standard & Poors and had higher costs of funds.  We were comfortable being placed under a microscope but I have to admit to being very frustrated with some of the **outlandish stories and headlines**.  They damaged our reputation, hurt and confused our employees, and certainly cost our shareholders money.  We responded to these series of rumors

-135-

**more importantly the integrity of our numbers.**
[Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and B.3.

346.   On April 3, 2002, J.P. Morgan, reporting materially false and misleading information received from Tyco, issued an analyst report entitled, "Tyco Int'l: The Weekly Conference Call and Fine Tuning Estimates."  The report stated:

> Tyco's disclosure and openness in the past several months has been unprecedented, and we are still left without a "smoking gun". We think Tyco remains a collection of valuable and strong franchises that are positioned for growth.
>
> * * *
>
> We find Tyco a compelling investment given its strong collection of businesses and attractive valuation.

347.   A few weeks later, on April 25, 2002, Tyco announced the termination of the breakup plan and poor financial results.  The press release stated:[23]

> Pembroke, Bermuda, April 25, 2002--Tyco International Ltd. (NYSE: TYC, BSX: TYC, LSE: TYI) today announced that it has terminated its plan to separate the company into four separate businesses and is taking steps to further strengthen the long-term prospects of the company.  It also reported earnings for the second quarter in an accompanying release.

348.   The press release also attached a letter from Kozlowski to all shareholders in which he announced abandonment of the plan to break up Tyco, and then took "full responsibility":

> Having said that, it's been upsetting to see inaccurate reporting and unsubstantiated rumors about Tyco given such a public platform. As stewards of a public company we know we are subject to scrutiny every day and the current climate is one in which all companies are under a microscope.  **We have always tried to be as transparent in our accounting as possible.  Indeed, I consider our disclosure to be second to none among our peer**

---

[23]   The April 25, 2002 press release was filed with the SEC on Form 8-K on May 1, 2002, which was signed by Swartz.

> **appropriate not only by ourselves, but also our auditors and others. We are at a total loss to explain how recycled and disproved allegations like these warrant placement as the second most important news story in the global business in finance areas today.** [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and A.5.

**4/2/02 Conference Call**

345. On April 2, 2002, the Company held yet another conference call in its ongoing efforts to provide false assurances concerning Tyco's accounting practices. Swartz, on Tyco's behalf, stated as follows:

SWARTZ:                [Referring to] **"recycled allegations of so-called spring loading"**

* * *

As I have said over the past few weeks based on January and February's numbers, we see no need to revise earnings or cash flow guidance for the quarter.

* * *

SWARTZ:                We know of no insider sales that have taken place during this period.

* * *

**We also are real pleased and proud of our accounting policies and the standard we have set for open and forthright disclosure.**

* * *

**We are unaware of any other management team of any company, of any size or complexity that has been willing to subject itself to as open a discussion of its accounting and disclosure practices as Tyco has. We think that says something about our confidence in Tyco and**

-133-

**proper disclosure for our investors to see the performance of our business**.  [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**3/12/02 Conference Call**

343.    Swartz's campaign to falsely reassure investors and analysts about Tyco's acquisition accounting and liquidity continued during the next weekly conference call, on March 12, 2002:

SWARTZ:           . . . **as we have said, our accounting, as far as acquisition accounting, in addition to the other areas that we have talked about, is in accordance with GAAP in an appropriate and consistent basis.**

* * *

**There is not a cash crisis looming at Tyco,** nor has there been one in the past.

* * *

**We have ample amounts of cash and liquidity available** and given the ongoing uncertainty in that CP market, we don't think it makes sense for us to jump in until that all balances itself out on issues unrelated to Tyco.  [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**3/19/02 Conference Call**

344.    During the weekly investor call on March 19, 2002, Swartz, on Tyco's behalf, again tried to characterize the allegations of improper acquisition accounting at Tyco as a "rehash":

SWARTZ:           They [recent stories in The Wall Street Journal, New York Times and Fortune.com] continue to be a **rehash of a rehash of items that we have thoroughly gone through and found to be totally**

341.    Swartz also sought to give false reassurance regarding Tyco's liquidity:

SWARTZ:    . . . **we are in a very liquid position right now for the next 12 months** and that divestitures that we're looking at and have talked about publicly to this point, which is both plastics and CIT, will be incremental to that liquidity and should give people even more comfort relative to our outlook and **our ability to continue to go ahead and increase shareholder value and get the credit side of the house comfortable that all these other assertions that are being made are not true.**  [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and B.3.

**3/5/02 Conference Call**

342.    During a weekly conference call on March 5, 2002, Swartz, on Tyco's behalf, continued to attempt, falsely, to allay concerns about Tyco's acquisition "strategy," and its accounting practices:

SWARTZ:    . . anyone who has been following Tyco over the past few years knows, we are extremely disciplined when it comes to acquisition.  **Every acquisition needs to be immediately additive to earnings and cash flow during the first quarter of ownership, needs to add to the competitive strength of our businesses, has to provide minimum returns in the mid teens during the first year of ownership.  That is our acquisition strategy**, it is true for every acquisition and we continue to expect as we make acquisitions going forward, that we will continue to have income statement benefits and cash flow benefits as it reflects the strength of these acquisitions and the benefit it ends up bringing to our business.

* * *

Well again, thank you for listening to us today and learning more about **the accounting here at Tyco which, as you hear, continues to be in conformance with GAAP, prepared on a conservative basis with**

-131-

**2/26/02 Conference Call**

340.    During a weekly conference call on February 26, 2002, Swartz, on Tyco's behalf, sought to falsely reassure analysts and investors about the propriety of Tyco's acquisition accounting practices.  According to Swartz:

SWARTZ:    This is the same corporate management team we have in place today that was in place 2 years ago which is the last time we had accounting allegations against the company.  Allegations that are exactly the same today as they were 2 years ago, however the names of the acquisition and the dollar amount have changed.  **Two years ago when we had these false allegations, as the management group, we told you that our accounting was appropriate and conservative, that the auditor opinions continued unchanged, the SEC ended up their enforcement action with no action being taken, and that the shareholder suits were baseless.** With the court coming out yesterday and affirming the last point, **the integrity of what we communicated to you 2 years ago was completely true**, and 2 years ago we saw the same stock market volatility and credit market uncertainty that is in place today.  **So now roll forward 2 years where we do have the same accounting allegations once again and as a management group we tell you once again that the accounting is appropriate and conservative, PwC, our outside auditors continue with their opinions unchanged and the new round of shareholder suits that copy the ones 2 years ago are also baseless.  And our integrity is extremely important to us, that is why we believe in being completely open, disclosing to a level far beyond others and we will continue to do that until we are able to in the future provide you the same closure that we have been able to provide to the accusations that we had 2 years ago.**

* * *

. . . **to conclude, our accounting continues to be done appropriately and conservatively.** [Emphasis added.]

-130-

338.    On March 19, 2002, an article in THE WALL STREET JOURNAL entitled "Tyco Inflated Cash Flow Of Acquisition" reported that the Company engaged in certain accounting manipulations as part of its Raychem acquisition:

> **A Tyco executive vice president, J. Brad McGee, denied there was any attempt to boost Tyco's results, and defended its accounting as proper.**  Mr. McGee said the specific payments discussed in the e-mails were investigated by the Securities and Exchange Commission in 1999 and 2000 as part of a broader informal probe of Tyco's accounting.  The SEC ended its probe in mid-2000, taking no action.
>
> * * *
>
> Mr. McGee said Tyco has never "manipulated the cash flow or earnings of companies we acquire for the purpose of spring-loading, or getting better results after the acquisition."  [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d. and B.3.

339.    On March 20, 2002, Deutsche Bank Alex Brown, reporting materially false and misleading information received from Tyco, issued an analyst report entitled, "TYC: S&P Comments."  The report stated:

> Tyco's CFO Mark Swartz addressed recent articles in The Wall Street Journal, Fortune.com and the New York Times regarding Tyco's acquisition accounting practices.  **Tyco believes that these articles are based on information that has been inaccurately "hashed and rehashed" during the past two months.  .  .  . Tyco still believes that its accounting policies are appropriate .  .  .  . and that allegations in the press are the results of reporting without knowledge of Tyco's accounting practices.** [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and B.3.

The disclosure about Raychem came in response to questions about a letter sent by a former Raychem employee to the Securities and Exchange Commission. The letter outlined payments that Raychem made at Tyco's behest before the acquisition closed. Tyco paid $3 billion for Raychem in August 1999. Mr. McGee said last night that he had not seen the letter but that "some former employees did approach the S.E.C. with allegations." He added that the S.E.C. had carefully reviewed Tyco's actions and had found no problems.

**"The enforcement division of the S.E.C. specifically inquired into these allegations," he said. "The results of their inquiry are now a matter of public record, a no-action letter."**

**The accusations, Mr. McGee said, "are well-covered territory, lacking any substance, that we consider to be a dead issue." He said the prepayments had no effect on Tyco's reported income, although they did improve its reported cash flow.**

* * *

Last month, with its stock sliding, Tyco said it would split into four companies, reversing its decade-long strategy of growth by acquisition. Tyco's shares have also been buffeted by the disclosure that L. Dennis Kozlowski, its chairman, and Mark H. Swartz, its chief financial officer, have sold more than $500 million in Tyco stock over the last three years. Mr. Kozlowski said in December that "100 percent of my net worth" is in Tyco stock. [Emphasis added].

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and B.3.

337.     On March 10, 2002, in an article entitled, "TYCO's WALKING A FINE LINE; CEO INSISTS BREAKUP WILL ADD VALUE," the SUN-SENTINEL (Ft. Lauderdale) reported:

**"Tyco has always been an open company and we have nothing to hide,"** Kozlowski told the shareholders, according to a Reuters report. **"Our accounting is conservative and proper, living up to the letter and the spirit of the law."** [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and B.3.

335.    During this time, Kozlowski, on Tyco's behalf, continued to assure investors that there were no accounting improprieties at Tyco.  For example, an article in the February 22, 2002 edition of the Boston Globe, entitled "CEO DEFENDS TYCO PLAN, ACCOUNTING TYCO CHIEF DEFENDS BREAKUP PLAN, ACCOUNTING," stated:

> HAMILTON, Bermuda - Tyco International Ltd. chief executive Dennis Kozlowski yesterday defended the conglomerate's accounting methods and breakup plan, declaring, "**We have nothing to hide**," even as a large investor questioned the impartiality of Tyco's auditors.
>
> Kozlowski sought to reassure investors at Tyco's annual shareholder meeting here that, despite a wave of uncertainty that has battered the company's stock in recent weeks, "**Our accounting is conservative and it is proper**."  He said Tyco had been unfairly sucked into the cyclone of concern around the collapse of Enron Corp.
>
> "**Let me assure you, Tyco is a very healthy and viable company**," Kozlowski said.
>
> [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and B.3.

336.    On February 28, 2002, THE NEW YORK TIMES reported that, prior to acquisition, Tyco encouraged Raychem to prepay some expenses before the acquisition was completed.

> Tyco International said yesterday that it had encouraged Raychem, an electronic components maker that it bought in 1999, to prepay some expenses before the acquisition was completed.
>
> Tyco executives have denied that Tyco changes the payment practices of companies it buys before the takeovers are final. Brad McGee, a spokesman for Tyco, said yesterday that the prepayments at Raychem were standard business practices and did not contradict the company's earlier statements.

\* \* \*

***pre-tax income was overstated by more than 21%.***  As both the December Report and Tyco's

10-Q/A for the quarter ended December 31, 2001 (filed on December 31, 2002) reflect, Tyco has

now recorded charges of $290.6 million for the first quarter of fiscal 2002, $185.9 million of

which is attributable to ADT dealer reimbursements.

**Tyco's Reserves**

334.    The 2/14/02 10-Q also gives materially false and misleading information

concerning Tyco's reserves.  For example:

> At the beginning of fiscal 2002, purchase accounting reserves were
> $732.1 million as a result of purchase accounting transactions in
> prior years.   In connection with first quarter fiscal 2002
> acquisitions, we established purchase accounting reserves of $80.7
> million for transaction and integration costs.  In addition, purchase
> accounting liabilities of $216.2 million and a corresponding
> increase to goodwill and deferred tax assets were recorded during
> the quarter ended December 31, 2001 relating to fiscal 2001
> acquisitions.   These reserves related primarily to revisions
> associated with finalizing the exit plans of LPS, Tyco Capital and
> SecurityLink, all acquired during fiscal 2001.  During the quarter
> ended December 31, 2001, we paid out $176.9 million in cash for
> purchase accounting liabilities, plus $41.8 million relating to earn-
> out liabilities, and incurred $2.6 million in non-cash charges
> (including $2.3 million relating to earn-out liabilities) against the
> reserves established during and prior to this quarter.   Certain
> acquisitions have provisions which require Tyco to make
> additional "earn-out" payments to the sellers, if the acquired
> company achieves certain milestones subsequent to its acquisition
> by Tyco.   Also, in the quarter ended December 31, 2001, we
> determined that $15.8 million of purchase accounting reserves
> related primarily to acquisitions prior to fiscal 2002 were not
> needed and reversed that amount against goodwill.  At December
> 31, 2001, there remained $836.0 million in purchase accounting
> reserves on Tyco Industrial's Consolidated Balance Sheet, of
> which $650.8 million is included in accrued expenses and other
> current liabilities and $185.2 million is included in other long-term
> liabilities.

These statements when made were materially false and misleading and omitted material

information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**liquidity crisis.**"  [Emphasis added].  These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and A.1.f.

**2/14/02 10-Q**

331.    On February 14, 2002, Tyco filed Tyco's Form 10-Q for the quarter ended December 31, 2001 (the "2/14/02 10-Q"), in which Tyco set out numerous materially false and misleading statements.  These false and misleading statements addressed a variety of topics, including the following:

**Tyco's Operating Results**

332.    The 2/14/02 10-Q also gives favorable, purportedly accurate information concerning Tyco's operating results.  For example, Tyco provided the following summary information:

|  | TYCO INTERNATIONAL LTD. AND CONSOLIDATED SUBSIDIARIES | |
|---|---|---|
|  | FOR THE QUARTERS ENDED DECEMBER 31, | |
|  | 2001 | 2000 |
| INCOME BEFORE INCOME TAXES, MINORITY INTEREST, EXTRAORDINARY ITEMS AND CUMULATIVE EFFECT OF ACCOUNTING CHANGES | | |
| Income taxes.................................................................... | 1,845 | 1,538 |
| Minority interest ............................................................ | (390 | (525 |
|  | (0 | (12 |
| Income before extraordinary items and cumulative effect of accounting changes............................................. | 1,453 | 1,000 |
| Extraordinary items, net of tax....................................... | (2 | -- |
| Cumulative effect of accounting changes, net of tax ..................... | -- | (683 |
| NET INCOME............................................................................ | $  1,451 | $    317 |

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

333.    In addition, these statements are false and misleading and omit material information because Tyco has admitted that ***during the quarter ended December 31, 2001, its***

329.    As part of their ongoing effort to keep investors continually in the dark, Tyco also held a conference with analysts on February 13, 2002.  Tyco stated:

KOZLOWSKI:    I do want to remind you that we will be filing our fiscal first quarter Q on tomorrow.  You'll see even more disclosure than you are used to at Tyco.  **We already provide substantially more disclosure than our peers.**  We believe this is a good thing. **The more you know about our accounting, I believe the more comfortable you will be.**

* * *

SWARTZ:    . . . **We believed that as with all of our accounting that the best approach for us is to follow the most conservative that we can as far as showing the financial strength of the company.**

* * *

KOZLOWSKI:    We're confident once we sit with these people and walk with them through what's going on they see there is a stable company that's a going concern, that'll continue to be a going concern and **does not have a liquidity crisis.**  [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and B.3.

330.    On February 13, 2002, THE NEW YORK TIMES reported that in 30 months, Kozlowski and Swartz made hundreds of millions of dollars selling their shares of Tyco stock:

Since July 1999, Tyco International's two top executives have made more than $500 million in profits by selling Tyco shares, while saying publicly that they rarely, if ever, reduce their holdings.

**2/13/02 Conference Call**

During a conference call that same day, Kozlowski, on Tyco's behalf, continued to falsely reassure analysts and investors concerning Tyco's liquidity:  "We're confident once we sit with these people and walk with them through what's going on they see there is a stable company that's a going concern, that'll continue to be a going concern **and does not have a**

> we did not put out individual press releases on;
> however, as far as the financial statements are
> concerned, 100% of the acquisitions are included in
> there; we did have to pay the cash; it came out of
> our accounts.  And additionally, the organic growth
> that we talk about on a quarterly basis, continues to
> exclude all acquisitions, effective foreign currency,
> and raw materials.

* * *

KOZLOWSKI:          **There is no liquidity issue.**  [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and B.3.

327.     That same day, Tyco took an unusual step and issued a press release to reassert some points that were made during the February 6, 2002 conference call, including that "Tyco's business fundamentals are strong."[22]   This statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

328.     On February 11, 2002, THE WALL STREET JOURNAL reported that Tyco was trying to gain credibility with investors and convince them that the Company was healthy:

> Tyco International Ltd., seeking to raise its credibility with
> investors, released detailed quarterly financial projections showing
> strong cash flow from its operations, enough money to pay its
> debts and a $2.15 billion cash balance at the end of 2002.
>
> J. Brad McGee, a Tyco executive vice president, said the big
> industrial and financial-services concern took the unusual step to
> make a strong case it wasn't in financial distress.  "**We wanted to
> make sure questions about liquidity were off the table**," he said.
> [Emphasis added.]

This statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

---

[22]   The February 6, 2002 press release was filed with the SEC on Form 8-K on February 8, 2002, which was signed by Swartz.

**that the accounting continues to be as sound as it was two years ago, a year ago and as included in our 10-K and our 10-Q that will be coming, one of full disclosure.  So we do believe that the discussion we are having today, this morning, on our liquidity and accounting, will be able to prove that our business fundamentals and our approach to day-to-day business continues unchanged.**

* * *

KOZLOWSKI:      We still believe that we will earn about $4 billion in free cash for the year, even with some of the other fluctuations in earnings that we talked about here and the possibilities of some downturns in electronics.

* * *

**So to state the obvious, there is a crisis of confidence at Tyco, but there's no crisis of reality.**  Although I would argue this is not a crisis of our creation, but we will be out talking to you, doing whatever is necessary over communicating to do our best to eliminate this crisis, as well as providing you pertinent financial information that will answer all of your questions.

* * *

SWARTZ:      . . . since you brought up the issue on other acquisitions, the articles that came out Friday and Monday related to the headlines of an inflammatory nature that these had never been included in financial statements or our cash flows.  If anyone had been interested in seeing what the total amounts of cash acquisitions were for the 3-year period, they could go to the statement of cash flows on a line that says, "cash paid for acquisitions", and be able to see that total.  Additionally, footnote 2, which I talked about earlier, which is extremely comprehensive, and includes all the detailed information, is related to 100% of those acquisitions that are included on the cash flow statement.  And if there had been a story that could have come out, it would have been that there were acquisitions that

aspects of the accounting that is necessary.  Now let's look back at the business.  **I want to assure that TYCO remains on solid ground in its businesses.**

\* \* \*

Another benefit of the bank debt is that it makes us less susceptible to various market rumors, including those that we could have a liquidity issue, which we don't, but if it is left to grow, it could become some kind of a self-fulfilling prophecy.

\* \* \*

The bank lines that we have put in place are more expensive than commercial paper and that's why we did commercial paper in the past as opposed to bank lines.

\* \* \*

SWARTZ:        **On one other issue, the accounting questions that have been asked.  Unfortunately, buried in a New York Times article today, they do come out and say that no evidence of accounting irregularities have been found at Tyco.  That is true, that is exactly what happened two years ago when these same allegations were given, same exact arguments, and we were able to demonstrate two years ago that our accounting was sound, the results we were showing were appropriate, and that was confirmed by independent reviews both from the government and also from independent auditors.  We are in the same position today as far as our approach to accounting.  It's on a conservative basis, it is full disclosure, second to none, and we do know that as a result of the questions being thrown out into the marketplace, in a current jittery market, that there are questions that end up coming from just the allegations themselves.  We understand that, we recognize that, and we are currently working on the best way to once again demonstrate that the accounting is sound and appropriate and we will put that on a public filing in an 8-K with SEC to be able to once again demonstrate to you**

-121-

emergency backup credit facilities substantially impaired the Company's credit rating.  During the opening of Tyco's conference call on February 6, 2002, Swartz stated that "you did see the effect of our draw down on two of the agencies this week.  S&P took a dramatic step downward to BBB in our rating."  Standard & Poor's also placed the Company on "CreditWatch," citing concern over the "uncertainty" regarding Tyco's access to the capital markets, and the smaller cushion available to the Company after the exhaustion of its emergency backup credit facilities.  Similarly, Fitch Ratings placed Tyco's commercial paper ratings on "Rating Watch Negative," downgraded Tyco's Senior Unsecured Debt (along with the Unconditionally Guaranteed Debt of Tyco's subsidiary, Tyco International Group S.A.) from A to A-, and downgraded Tyco's commercial paper from F1 to F2.

**2/6/02 Conference Call**

326.    In a conference call on February 6, 2002, Tyco announced that it was drawing down its bank lines, and attempted to squelch rumors about manipulative acquisition accounting.  According to Kozlowski:

> KOZLOWSKI:    Tyco has been over the last few weeks subjected to various **rumors and we believe misleading press coverage**.  We have several examples of this in recent days, ranging from outlandish headlines in a particular newspaper that is not even close to supported in the related article, to charges in things like TheStreet.com that we failed to disclose acquisitions that was later retracted by TheStreet.com.  Reports and rumors such as this do harm to our company and our shareholders.  They spook investors during these times, and they require lots of our management time to refute and they distract our employees.
>
> * * *
>
> Now that you heard about **there's no liquidity problems** and we're going to be filing even more disclosures on our Qs and Ks at the end of the quarter and we're rolling out ....even more disclosure to you and we have nothing at all that concerns us and we'll walk anybody through any

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

322.    On February 4, 2002, Tyco admitted in a press release that, contrary to its repeated assurances, Tyco did not have a healthy cash flow, had to exit the commercial paper market, and had to draw down the full $5.9 billion from its emergency backup credit lines to pay for $4.5 billion in outstanding commercial paper debt.

323.    In addition to admitting that Tyco's use of emergency debt would reduce the Company's earnings and free cash flow, Swartz also admitted that Tyco's draw-down of its emergency backup credit facilities substantially impaired the Company's credit rating. At the beginning of Tyco's conference call on February 6, 2002, Swartz told investors that they "did see the effect of our draw down on two of the agencies this week. . . . S&P took a dramatic step downward to BBB in our rating."    Standard & Poor's also placed the Company on "CreditWatch," citing concern over the "uncertainty" regarding Tyco's access to the capital markets, and the smaller cushion available to the Company after the exhaustion of its emergency backup credit facilities.  Similarly, Fitch Ratings placed Tyco's commercial paper ratings on "Rating Watch Negative," downgraded Tyco's Senior Unsecured Debt (along with the Unconditionally Guaranteed Debt of Tyco's subsidiary, Tyco International Group S.A.) from A to A-, and downgraded Tyco's commercial paper from F1 to F2.

324.    Fear that the Company's debt structure would explode only worsened.  Tyco was foreclosed from the traditional commercial paper market and was forced into more costly forms of debt.  For example, Tyco announced on January 8, 2003 that it sold $2.5 billion of 15-year convertible bonds and $1.25 billion of 20-year convertible bonds.  The 15-year bonds carry a 2.75 percent coupon and are convertible into Tyco shares at $22.78, a 32 percent premium over January 7, 2003's closing price, $17.26.  The 20-year bonds carry a 3.125 percent coupon and a $21.75 conversion price, a 26 percent premium.

325.    In addition to admitting that Tyco's use of emergency debt would reduce the Company's earnings and free cash flow, Swartz later admitted that Tyco's draw-down of its

When asked about prior years, Mr. Swartz said Tyco paid about $2.3 billion for 225 unannounced deals in fiscal 2000, and roughly $1.5 billion for between 150 and 175 companies in fiscal 1999.

Mr. Swartz agreed that it would be impossible for an investor to discern the amounts it spent on unannounced deals, because Tyco doesn't provide a crucial piece of information in its regulatory filings:  The amount of cash on the balance sheets in companies it acquires.  Tyco subtracts that amount from its total acquisition spending to get the "net" figure, but calculating the unannounced deals requires it to be added back.  "You could fault me for that," Mr. Swartz said, adding that the company may include that extra detail in future financial filings.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

321.  On February 4, 2002, Tyco admitted in a press release that, contrary to its repeated assurances, Tyco did not have a healthy cash flow, had to exit the commercial paper market, and had to draw down the full $5.9 billion from its emergency backup credit lines to pay for $4.5 billion in outstanding commercial paper debt.[21]  The press release stated:

PEMBROKE, BERMUDA, FEBRUARY 4, 2002--Tyco International Ltd. (NYSE: TYC, LSE: TYI, BSX: TYC) today announced that it will repurchase all of the company's $4.5 billion commercial paper at its scheduled maturities.  To fund these purchases, Tyco will borrow under its $5.9 billion of existing bank facilities with a term maturity of February 2003 as to $3.9 billion and February 2006 as to the other $2.0 billion.

L. Dennis Kozlowski, Tyco's Chairman and Chief Executive Officer, said, "While the increased interest costs will reduce earnings by up to $0.02 per share in fiscal 2002, by taking these actions we are enhancing Tyco's flexibility, liquidity, and eliminating uncertainty about our ability to finance our recently announced plan to unlock shareholder value.  Additionally, **the company has projected remaining fiscal year 2002 free cash flow to be in excess of $4 billion**, of which a majority will be used to reduce existing indebtedness."

---

[21]  The February 4, 2002 press release was filed with the SEC on Form 8-K on February 6, 2002, which was signed by Swartz.

319.    On January 31, 2002, J.P. Morgan, reporting materially false and misleading information received from Tyco, issued an analyst report entitled, "Tyco Int'l: Our Rebuttal to the Short Case and Liquidity Risk."  The report stated:

> The notion that Tyco "spring loads" its results in the quarters following an acquisition is not supported by an analysis of the segment results.  In spite of the continual grind of bad press, rumors and a falling stock price, we believe there remains no smoking gun on Tyco accounting or business practices, and we see no liquidity risks.

320.    On February 4, 2002, Swartz admitted to THE WALL STREET JOURNAL that Tyco that, in fiscal years 1999, 2000 and 2001, the Company paid almost $8 billion in cash for over 700 undisclosed acquisitions, the existence or terms of which were never revealed to the investing public or disclosed in the Company's public filings. The article stated:

> Tyco International Ltd. said it spent about $8 billion in its past three fiscal years on more than 700 acquisitions that were never announced to the public.
>
> * * *
>
> Although Tyco says its disclosures have been adequate, the company late last week sent a special alert to its investors giving new details about its unannounced acquisitions after questioned about them for this article.  The alert, which gave fresh information about last year but not the full three-year period, revealed that Tyco paid $4.19 billion in cash for unannounced deals in the fiscal year ended Sept. 30, 2001, or about 37% of the $11.3 billion in cash it spent on all deals.  The company said separately that it made 350 unannounced acquisitions in that fiscal year
>
> * * *
>
> Mark Swartz, Tyco's chief financial officer, said the company clearly states in its financial filings the "net" amount of cash it paid for all acquisitions, a number that includes the hundreds of unannounced deals.  He said the company doesn't disclose details on its numerous smaller deals because they aren't "material" given Tyco's huge size.

> America, and for that matter, of Tyco." Mr. Kozlowski has
> repeatedly defended the company's accounting as proper. He said
> he believes the sharp fall in Tyco's stock price was "unjustified,"
> adding that the company is moving forward in "high gear" with its
> plan to break itself into four pieces to create more shareholder
> value. [Emphasis added.]

These statements when made were materially false and misleading and omitted material

information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and B.7.f.

318.   On January 30, 2002, THE NEW YORK TIMES reported that Kozlowski and

Swartz had sold stock by returning it to the Company:

> Two senior executives of Tyco International Ltd. quietly disposed
> of more than $100 million in Tyco stock during the company's last
> fiscal year, despite public comments that they rarely if ever sold
> Tyco shares.
>
> L. Dennis Kozlowski, Tyco's chairman, and Mark Swartz, its chief
> financial officer, returned the stock to the company in late 2000
> and 2001, according to forms filed with the Securities and
> Exchange Commission in November.
>
> * * *
>
> Mr. Kozlowski has repeatedly told analysts and the media that his
> large holdings in Tyco stock demonstrate his commitment to the
> company.
>
> "I'm paid in Tyco stock," Mr. Kozlowski said in an interview last
> month. "We, the board, everybody, feel the best way to keep
> management's interest aligned with shareholders is to keep 100
> percent of our net worth in Tyco's stock."
>
> Mr. Kozlowski returned about 1.25 million shares of stock to the
> company last year, according to the filings. Mr. Kozlowski owns
> about three million shares of Tyco stock, according to a report
> Tyco filed Monday with the S.E.C., and has an additional 11
> million Tyco options.

These statements when made were materially false and misleading and omitted material

information for the reasons set forth above in Section(s) B, B.9.

-116-

Mr. Boggess, $20,702 was outstanding for Mr. Meelia and $0 was outstanding for Mr. Swartz.  The largest amount of indebtedness under the program during fiscal 2001 for each of the named officers was $23,009,703 for Mr. Kozlowski, $6,500,000 for Mr. Swartz, $20,702 for Mr. Meelia and $231,718 for Mr. Boggess. . . .

Mr. Walsh, a director, was instrumental in bringing about the acquisition by a subsidiary of the Company of The CIT Group, Inc. (now Tyco Capital Corporation) of Livingston, New Jersey.  For his services, Tyco paid Mr. Walsh a fee of $10 million.  In addition, at Mr. Walsh's request, Tyco contributed $10 million to a charitable fund established under The Community Foundation of New Jersey.  Mr. Walsh, as trustee of this fund, recommends the public charities to which contributions are made.  At the time of the acquisition, Mr. Walsh owned 50,000 shares of common stock of The CIT Group, Inc., which were converted to 34,535 Tyco common shares at the exchange ratio applicable to all stockholders of CIT.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B, B.4, B.5 and B.7.f.

316.   In the January 29, 2002 edition of THE WALL STREET JOURNAL, Tyco disclosed that it paid Walsh $20 million for his role in the CIT merger deal:

**Tyco spokeswoman Maryanne Kane said Tyco's board decided, without any outside help, that the $20 million payment was "appropriate based on the amount of work" Mr. Walsh did, which she said included providing guidance, advice and facilitating meetings.** [Emphasis added.]

A Tyco press release of that same date quoted Kozlowski as saying:  "The Board felt that fee was appropriate in light of Mr. Walsh's efforts."  These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B, B.7.f

317.   Tyco's stock fell 20% in reaction to Tyco's disclosure.  On January 30, 2002, THE WALL STREET JOURNAL reported that:

L. Dennis Kozlowski, Tyco's chief executive, said in a statement that the payment was "**appropriate in light of Mr. Walsh's efforts**."  But Mr. Kozlowski added that "clearly we are in an environment where people are intensely skeptical of corporate

-115-

restricted stock on October 1, 2001.  If the pre-determined specified performance criteria are met, these shares will vest over a period of up to three years.  After three years, any remaining unearned shares will be forfeited and returned to the Company.

Mr. Kozlowski also received restoration options in accordance with the restoration option provision of the Company's option program.  The restoration provision enables executive officers to use certain earned equity awards and certain proceeds from the sale of shares acquired upon the exercise of options to pay option exercise costs, repay indebtedness owed to Tyco International (US) Inc., or for tax planning purposes while maintaining their equity position in Tyco.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B, B.1.a, B.2, B.3, B.4.a, B.5, and B.7.

**Key Employee Loan Program**

314.  The 2002 Proxy Statement provides materially false and misleading statements concerning Tyco's KEL Program.  It states, for example:

The Compensation Committee administers the loan program.  **The Committee authorizes loans, which may not exceed the amount allowable under any regulation of the United States Treasury or other state or federal statute.**  Loans may be required to be secured by Tyco common shares owned by the borrower or may be unsecured.  Loans under the loan program generally bear interest at Tyco's incremental short-term borrowing rate (which was 3.7% for 2001).  The loans are generally repayable in ten years or when the borrower reaches age 69, whichever occurs first, except that earlier payments must be made in the event that the borrower's employment with Tyco or its subsidiaries terminates.    The borrower is also required to make loan payments upon the sale or other disposition of Tyco common shares with respect to which loans have been granted, other than gifts to certain family members.  [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B, B.4 and B.5.

315.  The 2002 Proxy Statement also falsely and misleadingly states:

At September 30, 2001, the amount of loans outstanding under the [Key Employee Loan] program totaled $11,230,192, of which $0 was outstanding for Mr. Kozlowski, $231,718 was outstanding for

The Compensation Committee of the Board of Directors is composed solely of independent directors, none of whom has any interlocking relationships with Tyco that are subject to disclosure under rules of the SEC relating to proxy statements.    The Compensation Committee approves all of the policies under which compensation is paid or awarded to Tyco's Chief Executive Officer, reviews and, as required, approves such policies for executive officers and key managers, and has oversight of the administration of executive compensation programs.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B.

312.    The 2002 Proxy Statement contains the following specific information concerning the compensation of Kozlowski and Swartz:

| | | | ANNUAL COMPENSATION(1) | | | LONG TERM COMPENSATION | |
| NAME & PRINCIPAL POSITION OTHER COMPENSATION (7) | YEAR | SALARY | CASH BONUS(3) | STOCK BONUS(4) | OTHER ANNUAL COMPENSATION(5) | RESTRICTED STOCK AWARD(S)(6) | SHARES UNDERLYING STOCK OPTIONS |
|---|---|---|---|---|---|---|---|
| L. Dennis Kozlowski ................................ $4,313,553 | 2001 | $1,650,000 | $4,000,000 | | $219,543 | $30,398,880 | 1,439,135 |
|   CHAIRMAN & CEO, 383,500 | 2000 | 1,350,000 | 2,800,000 | | 143,652 | 21,207,540 | 5,357,798(8) |
|   TYCO INTERNATIONAL  LTD. 305,041 | 1999 | 1,350,000 | 3,200,000 | | 81,960 | 25,707,178 | 6,621,834 |
| | | | | | | | |
| Mark H. Swartz ........................................ 2,112,968 | 2001 | 968,750 | 2,000,000 | 500,014 | 277,856 | 15,199,440 | 788,425 |
|   EVP & CFO, TYCO 121,448 | 2000 | 768,750 | 1,400,000 | | 171,039 | 10,603,770 | 2,692,649(8) |
|    INTERNATIONAL LTD. 86,948 | 1999 | 750,000 | 1,600,000 | | 63,066 | 12,029,641 | 2,976,480 |

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B, B.1.a-b, B.2, B.3, B.4.a-b, B.5, B.6, B.7 and B.8.

313.    The 2002 Proxy Statement failed to disclose and misrepresented the actual compensation of Kozlowski:

For fiscal 2001, Mr. Kozlowski received a base salary of $1.65 million and, based on a 38.9% increase in Net Income before non-recurring items and a 31.3% increase in Operating Cash Flow, a cash bonus in the amount of $4 million, as shown in the SUMMARY COMPENSATION TABLE on page 14.    Mr. Kozlowski was granted 600,000 shares of performance-based

> "Crooks are going to be crooks at any company," Mr. Kozlowski
> said.  "**But we have executives of very high integrity.**"
> [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**1/28/02 Proxy Statement**

309.   On January 28, 2002, Tyco filed with the SEC its Proxy Statement for the 2002 annual meeting.  The Proxy Statement contains materially false and misleading statements on a variety of topics, including management remuneration, the Key Employee Loan Program, and allegations of accounting impropriety by the Company.

**Management Remuneration**

310.   Concerning Tyco's executive compensation program generally, the 2002 Proxy Statement states:

> [Tyco's executive compensation program] offers the executive significant financial rewards when Tyco and the executive achieve excellent results.  At lower levels of performance, where expected compensation targets are not achieved, executive compensation is sharply reduced.  Executives are ineligible for cash bonuses and do not benefit from equity-based compensation.  Thus, in order for Mr. Kozlowski and Mr. Swartz to have earned a cash bonus in fiscal 2001, the Company had to achieve a minimum of 15% growth in net income and at least a 10% growth in operating cash flow over fiscal 2000.  The performance criterion required to vest the minimum number of restricted shares granted to these executives was a growth rate in earnings per share before non-recurring items of at least 15% over fiscal 2000.  The Committee reports that the Company achieved each of these benchmarks, reflecting superior performance notwithstanding a very difficult business and economic environment.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B.

311.   The 2002 Proxy Statement also contains materially false and misleading information regarding the administration of compensation to executive officers and key managers:

> * * *
>
> **. . . there's absolutely no new accounting questions** . . .
>
> * * *
>
> I want to stress that this is not a defensive response to the **baseless ridiculous rumors** last week
>
> * * *
>
> **The quality of our earnings has been excellent.** This is shown in the ratio of pre-cash flow to earnings or the cash conversion ratio. Our free cash flow has represented over 90% of earnings during the last couple of years. [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

306. Investors saw Tyco's plan to break itself up as a further sign that there were no accounting improprieties at the Company. For example, a January 23, 2002 article in USA TODAY entitled, "Tyco to split into four independent companies," reported:

> "You don't create four new public entities if you have something to hide," says John Inch, analyst at Bear Stearns.

307. On January 23, 2002, Wachovia Securities, reporting materially false and misleading information received from Tyco, issued an analyst report entitled, "TYC: Raising Target Price to $80." The report stated:

> Management - we like the individual business teams and have seen their businesses first hand over the past few years - we think they will do just fine. But - while this was an excellent company before Dennis Kozlowski became CEO (soon followed by Mark Schwartz) [sic] he clearly took things to a different level, and that will be difficult to replicate in terms of vision and sheer drive. There are only one of each.

308. Kozlowski, on Tyco's behalf, was then quoted in THE NEW YORK TIMES on January 24, 2002 as saying that investors should not react negatively to the Company's new breakup strategy:

continue strong.  Guidance for the second quarter is a strong 14% to 17% growth over the prior year. The full year earnings of $3.70 are in excess of 20% growth over the prior year, and every one of these businesses will enter fiscal 2003 with extremely strong organic fundamentals to continue to have these strong earnings.

\* \* \*

SWARTZ:        **I do take issue with better disclosure and we have many times asked people to show us better disclosure on acquisitions and we'll do it and have yet to see any that would be improved from what we currently have.**  Secondly, as far as cash pay for acquisitions, they are included in those footnotes 100 percent and back to footnote 2 you can look and see exactly what the cash was this year and last year and go back every year you want to so every acquisitions we have made is disclosed and it is included. . . .

\* \* \*

SWARTZ:        . . . So the amount of disclosure that will end up being seen will be the same good state of art disclosure that we have had better than anyone else we can find out there but it will be done on a more reduced level and **even with all these accounting insinuations, allegations, rumors, etc. we have had over the past few weeks, this has not changed our plan ANY nor any level of comfort as far as being able to go forward, have these individual financial statements and send each of these businesses off with extremely strong earnings and cash flows.** [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and A.3.

305.    Kozlowski, on Tyco's behalf, also went out of his way to assure investors that there were no accounting improprieties or cash flow issues at Tyco.  For example, Kozlowski stated:

KOZLOWSKI:          . . . **we have no liquidity crisis** . . .

-110-

Mr. Kozlowski continued, "I am extremely proud of Tyco's performance. **We have built a great portfolio of businesses and over the five years ended September 30, 2001, we have delivered earnings per share growth at a compounded annual rate of over 40% and industry-leading operating profit margins in each of our businesses. During this same period, we have increased annual free cash flow from $240 million in 1996 to $4.8 billion in fiscal 2001. Nonetheless, even with this performance, Tyco is trading at a 2002 P/E multiple of 12.0x, a discount of almost 50% to the S&P 500."**

"The plan announced today is designed to close that gap--the gap between Tyco's market value in recent years and the value of our businesses. Our objective has always been to deliver value to our shareholders. That is why we are taking this action today, and why we are all very excited about the future." [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**1/22/02 Conference Call**

304.   Tyco held a conference call with analysts on January 22, 2002 to discuss its plan to break the Company into four separate parts. Kozlowski and Swartz, on behalf of Tyco, stated as follows:

KOZLOWSKI:       . . . the plan [to break up the company] will release value . . . . the separation will enhance our ability to continue to create shareholder value in the future. . . . We are strictly playing offense here. I want to stress that this is not a defensive response to the **baseless ridiculous rumors** last week nor the recent weakness in the stock price.

\* \* \*

SWARTZ:       **Related to the accounting rumors and accusations that Dennis talked about earlier, the split offs are going to create more transparency and financial disclosure on the pure play individual businesses that you will be seeing.**

\* \* \*

SWARTZ:       During the balance of this year, and as we look forward to fiscal 2003, the earnings of Tyco will

303.    Shortly thereafter, on January 22, 2002, Tyco issued a press release concerning its plan to separate into "four independent, publicly traded companies."[20] The press release stated:

> PEMBROKE, BERMUDA, JANUARY 22, 2002--Tyco International Ltd. (NYSE-TYC, BSX-TYC, LSE-TYI) today announced a plan to unlock tens of billions of dollars of shareholder value by separating Tyco into four independent, publicly traded companies: Security and Electronics; Healthcare; Fire Protection and Flow Control; and Financial Services. Tyco believes these actions will lead to substantially greater total shareholder value by creating independent companies that will be more appropriately valued by the market. Each new public company created from these transactions will be a proven industry leader, and each will go forward with a global market position; a strong and experienced management team; an entrepreneurial culture; an independent Board of Directors and significant financial strength.
>
> * * *
>
> "This is a bold, shareholder-value driven plan that we believe will create extraordinary near- and long-term benefits for Tyco's shareholders and bondholders, as well as for our employees and customers," said L. Dennis Kozlowski, Chairman and Chief Executive Officer of Tyco. "Over the past decade, Tyco's share price has increased ten-fold as we have used Tyco's size, access to capital and operating philosophy to build world-class healthcare, electronics, telecommunications, security, fire protection, flow control, and financial services businesses. These businesses have now developed to a size and stage where they can thrive on their own and perhaps be even more agile than Tyco. The plan we are announcing today is the logical extension of the same value creation strategy we have successfully pursued for nearly a decade."
>
> "Furthermore, as independent, public companies, each of these businesses will offer investors a 'pure-play' opportunity with excellent growth prospects and greatly increased simplicity, clarity and transparency. As such, we believe each will be valued substantially higher than the implied valuations it has received in recent years as part of Tyco."

---

[20]    The January 22, 2002 press release was filed with the SEC on Form 8-K on January 24, 2002, which was signed by Swartz.

> an unfortunate part of this business, but **here at Tyco we're willing to discuss anything at all that anybody might have** . . . . [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and A.3.

301. A January 16, 2002 article in THE WALL STREET JOURNAL entitled, "Tyco International Says Soft Demand Will Depress Fiscal Second-Quarter Results," reported:

> Mr. Kozlowski said the company remains "**frustrated by continuing negative rumors**" regarding the company's accounting. "**There is nothing negative going on at any place at Tyco**," he said, inviting anyone with questions about the company's accounting practices to "give us a call." He also said the company stands by its earnings estimate of $3.70 a share for the fiscal year. Tyco is based in Bermuda but managed from Exeter, N.H. [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

302. Similarly, a January 16, 2002 article in THE NEW YORK TIMES entitled, "Tyco Shares Fall as Investors Show Concern on Accounting," reported:

> Dennis Kozlowski, Tyco's chairman, expressed frustration in a conference call with analysts yesterday morning that Tyco's accounting continues to be questioned. "**Our accounting has been reviewed and found to be sound**," Mr. Kozlowski said. "**Our disclosure is exceptionally detailed.**"
>
> * * *
>
> **Mr. Swartz, Tyco's chief financial officer, said Tyco follows standard accounting in its acquisitions and does not manipulate balance sheets. [Emphasis added.]**

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d. and A.3.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1.a and A.1.d.

298.    The 2001 Annual Report also sets forth all the identical operating results quoted above from the 2001 10-K.  Those results are materially false and misleading, and omit material information, for the same reasons given above.

**2002 Materially False and Misleading Statements and Omissions**

**1/15/02 Conference Call**

299.    On January 15, 2002, Tyco held a conference call to discuss, among other things, its earnings during the first quarter of fiscal 2002.  Although the Company was to announce its breakup into four separate parts the following week, the Company continued to give false reassurance of favorable results:

> KOZLOWSKI:    Putting all this together, we remain committed to our full year earnings guidance of $3.70 per share, up 21% from last year.  We have not previously offered any guidance at all on the second quarter.  Given the likelihood of another tough quarter in electronics, we think second quarter earnings will be in the range of 80-824 per share up roughly 17% for the quarter.

300.    Tyco also falsely reassured investors and analysts about "rumors" that were resurfacing about Tyco's accounting, and about the openness of its disclosures:

> KOZLOWSKI:    **We're a very open company**, we're very willing to talk about anything that our investors, shareholders, interested parties have to talk to us about, we have Jack Blackstock, Maryanne Kane, Mark Swartz, myself, available, we present our accounting in the best disclosures that we can possibly put together here.  Are we complex?  Yes, but because we are complex **we have absolutely no qualms whatsoever in presenting a good disclosure, there's nothing hidden behind the scenes**, our cash flows are going to be strong, we will back up our earnings with our cash flows and from time to time there are, of course, some motivated parties who can thrive or make money on rumors and that's

Much of the increase came from organic growth. If Tyco never made another acquisition, we should be able to increase our earnings at a solid double-digit rate. We are fortunate to be in the types of businesses that grow even during economic slowdowns. For fiscal 2002, we are looking forward to earnings growth of 20 percent or better

I remain optimistic about Tyco's future. It's a cliché today for a CEO to proclaim that his company is "well-positioned" but, in truth, we are.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

296.    The letter continues:

Fiscal 2001 was a year of many achievements. Among the highlights:

* * *

* *We acquired The CIT Group, Inc., a leading commercial consumer finance company with over $50 billion in assets. In the four months we have owned CIT (now known as Tyco Capital Corporation), it has performed exceptionally well.* Tyco Capital is a broadly diversified lender **both geographically and by industry** with powerful franchises and the ability to grow its earnings in all types of environments. It has a large base of recurring revenue. [Italics in original.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and A.1.e.

297.    The letter also states:

In 2001, Tyco demonstrated that, despite difficult business conditions, it could indeed grow its business in virtually any environment. We believe we can continue to do so, and that we can deliver consistent growth for investors in the future.

We are in excellent businesses, and everywhere we look we see opportunities to expand by creating new products, by moving into new markets and sometimes by acquisitions. We are poised to deliver many years of exciting returns.

> During Fiscal 2001, the maximum amount outstanding under [the
> Key Employee Loan] program was $29.5 million.   Loans
> receivable under this program were $11.2 million and $11.4
> million at September 30, 2001 and 2000, respectively.

These statements when made were materially false and misleading and omitted material

information for the reasons set forth above in Section(s) B, B.4 and B.5.

294.     The 2001 Annual Report also included a letter to Tyco shareholders from

Kozlowski on Tyco's behalf, which states:

> Fiscal 2001 was a year of outstanding performance for Tyco
> International.   And, although I have made similar statements
> before, the consistency of our ability to deliver strong results is
> important, especially in a year marked by global economic
> turbulence.   Many outstanding companies found it impossible to
> meet their financial targets last year; and some couldn't make any
> money at all.
>
> Yet in the worst economic environment we have seen in a decade,
> Tyco managed to exceed its profit goals.   All of us at Tyco are
> very proud of that achievement.
>
> How were we able to perform so well?   The answers go to the
> heart of what makes Tyco tick.   And they explain why, despite the
> current economic slowdown, we remain optimistic about fiscal
> 2002.
>
> We grew diluted earnings per share 29 percent in fiscal 2001 in
> large part because of the strategy we formed during the 1990-1991
> recession to reinvent Tyco as a company that could thrive in any
> economy.   Since then, we have built business with low cyclicality
> and the ability to generate strong recurring revenues.

These statements when made were materially false and misleading and omitted material

information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

295.     Kozlowski's letter goes on to say:

> This strength was reflected in our earnings.   For the ninth
> consecutive year, we increased revenues and earnings
> substantially.   Revenues rose 25 percent to $36.3 billion and
> earnings grew $1.4 billion to $5.1 billion, a 38 percent increase
> over the prior year.   Our diluted earnings per share increased 29
> percent to $2.81.   Free cash flow exceeded $4.7 billion in fiscal
> 2001 and should surpass $5 billion next year.

> Information concerning executive compensation is hereby incorporated by reference to the Registrant's definitive proxy statement which will be filed with the Commission within 120 days after the close of the fiscal year.

Because the 2001 10-K incorporates Tyco's Proxy Statement, filed on January 8, 2002, the 2001 10-K contains the same materially false and misleading statements set forth therein, as described below.

291.    The 2001 10-K also gives limited information concerning loans taken by senior management under Tyco's Key Employee Loan Program (the "KEL program"), which was instituted to encourage ownership of the Company's common stock by executives and other key employees.  According to the 10-K:  "During Fiscal 2001, the maximum amount outstanding under [the KEL] program was $29.5 million.  Loans receivable under this program were $11.2 million and $11.4 million at September 30, 2001 and 2000, respectively."  These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B, B.4 and B.5.

**2001 Annual Report to Shareholders**

292.    On or about January 11, 2002, Tyco released its 2001 Annual Report to Shareholders (the "2001 Annual Report").  The 2001 Annual Report again reminded investors of Tyco's strategy to achieve growth by acquisitions:

> **DISCIPLINED ACQUIRER**    Good acquirers don't build empires.  They make money.  **Tyco approaches acquisitions with a strict set of rules.  We begin with the strategic logic:  the transaction must improve our potential for long-term internal growth.  It must be immediately accretive to earnings and cash flow per share and produce high returns on invested capital.**  To consistently achieve these targets, we require that each acquisition be championed by a business unit that will oversee the integration into one of our existing segments.  [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

293.    The 2001 Annual Report also set forth information concerning Tyco's Key Employee Loan program:

> accounting and from organic growth.  We enhanced our margins
> through improved productivity and cost reductions in the ordinary
> course of business, unrelated to acquisition or divestiture activities.

These statements when made were materially false and misleading and omitted material
information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

289.   And concerning profits in Tyco's electrical business, Tyco stated:

> The 14.3% increase in revenue, before accounting change, in
> Fiscal 2001 over Fiscal 2000 resulted primarily from acquisitions.
> These acquisitions included:  Siemens Electromechanical
> Components GmbH & Co. KG ("Siemens") and AFC Cable
> Systems, Inc. ("AFC Cable") in November 1999; Praegitzer
> Industries, Inc. ("Praegitzer") in December 1999; Critchley Group
> PLC ("Critchley") in March 2000; the electronic OEM business of
> Thomas & Betts in July 2000; CIGI Investment Group, Inc.
> ("CIGI") in October 2000; and Lucent Technologies' Power
> Systems business unit in December 2000.  Excluding the impact of
> these acquisitions, revenue increased an estimated 0.3%, which
> reflects an economic slowdown in the computer and consumer
> electronics and communications industries and, to a lesser extent,
> the effect of foreign exchange rates.

> The 62.1% increase in revenue in Fiscal 2000 over Fiscal 1999 was
> predominantly due to acquisitions and, to a lesser extent, organic
> growth.  These acquisitions included:  Glynwed International, plc
> in March 1999; Raychem Corporation ("Raychem") in August
> 1999; Siemens and AFC Cable in November 1999; Praegitzer in
> December 1999; Critchley in March 2000; and the electronic OEM
> business of Thomas & Betts in July 2000.  Excluding the impact of
> these acquisitions, revenue increased an estimated 13.1%.

> The 20.0% increase in operating income and the increase in
> margins, before certain (charges) credits and accounting change, in
> Fiscal 2001 compared with Fiscal 2000 was primarily due to
> acquisitions and improved margins at both Tyco Printed Circuit
> Group and AMP.  These increases were somewhat offset by
> decreased operating income and margins at Allied Tube and
> Conduit resulting from higher raw material prices.

These statements when made were materially false and misleading and omitted material
information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**Management Remuneration**

290.   The 2001 10-K addresses management remuneration only by reference, stating:

> We promote our leadership position by investing in existing businesses, developing new markets and acquiring complementary businesses and products.  Combining the strengths of our existing operations and our business acquisitions, we seek to enhance shareholder value through increased earnings per share and strong cash flows.

This statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**Tyco's Operating Results**

287.   The 2001 10-K also gives favorable, purportedly accurate information concerning Tyco's operating results.  For example, Tyco provided the following summary information ($ in millions):

|  | Fiscal 2001 | Fiscal 2000 | Fiscal 1999 |
|---|---|---|---|
| Income before income taxes, minority interest, extraordinary items and cumulative effect of accounting changes ............................................ | 6,003.5 | 6,464.8 | 1,705.2 |
| Income taxes ....................................................................................... | (1,284.9) | (1,926.0) | (637.5) |
| Minority interest .................................................................................. | (47.5) | (18.7) | -- |
| INCOME BEFORE EXTRAORDINARY ITEMS AND CUMULATIVE EFFECT OF ACCOUNTING CHANGES ..................................................................... | 4,671.1 | 4,520.1 | 1,067.7 |
| Extraordinary items, net of tax............................................................. | (17.1) | (0.2) | (45.7) |
| Cumulative effect of accounting changes, net of tax .................................... | (683.4) | -- | -- |
| TYCO INDUSTRIAL NET INCOME ........................................................... | $3,970.6 | $4,519.9 | $1,022.0 |

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

288.   In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), but instead attribute Tyco's favorable results to organic growth and synergies resulting from Tyco's acquisitions.  According to the 2001 10-K:

> Operating income, before certain (charges) credits and accounting change, improved in all segments in each of Fiscal 2001 and Fiscal 2000, with the exception of the Telecommunications segment as discussed below.  The operating improvements are the result of both increased revenues in all but our Telecommunications segment and enhanced margins in all but our Healthcare and Specialty Products segment.  Increased revenues resulted from acquisitions that are accounted for under the purchase method of

> Looking to the business cycle, we believe Tyco will
> grow revenues at a 10% rate and we expect our long
> track record of margin improvements to continue. . .

These statements when made were materially false and misleading and omitted material

information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

282.    On December 7, 2001, J.P. Morgan, reporting materially false and misleading

information received from Tyco, issued an analyst report entitled, "Tyco Int'l: Investor Meetings

Reinforce Increasing ROIC Message."  The report stated:

> The story at Tyco remains on track, characterized by accelerating
> ROIC and strong to improving fundamentals across the portfolio.
> We recently had the opportunity to spend a few days with Dennis
> Kozlowski, during which the Tyco CEO reinforced some of the
> themes discussed at the investor day. . . .  The story seems very
> much on track as management presentations touched on most of
> the major current issues, including expectations for increasing
> ROIC, strong operating trends in key businesses and the
> acquisition strategy going forward. . . .  We continue to rate Tyco
> our top pick and look for further multiple expansion. . . .

283.    The price of Tyco stock closed at $58.84 on December 7, 2001.

**12/28/01 10-K for fiscal year ended 9/30/01**

284.    On December 28, 2001, Tyco filed its Form 10-K for the fiscal year ended

September 30, 2001 (the "2001 10-K").

285.    In the 2001 10-K, Tyco set out numerous materially false and misleading

statements, as evidenced by (among other things) Tyco's restatement of the Company's

operating results in a December 31, 2002 Form 10-K/A for the 2001 fiscal year.   These

materially false and misleading statements addressed a variety of topics, including the following:

**Tyco's "Strategy"**

286.    The 2001 10-K purports to set forth Tyco's "Strategy," which Tyco repeated

verbatim statements in other SEC filings discussed above.  According to the 2001 10-K:

> Tyco's strategy is to be the low-cost, high-quality producer and
> provider in each of our industrial markets and, through Tyco
> Capital, to provide innovative financing and leasing solutions to
> independent customers and in support of our industrial segments.

and diluted earnings per share for the fourth quarter of fiscal 2001
were $0.70 per share, compared to $1.12 diluted earnings per share
in the fourth quarter of fiscal 2000.

\* \* \*

Revenues before non-recurring items and the adoption of SAB 101
for the year ended September 30, 2001 increased to $36.29 billion,
25% higher than last year's $28.93 billion.  Diluted earnings per
share before non-recurring charges and credits and extraordinary
items, and the adoption of SAB 101, for the year rose to $2.81 per
diluted share, or $5.15 billion, a 29% increase over last year's
diluted per share earnings of $2.18, or $3.73 billion.

These statements when made were materially false and misleading and omitted material
information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

279.   On November 13, 2001, Tyco filed with the SEC a Prospectus relating to the
amalgamation agreement between TyCom and a subsidiary of Tyco (the "11/13/01 Prospectus").
Because the 11/13/01 Prospectus incorporates by reference the same documents that were
incorporated by reference in the 10/23/01 S-4, it contains the same materially false and
misleading statements set forth in those documents, as described herein.

280.   Like the 10/23/01 S-4 and 11/9/01 S-4/A, the 11/13/01 Prospectus contains false
and misleading statements about Tyco's financial results under the heading "Recent
Developments of Tyco and TyCom."  These statements are identical to those quoted above from
the 11/9/01 S-4/A under the same heading, and are materially false and misleading for the same
reasons.

**11/15/01 Conference Call**

281.   Tyco hosted another conference call with investors on November 15, 2001.
During the call, Kozlowski, on Tyco's behalf, continued to provide investors with false
assurances concerning the Company's projected earnings growth:

KOZLOWSKI:   Let me start here this morning with our guidance for
fiscal year 2002.  We expect earnings per share to
grow over 21% this year to $2.70 a share.

\* \* \*

Report on Forms 10-K and 10-K/A for the fiscal year ended September 30, 2000; (ii) Tyco's

Quarterly Reports on Form 10-Q for the quarterly periods ended December 31, 2000, March 31,

2001 and June 30, 2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1,

2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001,

May 24, 2001, June 15, 2001, July 25, 2001, August 3, 2001, and August 16, 2001.

276.    Under the heading "Recent Developments of Tyco and TyCom," Tyco stated the

following with regard to its fourth quarter of fiscal 2001 financial results:

> Revenues before non-recurring items. . . for the quarter rose 29%
> to $10.08 billion compared with last year's $7.80 billion.  Diluted
> earnings per share before non-recurring items, extraordinary items
> and the adoption of SAB 101 for the fourth quarter fiscal 2001
> were $0.86, a 34% increase over earnings of $0.64 per diluted
> share in the fourth quarter fiscal 2000.  After giving effect to such
> items, revenues for the fourth quarter fiscal 2001 were $10.01
> billion compared to $9.57 billion in the fourth quarter fiscal 2000
> and diluted earnings per share for the fourth quarter of fiscal 2001
> were $0.70 per share, compared to $1.12 diluted earnings per share
> in the fourth quarter of fiscal 2000.

These statements when made were materially false and misleading and omitted material

information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

277.    On November 9, 2001, Tyco filed with the SEC a Form S-4/A (the "11/9/01 S-

4/A"), amending the 10/23/01 S-4.  Because the 11/9/01 S-4/A incorporates by reference the

same documents that were incorporated by reference in the 10/23/01 S-4, it contains the same

materially false and misleading statements set forth in those documents, as described herein.

278.    Like the 10/23/01 S-4, the 11/9/01 S-4/A contains false and misleading statements

about Tyco's financial results under the heading "Recent Developments of Tyco and TyCom."

> Revenues before non-recurring items . . . for the quarter rose 29%
> to $10.08 billion compared with last year's $7.80 billion.  Diluted
> earnings per share before non-recurring items, extraordinary items
> and the adoption of SAB 101 for the fourth quarter fiscal 2001
> were $0.86, a 34% increase over earnings of $0.64 per diluted
> share in the fourth quarter fiscal 2000.  After giving effect to such
> items, revenues for the fourth quarter fiscal 2001 were $10.01
> billion compared to $9.57 billion in the fourth quarter fiscal 2000

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**10/18/01 Conference Call**

273.    On October 18, 2001, Tyco conducted another conference call with analysts to convey their positive earnings estimates.

> KOZLOWSKI:    Putting this together, we are reiterating our previous guidance of $3.70 per share for the current fiscal year we are in that began on October 1st which represents around 23% growth.
>
> \* \* \*
>
> We remain very comfortable with our projection .3 cents per share of earnings accretion from the [Sensormatic] deal.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

274.    The next day, on October 19, 2001, THE WALL STREET JOURNAL reported Tyco's false assurance that it was well-positioned to grow during the economic downturn.

> L. Dennis Kozlowski, Tyco's chairman and chief executive officer, also gave a bullish forecast for fiscal 2002, slightly raising the range of the company's earnings targets and saying Tyco "has never been better positioned to grow during an economic downturn."

This statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**10/23/01 S-4 (and related S-4/A and Prospectus)**

275.    On October 23, 2001, Tyco filed with the SEC a Form S-4 relating to a proposed amalgamation agreement between TyCom and a subsidiary of Tyco wherein TyCom would become a wholly-owned subsidiary of Tyco (the "10/23/01 S-4").  Because the 10/23/01 S-4 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual

> During the nine months ended June 30, 2001, we paid out $113.5 million in cash and incurred $86.2 million in non-cash charges that were charged against these reserves. At June 30, 2001, there remained $214.1 million of merger, restructuring and other non-recurring reserves in Tyco Industrial's Consolidated Balance Sheet, of which $183.8 million is included in current liabilities and $30.3 million is included in long-term liabilities.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**9/11/01 Conference Call**

272.    On September 11, 2001, Tyco held a conference call/investor meeting with analysts. During the call, Tyco provided investors with significant assurance that the Company was performing well and that it would remain profitable. For example:

> KOZLOWSKI:    . . . **we remain very much on track to achieve our earnings and cash flow targets for the year.** Specifically, we're confident that Tyco will earn $2.77-2.78 a share in fiscal year '01 which would represent a 27% increase vs. last year. Our free cash flow will exceed $4 billion, compared to $3.4 billion last year. For fiscal year '02, we are looking for around $3.45 per share, with a range of 320 to 365, depending upon the end-markets for the electronics industry. This is the same thing we have been saying for months. The $3.45 would represent around a 25% increase above this year's record total and even the low end of our range would show better than a 15% growth. We expect free cash flows to exceed $5 billion next year. Our ability to deliver this growth in a pretty tough economic environment is a function of our very large exposure to recurring and service businesses such as security and businesses with no economic volatility like health care.
>
> *  *  *
>
> So we thought about titling my section of this agenda because there's been a lot of negative sentiment, a lot of questions, **so we thought I'd call this part "Don't worry, be happy." Everything at Tyco is going to be okay.** [Emphasis added.]

-96-

| | | |
|---|---|---|
| NET INCOME............................................................................ | $ 1,216 | $ 997 |

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

270.   In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), but instead attribute Tyco's favorable results to organic growth and synergies resulting from Tyco's acquisitions:

> Operating income, before certain (charges) credits, improved in all segments in both the quarter and nine months ended June 30, 2001 as compared to the quarter and nine months ended June 30, 2000, with the exception of the Telecommunications segment discussed below.  The operating income improvements are the result of increased revenues resulting from organic growth and from acquisitions that are accounted for under the purchase method of accounting.   We enhance our margins through improved productivity and cost reductions in the ordinary course of business, unrelated to acquisition or divestiture activities.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**Tyco's Reserves**

271.   The 8/13/01 10-Q also gives materially false and misleading information regarding the Company's reserves.  For example:

> During the nine months ended June 30, 2001, we recorded restructuring and other non-recurring charges of $214.7 million, of which $39.8 million was included in cost of sales, primarily related to the closure of several manufacturing plants, sales offices, warehouses and administrative offices and an environmental remediation project.  In addition, we incurred a non-recurring charge of $39.0 million related to the write-up of inventory under purchase accounting, which has been included in cost of sales.  We also determined that $166.8 million of non-recurring charges established in the prior year were not needed due to the settlement of litigation.  At September 30, 2000, there existed merger, restructuring and other non-recurring reserves of $365.9 million.

-95-

excellent deal for us . . . . and it's immediately accretive by at least .3 cents per share during the first year of our ownership."

267.   About Tyco's earnings guidance, Kozlowski added:

> KOZLOWSKI:   . . . all in all, we remain very comfortable with our guidance of $2.77-2.78 per share for our fiscal '01 which closes on September 30th this year which would represent about a 27% increase vs. last year. For fiscal year 2002, we continue to believe that $3.45 per share is a reasonable estimate, but as we said on the conference call, we will allow for a range between $3.20 and $3.60 . . .

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**8/13/01 10-Q for quarter ended 6/30/01**

268.   On August 13, 2001, Tyco filed its Form 10-Q for the quarter ended June 30, 2001 (the "8/13/01 10-Q"), in which Tyco set out numerous materially false and misleading statements.   These false and misleading statements addressed a variety of topics, including the following:

**Tyco's Operating Results**

269.   The 8/13/01 10-Q also gives favorable, purportedly accurate information concerning Tyco's operating results.   For example, Tyco provided the following summary information:

|  | TYCO INTERNATIONAL LTD. AND CONSOLIDATED SUBSIDIARIES | |
|---|---|---|
|  | FOR THE QUARTERS ENDED JUNE 30, | |
|  | 2001 | 2000 |
| INCOME BEFORE INCOME TAXES, MINORITY INTEREST, AND EXTRAORDINARY ITEMS ....................................... | 1,614 | 1,333 |
| Income taxes.......................................................................... | (378 | (333 |
| Minority interest .................................................................... | (15 | (2 |
| Income before extraordinary items................................................ | 1,220 | 997 |
| Extraordinary items, net of tax....................................................... | (3 | -- |

earnings of $0.58 per diluted share in the third quarter of fiscal 2000.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**7/18/01 Conference Call**

265.    On July 18, 2001, Tyco held a conference call to discuss, among other things, its earnings during the third quarter of fiscal 2001.  According to Tyco:

> KOZLOWSKI:      Organic growth excluding TyCom, was 6% for the combined company, with a 17% increase at Fire & Security, an 8% increase in Healthcare more than offsetting a 5% decline at Electronics. . . .
>
> * * *
>
> The outlook for continued growth at Tyco is excellent.  Based on the business trends we see today, we remain comfortable with our previous guidance of 277-278 for fiscal year 2001.  That's primarily because of the recurring revenue, healthcare and service businesses that I emphasized earlier on.  Looking out to 2002, while it may be too early to be precise, we believe that a 345 estimate is quite reasonable.  In regards to Free Cash Flow, our previous guidance of $4 billion for 2001 now appears to be too conservative and I would point toward a higher $4.3 or 4.4 billion number.  We are confident we can grow our Free Cash Flow by 20% to exceed $5 billion and some of that is coming from some reduction in working capital, specifically on the Electronics side of the business.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**8/3/01 Conference Call**

266.    On August 4, 2000, Tyco held a conference call to discuss, among other things, its acquisition of Sensormatic.  According to Kozlowski, on behalf of Tyco:  "This will be an

> bolt-on transaction.  We'll fold Cambridge into our existing ADT infrastructure, thereby standing about $220 million of cost efficiencies.  We look for the deal to add about 34 to earnings during the first year that we have it, with an initial cash on cash return in excess of 20% for the year.  So from our organic growth plan for next year and the acquisitions of Cambridge, CIT, and Bard, we're starting to view the year fiscal year 2002 as a good year - a very good year for us.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and A.1.e.

263.    On July 6, 2001, in an article entitled, "Tyco Closes $1 Billion Purchase," THE WALL STREET JOURNAL reported that:

> Tyco International Ltd. said it closed its $1 billion acquisition of the electronic-security business of Cambridge Protection Industries LLC. . . .
>
> Tyco Chairman Dennis Kozlowski said the acquisition would be **"immediately accretive" to earnings and would generate "strong organic growth with attractive incremental margins."** The acquisition was announced May 17. [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

264.    On July 18, 2001, Tyco announced its results for the third quarter of fiscal 2001 (the three months ended June 30, 2001):[19]

> Revenues for the quarter rose 25% to $9.29 billion compared with last year's $7.42 billion.  Diluted earnings per share before extraordinary items for the third quarter of fiscal 2001 were $0.67, or $1.22 billion, compared to $0.58, or $997.3 million, in the third quarter of fiscal 2000.  Net income before non-recurring and extraordinary items rose to $1.31 billion, an increase of 32% compared to $992.1 million last year.  Diluted earnings per share before non-recurring and extraordinary items for the third fiscal quarter ended June 30, 2001 were $0.72, a 24% increase over

---

[19]   On July 25, 2001, Tyco filed this announcement with the SEC on Form 8-K, which was signed by Swartz.

of litigation.   At September 30, 2000, there existed merger, restructuring and other non-recurring reserves of $365.9 million. During the six months ended March 31, 2001, we paid out $55.6 million in cash and incurred $35.7 million in non-cash charges that were charged against these reserves.   At March 31, 2001, there remained $272.3 million of merger, restructuring and other non-recurring reserves in our Consolidated Balance Sheet, of which $231.6 million is included in current liabilities and $40.7 million is included in long-term liabilities.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**5/30/01 Conference Call**

262.   On May 30, 2001, Tyco held a conference call with analysts to discuss the Company's continued strategy of growing through acquisitions (including the CIT merger). Tyco stated:

KOZLOWSKI:   This morning we announced the acquisition of C.R. Bard for roughly $3.2 billion.   We are of course excited about this deal and let me tell you why.   It strengthens and broadens our healthcare franchise and is immediately accretive by about 54 per share for the first 12 months of ownership. . . . our operations continue to perform well and we are on target to achieve our earnings and cash flow targets for the quarter and for the rest of our fiscal year.

* * *

We are on schedule to close CIT this coming Friday. . . . CIT will be immediately accretive to us probably adding about a penny to our fiscal third quarter earnings for the one month that we own the company and another couple of cents for our fiscal fourth quarter results.   The accretion is incremental to the earnings comments we have made in the past. In other words, we are comfortable with earning expectations of around 694 per share in the third quarter, consensus is now around 684, and around 277-278 for the year versus a consensus of about 275 for the year.   I also want to take this opportunity to briefly outline the acquisition of Cambridge Security. . . .   This deal is a classic Tyco

| | | | |
|---|---|---|---|
| Cumulative effect of accounting change, net of tax ..................... | -- | -- | (29.7) | -- |
| Net income ............................................................................... | $1,137.0 | $855.5 | $2,116.5 | $1,612.5 |

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

260.    In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), but instead attribute Tyco's favorable results to organic growth and synergies resulting from Tyco's acquisitions:

> Operating income, before certain credits (charges), improved in all segments in both the three months and six months ended March 31, 2001 as compared to the three months and six months ended March 31, 2000, with the exception of the Telecommunications segment for reasons that are discussed below.  The operating income improvements are the result of both increased revenues and, with the exception of Tyco Healthcare, enhanced margins. Increased revenues result from organic growth and from acquisitions that are accounted for under the purchase method of accounting.   We enhance our margins through improved productivity and cost reductions in the ordinary course of business, unrelated to acquisition or divestiture activities.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1 d.

**Tyco's Reserves**

261.    The 5/11/01 10-Q also gives materially false and misleading information regarding the Company's reserves. For example:

> During the six months ended March 31, 2001, we recorded restructuring and other non-recurring charges of $164.5 million, of which $32.4 million was included in cost of sales, primarily related to the closure of several manufacturing plants, sales offices, warehouses and administrative offices and an environmental remediation project.  In addition, we incurred a non-recurring charge of $39.0 million related to the write-up of inventory under purchase accounting, which has been included in cost of sales.  We also determined that $166.8 million of non-recurring charges established in the prior year were not needed due to the settlement

**4/18/01 Conference Call**

257.    On April 18, 2001, Tyco held a conference call with analysts to discuss the Company's purported earnings growth.  During the call, Kozlowski stated, among other things, that Tyco's earnings continued to increase despite the economic downturn:

> KOZLOWSKI:    Okay, so to recap here, we're very pleased with our earnings increase of 30% from last year, our revenue growth of some 25%, overall Tyco organic growth of some 13% and our free cash flow of $1.1 billion.  We had what we feel was a strong quarter. We anticipate a strong ending to the second half of our year and our outlook for next year at this time continues to be, continues to be good in spite of the various economic conditions that are going on around the world.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**5/11/01 10-Q for quarter ended 3/31/01**

258.    On May 11, 2001, Tyco filed its Form 10-Q for the quarter ended March 31, 2001 (the "5/11/01 10-Q"), in which Tyco set out numerous materially false and misleading statements.  These false and misleading statements addressed a variety of topics, including the following:

**Tyco's Operating Results**

259.    The 5/11/01 10-Q also gives favorable, purportedly accurate information concerning Tyco's operating results.  For example, Tyco provided the following summary information:

| | For The Quarters Ended March 31, | | For The Six Months Ended March 31 | |
|---|---|---|---|---|
| | 2001 | 2000 | 2001 | 2000 |
| | | (UNAUDITED) | | |
| Income before income taxes, minority interest, extraordinary items and cumulative effect of accounting change: | 1,544.9 | 1,141.6 | 3,096.1 | 2,166.0 |
| Income taxes | (385.9) | (285.0) | (915.4) | (549.0) |
| Minority interest | (11.7) | (1.1) | (24.2) | (4.3) |
| Income before extraordinary items and cumulative effect of accounting change | 1,147.3 | 855.5 | 2,156.5 | 1,612.7 |
| Extraordinary items, net of tax | (10.3) | -- | (10.3) | (0.2) |

you and Mr. Walsh rode together back to the airport. Right?

A.     That's correct, yes.

Q.     And -- and during that conversation, you suggested to Mr. Walsh that if the CIT transaction were to close, he'd be entitled to some kind of consideration, some kind of fee in connection with the work he had done in setting you up with Mr. Gamper? Is that right?

A.     I recall having some type of vague discussion about a fee, yes.

Q.     And -- and that was a fee that you suggested that Mr. Walsh would be entitled to. Right?

A.     I -- I recall Mr. Walsh functioning as an investment banker in this transaction, yes.

Q.     And -- and you suggested that he could be rewarded for his work as an investment banker. Right?

A.     I believe so. Yes.

256.     Based upon the testimony of the only two parties to the agreement, along with the criminal plea allocation of Walsh, there can be no serious dispute that the CIT Registration Statement was false for its failure to disclose that Walsh was acting as an investment banker on the transaction and--at the very least-- "might" get an investment banking fee while at the same time serving as a director of Tyco. It was agreed between Kozlowski and Walsh that Walsh would be entitled to a fee if and when the transaction closed. Accordingly, he was someone who "had or will have" a "material interest" in the transaction whose identity and interest was required to be disclosed under Item 404. He also had been "retained" or "authorized to act" as an "investment banker" or "finder" who "might be entitled to [a] fee," whose identity was not disclosed by Tyco when it falsely stated that there were no such persons other than Goldman Sachs and Lehman Brothers.

A.    It is true that I pled to that, yes.

Q.    But it is also true that it happened?

A.    It happened that I signed a document that did not disclose that and I pled that it was a crime; whether it was a crime or not, I didn't go to law school.

Q.    Okay, but what was the document that you're referring to?

A.    I believe it was an S-4.

Q.    It was an S-4 filed in connection with the CIT transaction, correct?

A.    Yes.

Q.    And what you're saying is that you did not disclose that you stood to receive a fee, is that correct?

A.    That's correct.

Q.    As a result you pled that that made the filing false?

A.    That is correct.

254.    The testimony of Walsh was corroborated by Kozlowski, the only other party to the agreement to pay Walsh a fee.  According to Kozlowski, from the outset of the CIT negotiations, he viewed Walsh as an investment banker on the transaction. Kozlowski stated:

Q.    Do you remember who your investment bankers were on the CIT transaction?

A.    Aside from Frank Walsh?

Q.    Was Mr. Walsh an investment banker for Tyco on the CIT transaction?

A.    I believe he was, yes.

255.    Kozlowski went on to testify that he viewed Walsh as functioning as an investment banker on the transaction from the outset of the CIT negotiations.  He stated:

Q.    And -- and when [you left] that meeting [the initial meeting with the CEO of CIT to discuss a potential deal],

> **However, I intentionally did not disclose to any of the members of the Board, other than Kozlowski and Swartz, that I stood to receive a substantial fee if the transaction was approved.**

251.    The CIT merger was approved by the Tyco board on March 13, 2001.  Thereafter, the Registration Statement relating to the CIT acquisition was filed with the SEC, which Walsh <u>admitted</u> in his allocation was false and misleading.

> **Following the Board's approval, a securities filing was done by Tyco in which the company omitted to disclose that I was to get a fee.  That made the filing false.** Thereafter, I reached an agreement with L. Dennis Kozlowski that I would receive a ten million dollar fee for my services, and Tyco would further contribute ten million dollars to a charity recommended by me.  (emphasis added)

252.    Based upon Walsh's plea allocution, it is clear that: (i) at the time Walsh voted on the CIT transaction, Walsh, Kozlowski and Swartz were all well-aware that if the transaction was approved, Walsh "stood to receive a substantial fee," and (ii) the Registration Statement filed by Tyco after the transaction was approved was "false" because it "omitted to disclose" that Walsh "was to get a [substantial] fee."

253.    10.    At his civil deposition, Walsh testified that he pled guilty to the filing of a false registration statement, and <u>confirmed that the securities filing was in fact false</u>.  Walsh stated:

> Q.    At your guilty plea allocation, you also told the court that following the board's approval of the transaction, a securities filing was done by Tyco that didn't disclose that you were to get a fee, is that right?
>
> A.    That is correct.
>
> Q.    And that made the securities filing false, correct?
>
> A.    That is what I pled to or whatever.
>
> Q.    And that is true, correct?

249.    On December 17, 2002, Frank Walsh pled guilty to a Class E felony, "a violation of General Business Law Section 352(6) charging that he intentionally concealed information concerning a payment of a finder's fee in connection with the acquisition of the CIT Corp. Inc. by Tyco from the directors and shareholders of Tyco and thereby obtained property with a value in excess of two hundred and fifty thousand dollars; that is a value of twenty million dollars."

250.    At his plea allocution, and in his own carefully crafted words, Frank Walsh admitted that after the very first "initial meeting" with CIT, Kozlowski informed Walsh that he "should receive an investment banking or finder's fee" for his services and that when he voted to approve the CIT transaction he "intentionally did not disclose" that he "stood to receive an substantial fee if the transaction was approved".  Walsh admitted his guilt and represented to a Justice of the Supreme Court of the State of New York that Tyco's Registration Statement concerning the CIT merger was <u>false</u>.  Walsh stated:

> THE DEFENDANT: During the period from 1992 to January 2002, I served as a director of Tyco International Limited, a public corporation whose stocks is traded in New York county and elsewhere.
>
> In late 2000, I became aware that Tyco was interested in pursuing a possible acquisition of a financial services company as a way of expending and diversifying its business operations.  I recommended that Tyco consider acquiring a company I was familiar with, the C.I.T. Group, Inc.  L. Dennis Kozlowski, Tyco's C.E.O. indicated that Tyco was interested in pursuing my proposal, and as a result, in early 2001 I arranged for a meeting between him and Al Gamper Junior, the C.E.O. of C.I.T. and followed up with additional actions to further the acquisition.
>
> After the initial meeting, Kozlowski proposed that if the acquisition was successfully completed I should receive an investment banking or finder's fee for my services.  We agreed not to discuss it further at that time.  After the extended negotiations, the proposed transaction was submitted to the Tyco Board for its approval.  I participated in the discussions and along with all the other members of the Board, voted in favor of the transaction which I believe at the time to be a very favorable transaction for Tyco.

"investment banking fee."  Accordingly, Walsh was a director of the company who had or "will have" a "direct or indirect material interest" in the transaction.  As a result, the "nature of his interest" in the proposed transaction--that he was to be paid an investment banking fee or finder's fee--was required to be disclosed.

246.    In addition to its failure to comply with the mandatory disclosure obligations in Regulation S-K, Tyco was also required to disclose the Walsh payment in order to make the statements made in the Registration Statement not false or misleading.  In the Registration Statement Tyco falsely stated that Walsh was not entitled to any fee on the CIT transaction:

> Except for Lehman Brothers and Goldman, Sachs and Co., the fees and expenses of which will be paid by Acquiror, there is no investment banker, broker, finder or other intermediary that has been retained by or authorized to act on behalf of Acquiror or Guarantor who might be entitled to any fee or commission from Acquiror, Guarantor or any of their respective affiliates in connection with the [CIT] transaction contemplated by this Agreement.

247.    At the time of the referenced filings, Walsh had earned the right to be paid a so-called "finder's fee" in connection with the CIT transaction.  Indeed, Tyco filed a Complaint against Walsh for breach of his fiduciary obligation for arranging the $20 million "finder's fee" from Tyco, hiding it from his fellow directors, and refusing to return the fee upon demand of the Board.

248.    As set forth above, Tyco was required to disclose any "direct or indirect" interest that Walsh had or "would have" in the CIT transaction.  In addition, CIT falsely stated that other than Goldman Sachs and Lehman Brothers, no "finder" or "investment banker" had been "retained" or "authorized to act" who "might be" entitled to a fee in connection with the CIT transaction.  Thus even if the Walsh payment was only "proposed" and even if the amount of the payment was not agreed upon until after the transaction closed, the Registration Statement contained omissions and misstatements.

director "will have" an interest and requires the issuer to identify the director and "where practicable" the amount of his or her interest.  In one item titled "Certain Relationships and Related Transactions," Item 404 requires the following disclosure:

> (a)    Transactions With Management and Others. <u>Describe</u> briefly any transaction, or series of similar transactions, since the beginning of the registrant's last fiscal year, or <u>any currently proposed transaction</u>, or series of similar transactions, <u>to which the registrant</u> or any of its subsidiaries was or <u>is to be a party, in which the amount involved exceeds $60,000, and in which any of the following persons</u> had, or <u>will have, a direct or indirect material interest, naming such person</u> and indicating the person's relationship to the registrant, <u>the nature of each such person's interest in the transaction(s), the amount of such transaction(s) and, where practicable, the amount of such person's interest in the transaction(s):</u>

> (1)    <u>Any director</u> or executive officer <u>of the registrant;</u>

> *Instructions to Paragraph (a) of Item 404.*

> 1.    The materiality of any interest is to be determined on the basis of the significance of the information to investors in light of all the circumstances of the particular case.  The importance of the interest to the person having the interest, the relationship of the parties to the transaction with each other and the amount involved in the transactions are among the factors to be considered in determining the significance of the information to investors.

> (Compl. ¶ 150, Ex. A to Movant's Brief). [18]

245.    The multi-billion dollar CIT acquisition was a "proposed transaction" in excess of $60,000.  In connection with that transaction Walsh was to be paid a "finder's fee" or

---

[18]    Similarly, Item 402 requires the disclosure of all compensation "awarded to" or "earned by" a director for "all services" and in "all capacities" to the issuer: (2) *All compensation covered.*  This item requires clear, concise and understandable disclosure of all plan and non-plan compensation awarded to, earned by, or paid to the…directors covered by paragraph (k) of this Item, by any person <u>for all services rendered in all capacities to the registrant</u> and its subsidiaries, unless otherwise specified in this item.  Item (K)(3) requires a "narrative description" of director compensation, including the standard compensation arrangements" and "whether any director has a different compensation arrangement, identifying that director and describing the terms of that arrangement." (Compl. ¶ 149, Ex. A to Movant's Brief).

240.    On June 5, 2001, Tyco filed with the SEC a prospectus relating to Tyco's proposed offer to exchange up to 7,141,083 common shares of Tyco stock for exchangeable shares of Tyco's direct subsidiary, CIT Exchangeco, Inc. (the "6/5/01 Prospectus").  Because the 6/5/01 Prospectus incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco's Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Reports on Form 10-Q for the quarters ended December 31, 2000 and March 31, 2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001, and May 24, 2001.

241.    The 6/5/01 Prospectus recites Tyco's purported strategy, quoted and discussed above.  This statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

242.    On June 7, 2001, Tyco filed with the SEC a Form S-8 in connection with the issuance of securities to The CIT Group, Inc. Savings Incentive Plan, relating to the proposed merger between The CIT Group, Inc. and Tyco (the "6/7/01 S-8"). Because the 6/7/01 S-8 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein:  (i) Tyco's Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Reports on Form 10-Q for the quarters ended December 31, 2000 and March 31, 2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001 and May 24, 2001.

243.    The 3/29/01 S-4, 4/13/01 S-4/A, 4/24/01 Prospectus, 5/24/01 Post-Effective Amendment, 6/5/01 Prospectus, and 6/7/01 S-8 were also materially false and misleading when made in that they failed to disclose the payment to Walsh described in Section B.7.f. above.

Tyco was Required to Disclose the Walsh Payment in its CIT Registration Statement.

244.    Regulation S-K sets forth instructions for filing forms under the 1933 and 1934 Acts.  Item 404 requires disclosure of any proposed transaction greater than $60,000 in which a

precisely the same language quoted from the 3/29/01 S-4, above. These statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

237.   The 4/24/01 Prospectus also gives favorable, purportedly accurate information concerning Tyco's operating results, including the following:

| | Quarters Ended December 31 | | Year Ended September 30 | |
| --- | --- | --- | --- | --- |
| | 2000 (2) | 1999 (2) | 2000 (3) | 1999 (4) |
| | (UNAUDITED) | | | |
| (IN MILLIONS, EXCEPT PER SHARE DATA) | | | | |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA: | | | | |
| Operating income | 1,308.9 | 1,189.0 | 5,474.4 | 2,190.8 |
| Income (loss) from continuing operations | 1,009.2 | 757.2 | 4,520.1 | 1,067.7 |
| Income (loss) from continuing operations per common share (10): | | | | |
| Basic | 0.58 | 0.45 | 2.68 | 0.65 |
| Diluted | 0.57 | 0.44 | 2.64 | 0.64 |

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

238.   On May 24, 2001, Tyco filed with the SEC a Post-Effective Amendment No. 1 to Form S-4 relating to the proposed merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV) (the "5/24/01 Post-Effective Amendment"). Because the 5/24/01 Post-Effective Amendment incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Report on Form 10-Q for the quarter ended December 31, 2000 and March 31, 2001; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, April 3, 2001 and May 24, 2001.

239.   The 5/24/01 Post-Effective Amendment recites Tyco's purported strategy, quoted and discussed above. These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

| (10):................................................................................ | | | | |
|---|---|---|---|---|
| Basic .............................................................................. | 0.58 | 0.45 | 2.68 | 0.65 |
| Diluted............................................................................ | 0.57 | 0.44 | 2.64 | 0.64 |

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

233.    On April 13, 2001, Tyco filed with the SEC a Form S-4/A (the "4/13/01 S-4/A"), amending the 3/29/01 S-4.  Because the 4/13/01 S-4/A incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Reports on Form 10-Q for the quarters ended December 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, and April 3, 2001.

234.    The 4/13/01 S-4/A recites Tyco's purported strategy, quoted and discussed above. It also reiterates its so-called strategy in its discussion of Tyco's acquisition of CIT, using precisely the same language quoted from the 3/29/01 S-4, above.  These statements of strategy when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

235.    On April 24, 2001, Tyco filed with the SEC a prospectus relating to the proposed merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV) (the "4/24/01 Prospectus").   Because the 4/24/01 Prospectus incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents, as described herein: (i) Tyco's Annual Report on Form 10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Report on Form 10-Q for the quarter ended December 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on November 1, 2000, November 15, 2000, February 9, 2001, March 15, 2001, March 29, 2001, and April 3, 2001.

236.    The 4/24/01 Prospectus recites Tyco's purported strategy, quoted and discussed above.  It also reiterates its so-called strategy in its discussion of Tyco's acquisition of CIT, using

> now we're probably talking about some .10 to
> .12 cents before we get into the revenue
> enhancements for the business.

These statements when made were materially false and misleading and omitted material

information for the reasons set forth above in Section(s) A, A.1, A.1.d and A.1.e.

### 3/29/01 S-4 (and related S-8)

230.     On March 29, 2001, Tyco filed with the SEC a Form S-4 relating to a proposed

merger between The CIT Group, Inc. and Tyco Acquisition Corp. XIX (NV), a direct wholly-

owned subsidiary of Tyco (the "3/29/01 S-4").   Because the 3/29/01 S-4 incorporates the

following documents by reference, it contains the same materially false and misleading

statements set forth in those documents, as described herein:  (i) Tyco's Annual Report on Form

10-K for the fiscal year ended September 30, 2000; (ii) Tyco's Quarterly Report on Form 10-Q

for the quarter ended December 31, 2000; and (iii) Tyco's Current Reports on Form 8-K filed on

November 1, 2000, November 15, 2000, and February 9, 2001.

231.     The 3/29/01 S-4 recites Tyco's purported strategy, quoted and discussed above.  It

also reiterates its so-called strategy in its discussion of Tyco's acquisition of CIT:

> The acquisition of CIT would also be consistent with Tyco's
> corporate strategy of complementing internal growth with
> synergistic acquisitions that are expected to be immediately
> accretive to earnings per share.

These statements when made were materially false and misleading and omitted material

information for the reasons set forth above in Section(s) A, A.1.a, A.1.d and A.1.e.

232.     The 3/29/01 S-4 also gives favorable, purportedly accurate information

concerning Tyco's operating results, including the following:

| | Quarters Ended December 31 | | Year Ended September 30 | |
|---|---|---|---|---|
| | 2000 (2) | 1999 (2) | 2000 (3) | 1999 (4) |
| | (UNAUDITED) | | | |
| (IN MILLIONS, EXCEPT PER SHARE DATA) | | | | |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA: | | | | |
| Operating income | 1,308.9 | 1,189.0 | 5,474.4 | 2,190.8 |
| Income (loss) from continuing operations | 1,009.2 | 757.2 | 4,520.1 | 1,067.7 |
| Income (loss) from continuing operations per common share | | | | |

recurring charge of $25.0 million related to the write-up of inventory under purchase accounting. The $25.0 million charge has been included in cost of sales. At September 30, 2000, there existed merger, restructuring and other non-recurring reserves of $365.9 million. During the quarter ended December 31, 2000, we paid out $11.3 million in cash and incurred $1.7 million in non-cash charges that were charged against these reserves. At December 31, 2000, there remained $371.0 million of merger, restructuring and other non-recurring reserves in our Consolidated Balance Sheet, of which $341.3 million is included in current liabilities and $29.7 million is included in long-term liabilities. p25

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

### 3/13/01 Conference Call

229. On March 13, 2001, Tyco held a conference call to discuss, among other things, its proposed acquisition of CIT. On Tyco's behalf, Kozlowski stated:

KOZLOWSKI: On the plus side, this transaction is accretive to Tyco shareholders delivering .10 cents the first full year. If one were to take out the amortization on this we'd be delivering some .72 cents the first full year.

The new accounting rules allow us to deliver .10 cents and if we were to pool, to be on an apples to apples basis, we would be delivering that .10 cents. This .10 cents now is based upon putting the two companies together at current rent rates and a little bit of some cost reductions at CIT . . . . **This acquisition meets all of our criteria. CIT is a market leader. The transaction is immediately accretive to earnings before any revenue enhancements**. [Emphasis added.]

\* \* \*

We're very, very enthused by this acquisition. It's certainly going to add to earnings. We feel good about our earnings right now. The transaction most likely will close in about July. It should add a couple of cents this year, that we're in, and next year for the full year for the full fiscal year

**2/13/01 10-Q for quarter ended 12/31/00**

226.    On February 13, 2001, Tyco filed Tyco's Form 10-Q for the quarter ended December 31, 2000 (the "2/13/01 10-Q"), in which Tyco set out numerous materially false and misleading statements.   These false and misleading statements addressed a variety of topics, including the following:

**Tyco's Operating Results**

227.    The 2/13/01 10-Q also gives favorable, purportedly accurate information concerning Tyco's operating results.   For example, Tyco provided the following summary information:

|  | (Unaudited) For the Quarters Ended December 31, | |
| --- | --- | --- |
|  | 2000 | 1999 |
| Income before income taxes, minority interest, extraordinary item and cumulative effect of accounting change............... | 1,551.2 | 1,024.3 |
| Income taxes ...................................................................... | (529.5) | (263.9) |
| Minority interest................................................................. | (12.5) | (3.2) |
| Income before extraordinary items and cumulative effect of accounting change........................................................... | 1,009.2 | 757.2 |
| Extraordinary item, net of tax.............................................. | -- | (0.2) |
| Cumulative effect of accounting change, net of tax.............. | (29.7) | -- |
| Net income........................................................................ | $979.5 | $757.0 |

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**Tyco's Reserves**

228.    The 2/13/01 10-Q also gives materially false and misleading information concerning Tyco's reserves.   For example:

> During the quarter ended December 31, 2000, we recorded restructuring and other non-recurring charges of $18.1 million primarily related to an environmental remediation project and the closure of a manufacturing plant.   Additionally, we incurred a non-

-77-

outstanding growth in earnings per share of 42.5%, operating cash
flow of 48.6%, and net sales of 29%.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B.1.a, B.2, B.3, B.4.a, B.5, B.7 and B.8.

**Key Employee Loan Program**

224.    The 2001 Proxy Statement provides materially false and misleading statements concerning Tyco's KEL Program.  It states, for example:

> The Compensation Committee administers the loan program.  **The Compensation Committee authorizes loans, which may not exceed the amount allowable as provided by any regulation of the United States Treasury or other state or federal statute.** Loans may be required to be secured by Tyco common shares owned by the employee or may be unsecured.  Loans under the loan program generally bear interest at Tyco's incremental short-term borrowing rate (6.67% for 2000) and are generally repayable in ten years or when the participant reaches age 69, whichever occurs first, except that earlier payments must be made in the event that the participant's employment with Tyco or its subsidiaries terminates.  The participant is also required to make loan payments upon the sale or other disposition of Tyco common shares (other than gifts to certain family members) with respect to which loans have been granted.  [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B.4 and B.5.

225.    The 2001 Proxy Statement also falsely and misleadingly states:

> At September 30, 2000, the amount of loans outstanding under the [Key Employee Loan] program totaled $11,421,655, of which nothing was outstanding for any of the Named Officers.  The largest amount of indebtedness since October 1, 1999 for each of these individuals was $12,711,768 for Mr. Kozlowski, $304,363 for Mr. Garvey, and $1,000,000 for Mr. Swartz.  Neither Dr. Gromer nor Mr. Meelia had loans under the program during fiscal 2000.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B.4 and B.5.

| | | | | | | |
|---|---|---|---|---|---|---|
| EVP & CFO, Tyco | 1999 | 750,000 | 1,600,000 | 12,029,641 | 2,976,480 | 150,014 |
| International Ltd. | 1998 | 559,500 | 1,250,000 | 10,070,000 | 2,764,666 | 256,878 |

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B.1, B.2, B.3, B.4, B.5, B.6, B.7 and B.8.

223.    The 2001 Proxy Statement failed to disclose and misrepresented the actual compensation of Kozlowski:

> For fiscal 2000, Mr. Kozlowski received a base salary of $1.35 million and a cash bonus in the amount of $2.8 million, as shown in the SUMMARY COMPENSATION TABLE on page 14.  Mr. Kozlowski was granted 600,000 shares of restricted stock on January 5, 2000.  These shares will vest over a period of up to three years if the specified performance criteria referred to above are met.
>
> Mr. Kozlowski also received an aggressive performance-based option award, which includes significant growth in earnings per share and stock price appreciation measures (described in footnote 3 on page 16).  Mr. Kozlowski also received restoration options in accordance with the restoration option provision.  The restoration provision enables executive officers to use certain earned equity awards and certain proceeds from the sale of shares acquired upon the exercise of options to pay option exercise costs, repay indebtedness owed to Tyco International (US) Inc., or for tax planning purposes while maintaining their equity position in Tyco. At the time of the TyCom initial public offering, Mr. Kozlowski received an award of options to purchase 800,000 TyCom common shares at the initial public offering price of $32.00 with pro-rata vesting over four years.  The Committee believes Tyco is best served by the continued leadership of Mr. Kozlowski.  The Committee conferred with a nationally recognized consulting firm that analyzed Tyco's performance, as well as the marketplace for executive talent. The firm reviewed the performance option award, designed to focus on Mr. Kozlowski's retention as well as growth in shareholder value, and made its recommendations.  Another consulting firm reviewed and concurred with the recommendations.
>
> The Committee considers Mr. Kozlowski's level of compensation appropriate in view of his performance and continued leadership of Tyco during fiscal 2000.  As noted above, Tyco experienced

> Tyco's executive compensation program [offers] significant financial rewards when Tyco and the individual achieve excellent results; however, significantly lower compensation is tied to lower levels of performance.  Specifically, if the compensation targets are not achieved, Tyco executives are ineligible for either cash bonuses or equity-based compensation.   In order for Mr. Kozlowski and Mr. Swartz to earn a cash bonus in fiscal 2000, a minimum of 22.5% growth in pre-tax income and operating cash flow growth over fiscal 1999 performance was required.   In addition, in order to meet the performance criteria to vest the minimum number of restricted shares, growth in earnings per share of at least 22.5% over fiscal 1999 was required.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B.

221.   The 2001 Proxy Statement also contains materially false and misleading information regarding the administration of compensation to executive officers and key managers:

> The Compensation Committee of the Board of Directors is composed solely of independent directors, none of whom has any interlocking relationships with Tyco that are subject to disclosure under rules of the SEC relating to proxy statements.   The Compensation Committee approves all of the policies under which compensation is paid or awarded to Tyco's Chief Executive Officer, reviews and, as required, approves such policies for executive officers and key managers, and oversees the administration of executive compensation programs.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) B.

222.   The 2001 Proxy Statement contains the following specific information concerning the compensation of Kozlowski and Swartz:

| Name & Principal Position | Year | Annual Compensation (1) | | Stock Bonus (4) | Restricted Stock Award(s)(5) | Long-Term Compensation | | All Other Compensation(6) |
| | | Salary | Cash Bonus(3) | | | Tyco Shares Underlying Stock Options | Tycom Shares Underlying Stock Options | |
| L. Dennis Kozlowski Chairman & CEO, Tyco International Ltd. | 2000 | $1,350,000 | $2,800,000 | | $21,270,540 | 5,107,158 | 800,000 | $527,152 |
| | 1999 | 1,350,000 | 3,200,000 | | 25,707,178 | 6,621,834 | | 387,001 |
| | 1998 | 1,250,000 | 2,500,000 | | 20,140,000 | 3,832,800 | | 901,002 |
| Mark H. Swartz | 2000 | 768,750 | 1,400,000 | | 10,603,770 | 2,535,999 | 500,000 | 292,487 |

-74-

EPS upside as a possibility. Weathering a sharp economic slowdown, or even a recession, with greater than 20% earnings growth should finally deliver the respect (and the multiple) we think the stock deserves. We look for TYC to be a strong performer both heading into a slowdown given our earnings confidence, and coming out because of the enhanced credibility.

\* \* \*

Tyco is our highest conviction Buy rated stock and we have a $95 per share target.

217. The price of Tyco stock closed at $59.63 on January 13, 2001.

## 1/17/01 Conference Call

218. On January 17, 2001, Tyco held a conference call with analysts. During the call, Tyco continued to report "organic growth":

> KOZLOWSKI: Tyco International today reported a 24% increase in first quarter earnings per share. Our earnings per share increased to 57 cents a share from 46 cents last year. Our revenue was up 21% to $8 billion for the quarter and we are pleased to report that organic growth for Tyco which excluding TyCom which has a different business model now where they building out their own system. Organic growth was up from 16%.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

## 2001 Proxy Statement

219. On January 29, 2001, Tyco filed with the SEC its Proxy Statement for the 2001 annual meeting (the "2001 Proxy Statement"). The 2001 Proxy Statement contains materially false and misleading statements on a variety of topics, including management remuneration, the Key Employee Loan Program, and allegations of accounting impropriety by the Company.

## Management Remuneration

220. Concerning Tyco's executive compensation program generally, the 2001 Proxy Statement states:

and a gain of $1,007.4 million ($1,760.0 million pre-tax) on the issuance of common shares in connection with TyCom's initial public offering. Income before extraordinary items for Fiscal 1999 included an aftertax net charge of $1,304.8 million ($1,542.7 million pretax) primarily related to the mergers with USSC and AMP and costs associated with AMP's profit improvement plan. Income before extraordinary items for Fiscal 1998 included an after-tax charge of $192.0 million ($256.9 million pre-tax) primarily related to AMP's profit improvement plan and costs incurred by USSC to exit certain businesses.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

215.   The 2000 Annual Report also provides limited information concerning loans taken by senior management under Tyco's KEL program, which was instituted to encourage ownership of the Company's common stock by executives and other key employees. According to the 2000 Annual Report: "During Fiscal 2000, the maximum amount outstanding under is program was $26.0 million. Loans receivable under this program were $11.4 million and $18.6 million at September 30, 2000 and 1999, respectively." This statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A.1.b, B.4 and B.5.

**2001 Materially False and Misleading Statements and Omissions**

216.   On January 12, 2001, J.P Morgan, reporting materially false and misleading information received from Tyco, issued an analyst report entitled, "Strong 1Q Results Could Be A Catalyst." The report stated:

> We expect very solid earnings and revenue results from Tyco when they report earnings next week, and believe the news would be enough to push the stock beyond its recent $52-58 trading range. We think nervousness about the economy has weighed on the stock lately, and just making expectations should be worth something. Of course, the 2001 outlook is the key ingredient to investor interest this time around given the questions on the economy, but even here we expect the company to remain bullish. We continue to believe the company is in very good shape to deliver on its full year expectations in almost any conceivable scenario this year, and is actually one of the few on our list where we view meaningful

and earnings grew $1.2 billion to $3.7 billion, a 46 percent increase over the prior year.  Our diluted earnings per share increased 42 percent to $2.18.  These are outstanding numbers, the result of our focus on lean, efficient management, continuous production improvement and aggressive expansion into new markets. . . .

I have never been more confident about Tyco's core businesses and our growth opportunities. We generated more than $3.3 billion in free cash flow in 2000, an amount that we hope to increase to over $4 billion -- before capital spending on the TyCom Global Network -- in 2001. . . .

**Growth on Growth**

At Tyco, we have a two-pronged growth strategy.  First, we seek to achieve double-digit organic growth every year.  This is growth without ever doing another acquisition. . . . Strategic acquisitions also play a key role in our growth.  A good acquisition should not only be profitable on its own terms, it should also help existing businesses and product lines. . . .

Tyco's future looks outstanding and I am confident that our "growth-on-growth" strategy will continue to deliver enviable results.  We are poised for growth because we have the best brand names in our industries, names that represent "reliability" and "innovation" to purchasers.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

214.    In addition, the 2000 Annual Report provided investors with a false overview of the Company's operations:

Sales increased 28.6% during Fiscal 2000 to $28,931.9 million from $22,496.5 million in Fiscal 1999.  Sales in Fiscal 1999 increased 18.0% compared to Fiscal 1998.  Income before extraordinary items was $4,520.1 million in Fiscal 2000, as compared to $1,067.7 million in Fiscal 1999 and $1,168.6 million in Fiscal 1998.  Income before extraordinary items for Fiscal 2000 included an after-tax net credit of $793.7 million ($1,484.7 million pre-tax) consisting of restructuring, non-recurring and impairment charges of $327.3 million ($424.2 million pre-tax) primarily for non-recurring claims related to a merged company and the exiting of USSC's interventional cardiology business, offset by a credit of $113.6 million ($148.9 million pre-tax) representing a revision of estimates of merger, restructuring and other non-recurring accruals

> over $3.3 billion in free cash flow.  Cash generation is crucial because it is the very best indicator of how a company is really performing and it provides the resources for us to continue to grow our businesses by acquisition or other types of investment, such as through Tyco Ventures, our new venture capital arm.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

212.    The 2000 Annual Report also provided investors with a false and misleading explanation of Tyco's acquisition strategy, including its purported ability to acquire companies that "immediately" add to earnings:

> Acquisitions are a definite growth driver at Tyco.  The second part of the growth-on-growth strategy involves acquisitions that add new products and businesses to complement our core groups.  We seek to acquire companies with superior products that have long-term growth potential but are performing below peak level, or companies that fill a gap in our existing product lines.   All acquisitions must immediately add to earnings, but they must also make strategic sense by helping us become a stronger competitor in one of our existing business segments.  Buying at a good price is important; finding a company whose people and products fit well in our organization is essential.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

213.    The 2000 Annual Report also included a letter to Tyco shareholders from Kozlowski, which states:

> Fiscal 2000 was another very strong year for Tyco.  I am pleased to report that all our operating units beat their performance targets, and they are in a position to achieve excellent growth in 2001 and beyond.
>
> Tyco's internal revenue growth in fiscal 2000 was 14 percent, a remarkable feat for a company of our size.  Put another way, our business units delivered $3.7 *billion* in incremental sales last year alone -- not counting acquisitions.  That is what I call a growth company.
>
> For the seventh consecutive year, we increased revenues and earnings substantially.  Revenues rose 29 percent to $28.9 billion

This statement when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**2000 Annual Report to Shareholders**

209.     On or about January 30, 2001, Tyco released its 2000 Annual Report to Shareholders (the "2000 Annual Report").  On its very first page, the 2000 Annual Report falsely and misleadingly states that its "exceptional financial results" are the product of its "growth-on-growth" strategy:

> Tyco has demonstrated the ability to grow each of its businesses organically, as well as by the acquisition of complementary businesses or product lines.  This "growth-on-growth" strategy has yielded exceptional financial results for several years, and puts us in a position to achieve excellent growth in the future.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

210.     The 2000 Annual Report touts Tyco's ability to achieve "Organic Growth," even in the absence of any additional acquisitions:

> Based on its performance to date, Tyco would continue growing revenues and achieving double-digit earnings gains annually for the foreseeable future even without additional acquisitions.  This is because we have leadership positions in many of the world's best growth industries.  Thus, we have the ability to increase sales each year through a combination of geographic expansion, the introduction of innovative new products and market share gains fueled by our status as the low-cost producer in most of our markets.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

211.     The 2000 Annual Report included a full page description of the Company's "free cash flow":

> At Tyco, cash is king.  We judge ourselves by the amount of free cash flow that we generate each year after we have paid all necessary expenses, including capital expenditures, which exceeded $1.8 billion last year.  In fiscal 2000, Tyco generated

> The 49.6% increase in operating income, before certain credits (charges), in Fiscal 1999 compared with Fiscal 1998 was due to improved margins at AMP, the acquisition of Raychem, and higher sales volume at the Tyco Printed Circuit Group.  The improved operating margins, before certain credits (charges), in Fiscal 1999 compared with Fiscal 1998 were primarily due to the implementation of AMP's profit improvement plan, which was initiated in the fourth quarter of Fiscal 1998, cost reduction programs associated with the AMP merger, a pension curtailment/settlement gain and the acquisition of Raychem.

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

**Management Remuneration and Related Transactions**

206.    The 2000 10-K addresses management remuneration only by reference, stating: "Information concerning management remuneration is hereby incorporated by reference to the Registrant's definitive proxy statement which will be filed with the Commission within 120 days after the close of the fiscal year."  Because the 2000 10-K incorporates Tyco's Proxy Statement, filed on January 29, 2001, by reference, the 2000 10-K contains the same materially false and misleading statements set forth therein, as described below.

207.    Similarly, the 2000 10-K addresses related transactions by reference, stating: "Information concerning certain relationships and related transactions is hereby incorporated by reference to the Registrant's definitive proxy statement which will be filed with the Commission within 120 days after the close of the fiscal year."  Because the 2000 10-K incorporates Tyco's Proxy Statement, filed on January 29, 2001, by reference, the 2000 10-K contains the same materially false and misleading statements set forth therein, as described below.

208.    On January 2, 2001, THE WALL STREET JOURNAL reported that Tyco completed its purchase of a Lucent unit for $2.5 billion.  The article included a comment from Tyco concerning the benefits of the acquisition:

> Tyco said the acquisition, which gives it a strong foothold in the fast-growing business of providing power supplies to telecommunications concerns, will be "immediately accretive."

> **September 30, 2000, there remained $372.6 million in purchase accounting reserves on our Consolidated Balance Sheet, of which $349.2 million is included in current liabilities and $23.4 million is included in long-term liabilities.**
> [Emphasis added.]

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

### Tyco's Operating Results

204.    The 2000 10-K also gives favorable, purportedly accurate information concerning Tyco's operating results.  For example, Tyco provided the following summary information:

| | Fiscal 2000 | Fiscal 1999 | Fiscal 1998 |
|---|---|---|---|
| Income before income taxes, minority Interest and extraordinary items.............. | 6,464.8 | 1,705.2 | 1,702.8 |
| Income taxes ............................................. | (1,926.0) | (637.5) | (534.2) |
| Minority interest ...................................... | (18.7) | -- | -- |
| Income before extraordinary items............. | 4,520.1 | 1,067.7 | 1,168.6 |
| Extraordinary items, net of taxes................ | (0.2) | (45.7) | (2.4) |
| Net income................................................. | $4,519.9 | $1,022.0 | $1,166.2 |

These statements when made were materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d

205.    In addition, these statements are materially false and misleading because they fail to disclose the aggressive accounting and incentivizing practices described above (and admitted by Tyco in the December Report), but instead attribute Tyco's favorable results to "organic growth" and "synergies" resulting from Tyco's acquisitions.  According to the 2000 10-K:

> Operating income improved in all segments in each of Fiscal 2000 and Fiscal 1999.  The operating improvements are the result of both increased revenues in all segments and enhanced margins in all but one segment in Fiscal 2000.  Increased revenues result from organic growth and from acquisitions that are accounted for under the purchase method of accounting.

Tyco also stated:  "By integrating merged companies with our existing businesses, we expect to realize operating synergies and long-term cost savings."   And concerning profits in Tyco's electrical business, Tyco stated:

## TYCO'S MATERIALLY FALSE AND MISLEADING STATEMENTS

### 2000 Materially False and Misleading Statements and Omissions

### The 2000 10-K filed on 12/21/00

201.    On December 21, 2000, Tyco filed its 10-K for the fiscal year ended September 30, 2000 (the "2000 10-K"), in which Tyco set out numerous materially false and misleading statements on a variety of topics, including the following:

### Tyco's "Strategy"

202.    The 2000 10-K recites Tyco's purported strategy:

> Tyco's strategy is to be the low-cost, high quality producer and provider in each of our markets.  We promote our leadership position by investing in existing businesses, developing new markets and acquiring complementary businesses and products. Combining the strengths of our existing operations and our business acquisitions, we seek to enhance shareholder value through increased earnings per share and strong cash flows.

This statement of strategy when made was materially false and misleading and omitted material information for the reasons set forth above in Section(s) A, A.1.a and A.1.d.

### Tyco's Manipulation of Purchase Accounting Reserves

203.    The 2000 10-K sets forth statements that were materially false and misleading concerning Tyco's manipulation of purchase accounting reserves:

> In Fiscal 2000, we made acquisitions that were accounted for under the purchase accounting method at an aggregate cost of $5,162.0 million.  Of this amount, $4,246.5 million was paid in cash (net of cash acquired), $671.4 million was paid in the form of Tyco common shares, and we assumed $244.1 million in debt.  In connection with these acquisitions, we established purchase accounting reserves of $426.2 million for transaction and integration costs.  **At the beginning of Fiscal 2000, purchase accounting reserves were $570.3 million as a result of purchase accounting transactions made in prior years.  During Fiscal 2000, we paid out $544.2 million in cash and incurred $52.1 million in non-cash charges against the reserves established during and prior to Fiscal 2000.  Also in Fiscal 2000, we determined that $117.8 million of purchase accounting reserves related to acquisitions made prior to Fiscal 2000 were not needed and reversed that amount against goodwill.  At**

Dennis Kozlowski's conduct and will pursue whatever remedies are appropriate based on the results of that investigation.

**g.    Compensation Committee Deceptions**

200.    On June 22, 2001, Tyco acquired 15 million shares of Flag, a telecom company for $11,421,810 cash and 5,580,647 TyCom shares.  The Company reported a $79,364,700 gain associated with the swap of TyCom shares for the Flag equity.  As a result of the gain, purportedly as another bonus, accelerated vestings of restricted shares were made to various key individuals.[17]  Each of the executives involved in the grant of restricted shares sold the shares back to the Company's Newington subsidiary on June 20, 2001 and received wire transfers to their personal accounts in the amounts indicated in the note below, justified on the basis that the transaction resulted in a $79 million gain to TyCom.  The Compensation Committee approved and certified the vesting of 290,000 shares for Kozlowski and Swartz only on October 1, 2001 "in conjunction with the gain" on the Flag transaction.  The total cost to the Company related to the award of these shares was $15,378,700.  However, by the end of the quarter (September 30, 2001) and prior to the October 1, 2001 certification by the Compensation Committee, the value of the Flag stock decreased substantially, to the point that it was impaired, thus undermining the basis on which the special bonus vesting was approved.  The Company admitted in its September Report that neither Kozlowski nor Swartz, who were both members of the Board of Directors during this time period, ever disclosed this impairment or the full circumstances of the Flag transaction to the Compensation Committee.  Their entitlement to these bonuses was predicated upon a failure to disclose relevant facts for their own personal benefit.  Other examples of self-dealing and serious breaches of fiduciary duties owed to Tyco by Kozlowski, in particular his deceptions to the Compensation Committee resulting in the accelerated vesting of his own and other executives' shares of restricted stock and his entitlement to executive benefits, are the subject of litigation in Tyco's civil suit against Kozlowski and are further detailed in that complaint.

---

[17]    For example, Kozlowski received 155,000 shares with a vesting value of $8,219,650 and Swartz received 77,500 shares with a vesting value of $4,109,825.

that he introduce Kozlowski to the Chairman and CEO of The CIT Group, a large financial services company.  The report states:

> Subsequent negotiations led to an agreement for Tyco to acquire CIT, which closed in June 2001.  After the terms of the CIT transaction had been agreed to, Mr. Kozlowski caused Tyco to pay to and for the benefit of Mr. Walsh a $20 million fee for his role in the transaction.
>
> Mr. Kozlowski told Mr. Walsh, and Mr. Walsh agreed, that they should conceal this payment from the Board.

197.   On June 17, 2002, Tyco filed suit against Walsh for breaching his fiduciary obligations by arranging an unauthorized $20 million "finder's fee" from Tyco for himself in connection with the Company's 2001 acquisition of CIT, hiding it from his fellow directors and, when confronted by the Board, refusing to return it.

198.   According to the Walsh Complaint, the day after the fee was disclosed in the Company's proxy statement, Tyco's stock dropped sharply, resulting in an almost $17 billion decline in the Company's market capitalization in a single day.  As stated by Tyco in the Walsh Complaint:

> On January 28, 2002, Tyco filed its proxy statement for its upcoming annual general meeting with the Securities and Exchange Commission, and the contents of that proxy, including the disclosure of the payments to Walsh, became public. ***Following this disclosure, which was immediately picked up and publicized in the national financial press, the share price of Tyco's stock fell from $42 to $33.65, reducing the Company's market capitalization by $16.7 billion, in one day***.  [Emphasis added].

199.   Tyco said in a June 17, 2002 press release:

> We are taking this action because Frank Walsh violated his fiduciary duties as a Tyco director and put his personal gain ahead of the interests of the company and its shareholders.  Mr. Walsh engaged in a pattern of self-dealing and unethical conduct.  He had a clear and unambiguous disclosure obligation to the Board that he chose not to honor.  We will pursue this matter aggressively so that Mr. Walsh is held accountable for the damage done to Tyco and its shareholders.  The company is also continuing its investigation of

often indicated that they were made "on behalf of L. Dennis Kozlowski," such as a 1997 pledge to Seton Hall University that enclosed a $1 million Tyco check with a letter signed by Mr. Kozlowski that referred to "my pledge to Seton Hall University." Mr. Kozlowski made two other million-dollar pledges to schools under his own name but using Tyco funds, and made several other pledges that were publicly announced as being from Mr. Kozlowski, or in which a facility was named after him or his family, even though he had used Tyco's money to make the pledge.

194.    In addition, Kozlowski donated $4 million to Cambridge University to study corporate governance, falsely claiming that half the contribution was being made from his personal funds, whereas in fact all the money had been appropriated from Tyco.  According to the November 6, 2002 edition of THE DAILY TELEGRAPH (LONDON):

> Even the producers of The Office [a British television sitcom] would be hard-pressed to invent a script quite as whacky as a chair of Corporate Governance donated to Cambridge University by Tyco International.
>
> Mr. Kozlowski claimed the glory for endowing the chair with $4m, but it seems that half of it came from the Tyco shareholders.  In practice, it all came from their pockets, since he seemed to have some difficulty in distinguishing between what was his, and what belonged to the company . . . .

195.    According to the September Report:

> [m]ost egregiously, in 2001 Mr. Kozlowski donated to the Nantucket Conservation Foundation, Inc. a total of $1,300,000 in Company money.  The donation was used partially to purchase 60 acres of property called "Squam Swamp" adjacent to Mr. Kozlowski's own Nantucket estate on Squam Road.  The effect of this gift was to preclude future development of the land and thereby increase the value of Mr. Kozlowski's home.

**f.      Walsh Payment**

196.    In early 2001, according to the Company's September Report, Frank E. Walsh, Jr., Tyco's Lead Director and the former Chairman of its Compensation Committee, recommended to the Board that Tyco acquire a financial services company, and later proposed

### b.    Kozlowski's Fraudulent New York Home Purchase

190.    According to the Company's September Report, a Tyco subsidiary purchased a cooperative apartment in New York City in November 1998 for $5,547,248 "[u]pon Mr. Kozlowski's instructions," and made subsequent improvements to it.  The September Report admits that "Mr. Kozlowski purchased this property from the Tyco subsidiary in May 2000 at the depreciated book value of $7,011,669, rather than its then current market value."

### c.    Concealed, Fraudulent Overpayment to Kozlowski for NH Property

191.    The September Report also admits that Kozlowski and others caused a Tyco subsidiary to purchase property in Rye, New Hampshire from Kozlowski on July 6, 2000 for approximately $4,500,000.  After an appraisal in March 2002 valued the property at $1,500,000, the September Report states that "Tyco wrote down the carrying value of the property to the appraised value and charged Mr. Kozlowski's $3,049,576 overpayment to expense."

### d.    Kozlowski Non-Legitimate Business Expenses

192.    The Company's September Report also admits that Kozlowski "used millions of dollars of Company funds to pay for his other personal interests and activities", "including a $700,000 investment in the film 'Endurance'; more than $1 million for an extravagant birthday party celebration for his wife in Sardinia; over $1 million in undocumented business expenses, including a private venture (West Indies Management $134,113); jewelry ($72,042); clothing ($155,067); flowers ($96,943); club membership dues ($60,427); wine ($52,334); and an undocumented $110,000 charge for the purported corporate use of Mr. Kozlowski's personal yacht, 'Endeavour.'"

### e.    Kozlowski Charitable Contributions For Personal Benefit

193.    Also, as set forth in the Company's September Report, Kozlowski:

> caused Tyco to make donations or pledges to charitable organizations totaling over $106 million.  Of this total, at least $43 million in donations were represented in transmittal letters or otherwise as Mr. Kozlowski's personal donations, or were made using the Company's funds for Mr. Kozlowski's personal benefit. Mr. Kozlowski's letters accompanying these donations or pledges

Company, "[t]his was done without the knowledge or approval of the Compensation Committee."

186.    As set forth in the September Report, "Mr. Kozlowski, through his attorneys, has acknowledged to Tyco that he sought no approvals for these credits and that, if they were entered as a credit to his KEL account, it was done so improperly."   The September Report also states that "Mr. Swartz was advised that the credit was unauthorized and has also agreed to repay his forgiven indebtedness with interest."   Thus, Tyco has stated that it has "reversed these unauthorized entries, after notice to investigating authorities."

### 6.    Other Undisclosed Perquisites to Kozlowski and Swartz

187.    The Company admitted in the September Report that "both Mr. Kozlowski and Mr. Swartz each received auto and aircraft perquisites from Tyco that, in the aggregate, exceeded $50,000 per year."   In addition, the Company admitted in its September Report that "Mr. Kozlowski caused Tyco to make available to him various properties that the Company owned for his purported business use," and that the value of these personal uses "was also not reported."

### 7.    Self-Dealing Transactions and Other Misuses of Corporate Trust

188.    The Company has also admitted to numerous other examples of self-dealing and flagrant abuses of corporate trust.   These include, but are not limited to, the following:

#### a.    Kozlowski Evidence Tampering

189.    The September Report admits that from at least 1997 through the time of his departure in 2002, "Mr. Kozlowski has systematically abused his position and caused Tyco to expend funds for his personal benefit."   For example, the September Report states that "after his violation of the sales tax rules led to the service of a subpoena on the Company, [Kozlowski] caused Tyco not to comply with a subpoena.   Concerned only with protecting his wrongdoing from discovery, he tampered with evidence subject to a subpoena, and risked exposing the Company to an obstruction of justice claim."

program loans).  Balances after the date of August 31, 1999, reflect the effect of a $12.5 million unauthorized credit that has been reversed by Tyco and all balances thereafter should be adjusted accordingly.

183.    The September Report concludes that, like Kozlowski, "Mr. Swartz also generally abandoned his investment in the Company by selling substantially all of his restricted shares when they vested or shortly thereafter thus violating both the spirit and the letter of the KEL program."  As explained above, Swartz was indicted on September 12, 2002 for conspiring with Kozlowski to use the KEL loan program as a vehicle for misappropriating millions of dollars from Tyco.  The September Report states that Swartz's "total principal outstanding balance under the KEL program (including adjustments for improperly classified loans), as of July 18, 2002, was approximately $2,853,025, plus accrued interest."

c.    **Other Executive Officers**

184.    The September Report also provides a summary of KEL borrowing by other executive officers.

- **Mark A. Belnick**.  Belnick borrowed a total of $8,603,218 under the KEL program.

- **Jerry R. Boggess**.  Mr. Boggess borrowed a total of $4,461,645 under the KEL program.

- **Neil R. Garvey**.  Mr. Garvey borrowed a total of $1,342,572 under the KEL program.

5.    **Attempted Unauthorized Credits to Key Employee Loan Accounts**

185.    The September Report admits that in August 1999, at the direction of Kozlowski and Swartz, "entries were made in Tyco's KEL records that purported to reduce $25,000,000 of Mr. Kozlowski's outstanding KEL indebtedness, $12,500,000 of Mr. Swartz's KEL indebtedness, and $1,000,000 of the KEL indebtedness of another employee."  According to the

loan balance (including both authorized program uses and non-authorized non-program loans). Balances after the date of August 31, 1999 reflect the effect of a $25 million unauthorized credit that has been reversed by Tyco and all balances thereafter should be adjusted accordingly.

178.   The September Report also concludes that Kozlowski "generally abandoned his investment in the Company by selling substantially all of his restricted shares when they vested (or shortly thereafter thus violating both the spirit and the letter of the KEL program)."

179.   Kozlowski was indicted on September 12, 2002 for using the KEL loan program as a vehicle for misappropriating millions of dollars from Tyco.  The September Report states that Kozlowski's "total principal outstanding balance under the KEL program (including adjustments for improperly classified loans), as of June 30, 2002, was approximately $43,841,000, plus accrued interest."

### b.   Mark H. Swartz

180.   As Tyco's Chief Financial Officer, Swartz was responsible for approving and monitoring the KEL loans of senior management, including Kozlowski's KEL loans.  As such, the September Report admits that "he was aware of the nature and extent of Mr. Kozlowski's loans."  As a Tyco director, the report states that Swartz was also "responsible for reporting any issues relating to those loans to the Compensation Committee."

181.   The Company admitted in its September Report that:

> Mr. Swartz, like Mr. Kozlowski, borrowed millions in non-program loans.  Like Mr. Kozlowski, Mr. Swartz used those unauthorized loans to purchase, develop and speculate in real estate; to fund investments in various business ventures and partnerships (including private ventures in which both he and Mr. Kozlowski used Tyco KEL loans to invest); and for miscellaneous personal uses having nothing to do with the ownership of Tyco stock.

182.   The Company's September Report sets forth some of Swartz's KEL loans, including the journal entries used to describe the purpose for which the money was used and the resulting total loan balance (including both authorized program uses and non-authorized non-

ownership plan without having to sell the shares at the time of vesting to pay the resultant tax liability.

173.    According to the September Report, during the fiscal years from 1997 to 2002, "certain executive officers used KEL loans for purposes other than the payment of taxes due upon the vesting of restricted shares, borrowed more than the limits allowed under the program's terms, or both."

### a.    L. Dennis Kozlowski

174.    According to the Company's September Report, Kozlowski improperly "borrowed funds for purposes other than those stated in the KEL program and used the KEL program like an unlimited line of credit.  In addition to taking non-program loans, Kozlowski borrowed in excess of the KEL program's limits."

175.    According to the September Report, Kozlowski's "non-program KEL borrowing principally occurred in 1999 and afterwards."  The September Report stated:

> As of August 1998, Mr. Kozlowski's total KEL account balance was $132,310.  By August 1999, Mr. Kozlowski's outstanding balance had increased to over $55.9 million.  By the end of 2001, Mr. Kozlowski had taken over 200 KEL loans some for millions of dollars, and some as small as $100.  Mr. Kozlowski used these loans to purchase, develop and speculate in real estate; to fund investments in various business ventures and partnerships (including private ventures in which both he and Mr. Swartz used Tyco KEL loans to invest); and for miscellaneous personal uses having nothing to do with any taxes due on the vesting of his shares of Tyco stock.

176.    According to Tyco records cited in the September Report, "approximately 90% of Mr. Kozlowski's KEL loans were non-program loans, which he used to fund his personal lifestyle, including speculating in real estate, acquisition of antiques and furnishings for his properties (including properties purchased with unauthorized 'relocation loans'), and the purchase and maintenance of his yacht."

177.    The September Report sets forth some of Kozlowski's KEL loans, including the journal entries used to describe the purpose for which the money was used and the resulting total

$55,954,455." The distribution of this benefit is summarized in the Company's September Report as follows:

| EMPLOYEES | CASH BONUS | VALUE OF RESTRICTED SHARES | "RELOCATION" BENEFITS | TOTAL |
|---|---|---|---|---|
| Kozlowski | $700,000.00 | $8,378,576.00 | $16,488,034.00 | $25,566,610.00 |
| Swartz | $350,000.00 | $4,189,288.00 | $8,305,344.00 | $12,844,632.00 |
| Foley | $100,000.00 | $113,224.00 | $422,180.00 | $635,404.00 |
| Gutin | $500,000.00 | | $2,637,804.00 | $3,137,804.00 |
| Mattfolk | $312,500.00 | $424,590.00 | $699,746.00 | $1,436,836.00 |
| McGee | $500,000.00 | $424,590.00 | $1,647,181.00 | $2,572,771.00 |
| Prue | $312,500.00 | $424,590.00 | | $737,090.00 |
| Robinson | $312,500.00 | $424,590.00 | $901,913.00 | $1,639,003.00 |
| Stevenson | $312,500.00 | $424,590.00 | $717,447.00 | $1,454,537.00 |
| Other Employees | $579,000.00 | $424,590.00 | $189,992.00 | $768,992.00 |
| **TOTAL** | $3,979,000.00 | $14,804,038.00 | $32,009,641.00 | $50,792,679.00 |

171.    In sum, the Company has admitted in its September Report that "in November 2000, Mr. Kozlowski authorized Tyco to pay cash, award property and restricted shares of Tyco common stock, and purportedly forgive the same relocation loans (and make related tax payments) to those Tyco officers and employees notwithstanding that the relocation loans of each of these persons had already been paid in full as a result of the September 2000 misappropriation described above."

### 4.    Key Employee Loan Program

172.    Tyco's Key Employee Loan Program (KEL program) was intended to encourage ownership of Tyco common shares by executive officers and other key employees. The KEL program was intended to provide loans (KEL loans) on favorable terms to these officers to enable them to pay taxes due upon the vesting of shares granted under Tyco's restricted share

extra-program benefit.  Regardless of advice that may have been offered relating to the disclosure requirements for nondiscriminatory relocation benefits, the forgiveness benefit was not applied in a nondiscriminatory fashion as part of a nondiscriminatory program and, therefore, should not have qualified for nondisclosure.

167.    All of the forgiveness benefits were individually reported on separate W-2s, yet Tyco admits in its September Report that "none of the income associated with the forgiveness benefits was reported in the Company's proxies for [Kozlowski and Swartz] in the year 2000."

### 3.    The "ADT Automotive Bonus" Misappropriations

168.    The September Report also states that Kozlowski introduced a second bonus program only a few weeks after the unauthorized forgiveness and gross-up of Florida relocation loan liability.  According to the September Report, "Mr. Kozlowski sent a letter to 16 of the Company's executive officers and key managers [on November 13, 2000] thanking them for their many contributions towards the successful divestiture of Tyco's ADT Automotive business and enclosing bonuses and 'relocation' payments."  The report states that "[e]ach of the intended recipients of the purported relocation benefits had already recovered all of the grossed-up costs associated with their recent relocations as part of the near-$100 million unauthorized forgiveness program just completed."  The report also states that "[t]he total of the additional ADT Automotive cash bonus and 'relocation' benefits were $3,979,000 and $32,009,641, respectively."

169.    According to the September Report, Kozlowski's letter "noted that information regarding the vested shares had already been previously communicated and that the amounts listed were reviewed and approved by the Chairman of Tyco's Compensation Committee."  The report states that "[t]he total number of shares awarded was 261,500 with a then market value of $14,804,038."

170.    Thus, the September Report concludes that "the total benefits awarded at the time of the ADT Automotive divestiture were, and total cost [to] the Company was, approximately

employees, at a total cost of $56,415,037, and to pay compensation sufficient to discharge all of the tax liability due as a result of the forgiveness of those loans." The September Report explains that "[t]his action was purportedly related to the successful completion of the TyCom Initial Public Offering." The September Report concludes that the "total gross wages paid by the Company in this loan forgiveness program were $95,962,000, of which amount Mr. Kozlowski received $32,976,000 and Mr. Swartz $16,611,000."

165. Listed below are key managers of Tyco other than Kozlowski and Swartz who received unauthorized loan forgiveness and "gross-up" bonuses pursuant to the September 2000 program that, according to the September Report, was "conceived and implemented by Mr. Kozlowski":

| NAME | LOAN BALANCES FORGIVEN | | GROSSED UP |
|---|---|---|---|
| Jerry Boggess | $ | 5,000,000 | $ | 8,481,764 |
| Irving Gutin | $ | 3,109,971 | $ | 5,275,608 |
| Jeffrey Mattfolk | $ | 825,000 | $ | 1,399,491 |
| Brad McGee | $ | 1,942,026 | $ | 3,294,361 |
| Patricia Prue | $ | 748,309 | $ | 1,269,396 |
| Michael Robinson | $ | 1,063,355 | $ | 1,803,826 |
| Scott Stevenson | $ | 845,869 | $ | 1,434,893 |
| **TOTAL** | $ | 13,534,523 | $ | 22,959,338 |

166. In sum, the September Report concludes that:

the program was discriminatory in scope, terms or operation in favor of executive officers. First, forgiveness was offered to some people who never moved, some people at the operating division level who were never part of the corporate relocation to Florida and people who did not even have a Tyco mortgage. Second, forgiveness was never offered to those who were originally eligible for relocation, yet declined to move. In short, forgiveness was never part of the Florida relocation program, but rather was an

### d.    Other Executive Officers

162.    The September Report also describes the relocation loan activity of Tyco's executive officers as defined by Section 16 of the Securities Exchange Act of 1934 and identified in Tyco's proxy statements.    Many (if not all) of these loans were given as pay-offs for participating in Tyco's fraudulent scheme to manipulate the Company's financial results.    For example, almost $12 million was loaned to senior executives to incentivize them to participate in Tyco's fraudulent scheme to manipulate its financial results:

- **Jerry R. Boggess**.  Mr. Boggess is currently President of Tyco's Fire and Security Services division.  Mr. Boggess borrowed a total of $5,000,000 in relocation loans to purchase property in Boca Raton in 1997.  This loan was forgiven and grossed-up as part of the TyCom Bonus in September 2000 discussed in the next section, which also had not been approved by the Compensation Committee.  Mr. Boggess also borrowed an additional amount which was purportedly forgiven by Kozlowski in January 2002.

- **Neil R. Garvey**.  Mr. Garvey served as President and Chief Executive Officer of TyCom Ltd., a Tyco subsidiary, until July 19, 2002.  Mr. Garvey borrowed $5,000,000 in relocation loans related to his relocation to New Hampshire in 2000.  Mr. Garvey's loan exceeded approved program guidelines by $472,703.  As of September 2002, Mr. Garvey's entire $5,000,000 loan was outstanding, and the Company was seeking repayment of the balance.

163.    In addition, and as set forth in the December Report, "relocation loans outstanding at the segment level units [rather than the corporate level] reviewed as of June 30, 2002, totaled $3.8 million," and "of the total $3.8 million loans outstanding, about $3.2 million appear not to have conformed to applicable policies and guidelines, although some had legitimate business justification."

### 2.    The "TyCom Bonus" Misappropriation

164.    The September Report also admits that in September 2000, Kozlowski "caused Tyco to pay a special, unapproved bonus to 51 employees who had relocation loans with the Company."   (The list is set forth as an exhibit to Tyco's civil complaint against Kozlowski.)   According to the report, "[t]he bonus was calculated to forgive the relocation loans of all 51

- "$20,992,000 in interest free loans were taken by Mr. Swartz under an unauthorized Florida relocation program and"
- "$4,437,175 was borrowed, interest-free, for the acquisition of other properties that were not authorized by any relocation program and"

158.   Of Swartz's $33,097,925 of unauthorized interest-free relocation loans, the September Report concludes that:

- "$10,786,977 was repaid by him, but without interest";
- "$9,792,000 was repaid through forgiveness that Mr. Kozlowski was not authorized to bestow and"
- "$12,518,948 was reclassified to other Mr. Swartz loan accounts that he maintained with the Company."

      c.     **Mark A. Belnick**

159.   As set forth above, Belnick served as Tyco's Executive Vice President and Chief Corporate Counsel from September 1998 until June 10, 2002.  According to the September Report, Belnick improperly "used the unauthorized version of the New York relocation program to borrow approximately $4,217,000 from September 1998 through May 2001 for the purchase and improvement of a cooperative apartment in New York City."  The September Report also admits that Belnick improperly "used the relocation program to pay his rent for several months while his new apartment was being renovated."

160.   From 2001 through March 2002, the September Report also states that Belnick wrongly "borrowed an additional $10,418,599 to purchase land and build a home" in Park City, Utah.  The report states that Belnick "then charged Tyco $1600 per month for his home office located in that house," even though the Company "maintains no corporate offices in Utah, and Mr. Belnick was not requested to relocate to Utah."

161.   In sum, the September Report concludes that Belnick's indebtedness "was not incurred through an authorized employee relocation plan available generally to all salaried employees, and as such was not exempt from disclosure in the Company's proxies."

approximately $7,012,000 in non-qualifying relocation loans to purchase a cooperative apartment in New York City in 2000."

154.    In sum, the September Report concludes that:

- "$7,011,669 in interest free loans was charged by Mr. Kozlowski for purported New York relocations that did not qualify under the New York Relocation Program."

- "$29,756,110 in interest free loans was charged by Mr. Kozlowski for the acquisition of property under an unauthorized Florida relocation program and"

- "$24,922,849 in interest free loans was borrowed by Mr. Kozlowski for the acquisitions of other properties that were not authorized by any relocation program."

155.    Of Kozlowski's $61,690,628 of unauthorized interest free relocation loans, the September Report concludes that:

- "$21,697,303 were actually repaid by him, but without interest";

- "$19,439,392 were repaid through unauthorized forgiveness, discussed in the next section, that he bestowed upon himself and"

- "$20,553,933 were reclassified to other Mr. Kozlowski loan accounts that he maintained with the Company."

### b.    Mark H. Swartz

156.    As set forth above, Swartz was Tyco's CFO from 1995 through August 2002, and a Tyco director from February 2001 through August 2002.  Swartz has improperly taken numerous undisclosed interest-free "relocation loans" since the inception of his relocation program account, including loans and charges reflected in the Company's records for Swartz's relocation account.

157.    In sum, the September Report concludes that:

- "$7,668,750 in interest free loans were taken by Mr. Swartz for property acquisitions in New York and New Hampshire under the unauthorized New York Relocation Program";

time since the beginning of the registrant's last fiscal year in an amount in excess of $60,000, indicate the name of such person, the nature of the person's relationship by reason of which such person's indebtedness is required to be described, the largest aggregate amount of indebtedness outstanding at any time during such period, the nature of the indebtedness and of the transaction in which it was incurred, the amount thereof outstanding as of the latest practicable date and the rate of interest paid or charged thereon:

> (1)    Any director or executive officer of the registrant;

> (2)    Any nominee for election as a director;

> (3)    Any member of the immediate family of the persons specified in paragraph (c)(1) or (2);

> (4)    Any corporation or organization (other than the registrant or a majority-owned subsidiary of the registrant) of which any of the persons specified in paragraph (c)(1) or (2) is an executive officer or partner or is, directly or indirectly, the beneficial owner of ten percent or more of any class of equity securities; and

> (5)    Any trust or other estate in which any of the persons specified in paragraphs (c)(1) or (2) has a substantial beneficial interest or as to which such person serves as a trustee or in a similar capacity.

151.    As set forth below, Tyco failed to comply with these disclosure requirements.

### 1.    Relocation Programs

152.    The September Report admits that various Tyco executives "used the relocation program to receive non-qualifying loans and unauthorized benefits that were not generally available to all salaried employees affected by relocations, or were not related to any Tyco relocation."  This provided these executives with an additional method to steal from the Company.

### a.    L. Dennis Kozlowski

153.    According to the September Report, Kozlowski "improperly borrowed approximately $29,756,000 in non-qualifying relocation loans to purchase land and construct a home in Boca Raton, Florida during the years 1997 to 2000, and improperly borrowed

*Instructions to Item 402(a)(3).* 1. *Determination of Most Highly Compensated Executive Officers.* The determination as to which executive officers are most highly compensated shall be made by reference to total annual salary and bonus for the last completed fiscal year . . . .

150.    Similarly, Item 404 requires disclosure of "Certain Relationships and Related Transactions":

(a)     *Transactions With Management and Others.* Describe briefly any transaction, or series of similar transactions, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, or series of similar transactions, to which the registrant or any of its subsidiaries was or is to be a party, in which the amount involved exceeds $60,000, and in which any of the following persons had, or will have, a direct or indirect material interest, naming such person and indicating the person's relationship to the registrant, the nature of such person's interest in the transaction(s), the amount of such transaction(s) and, where practicable, the amount of such person's interest in the transaction(s):

(1)     Any director or executive officer of the registrant;

(2)     Any nominee for election as a director;

(3)     Any security holder who is known to the registrant to own of record or beneficially more than five percent of any class of the registrant's voting securities; and

(4)     Any member of the immediate family of any of the foregoing persons.

*Instructions to Paragraph (a) of Item 404.*

1.     The materiality of any interest is to be determined on the basis of the significance of the information to investors in light of all the circumstances of the particular case. The importance of the interest to the person having the interest, the relationship of the parties to the transaction with each other and the amount involved in the transactions are among the factors to be considered in determining the significance of the information to investors.

\* \* \*

(c)     *Indebtedness of Management.* If any of the following persons has been indebted to the registrant or its subsidiaries at any

-50-

financial reporting, and the compensation received by its executives were materially false and misleading and omitted to state this material information.

148.    According to the Company's September Report," during at least the five years prior to June 3, 2002, Tyco's three top corporate officers its CEO [Kozlowski], its CFO [Swartz], and its Chief Corporate Counsel [Belnick] engaged in a pattern of improper and illegal conduct" by which they looted hundreds of millions of dollars from Tyco.   In fact, the Company has admitted in its December Report that senior management's stewardship of Tyco "was characterized by serious abuses of trust and self-dealing by the highest officers of Tyco."

149.    Tyco was obligated to disclose this information to investors.   For example, Regulation S-K sets forth instructions for filing forms under the 1933 and 1934 Acts.   One of these rules, Item 402, relates to the disclosure of information concerning" Executive Compensation."   Item 402 provides:

> (2)    *All compensation covered.*   This item requires clear, concise and understandable disclosure of all plan and non-plan compensation awarded to, earned by, or paid to the named executive officers designated under paragraph (a)(3) of this item, and directors covered by paragraph (g) of this item by any person for all services rendered in all capacities to the registrant and its subsidiaries, unless otherwise specified in this item.

> (3)    *Persons covered.*   Disclosure shall be provided pursuant to this item for each of the following (the "named executive officers"):

> (i)     All individuals serving as the registrant's chief executive officer or acting in a similar capacity during the last completed fiscal year ("CEO"), regardless of compensation level;

> (ii)    The registrant's four most highly compensated executive officers other than the CEO who were serving as executive officers at the end of the last completed fiscal year;

> (iii)   Up to two additional individuals for whom disclosure would have been provided pursuant to paragraph (a)(3)(ii) of this item but for the fact that the individual was not serving as an executive officer of the registrant at the end of the last completed fiscal year.

transparency, will create better communications to the marketplace and, ultimately, rebuild investor confidence.

But that is going to require looking at internal control not as a checklist, as many do, but as a dynamic process.

The daily challenges a business faces new staff, less staff, more demands and an even greater opportunity for conflict should not be allowed to create opportunities for fraud, confusion or even innocent human error.

144. Tyco's lack of adequate internal controls increased the opportunity for it to commit the fraud alleged above, and rendered the Company's financial statements inherently unreliable and non-compliant with GAAP. Nonetheless, throughout the relevant period, the Company consistently issued materially false and misleading financial statements without ever disclosing the existence of the significant and material deficiencies in its internal accounting controls.

145. Although these materially adverse factors, trends and facts were apparent, at all material times Tyco failed to timely and adequately disclose them.

**B.    Material Omitted Information Concerning Looting of the Company by its Senior Executives Who Were Conducting Tyco as a Criminal Enterprise**

146. Executives at Tyco were motivated to engage in the financial misreporting and manipulation of Tyco's financial results by engaging in wide-scale looting of Tyco. Similarly, the previously undisclosed abuse and improper accounting of Tyco's executive compensation and loan programs for the benefit of other Tyco executives and employees was intended to incentivize Tyco's management to participate in the scheme, including the falsification of Tyco's financial reporting.

147. Tyco did not disclose its executives' looting to investors. Rather, Tyco and its executives vehemently denied what they falsely described as unfounded "rumors" and falsely represented that Tyco's management and its practices were of the highest integrity. Accordingly, Tyco's statements concerning the integrity of its executives and management team, Tyco's

companies of varying size and in varying businesses around the world, "but which also strained the internal control environment and limited [the Company's] investment in these areas."

142.    In addition, the fiscal 2002 Form 10-K states that Tyco now believes that prior senior management during the past three years placed "undue reliance on non-recurring charges and pro forma financial information." According to Tyco's new senior management, "the rapid pace of acquisitions and attendant restructurings made it difficult to ascertain the level of [the Company's] organic growth."

143.    PwC placed a full page advertisement in the LOS ANGELES TIMES (January 15, 2003) stating its view concerning the importance of effective internal controls:[16]

> Today's topic for conversation: Internal control, *i.e.*, the ability of a company to monitor itself
>
> It is sobering to see how many of last year's corporate scandals were apparently a result of lax controls or management's override of internal control processes. A better system of internal checks and balances would have caught many of these problems before they became headlines, before they hurt investors.
>
> The Sarbanes-Oxley Act has responded to this situation by putting the accountability of internal financial control squarely on the shoulders of both company management and, ultimately, in our opinion, its board of directors.
>
> Sarbanes-Oxley is also requiring external auditors to attest to management's assertions regarding the effectiveness of the company's internal control and procedures for financial reporting.
>
> These changes are good, but no one should think the goal here is just a good report card. The opportunity exists to create a higher level of monitoring and control, which, coupled with a spirit of

---

[16]    A January 1, 2003 article in THE NEW YORK TIMES concerning PwC's recent advertisements, entitled "Pricewaterhouse Taking a Stand, And a Big Risk," states that PwC "faces a significant challenge from continuing public scrutiny of its past work. For instance, it approved of financial disclosures at Tyco International despite the company's use of "aggressive accounting that, even when not erroneous, was undertaken with the purpose and effect of increasing reported results above what they would have been if more conservative accounting were used."

New York state criminal law, including enterprise corruption and obtaining monies by theft and fraud, and Belnick was charged with falsifying business records in violation of New York state criminal law.  Kozlowski was subsequently convicted of numerous counts and sentenced to prison.

139.    Despite its stated limitations, the December Report nevertheless concluded, among other things, that: (found in 10-K)

- "There were a number of accounting entries and treatments that were incorrect and required correction"; and

- Tyco's "prior senior management engaged in a pattern of aggressive accounting which . . . was intended to increase reported earnings above what they would have been if more conservative accounting had been employed."

140.    In addition, the Company's Form 10-K for fiscal 2002 (dated December 30, 2002) stated that the Company's new senior management team (in conjunction with its Board of Directors) reviewed overall company policies and procedures in areas that were viewed as important.  Specific areas of focus included acquisition accounting, restructuring, financial and legal controls, reserve utilization, incentive compensation and a number of other areas relevant to Tyco's financial statements.  The Company's new senior management determined that Tyco's existing policies and standards of approval needed "substantial improvement" and found that there were instances in which documentation of important financial reporting matters was substandard; there had been limited review of bonuses and incentive compensation across Tyco; and the manner in which former senior management managed Tyco reflected neither a commitment to sound corporate governance nor the processes required to ensure the highest standards of financial integrity and accounting rigor.

141.    According to Tyco's fiscal 2002 Form 10-K, prior senior management's "primary focus" was on earnings-per-share accretive acquisitions that resulted in Tyco's growing considerably over the past several years, including the acquisition of approximately 700

reporting was inherently corrupted, subject to manipulation, and unreliable, resulting in materially false and misleading financial statements.  Indeed, according to the December Report: (found in 10-K)

> We learned of instances of breakdowns of certain internal controls during fiscal 2002.  This began in January 2002 when our Board of Directors learned of an unauthorized payment to our former Lead Director, Frank E. Walsh, and eventually led to the Board replacing our senior management team.  These instances included abuse of our employee relocation loan programs, unapproved bonuses, attempted unauthorized credits to employee loans, undisclosed compensation arrangements, unreported perquisites, self-dealing transactions and other misuses of corporate trust, and have been widely reported in the press.  We believe the publicity resulting from such instances negatively impacted our results of operations and cash flow in fiscal 2002.  In addition, such publicity contributed to a deterioration in our financial condition as we lost access to the commercial paper market and credit ratings on our term debt declined during fiscal 2002 from ratings as of the end of fiscal 2001.

137.    In addition, the December Report concluded that:

> the company in general suffered from poor documentation; inadequate policies and procedures to prevent the misconduct of senior executives that occurred; inadequate procedures for proper corporate authorizations; inadequate approval procedures and documentation; a lack of oversight by senior management at the corporate level; a pattern of using aggressive accounting that even when not erroneous, was undertaken with the purpose and effect of increasing reported results above what they would have been if more conservative accounting were used; pressure on, and inducements to, segment and unit managers to increase current earnings, including by decisions as to what accounting treatment to employ.

138.    Moreover, Tyco's former Chief Executive Officer (Kozlowski) resigned on June 3, 2002, its former Chief Corporate Counsel (Belnick) was dismissed on June 10, 2002 and its former Chief Financial Officer (Swartz) resigned on August 1, 2002.  In addition, these members of former senior management were each indicted by the State of New York for violations of criminal law.  On September 12, 2002, Kozlowski and Swartz were charged with 39 violations of

Dennis Kozlowski and a host of accounting problems at the company in early 2000.

The e-mails - written by Wilmer, Cutler & Pickering partners Lewis Liman and William McLucas - have been obtained by the Manhattan district attorney's office and the Securities and Exchange Commission in their continuing investigation into Tyco and some of its former top executives, according to people familiar with the matter. Part of the SEC's probe involves whether the conglomerate and Wilmer Cutler withheld relevant information that would have helped the SEC in an informal inquiry it launched in 1999 into Tyco's accounting practices . . . .

134.    The December 27th article in THE WALL STREET JOURNAL quotes two of the emails:

> March 23, 2000 e-mail from Lewis Liman (Wilmer Cutler partner) to Mark Belnick, former Tyco General Counsel: "There are payments to a woman whom the folks in finance describe to be Dennis's girlfriend. I do not know Dennis's situation, but this is an embarrassing fact." (This refers to payments from the key Employee Loan Account in 1997 to Karen Mayo, now Karen Kozlowski.)
>
> May 25, 2000 e-mail from William McLucas of Wilmer Cutler to Belnick: "We have found issues that will likely interest the SEC. . . creativeness is employed in hitting the forecasts. . ." "There is also a bad letter from the Sigma people just before the acquisition confirming that they were asked to hold product shipment just before the closing..." The same e-mail also said that the company's financial reports suggest "something funny which is likely apparent if any decent accountant looks at this."

135.    As a result of the Company's failure to cooperate with the investigation, the SEC reached a false conclusion concerning Tyco's accounting practices and investors remained in the dark concerning Tyco's fraudulent scheme.

### 4.    Breakdown of Internal Controls

136.    Although Tyco claimed throughout the relevant period that there was no accounting fraud at Tyco and that it had been vindicated by the conclusion of an investigation commenced by the SEC, in fact, however, the Company was suffering from a chronic and systematic breakdown of its internal controls and procedures such that its internal financial

unannounced deals . . . , or about 37% of the $11.3 billion in cash it spent on all deals."
Moreover, according to the report, Swartz admitted that it would be impossible for an investor to
discern the amounts it spent on the unannounced deals because Tyco failed to disclose the
amount of cash on the balance sheets of the companies it acquired.  Tyco subtracted that amount
from its total acquisition spending to get the "net" figure, according to the report, but calculating
the unannounced deals requires it to be added back.  "You could fault me for that," Mr. Swartz is
quoted as saying.

### 3. Tyco's Withholding of Documents From The SEC During Its 1999-2000 Inquiry

130.    Tyco also withheld a substantial number of documents from the SEC, causing the
SEC to reach a false conclusion in its investigation.  Moreover, as set forth below, Tyco made
false statements to investors concerning the merits of the SEC investigation and the Company's
purported "cooperation."

131.    In 1999 and 2000, the SEC conducted a Matter Under Inquiry (MUI) concerning
the Company's acquisition accounting.  At the beginning of the inquiry, the SEC requested that
Tyco produce various categories of documents.

132.    In July 2000, the SEC closed its informal inquiry.  However, the Company has
recently admitted in its December Report that "[a] large quantity of documents collected by Tyco
and its counsel in connection with the SEC's document request had not been produced to the
SEC at the time the SEC closed its inquiry."

133.    An article in the December 27, 2002 edition of THE WALL STREET JOURNAL
also shows that Tyco's outside counsel knew in early 2000 that the Company had serious
accounting problems and that corporate funds were being misused by the Company's senior
executives.  The article states:

> Newly discovered e-mails written by attorneys at Tyco
> International Ltd.'s former outside law firm reveal that they knew
> about personal use of corporate funds by former Tyco Chairman L.

> [d]escribe any known trends or uncertainties that have had or that
> the registrant reasonably expects will have a material favorable or
> unfavorable impact on net sales or revenues or income from
> continuing operations.

The Instructions to Paragraph 303(a) further state:

> The discussion and analysis shall focus specifically on material
> events and uncertainties known to management that would cause
> reported financial information not to be necessarily indicative of
> future operating results. . .

127.    In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has indicated that registrants should employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K:

> A disclosure duty exists where a trend, demand, commitment,
> event or uncertainty is both presently known to management and is
> reasonably likely to have a material effect on the registrant's
> financial condition or results of operations.

128.    Nonetheless, Tyco's Forms 10-K and 10-Q failed to disclose that the Company's internal control system deficiencies, "pattern" of aggressive accounting for the purpose of inflating Tyco's operating results, related party transactions, accounting reserves manipulation, including the employment of "financial engineering" reserves, each of which were all reasonably likely to have a material adverse effect on Tyco's operating results, which was necessary for a proper understanding and evaluation of the Company's operating performance and an informed investment decision.

### 2.    Tyco's Failure to Disclose Numerous Acquisitions

129.    In addition to engaging in manipulative accounting, Tyco failed to disclose the sheer number of companies it was acquiring, and the amount it was paying for each. According to a February 4, 2002 report in THE WALL STREET JOURNAL ("Tyco Made $8 Billion of Acquisitions Over 3 Years but Didn't Disclose Them"), Swartz admitted that Tyco had spent about $8 billion over the three previous fiscal years on more than **700 acquisitions that were never announced to the public**. In fiscal 2001 alone, "Tyco paid $4.19 billion in cash for [350]

- MOVED OFFSHORE to the tax haven of Bermuda through a reverse merger with ADT Ltd. in 1997. This put all non-U.S. income beyond the reach of the Internal Revenue Service.

- SET UP A FINANCE SUBSIDIARY in Luxembourg known as Tyco International Group (TIG). TIG helped finance Tyco's debt by borrowing billions and reloaning the money to Tyco units in the U.S. and other high-tax jurisdictions. The interest that Tyco's U.S. units pay on these loans is not taxed in Luxembourg and is tax-deductible in the U.S. - thus cutting Tyco's U.S. tax liabilities. By 2001, Tyco had $16.7 billion in such intracompany loans outstanding.

- SET UP OVER 100 SUBSIDIARIES with names like "Driftwood" and "Bunga Berabu" in such tax havens as the Cayman Islands, Barbados, and Jersey. They are perfect vehicles for shielding interest, dividends, royalties, and other forms of passive income from tax, says Samuel C. Thompson Jr., a professor at the University of Miami School of Law. The subs may be part of the reason Tyco was able to report in 2001 that while 65% of its revenues came from the U.S., only 29% of its income did.

Now that Kozlowski is gone, Tyco is scaling back its use of these tax tricks. On Sept. 25, Kozlowski's replacement as CEO, Edward Breen, said a reexamination of its financials had caused him to raise Tyco's estimate of its effective tax rate for the year ending September, 2002, to 22%, from 18.5%. Later, he said it would climb into the high 20s in 2003. Some observers believe Tyco may be forced to move back to the U.S. as part of the drive to leave its problems behind.

125. In addition, Tyco's financial statements failed to disclose the significant risks and contingent liability ensuing from its improper withholding of documents from the SEC during its 1999-2000 inquiry as noted below. In this way, Tyco's financial statements also fail to comply with GAAP.

### g. Violations of SEC Regulations

126. Item 7 of Form 10-K and Item 2 of Form 10-Q, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") require the issuer to furnish information required by Item 303 of Regulation S-K [17 C.F.R. 229.303]. In discussing results of operations, Item 303 of Regulation S-K requires the registrant to:

way, U.S. Tyco entities were able to realize the benefits of the tax deductions without offsetting such deductions by the amount of volume rebates due them.

122.    For example, one witness associated with a provider of transportation services to Tyco told plaintiffs' counsel that his employer and other companies in the transportation industry with whom Tyco does business were instructed by Steve Huntley - Tyco's Director of Global Transportation - that his transportation company should send refund checks for volume discounts to a different company, called World Services Inc.  In addition, the witness stated that, even though his company provided transportation services for only a small fraction of Tyco's overall business, his company paid rebates in the millions of dollars to non U.S. Tyco entities, including World Services, Inc.

123.    Nonetheless, Tyco's financial statements, in violation of GAAP, failed to disclose the existence of this practice or the potential adverse consequences ensuing from such practice. In fact, the Company recently conceded in its Form 10-K for fiscal 2002 that:

> Tyco and its subsidiaries' income tax returns are routinely examined by various regulatory tax authorities.  In connection with such examinations, tax authorities, including the Internal Revenue Service, have raised issues and proposed tax deficiencies.  We are reviewing the issues raised by the tax authorities and are contesting such proposed deficiencies.   Amounts related to these tax deficiencies and other tax contingencies that management has assessed as probable and estimable have been accrued through the income tax provision.  We believe but cannot assure you that ultimate resolution of these tax deficiencies and contingencies will not have a material adverse effect on our results of operations, financial position or cash flows.

Thus, the Company has admitted in the December Report that it is under investigation by the Internal Revenue Service for tax evasion and has refused to quantify its resulting liabilities.

124.    Moreover, according to a December 23, 2002 article in *BusinessWeek*, entitled "The Rise and Fall of Dennis Kozlowski," Tyco was saving "over $600 million a year in income taxes thanks to one of the most aggressive efforts ever by a multinational to avoid paying U.S. taxes."  The *BusinessWeek* article explains "How Kozlowski Did It":

**f.     Tyco's Improper Failure To Disclose Contingent Liabilities And Significant Risks And Uncertainties**

116.     Tyco's attempt to deceive investors is also evidenced by the failure of Tyco's financial statement to disclose its contingent liabilities in conformity with GAAP.

117.     GAAP requires that financial statements disclose contingencies when it is at least reasonably possible (*i.e.*, a greater than slight chance) that a loss may have been incurred.  SFAS No. 5, § 10.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss, or state that such an estimate cannot be made.  *Id.*

118.     The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it issued Article 10-01 of Regulation S-X [17 C.F.R. ' 210.10-01], which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, **except that** "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

119.     In addition, GAAP requires that financial statements disclose significant risks and uncertainties associated with an entity's business.  American Institute of Certified Public Accountant's Statement of Position No. 94-6.

120.     In violation of GAAP, Tyco's financial statements improperly failed to disclose that it engaged in certain practices that violated U.S. income tax laws.  For example, certain of the businesses that provide services to Tyco's customers are contractually required to rebate monies to Tyco upon the attainment of certain milestones - that is, companies are obligated to give Tyco volume discounts based on the level of business Tyco may give to a particular company.

121.     In an apparent attempt to evade U.S. income tax on such rebates, Tyco directed companies to remit periodic rebate checks to Tyco entities domiciled outside the U.S. even though the companies billed and transacted with U.S. Tyco entities domiciled in the U.S.  In this

113.    Tyco knew or recklessly ignored that GAAP, in SAB No. 101, required Tyco to recognize such fee income over the life of the dealer contract.   In order to accelerate the recognition of such fee income, Tyco improperly accounted for the fees charged to dealers as an immediate reduction in its reported expenses.   In so doing, Tyco improperly inflated its reported financial performance.

114.    Moreover, GAAP, in Accounting Principles Board ("APB") Opinion No. 22, § 7, provides that **the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company.** In fact, GAAP states that **information about the accounting policies** adopted by a reporting company is "essential" for financial statement users.   (APB Opinion No. 22, § 8).   Accordingly, GAAP, in § 12 of APB Opinion No. 22 provides:

> In general, the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it should encompass those accounting principles and methods that involve any of the following:
>
> a.    A selection from existing acceptable alternatives;
>
> b.    Principles and methods peculiar to the industry in which the reporting entity operates, even if such principles and methods are predominantly followed in that industry;
>
> c.    Unusual or innovative applications of generally accepted accounting principles (and, as applicable, of principles and methods peculiar to the industry in which the reporting entity operates).

115.    Tyco's financial statements were thus also false and misleading and failed to comply with GAAP because they improperly failed to identify and describe important judgments associated with its recognition of excess "reimbursements" received by ADT.   Accordingly, investors were unable to assess the appropriateness of, or the risks associated with, Tyco's accounting of excess payments received by ADT or even, for that matter, the bona-fides of such "reimbursements" that Tyco has admitted materially exceeded the actual cost it incurred.

**Question:** When should Company A recognize the service revenue?

**Interpretive Response**: The staff believes that, provided all other revenue recognition criteria are met, *service revenue should be recognized* on a straight-line basis, unless evidence suggests that the revenue is earned or obligations are fulfilled in a different pattern, *over the contractual term of the arrangement or the expected period during which those specified services will be performed, whichever is longer*.   In this case, the customer contracted for the on-going activity tracking service, not for the set-up activities. *The staff notes that the customer could not, and would not, separately purchase the set-up services without the on-going services*.   The services specified in the arrangement are performed continuously over the contractual term of the arrangement (and any subsequent renewals).   Therefore, the staff believes that Company A should recognize revenue on a straight-line basis, unless evidence suggests that the revenue is earned or obligations are fulfilled in a different pattern, over the contractual term of the arrangement or the expected period during which those specified services will be performed, whichever is longer.

In this situation, the staff would object to Company A recognizing revenue in proportion to the costs incurred because the set-up costs incurred bear no direct relationship to the performance of services specified in the arrangement.   The staff also believes that it is inappropriate to recognize the entire amount of the prepayment as revenue at the outset of the arrangement by accruing the remaining costs because the services required by the contract have not been performed.

[Emphasis added].

111.    In violation of the requirements of SAB No. 101, Tyco improperly included the excess "reimbursements" received by ADT in the Company's earnings rather than recognizing such payments over the life of the contract, as Tyco knew or recklessly ignored.

112.    Tyco has now admitted that the cumulative effect of the "reimbursements" recorded in years prior to fiscal 2002 in excess of costs incurred, net of the effect of the appropriate recognition of such payments, totaled approximately $186 million and materially inflated, at least, the reported operating results of Tyco Fire and Security Services segments, as noted above.

e.   **Tyco's Improper Recognition Of Excess Reimbursements From Independent Dealers**

108.   Tyco's ADT subsidiary routinely purchases residential security monitoring contracts from external independent dealers who operate under the umbrella of ADT's authorized dealer network.  ADT incurs costs for performing due diligence associated with the purchase of such contracts and for maintaining and operating the authorized dealer network.

109.   The independent dealers operating within the network reimburse ADT for certain of the costs noted above.  Tyco has now disclosed that the amounts reimbursed to ADT by the independent dealers materially exceed the actual costs incurred by ADT.[15]  Prior to fiscal 2002, Tyco improperly recognized into earnings the amount by which the independent dealer reimbursements exceeded the amount actually incurred by ADT.

110.   In 1999, the SEC issued SAB No. 101, which includes a series of hypothetical questions and interpretive responses intended to provide guidance to SEC registrants associated with the recognition of revenue.  Question 6 of SAB No. 101 provides:

> **Facts**: Company A provides its customers with activity tracking or similar services (e.g., tracking of property tax payment activity, sending delinquency letters on overdue accounts, etc.) for a ten-year period.  Company A requires customers to prepay for all the services for the term specified in the arrangement.  ***The on-going services to be provided are generally automated after the initial customer set-up.  At the outset of the arrangement, Company A performs set-up procedures to facilitate delivery of its on-going services to the customers***.  Such procedures consist primarily of establishing the necessary records and files in Company A's pre-existing computer systems in order to provide the services.  Once the initial customer set-up activities are complete, Company A provides its services in accordance with the arrangement. Company A is not required to refund any portion of the fee if the customer terminates the services or does not utilize all of the services to which it is entitled.  However, Company A is required to provide a refund if Company A terminates the arrangement early.  Assume Company A's activities are not within the scope of SFAS No. 91.

---

[15]   It is uncertain why costs "reimbursed" to ADT should exceed the actual amount of costs incurred.

[Emphasis and footnote added].

103.    Tyco's March 31, 2002 financial statements further disclosed:

> However, during the quarter ended March 31, 2002, circumstances developed that could potentially impair the value of goodwill with respect to our Tyco Telecommunications reporting unit and Tyco Capital.   Updated valuations were completed as of March 31, 2002, which resulted in no impairment of goodwill at that date.

104.    Shortly after Kozlowski resigned, however, Tyco filed an amendment to its March 31, 2002 Form 10-Q that included its restated financial statements for the quarter then ended.

105.    Tyco's restated March 31, 2002 financial statements filed with the SEC on or about June 12, 2002 reported a **$4.5 BILLION** impairment in the value of CIT's goodwill*.   **The effect of this charge eliminated almost 40% of the retained earnings Tyco accumulated <u>since its inception</u>**.   In its originally filed financial statements for the quarter ended March 31, 2002, Tyco reported **accumulated earnings** of $11.8 billion.   This amount, which **generally represents the total net income, less dividends, over the life of a corporation** was inflated, as Tyco has admitted, by $4.5 billion, or approximately 38%.

106.    In addition, Tyco has now admitted that it improperly failed to timely record an impairment in the value of goodwill at Tyco Telecommunications and Tyco Infrastructure Services during the quarter ended June 30, 2002.  As a result, **Tyco's reported pre-tax earnings of approximately $151 million during the quarter ended June 30, 2002 were overstated by approximately $387 million.**

107.    Here again, Tyco has admitted that its previously issued financial statements were materially false and misleading to the detriment of unsuspecting investors when they were issued.

### d.    Tyco's Improper Failure To Timely Record Impaired Goodwill

100.    Tyco's financial statements were also materially false and misleading because the Company failed to timely record a loss due to an impairment in the value of its CIT subsidiary, as it has now admitted.  Thus, in yet another way, Tyco's financial statements were not presented in conformity with GAAP, the rules and regulations of the SEC, and deceived investors about the Company's true financial condition and operating performance.

101.    As noted in Tyco's financial statements for the year ended September 30, 2002:

> During the quarter ended March 31, 2002, Tyco experienced disruptions to its business surrounding its announced break-up plan, a downgrade in its credit ratings, and a significant decline in its market capitalization.  During this same time period, CIT also experienced credit downgrades and a disruption to its historical funding base.   Further, market-based information used in connection with the Company's preliminary consideration of the proposed IPO of CIT indicated that CIT's book value exceeded its estimated fair value as of March 31, 2002.   As a result, **_the Company performed a SFAS 142 first step impairment analysis as of March 31, 2002 and concluded that an impairment charge was warranted at that time._**  [Emphasis added.]

102.    In furtherance of its on-going scheme to inflate it operating results, Tyco improperly failed to record such impairment in conformity with GAAP.  *In fact, when Tyco filed its financial statements for the quarter ended March 31, 2002 with the SEC on Form 10-Q on or about May 15, 2002, such financial statements did **not** recognize an impairment in the value of CIT's goodwill.*  To the contrary, Tyco's March 31, 2002 Form 10-Q disclosed:

> The Company periodically reviews and evaluates its goodwill and other intangible assets for potential impairment.  Effective October 1, 2001, the beginning of Tyco's fiscal year 2002, the Company adopted SFAS No. 142, "Goodwill and Other Intangible Assets," under which goodwill is no longer amortized but instead is assessed for impairment at least annually.  Under the transition provisions of SFAS No. 142, there was no goodwill impairment at October 1, 2001.  *Updated valuations were completed as of March 31, 2002 for our Tyco Telecommunications (formerly TyCom) reporting unit and Tyco Capital,[14] which resulted in no impairment of goodwill at that date.*

---

[14]    Tyco Capital includes CIT and all of its subsidiaries.

97.     Tyco also falsely stated that the Company had and would continue to acquire other companies that would be immediately accretive to the Company's free cash flow (the net amount of cash generated from operating activities, less capital expenditures, less dividends paid) and earnings and, consequently, that the Company's healthy cash flow position would not require it to tap into its high-interest emergency credit facilities.  This disclosure was materially false and misleading as Tyco failed to disclose that its reported cash flow was manipulated because it required companies about to be acquired to accelerate payments on outstanding obligations prior to the acquisition, as noted herein in detail.  This undisclosed practice had the effect of increasing Tyco's reported cash flow after the acquisition.

98.     In fact, Tyco has now admitted that it "encouraged" companies it was acquiring to accelerate vendor payments, which increased Tyco's operating cash flow after the acquisition. For example, on February 28, 2002, THE NEW YORK TIMES reported:

> **Tyco International said yesterday that it had _encouraged_ Raychem, an electronic components maker that it bought in 1999, to prepay some expenses before the acquisition was completed.**
>
> The disclosure about Raychem came in response to questions about a letter sent by a former Raychem employee to the Securities and Exchange Commission.  The letter outlined payments that Raychem made at Tyco's behest before the acquisition closed. [Emphasis added].

99.     In furtherance of its scheme to mislead investors, Tyco actually told investors to focus on its misleading reporting of cash flow in measuring the Company's financial performance.  For example, on March 5, 2002, THE WALL STREET JOURNAL reported that:

> Tyco repeatedly has pointed to what it characterizes as its strong "free cash flow". . . . Tyco considers the [free cash flow] measure so critical that its **chief financial officer, Mark Swartz, told investors last month to "forget reported earnings" and instead focus on cash-flow generation as a percentage of net income, to "show that our quality of earnings is good."** [Emphasis added].

who reviewed Tyco's filing. ***Instead, Tyco seems to have hidden the sum in two different reserve accounts that had been previously established on the balance sheet for unrelated purposes.*** The majority of the money, $41 million, was booked against "Accrued Federal Income Tax," the filing says, in effect reducing sums that Tyco had put aside to pay its federal corporate taxes.

***"This looks like blatant misstatement of both the income statement and the balance sheet," said Charles Mulford, an accounting professor at Georgia Institute of Technology in Atlanta, who reviewed the Tyco report but isn't involved in the case. Based on the filing, Mr. Mulford said the maneuver appears to have improperly inflated Tyco's pretax income by $52.8 million in the period, the fourth quarter of fiscal 2000.*** For that quarter, Tyco reported net income of $1.1 billion before the TyCom gain.

***Mr. Mulford called dipping into the income-tax kitty particularly "egregious,"*** and said "it would be very surprising if it wasn't picked up by the auditors."

[Emphasis added].

94.    Indeed, GAAP expressly prohibits the manipulation of accounting reserves described herein. Tyco has admitted in the December Report the existence of accounting reserve reversals that were ***"timed on a number of occasions for the purpose of making EBIT targets."***

95.    In SFAS No. 5, GAAP provides that companies may establish reserves for identifiable, probable and estimable risks, and precludes the use of reserves for general or unknown business risks, including excess reserves, because they do not meet the accrual requirements of SFAS No. 5. Any reserves that do not meet the accrual requirements of SFAS No. 5, when identified, should be immediately released into income. A systematic or timed release of excess reserves into income violates GAAP. *See e.g., In re Rush*, SEC Exchange Act of 1934 Release No. 44501 (July 2, 2001); *SEC v Dunlap*, No. 01-8437-Civ, SEC Litig. Release No. 17710 (Sept. 4, 2002); *Xerox Settles SEC Enforcement Action*, SEC Press Release No. 2002-52 (Apr. 11, 2002).

96.    Moreover, Tyco has stated in the December Report that the above-noted admissions have been circumscribed by a lack of documentation.

-32-

90.     The manipulation of accounting reserves employed by Tyco in accounting for acquisitions is one that the SEC specifically has identified as improper.  For example, the SEC's SAB No. 100, issued in 1999, addresses asset reserves and liabilities associated with acquisitions.  SAB No. 100 provides:

> . . . the staff believes that purchase price adjustments necessary to record liabilities and loss accruals at fair value typically are required, while *merely adding an additional "cushion" of 10 or 20 or 30 percent to such account balances is not appropriate*.  [Emphasis added.]

91.     In fact, Tyco has now admitted in its Form 10-K for fiscal 2002 that it has "identified several adjustments" that its auditor, PricewaterhouseCoopers ("PwC") proposed to make during its year-end audits but which Tyco never recorded.  For example, prior to fiscal 2000, PwC identified and proposed adjustments to Tyco's financial statements for improper "adjustments" to Tyco's acquisition reserves that overstated Tyco's reported income by a net amount of $22.7 million.  In fiscal 2001, PwC identified and proposed adjustments to Tyco's financial statements for improper "adjustments" to Tyco's acquisition reserves that overstated Tyco's reported income by a net amount of $26.4 million.

92.     In addition to Tyco's improper manipulation of reserves when accounting for acquired entities, Tyco otherwise manipulated accounting reserves in order to inflate its reported operating results.

93.     For example, on September 30, 2002, THE WALL STREET JOURNAL reported:

> Typically, accounting experts say, employee bonuses are accounted for as part of general and administrative expenses.  But Tyco's [report on its internal investigation filed with the SEC] says the TyCom bonus was booked in three different accounts totaling $97.4 million - a slightly larger figure than the bonus payments, which Tyco didn't explain.  About $44.6 million of the total was booked as part of the TyCom offering expense, which some accounting experts said was incorrect but at least resulted in a similar bottom-line effect as the proper accounting treatment.
>
> The other $52.8 million, however, doesn't appear to have been counted as an expense at all, according to three accounting experts

*earnings subsequent to the consummation of the acquisition."* [Emphasis added.]

2)   "For example, in the month before the merger, US Surgical accrued $18.7 million for potential legal fees related to on-going patent defenses and other items.  The Company later reduced this amount by $18.2 million, in the same period, as a result of discussions with the Company's external auditors, because it concluded that *the initial accrual did not represent a reasonable estimate of legal fees."*  [Emphasis added.]

3)   "Another document dated September 10, 1996 discusses 'Carlisle Plastics - Financial Engineering and Purchase Accounting.'  **The memo and attachments define 'financial engineering' as 'pre-merger entries'"** and 'purchase accounting' items as 'post-merger entries.'   A 'Discussion Items' attachment states *'we'll' book additional 'Financial Engineering' reserves in July with the objective of having a break even month.  This way we won't raise any flags with the Lender reporting.  The balance of the reserves will be booked in August.'  The equity balance sheet attachment for the Carlisle acquisition contemplates $26,440,000 in financial engineering, thereby reducing pre-merger earnings by that amount.*   The detailed schedule demonstrates that the overwhelming portion of the financial engineering will be in the month just prior to the consummation of the merger."  [Emphasis added].

4)   "A September 9, 1998 memo stated that a *manager 'started putting pressure' on Surgical's former CFO and presented a 'plan' for increasing earnings.*  [Emphasis added].

5)   "A similar document summarizes a September 18, 1998 Tyco presentation on the US Surgical ('Surgical') merger which closed October 1, 1998.  The presentation in its 'Synergies Summary,' indicated that *Tyco could recognize $72 million from 'Financial Engineering' in 1999 and $52 million in the each of the following two years."*  [Emphasis added].

6)   "An August 17, 1998 memorandum similarly identified means to achieve EBIT goals for Surgical in the first year after the merger.  The memo lists numerous cost-savings measures, and reaches a 'total savings before financial engineering' of $145.4 million.  The memo also suggests *$64.6 million in 'financial engineering' categories, including plans to 'over-accrue expenses in Q3 before closing' and 'accrue in advance rebates.'"*  [Emphasis added].

*earnings and cash flow in subsequent quarters.* These actions included *directions* from Raychem management *to hold back shipments and pay all bills received whether due or not, prior to the consummation of the acquisition. These documents fit the pattern discussed above of the Company's aggressive use of numerous accounting opportunities where available to enhance earnings in the first few quarters after companies were acquired, compared to the period just before acquisition.* [Emphasis added.]

87.     Indeed, on September 30, 2002, THE WALL STREET JOURNAL reported that the SEC and the Manhattan District Attorney's Office were investigating whether a secret $40 million payment made by Tyco to settle a 2000 lawsuit represented a pay-off to hide incriminating documents that detailed the ways Tyco would help U.S. Surgical slow its growth after Tyco agreed to acquire that company in the months before the purchase was completed.

88.     Moreover, Tyco has also admitted in the December Report that *"there were instances where prior management appeared to influence the management of an acquisition target into adopting accounting treatments that* 'over-accrued' expenses prior to an acquisition's consummation or otherwise *exceeded what was permitted by GAAP."* In fact, among other things, Tyco caused acquired entities to record significant accounting reserves for: (1) litigation and other accruals recorded in purchase accounting, some of which were subsequently reversed; (2) exit costs, which included amounts that did not qualify as exit costs; and (3) *matters not reserved previously by the acquired entity* (including warranty, environmental accruals).

89.     For example, Tyco has admitted in its December Report:

1)     "With respect to the purchase accounting and pooling transactions examined, *there were instances in which the pre-acquisition earnings of an acquired entity for the period immediately preceding the consummation of its acquisition by Tyco were significantly lower than the entity's earnings in prior periods. The decrease in reported earnings in the period immediately preceding the consummation of an acquisition,* which decreases were for the most part due to non-recurring charges, *raise the issue as to whether the acquired entity's pre-merger financials had been improperly manipulated in order to increase reported*

83.   One theory was that Tyco was aggressively undervaluing the assets of acquisition targets before the new companies joined Tyco's balance sheet.

84.   The practice, detractors said, allowed Tyco to build a pool of assets from which it could then unlock value at a later point.

> Though the SEC gave Tyco a clean bill of health two years ago, *at least one New York businessman with close ties to Simplex Time Recorder, a December 2000 Tyco acquisition, told the Daily News he witnessed such dealings first-hand.*
>
> *"I think it's fair and accurate to say they made [Simplex] writedowns on the value of their receivables to a level that, if it didn't break the law, certainly bordered on breaking the law,"* *the businessman said.*

[Emphasis added].

85.   Tyco has now admitted that it engaged in the above-noted accounting manipulations so that the Company could report favorable pre- to post-acquisition comparisons and mislead investors about Tyco management's ability to generate better returns from acquired entities than the previous management of such entities.

86.   For example, Tyco has now admitted in its December Report:

1)   [A] June 19, 1998 letter from the Sigma Chief Financial Officer was identified in which *the Sigma CFO indicated that he was "prepared to delay shipment of certain product until early July" as requested by Tyco and, as a result of which, Sigma would not achieve its anticipated revenue minimum* established in the June 1, 1998 Merger Agreement. *The Sigma CFO asked Tyco to confirm that the resulting failure of Sigma to meet the quarterly revenue minimum established in the Merger Agreement was "acceptable to Tyco* and within the spirit of the Definitive Agreement." The Sigma CFO's June 19 letter was faxed to Tyco the same day and, later that day, faxed from the recipient to others within Tyco.  [Emphasis added.]

2)   Similarly, Tyco's acquisition of Raychem was announced May 19, 1999 and consummated August 12, 1999. *Internal Tyco documents raise issues whether actions taken by Raychem, even if consistent with GAAP, artificially reduced revenue or increased expenses in the quarter immediately prior to the consummation of the acquisition, and artificially inflated*

78.     The same article reported that:

> At the same time [that CIT appeared to achieve a $150 million swing in profit after the merger], CIT booked a $54 million charge for acquisition-related costs. . . .  Jack Ciesielski, publisher of the <u>Accounting Observer</u>, notes that CIT also adopted "a new basis of accounting" on June 2 [2001], allowing Tyco to "push down" deal costs to CIT.  "That [shifts] some of Tyco's closing transactions into the CIT financials, making them appear as if they were CIT's own," he says.
>
> * * *
>
> ***[T]he bottom-line impact is indisputable: The huge surge in charges taken by CIT just before the deal closed - combined with the drop in "other revenue" - helped produce a noticeable jump in CIT earnings just after the deal closed.  Indeed, CIT was the major reason Tyco reported a 34% increase in per-share earnings for the quarter ending September 30 [2001] . . . .***

[Emphasis added].

79.     The February 25, 2002 *BusinessWeek Online* article quoted Mr. McGee's admission that "CIT made downward adjustments to income totaling $221.6 million last May, just before the [CIT] deal closed."  The article also stated that "McGee concedes [that] the provision for credit losses and the acquisition charge caused a $143.5 million spike in CIT's costs in April and May [2001]."

80.     Furthermore, the *BusinessWeek Online* article reported that Tyco's financial statements for fiscal 2001 revealed that, in CIT's first four months under Tyco's umbrella - from June 2 to September 30, 2001 - CIT generated $252.5 million in net income, <u>more than triple</u> the $81.3 million CIT earned in the last four months as an independent public company (from January 1, 2002 to June 1, 2002).

81.     Similarly, on June 12, 2002 THE NEW YORK DAILY NEWS reported that the SEC was again looking into Tyco's accounting for acquisitions:

82.     The original inquiry got its start in 1999 after a Dallas investment manager began warning clients that cash flow from Tyco acquisitions appeared inflated.

-27-

"develop synergies" and help "boost business."  In reality, McGee was there to "prepare for the acquisition."

75.     Although Mr. McGee (with the assistance of another Tyco employee) was supposed to assist with the transition and report to Al Gumper (CIT's CEO), McGee began dictating important business decisions for CIT.  In fact, what had previously been a mild-tempered and quiet executive staff, quickly changed upon McGee's arrival.  Screaming matches between McGee and CIT's executives were common.  McGee was de facto dictating and running the company.

76.     On January 7, 2002, THE WALL STREET JOURNAL's "Heard On The Street" column reported that some investors were critical of "a series of charges by" CIT immediately before the acquisition that "depressed CIT's earnings but didn't show up on Tyco's books."  As a result, the JOURNAL reported, "CIT's results surged in the first month after Tyco took control."  Specifically, THE WALL STREET JOURNAL reported that during April and May of 2001 CIT posted a $148 million provision for credit loss resulting in a net loss of $78.8 million.  In June 2001, after being absorbed by Tyco, CIT posted net profits of $71.2 million, which added 1.5 cents per share to Tyco's third quarter results, and substantially contributed to Tyco's beating analysts' expectations by $0.03 per share.

77.     Albert J. Meyer, an analyst working for David W. Tice & Associates, explained the highly suspicious nature of Tyco's accounting treatment with respect to CIT in an interview on February 25, 2002 with *BusinessWeek Online* ("Behind Tyco's Accounting Alchemy: The CIT acquisition offers new insight into how the company produced huge pop up profits"):

> ***"This is one of the most startling examples of financial engineering you can hope to find". . . .*** Several things look fishy about that $150 million turnabout, Tice's Meyer maintains.  ***To start with, in that April-May [2001] period, CIT took a massive $148.1 million "provision for credit losses."  That was well over twice the $68.3 million provision CIT took in the entire first quarter.***

[Emphasis added].

-26-

*President of Tyco Engineered Products and Services and, later, the Plastics division,*
*"borrowed" $1,750,000 from Tyco, and a former President and Chief Executive Officer of*
*TyCom borrowed $5,000,000 from Tyco in 2000.*

70.    In apparent violation of the terms of Tyco's Key Employee Loan ("KEL")
Program, ***Kozlowski "borrowed" over $55.9 million from Tyco in 1999.*** As of June 30, 2002,
Kozlowski owed Tyco approximately $43.8 million, plus accrued interest, for amounts borrowed
under Tyco's KEL Program.

71.    Similarly, ***Swartz's total principal outstanding balance under the KEL program***
***as of July 18, 2002 was approximately $2.8 million, plus accrued interest.*** In addition, ***Belnick***
***"borrowed" a total of $8.6 million under the KEL program, and other Tyco Executive Officers***
***"borrowed" more than $6 million*** under the KEL program.

72.    Tyco knew that, in gross violation of GAAP, these material related party
transactions (to which the Company has now admitted) were not disclosed in Tyco's financial
statements. Tyco also knew that, by failing to do so, the Company's financial statements
violated GAAP and were materially false and misleading.

c.    **Tyco's False and Misleading Accounting for Acquired Companies and**
**Improper Manipulation of Accounting Reserves**

73.    As noted above, Tyco knew or recklessly ignored that it caused certain of the
companies it acquired to engage in deceptive accounting practices before the closing of an
acquisition so that the financial performance of these companies would compare favorably after
the acquisition. Among other things, these acquired entities overstated accounting reserves to
show more favorable financial metrics in quarters after Tyco's acquisition.

74.    For example, on March 13, 2001, Tyco announced that it had entered into a
definitive agreement to acquire CIT. At or around that time, the Company sent Brad McGee,
who was Executive Vice President and Chief Strategy Officer at Tyco, as well as Kozlowski's
"right hand man," to CIT's offices in Livingston, New Jersey to, according to Kozlowski,

investment; (2) an "extravagant" $1 million birthday celebration for his wife in Sardinia; (3) over $1 million in undocumented business expenses; and (4) *at least $43 million in personal donations or for his personal benefit.*

### ii.    Undisclosed Related Party Loans

65.    Tyco also violated GAAP by failing to disclose in the Company's financial statements a number of related party loans.  As set forth below in Sections B.1 and B.4, these loans were either repaid by various insiders without interest, repaid through unauthorized "forgiveness," or simply reclassified to other loan accounts that the insiders had with the Company.

66.    For example, in violation of the terms of Tyco's relocation loan program, *Kozlowski "borrowed" approximately $29.7 million from the Company to purchase land and construct a home in Boca Raton, Florida* during the years 1997 to 2000.  In addition, *Kozlowski improperly "borrowed" approximately $7 million to purchase a cooperative apartment in New York City* in 2000.

67.    Similarly, Mark H. Swartz ("Swartz"), Tyco's Executive Vice President and Chief Financial Officer, *"borrowed" approximately $20.1 million from Tyco* in violation of the Company's relocation loan program purportedly to purchase property in Boca Raton, Florida during the period 1997-2000.

68.    Mark Belnick, Tyco's Executive Vice President and General Counsel ("Belnick"), *"borrowed" approximately $4.2 million from Tyco* during the period September 1998 through May 2001 for the purchase and improvement of a cooperative apartment in New York City. From 2001 through March 2002, *Belnick "borrowed" an additional $10.4 million from Tyco to purchase land and build a home in Park City, Utah.*  Belnick then charged Tyco $1,600 per month for his home office located in that house.

69.    In 1997, the *President of Tyco's Fire and Security Services division "borrowed" a total of $5 million from Tyco* to purchase property in Boca Raton, Florida.  *The former*

through February 2002.  This fee, $10 million of which went to Walsh with the balance to a charity of which he was a trustee, purportedly compensated Walsh in connection with Tyco's acquisition of CIT.

60.    In September 2000, **Kozlowski caused Tyco to pay "special" bonuses** purportedly related to the successful completion of the TyCom initial public offering.  These bonuses **approximated $96 million**, of which Kozlowski and Swartz received approximately $33 million and $17 million respectively.  In addition, Belnick received $1 million as a special bonus, purportedly relating to the TyCom deal.

61.    In connection with the above arrangement, a Tyco Vice President of Finance prepared a memorandum signed by Swartz that explained:

> The sale of 14% of TyCom generated a one-time gain of approximately $1.76 billion on the books of Tyco.  We have decided to award special bonuses to various Tyco employees for their efforts over the past few years in enhancing the value of TyCom and thereby contributing to this gain.  Selected employees will receive their bonus in the form of cash, forgiveness of relocation loans, and/or Tyco Common shares under Tyco's restricted stock program.

62.    As a result of this accounting treatment, Tyco's September Report admitted: "[T]his **extraordinary $100 million charge** was allocated to several different accounts and appears in the general ledger and financial statements" (emphasis added).

63.    In addition, according to the September Report, Tyco purchased a cooperative apartment in New York City in 1998 for approximately $5.5 million and thereafter made improvements to the apartment.  In May 2000, **Kozlowski purchased the property from Tyco at its depreciated book value of approximately $7 million**, rather than its then current market value.

64.    In July 2000, **Tyco purchased a Rye, New Hampshire property** worth $1.5 million from **Kozlowski for approximately $4.5 million.  In addition, Kozlowski also used millions of dollars of Company funds to pay for, among other things:** (1) a $700,000

###### b. Tyco's Improper Failure To Disclose Material Related Party Transactions

56. In FASB's SFAS No. 57, GAAP provides guidance on disclosures of transactions between related parties.[12] SFAS No. 57 states that an "enterprise's financial statements may not be complete without additional explanations of and information about related party transactions and thus may not be reliable."   Accordingly, *SFAS No. 57 requires that financial statements identify material related party transactions and disclose (a) the nature of the relationship(s), (b) a description of the transaction, (c) the dollar amount of transactions for each period for which an income statement is presented, and (d) the amounts due from or to the related parties as of the date of each balance sheet[13].*

(Emphasis added).

57. In addition, as noted in the SEC's SAB Topic 4E, GAAP provides that

> in some cases, the significance of an amount may be independent of the amount involved.  For example, *amounts due to and from officers and directors, because of their special nature and origin, ought generally to be set forth separately [in financial statements] even though the dollar amounts involved are relatively small.*

58. As Tyco has now admitted, it engaged in numerous material related party and self-dealing transactions that were not disclosed in its financial statements in violation of GAAP, including at least the following:

###### i. Undisclosed Extraordinary Related Party Compensation

59. On June 17, 2002, Tyco filed a complaint in the United States District Court for the Southern District of New York alleging that *Kozlowski approved a $20 million "fee" that was paid to Frank Walsh*, who served as a member of Tyco's Board of Directors from 1997

---

[12]   Pursuant to SFAS No. 57, related party transactions include transactions between an enterprise and its Directors of the Board, CEO, COO, Vice Presidents in charge of principal business functions, and other persons who perform similar policy-making functions.

[13]   Pursuant to SFAS No. 57, disclosure of compensation arrangements that are not in the ordinary course is necessary for users to understand financial statements.

enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, § 50);

d.      financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, § 42);

e.      financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, §§ 58-59);

f.      financial reporting should be complete, so that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, § 79); and

g.      financial reporting should be conservative and ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, §§ 95, 97).

55.      Accordingly, Tyco's "pattern" of "aggressive" accounting and its employment of numerous "financial engineering" practices "undertaken with the purpose and effect of increasing reported results" caused Tyco to issue financial statements that were neither useful, complete, neutral, conservative, nor unbiased.   Accordingly, Tyco has admitted, albeit backhandedly, that it violated fundamental precepts of GAAP,[11] and that its "aggressive" accounting practices rendered its financial statements materially false and misleading.

---

[11]    In Concepts Statement No. 2, GAAP defines neutrality as the "absence in reported information of bias intended to attain a predetermined result or to induce a particular mode of behavior.   Neutrality is a necessary and important characteristic of accounting information.  FASB's Statement of Financial Accounting Standards ("SFAS") No. 141.

failure to document many decisions contemporaneously," and because documentation supporting its transactions is "not always available" and is "often dispersed."   These failures of documentation violate the mandate of Section 13 of the Securities Exchange Act of 1934.[10]

52.     Moreover, *the December Report admits the existence of pay-offs to executives at companies to be acquired by Tyco, and that the financial reporting of the to-be-acquired companies was manipulated by Tyco in advance of the acquisition to create the false appearance of superior earnings and management by Tyco after the acquisition.*

53.     Indeed, in Concepts Statement No. 2, GAAP provides that accounting information is not useful if it is unreliable, and that *reliable accounting information must be verifiable and neutral*.   In addition, in Concepts Statement No. 2, GAAP provides that the convention of conservatism - meaning prudence - is to be applied in financial accounting and reporting. Similarly, FASB's Concepts Statement No. 1 states that the role of "financial reporting requires it to provide evenhanded, neutral, or unbiased information."

54.     In addition, GAAP provides that:

a.     financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, § 34);

b.     financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, § 40);

c.     financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.   To the extent that management offers securities of the

---

[10]     Section 13 of the Securities Exchange Act of 1934 and the rules thereunder require SEC registrants to make and keep books, records and accounts that accurately and fairly reflect its transactions.

analyst at the Standard & Poor's rating agency who covers Tyco. "I would hope we see something soon."

\* \* \*

***The other important factors in the bank negotiations are the status and findings of the SEC and Manhattan DA investigations of Tyco.***  These may not be completed before February.  If they're not, ***the threat that the probes will turn up evidence of accounting fraud after February is one more argument for why the banks will be ultracautious when deciding whether to roll over their loans.***

***The company*** has itself appointed experts and lawyers to ***conduct its own internal accounting investigation, and it is probably hoping that if it finds no serious fraud, the banks will be placated.***  However, the banks might doubt the thoroughness of the probe after the third-quarter conference call, when David Boies, the outside lawyer overseeing the probe, said "we're obviously not reauditing the company and going through every single accounting issue."

[Emphasis added].

50.   Tyco's pattern of "aggressive" accounting violated GAAP. For example, the Company's December Report disclosed that "Tyco's aggressive accounting in the past was not neutral as to the timing of the recognition of revenues and expenses."  Indeed, as set forth above, the December Report acknowledges that "the Company in general suffered from poor documentation; inadequate policies and procedures to prevent the misconduct of senior executives that occurred; inadequate procedures for proper corporate authorizations; inadequate approval procedures and documentation; a lack of oversight by senior management at the corporate level; a pattern of using aggressive accounting that, even when not erroneous, was undertaken with the purpose and effect of increasing reported results above what they would have been if more conservative accounting were used; pressure on, and inducements to, segment and unit managers to increase current earnings, including by decisions as to what accounting treatment to employ."

51.   Tyco has also admitted (in the December Report) that it is unable to make judgments about the appropriateness of accounting treatments because of "the Company's past

say that *Tyco's future now lies in the hands of its banks and bond creditors.*   Tyco's cash crunch was eased after it sold its commercial lender CIT (CIT:NYSE) for $4.4 billion in July, and the company has $6.5 billion of cash on its balance sheet.   Yet even with that cash on hand, the company's maturity schedule looks daunting.

* * *

But a look at the company's demanding debt-repayment schedule suggests Tyco's next bout of trouble may come quite a bit sooner. *The company must repay nearly $3.9 billion of bank debt that comes due in February [2003], the same month that investors have the right to demand that Tyco repay $2.3 billion of convertible bonds* - an obligation Tyco can meet in stock or cash.

*There could be as much as $1.85 billion of bond debt coming due in the second and third quarters of 2003*, though the actual sum may have been reduced by debt repurchases.  Then, in the fourth quarter, holders of another convertible issue have the right to redeem their securities for $3.6 billion in cash.

At the same time, cash from operations looks anemic.  All those obligations add up to $11.7 billion.  In fiscal 2003 ending next September, Tyco expects $2.5 billion to $3 billion of free cash flow, which is a company-devised measure of cash flow that factors in capital spending but excludes other types of cash outflows.  The company hasn't updated its guidance for the last quarter of calendar 2003, though in an August regulatory filing Tyco indicated it expected to bring in cash flow of around $700 million for that period.  Previous cash flow guidance provided by Tyco has proved to be generous, however.

If Tyco were to pay its February convertible back in stock, its cash obligations would be $9.4 billion, which more or less matches cash flow plus cash in hand.

**Lemon Fresh**

Clearly, that's too close for comfort.  *No surprise, then, that Tyco is talking to its banks to gain some financial breathing room.  On a third-quarter earnings conference call in October, Tyco's Breen said that dealing with the financing issue "continues to be our top priority," and added that he hopes to have a deal with the banks "well in advance of our February maturities."*

The market is eager to see details of a bank deal.  "The clock is ticking, as far as I am concerned," says Cynthia Werneth, the

-18-

46.     If management's conduct demonstrates a lack of integrity or candor, that lack of integrity or candor is relevant to an investor and thus material, even if the conduct itself was not financially significant to the company.[9] Accordingly, the nine percent overstatement of operating income for Tyco's Fire and Security Services segment is material.

47.     Indeed, **Tyco has admitted that it engaged in numerous "financial engineering" practices that were "undertaken with the purpose and effect of increasing reported results."** In addition, the December Report concluded that "'[d]uring **at least** the five years preceding Kozlowski's resignation, **Tyco <u>pursued a pattern</u> of aggressive accounting** that was intended, within the range of accounting permitted by GAAP, to increase current earnings above what they would have been if a more conservative accounting approach had been followed" (emphasis added).

48.     All these facts belie Tyco's denials that it engaged in fraud or materially misstated its financial statements.  Tyco's position in the December Report that "aggressive accounting is not necessarily improper accounting" - that certain of its accounting practices may have been "aggressive" but not improper - is untrue.

49.     Because it urgently needed financing in the face of an imminent cash crunch, Tyco was strongly motivated to minimize reporting of its improper accounting practices. According to a November 15, 2002 report on *The Street.com*:

> Tyco (TYC:NYSE) will be glad to bid farewell to this year.  But believe it or not, **2003 could be even worse for the troubled conglomerate.**
>
> Next year, **Ed Breen**, the ex-Motorola (MOT:NYSE) executive who recently replaced the disgraced Dennis Kozlowski as CEO, **must find a way to pay back nearly $12 billion in debt and other obligations that fall due.  If the size of the debt mountain weren't problem enough, Breen's task is made more arduous by a strict legal provision that could complicate any efforts by Tyco to pledge assets to secure loans from risk-averse lenders.**  This potential legal thicket is important, because it's no exaggeration to

---

[9]     *See, e.g., SEC v. Jos. Schlitz Brewing Co.*, 452 F. Supp. 824, 830 (E.D. Wis. 1978).

45.     As the SEC's Staff Accounting Bulletin ("SAB") No. 9[8] provides:

Evaluation of materiality requires a registrant and its auditor to consider *all* the relevant circumstances, and the staff believes that there are numerous circumstances in which **misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material**; as stated in the auditing literature:

As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements. Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are -

- Whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate.

- ***Whether the misstatement masks a change in earnings or other trends.***

- ***Whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise.***

- ***Whether the misstatement changes a loss into income or vice versa.***

- ***Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.***

- Whether the misstatement affects the registrant's compliance with regulatory requirements.

- Whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements.

- Whether the misstatement has the effect of increasing management's compensation - for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation.

- ***Whether the misstatement involves concealment of an unlawful transaction.***

This is not an exhaustive list of the circumstances that may affect the materiality of a quantitatively small misstatement.

[Footnotes deleted, bolded italics added.]

---

[8]     17 C.F.R. Part 211.

During the fourth quarter of fiscal 2002, the Company identified various adjustments relating to prior year financial statements. ***Management concluded <u>the effects of these adjustments</u>, as well as any unrecorded proposed audit adjustments, <u>were not material individually or in the aggregate</u> to the current year or any prior year. Accordingly, prior year financial statements have not been restated.*** Instead, these adjustments, which aggregate $261.6 million on a pre-tax income basis or $199.7 million on an after-tax income basis, have been recorded effective October 1, 2001. The nature and amounts of these adjustments are principally as follows: The Company determined the amounts reimbursed from dealers under ADT's authorized dealer program exceeded the costs actually incurred. The ***cumulative*** effect of reimbursements recorded in years prior to fiscal 2002 in excess of costs incurred, net of the effect of the deferred credit, which would have been amortized as described further in Note 1, is $185.9 million. [Emphasis added.]

43.     Tyco's conclusion - that the effects of the adjustments in question were not material individually or in the aggregate - is untrue. For example, $98.8 million of the $185.9 million "adjustment" for ADT reimbursements related to fiscal 2001.[5] During fiscal 2001, Tyco reported that the operating income of its Fire and Security Services segment, after restructuring and other charges, totaled $1,207.7 million.[6] Accordingly, the operating income of Tyco's Fire and Security Services segment for fiscal 2001 was overstated by approximately 9%.[7]

44.     An approximately nine percent overstatement of a company's reported segment's operating income is, at least individually, a material overstatement. Nonetheless, Tyco, in violation of GAAP, failed to restate its fiscal 2001 financial statements because its management concluded such overstatement is "***not material <u>individually</u> or in the aggregate*** to the current year or any prior year" (emphasis added).

---

[5]     Tyco's Fire and Security Services segment includes the results of ADT.

[6]     Tyco's 2002 Form 10-K indicates the reported $1,289.2 million in operating income for its Fire and Security Services Segment excludes restructuring, other unusual, and impairment charges of $81.5 million. Reducing Tyco's reported $1,289.2 million in operating income for its Fire and Security Services Segment by the excluded charges yields $1,207.7 million.

[7]     The Fire and Security Services segment's purported operating income for 2001 of $1,207.7 million less the admitted overstatement of $98.8 million totals $1,108.9 million. $98.8 million divided by $1,108.9 million equals an overstatement of approximately 9%.

an internal investigation into the Company's accounting matters that was "selected" in scope. By the Company's own admission, these factors "limited the conclusions that could be drawn concerning individual accounting treatments in any event." Second, Tyco's restatements of its interim 2002 financial statements are admissions, in and of themselves, that those financial statements were materially misstated. GAAP provides that the retroactive restatement of previously-issued financial statements is appropriate only when those statements were materially misstated when issued.[4]

40.    In fact, Tyco has admitted that **during the quarter ended December 31, 2001, Tyco's pre-tax income was overstated by more than 21%. During the quarter ended March 31, 2002, Tyco understated its reported loss by more 71%, and for the quarter ended June 30, 2002, Tyco's reported pre-tax <u>income</u> of $150.6 million was restated to a <u>loss</u> of $236.1 million.**

41.    For example, Tyco's actual net loss for the quarter ended March 31, 2002 was $3.22 per diluted common share, not $0.96 as originally reported. Accordingly, Tyco's March 31, 2002 Form 10-Q filed with the SEC, which represented that "in the opinion of management, such financial statements include all adjustments, consisting only of normal recurring adjustments, necessary to summarize fairly the Company's financial position and results of operations," was materially false and misleading.

42.    Concerning the false financial statements that Tyco issued before fiscal 2002, Tyco's 2002 Form 10-K disclosed:

> As a result of the Phase 2 Review, the Company identified certain adjustments relating to years preceding fiscal 2002. Such adjustments were recorded in the first quarter of fiscal 2002, and are discussed further below.
>
> CHARGES RELATING TO PRIOR YEARS RECORDED IN FISCAL 2002--

---

[4]    *See generally* Accounting Principles Board ("APB") Opinion No. 20, §§ 13, 38.

***in connection with accepting an improper $20 million payment.***  See December Report; 2002 Form 10-K.

35.    The undisputed facts that constitute a pattern of acts of corporate misconduct at the Company belie Tyco's representation that there "was no significant or systemic fraud affecting Tyco's prior financial statements."

> a.    **Tyco's Admission That It Issued Materially False and Misleading Financial Statements**

36.    At all relevant times during the relevant period, each of Tyco's financial statements was represented to have been prepared in accordance with GAAP.[2]    These representations were materially false and misleading because ***Tyco's financial statements artificially and improperly inflated the Company's operating results and failed to disclose numerous acts of self-dealing, which are currently being prosecuted as violations of U.S. and state criminal laws***.

37.    By failing to file financial statements with the SEC that conformed to GAAP (and the rules and regulations of the SEC), Tyco repeatedly disseminated financial statements that are "presumed to be misleading or inaccurate."[3]   In fact, Tyco's actual financial performance was materially distorted and its financial statements were materially false and misleading, as Tyco knew or recklessly ignored.

38.    In an apparent attempt to shield itself from liability, Tyco has alleged that:

> ***[t]he incorrect accounting entries and treatments are not <u>individually</u> or in the aggregate material to the overall financial statements of Tyco.***  [Emphasis added.]

39.    Contrary to this assertion, the "incorrect accounting entries and treatment" are indeed material.  First, Tyco's restatements have been limited by a lack of documentation and by

---

[2]    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.

[3]    Regulation S-X (17 C.F.R. ¶ 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

practices over an extended period of time that were intended to artificially increase reported current earnings.

32.     Despite this admission, Tyco baselessly contends that the Company's deliberate and long-standing attempts to inflate its operating results did not result in a "significant or systematic fraud affecting Tyco's prior financial statements."   This conclusion is flatly inconsistent with Tyco's recognition of the following in the December Report and the Company's fiscal 2002 Form 10K: (1) "a number of *accounting entries that were incorrect and required*"; (2) the "*aggressive accounting pursued by prior senior management*"; (3) "*breakdowns of internal control* which occurred during fiscal 2002"; (4) "*abuse of our employee relocation loan programs*"; (5) "*unapproved bonuses*"; (6) "*undisclosed compensation arrangements*"; (7) "*unreported perquisites*"; (8) "*self-dealing transactions*"; (9) "*a lack of* a stated and demonstrable commitment by former senior management to set *appropriate standards of ethics, integrity, accounting, and corporate governance*"; and (10) "other *misuses of corporate trust."* (Emphasis added).

33.     In addition to the foregoing, Tyco has also admitted: (1) instances in which *senior management* "exerted pressure" and "provided incentives" to report higher earnings; (2) the recording and manipulation of "*Financial Engineering" reserves*; (3) instances in which Tyco's management pressured the management of an acquisition target into adopting accounting treatments that violated GAAP; and (4) *a "pattern" of "aggressive" accounting over a period of years.* [Emphasis added].

34.     Securities litigation against Tyco, as well as media coverage of the Tyco scandal, have in turn prompted: (1) *investigations by the U.S. Attorney, the SEC, the District Attorney for New York County, and the State of New Hampshire Bureau of Securities Regulation*; (2) the replacement of Tyco's *entire* Board of Directors; (3) the termination and *criminal indictment of Tyco's former Chief Executive Officer, Chief Financial Officer, and Chief Corporate Counsel*; and (4) *the guilty plea of one of Tyco's former outside directors in New York County*

28.     The December Report also admits:

> Tyco's aggressive accounting in the past was not neutral as to the timing of the recognition of revenues and expenses. The Company, for example, devoted considerably less attention to identifying appropriate accounting adjustments that would reduce reported earnings in the period immediately after an acquisition than it devoted to identifying appropriate accounting adjustments that would increase reported earnings after an acquisition.

29.     Moreover, the December Report admits that:

> there were instances where prior management appeared to influence the management of an acquisition target into adopting accounting treatments that "over-accrued" expenses prior to an acquisition's consummation or otherwise exceeded what was permitted by GAAP. For example, in the month before the merger, US Surgical accrued $18.7 million for potential legal fees related to on-going patent defenses and other items. The Company later reduced this amount by $18.2 million, in the same period, as a result of discussions with the Company's external auditors, because it concluded that the initial accrual did not represent a reasonable estimate of legal fees. As set forth below, in a number of instances the accounting treatment applied to certain transactions in the Company's reported financials was erroneous.

30.     Tyco continued to manipulate its income statement even after the release of the December Report. According to a January 21, 2003 article in THE WALL STREET JOURNAL, Tyco "delayed paying many annual bonuses that were due to be awarded in its fiscal first quarter ended Dec. 31, a move that likely boosted its cash flow in the quarter by a significant sum." In fact, Tyco confirmed that $200 million in employee bonuses typically paid in the first quarter were in fact delayed, such that they were not recorded in the first fiscal quarter.

### 1.     Tyco's Materially False And Misleading Financial Statements and Financial Disclosures

31.     During the relevant period, Tyco represented that each of the financial statements it issued to investors was prepared in accordance with GAAP and the rules and regulations of the SEC. These representations were materially false and misleading because, as Tyco has now admitted, the Company knowingly or recklessly employed numerous deceptive accounting

24.     With respect to "transitioning the acquired company" by creating reserves to cover one-time costs, the presentation stated, "**being aggressive in our estimates will allow us to be aggressive in the cost we apply**."  (Emphasis added).  It also stated, "**keep the reserve descriptions within the accounting rules but stretch the expenditures that go in**."  (Emphasis added).

25.     A similar document cited in the December Report summarizes a September 18, 1998 Tyco presentation on the US Surgical merger (which document has not yet been made available to the public) that closed on October 1, 1998.  In a section called "Synergies Summary," the presentation indicated that with "Financial Engineering," Tyco could recognize $72 million in 1999, $52 million in 2001 and $52 million in 2002.

26.     An August 17, 1998 memorandum cited in the December Report (which document has not yet been made available to the public) identified similar means to achieve EBIT ("Earnings Before Interest and Taxes") goals for US Surgical in the first year after the merger.  The memo lists numerous cost-savings measures, and reaches a "total savings before financial engineering" of $145.4 million.  The memo also suggests $64.6 million in "financial engineering" categories, including plans to "over-accrue expenses in Q3 before closing," and to "accrue in advance rebates."

27.     Another document, dated September 10, 1996, discusses "Carlisle Plastics - Financial Engineering and Purchase Accounting."  The memo and attachments define "financial engineering" as "pre-merger entries" and "purchase accounting" items as "post-merger entries." A "Discussion Items" attachment states, "we'll book additional 'Financial Engineering' reserves in July with the objective of having a break even month.  This way we won't raise any flags with the Lender reporting.  The balance of the reserves will be booked in August."  According to the December Report, the equity balance sheet attachment for the Carlisle acquisition contemplates $26,440,000 in "financial engineering," thereby reducing pre-merger earnings by that amount. The detailed schedule demonstrates that the overwhelming portion of the financial engineering was to be in the month just before the consummation of the merger.

treatment to employ."  The December Report also acknowledged that Tyco's Form 8-K filed on September 17, 2002 (the "September Report") contained admissions of "evidence of intentional fraud."

21.     The December Report admits the existence of pay-offs to executives at companies to be acquired by Tyco, and that the financial reporting of the to-be-acquired companies was manipulated by Tyco in advance of the acquisitions to create the false appearance of superior earnings and management by Tyco after the acquisitions.  Moreover, the December Report concludes that there were "instances" where Tyco's prior management paid off executives at acquired companies "to influence the management of an acquisition target into adopting accounting treatments that 'over-accrued' expenses prior to an acquisition's consummation or otherwise exceeded what was permitted by GAAP."

22.     Despite their limitations, the September and December Reports amply document numerous instances of a previously undisclosed pattern of company-wide accounting fraud.  For example, the December Report states that:

> in 1999 a controller for one of [Tyco's] Fire & Security business units prepared and gave a presentation to the subsidiary's operating managers relating to what was entitled "Acquisition Balance Sheet Opportunities."   [The controller] urged [the managers] to "**be aggressive in determining exposures; determine reserves with worst case scenario; have a strong story to tell regarding each reserve; book the reserves on the acquired company's financial system; use the owner for ideas; improve on your estimates**."  [The controller] also told [the] audience to "**be aggressive in determining the reductions of the asset**," and "**create stories to back the reductions**."  [Emphasis added.]

23.     The December Report also states that one version of the presentation (which has not yet been made available to the public) has a marginal notation adjacent to this comment as follows: "**Be Careful!!  - I wouldn't want this to get out**."  (emphasis added).  In addition, opposite the comment "Severance - if immaterial, our existing business - include fringe at high rate," there is a handwritten notation that states, "**I would strongly recommend <u>Never</u> to put this in writing**!!" (Emphasis added).

17.     In addition, according to the December Report:

> the accounting for fifteen large transactions, the selection of which was made after consultation with the SEC staff, has been reviewed in detail.  Of the fifteen, three of the transactions (AMP, Surgical, and Keystone) were accounted for under the pooling of interests method.  The remaining twelve (Sherwood, Mallinckrodt, Carlisle Plastics, Thomas & Betts, SSI, Raychem, Central Sprinkler, AFC Cable, Scott Tech, Simplex, Sensormatic, and Wells Fargo) were accounted for under the purchase accounting method.

Although it states that "[d]uring the period 1999-2002, Tyco completed more than 700 acquisitions," the December Report considered only 15 of those deals "where there was sufficient documentation on the nature of the reserve to reach a conclusion."

18.     Moreover, at least with respect to the Company's purchase accounting, the December Report concludes that there was "a notable lack of documentation supporting the establishment and utilization of reserves and a pattern of aggressive purchase accounting."

19.     Even as to this circumscribed subset of transactions for which "sufficient documentation" was available to permit examination, virtually all of the conclusions in the December Report are phrased as follows: "On the basis of *information currently available*, the Company *with the concurrence of its auditors* has concluded that the accounting treatment . . . should not be revised."  Or: "*there is not now* sufficient evidence to warrant changing" the accounting treatment previously given (emphasis added).

20.     Indeed, the December Report acknowledged that "the Company in general suffered from poor documentation; inadequate policies and procedures to prevent the misconduct of senior executives that occurred; inadequate procedures for proper corporate authorizations; inadequate approval procedures and documentation; a lack of oversight by senior management at the corporate level; a pattern of using aggressive accounting that, even when not erroneous, was undertaken with the purpose and effect of increasing reported results above what they would have been if more conservative accounting were used; pressure on, and inducements to, segment and unit managers to increase current earnings, including by decisions as to what accounting

and segment officers to achieve higher earnings, including in some cases by their choice of accounting treatments."

15.     The admissions in the December Report were largely based on the findings of Boies Schiller & Flexner (the "Boies firm"), a law firm retained by Tyco to conduct an internal investigation.  As described in the December Report, the investigation by the Boies firm was limited.  Thus, the material admissions that Tyco made in the wake of the investigation represented the proverbial "tip of the iceberg."  The December Report stated that the investigation was principally restricted to "the integrity of the company's financials and the possible existence of systemic or significant fraud, or other improper accounting that would materially adversely affect the Company's reported earnings or cash flow from operations *in 2003 or thereafter*" (emphasis added).  Thus, the Company's past financial statements were not examined to see whether they were false, and indeed the adjustments that did result from the investigation were largely recorded in fiscal year 2002, which ended on September 30, 2002.  As Tyco admits: "the Company has not sought to go back and identify every accounting decision and every corporate act over a multi-year period that was wrong or questionable, or whether there was a preferable accounting treatment among the alternative accounting treatments available under generally accepted accounting principles (GAAP)."  Such an examination was deemed "impossible" in the December Report, which stresses that "documentation was not always available; the documentation that was available was often dispersed."

16.     The investigation was also limited because of the "Company's past failure to document many decisions contemporaneously."  Journal entries[1] were apparently used to engineer desired financial results and in many cases to lack any documentation, without any description of the entry, who made it, prepared it, or approved it.

---

[1]     Journal entries are records made to change numerical account balances in a company's accounting system.  Standard internal control practices and procedures require that journal entries include:  (1) an explanation as to why account balances are being changed; (2) the date of the journal entry; (3) the identification the preparer of the journal entry; and (4) the identification of management who approved the recording of the journal entry.

appropriate recognition of such payments, totaled approximately $186 million (Section A.1.f below);

(10)    failed to disclose contingent liabilities and significant risks and uncertainties (Section A.1.g below);

(11)    failed to disclose the effects of Tyco's numerous (approximately 700) undisclosed acquisitions (Section A.2 below); and

1.    failed to disclose that it improperly withheld incriminating responsive documents from the SEC during that agency's 1999-2000 inquiry into Tyco's accounting practices (Section A.1.3 below).

## A.    Material Omitted Information Concerning the Falsification of Tyco's Financial Reporting, Reported Acquisition Costs, and the Purported Success of its Acquisition Strategy

13.    Tyco touted its financial success, falsely stating that it arose "organically" out of "synergies" created by the management strategies that Tyco applied to the companies it acquired. In fact, Tyco's financial reporting was falsified in myriad ways to create the appearance of financial success through an intentional and undisclosed scheme to inflate financial results, as Tyco has now admitted.  The nature of this scheme was never disclosed to investors.  To the contrary, Tyco falsely and repeatedly represented that there was no accounting manipulation at Tyco.  As a result, throughout the relevant period, all of Tyco's periodic reports of earnings and revenues and its financial projections given to investors and securities analysts were materially false and misleading and omitted material information.

14.    As the Company has admitted in its Form 8-K filed on December 30, 2002 (the "December Report"), during at least the five years preceding the resignation of Tyco's President, Chief Executive Officer and Chairman, L. Dennis Kozlowski ("Kozlowski") in June 2002, Tyco pursued a "pattern of aggressive accounting" that was "intended" to "increase current earnings above what they would have been if a more conservative accounting approach had been followed."  The Company has also admitted that there were instances when senior management "exerted pressure and provided incentives which had the purpose and effect of encouraging unit

(1)     failed to disclose that it was engaged in "a pattern of aggressive accounting which . . . was intended to increase reported earnings above what they would have been if more conservative accounting had been employed" (Section A below);

(2)     misrepresented that growth was "organic," and failed to disclose that it engineered financial results through a wide variety of improper accounting procedures, including the widespread use of undocumented journal entries (Section A.1 below);

(3)     failed to disclose that senior management "exerted pressure" on and "provided incentives" to employees to artificially inflate reported earnings (Sections A.1.b, B.1, B.2, B.3 and B.4 below);

(4)     failed to disclose that it paid off executives at companies to be acquired by Tyco to incentivize them to manipulate their financial reporting before the acquisition to create the false appearance of superior earnings for Tyco after the acquisition (Sections A.1.b, below);

(5)     failed to disclose "a number of accounting entries that were incorrect and required correction" (Section A.1.a below);

(6)     failed to disclose a number of material related party transactions, including 1. "abuse of [Tyco's] employee relocation loan program"; 2. "unapproved bonuses"; 3. "compensation arrangements"; 4. "perquisites"; and 5. "self-dealing transactions" (Sections A.1.b, below);

(7)     failed to disclose that it artificially inflated the Company's earnings by engaging in "Financial Engineering" and the improper manipulation of accounting reserves (Section A.1.d below);

(8)     failed to disclose that Tyco's earnings were inflated as a result of the failure to timely recognize expenses, including an impairment in the value of reported goodwill (Section A.1.e below);

(9)     failed to disclose that it improperly included excess "reimbursements" received by its home security business (ADT) in the Company's earnings rather than recognizing such payments over the life of the contract; Tyco has now admitted that the cumulative effect of the "reimbursements" recorded in years prior to fiscal 2002 in excess of costs incurred, net of the effect of the

company.  Its principal place of business is 26, boulevard Royal, L-2449 Luxembourg, Grand Duchy of Luxembourg.

9.    Each of the Plaintiff funds identified in paragraphs 5-8 above are managed by Plaintiff Franklin Mutual Advisers, LLC, ("FMA" and, collectively with the other plaintiffs, "Franklin" or "Plaintiffs") which pursuant to advisory contracts with each Plaintiff, has discretionary investment and voting power over the securities beneficially owned by the Plaintiff funds.  In its capacity as investment adviser, FMA made the decision to purchase the Tyco securities at issue in this action on behalf of these funds, which own the securities that were purchased.  FMA's principal place of business is 51 John F. Kennedy Parkway, Short Hills, NJ 07079.

10.    Franklin held shares of the CIT Group, Inc., which were exchanged for securities of Tyco at an artificially inflated price as a result of a merger between CIT Group and Tyco in June 2001.  As a result of this merger transaction, Franklin exchanged its CIT Group shares for shares of Tyco and thereby purchased shares of Tyco at an artificially inflated price.  In addition, Franklin purchased shares of Tyco on the open market at artificially inflated prices in reliance on false statements by Tyco.  Plaintiffs' purchases and sales of Tyco securities between June 4, 2001 and April 30, 2002 are set forth in Exhibit A attached hereto.

## B.    DEFENDANT

11.    Defendant Tyco is a Bermuda corporation and holds itself out as a diversified manufacturing and services company.

## TYCO'S WRONGFUL COURSE OF CONDUCT

12.    Throughout the relevant period, Tyco failed to disclose and falsely denied the falsification of its financial reporting, reported acquisition costs, and the purported success of its acquisition strategy.  Tyco also failed to disclose the looting of the Company by its senior executives who were conducting Tyco as a criminal enterprise.  Tyco has admitted that it, among other things:

3.      Venue is proper in this District pursuant to Section 22 of the Securities Act and Section 27 of the Exchange Act.  Many of the acts or transactions constituting violations of the Securities Act and Exchange Act alleged herein occurred in this District.  In addition, Tyco transacts business in this district.

4.      In connection with the acts, conduct and other wrongs alleged in this complaint, Tyco, directly or indirectly, used the means and instrumentalities of interstate commerce including the mail, the internet, telephone communications and the facilities of national securities exchanges.

**PARTIES**

**A.    PLAINTIFFS**

5.      Plaintiffs Mutual Beacon Fund, Mutual Discovery Fund, Mutual Qualified Fund and Mutual Shares Fund and Mutual Financial Services Fund are five of the six mutual funds comprising the Franklin Mutual Series Fund Inc., a Maryland corporation registered with the United States Securities and Exchange Commission as an investment company under the Investment Company Act of 1940.  The principal place of business for each fund is 51 John F. Kennedy Parkway, Short Hills, NJ 07078.

6.      Plaintiffs Mutual Discovery Securities Fund and Mutual Shares Securities Fund are two of the twenty three investment portfolios comprising Franklin Templeton Variable Insurance Products Trust, a Massachusetts business trust.  The principal place of business for each fund is One Franklin Parkway, San Mateo, CA 94403.

7.      Plaintiff Mutual Beacon Fund (Canada) is an Ontario (Canada) mutual fund trust, with its principal place of business at 1 Adelaide Street East, Suite 2101, Toronto, Ontario, M5C 3B8, Canada.

8.      Plaintiff Franklin Mutual Beacon Fund is one of more than twenty sub-funds comprising Franklin Templeton Investment Funds, a Grand-Duchy of Luxembourg investment

Plaintiffs, by their attorneys, for their First Amended Complaint (the "Complaint"), make the following allegations against defendant Tyco International, Ltd. ("Tyco" or the "Company"), upon information and belief (except as to allegations specifically pertaining to plaintiffs and their counsel, which are based on personal knowledge) based upon the thorough investigation conducted by and under the supervision of plaintiffs' counsel, which included reviewing and analyzing information and financial data relating to the relevant time period concerning Tyco and obtained from numerous public and proprietary sources (such as LEXIS-NEXIS, Dow Jones and Bloomberg), including, among other things, filings with the Securities and Exchange Commission (the "SEC"), publicly available annual reports, press releases, published interviews, news articles and other media reports (whether disseminated in print or by electronic media), and reports of securities analysts and investor advisory services, in order to obtain the information necessary to plead plaintiffs' claims with particularity. Except as alleged herein, the underlying information relating to defendant's misconduct and the particulars thereof are not available to plaintiffs and the public and lie exclusively within the possession and control of defendant and insiders, thus preventing plaintiffs from further detailing defendant's misconduct. Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. Sections 1331 and 1337, Section 22 of the Securities Act of 1933 ("Securities Act") [15 U.S.C. ¶ 77v], and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. ¶ 78aa].

2.      The claims asserted herein arise under Sections 11 of the Securities Act [15 U.S.C. ¶¶ 77k], Sections 10(b) of the Exchange Act [15 U.S.C. ¶ 78j(b)], Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. ¶ 240.10b-5], and Section 18 of the Exchange Act [15 U.S.C. ¶78r].

Marc B. Kramer, Esq. (MK-8473)
**LAW OFFICES OF MARC B. KRAMER**
A Professional Corporation
150 JFK Parkway, Suite 100
Short Hills, New Jersey 07078
973.847.5924
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| In Re TYCO INTERNATIONAL LTD. SECURITIES LITIGATION | : : : | MDL Docket No. 02-1335-B Civ. No. 07-4575-B |
| FRANKLIN MUTUAL ADVISERS, LLC; MUTUAL BEACON FUND, A SERIES OF FRANKLIN MUTUAL SERIES FUND INC.; MUTUAL DISCOVERY FUND, A SERIES OF FRANKLIN MUTUAL SERIES FUND INC.; MUTUAL QUALIFIED FUND, A SERIES OF FRANKLIN MUTUAL SERIES FUND INC.; MUTUAL SHARES FUND, A SERIES OF FRANKLIN MUTUAL SERIES FUND INC.; MUTUAL FINANCIAL SERVICES FUND, A SERIES OF FRANKLIN MUTUAL SERIES FUND INC.; MUTUAL BEACON FUND; FRANKLIN MUTUAL BEACON FUND, A SUB-FUND OF FRANKLIN TEMPLETON INVESTMENT FUNDS; MUTUAL DISCOVERY SECURITIES FUND, A SERIES OF FRANKLIN TEMPLETON VARIABLE INSURANCE PRODUCTS TRUST; and MUTUAL SHARES SECURITIES FUND, A SERIES OF FRANKLIN TEMPLETON VARIABLE INSURANCE PRODUCTS TRUST, Plaintiffs, -v- TYCO INTERNATIONAL, LTD., Defendant. | | **PLAINTIFFS' FIRST AMENDED COMPLAINT AND JURY DEMAND** |